IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

_____ )

WYETH,                                      )

                Plaintiff,                )

                             )

                v.                        )          Civil Action No.  06-222 (JJF)

                             )

IMPAX LABORATORIES, INC.,                   )

                             )

             Defendant.                )

_____ )

**WYETH'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR PROTECTIVE
ORDER TO STRIKE AND LIMIT THE SCOPE OF IMPAX'S AMENDED NOTICE
OF DEPOSITION OF WYETH PURSUANT TO FED. R. CIV. P. 30(b)(6)**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
1201 N. Market Street
Wilmington, DE  19899-1347
(302) 658-9200
klouden@mnat.com
  Attorneys for Plaintiff Wyeth

OF COUNSEL:

Basil J. Lewris
Linda A. Wadler
Finnegan, Henderson, Farabow,
  Garrett & Dunner, L.L.P.
901 New York Avenue, N.W.
Washington, DC  20001
(202) 408-4000

730611

i.

TABLE OF CONTENTS

Page

TABLE OF CITATIONS                                                                                      ii

NATURE AND STAGE OF PROCEEDINGS                                                    1

SUMMARY OF ARGUMENT                                                                              1

STATEMENT OF FACTS                                                                                   3

ARGUMENT                                                                                                        9

     A.     Impax's Amended Rule 30(B)(6) Notice Places An Undue Burden
            On Wyeth And Is Unreasonable In Scope.                                          10

     B.     Impax's Amended Notice Improperly Seeks Contention Discovery.    15

     C.     Impax's Notice Improperly Seeks Information Protected By The
            Attorney Client Privilege And/Or Attorney Work Product
            Immunity.                                                                                             19

CONCLUSION                                                                                                   23

ii.

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Advanced Cardiovascular Sys., Inc. v. C.R. Bard, Inc.*,
    144 F.R.D. 372 (N.D. Cal. 1992)...................................................................19

*ArthoCare Corp. v. Smith & Nephew, Inc.*,
    C.A. No. 01-504 (SLR)(D.Del. Oct. 15, 2002)...........................................15

*Axiohm IPS, Inc. v. Epson Am., Inc.*,
    C.A. No. 00-420 (SLR) (D. Del. Mar. 28, 2001).........................................14

*Carpenter Tech. Corp. v. Armco, Inc.*,
    1990 U.S. Dist. LEXIS 5538 (E.D. Pa. May 7, 1990) ..................................13

*Conner Peripherals, Inc. v. Western Digital Corp.*,
    No. C93-20117 RMW/EAI, 1993 WL 726815 (N.D. Cal. June 8, 1993),  ...........19, 20

*Hercules Inc. v. Exxon Corp.*,
    434 F. Supp. 136 (D. Del. 1977)..................................................................19

*Heron v. Potter*,
    No. Civ. A. 03-313-JJF, 2006 WL 3703693 (D. Del. Oct. 23, 2006).....................8, 14

*Markman v. Westview Instruments, Inc.*,
    52 F.2d 967 (Fed. Cir. 1995) (*en banc*) ....................................................20

*McCormick-Morgan, Inc. v. Teledyne Indus., Inc.*,
    134 F.R.D. 275 (N.D. Cal. 1991)...........................................................15, 16

*McKesson Information Solutions LLC v. The TriZetto Group, Inc.*,
    C.A. No. 04-01258 (SLR) (D. Del. Aug. 2, 2005).......................................15

*Pharmacia & Upjohn Co. v. Sicor, Inc.*,
    C.A. No. 04-833 (KAJ) (D. Del. Oct. 11, 2005).........................................14

*Reed v. Bennett*,
    193 F.R.D. 689 (D. Kan. 2000)...................................................................10

*Rohm & Haas Co. v. Brotech Corp.*,
    815 F. Supp. 793 (D. Del. 1993)..................................................................19

*SmithKline Beecham Corp. v. Apotex Corp.*,
    232 F.R.D. 467 (E.D. Pa. 2005)..................................................................19

iii.

*SmithKline Beecham Corp. v. Apotex Corp.*,
   No. 98 C 3952, 2000 WL 116082 (N.D. Ill. Jan 24, 2000) ..........................................2

*In re Spalding Sports Worldwide, Inc.*,
   203 F.3d 800 (Fed. Cir. 2000).................................................................................17

*Tiegel Manu Co. v. Globe-Union, Inc.*, C.A. No. 84-483 (D. Del. Oct. 5, 1984).............14

*United States v. District Council of New York City*,
   No. 90 CIV. 5722 (CSH), 1992 WL. 208284 (S.D.N.Y. Aug. 18, 1992)......................9

*Westchester Fire Ins. Co. v. Household Int'l, Inc.*,
   2005 U.S. Dist. LEXIS 116 (D. Del. Jan. 5, 2005)....................................................13

**STATUTES**

Fed. R. Civ. P. 26(b)(2)...................................................................................10

Fed. R. Civ. P. 26(c) .........................................................................................8

Fed. R. Civ. P. 30(b)(6)................................................................................ *passim*

**OTHER AUTHORITIES**

Kent Sinclair and Roger P. Fendrich, *Discovering Corporate Knowledge and
   Contentions: Rethinking Rule 30(b)(6) and Alternative Mechanisms*, 50
   Alabama L. Rev. 651 (1999) .......................................................................9

1.

Pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, Plaintiff Wyeth has moved for a protective order to strike and limit the scope of Defendant Impax Laboratories, Inc.'s ("Impax") Amended Rule 30(b)(6) Notice of Deposition of Wyeth served on January 22, 2007 ("Amended Notice"). This is Wyeth's opening brief in support of that motion.

## NATURE AND STAGE OF PROCEEDINGS

This is a Hatch-Waxman patent infringement action involving three patents covering Wyeth's Effexor® XR, one of the world's most commercially successful drugs for treating, among other things, depression and anxiety. Wyeth filed this action against Impax on April 5, 2006, after Impax filed an Abbreviated New Drug Application ("ANDA") seeking FDA approval to market generic copies of Effexor® XR prior to the expiration of Wyeth's patents-in-suit. Although no depositions have yet been taken in this case, on November 20, 2006, Impax served an improper and unwieldy Rule 30(b)(6) deposition notice on Wyeth containing sixty-nine (69) topics, and later amended it on January 22, 2007. Because the Amended Notice is still overbroad and improper, Wyeth has filed the present motion for protective order.

## SUMMARY OF ARGUMENT

Wyeth has provided Impax with extensive responses to contention interrogatories, has produced approximately one million pages of documents in response to document requests, and has provided discovery responses, expert reports and deposition transcripts of Wyeth fact, expert and Rule 30(b)(6) witnesses from a prior litigation involving the same patents-in-suit. Notwithstanding this wealth of information, Impax unreasonably seeks to burden Wyeth with an expansive Rule 30(b)(6) Notice

2.

embracing thirty-four (34) topics (not counting numerous subtopics) directed to virtually every issue in the case, spanning over a decade of research, development, and regulatory efforts in an untold number of disciplines that are implicated in designing, testing, and bringing a pharmaceutical product to market. Further, many topics are simply not relevant to any issue in the case.

Rather than analyzing and assessing the discovery that it has already been provided pursuant to its requests and then taking depositions of relevant fact witnesses, Impax improperly seeks to use its Amended Notice to force Wyeth to analyze a massive volume of documents, interview scores of its employees, and then educate a witness to be prepared to answer any conceivable question Impax may have relating to its virtually unbounded Rule 30(b)(6) Notice. "[T]he [Federal] Rules . . . preclude proponents of discovery from wielding the discovery process as a club by propounding requests compelling the recipient to assume an excessive burden." *SmithKline Beecham Corp. v. Apotex Corp.*, No. 98 C 3952, 2000 WL 116082, *9 (N.D. Ill. Jan. 24, 2000). That is precisely what Impax seeks to do here. On its face, Impax's Amended Notice far exceeds the proper bounds of Rule 30(b)(6) discovery.

Aside from its undue breadth, Impax's Amended Notice also improperly seeks Wyeth's contentions on every issue in the case. For example, Topic 33 of the Notice would require a witness to testify on the "facts and DOCUMENTS CONCERNING the denials and statements in WYETH'S REPLY" to Impax's counterclaims. This Court, as well as many others, has recognized that Rule 30(b)(6) depositions are not the appropriate vehicle to ascertain a party's contentions. In addition to improperly impinging upon matters of attorney-client privilege and work product,

3.

providing a Rule 30(b)(6) witness on a party's contentions imposes an undue burden, and is needlessly duplicative of other forms of discovery. In addition, there are many other portions of Impax's Notice that directly seek testimony on topics clearly protected by the attorney-client privilege, such as invention records and the drafting and preparation of patent applications.

Wyeth has made a good faith attempt to identify more narrow and appropriate topics for a Rule 30(b)(6) deposition on several occasions. [*See, e.g.,* Ex. 3 at 6; Ex. 5 at 7-8, Ex. 6]. Notwithstanding these efforts, Impax has persisted in asserting overbroad and improper topics in an attempt to force an unduly burdensome Rule 30(b)(6) deposition. Wyeth's motion for protective order should be granted and Impax's Amended Notice should be stricken and any Rule 30(b)(6) deposition limited to the narrowed topics which Wyeth has proposed.

<u>STATEMENT OF FACTS</u>

On November 20, 2006, Impax filed its original Rule 30(b)(6) Notice which contained *sixty-nine* (69) separate deposition topics. Wyeth promptly objected, asserting that the noticed topics: (1) were unreasonably overbroad; (2) improperly sought Wyeth's legal contentions and proofs on virtually every issue in this case including infringement, validity, enforceability, prior art, claim construction, and prosecution; (3) sought testimony regarding subject matter protected by the attorney-client privilege and/or work product immunity; (4) sought expert testimony; and (5) lacked reasonable particularity making it unduly burdensome and oppressive for Wyeth to properly prepare a witness. [Ex. 3 (Letter from Rudolph to Kassabian of 11/29/06)]. Further, many of Impax's Rule 30(b)(6) topics directly mirrored Impax's previous document requests, in

4.

response to which Wyeth had already produced approximately one million pages of documents.

In an attempt to resolve the dispute, Wyeth suggested that Impax first review the information it already had in hand, including Wyeth's document production, discovery responses, and voluminous materials from the earlier *Wyeth v. Teva* litigation ("*Teva* litigation"), including fact, expert, and Rule 30(b)(6) deposition transcripts and their exhibits, interrogatory responses, and expert reports.[1]  *Id.* at 6.  These documents contain much of the information Impax seeks and also identify individuals that Impax could depose who would have personal knowledge concerning the various noticed topics. Impax rejected Wyeth's proposal, however, and made no attempt to either reduce the number or narrow the scope of the noticed topics.  [Ex. 4 (Letter from Kassabian to Rudolph of 12/15/06)].

In response, Wyeth reiterated that Impax's Notice remained oppressive and unduly burdensome, and restated its objections.  [Ex. 5 (Letter from Rudolph to Kassabian of 1/08/06)].  In a further attempt to resolve the matter, however, Wyeth offered to provide a Rule 30(b)(6) deponent for certain portions of the noticed topics, and additionally invited alternative compromise proposals from Impax.  *Id.* at 7-8.

Thereafter, on January 22, 2007, Impax served the Amended Notice that is the subject of this motion.  [Ex. 1].  The Amended Notice still contains thirty-four (34)

---

[1]     From 2003 to 2005, Wyeth was involved in a litigation with Teva Pharmaceuticals, USA, Inc. and Teva Pharmaceutical Industries, Ltd. in the District of New Jersey involving the same patents-in-suit, Civil Action No. 03-CV-1293.  The case was settled on the eve of trial.

5.

overly broad topics, which lack reasonable particularity, would require a witness to learn and recite Wyeth's contentions, and would impinge upon the attorney-client privilege.

For example, Topic 2 seeks information about Wyeth's "invention records" which are clearly protected by the attorney-client privilege. [Ex. 1 at 5]. And Topic 33, which seeks testimony on the "facts and DOCUMENTS CONCERNING the denials and statements in WYETH'S REPLY," is simply an effort to depose Wyeth on its contentions on every issue in this case. [Ex. 1 at 12]. Courts have routinely denied such attempts to solicit a party's contentions through the vehicle of a Rule 30(b)(6) deposition.

In light of the parties' continued dispute, Wyeth made an additional attempt to reach a compromise, proposing to provide a deponent for Topics 3-16, 19, 30, 32, and 34 of the Amended Notice, subject to certain objections. [Ex. 6 (Letter from Rudolph to Kassabian of 1/30/07]. Because Impax also has refused this compromise proposal, Wyeth has filed the present motion for protective order. Wyeth requests that the Court strike Impax's Amended Notice and limit any Rule 30(b)(6) topics to the following narrowed topics for which Wyeth has offered to provide Rule 30(b)(6) deposition testimony on information not subject to the attorney client privilege or work product immunity:

1. Up to the March 25, 1996 effective filing date of the patents-in-suit, the formulation of EFFEXOR® XR as sold in the United States, including without limitation when those formulations were developed, who developed them, and what materials and methods were used to develop them (narrowed topic 3);

2. Up to the March 25, 1996 effective filing date of the patents-in-suit, the formulation of an extended release formulation by Wyeth comprising venlafaxine and hydrogel tablets, including without limitation when those formulations were developed, who developed them, and what materials and methods were used to develop them (narrowed topic 4);

6.

3.    Up to the March 25, 1996 effective filing date of the patents-in-suit, the formulation of an extended release formulation by Wyeth comprising venlafaxine and Gelucire capsules, including without limitation when those formulations were developed, who developed them, and what materials and methods were used to develop them (narrowed topic 5);

4.    Up to the March 25, 1996 effective filing date of the patents-in-suit, the formulation of an extended release formulation by Wyeth comprising venlafaxine and ALZA's OROS® oral delivery technology, including without limitation when those formulations were developed, who developed them, and what materials and methods were used to develop them (narrowed topic 6);

5.    Up to the March 25, 1996 effective filing date of the patents-in-suit, the *in vitro* and *in vivo* release profiles of EFFEXOR® XR as sold in the United States, including without limitation when those profiles were first achieved, and what materials and methods were used to test and achieve them  (narrowed topic 7);

6.    Up to the March 25, 1996 effective filing date of the patents-in-suit, *in vitro* and/or *in vivo* release profiles of an extended release formulation by Wyeth comprising venlafaxine and hydrogel tablets, including without limitation when those profiles were first achieved, and what materials and methods were used to achieve them (narrowed topic 8);

7.    Up to the March 25, 1996 effective filing date of the patents-in-suit, *in vitro* and/or *in vivo* release profiles of an extended release formulation by Wyeth comprising  venlafaxine and Gelucire capsules, including without limitation when those profiles were first achieved, and what materials and methods were used to achieve them (narrowed topic 9);

8.    Up to the March 25, 1996 effective filing date of the patents-in-suit, *in vitro* and/or *in vivo* release profiles of an extended release formulation by Wyeth comprising venlafaxine and Alza's OROS® oral delivery technology, including without limitation when those profiles were first achieved, and what materials and methods were used to achieve them (narrowed topic 10);

9.    Examples 1 through 7 of the patents in suit, including without limitation the data underlying Examples 1 through 7 and documents produced by Wyeth evidencing that data (topic 11);

10.    Tables 1 through 3 of the patents in suit, including without limitation the data underlying Tables 1 through 3 and documents produced by Wyeth evidencing that data (topic 12);

11.    Wyeth's research prior to the March 25, 1996 effective filing date of the patents-in-suit demonstrating that the extended release formulation

comprising venlafaxine claimed in the patent in suit provided a therapeutic blood plasma concentration of venlafaxine over a twenty-four hour period with diminished incidences of nausea and emesis (narrowed topic 13);

12.    Wyeth's research prior to the March 25, 1996 effective filing date of the patents-in-suit demonstrating that the extended release formulation comprising venlafaxine claimed in the patent in suit eliminated the troughs and peaks of drug concentration in a patients blood plasma attending the therapeutic metabolism of plural daily doses of venlafaxine (narrowed topic 14);

13.    The Integrated Safety Summary of NDA No. 20-699 as originally filed with the U.S. Food and Drug Administration on May 16, 1996  (narrowed topic 15);

14.    The Summary of Human and Pharmacokinetics and Bioavailability section of NDA No. 20-699 as originally filed with the U.S. Food and Drug Administration on May 16, 1996  (narrowed topic 15);

15.    The passage with respect to 600B-144FR stating that there was "a dissociation between peak venlafaxine concentration and peak nausea.  In all treatment conditions the maximum nauseating effect occurred before the time of peak concentration. . . . Compared with venlafaxine CF, the ER formulation, which reached comparable levels with delayed tmax produced a much less intense maximum effect and a decrease of 63% in the area under the concentration-time curve (AUC) of nausea normalized by dose" as originally filed with the U.S. Food and Drug Administration on May 16, 1996  (narrowed topic 15);

16.    The passage with respect to 600B-144FR stating that "the incidence and severity of nausea would be expected to be less with venlafaxine ER than venlafaxine IR.  This conclusion is based on the results of the study 600B-144FR. . . The incidence of nausea as an adverse event and the severity of the nausea, measured as the AUC for a visual analog scale, where lower with venlafaxine ER administration than with venlafaxine IR administration," as originally filed with the U.S. Food and Drug Administration on May 16, 1996  (narrowed topic 15);

17.    Annual gross sales, annual net sales, and annual direct selling and marketing expense for U.S. sales of Effexor® XR from 1997 through the second quarter of 2006 (narrowed topic 16);

18.    The content of advertising done for Effexor® XR in the United States from 1997 to mid 2006 and annual direct selling and marketing expense for U.S. sales of Effexor® XR from 1997 through second quarter of 2006 (narrowed topic 19);

8.

19.   Annual direct selling and marketing expense for U.S. sales of Effexor®
      from 1993 through the second quarter of 2006 (narrowed topic 20);

20.   The factual support for the following passages of the patents-in-suit:

> The use of the one-a-day venlafaxine hydrochloride
> formulations of this invention reduces by adaptation,
> the level of nausea and incidence of emesis that attend
> the administration of multiple daily dosing.  In clinical
> trials of venlafaxine hydrochloride ER, the probability
> of developing nausea in the course of the trials was
> greatly reduced after the first week.  Venlafaxine ER
> showed a statistically significant improvement over
> conventional venlafaxine hydrochloride tablets in two
> eight-week and one 12 week clinical studies.  Thus, in
> accordance with this use aspect of the invention there
> is provided a method for reducing the level of nausea
> and incidence of emesis attending the administration
> of venlafaxine hydrochloride which comprises dosing
> a patient in need of treatment with venlafaxine
> hydrochloride once a day in a therapeutically effective
> amount.
>
> ***
>
> It was completely unexpected that an extended release
> formulation containing venlafaxine hydrochloride
> could be obtained because the hydrochloride of
> venlafaxine proved to be extremely water soluble.

      (narrowed topics 22 and 23, respectively);

21.   The factual support for the following passage from the Reply Under Rule
      111 of November 5, 1997 filed with the PTO in U.S. Patent Application,
      serial no. 08/964,328:

> Moreover, there is a tremendous difference in water
> solubility of the two compounds.  The water solubility
> of propanolol hydrochloride is 93 mg/ml, whereas that
> of venlafaxine hydrochloride is 574 mg/ml -- i.e. 6
> fold greater.

      (narrowed topic 28);

22.   The persons at WYETH involved in drafting, reviewing, editing,
      commenting on, or revising drafts of the article by Lynn Cunningham,
      M.D., entitled *Once-Daily Venlafaxine Extended Release (XR) and
      Venlafaxine Immediate Release (IR) in Outpatients with Major
      Depression*, published in volume 9, no. 3 of the Annals of Clinical

9.

Psychiatry in 1997, including the titles of, job responsibilities of, and reporting structure surrounding those persons (topic 30);

23.     The persons at WYETH involved in drafting, reviewing, editing, commenting on, or revising drafts of the article by Richard Entsuah, Ph.D. et al, entitled *A Benefit Risk Analysis of* Once-*Daily Venlafaxine Extended Release (XR) and Venlafaxine Immediate Release (IR) in Outpatients with Major Depression*, published in volume 33, no. 4 of the Psychopharmacology Bulletin in 1997, including the titles of, job responsibilities of, and reporting structure surrounding those persons (topic 32); and

24.     The identity of each Wyeth employee from whom documents were collected in connection with Wyeth's document production to Impax (narrowed topic 34).

## ARGUMENT

Fed. R. Civ. P. 26(c) provides that upon "motion by a party or by the person from who discovery is sought . . . the court . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." *Heron v. Potter*, No. Civ. A. 03-313 (JJF), 2006 WL 3703693, *1 (D. Del. Oct. 23, 2006). To prevail, the movant must show good cause for the protective order. *Id.* Good cause exists here to grant Wyeth's motion.

As set forth more fully below, Impax's Amended Rule 30(b)(6) Notice is overly broad and unduly burdensome. Aside from the sheer number of topics -- thirty-four (34) (not counting numerous subtopics) -- the Notice lacks particularity and seeks testimony on issues that should be explored, if at all, through other mechanisms such as contention interrogatories. Finally, many of Impax's topics improperly encroach upon the attorney-client privilege.[2]

---

[2]     Given the large number of topics, Wyeth has attempted to group its objections to those topics into broad categories as discussed below. Wyeth, however, has
(continued . . .)

10.

A.    Impax's Amended Rule 30(B)(6) Notice Places An
Undue Burden On Wyeth And Is Unreasonable In
Scope.

Impax's Amended Rule 30(b)(6) Notice places an impossible burden on

Wyeth, in effect, to prepare a "super-human," omniscient witness for deposition on all of

Wyeth's theories, and the factual support thereof, for the myriad issues in a complex

case. *See* Kent Sinclair and Roger P. Fendrich, *Discovering Corporate Knowledge and*

*Contentions: Rethinking Rule 30(b)(6) and Alternative Mechanisms*, 50 Alabama L. Rev.

651, 704 (1999) ("Reliance on Rule 30(b)(6) as a basis for requiring creation of a single,

omniscient witness who can synthesize all of the preparations and knowledge of a party

has been roundly castigated as a procedure not meriting serious consideration and one

that refutes itself when spelled out.")  [attached as Exhibit 7].  Impax's approach on its

face is improper.  As stated in *United States v. District Council of New York City*, No. 90

CIV. 5722, 1992 WL 208284, at *15 (S.D.N.Y. Aug. 18, 1992):

> Defendants' contention that, as a Rule 30(b)(6) deponent,
> Agent Worsham has an obligation to supplement her
> limited personal knowledge with all relevant information
> known to the Government, does not, in my view, merit
> serious consideration.   Taken to its logical conclusion,
> defendants' position would require that:   1) the various
> Assistant United States Attorneys with responsibility for
> drafting the Supplemental Complaint, supervising the
> investigation and preparing for trial in this action, collect
> and synthesize all of the information in their possession;
> 2) that they then impart that body of knowledge to Agent
> Worsham; and 3) that Agent Worsham, in turn, feed it back
> to defendants in response to their deposition questions.  To
> state the proposition is to defeat it.  However liberal the
> discovery rules are, they could not reasonably be construed

---

(. . . continued)

specific, individualized objections to each of the 34 topics which are set out in
detail in Exhibit 2.

> as requiring a party in a case such as this to make a Rule 30(b)(6) deponent, who is an investigator assisting counsel, the repository of all information known to counsel so that she could then provide it to an adversary.

As the court further recognized, the information that Defendants sought through the Rule 30(b)(6) notice was more properly available through the documents provided and through depositions of fact witnesses who had personal knowledge. *Id*.

A Rule 30(b)(6) notice must define its subject matter "with reasonable particularity." Fed. R. Civ. P. 30(b)(6). That is because an overbroad notice subjects a party to the impossible task of having to guess as to the scope of the topics in preparing a deponent to testify. *Reed v. Bennett*, 193 F.R.D. 689, 692 (D. Kan. 2000)(court granted in part defendant's motion to quash or modify plaintiff's 30(b)(6) notice because defendant could not identify the outer limits of the areas of inquiry noticed). Moreover, Fed. R. Civ. P. 26(b)(2) provides that discovery "shall be limited" if a court determines "that: (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit . . . ."

Here, many of the topics are plainly overbroad and fail to define the testimony sought with reasonable particularity. For example, Topic 3 which seeks testimony on the "formulation of Effexor XR and the development thereof," literally calls for information from numerous Wyeth employees encompassing almost fifteen years of work, and embraces countless activities including not only the formulation work leading up to Effexor® XR, but also *in vitro* and clinical testing of those formulations; stability;

12.

toxicology; scale-up to commercial production; quality control; animal testing; selection, purchasing, and qualification of raw materials; clinical batch manufacturing; commercial manufacturing; packaging; and regulatory matters, to name but a few.  [Ex. 1 at 5].  As it stands, there is no reasonable way Wyeth could prepare a witness to marshal all of the facts necessary to properly address the sheer breadth of this topic.

Similarly, Topic 27, which seeks testimony of Wyeth's knowledge of studies, tests, trials, research, or experiments conducted prior to July 16, 2002 comparing the chemical properties of propranolol and venlafaxine, would require Wyeth to review over two decades of information from countless people who are not primarily involved in the subject matter of this case, without any articulation of the relevance of such a comparison to the issues in this case.  [Ex. 1 at 10]

Topic 18, which asks for the reasons for and results of ten years of market research regarding the treatment of persons suffering from major depressive disorder from 1997 to the present, is not even limited to the patented invention.  [Ex. 1 at 8].  Topic 17 regarding the "causes in any fluctuations of, and strategies to maintain or increase the market share of Effexor XR" is overly broad, and irrelevant in this Hatch-Waxman case where damages are not at issue.  *Id.*  Topic 20 seeks testimony concerning the content and effectiveness of advertising for immediate release Effexor which is not even the subject of the litigation.  *Id.* at 9.  The "effectiveness" of advertising and promotional efforts is not only vague and ambiguous, but also overly broad and unduly burdensome.  Wyeth has agreed to provide, and already has provided, the annual direct selling and marketing expense for U.S. sales of Effexor® from 1993 through second

13.

quarter of 2006.  [Ex. 6 at 4].  Any additional information is unduly burdensome and irrelevant.

Topic 24, in turn, seeks testimony regarding over 15 years of Wyeth's internal practices and policies regarding patenting of its intellectual property.  [Ex. 1 at 10].  This topic is plainly overbroad, encompasses inventions having nothing to do with the patents-in-suit, and, as will be discussed below, is inextricably intertwined with communications protected by the attorney-client privilege and/or work product immunities.

Topic 33 seeks testimony on the facts and documents concerning the denials and statements in Wyeth's Reply to First Amended Counterclaims of Impax (which itself contains 57 numbered paragraphs and is twelve (12) pages long) encompassing every issue in the case.  [Ex. 1 at 12].  Wyeth cannot reasonably be expected to produce a Rule 30(b)(6) witness for each of these diverse subjects, all encompassed by just *one* of Impax's topics.  Impax's Amended Notice thus clearly oversteps the bounds of permissible, reasonable discovery on the basis of this one topic alone.

Topics 29 and 31 seek "WYETH's awareness" of subject matter significantly overlapping with Topics 30 and 32, for which Wyeth has offered to provide testimony as described above.  [Ex. 1].  As drafted, however, those topics are vague and ambiguous and, particularly as "WYETH" is defined by Impax, are overly broad in encompassing countless people who are not primarily involved in the subject matter of this case.  Topics 25 and 26 similarly seek "WYETH'S knowledge" and are objectionable for the same reasons.

14.

As explained above, Wyeth has offered to produce a witness to testify regarding much of topics 3-16, 19, 20, 22, 23, 28, 30, 32, and 34, subject to its objections as to overbreadth and relevancy (as detailed in Exhibit 2). Wyeth particularly objects to these topics to the extent that they seek testimony concerning: (1) research and testing done by Wyeth after the effective filing date of the patents-in-suit; (2) voluminous post-filing amendments to the NDA after May 1996; (3) advertising budgets, sales projections and profit margins for Effexor® XR; and (4) document collection procedures already outlined in a July 14, 2006 letter to Impax.

In short, the topics listed in Impax's Amended Notice lack any reasonable particularity, and embrace such a breadth of information that much of it is either irrelevant to the issues in the lawsuit or of such marginal relevance as to be unduly burdensome. Rather, Impax's topics appear to be no more than the proverbial fishing expedition. Clearly, the use of such an overreaching, burdensome Rule 30(b)(6) deposition for this purpose is improper. *See Carpenter Tech. Corp. v. Armco, Inc.*, 1990 U.S. Dist. LEXIS 5538, *8, *11-12 (E.D. Pa. May 7, 1990) (noting that the scope of discovery is "not without its bounds," and striking irrelevant topics from Rule 30(b)(6) notice of deposition); *see also Westchester Fire Ins. Co. v. Household Int'l, Inc.* 2005 U.S. Dist. LEXIS 116, *7 (D. Del. Jan. 5, 2005) (denying discovery, including Rule 30(b)(6) deposition testimony, as to matters for which defendants failed to establish relevance). Especially when viewed in the aggregate, Impax's Amended Notice is a wholly inappropriate abuse of the discovery process and would compel Wyeth to assume an excessive burden.

15.

Moreover, requiring Wyeth to provide a witness to testify on such overbroad topics further places an unfair risk on Wyeth of possible preclusion if the witness cannot adequately respond to all questions posed, including the risk of preclusion of proofs:

> The potential for abuse by the discovering party is high here. Courts have noted that "if it's [sic] Rule 30(b)(6) representative cannot answer a question, either because the witness was not 'fully educated' or due to faulty memory, the party may well be confronted with a motion to dismiss or for summary judgment as a result of the witness' inability to answer." Because in a complex case it may be impossible to "fully educate" any slate of witnesses to restate all aspects of the case in deposition format, the risk of a preclusive motion following the Rule 30(b)(6) deposition makes the propriety of requiring such a synthesis in the first place a consideration of enormous import.

[Ex. 7 at 701-702 (citations omitted)]. Even as modified, Impax's Amended Notice topics seek testimony that pose an impossible burden on Wyeth, and are contrary to the purposes of Rule 30(b)(6).

> B.    Impax's Amended Notice Improperly Seeks Contention Discovery.

Topics 1 and 33 of Impax's Amended Notice seek, respectively, Wyeth's testimony on "[t]he conception and reduction to practice of the alleged invention(s) claimed in each of the asserted claims of the PATENTS IN SUIT and claim 1 of U.S. Patent No 6,274,171 B1" (Topic 1), and "[t]he facts and DOCUMENTS CONCERNING the denials and statements in WYETH'S REPLY" (Topic 33). [Ex. 1]. These topics plainly seek Wyeth's contentions.

Rule 30(b)(6) was intended to provide a vehicle for information on the identity of knowledgeable people, not as a contention specification mechanism:

16.

> The essential purpose of the Rule 30(b)(6) deposition
> mechanism is reflected in the Advisory Committee's focus
> on the burdens involved. The Committee recognized that
> finding witnesses to address topics required effort by an
> entity. The counter-weight -- the factor which was stated
> by the Committee to justify the imposition of this burden
> on the company -- was *not* that the discovery party had a
> need to learn contentions (a matter not even raised in the
> comment to Rule 30(b)(6)). Rather, it was the discovering
> party's need to obtain *leads to the identity of
> knowledgeable people* and some basic information about
> the company.

[Ex. 7 at 718-719 (emphasis added) (citations omitted)].

This Court has repeatedly recognized that it is improper to seek a party's

contentions through a Rule 30(b)(6) deposition. [*See e.g.,* Ex. 8 (*Axiohm IPS, Inc. v.

Epson Am., Inc.,* C.A. No. 00-420 (SLR) (D. Del. Mar. 28, 2001) (Tr. at 4))("[W]e don't

do contention depositions in this district…."); Ex. 9, (*Tiegel Manu Co. v. Globe-Union,

Inc.,* C.A. No. 84-483, (D. Del. Oct. 5, 1984) (Tr. at 14)(noting that "[i]t has been the

consistent position of this Court" that witnesses should not be required to testify as to

contentions; instead, contention discovery is confined to interrogatories)].

Rule 30(b)(6) depositions should not be used to discover the bases for a

party's legal positions. *See e.g., Heron v. Potter*, 2006 WL 3703693 at *1 (Rule 30(b)(6)

notice requesting testimony "'as to why the plaintiff was not accommodated' . . . amounts

to requiring a deponent to either deny that Plaintiff was accommodated, thus rendering

the deposition useless, *or to make a legal opinion or conclusion, which is

objectionable.*") (emphasis added); *see also* Ex. 10 *McKesson Info. Solutions LLC v. The

TriZetto Group, Inc.,* C.A. No. 04-01258 (SLR) (Tr. at 21) (D. Del. Aug. 2, 2005)("I have

never thought contention Interrogatories are appropriately responded to via 30(b)(6)

depositions…. So if you ask for depositions concerning the basis for a defense, that is a

17.

contention interrogatory.")).  Indeed, Impax's topics are "so broadly worded, it can't help but really be a circumstance where somebody is asked to know every fact pertaining to every contention and that's a little bit much to put on a deponent."  [Ex. 11 (*Pharmacia & Upjohn Co. v. Sicor, Inc.,* C.A. No. 04-833 (KAJ) (D. Del. Oct. 11, 2005) (Tr. at 37)).

        The fact that these topics do not explicitly recite the word "contention" and use the words "facts concerning" does not somehow transform Impax's Topics 1 and 33 into appropriate Rule 30(b)(6) topics.  *See Pharmacia* (Ex 11, Tr. at 36) (finding "good force to the argument" that "inserting of the word 'facts' doesn't make [a deposition topic] less of an effort to get at what is essentially the legal position of the party ….."); *see also* Ex. 12 (*ArthoCare Corp. v. Smith & Nephew, Inc*., C.A. No. 01-504 (SLR)(D.Del. Oct. 15, 2002) (Tr. at 13-14) ("I would not put any credence in contention depositions to have one person be designated as the corporate spokesperson for legal issues . . . and even incorporating all the facts.  That's what interrogatories are for . . . I would say don't bother taking them [contention depositions].  I think they're ridiculous. . .").

        Particularly in patent cases, such as this one, involving interplay between complex facts, law, and expert analyses, courts have concluded that Rule 30(b)(6) discovery is not an appropriate vehicle for addressing these topics.  As noted in *McCormick-Morgan, Inc. v. Teledyne Indus., Inc.*, 134 F.R.D. 275, 287 (N.D. Cal. 1991) in denying Rule 30(b)(6) depositions on the parties' contentions:

> Patent cases turn peculiarly on a conceptually dense dynamic between physical objects, words in claims, and principles of law.  Understanding that dynamic, and describing the relationships that serve as the bases for a given parties' contentions, is something best done by patent lawyers . . . .

18.

134 F.R.D. at 287, *rev'd on other grounds*, 765 F. Supp. 611 (N.D. Cal 1991).

Even if the synthesis Impax seeks could be done (which it cannot), it would in any event likely require the disclosure of privileged communications and work product. Especially where, as here, all non-privileged, relevant information has been produced to Impax, a Rule 30(b)(6) Notice seeking a roadmap to Wyeth's selection, organization, synthesis and assessment of a myriad of facts and documents raises fundamental work product concerns:

> A seminal decision on the issue of whether selection and compilation of documents by counsel in preparation for pretrial discovery falls within the protected category of opinion work product reasoned that the selection and compilation of documents by counsel inevitably reveals important aspects of an attorney's understanding of the case. . . . This conclusion follows even though the individual documents included in the compilation are not protected under the work product doctrine.

[Ex. 7 at 723-24 (citations omitted)]. Specifically, Rule 30(b)(6) depositions that seek facts supporting allegations become an easy window into counsel's thought processes in the selection of evidence used to prepare a witness in an effort to comply with Rule 30(b)(6) obligations. However broad the discovery rules may be, Rule 30(b)(6) is not a license to discover such protected information:

> When the entity demonstrates that all relevant, non-privileged evidence has been disclosed to the defendants, a proposed Rule 30(b)(6) deposition seeking synthesis of the supporting facts "constitutes an impermissible attempt by defendant to inquire into the mental processes and strategies of the [entity]," . . . and hence the court was "drawn inexorably to the conclusion that [the] Notice of Deposition is intended to ascertain how the [entity] intends to marshall the facts, documents and testimony in its possession, and to discover the inferences that plaintiff believes properly can be drawn from the evidence it has accumulated."

19.

[Ex. 7 at 726 (citations omitted)].  Thus, Impax's topics remain an impermissible attempt to inquire into protected work product.  [*Id.* at 724 ("The criticism [of seeking information protected by work product] is true of a series of oral questions asking for the 'facts and documents which [the entity] contends support' each affirmative claim averment or defense, or of a notice stated with similar breadth.) (citation omitted)].

Wyeth has answered contention interrogatories regarding Wyeth's dates of conception and reduction to practice, infringement, validity, and claim construction, and has produced approximately one million pages of documents in this litigation, including voluminous materials from the earlier *Teva* litigation.  Further discovery of Wyeth's contentions by way of a Rule 30(b)(6) deposition is not proper, and is best left for other mechanisms such as expert discovery.

C.    Impax's Notice Improperly Seeks Information Protected By The Attorney Client Privilege And/Or Attorney Work Product Immunity.

Several of the topics in Impax's Amended Notice also directly implicate attorney-client communications and/or attorney work product.  For example, Topic 2 seeks testimony on "all invention records CONCERNING the asserted claims of the PATENTS IN SUIT and claim 1 of the U.S. Patent No. 6,274,171 B1."  [Ex. 1 at 5].  Wyeth's invention records, however, contain attorney client communications, and thus are protected from discovery.  *See In re Spalding Sports Worldwide, Inc.,* 203 F.3d 800, 806 (Fed. Cir. 2000)("since [patentee's] invention record was prepared and submitted primarily for the purpose of obtaining legal advice on patentability and legal services in

20.

preparing a patent application . . . it is privileged in its entirety").[3]  Finally, to the extent Impax seeks any general, non-privileged information regarding invention records, that information already has been provided.  Specifically, Wyeth has already produced to Impax Rule 30(b)(6) deposition testimony from the prior *Teva* litigation concerning the same patents-in-suit.  That testimony concerns, for example, Wyeth's general understanding of the purpose of invention records, the type of information generally recorded in the records, to whom such records are disclosed, and the general process of preparing the records in the early to mid-1990s.

Topics 21-23, and 28, seek testimony regarding the drafting, preparation, filing, prosecution and "intended meaning" of the applications that matured into the patents-in-suit (Topic 21); and the support for, drafting of, preparation of, and intended meaning of (1) cited passages of the patents-in-suit (Topics 22 and 23); and (2) a statement in the prosecution history of U.S. Patent Application, Serial No. 08/964,328 (Topic 28).  [Ex. 1].  Similarly, Topic 24 seeks testimony on

> WYETH's standard practices and policies from 1990 to the present with respect to the prosecution of U.S. patent applications, including the preparation of invention disclosures, evaluation of inventions, performing prior art searches, preparing patent applications, informing inventors of their duty of candor to the Patent Office, gathering and submitting prior art during the course of patent prosecution, evaluation of U.S. Patent and Trademark Office actions and examiner amendments, drafting and review of responses to Office actions, decisions to file provisional, continuation or

---

[3]  Additionally, Wyeth objects to this topic as irrelevant and not reasonably calculated to lead to the discovery of admissible evidence to the extent it seeks information pertaining to claim 1 of U.S. Patent No. 6,274,171 B1, which is not asserted in this litigation.

continuation-in-part applications, and decisions to abandon applications.[4]

*Id.* at 10.  All of these topics seek information protected by the attorney-client privilege and/or work product immunity.

Specifically, the preparation and prosecution of a patent are the "hallmark activities of a lawyer," and this Court has recognized that communications between a client and patent attorney for the purpose of securing legal advice in connection with those proceedings is protected by the attorney-client privilege.  *Hercules Inc. v. Exxon Corp.,* 434 F. Supp. 136, 147 (D. Del. 1977) (citing *Sperry v. State of Florida*, 373 U.S. 379 (1963)).  The testimony Impax seeks would reveal confidential communications made by the client to the attorney for the purpose of obtaining legal services, and, as such, is properly immune from discovery.  *See Hercules*, 434 F. Supp. at 144; *Rohm & Haas Co. v. Brotech Corp.*, 815 F. Supp. 793, 797 (D. Del. 1993) (draft patent applications held privileged because they can "contain information and communications relating to the subject matter of the document, including, for example, proposed material to be included, suggested additions and deletions, and comments on the contents, all of which are intended to be considered confidential between attorney and client and not intended for public disclosure.").

Moreover, the mental impressions of the attorneys who drafted the patent applications as to the meaning of certain terms likewise are protected to the extent they

---

[4]    Topic 24 also is overly broad, irrelevant and not reasonably calculated to lead to admissible evidence to the extent it seeks information going back to 1990. Wyeth's standard policies and practices with regards to prosecution of U.S. patent applications dating long before the patents-in-suit were prosecuted are not pertinent to this litigation.

are based on privileged communications. *Advanced Cardiovascular Sys., Inc. v. C.R. Bard, Inc.,* 144 F.R.D. 372, 378-79 (N.D. Cal. 1992) (patent attorney's understanding of terms in a patent is not discoverable to the extent it was based on privileged communications from inventors). The privilege also extends to technical information communicated between attorney and client for the purpose of securing legal advice. *See SmithKline Beecham Corp. v. Apotex Corp.,* 232 F.R.D. 467, 480 (E.D. Pa. 2005); *see also Conner Peripherals, Inc. v. Western Digital Corp.,* No. C93-20117 RMW/EAI, 1993 WL 726815, * 3 (N.D. Cal. June 8, 1993). Because the requested discovery is so intertwined with issues of attorney-client privilege and/or work product immunity, it is best conducted through means other than a Rule 30(b)(6) deposition.

Topics 21-23 and 28 also are not reasonably calculated to lead to admissible evidence to the extent that they seek any information pertaining to the "intended meaning" of any passages of the patents-in-suit or statements made in the prosecution of the patents-in-suit. The only meaning that is relevant is the meaning to one skilled in the art, not the meaning that was "intended" by the applicant:

> No inquiry as to the subjective intent of the applicant or PTO is appropriate or even possible in the context of a patent infringement suit. The subjective intent of the inventor when he used a particular term is of little or no probative weight in determining the scope of a claim (except as documented in the prosecution history). . . . Thus the focus in construing disputed terms in claim language is not the subjective intent of the parties to the patent contract when they used a particular term. Rather the focus is on the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean.

*Markman v. Westview Instruments, Inc.*, 52 F.2d 967, 985-86 (Fed. Cir. 1995)(*en banc*)(citation omitted). These topics, therefore, are improper on their face. Wyeth's

23.

willingness to provide non-privileged testimony on the factual support for the cited passages of the patents-in-suit of Topics 22 and 23, and the statement made during prosecution of Topic 28, as set forth above provides the appropriate scope of discovery under Rule 30(b)(6).

<u>CONCLUSION</u>

Impax's Amended Notice is improper for all of the reasons set forth above. In contrast, Wyeth's proposed compromise to provide Rule 30(b)(6) testimony on the topics listed on pages 5-9 above is entirely reasonable. For the foregoing reasons, Wyeth respectfully requests that its motion for protective order to strike or limit Impax's Amended Rule 30(b)(6) deposition notice be granted.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Karen Jacobs Louden (#2881)*
Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
1201 N. Market Street
Wilmington, DE  19899-1347
(302) 658-9200
klouden@mnat.com
Attorneys for Plaintiff Wyeth

OF COUNSEL:
Basil J. Lewris
Linda A. Wadler
Finnegan, Henderson, Farabow,
  Garrett & Dunner, L.L.P.
901 New York Avenue, N.W.
Washington, DC  20001
(202) 408-4000

Dated: February 6, 2007

## CERTIFICATE OF SERVICE

I, Karen Jacobs Louden, hereby certify that on February 6, 2007, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Mary B. Matterer
> MORRIS JAMES LLP

I also certify that copies were caused to be served on February 6, 2007 upon the following in the manner indicated:

### BY HAND

> Mary B. Matterer
> Morris James LLP
> 500 Delaware Avenue
> Suite 1500
> Wilmington, DE  19899

### BY FEDERAL EXPRESS

> M. Patricia Thayer
> John M. Benassi
> Jessica R. Wolf
> Heller Ehrman LLP
> 4350 La Jolla Village Drive
> San Diego, CA  92102

> */s/ Karen Jacobs Louden (#2881)*
> Karen Jacobs Louden (#2881)
> klouden@mnat.com

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| WYETH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 06-222 JJF |
| | ) | |
| IMPAX LABORATORIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### DEFENDANT IMPAX LABORATORIES, INC.'S AMENDED NOTICE OF DEPOSITION OF WYETH PURSUANT TO FED. R. CIV. P. 30(b)(6)

PLEASE TAKE NOTICE that commencing at 9:30 a.m. on February 5, 2007 at the offices of Morris James LLP, 500 Delaware Avenue, Suite 1500, Wilmington, Delaware 19801, or at another mutually agreed upon time and place, Defendant Impax Laboratories, Inc. ("Impax"), through its attorneys, will take the deposition of Plaintiff Wyeth pursuant to Federal Rule of Civil Procedure 30(b)(6). At the time of the deposition, Wyeth shall designate one or more of its directors, officers, managing agents, or other persons who will testify on behalf of Wyeth as to all information known or reasonably available to Wyeth regarding the topics set forth in Schedule A hereto. In addition, "(1) the deponent must be knowledgeable on the subject matter identified as the area of inquiry, (2) Wyeth must designate more than one deponent if necessary in order to respond to the relevant areas of inquiry specified by Impax, (3) Wyeth must prepare the witness to testify on matters not only known by the deponent, but those that should be known by Wyeth; and (4) Wyeth must substitute an appropriate deponent when it becomes apparent that the previous deponent is unable to respond to certain relevant areas of inquiry." 7-30 MOORE'S FEDERAL PRACTICE - CIVIL §30.25 (2006) (quoting

1

*Alexander v. FBI*, 186 F.R.D. 137, 141 (D.D.C. 1998)). The deposition will take place

upon oral examination before a notary public or other person authorized to administer

oaths, will be recorded by stenographic and/or sound and video means, and will continue

from day to day until completed. You are invited to attend and participate.

Dated: January 22, 2007

MARY B. MATTERER (I.D. No. 2696)
MORRIS JAMES HITCHENS & WILLIAMS LLP
222 Delaware Ave., 10th Floor
Wilmington, DE 19801
Telephone: (302) 888-6800

M. PATRICIA THAYER (*pro hac vice*)
JOHN M. BENASSI (*pro hac vice*)
JESSICA R. WOLFF (*pro hac vice*)
SAMUEL F. ERNST (*pro hac vice*)
HELLER EHRMAN LLP
4350 La Jolla Village Drive, 7th Floor
San Diego, CA 92101
Telephone: (858) 450-8400
Facsimile: (858) 450-8499

Attorneys for Defendant
IMPAX LABORATORIES, INC.

2

## SCHEDULE A

### DEFINITIONS FOR DEPOSITION TOPICS

When used in the following deposition topics, the following definitions apply:

1.    "WYETH" means Plaintiff Wyeth and that company as it was previously named and any related companies, parents, divisions, or subsidiaries, past or present, located in the U.S. or abroad, and the past or present directors, officers, employees, agents, representatives or attorneys thereof.

2.    "IMPAX" means Defendant IMPAX Laboratories, Inc. and its past or present directors, officers, employees, agents, representatives or attorneys known to WYETH.

3.    "CONCERNING" means referring to, relating to, regarding, reflecting, associated with, comprising, constituting, containing, demonstrating, describing, discussing, evidencing, evincing, indicating, on the subject of, on the topic of, showing, or prepared in connection with the stated matter.

4.    "DATE" means the exact day, month, and year, if so ascertainable, or if not, the best approximation (including relationship to other events).

5.    "DOCUMENT" or "DOCUMENTS" means all written, printed, typed, electronically produced, electronically stored, photostatic, photographed, recorded, or otherwise reproduced communications or records of every kind and description, whether comprised of letters, words, pictures, sounds, symbols, or combinations thereof. DOCUMENTS include originals as well as drafts, copies, marked-up copies, non-identical duplicates, and computer files, including backup or archival copies.

6.    "THING" or "THINGS" means any tangible item, including without limitation models, prototypes, research models or samples, and samples of any device or apparatus, or product.

3

7.    "PERSON" means any natural person, firm, association, organization, partnership, business, trust, corporation, or public entity.

8.    "PTO" means the United States Patent and Trademark Office.

9.    "FDA" means the United States Food and Drug Administration.

10.    "NDA" means New Drug Application.

11.    "ANDA" means Abbreviated New Drug Application.

12.    "INDA" means Investigational New Drug Application.

13.    "ORANGE BOOK" means the FDA publication entitled, *Approved Drug Products with Therapeutic Equivalence Evaluations*.

14.    "IMPAX'S VENLAFAXINE HYDROCHLORIDE EXTENDED RELEASE CAPSULE" means those pharmaceutical products that are the subject of ANDA No. 78-057.

15.    "VENLAFAXINE" means the compound 1-[(2-dimethylamino)-1-(4-methoxyphenyl)ethyl]cyclohexanol commonly known as venlafaxine, as well as all compositions, formulations, and preparations containing venlafaxine, including without limitation VENLAFAXINE and other pharmaceutically acceptable salts of venlafaxine.

16.    "EFFEXOR" means the VENLAFAXINE product sold by WYETH as Effexor®.

17.    "EFFEXOR XR" means the VENLAFAXINE product sold by WYETH as Effexor® XR.

18.    "PATENTS IN SUIT" means U.S. Patent No. 6,274,171 B1, U.S. Patent No. 6,403,120 B1, U.S. Patent No. 6,419,958 B2, and any other patent asserted by WYETH as infringed by IMPAX in the above-captioned action, individually or collectively.

4

19.   "NAMED INVENTORS" means Deborah M. Sherman, John C. Clark, John U. Lamer, Steven A. White, and any other person listed as an inventor for the PATENTS IN SUIT, individually or collectively.

20.   For the purposes of these requests for production only, "EXTENDED RELEASE FORMULATION" means a formulation which releases the active ingredient at a slower rate than the immediate release formulation of the active ingredient such that the desired dosing frequency is or would be less than that for the immediate release formulation.

21.   "WYETH'S COMPLAINT" means the Complaint for Patent Infringement filed by WYETH filed by WYETH in the above-captioned action on April 6, 2006, and any amendments thereto.

22.   "WYETH'S REPLY" means the Plaintiff Wyeth's Reply to First Amended Counterclaims of Defendant Impax Laboratories, Inc. filed by WYETH in the above-captioned action on August 30, 2006, and any amendments thereto.

23.   "ALZA" means Alza Corporation, and its past or present directors, officers, employees, agents, representatives or attorneys known to WYETH.

## DEPOSITION TOPICS

1.   The conception and reduction to practice of the alleged invention(s) claimed in each of the asserted claims of the PATENTS IN SUIT and claim 1 of U.S. Patent No. 6,274,171 B1.

2.   All invention records CONCERNING the asserted claims of the PATENTS IN SUIT and claim 1 of U.S. Patent No. 6,274,171 B1.

3.   The formulation of EFFEXOR XR and the development thereof, including without limitation when those formulations were developed, who developed them, and what materials and methods were used to develop them.

5

4.    The development and formulation of an EXTENDED RELEASE
FORMULATION by WYETH comprising VENLAFAXINE and hydrogel tablets,
including without limitation when those formulations were developed, who developed
them, and what materials and methods were used to developed them.

5.    The development and formulation of an EXTENDED RELEASE
FORMULATION by WYETH comprising VENLAFAXINE and Gelucire capsules,
including without limitation when those formulations were developed, who developed
them, and what materials and methods were used to developed them.

6.    The development and formulation of an EXTENDED RELEASE
FORMULATION by WYETH comprising VENLAFAXINE and ALZA's OROS® oral
delivery technology, including without limitation when those formulations were
developed, who developed them, and what materials and methods were used to developed
them.

7.    The *in vitro* and *in vivo* release profiles of EFFEXOR XR including
without limitation when those profiles were first achieved, and what materials and
methods were used to test and achieve them.

8.    The *in vitro* and/or *in vivo* release profiles of an EXTENDED RELEASE
FORMULATION by WYETH comprising VENLAFAXINE and hydrogel tablets,
including without limitation when those profiles were first achieved, and what materials
and methods were used to test and achieve them.

9.    The *in vitro* and/or *in vivo* release profiles of an EXTENDED RELEASE
FORMULATION by WYETH comprising VENLAFAXINE and Gelucire capsules,
including without limitation when those profiles were first achieved, and what materials
and methods were used to test and achieve them.

6

10.     The *in vitro* and/or *in vivo* release profiles of an EXTENDED RELEASE FORMULATION by WYETH comprising VENLAFAXINE and ALZA's OROS® oral delivery technology, including without limitation when those profiles were first achieved, and what materials and methods were used to test and achieve them.

11.     Examples 1 though 7 of the PATENTS IN SUIT, including without limitation the data underlying Examples 1 though 7 and DOCUMENTS produced by WYETH evidencing that data.

12.     Tables 1 though 3 of the PATENTS IN SUIT, including without limitation the data underlying Tables 1 through 3 and DOCUMENTS produced by WYETH evidencing that data.

13.     WYETH's knowledge and research prior to November 5, 1997 demonstrating that the EXTENDED RELEASE FORMULATION comprising VENLAFAXINE claimed in the PATENTS IN SUIT provided a therapeutic blood plasma concentration of VENLAFAXINE over a twenty-four hour period with diminished incidences of nausea and emesis.

14.     WYETH's knowledge and research prior to November 5, 1997 demonstrating that the EXTENDED RELEASE FORMULATION comprising VENLAFAXINE claimed in the PATENTS IN SUIT eliminated the troughs and peaks of drug concentration in a patients blood plasma attending the therapeutic metabolism of plural daily doses of VENLAFAXINE.

7

15.    The following parts and contents of NDA No. 20-699 including without limitation any amendments thereto:

        (a)    Integrated Safety Summary

        (b)    Summary of Human and Pharmacokinetics and Bioavailability

        (c)    The passage with respect to 600B-144FR stating that that there was "a dissociation between peak venlafaxine concentration and peak nausea.  In all treatment conditions the maximum nauseating effect occurred before the time of peak concentration . . . .  Compared with venlafaxine CF, the ER formulation, which reached comparable levels with a delayed tmax produced a much less intense maximum effect and a decrease of 63% in the area under the concentration-time curve (AUC) of nausea normalized by dose."

        (d)    The passage with respect to 600B-144FR stating that that there was "The incidence and severity of nausea would be expected to be less with venlafaxine ER than venlafaxine IR.  This conclusion is based on the results of the study 600B-144FR…The incidence of nausea as an adverse event and the severity of nausea, measured as the AUC for a visual analog scale, where lower with venlafaxine ER administration than with venlafaxine IR administration."

16.    For the years 1997 to the present, revenue, expenses, and profitability from the sale of EFFEXOR XR in the United States, including without limitation advertising budgets, sales projections, actual sales, market shares, and profit margins;

17.    For the years 1997 to the present, causes in any fluctuations of, and strategies to maintain or increase, the market share of EFFEXOR XR in the United States.

18.    For the years 1997 to the present, the reasons for and the results of market research conducted by or at the direction of WYETH regarding the treatment of the signs and symptoms of persons suffering from major depressive disorder in the United States.

8

19.     For the years 1997 to the present, the content and effectiveness of any advertising and promotional efforts for EFFEXOR XR in the United States, including without limitation detailing, sampling, and print, radio, and television advertisements, the size of the marketing and sales force, yearly advertising budgets and expenditures.

20.     The content and effectiveness of any advertising and promotional efforts for EFFEXOR in the United States, including without limitation detailing, sampling, and print, radio, and television advertisements, the size of the marketing and sales force, yearly advertising budgets and expenditures.

21.     The drafting, preparation, filing, prosecution, and intended meaning of the applications that matured into the PATENTS IN SUIT.

22.     The support for, the drafting of, the preparation of, and intended meaning of the following passage of the PATENTS IN SUIT:

> The use of the one-a-day venlafaxine hydrochloride formulations of this invention reduces by adaptation, the level of nausea and incidence of emesis that attend the administration of multiple daily dosing. In clinical trials of venlafaxine hydrochloride ER, the probability of developing nausea in the course of the trials was greatly reduced after the first week. Venlafaxine ER showed a statistically significant improvement over conventional venlafaxine hydrochloride tablets in two eight-week and one 12 week clinical studies. Thus, in accordance with this use aspect of the invention there is provided a method for reducing the level of nausea and incidence of emesis attending the administration of venlafaxine hydrochloride which comprises dosing a patient in need of treatment with venlafaxine hydrochloride with an extended release formulation of venlafaxine hydrochloride once a day in a therapeutically effective amount.

23.     The support for, the drafting of, the preparation of, and the intended meaning of the following passage of the PATENTS IN SUIT:

> It was completely unexpected that an extended release formulation containing venlafaxine hydrochloride could be obtained because the hydrochloride of venlafaxine proved to be extremely water soluble.

9

24.    WYETH's standard practices and policies from 1990 to the present with respect to the prosecution of U.S. patent applications, including the preparation of invention disclosures, evaluation of inventions, performing prior art searches, preparing patent applications, informing inventors of their duty of candor to the Patent Office, gathering and submitting prior art during the course of patent prosecution, evaluation of U.S. Patent and Trademark Office actions and examiner amendments, drafting and review of responses to Office actions, decisions to file provisional, continuation or continuation-in-part applications, and decisions to abandon applications.

25.    WYETH's knowledge of the development and formulation of any EXTENDED RELEASE FORMULATION comprising VENLAFAXINE by ALZA, including without limitation when WYETH first learned of the development and/or formulation, and its knowledge of any changes in the formulation.

26.    WYETH's knowledge of the *in vitro* and/or *in vivo* release profile of any EXTENDED RELEASE FORMULATION comprising VENLAFAXINE by ALZA, including without limitation when WYETH first learned of the release profile, and its knowledge of any changes in the profile, and any dissolution, clinical, or other testing of the profile.

27.    WYETH's knowledge of studies, tests, trials, research, or experiments conducted prior to July 16, 2002, that compare chemical properties, including without limitation solubility, of propranolol and its salts, with that of VENLAFAXINE and its salts.

28.    The support for, the drafting of, the preparation of, and intended meaning of the following passage from the Reply Under Rule 111 With Amendment Under Rule 115 of November 5, 1997 filed with the PTO in U.S. Patent Application, serial no. 08/964,328:

10

Moreover, there is a tremendous difference in water solubility of the two compounds. The water solubility of propanolol hydrochloride is 93 mg/ml, whereas that of venlafaxine hydrochloride is 574 mg/ml – i.e. 6 fold greater.

29.    WYETH's awareness of an article by Lynn A. Cunningham, M.D., entitled *Once-Daily Venlafaxine Extended Release (XR) and Venlafaxine Immediate Release (IR) in Outpatients with Major Depression*, published in volume 9, no. 3 of the Annals of Clinical Psychiatry in 1997 prior to and during the prosecution of the PATENTS IN SUIT, including the awareness of those persons involved in the prosecution of the PATENTS IN SUIT.

30.    The persons at WYETH involved in drafting, reviewing, editing, commenting on, or revising drafts of the article by Lynn A. Cunningham, M.D., entitled *Once-Daily Venlafaxine Extended Release (XR) and Venlafaxine Immediate Release (IR) in Outpatients with Major Depression*, published in volume 9, no. 3 of the Annals of Clinical Psychiatry in 1997, including the titles of, job responsibilities of, and reporting structure surrounding those persons.

31.    WYETH's awareness of an article by Richard Entsuah, Ph.D et al, entitled *A Benefit Risk Analysis of Once-Daily Venlafaxine Extended Release (XR) and Venlafaxine Immediate Release (IR) in Outpatients with Major Depression*, published in volume 33, no. 4 of the Psychopharmacology Bulletin in 1997 prior to and during the prosecution of the PATENTS IN SUIT, including the awareness of those persons involved in the prosecution of the PATENTS IN SUIT.

32.    The persons at WYETH involved in drafting, reviewing, editing, commenting on, or revising drafts of the article by Richard Entsuah, Ph.D et al, entitled *A Benefit Risk Analysis of Once-Daily Venlafaxine Extended Release (XR) and Venlafaxine Immediate Release (IR) in Outpatients with Major Depression*, published in volume 33, no. 4 of the Psychopharmacology Bulletin in 1997, including the titles of, job responsibilities of, and reporting structure surrounding those persons.

11

33.    The facts and DOCUMENTS CONCERNING the denials and statements in WYETH'S REPLY.

34.    WYETH's procedures for collecting and maintaining DOCUMENTS and/or THINGS in their central files, archival or storage locations, and/or kept by individual employees, including without limitation how the DOCUMENTS are organized in central files and/or archival or storage locations, the criteria for whose DOCUMENTS should be or were collected, and what measures are or were taken to ensure that all relevant documents are or were collected in response to requests for DOCUMENTS and THINGS propounded by IMPAX in this action.

12

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of January 2007, the foregoing document,

DEFENDANT IMPAX LABORATORIES, INC.'S AMENDED NOTICE OF

DEPOSITION OF WYETH PURSUANT TO FED. R. CIV. P. 30(b)(6), was served on

counsel via U.S. Mail:

Jack B. Blumenfeld
Melissa S. Myers
Morris Nichols Arsht & Tunnell
1201 N. Market Street
Wilmington, DE 19801

Basil J. Lewris
Linda A. Wadler
Finnegan Henderson Farabow Garrett & Dunner
901 New York Avenue, N.W.
Washington, DC 20001

Dated: January 22, 2007

M. PATRICIA THAYER (*pro hac vice*)
JOHN M. BENASSI (*pro hac vice*)
JESSICA R. WOLFF (*pro hac vice*)
SAMUEL F. ERNST (*pro hac vice*)
HELLER EHRMAN LLP
4350 La Jolla Village Drive, 7th Floor
San Diego, CA 92101
Telephone: (858) 450-8400
Facsimile: (858) 450-8499

MARY B. MATTERER (I.D. No. 2696)
MORRIS JAMES HITCHENS & WILLIAMS LLP
222 Delaware Ave., 10th Floor
Wilmington, DE 19801
Telephone: (302) 888-6800

Attorneys for Defendant
IMPAX LABORATORIES, INC.

13

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WYETH, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No.: 06-222 JJF |
| v. | ) |
| | ) |
| IMPAX LABORATORIES, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

### NOTICE OF SERVICE

Please take notice that on the 22nd day of January, 2007, copies of the following

document, **DEFENDANT IMPAX LABORATORIES, INC.'S AMENDED NOTICE OF
DEPOSITION OF WYETH PURSUANT TO FED. R. CIV. P. 30(b)(6)**, were served on

counsel as indicated:

**VIA EMAIL**
Jack B. Blumenfeld, Esq.
Karen Jacobs Louden, Esq.
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
302.658.9200

**VIA EMAIL**
Linda A. Wadler, Esq.
Barbara Rudolph, Esq.
Finnegan Henderson Farabow
        Garrett & Dunner L.L.P.
901 New York Avenue, N.W.
Washington, DC 20001
202.408.4000

Dated:  January 23, 2007

                                   */s/ Mary B. Matterer*
                                Mary B. Matterer (I.D. No. 2696)
                                Morris James LLP
                                500 Delaware Avenue, Suite 1500
                                Wilmington, DE  19801-1494
                                (302) 888-6800
                                mmatterer@morrisjames.com

                                M. Patricia Thayer (State Bar No. 90818)
                                John M. Benassi (State Bar No. 74137)
                                Jessica R. Wolff (State Bar No. 162295)
                                Heller Ehrman LLP
                                4350 La Jolla Village Drive, 7th Floor
                                San Diego, California  92101
                                Telephone:  (858) 450-8400
                                Facsimile:  (858) 450-8499

                                Attorneys for IMPAX LABORATORIES, INC.

2

EXHIBIT 2

## WYETH'S DETAILED OBJECTIONS TO IMPAX'S
## AMENDED RULE 30(b)(6) DEPOSITION TOPICS

The following sets forth the rationale for Wyeth's particular objections to each of the thirty-four (34) topics in Impax's Amended Rule 30(b)(6) Notice ("Amended Notice"), providing in each instance the reasons why Impax's Amended Notice is inappropriate and should be quashed.

### I.    Topics for which Wyeth objects to only a portion

Wyeth is willing to provide a Rule 30(b)(6) deponent for significant portions of Topics 3-16, 19, 20, 22, 23, 28, 30, 32, and 34 listed in Impax's Amended Notice, subject to the objections set forth below.  Wyeth objects to each of Topics 3-16, 19, 20, 22, 23, 28, 30, 32, and 34 as overly broad, as not described with reasonable particularity, and to the extent they seek information subject to the attorney-client privilege or work product immunity.  Nevertheless, Wyeth will make a good faith effort to prepare a witness for these topics subject to the following objections.  Wyeth requests that the Court quash the portions of the topics to which Wyeth has objected.

**Topic 3** calls for the "formulation of EFFEXOR XR and the development thereof, including without limitation when those formulations were developed, who developed them, and what materials and methods were used to develop them."

Wyeth objects to Topic 3 as overly broad, unduly burdensome, and irrelevant to the extent it covers research, testing, and development conducted after the effective filing date of the patents-in-suit, March 25, 1996.  Wyeth further objects to this topic as overly broad, unduly burdensome, and irrelevant to the extent that it pertains to any formulation other than Wyeth's Effexor® XR products that are sold within the United States.  Wyeth also objects to Topic 3 as vague, ambiguous, and overly broad insofar as it refers to "methods" used to develop the

formulation of Effexor® XR.   Further, Wyeth objects to this topic as vague, ambiguous, overly broad, and as not described with reasonable particularity to the extent it is directed toward "development" of the formulation of Effexor® XR.  Wyeth will provide, subject to its objections, Rule 30(b)(6) deposition testimony on information not subject to the attorney-client privilege or work product immunity pertaining to Topic 3 to the extent that:  (1) it extends only to research, testing, and development completed prior to March 25, 1996;  (2) it is directed only to the formulation of Wyeth's Effexor® XR products that are sold in the United States; and (3) the "development" of the formulations referred to in this topic is limited to the pharmaceutical formulation research, and does not encompass subjects such as stability; toxicology; scale-up to commercial production; quality control; animal and/or human testing; selection, purchasing, and qualification of raw materials;  clinical batch manufacturing; commercial manufacturing; packaging; and regulatory matters.

   **Topics 4-6** call for the "development and formulation of an EXTENDED RELEASE FORMULATION by Wyeth" comprising, respectively, (1) VENLAFAXINE and hydrogel tablets (Topic 4); (2) VENLAFAXINE and Gelucire capsules (Topic 5); and (3) VENLAFAXINE and ALZA's OROS® oral delivery technology (Topic 6), including without limitation for each "when those formulations were developed, who developed them, and what materials and methods were used to develop them."

   Wyeth objects to each of Topics 4 through 6 as overly broad, unduly burdensome, and irrelevant to the extent that they cover research, testing, and development conducted after March 25, 1996, the effective filing date of the patents-in-suit.  Wyeth also objects to Topics 4 through 6 as vague, ambiguous, and overly broad insofar as they refer to "methods" used to develop the formulations referred to in these topics.   Further, Wyeth objects to these topics as vague,

ambiguous, overly broad, and as not described with reasonable particularity to the extent they are directed toward "development" of the formulations referred to in these topics. Wyeth will provide, subject to its objections, Rule 30(b)(6) deposition testimony on information not subject to the attorney-client privilege or work product immunity pertaining to Topics 4 through 6 to the extent that: (1) each such topic extends only to research, testing, and development completed prior to March 25, 1996; and (2) the "development" of the formulations referred to in each of these topics is limited to the pharmaceutical formulation research, and does not encompass subjects such as stability; toxicology; scale-up to commercial production; quality control; animal and/or human testing; selection, purchasing, and qualification of raw materials; clinical batch manufacturing; commercial manufacturing; packaging; and regulatory matters.

Topic 7 calls for "[t]he *in vitro* and *in vivo* release profiles of EFFEXOR XR including without limitation when those profiles were first achieved, and what materials and methods were used to test and achieve them."

Wyeth objects to Topic 7 as overly broad, unduly burdensome, and irrelevant to the extent that it covers testing conducted after March 25, 1996, the effective filing date of the patents-in-suit. Wyeth further objects to this topic as overly broad, unduly burdensome, and irrelevant to the extent that it pertains to any formulation other than Wyeth's Effexor® XR products that are sold within the United States. Wyeth also objects to Topic 7 as vague, ambiguous, and overly broad insofar as it refers to "methods" used. Wyeth additionally objects to the topic to the extent it seeks batch records or testing performed for quality control purposes as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Wyeth will provide, subject to its objections, Rule 30(b)(6) deposition testimony on information not subject to the attorney-client privilege or work product immunity

pertaining to Topic 7 to the extent that: (1) it extends only to testing completed prior to March 25, 1996; and (2) the topic is directed only to the formulation of Wyeth's Effexor® XR products that are sold in the United States.

**Topics 8-10** call for the "*in vitro* and/or *in vivo* release profiles of an EXTENDED RELEASE FORMULATION by Wyeth" comprising, respectively, (1) VENLAFAXINE and hydrogel tablets (Topic 8); (2) VENLAFAXINE and Gelucire capsules (Topic 9); and (3) VENLAFAXINE and ALZA's OROS® oral delivery technology (Topic 10), including without limitation for each "when those profiles were first achieved, and what materials and methods were used to achieve them."

Wyeth objects to each of Topics 8 through 10 as overly broad, unduly burdensome, and irrelevant to the extent they cover testing conducted after March 25, 1996, the effective filing date of the patents-in-suit. Wyeth also objects to each of Topics 8 through 10 as vague, ambiguous and overly broad insofar as they refer to "methods" used. Wyeth will provide, subject to its objections, Rule 30(b)(6) deposition testimony on information not subject to the attorney-client privilege or work product immunity pertaining to Topics 8 through 10 to the extent that each such topic extends only to testing completed prior to March 25, 1996.

**Topics 11 and 12** seek testimony on (1) "Examples 1 though (sic, through) 7 of the PATENTS IN SUIT" (Topic 11), and (2) "Tables 1 though (sic, through) 3 of the PATENTS IN SUIT" (Topic 12), "including without limitation the data underlying" these Examples and Tables "and DOCUMENTS produced by WYETH evidencing that data."

Wyeth objects to each of Topics 11 and 12 to the extent they seek information protected by the attorney-client privilege and/or work product immunity. Wyeth will provide, subject to its

4

objections, Rule 30(b)(6) deposition testimony on information not subject to the attorney-client privilege or work product immunity pertaining to Topics 11 and 12.

**Topic 13** calls for "WYETH's knowledge and research prior to November 5, 1997 demonstrating that the EXTENDED RELEASE FORMULATION comprising VENLAFAXINE claimed in the PATENTS IN SUIT provided a therapeutic blood plasma concentration of VENLAFAXINE over a twenty-four hour period with diminished incidences of nausea and emesis." **Topic 14** seeks "WYETH's knowledge and research prior to November 5, 1997 demonstrating that the EXTENDED RELEASE FORMULATION comprising VENLAFAXINE claimed in the PATENTS IN SUIT eliminated the troughs and peaks of drug concentration in a patients blood plasma attending the therapeutic metabolism of plural daily doses of VENLAFAXINE."

Wyeth objects to each of Topics 13 and 14 to the extent they seek information protected by the attorney-client privilege and/or work product immunity. Wyeth further objects to each of these topics as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant information, and not described with reasonable particularity to the extent that these topics are directed to "WYETH's knowledge," particularly as Impax defines "WYETH" in seeking information from countless numbers of people who are not primarily involved in the issues concerning this case. Wyeth's worldwide resources include 52,000 employees operating in more than 100 countries and spanning four continents. Wyeth further objects to these topics as vague and ambiguous, overly broad, and irrelevant to the extent they refer to "research prior to November 5, 1997." Wyeth will provide, subject to its objections, Rule 30(b)(6) deposition testimony on information not subject to the attorney-client privilege or

work product immunity pertaining to Topics 13-14 to the extent that it extends only to research that was completed prior to March 25, 1996, the effective filing date of the patents-in-suit.

**Topic 15** seeks testimony regarding several parts of NDA No. 20-699 including the Integrated Safety Summary, the Summary of Human Pharmacokinetics and Bioavailability, and two quoted passages from study 600B-144FR.

Wyeth objects to Topic 15 as overly broad, unduly burdensome, irrelevant, and not described with reasonable particularity. The Integrated Safety Summary, for example, covers the safety of the product as reported to the FDA, most of which is completely irrelevant to any issue in this litigation. It would be unduly burdensome to prepare a witness on all aspects of this one document alone. Wyeth further objects to this Topic as overly broad, unduly burdensome, irrelevant, and not described with reasonable particularity to the extent it pertains to NDA No. 20-699 "including without limitation any amendments thereto." Wyeth will provide, subject to its objections, Rule 30(b)(6) deposition testimony on information not subject to the attorney-client privilege or work product immunity pertaining to Topic 15 to the extent it extends only to the enumerated parts and contents of NDA 20-699 as originally filed with the U.S. Food and Drug Administration on May 16, 1996.

**Topic 16** calls for "For the years 1997 to the present, revenue, expenses, and profitability from the sale of EFFEXOR XR in the United States, including without limitation advertising budgets, sales projections, actual sales, market shares, and profit margins."

Wyeth objects to Topic 16 as overly broad, unduly burdensome, and irrelevant. For example, Wyeth's budgets, projections, and profit margins are irrelevant to any issue in this litigation. Wyeth will provide, subject to its objections, Rule 30(b)(6) deposition testimony on information not subject to the attorney-client privilege or work product immunity on annual

6

gross sales, annual net sales, and annual direct selling and marketing expense for U.S. sales of Effexor® XR from 1997 through the second quarter of 2006.

**Topic 19** calls for "For the years 1997 to the present, the content and effectiveness of any advertising and promotional efforts for EFFEXOR XR in the United States, including without limitation detailing, sampling, and print, radio, and television advertisements, the size of the marketing and sales force, yearly advertising budgets and expenditures."

Wyeth objects to Topic 19 as overly broad, unduly burdensome, irrelevant, and not described with reasonable particularity. For example, the size of the marketing and sales force over the years from 1997 to the present would be unduly burdensome to determine and irrelevant to any issue in this litigation. Wyeth further objects to this topic as vague and ambiguous and not described with reasonable particularity to the extent that it seeks information regarding the "content" and "effectiveness" of any advertising and promotional efforts for Effexor® XR in the United States. Wyeth further objects to this topic to the extent it seeks unspecified information regarding "detailing," "sampling," and "yearly advertising budgets and expenditures" from 1997 to the present. The burden of preparing a witness to address such topics far outweighs any possible, marginal relevance this information would have to any issue pending in this case. Wyeth will provide, subject to its objections, Rule 30(b)(6) deposition testimony on information not subject to the attorney-client privilege or work product immunity regarding the content of advertising done for Effexor® XR in the United States from 1997 to mid 2006. In addition, annual direct selling and marketing expense for U.S. sales of Effexor® XR from 1997 through second quarter of 2006 will be provided in response to Topic 16.

**Topic 20** seeks testimony regarding "the content and effectiveness of any advertising and promotional efforts for EFFEXOR in the United States, including without limitation detailing,

sampling, and print, radio, and television advertisements, the size of the marketing and sales force, yearly advertising budgets and expenditures."

Wyeth objects to this topic as overly broad, unduly burdensome and as not described with reasonable particularity. Moreover, Effexor®, an immediate release formulation of venlafaxine, is not the subject of this litigation. The "content" of advertising and promotional efforts for Effexor® is vague and ambiguous, and not relevant to any issue in this litigation. Wyeth has produced annual direct selling and marketing expenses for U.S. sales of Effexor® from 1993 through the second quarter of 2006. Impax has not articulated any relevance or need for additional information. Nonetheless, Wyeth will provide, subject to its objections, a Rule 30(b)(6) witness to testify on the direct selling and marketing expenses for U.S. sales of Effexor® from 1993 through the second quarter of 2006.

**Topics 22, 23, and 28** seek, respectively, testimony regarding the "support for, the drafting of, the preparation of, and intended meaning of" (1) two specific cited passages of the patents-in-suit (Topics 22 and 23); and (2) a specific statement in the prosecution history of U.S. Patent Application, Serial No. 08/964,328 (Topic 28).

Wyeth objects to these topics on the grounds that much, if not all, of the requested information implicates information which is protected by the attorney-client privilege and/or work product immunity concerning the preparation and prosecution of the patents-in-suit. Because the requested discovery is so intertwined with issues of attorney-client privilege and/or work product immunity, it is, not appropriate for a Rule 30(b)(6) deposition.

Additionally, Wyeth objects to these topics on the grounds that they are irrelevant and not reasonably calculated to lead to admissible evidence to the extent that they seeks any information pertaining to the "intended meaning" of any passages of the patents-in-suit or statements made in

8

the prosecution of the patents-in-suit.  The only meaning that is relevant is the meaning to one skilled in the art.

Wyeth is willing to provide testimony concerning the non-privileged, factual support for the cited passages.

**Topics 30 and 32** call for testimony on the "persons at WYETH involved in drafting, reviewing, editing, commenting on, or revising drafts of" two articles published in 1997, "including the titles of, job responsibilities of, and reporting structure surrounding those persons."

Wyeth objects to each of Topics 30 and 32 to the extent that they seek information protected by the attorney-client privilege and/or work product immunity.  Wyeth will provide, subject to its objections, Rule 30(b)(6) deposition testimony on information not subject to the attorney-client privilege or work product immunity pertaining to Topics 30 and 32.

**Topic 34** calls for "WYETH's procedures for collecting and maintaining DOCUMENTS and/or THINGS in their central files, archival or storage locations, and/or kept by individual employees, including without limitation how the DOCUMENTS are organized in central files and/or archival or storage locations, the criteria for whose DOCUMENTS should be or were collected, and what measures are or were taken to ensure that all relevant documents are or were collected in response to requests for DOCUMENTS and THINGS propounded by IMPAX in this action."

Wyeth objects to Topic 34 as overly broad, unduly burdensome, irrelevant, and not described with reasonable particularity.  The burden on Wyeth to prepare a witness to address all aspects of this topic outweighs any possible, marginal relevance the information would have to any issue in this litigation.  Moreover, Wyeth has already provided Impax with a detailed answer

that addresses information embraced by Topic 34 in correspondence dated July 14, 2006. Wyeth further objects to this Topic to the extent that it seeks information subject to the attorney-client privilege or work product immunity. Subject to these objections, Wyeth will provide Rule 30(b)(6) deposition testimony on information not subject to the attorney-client privilege or work product immunity regarding the identity of each Wyeth employee from whom documents were collected in connection with Wyeth's document production to Impax.

## II.    Topics to which Wyeth objects in their entirety

As demonstrated below, many of Impax's deposition topics are not suitable for a proper Rule 30(b)(6) deposition. Wyeth objects to topics 1, 2, 17-18, 21, 24-27, 29, 31, and 33 of Impax's Amended Notice in their entirety for at least the reasons set forth below. These deposition topics are inappropriate in their entirety for a Rule 30(b)(6) deposition and should be quashed.

**Topic 1** of Impax's Notice calls for testimony on the "conception and reduction to practice of the alleged invention(s) claimed in each of the asserted claims of the PATENTS IN SUIT and claim 1 of U.S. Patent No. 6,274,171 B1."

Wyeth objects to Topic 1 on the grounds that it seeks Wyeth's legal contentions on conception and reduction to practice. Contentions are not appropriate topics for a Rule 30(b)(6) deposition in the District of Delaware.

Moreover, Wyeth has already provided dates of conception and reduction to practice in its supplemental response to Impax's Interrogatory No. 12 served on October 10, 2006. In addition, Wyeth has already produced non-privileged documents from which Impax may ascertain factual information pertaining to the legal issues involved. It would be unreasonable to burden Wyeth with preparing witnesses to marshal information Impax already has at its disposal.

In addition, Wyeth has agreed to provide non-privileged testimony regarding, for example, Topics 3-5, 7-9 and 11-14 as objected to above, which should provide Impax with much of the requested factual information.

Finally, Wyeth additionally objects to this topic as irrelevant and not reasonably calculated to lead to admissible evidence to the extent that it seeks any information pertaining to claim 1 of U.S. Patent No. 6,274,171 B1 because that claim is not being asserted in this litigation.

**Topic 2** of Impax's Notice seeks testimony on "[a]ll invention records CONCERNING the asserted claims of the PATENTS IN SUIT and claim 1 of the U.S. Patent No. 6,274,171 B1."

Wyeth objects to this topic as seeking information protected by the attorney-client privilege, as lacking reasonable particularity, and as unreasonably broad. Wyeth's invention records concerning the asserted claims at issue in this litigation reflect confidential communications between Wyeth employees and Wyeth counsel both made for the purpose of obtaining legal advice and reflecting legal advice in connection with protection of Wyeth's intellectual property related to extended release venlafaxine formulations. Inventor records were properly withheld from production as privileged and are not a proper subject for a Rule 30(b)(6) deposition. To the extent Impax is entitled to any general, non-privileged information regarding invention records, that information already has been produced. Specifically, Wyeth has already produced to Impax Rule 30(b)(6) deposition testimony from a previous Teva litigation concerning the same patents-in-suit. That testimony concerns, for example, Wyeth's general understanding of the purpose of invention records, the type of information generally recorded on the records, to whom such records are disclosed, and the general process of preparing the records in the early to mid-1990s.

Additionally, Wyeth objects to this topic as irrelevant and not reasonably calculated to lead to admissible evidence to the extent that it seeks any information pertaining to claim 1 of U.S. Patent No. 6,274,171 B1 because that claim is not being asserted in this litigation.

**Topic 17** seeks testimony on "For the years 1997 to the present, causes in any fluctuations of, and strategies to maintain or increase, the market share of EFFEXOR XR in the United States."

Wyeth objects to this topic as overly broad, unduly burdensome, and as not described with reasonable particularity. Moreover, much of the requested information has no relevance to any claim or defense raised in this lawsuit. Furthermore, Wyeth has already produced to Impax non-privileged documents from the marketing department for Effexor® XR from which Impax can ascertain the information it seeks. It would be unreasonable for Wyeth to bear the burden of marshalling facts and preparing witnesses on information equally available to Impax from Wyeth's document production.

**Topic 18** calls for testimony regarding "the reasons for and the results of market research conducted by or at the direction of WYETH regarding the treatment of the signs and symptoms of persons suffering from major depressive disorder in the United States" for the years 1997 to the present.

Wyeth objects to this topic as overly broad, unduly burdensome and as not described with reasonable particularity. For example, this topic is not limited to the patented invention and, thus, much of the information covered by this topic has no relevance to any claim or defense raised in this lawsuit. Moreover, Wyeth has already produced to Impax non-privileged documents relating to market research done in connection with Effexor® XR from which Impax can ascertain the information it seeks. It would be unreasonable for Wyeth to bear the burden of

12

marshalling facts and preparing witnesses on information equally available to Impax from Wyeth's document production.

**Topic 21** seeks privileged testimony regarding the "drafting, preparation, filing, prosecution, and intended meaning of the applications that matured into the PATENTS-IN-SUIT" (Topic 21).

Wyeth objects to this topic on the grounds that all of the requested information implicates information protected by the attorney-client privilege and/or work product immunity. Because the requested discovery is so intertwined with issues of attorney-client privilege and/or work product immunity, it is not appropriate for a Rule 30(b)(6) deposition.

Additionally, Wyeth objects to this topic on the grounds that it is irrelevant and not reasonably calculated to lead to admissible evidence to the extent that it seeks any information pertaining to the "intended meaning" of any passage of the patents-in-suit or statements made in the prosecution of the patents-in-suit. The only meaning that is relevant is the meaning to one skilled in the art.

**Topic 24** seeks testimony on "WYETH's standard practices and policies from 1990 to the present with respect to the prosecution of U.S. patent applications, including the preparation of invention disclosures, evaluation of inventions, performing prior art searches, preparing patent applications, informing inventors of their duty of candor to the Patent Office, gathering and submitting prior art during the course of patent prosecution, evaluation of U.S. Patent and Trademark Office actions and examiner amendments, drafting and review of responses to Office actions, decisions to file provisional, continuation or continuation-in-part applications, and decisions to abandon applications."

Wyeth objects to this topic on the grounds that all of the requested information implicates information protected by the attorney-client privilege and/or work product immunity. The preparation and prosecution of a patent are the "hallmark activities of a lawyer," and the District of Delaware protects communications between a client and patent attorney for the purpose of securing legal advice in connection with those proceedings as attorney-client privileged.

Additionally, Wyeth objects to this topic on the grounds that it is overly broad, irrelevant, and not reasonably calculated to lead to admissible evidence. Wyeth's standard policies and practices with regard to prosecution of U.S. patent applications dating before the prosecution of the patents-in-suit are not pertinent to this litigation.

**Topic 25** seeks testimony regarding "WYETH's knowledge of the development and formulation of any EXTENDED RELEASE FORMULATION comprising VENLAFAXINE by ALZA, including without limitation when WYETH first learned of the development and/or formulation, and its knowledge of any changes in the formulation."

Wyeth objects to this topic on the grounds that it is unduly burdensome, overly broad, irrelevant, and not reasonably calculated to lead to admissible evidence, particularly to the extent it seeks "WYETH's knowledge," as Impax defines "WYETH," in seeking information from countless numbers of people who are not primarily involved in the issues concerning this case. Wyeth's worldwide resources include 52,000 employees operating in more than 100 countries and spanning four continents. Moreover, this topic is unbounded in time, lacks reasonable particularity, and is overly broad to the extent it seeks testimony concerning "EXTENDED RELEASE FORMULATION comprising VENLAFAXINE by ALZA."

**Topic 26** calls for testimony on "WYETH's knowledge of the *in vitro* and/or *in vivo* release profile of any EXTENDED RELEASE FORMULATION comprising VENLAFAXINE

14

by ALZA, including without limitation when WYETH first learned of the release profile, and its knowledge of any changes in the profile, and any dissolution, clinical, or other testing of the profile."

Wyeth objects to this topic on the grounds that it is unduly burdensome, overly broad, irrelevant, and not reasonably calculated to lead to admissible evidence, particularly to the extent it seeks "WYETH's knowledge" as Impax defines "WYETH" in requesting information from countless numbers of people who are not primarily involved in the issues concerning this case. Wyeth's worldwide resources include 52,000 employees operating in more than 100 countries and spanning four continents.

Moreover, this topic is unbounded in time, lacks reasonable particularity, and is overly broad to the extent it seeks testimony concerning "any EXTENDED RELEASE FORMULATION comprising VENLAFAXINE by ALZA."

**Topic 27** calls for testimony on "WYETH's knowledge of studies, tests, trials, research, or experiments conducted prior to July 16, 2002, that compare chemical properties, including without limitation solubility, of propranolol and its salts, with that of VENLAFAXINE and its salts."

Wyeth objects to this topic on the grounds that it is overly broad, irrelevant, not reasonably calculated to lead to admissible evidence and not described with reasonable particularity. For example, it seeks over two decades of "WYETH's knowledge," as Impax defines "WYETH," from countless numbers of people who are not primarily involved in the issues concerning this case. Wyeth's worldwide resources include 52,000 employees operating in more than 100 countries and spanning four continents.

15

Moreover, Wyeth has produced non-privileged documents pertaining to Inderal® LA (extended release propranolol) contained in the personal files of the inventors of the patents-in-suit and non-privileged documents located in the archived Rouses Point Pharmaceutical Sciences department administrative chronological files (the department files for the department in which the inventors worked) pertaining to Inderal® LA that were authored or received by any of the inventors of the patents-in-suit.

Finally, Impax has not articulated any relevance for a comparison of the chemical properties of venlafaxine and propranolol to this litigation.

**Topics 29 and 31** seeks testimony on "WYETH's awareness" of two articles published in 1997.

Wyeth objects to these topics on the grounds that they are vague, ambiguous, unduly burdensome, overly broad, irrelevant, not reasonably calculated to lead to admissible evidence, and not described with reasonable particularity to the extent they seek "WYETH's awareness" because as Impax defines "WYETH" it seeks information from countless numbers of people who are not primarily involved in the issues concerning this case. Wyeth's worldwide resources include 52,000 employees operating in more than 100 countries and spanning four continents. In addition, the term "awareness" is vague and ambiguous.

Moreover, Wyeth has agreed to provide non-privileged testimony for topics 30 and 32 which request information regarding "The persons at WYETH involved in drafting, reviewing, editing, commenting on, or revising the drafts" of these articles as described above.

**Topic 33** calls for testimony on the "facts and DOCUMENTS CONCERNING the denials and statements in WYETH'S REPLY."

Wyeth objects to Topic 33 on the grounds that it seeks Wyeth's contentions which are not appropriate topics for a Rule 30(b)(6) deposition in the District of Delaware.    Moreover, divulging this information to Impax would require disclosing information protected by the attorney work product immunity.    Topic 33 seeks testimony on the facts and documents concerning the denials and statements in Wyeth's Reply to First Amended Counterclaims of Impax (which itself contains 57 numbered paragraphs and is twelve (12) pages long) encompassing every issue in the case.  Wyeth cannot reasonably be expected to produce a Rule 30(b)(6) witness for each of these diverse subjects, all encompassed by just *one* of Impax's topics.

EXHIBIT 3



901 New York Avenue, NW ▪ Washington, DC  20001-4413 ▪ 202.408.4000 ▪ Fax 202.408.4400
www.finnegan.com

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

BARBARA R. RUDOLPH
202.408.4346
barbara.rudolph@finnegan.com

November 29, 2006

Daniel N. Kassabian, Esq.                                **VIA FACSIMILE**
Heller Ehrman LLP
333 Bush Street
San Francisco, CA  94104

_Wyeth v. Impax Laboratories, Inc.,_ Civil Action No.: 06-222 (D. Del.)

Dear Daniel:

I am writing in response to your November 20, 2006 Notice of a Rule 30(b)(6) deposition containing _sixty-nine (69)_ deposition topics.  Impax's Notice simply is not appropriate.  The number and breadth of the topics is oppressive, and would require undue burden and expense on the part of Wyeth to comply with that Notice.  Many of the topics are directed towards Wyeth's contentions, and therefore are not appropriate subjects for a Rule 30(b)(6) deposition.  In essence, Impax's Notice prematurely and improperly asks Wyeth to marshal all of its factual proofs on numerous, overbroad and complex topics that largely call for Wyeth's contentions on patent infringement, patent validity, patent enforceability, prior art, claim construction and patent prosecution, just to name a few.  Such subject matter is not appropriate for Rule 30(b)(6) discovery because of the interplay between complex facts, law and expert analyses and the unreasonableness of requiring a corporate representative to formulate Wyeth's contentions in response to deposition questions.

Furthermore, not only is the sheer number of overly broad topics oppressive, but many, if not most, of the topics lack reasonable particularity.  It therefore would be unduly burdensome and unreasonable to require Wyeth to prepare an individual to respond to these overbroad topics.  We further note that Impax's Notice improperly asks Wyeth to designate "the person(s) with the most knowledge regarding the subjects for which they have been designated to testify."  Rule 30(b)(6) has no such requirement.

**Impax's Notice Improperly Encompasses Contention Discovery**

The following listed topics amount to contention discovery and therefore are not appropriate topics for a Rule 30(b)(6) deposition:  Topics 1 and 9 (conception and reduction to practice); Topics 5 and 6 ("release profiles"); Topics 10 and 11 (support for certain claim limitations); Topics 14-18 and 28 (secondary considerations of non-obviousness of the patented invention); Topics 19-23 (public use, sale, offer for sale, experimental use); Topics 26-27 (written description); Topics 34-35 (evaluations of

Washington, DC ▪ Atlanta, GA ▪ Cambridge, MA ▪ Palo Alto, CA ▪ Reston, VA ▪ Brussels ▪ Taipei ▪ Tokyo

Daniel N. Kassabian, Esq.
November 29, 2006
Page 2

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

scope, validity, enforceability, and patentability of inventions claimed of patents-in-suit); Topic 36 (relating to alleged "equivalents" to microcrystalline cellulose); Topics 41-46 and 55 (support and intended meaning of various patent applications, passages in patent specifications, or statements in prosecution history); Topic 64 (the "effect" of the vacated *Markman* Opinion and Order from the *Teva* litigation); Topic 65 (scope of the claims in the patents-in-suit); and Topics 66-67 (allegations, denials and statements in Wyeth's Complaint and Reply). All of these topics amount to an attempt to elicit testimony as to Wyeth's contentions. Moreover, it is unreasonable to require an individual to be prepared to marshal all facts in support of a contention or determine the legal contours of a claim to determine what facts are relevant.

It is well settled that Rule 30(b)(6) is not an appropriate vehicle for the discovery of a party's contentions. Because these topics seek Wyeth's contentions as to the legal issues covered by the topics, the topics are more appropriately propounded as contention interrogatories, to the extent that Impax is entitled to the discovery. And indeed, Impax has already propounded contention interrogatories, to which Wyeth has already responded or will shortly respond, as set forth in our letter of November 27, 2006.

Furthermore, Wyeth has already produced non-privileged documents as well as certain pleadings, expert reports, and deposition transcripts from the *Teva* litigation from which Impax may ascertain factual information pertaining to the legal issues involved, focus on the additional facts it believes it needs, and explore those additional facts via further written discovery or personal deposition. It would be unreasonable to burden Wyeth with preparing Rule 30(b)(6) witnesses to marshal information Impax already has at its disposal or can readily obtain through proper channels of discovery.

## Impax's Notice Improperly Implicates Subject Matter Protected By The Attorney-Client Privilege or Work Product Immunity

The topics discussed above and other topics also are objectionable because they seek information protected by the attorney-client privilege and/or work product immunity. *See also, e.g.,* Topic 2 (invention records); Topic 37 (decision to submit patent applications); Topics 41-46 and 55 (drafting, preparation, filing, prosecution, and/or intended meaning of patent applications); and Topics 47-49 (standard practices regarding prosecution of patent applications). Discovery that is so intertwined with issues of attorney-client privilege and/or work product immunity is best conducted through other means.

## Impax's Notice Improperly Embraces Expert Opinion

Furthermore, discovery regarding many of these topics is best left for expert discovery. As just one example, Topic 36, relating to "compounds that are equivalents to microcrystalline cellulose. . . including the function of those equivalent compounds," is clearly overbroad. Wyeth has already responded to Impax's contention interrogatory

Daniel N. Kassabian, Esq.
November 29, 2006
Page 3

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

seeking an equivalence analysis between microcrystalline cellulose and Impax's generic copy. Further discovery on such a topic would clearly be the subject of expert discovery. Similarly, Topics 5 and 6 ("*in vitro* and *in vivo* release profiles"); Topic 12 (contents of parts of NDA No. 20-699); Topic 13 (clinical studies); Topics 14-18 and 28 (secondary considerations of non-obviousness); Topics 26-27 (written description); Topics 29-33 (sales and marketing); Topics 34-35 and 65 (scope, validity, enforceability, and patentability of patents in suit); and Topics 60 and 63 (clinical data) also implicate expert discovery.

## Impax's Notice Contains Topics Which Lack Reasonable Particularity, Are Overly Broad, and Are Impossible to Comply With

Topics 1-6, 9-13, 17-18, 24-27, 29-35, 38-41, 45-54, 56-63, 65-69 do not define subject matter with reasonable particularity and would subject Wyeth to an impossible task in preparing a witness. For example, Topics 3 and 5 seek information on "the formulation of EFFEXOR XR and the development thereof" and "the *in vitro* and *in vivo* release profiles" of Effexor XR; similarly, Topics 4 and 6 seek information on the "development and formulation of any EXTENDED RELEASE FORMULATION comprising VENLAFAXINE by WYETH" and "the *in vitro* and/or *in vivo* release profiles of any EXTENDED RELEASE FORMULATION comprising VENLAFAXINE by WYETH;" Topics 50 and 51 seek similar information regarding "any EXTENDED RELEASE FORMULATION comprising VENLAFAXINE by ALZA." These topics are impermissibly broad. The sheer volume of research, development, analysis and testing required of Wyeth to obtain FDA approval for just Effexor XR is staggering. For example, pharmaceutical formulation, dissolution, stability, toxicology, scale-up to commercial production, quality control, animal testing, clinical trials on safety, bioavailability, and efficacy are included within these topics. It would be unduly burdensome—if even possible—to prepare a witness or witnesses for a deposition on so many diverse topics having virtually no meaningful limitation, some of which have no relevance to any issue in this lawsuit. To the extent these topics cover *other* forms of extended release venlafaxine, including those outside the scope of the patents in suit, they are unduly burdensome.

Topics 9-13 and 52-54, are also impossibly broad, as they are directed to reduction to practice; clinical studies; "development;" and/or "knowledge" of such activities, of various formulations. It would be impossible to prepare a witness or witnesses on all aspects of the subject matter covered by these topics. Topic 13, for example, directed to 14 pharmacokinetic and clinical trials, encompasses a vast array of subjects including the selection and monitoring of study centers, the blinding and packaging of dosage forms, the collection and compilation of data from individual patient files etc. It is simply unreasonable to expect Wyeth to prepare witnesses on all possible aspects of these studies.

Topics 52 to 53, seeking information on Inderal® LA and other extended release formulations of propranolol, and Topic 54, directed to "WYETH's knowledge" of studies

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

conducted prior to July 16, 2002 that "compare chemical properties ... of propranolol and its salts, with that of VENLAFAXINE and its salts," are likewise unreasonable. Wyeth objects to these topics as overly broad, vague and ambiguous, unduly burdensome, and irrelevant to any issue in this lawsuit. The topics encompass over 20 years of research, development, testing, analysis, scale-up, quality control, clinical studies, and other activities concerning a product that does not contain venlafaxine and is not a subject of this lawsuit. To prepare a witness to handle all these aspects of propranolol, including Wyeth's Inderal® LA product, would be impossible. Moreover, Wyeth has produced all documents pertaining to propranolol that can be located within the inventor's personal files. Furthermore, Impax has the deposition transcripts of the inventors of the patents in suit from the previous *Teva* litigation, and is free to depose them again regarding the role, if any, of propranolol and/or Inderal® LA in the development of extended release venlafaxine. Wyeth submits that any additional discovery pertaining to propranolol/Inderal® LA would be unduly burdensome and irrelevant to this lawsuit.

Topics 24 and 25 seek testimony on "[a]ny non-disclosure or confidentiality agreements in existence prior to March 25, 1996" regarding Effexor XR and "the alleged invention(s) claimed in the PATENTS-IN-SUIT," respectively. Wyeth objects to these topics as overly broad, vague and ambiguous, unduly burdensome, and irrelevant to any issue in this lawsuit. Impax has not articulated any basis for which it needs testimony on these subjects. The burden of preparing a witness or witnesses on all aspects of the subject matter covered by these topics outweighs any possible relevance.

Topics 29-33 seek testimony on revenue, expenses, profitability, market share, market research, advertising and promotional efforts for Effexor XR or, in the case of Topic 33, Effexor. These topics are overly broad and unduly burdensome and lacking in reasonable particularity in calling for financial information and marketing efforts without suitable limitations. Much of the requested information has no relevance to any claim or defense raised in this lawsuit. Furthermore, Wyeth has already produced non-privileged documents to Impax from which Impax can ascertain the information it seeks, to the extent it is entitled to it. It would be unreasonable for Wyeth to bear the burden of marshalling facts and preparing witnesses on information equally available to Impax from Wyeth's document production and/or from information in the public domain.

Wyeth likewise objects to Topics 38-40 seeking the names of individuals who, without limitation in time or scope, "received originals and/or copies of correspondence to and/or from" U.S., Canadian, and European Patent Offices with respect to certain patent applications as overly broad, vague and ambiguous, unduly burdensome, and irrelevant to any issue in this lawsuit. It is unreasonable to require a corporate representative to recite the names of such individuals in response to deposition questions.

Daniel N. Kassabian, Esq.
November 29, 2006
Page 5

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

Topics 56-63 are directed to virtually every aspect surrounding certain publications, including "WYETH's awareness" of the articles, all persons involved in "drafting, reviewing, commenting on, or revising" the articles, all clinical data underlying the articles, and even, with respect to one article, the confidentiality agreements and grants, stipends, or other monetary support associated with the author. It would be unduly burdensome to prepare a witness or witnesses to cover this diverse and largely irrelevant subject matter.

Similarly, Topic 68 seeks, without limitation in time or scope, Wyeth's "organizational structure...including, the names, job titles, and duties of each PERSON employed by WYETH related to the research, design, development, manufacture, operation, sales and marketing of the alleged invention(s) claimed in the PATENTS IN SUIT, EFFEXOR XR, and any EXTENDED RELEASE FORMULATION comprising VENLAFAXINE." A Rule 30(b)(6) deposition obviously is an inappropriate vehicle to obtain such information, as it would require Wyeth to investigate the status and duties of hundreds of employees throughout the company, and a single individual to memorize and recite them in response to deposition questions. Impax also has offered no explanation why such broad reaching information is probative of any issue in the case. The same holds true for Topic 69, which seeks, without limitation in time or scope, Wyeth's "procedures for collecting and maintaining DOCUMENTS and/or THINGS in their central files, archival or storage locations, and/or kept by individual employees."

## Impax's Notice Improperly Embraces Subject Matter Already the Subject of Prior Rule 30(b)(6) Depositions

Furthermore, with respect to Topic 7 (examples 1 through 7 of the patents in suit), Topic 8 (Tables 1 through 3 of the patents in suit), Topic 13 (clinical studies relating to Effexor XR), and Topics 29-32 (market share, advertising and promotional efforts for Effexor XR), Wyeth already provided Rule 30(b)(6) testimony on these topics in the *Teva* litigation. Wyeth has produced those deposition transcripts and deposition exhibits. It would unreasonable to subject Wyeth to the same deposition when Impax already has the requested information at its disposal.

## Impax Can Obtain the Discovery it Requires Through Other Means

Aside from implicating questions of privilege and work product, and improperly seeking Wyeth's contentions, Impax's approach is improper on its face.[1] Wyeth cannot analyze this massive volume of documents and interview potentially scores of its employees so as to answer every conceivable question Impax may have on each of these broad topics. In sum, the burden on Wyeth of having to prepare one or more

---

[1] The above discussion should not be construed as a complete recitation of objections for each Topic, but is instead meant to be illustrative of the problems that Impax's Notice raises.

Daniel N. Kassabian, Esq.
November 29, 2006
Page 6

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

witnesses on each of the Notice's 69 topics would be an insurmountable challenge, creating an unfair, unworkable burden on Wyeth with the threat of the imposition of inappropriate sanctions, including preclusion of proofs.

We suggest a more rational approach to obtaining the discovery Impax seeks. The information that Impax seeks is more properly available through the documents Wyeth has produced in this litigation as well as the pleadings, expert reports, deposition transcripts and exhibits of fact witnesses, expert witnesses, and Rule 30(b)(6) witnesses from the Teva litigation that Wyeth produced to Impax, as well as Wyeth's interrogatory responses. These sources address Rule 30(b)(6) topics in Impax's Notice and identify individuals that may have knowledge concerning the various topics. Moreover, Impax can take personal depositions of fact witnesses with personal knowledge of the facts. The parties can revisit the need for Rule 30(b)(6) deposition testimony in this case on specific, particularized topics in view of that testimony and the prior deposition testimony in the *Teva* case.

We are, of course, willing to further discuss Impax's request for a Rule 30(b)(6) deposition at this time, if Impax can limit the scope of its Notice to proper and particularized topics. Please feel free to contact us to discuss this further. In the meantime, we ask that you promptly withdraw your Notice so that we are not forced to seek a Protective Order from the Court.

Sincerely,

Barbara Rudolph

Barbara R. Rudolph

BRR/jkl

cc:    Mary B. Matterer, Esq. (via facsimile)
       Richard K. Herrmann, Esq. (via facsimile)

EXHIBIT 4

# HellerEhrman LLP

December 15, 2006

Daniel N. Kassabian
Daniel.Kassabian@hellerehrman.com
Direct +1.415.772.6098
Direct Fax +1.415.772.1796
Main +1.415.772.6000
Fax +1.415.772.6268

40443.0005

*Via E-mail and U.S. Mail*

Barbara R. Rudolph, Esq.
Finnegan Henderson Farabow
 Garrett & Dunner LLP
901 New York Ave., N.W.
Washington, D.C. 20001-4413

Re:    **Wyeth v. Impax Laboratories, Inc.**
       **U.S. District Court, District of Delaware, Civil Action No. 06-222 JJF**

Dear Barbara:

I write in response to your letter dated November 29, 2006 in which Wyeth objects to Impax's Rule 30(b)(6) notice. I note at the outset that your objection to the number of topics noticed is not meaningful because each of these topics is drawn to elicit facts that are relevant to this litigation and that are in Wyeth's possession, as further explained below. Moreover, contrary to the assertion in your letter, the topics are drawn with particularity in order to provide Wyeth adequate notice of the facts sought by the examination. Furthermore, Impax's notice correctly indicates that Wyeth is obligated to prepare a witness to testify as to these subjects, and Impax's request that the person so prepared also be the most knowledgeable as to a particular topic was to avoid potentially wasting the time of all involved, and is in conformity with the case law. *See, e.g., FDIC v. Butcher*, 116 F.R.D. 196, 201 (E.D. Tenn. 1986) ("The FDIC's strategy in connection with the deposition of Mr. Hall was to have him examine the work papers, CCA records and credit files in connection with the WKIC claimed loss. . . . He was then presented to counsel for defendants as a 30(b)(6) witness for them to try and guess what information they should ask about with regard to the claimed losses. I realize that the FDIC does not have to prepare the other side's case but to engage in a game of 'pin the tail on the donkey' with defendants at this stage of the proceedings is uncalled for."). Preparing the person most knowledgeable as an initial matter, instead of preparing an in-house attorney with no personal knowledge as to the relevant facts for example, will reduce the burden of preparation by Wyeth and may eliminate the need for a second personal deposition of the person most knowledgeable. Indeed, one problem with your suggested alternative that Impax personally notice or subpoena those who would appear to have personal knowledge is that, due to the passage of time since Wyeth's early attempts to develop a extended release venlafaxine formulation, these persons may have faded memories

---

Barbara R. Rudolph, Esq.
December 15, 2006
Page 2

HellerEhrman LLP

and are under no obligation to refresh their own recollection in preparing to testify as to these matters. This problem was pervasive throughout the personal depositions of percipient fact witnesses of Wyeth, including the named inventors of the patents-in-suit, in the *Teva* litigation during which many witnesses could not recall seeing documents that were sent to them, and otherwise could not recall their participation in the development in the extended venlafaxine product. Finally, before addressing your more specific concerns by topic below, I note these specific concerns raise issues with each and every noticed topic, and thus appears to be a delay tactic to prevent Impax from taking Wyeth's deposition on any topic in December, as noticed. I hope that I am incorrect in this regard, and that we can resolve any issues as to the first set of topics regarding prosecution history—i.e., topic nos. 37-49— so that we can schedule a deposition on these at a mutually agreeable date and time this month.

**Topic Nos. 1, 5-6, 9-11, 14, 18-23, 26-28, 34-36, 41-46, 55, 64-67 Seek Relevant Facts Within Wyeth's Possession Irrespective Of Whether Those Facts Serve As A Basis For Wyeth's Contentions.**

Your letter mischaracterizes these topics as contention discovery, especially since no topic in Impax's notice calls for testimony regarding a Wyeth "contention." By way of comparison, Impax has sought discovery on Wyeth's contentions through interrogatories, which is proper. Instead, these deposition topics seek facts about the patents-in-suit, or the circumstances surrounding the patentability of the inventions claimed therein, all of which are in Wyeth's possession that are highly relevant to this case. Just because Wyeth may have positions in this case as to these subjects does not render the underlying facts in support of those positions outside of the scope of Rule 30(b)(6) deposition. To the contrary, Impax must be allowed to depose the corporation to test the veracity of those factual underpinnings. In any case, to the extent deposition topics like these have been characterized as contentions, courts have found that a Rule 30(b)(6) deposition should proceed as to any factual support for such contentions known by the corporation. *See, e.g., Ecrix Corp. v. Exabyte Corp.*, 95 F. Supp. 2d 1155, 1158 (D. Colo. 2000) ("Here, Ecrix does not seek the mental impressions of Exabyte's counsel or experts. Rather it requests information in Exabyte's possession on which Exabyte based and bases its assertions that Ecrix has infringed its patents. The information is relevant to Ecrix's claims of patent misuses and antitrust violations.")

**Topic Nos. 2, 37, 41-49, And 55 Seek Neither Attorney-Client Communications Nor Attorney Work Product**

Contrary to your assertion, these topics were specifically drawn to seek non-privileged information about the actual research and development conducted by Wyeth that resulted in the conception, reduction to practice, and enablement of the claims and disclosures of the patents-in-suit and the mental impressions of the attorneys who drafted them. For example, the topic regarding invention records (no. 2) seeks non-privileged testimony about the

HellerEhrman LLP

Barbara R. Rudolph, Esq.
December 15, 2006
Page 3

documents that Wyeth claims evidence any conception or reduction to practice of any patent claims. Because these invention records should have been produced, testimony regarding their subject matter clearly is not privileged.

As for the remaining topics, they seek Wyeth's knowledge, through its prosecuting attorney agents, of the basis for drafting various parts of the applications that resulted in the patents-in-suit. Thus, these topics do not seek privileged communications to or from the prosecuting attorney, but the attorneys' specific knowledge of factual support in their drafting of the statements made in the applications resulting in the patents-in-suit. In light of Impax's inequitable conduct claim, this knowledge is an issue in this litigation. *See Environ Prods., Inc. v. Total Containment, Inc.*, 1996 WL 494132, *4 (E.D. Pa. Aug. 22, 1996). Moreover, there is no basis to assert the work product privilege because such is restricted to situations where litigation is expected or pending (*see* Fed. R. Civ. P. 26(b)(3)) and these patents were prosecuted long before any litigation occurred. *Cf. Beasley v. Avery Dennison Corp.*, 2006 WL 2854396, *3 (W.D. Tex. Oct. 4, 2006) ("the work product immunity applies if the primary concern of the attorney is with future litigation rather than the ongoing patent application prosecution. Alternatively, the work product immunity does not apply if the primary concern is with claims raised in the *ex parte* patent application prosecution."); *Conner Peripherals, Inc. v. Western Digital Corp.*, 1993 WL 726815, *4 (N.D. Cal. June 8, 1993); *Hercules Inc. v. Exxon Corp.*, 434 F. Supp. 136, 152 (D. Del. 1977).

**Topic Nos. 5-6, 12-18, 26-28, 34-36, 60, 63, And 65 Do Not Exclusively Embrace Expert Opinion**

Your letter indicates that Impax's notice sets forth topics best left for expert discovery. However, the very example you cite—topic no. 36—is demonstrably not exclusively the subject of expert testimony. Wyeth is a large pharmaceutical company that uses microcrystalline cellulose and other chemical compounds in manufacturing extended release and other drugs. Surely, Wyeth has an understanding as to which chemical compounds are interchangeable with microcrystalline for certain purposes, which forms the basis of its assertion of infringement under the doctrine of equivalents in filing this suit against Impax. Wyeth's knowledge in this regard is subject to discovery pursuant to a Rule 30(b)(6) deposition. *See, e.g., Smithkline Beecham Corp. v. Apotex Corp.*, 2004 WL 739959, *4 (E.D. Pa. Mar. 23, 2004) ("However, SmithKline claims that questions about *in vivo* conversion of paroxetine hydrochloride require expert testimony, and that such testimony is premature. We disagree. If SmithKline has concluded that its patents are infringed when paroxetine hydrochloride converts to a different form inside the body, it must have some basis for that belief, and Alphapharm is entitled to discover that information. . . . Accordingly, SmithKline is ordered to prepare a witness to testify to the matters described in Category 1."); *AMP Inc. v. Melox Inc.*, 1985 WL 2284, *1 (N.D. Ill. Aug. 9, 1985) ("Plaintiff suggests that only an expert can testify on these issues. However, the court doubts that no non-expert

HellerEhrman<sub>LLP</sub>

Barbara R. Rudolph. Esq.
December 15, 2006
Page 4

representative could testify thereon, since plaintiff's agents and representatives made the decision to file this lawsuit. At least an agent responsible for inventing the patented devices could be deposed."). Similarly as to the remainder of the topics noted, just because Wyeth may seek to use experts to support its positions in the litigation as to these subjects, it does not mean that Wyeth is not without knowledge of these very topic surrounding its patents-in-suit. Indeed, Impax is entitled to test the reliability of the data or information from Wyeth relied upon by its experts making opinions in this litigation, by deposing its corporate representatives that are knowledgeable as to *in vivo* and *in vitro* release profiles, secondary considerations of nonobviousness, sales and marketing, and clinical data, among others.

**Topic Nos. 1-6, 9-13, 17-18, 24-27, 29-35, 38-41, 45-54, 56-63, And 65-69 Do Not Lack Reasonable Particularity, Are Not Overly Broad, and Are Not Impossible to Comply With**

Your letter generally asserts that each of these topics encompasses too much information to prepare a witness on. This assertion fails for two reasons: (1) Wyeth does have persons knowledgeable on each of these topics, such that having these persons testify on the corporation's behalf about the information they know is not unduly burdensome; and (2) Wyeth can designate more than one witness on each of these topics. Also contrary to your assertion, a witness is not required to memorize names or other relevant matters; a witness can bring documents with him or her, and prepare documents, notes or anything else that may help him or her testify as to Wyeth's corporate knowledge. Indeed, it appears that Wyeth intends to rely on what it considers to be years of research, development and testing, followed by years of sales of Effexor XR, to show the patentability of the various claims of the patents-in-suit. Thus, Wyeth cannot claim that topics that seek to explore these assertions in a number of particular, relevant areas are somehow unduly burdensome for such a large pharmaceutical company.

**Impax's Notice Embracing Subject Matter On Which Wyeth Was Previously Deposed Is Irrelevant**

We are astounded that your letter asserts that, in view of another litigant's questioning of Wyeth in another litigation, Impax should somehow be precluded from conducting questioning in this case. We are unaware of any case law that supports such a proposition. It also appears to counter the tenet that every litigant has their day in court, which is embedded in American jurisprudence and which is why *res judicata* does not apply to a litigant that did not participate in a prior litigation. If Wyeth is asserting that Impax should simply be bound by what transpired in the *Teva* litigation when Impax did not participate in that litigation, then why does Wyeth take a contrary position by refusing to be bound by the *Markman* opinion in that case when Wyeth did fully participate in it? Wyeth has chosen to sue in a district other than its home district of New Jersey so as to avoid the adverse outcome there. It cannot now

HellerEhrman LLP

Barbara R. Rudolph, Esq.
December 15, 2006
Page 5

indicate that Impax must be bound to what transpired in that case when Wyeth itself has refused to do so.

**Impax's Notice Sets Forth Topics That Are Properly The Subject Of A Deposition**

Your letter suggests an alternate approach of simply relying on documents and pleadings produced in the *Teva* litigation, in combination with Wyeth's responses to interrogatories, as prepared by its counsel. Clearly, this approach is "rational" to the extent that the goal of discovery is to minimize any inconvenience to Wyeth—but this is not the case. Impax is entitled to test the veracity of Wyeth's factual assertions in this case by deposing corporate representatives with knowledge of those facts. Nor can Wyeth dictate the order in which Impax decides to take its depositions in this case, and as noted above, it would appear that preparation of witnesses knowledgeable on topics would more likely avoid personal depositions of the same. Again, I note that your letter as a whole objects to each and every topic noticed by Impax, and Wyeth's failure to acknowledge that at least one topic is the proper subject of a deposition only demonstrates that these objections serve as yet another delay tactic to designed to prevent Impax from obtaining discovery in this case.

Putting aside Wyeth's obvious motives in asserting the baseless objections in your letter, we are willing to meet and confer by telephone next week to discuss the matter further. As I will be out of the office during that time, please contact Jessica Wolff or Sam Ernst about scheduling such a meet and confer.

Best regards,

Daniel N. Kassabian

cc:    M. Patricia Thayer, Esq.
Jessica R. Wolff, Esq.
Samuel F. Ernst, Esq.
Linda A. Wadler, Esq.
Mary B. Matterer, Esq.
Jack B. Blumenfeld, Esq.
Karen Jacobs Louden, Esq.

SF 1330038 v1
(40443.0005)

EXHIBIT 5



901 New York Avenue, NW ▪ Washington, DC 20001-4413 ▪ 202.408.4000 ▪ Fax 202.408.4400
www.finnegan.com

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

BARBARA R. RUDOLPH
202.408.4346
barbara.rudolph@finnegan.com

January 8, 2007

Daniel N. Kassabian, Esq.                                              *VIA FACSIMILE*
Heller Ehrman LLP
333 Bush Street
San Francisco, CA 94104

<u>*Wyeth v. Impax Laboratories, Inc.*, Civil Action No.: 06-222 (D. Del.)</u>

Dear Daniel:

    We are writing in response to your letter of December 15, 2006, regarding
Impax's Rule 30(b)(6) deposition notice ("Impax's Notice"). We note that you have
made no attempt to either reduce the number, or narrow the scope of, the noticed
topics. As such, Impax's Notice remains oppressive and unduly burdensome. Given
the sheer number and overly broad scope of topics, the proposed Rule 30(b)(6)
deposition is simply unworkable. Moreover, your request that we designate the "most
knowledgeable person" for each subject in lieu of preparing one witness to cover
multiple areas, combined with your blithe assertion on page 4 of your December 15th
letter that "Wyeth can designate more than one witness" per topic when there are sixty-
nine separate topics does nothing to alleviate Wyeth's burden. Impax is unreasonably
demanding that Wyeth produce an unnecessarily large number of witnesses to testify as
to their respective areas of particularized knowledge. Moreover, much of the
information covered by Impax's topics is irrelevant to the issues raised in this litigation.

    Furthermore, *FDIC v. Butcher*, 116 F.R.D. 196 (E.D. Tenn. 1986), upon which
you rely, does not require Wyeth to designate the "most knowledgeable person" as you
suggest. It instead requires the noticed party "to *prepare* its Rule 30(b)(6) witnesses to
speak *for the corporation* on all discoverable information and to give full, complete and
unevasive answers." *Id.* at 201.[1] This point precisely highlights the problem with
Impax's Notice—for Wyeth to fully comply with this obligation for all sixty-nine topics,

---

    [1] In *FDIC v. Butcher*, the Court found that the witnesses were not adequately
prepared, based in large measure on the fact that they were not able to enlighten the
defendants as to what the FDIC's contentions were with respect to the alleged
malfeasance or nonfeasance of each defendant, to the point of being unable to identify
which particular loans were at issue. Here, Wyeth already has provided detailed
information about its contentions on those issues for which it bears the burden of proof,
and, in addition, voluminous materials on issues for which Impax bears the burden of
proof through its responses to interrogatories. The case is, therefore, inapposite.

Daniel N. Kassabian, Esq.
January 8, 2007
Page 2

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

most of which are exceedingly broad in scope, would be enormously burdensome, if even possible. In addition, Impax's Notice includes topics that implicate the attorney-client privilege and/or are more appropriately explored during expert discovery. Absent any good faith effort to carve out focused, reasonable topics for a Rule 30(b)(6) deposition, Wyeth will be forced to seek a protective order from the Court.

We respond to your comments pertaining to our specific concerns below, but first note that, given the sheer breadth of Impax's Notice and Impax's complete failure to even attempt to limit the scope of the noticed topics, Impax's characterization of our November 29th letter objecting to Impax's Notice as a "delay tactic" is particularly inappropriate. Upon receipt and careful analysis of Impax's Notice, we promptly and succinctly articulated our legitimate concerns with your approach to the proposed Rule 30(b)(6) discovery, and suggested in good faith the alternative approach of having Impax first review the production documents, *Teva* litigation deposition transcripts and expert witness materials, take personal depositions, and then identify appropriate topics for a Rule 30(b)(6) deposition.

We believe that both parties have worked hard to resolve disputes in an amicable and professional manner, and have been largely successful at fashioning compromises without the need to seek the Court's intervention. Thus, rather than attempting any "delay," we suggested a procedure that we believe would expedite the process of focusing discovery on truly disputed issues.

**Impax's Notice Seeks Contention Discovery, Which Is Not Appropriate for a Rule 30(b)(6) Deposition**

As discussed in our letter of November 29, 2006, Topics 1, 5, 6, 9-11, 14-23, 26-28, 34-36, 41-46, 55, and 64-67 amount to contention discovery, since they seek Wyeth's contentions on various issues, which are not appropriate topics for a Rule 30(b)(6) deposition in the District of Delaware.[2] That none of these topics explicitly recite the word "contention" does not alter this conclusion.[3] *Pharmacia & Upjohn Co. v.*

---

[2] *Axiohm IPS, Inc. v. Epson Am., Inc.,* C.A. No. 00-420-SLR (D. Del. Mar. 28, 2001) (transcript of hearing before Chief Judge Robinson at 4) ("[W]e don't do contention depositions in this district."); *Tiegel Manu Co. v. Globe Union, Inc.,* C.A. No. 84-483 at 14 (D. Del. Oct. 5, 1984) (noting that "[i]t has been the consistent position of this Court" that witnesses should not be required to testify as to contentions; instead, contention discovery is confined to interrogatories).

[3] By way of example only, Topics 14 ("[a]ny unexpected properties or unexpected results of the alleged invention(s) claimed in the PATENTS-IN-SUIT as compared to the alleged invention(s) claimed in U.S. Patent No. 4,535,186"), 17 ("[a]ny evidence that the alleged inventions(s) claimed in the PATENTS IN SUIT satisfied a long-felt need"), 26 ("[a]ll written description support, either explicit or inherent, in the specification of the PATENTS IN SUIT for each of the claims therein"), 64 ("WYETH's understanding as to

Daniel N. Kassabian, Esq.
January 8, 2007
Page 3

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

*Sicor, Inc.,* C.A. No. 04-833-KAJ (D. Del. Oct. 11, 2005) (transcript of hearing before Judge Jordan at 36; finding "good force to the argument" that "inserting of the word 'facts' doesn't make [a deposition topic] less of an effort to get at what is essentially the legal position of the party ...."). And contrary to your assertion, Rule 30(b)(6) depositions should not be used to discover the bases for a party's legal positions.[4] Indeed, Impax's topics listed above are "so broadly worded, it can't help but really be a circumstance where somebody is asked to know every fact pertaining to every contention and that's a little bit much to put on a deponent." *Pharmacia* at 37. Therefore, we cannot agree with your assertion that Impax is entitled to Rule 30(b)(6) deposition testimony on the above-identified topics seeking contentions.

**Impax's Topics Lack Reasonable Particularity and are Unreasonably Broad**

Rule 30(b)(6) requires a party noticing a corporation for a deposition to "describe with reasonable particularity the matters on which examination is requested." Fed. R. Civ. P. 30(b)(6). In addition, Rule 26(b) limits the scope of permissible discovery to "any matter, not privileged, that is *relevant to the claim or defense of any party*," and provides that a Court should limit discovery if it is cumulative, can be obtained via other means, or is overly burdensome. Fed. R. Civ. P. 26(b). One of the hallmarks of an overbroad notice is that it subjects the noticed party to an impossible task. *Reed v. Bennett*, 193 F.R.D. 689, 692 (D. Kan. 2000).

Impax's Topics 1-6, 9-13, 17-18, 24-27, 29-35, 38-41, 45-54, 56-63, and 65-69 run afoul of these requirements. As just one example, Topic 3 seeks deposition testimony regarding "[t]he formulation of EFFEXOR XR and the development thereof,

---

the effect of the *Markman* Opinion and Order entered in [the *Teva* litigation], for its date of entry to the present, including the effect of any subsequent order to vacate the *Markman* Order"), 66 ("[t]he facts and DOCUMENTS CONCERNING the allegations in WYETH'S COMPLAINT"), and 67 ("[t]he facts and DOCUMENTS CONCERNING the denials and statements in WYETH'S REPLY") are clearly calculated to elicit Wyeth's contentions and legal theories. These topics are representative of the many topics in Impax's notice that amount to contention discovery.

[4] *E.g., Heron v. Potter*, 2006 U.S. Dist. LEXIS 77094 at *3 (D. Del. Oct. 23, 2006) (Rule 30(b)(6) notice requesting testimony "'as to why the plaintiff was not accommodated' . . . amounts to requiring a deponent to either deny that Plaintiff was accommodated, thus rendering the deposition useless, *or to make a legal opinion or conclusion, which is objectionable.*" (emphasis added)); *McKesson Info. Solutions LLC v. The TriZetto Group, Inc.*, C.A. No. 04-1258-SLR (D. Del. Aug. 2, 2005) (transcript of hearing before Chief Judge Robinson at 21) ("I have never thought contention Interrogatories are appropriately responded to via 30(b)(6) depositions.... So if you ask for depositions concerning the basis for a defense, that is a contention interrogatory.").

Daniel N. Kassabian, Esq.
January 8, 2007
Page 4

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

including without limitation when those formulations were developed, who developed them, and what materials and methods were used to developed [sic] them." This one broad topic alone covers years of research and development, involving untold numbers of people. It encompasses, for example, and as we explained in our November 29th letter, pharmaceutical formulation, dissolution, stability, toxicology, scale-up to commercial production, quality control, animal testing, clinical trials on safety, bioavailability, and efficacy. It also encompasses the selection, purchasing, and qualification of raw materials, clinical batch manufacturing, commercial manufacturing, packaging and labeling. It further embraces testing and use of Effexor XR for the treatment of depression, the treatment of social anxiety disorder, the treatment of generalized anxiety disorder, and the treatment of panic disorder. This topic also includes regulatory matters pertaining to Effexor® XR, encompassing 14 years of regulatory filings, correspondence, and label changes. Does Impax contend that all of these subjects are relevant to the claims and defenses in this litigation? Does Impax expect Wyeth to produce a Rule 30(b)(6) witness—in fact, as per Impax, "the most knowledgeable" on each subject—for each of these diverse subjects, all encompassed by just *one* of Impax's sixty-nine topics? Because you have failed to reasonably redefine your topics, after we had raised this concern in our December 15th letter, we can only assume that the answer is "yes." Impax's Notice thus clearly oversteps the bounds of permissible, reasonable discovery.

In your December 15th letter, you attempted to sidestep this issue by arguing that "Wyeth intends to rely on what it considers to be years of research, development and testing, followed by years of sales of Effexor XR, to show the patentability of the various claims of the patents-in-suit." But Impax is already aware of the nature of the subject matter Wyeth will rely upon, by virtue of having requested and received pleadings, transcripts, and expert reports from the *Teva* litigation. Impax cannot credibly maintain, given these materials and Wyeth's detailed answers to Impax's interrogatories, that it is "in the dark" with respect to Wyeth's positions and the factual underpinnings of those positions. Furthermore, the fact that Wyeth may rely on certain aspects of its research and development in this case does not justify Impax covering the entire subject matter in one broad deposition topic. That is the purpose of written discovery.

Finally, while many of the topics *embrace* irrelevant subject matter, others are *on their face* irrelevant to any claim or defense. For example, Topic 52 is directed to "WYETH's development and formulations of Inderal® LA (propranolol HCl) Long-Acting Capsules prior to March 25, 1996." Again, there are no claims or defenses pending in this litigation to which Wyeth's development and formulations of Inderal® LA (propranolol HCl) Long-Acting Capsules would be relevant.

In short, Impax's Notice covers a large amount of irrelevant information, and appears to be no more than the proverbial fishing expedition. Clearly, the use of such an overreaching, burdensome Rule 30(b)(6) deposition for this purpose is improper. *See Carpenter Technology Corp. v. Armco, Inc.*, 1990 U.S. Dist. LEXIS 5538 at *8, *11 (E.D. Pa. May 7, 1990) (noting that the scope of discovery is "not without its bounds,"

1235351_1.DOC

Daniel N. Kassabian, Esq.
January 8, 2007
Page 5

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

and striking irrelevant topics from Rule 30(b)(6) notice of deposition); *see also Westchester Fire Ins. Co. v. Household Int'l, Inc.* 2005 U.S. Dist. LEXIS 116 (D. Del. Jan. 5, 2005) (denying discovery, including Rule 30(b)(6) deposition testimony, as to matters for which defendants failed to establish relevance).

**Impax's Notice Improperly Seeks Attorney Client Privileged and Attorney Work Product Information**

As discussed in our November 29th letter, Impax's Topics 2, 37, 41–49, and 55 seek privileged information. Indeed, your assumption, in connection with Topic 2 ("invention records"), that Wyeth's "invention records should have been produced" is contrary to prevailing case law. *See In re Spalding Sports Worldwide, Inc.,* 203 F.3d 800, 805 (Fed. Cir. 2000). Because the invention record pertaining to the subject matter of the claims at issue in this litigation was a confidential communication to an attorney, made for the purpose of obtaining legal advice, it was properly withheld from production as privileged and is not a proper subject for a Rule 30(b)(6) deposition. *See Spalding,* 203 F.3d at 805-06.

Similarly, Topics 37, 41-19, and 55, which all seek testimony regarding the decision to submit, drafting, prosecution, and meaning of patent applications that matured into the patents-in-suit, all implicate attorney client privileged and/or work product immune information. The preparation and prosecution of a patent are the "hallmark activities of a lawyer," and the District of Delaware protects communications between a client and patent attorney for the purpose of securing legal advice in connection with those proceedings as attorney-client privileged. *Hercules, Inc. v. Exxon Corp.,* 434 F. Supp. 136, 147 (D. Del. 1977) (*citing Sperry v. State of Florida,* 373 U.S. 379 (1963)). The testimony Impax seeks cannot help but reflect confidential communications made by the client to the attorney for the purpose of obtaining legal services, and, as such, is properly immune from discovery under the attorney-client privilege and/or work product immunity. *See Hercules,* 434 F. Supp. at 144; *Rohm & Haas Co. v. Brotech Corp.,* 815 F. Supp. 793, 797 (D. Del. 1993) (draft patent applications held privileged because they can "contain information and communications relating to the subject matter of the document, including, for example, proposed material to be included, suggested additions and deletions, and comments on the contents, all of which are intended to be considered confidential between attorney and client and not intended for public disclosure"). The protection also extends to mental impressions of the attorneys who drafted the patent applications that are based on privileged communications. *Advanced Cardiovascular Sys., Inc. v. C.R. Bard, Inc.,* 144 F.R.D. 372, 378-79 (N.D. Cal. 1992) (patent attorney's understanding of terms in a patent is undiscoverable to the extent it was based on privileged communications from inventors).[5] It also extends to technical information communicated between attorney

---

[5] *Environ Products, Inc. v. Total Containment, Inc.,* 1996 WL 494132 (E.D. Pa. Aug. 22, 1996), cited at page 3 of your December 15th letter, carefully drew the distinction between attorney-client privileged information, which a party is not entitled to

1235351_1.DOC

Daniel N. Kassabian, Esq.
January 8, 2007
Page 6

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

and client for the purpose of securing legal advice. *See SmithKline Beecham Corp. v. Apotex Corp.*, 232 F.R.D. 467, 480 (E.D. Pa. 2005); *see also Conner Peripherals, Inc. v. Western Digital Corp.*, 1993 WL 726815 at * 3 (N.D. Cal. June 8, 1993) (cited at page 3 of your December 15th letter). Because the requested discovery is so intertwined with issues of attorney client privilege and/or work product immunity, it is, as we proposed in our November 29th letter, best conducted through means other than a Rule 30(b)(6) deposition.

**Impax's Notice Improperly Embraces Expert Opinion**

We find your position that Topic Nos. 5-6, 12-18, 26-28, 34-36, 60, 63, and 65 do not embrace expert opinion curious. It is directly contrary to Impax's approach to contention interrogatories. Indeed, when asked during a telephonic meet and confer if Impax would supplement its contentions to provide the factual support for its allegations that one of skill in the art would be allegedly motivated to combine the prior art references Impax has cited, Mr. Ernst repeatedly stated that Impax would not provide such discovery until the expert discovery phase of the case. Impax's position is inconsistent with its insistence that Wyeth now produce a Rule 30(b)(6) witness to address topics that are clearly the subject of expert discovery.

In contrast to Impax's inconsistent position with respect to discovery that embraces expert opinion, Wyeth's view has always been that such discovery is appropriately conducted through contention interrogatories, which can be supplemented, if necessary, due to developments that occur during expert discovery.

**Impax's Notice Includes Topics That Were the Subject of Prior Rule 30(b)(6) Depositions**

Putting aside your baseless accusations that Wyeth is somehow acting improperly, we stand by our original position that Impax's Notice of Deposition is unduly burdensome in that it is overly broad and covers topics that were already the subject of prior Rule 30(b)(6) depositions. Rather than have to proffer a witness to cover ground already covered, we believe it makes more sense for you to review that prior deposition testimony, as well as the expert reports, personal deposition transcripts, and other documents produced by Wyeth pertaining to the *Teva* litigation, and identify, if possible, specific areas that Impax feels requires additional discovery. A thus carefully tailored Rule 30(b)(6) Notice would be far more appropriate than the overly broad approach Impax is currently proposing. Furthermore, while your letter espouses fundamental

---

discover, and attorney-work product immune information, which is available under certain circumstances, only upon a showing that the need for such information is compelling. It did not rule that "the attorneys' specific knowledge of factual support in their drafting of the statements made in the applications resulting in the patents-in-suit" is fair game for discovery, without exception, as your letter suggests.

Daniel N. Kassabian, Esq.
January 8, 2007
Page 7

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

principles underlying American jurisprudence, you have apparently missed the point of our comments. We did not suggest that *Impax* is bound by Wyeth's prior deposition testimony.[6] We did, however, suggest a more rational approach to discovery, outlined on page 6 of our November 29th letter.

**Wyeth's Objections to Impax's Impossibly Broad Notice of Deposition are Entirely Appropriate**

We are dismayed by your implication that Wyeth's suggested approach to discovery is somehow improper or that our objections are baseless. As discussed above, our objections are entirely appropriate and well grounded in the case law. Furthermore, given our production of documents, pleadings, deposition transcripts, hearing transcripts, and expert reports from the *Teva* litigation, Wyeth could hardly be accused of "hiding the ball" or delaying the case. To the contrary, we are continually working to provide, within reason, Impax with its requested discovery and to move the case forward. Indeed, our suggested approach to discovery was intended to expedite the process and narrow the issues, so that both parties could focus on the truly disputed issues.

We are disappointed that Impax not only rejected our suggestion, but failed to offer any alternative solution or attempt to limit the scope of its deposition notice. However, we continue to believe that the parties can work together to arrive at suitable compromises. In this vein, then, we offer the following proposal.

If Impax agrees to withdraw its November 20, 2006, Rule 30(b)(6) notice, Wyeth will agree to provide a Rule 30(b)(6) deponent for the following subjects:

o   The research that led to the formulation of Effexor® XR, when that formulation was developed, who developed it, what materials were used in the formulation(s) made in connection with that research endeavor, and the methods and results of *in vitro* dissolution testing of the formulation(s) made in connection with that research endeavor.

o   Examples 1 through 7, and Tables 1 through 3 of the patents in suit and the data underlying such examples and tables.

o   Efficacy and safety results of Studies 127, 128, 134, 136, 138, 139, 143, 144, 145, 208, 209, 365, 367, and 369, and the Integrated Safety Summary filed with NDA No. 20-699.

o   Advertising of Effexor® XR in the United States for the years 1997 to 2006.

---

[6] As for the *Markman* ruling from the *Teva* litigation, that decision was vacated by the district court. Wyeth is unaware of any authority that would suggest that Wyeth is bound by a vacated decision.

1235351_1.DOC

Daniel N. Kassabian, Esq.
January 8, 2007
Page 8

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

      o     The identity of each Wyeth employee from whom documents were collected in connection with the *Teva* litigation and *Impax* litigation document productions.

Please let us know whether this proposal is acceptable. If not, Wyeth would, of course, be willing to consider any alternative compromise proposals.

                    Sincerely,

                    Barbara R. Rudolph

BRR/jkl

cc:    Mary B. Matterer, Esq. (via facsimile)

1235351_1.DOC

# EXHIBIT 6



901 New York Avenue, NW ▪ Washington, DC 20001-4413 ▪ 202.408.4000 ▪ Fax 202.408.4400
www.finnegan.com

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

BARBARA R. RUDOLPH
202.408.4346
barbara.rudolph@finnegan.com

January 30, 2007

Daniel N. Kassabian, Esq.
Heller Ehrman LLP
333 Bush Street
San Francisco, CA 94104

**_VIA FACSIMILE_**

_Wyeth v. Impax Laboratories, Inc.,_ Civil Action No.: 06-222 (D. Del.)

Dear Daniel:

We are writing in response to Impax's January 22, 2007 Amended Notice of Deposition under Rule 30(b)(6) ("Impax's Amended Notice"). As an initial matter, we appreciate Impax's willingness to compromise by reducing the number of topics from sixty-nine (in Impax's original Notice) to the current thirty-four.  In that same spirit of compromise, we will agree to provide a witness for some of the thirty-four topics, as discussed below. However, consistent with our letter of January 8, 2007, we continue to object to many of Impax's topics, as outlined below.

Accordingly, we are willing to provide a Rule 30(b)(6) deponent for Topics 3-16, 19, 30, 32, and 34 listed in Impax's Amended Notice, subject to our objections, below. Please note that Wyeth objects to each of Topics 3-16, 19, 30, 32, and 34 to the extent that they seek information subject to the attorney client privilege or work product immunity.  Wyeth also objects to each of these topics as overly broad, but nevertheless will make a good faith effort to prepare a witness, subject to our objections, for these topics, as we understand them.

**Topic 3**

Wyeth objects to Topic 3 as overly broad, unduly burdensome, and irrelevant to the extent that it covers research, testing, and development conducted after the effective filing date of the patents-in-suit, March 25, 1996. Wyeth further objects to this topic as overly broad, unduly burdensome, and irrelevant  to the extent that it pertains to any formulation other than Wyeth's Effexor® XR products that are sold within the United States. Wyeth also objects to Topic 3 as vague, ambiguous, overly broad insofar as it refers to "methods" used to develop the formulation of Effexor® XR.  Further, Wyeth objects to this topic as vague, ambiguous, and overly broad to the extent it is directed toward "development" of the formulation of Effexor® XR. Wyeth will provide, subject to

1254946_1.DOC

Washington, DC ▪ Atlanta, GA ▪ Cambridge, MA ▪ Palo Alto, CA ▪ Reston, VA ▪ Brussels ▪ Taipei ▪ Tokyo

Daniel N. Kassabian, Esq.
January 30, 2007
Page 2

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

its objections, Rule 30(b)(6) deposition testimony on information not subject to the attorney client privilege or work product immunity pertaining to Topic 3 to the extent that: (1) it extends only to research, testing, and development completed prior to March 25, 1996; (2) it is directed only to the formulation of Wyeth's Effexor® XR products that are sold in the United States; and (3) the "development" of the formulations referred to in this topic is limited to the pharmaceutical formulation research, and does not encompass subjects such as stability; toxicology; scale-up to commercial production; quality control; animal and/or human testing; selection, purchasing, and qualification of raw materials; clinical batch manufacturing; commercial manufacturing; packaging; and regulatory matters.

**Topics 4-6**

Wyeth objects to each of Topics 4 through 6 as overly broad, unduly burdensome, and irrelevant to the extent that they cover research, testing, and development conducted after March 25, 1996. Wyeth also objects to Topics 4 through 6 as vague and ambiguous and overly broad insofar as they refer to "methods" used to develop the formulations referred to in these topics. Further, Wyeth objects to these topics as vague, ambiguous, and overly broad as directed toward "development" of the formulations referred to in these topics. Wyeth will provide, subject to its objections, Rule 30(b)(6) deposition testimony on information not subject to the attorney client privilege or work product immunity pertaining to Topics 4 through 6 to the extent that: (1) each such topic extends only to research, testing, and development completed prior to March 25, 1996; and (2) the "development" of the formulations referred to in each of these topics is limited to the pharmaceutical formulation research, and does not encompass subjects such as stability; toxicology; scale-up to commercial production; quality control; animal and/or human testing; selection, purchasing, and qualification of raw materials; clinical batch manufacturing; commercial manufacturing; packaging; and regulatory matters.

**Topic 7**

Wyeth objects to Topic 7 as overly broad, unduly burdensome, and irrelevant to the extent that it covers testing conducted after March 25, 1996. Wyeth further objects to this topic as overly broad, unduly burdensome, and irrelevant to the extent that it pertains to any formulation other than Wyeth's Effexor® XR products that are sold within the United States. Wyeth also objects to Topic 7 as vague, ambiguous, and overly broad insofar as it refers to "methods" used. Wyeth will provide, subject to its objections, Rule 30(b)(6) deposition testimony on information not subject to the attorney client privilege or work product immunity pertaining to Topic 7 to the extent that: (1) it extends only to testing completed prior to March 25, 1996; and (2) the topic is directed only to the formulation of Wyeth's Effexor® XR products that are sold in the United States.

Daniel N. Kassabian, Esq.
January 30, 2007
Page 3

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

## Topics 8-10

Wyeth objects to each of Topics 8 through 10 as overly broad, unduly burdensome, and irrelevant the extent that they cover testing conducted after March 25, 1996.  Wyeth also objects to each of Topics 8 through 10 as vague and ambiguous and overly broad insofar as they refer to "methods" used.  Wyeth will provide, subject to its objections, Rule 30(b)(6) deposition testimony on information not subject to the attorney client privilege or work product immunity pertaining to Topics 8 through 10 to the extent that each such topic extends only to testing completed prior to March 25, 1996.

## Topics 11 and 12

Wyeth objects to each of Topics 11 and 12 to the extent that they seek attorney client privileged and/or work product immune information.  Wyeth will provide, subject to its objections, Rule 30(b)(6) deposition testimony on information not subject to the attorney client privilege or work product immunity pertaining to Topics 11 and 12.

## Topics 13 and 14

Wyeth objects to each of Topics 13 and 14 to the extent that they seek attorney client privileged and/or work product immune information.  Wyeth further objects to each of these topics as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant information to the extent that these topics are directed to "Wyeth's knowledge."  Wyeth further objects to these topics as vague and ambiguous, overly broad, and irrelevant to the extent they refer to "research prior to November 5, 1997."  Wyeth will provide, subject to its objections, Rule 30(b)(6) deposition testimony on information not subject to the attorney client privilege or work product immunity pertaining to Topics 13-14 to the extent that it extends only to research that was completed prior to March 25, 1996.

## Topic 15

Wyeth objects to Topic 15 as overly broad, unduly burdensome, and irrelevant.  The Integrated Safety Summary, for example, covers the safety of the product as reported to the FDA, most of which is completely irrelevant to any issue in this litigation.  It would be unduly burdensome to prepare a witness on all aspects of this one document alone.   Wyeth further objects to this Topic as overly broad, unduly burdensome, and irrelevant to the extent it pertains to NDA No. 20-699 "including without limitation any amendments thereto."  Wyeth will provide, subject to its objections, Rule 30(b)(6) deposition testimony on information not subject to the attorney client privilege or work product immunity pertaining to Topic 15 to the extent that it extends only to the enumerated parts and contents of NDA 20-699 as originally filed with the U.S. Food and Drug Administration.

Daniel N. Kassabian, Esq.
January 30, 2007
Page 4

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

## Topic 16

Wyeth objects to Topic 16 as overly broad, unduly burdensome, and irrelevant. For example, budgets, projections, and profit margins are irrelevant to any issue in this litigation. Wyeth will provide, subject to its objections, Rule 30(b)(6) deposition testimony on information not subject to the attorney client privilege or work product immunity on annual gross sales, annual net sales, annual direct selling and marketing expense for U.S. sales of Effexor® XR from 1997 through the second quarter of 2006.

## Topic 19

Wyeth objects to Topic 19 as overly broad, unduly burdensome, and irrelevant. For example, the size of the marketing and sales force over the years from 1997 to the present would be unduly burdensome to determine and irrelevant to any issue in this litigation. Wyeth further objects to this topic as vague and ambiguous to the extent that it seeks information regarding the "effectiveness" of any advertising and promotional efforts for Effexor® XR in the United States. Wyeth further objects to this topic to the extent it seeks information regarding "detailing," "sampling," and "yearly advertising budgets and expenditures" from 1997 to the present. The burden of preparing a witness to address such topics far outweighs any possible, marginal relevance this information would have to any issue pending in this case. Wyeth will provide, subject to its objections, Rule 30(b)(6) deposition testimony on information not subject to the attorney client privilege or work product immunity regarding the content of advertising done for Effexor® XR in the United States from 1997 to mid 2006. In addition, annual direct selling and marketing expense for U.S. sales from 1997 through second quarter of 2006 will be provided in response to Topic 16.

## Topics 30 and 32

Wyeth objects to each of Topics 30 and 32 to the extent that they seek attorney client privileged and/or work product immune information. Wyeth will provide, subject to its objections, Rule 30(b)(6) deposition testimony on information not subject to the attorney client privilege or work product immunity pertaining to Topics 30 and 32.

## Topic 34

Wyeth objects to Topic 34 as overly broad, unduly burdensome, and irrelevant. The burden on Wyeth to prepare a witness to address all aspects of this topic outweighs any possible, marginal relevance the information would have to any issue in this litigation. Moreover, Wyeth has already provided Impax with a detailed interrogatory answer that addresses information embraced by Topic 34. Wyeth further objects to this Topic to the extent that it seeks information subject to the attorney client privilege or work product immunity. Subject to these objections, Wyeth will provide, subject to its objections, Rule 30(b)(6) deposition testimony on information not subject to the attorney

Daniel N. Kassabian, Esq.
January 30, 2007
Page 5

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

client privilege or work product immunity regarding the identity of each Wyeth employee from whom documents were collected in connection with Wyeth's document production to Impax.

We cannot agree, however, to provide a witness for Topics 1, 2, 17-18, 20-29, 31, and 33 in Impax's Amended Notice. These topics are objectionable for at least the reasons set forth in our letter of January 8, 2007. In particular, Topics 2, 21-24, and 28, which you sought to expedite, all implicate attorney client privileged and/or work product immune information. As we explained in our January 8th letter, the requested discovery regarding Wyeth's invention records and patent prosecution is inextricably intertwined with privileged and/or work product immune information. Indeed, a Rule 30(b)(6) deposition on these topics would require Wyeth counsel to continually make instant judgment calls on matters of privilege and work product immunity, with the risk of inadvertent waiver looming. While that is acceptable for most deposition topics that may happen to stray into privileged areas, where the topics, as here, are directly drawn to undisputedly privileged/work product immune subjects, that task becomes unworkable. We, therefore, remain resolved that this discovery is best conducted through other means.

We hope that our proffer of Rule 30(b)(6) deposition testimony on Topics 3-16, 19, 30, 32, and 34, subject to our objections discussed above, will resolve this issue. If Impax persists in its demand for Rule 30(b)(6) deposition testimony on the remaining topics, or the portions of Topics 3-16, 19, 30, 32, and 34 to which we have objected, we will be forced to seek a protective order from the Court with respect to those topics. If we are forced to file a motion for a protective order, then we will not provide a witness for any Rule 30(b)(6) topic until the Court rules on our motion. If Impax agrees to our proposal, and withdraws the topics in dispute, then we will contact you to arrange a mutually convenient date and location for the Rule 30(b)(6) deposition. We remain, as always, happy to discuss this further so that we can avoid having to seek the Court's intervention.

Sincerely,

Barbara Rudolph

Barbara R. Rudolph

BRR/jkl

cc:    Mary B. Matterer, Esq. (via facsimile)

1254946_1

EXHIBIT 7



**The University of Alabama School of Law**

ALABAMA LAW REVIEW
(ISSN 002-4279)

The *Alabama Law Review* is published three times a year by students of The University of Alabama School of Law, Tuscaloosa, Alabama. The Editorial and Business Offices are located at:

*Alabama Law Review*
The University of Alabama School of Law
Box 870382
Tuscaloosa, Alabama 35487-0382
Phone (205) 348-7191
FAX (205) 348-3917

**Subscriptions and Single Issues.** The current subscription rates are $24.00 per three-issue volume, $12.00 per issue, plus a shipping and handling charge of $6.00 per volume or $2.00 per single issue order. Subscriptions are automatically renewed unless notification to the contrary is received. Information on back issues is available upon request.

**Manuscripts.** The *Alabama Law Review* invites submission of unsolicited manuscripts. Citations in the *Alabama Law Review* conform generally to *The Bluebook: A Uniform System of Citation* (16th ed. 1996). However, please note that the Review does *not* follow Rule 1.2(a) from the 16th Edition. The signal rule for the *Alabama Law Review* is Rule 1.2(a) of the 15th Edition *Bluebook*. The submission of articles on computer diskettes is encouraged, and IBM-compatible software must be used. An envelope with return postage should be enclosed if a manuscript or disk is to be returned after consideration.

**Copyright.** Copyright © 1999 by The University of Alabama (*Alabama Law Review*), except as otherwise indicated. The copyright in each article is owned by the respective author. All rights reserved. Opinions expressed are those of the contributor and are not presented as the views of the *Alabama Law Review*, its editors, or The University of Alabama School of Law.

**Printer.** The *Alabama Law Review* is printed by the Darby Printing Company in Atlanta, Georgia.

VOLUME 50 SPRING 1999 NUMBER 3

## Contents

DISCOVERING CORPORATE KNOWLEDGE AND CONTENTIONS: RETHINKING RULE 30(B)(6) AND ALTERNATIVE MECHANISMS — *Kent Sinclair, Roger P. Fendrich* — 651

ENHANCED OBLIGATION OF GOOD FAITH: A MINE FIELD OF UNANSWERED QUESTIONS AFTER *L & S ROOFING SUPPLY CO.* — *Karon O. Bowdre* — 755

THE LLC VERSUS LLP CONUNDRUM: ADVICE FOR BUSINESSES CONTEMPLATING THE CHOICE — *Fallany O. Stover, Susan Pace Hamill* — 813

## Commentary

LEVELING THE PLAYING FIELD: MAKING FEDERAL MARKET PARTICIPANTS ACCOUNTABLE FOR THEIR ANTITRUST VIOLATIONS — *Jennifer Marie Buettner* — 849

*BERNSTEIN, KARN,* AND *JUNGER*: CONSTITUTIONAL CHALLENGES TO CRYPTOGRAPHIC REGULATIONS — *Norman Andrew Crain* — 869

OUT WITH THE OLD: ABANDONING THE TRADITIONAL MEASUREMENT OF CONTRACT DAMAGES FOR A SYSTEM OF COMPARATIVE FAULT — *John Barclay Phillips* — 911

THE USURPATION OF LEGISLATIVE POWER BY THE ALABAMA JUDICIARY: FROM LEGISLATIVE APPORTIONMENT TO SCHOOL REFORM — *Susan Thompson Spence* — 929

INDEX TO VOLUME 50 — 969

# ALABAMA LAW REVIEW

| Volume 50 | Spring 1999 | Number 3 |
|---|---|---|

## DISCOVERING CORPORATE KNOWLEDGE AND CONTENTIONS: RETHINKING RULE 30(B)(6) AND ALTERNATIVE MECHANISMS

*Kent Sinclair[*]*
*Roger P. Fendrich[**]*

### I. INTRODUCTION

In 1970 the Supreme Court promulgated a useful, simple tool to assist parties litigating against an entity to find knowledgeable witnesses and leads to specific personnel with detailed information about matters in litigation. Rule 30(b)(6) of the Federal Rules of Civil Procedure allows the discovering party to specify topics on which testimony is sought, whereupon the responding entity is required to designate one or more witnesses to provide testimony on those topics. The procedure simplifies the early stages of discovery in many cases.

This tool has been increasingly misused in recent years. Aggressive litigants and a few short-sighted courts have bent this device into a form of "contention discovery" in which an

---

[*] Professor of Law, University of Virginia. J.D. 1971, University of California at Berkeley. William J. Moran, University of Virginia School of Law class of 1999, provided valuable research assistance on this Article.

[**] Member, Arnold & Porter, Washington, D.C. Ph.D., University of Texas, 1971; J.D., Yale Law School, 1980. Scott Helsel provided valuable preliminary research on the topics addressed in this Article.

entity may be required to respond in impromptu oral examination to questions that require its designated witness to "state all support and theories" for myriad contentions in a complex case. The growing misuse of this basic deposition tool creates unfair, unworkable burdens on the responding parties and risks imposition of inappropriate sanctions, including preclusion of proof.

A recent article in the National Law Journal, co-authored by one of the deans of the American litigating bar, illustrates the dangers.[1] Observing that the Rule 30(b)(6) deposition rule "revolutionized the discovery of corporate entities," the authors urge every litigant to use this procedure for *all* depositions of corporations as a way to force corporations to prepare an omnibus witness with knowledge of all facts anyone associated with the corporation may know.[2] Furthermore, the authors recommend the Rule as a means to obtain "binding admissions" for use on summary judgment or at trial.[3] The Rule 30(b)(6) device is vaunted as a major "offensive weapon to bind entities."[4] These claims are demonstrably false and only serve to highlight the mischief that a misguided reading of the Rule may engender.

Depositions of entities under this Rule were never intended to serve these purposes, and attempts to warp the rule into a device to achieve these ends creates significant unfairness and abuse.

This Article sketches the actual nature and purpose of the Rule 30(b)(6) device, describes the proper scope of the procedure—especially questions of proper preparation, which have begun to generate a significant body of case law, much of it misguided—and assesses the alternative means open to a discovering party to learn about the entity's factual and legal positions without the abuse inherent in the concept of a deposition of an "omnibus" witness, a super-human artifact whose role is not only impractical, but also unnecessary.

Fifteen years ago Rule 30(b)(6) was referred to as "The For-

1. Jerold Solovy & Robert Byman, *Discovery: Invoking Rule 30(b)(6)*, NAT'L L.J., Oct. 26, 1998, at B13.

2. *See id.*

3. *See id.* (asserting that if a litigator understands this powerful weapon, "[y]our notices will always" invoke the Rule 30(b)(6) mechanism).

4. *Id.*

gotten Rule,"[5] but more recently the tactical use of this device to force creation of a witness who will synthesize all facts and issues in the case has transformed the Rule into "a Trojan Horse."[6] As the tactical use of Rule 30(b)(6) against entities has become recognized as a tool of great power,[7] the number of published opinions citing the Rule has increased, presumably reflecting increased use of the device and an increase in motion practice over its proper boundaries. The cases discussing the Rule have increased four-fold since 1988 alone.[8]

*Epistemological Underpinnings.* The misuse of Rule 30(b)(6) which is explored in this Article may trace its roots to a peculiar conception of "corporate knowledge" which, we submit, takes a unique creation of the law—"constructive knowledge"—and distends it beyond reasonable bounds. The law sometimes indulges in the fiction that entities such as corporations and partnerships should be treated as if they "know" whatever their human constituents have learned.[9] The knowledge of the "parts" (at least those who stand in a close relationship to the entity, such as partners, directors, management personnel, and agents with sufficient authority) is "imputed" (attributed) to the entity itself.[10] For many legal purposes, the entity is deemed to know

5. *See* Mark A. Cymrot, *The Forgotten Rule*, 18 LITIGATION 3 (1992).

6. Bradley M. Elbein, *How Rule 30(b)(6) Became a Trojan Horse: A Proposal for Change*, 46 F.I.C.C. Q. 365 (1996).

7. *See infra* text accompanying notes 259-68.

8. The search "30(b)(6) w/22 deposition" was run on Lexis using the United States District Courts database separately for each year from 1971, the first year after the rule went into effect, through 1996. The results of the searches were: 1971=1, 1972=2, 1973=3, 1974=0, 1975=3, 1976=2, 1977=3, 1978=3, 1979=4, 1980=1, 1981=5, 1982=7, 1983=8, 1984=3, 1985=18, 1986=22, 1987=15, 1988=14, 1989=21, 1990=30, 1991=45, 1992=54, 1993=45. 1994=51, 1995=67, 1996=67. Other search routines would no doubt yield different absolute numbers, but there seems little doubt that this device has increasingly made its way into court decisions.

9. The law has had occasion to focus on corporate knowledge for a variety of purposes, but most of the developed case law and model statutes bearing on this subject deal with imputing knowledge of an employee or agent to an entity for purposes of determining whether to hold the entity liable to a third party, typically a contract or tort plaintiff. Generally, of course, when a senior officer is aware of a fact, it is deemed corporate knowledge. Personal participation by an officer is sufficient to make corporate "knowledge" of an event "quite evident." Gordon v. S.S. Vedalin, 346 F. Supp. 1178, 1181 (D. Md. 1972).

10. Knowledge of an employee is imputed to a corporation when one employee acts within the scope of the agency or employment, Grand Union Co. v. United States, 896 F.2d 888, 891 (11th Cir. 1983), and at least in part for the benefit of

the composite of the knowledge of all of its agents and employees.[11]

The rules governing such constructive knowledge were developed to serve a variety of purposes. For example, they can be used to defeat a claim that the entity "acted in ignorance;"[12] they provide a chastening incentive for a company to expect and to demand that its agents share information freely within the fold; they promote the proposition that a collective entity must take the consequences for what is known by *any* of its central "players."[13] (Compare, in this regard, similar rules which gov-

---

the corporation, United States v. One Parcel of Land, 965 F.2d 311, 316 (7th Cir. 1992). Conversely, it is hornbook law that knowledge of a corporate officer or agent acquired outside the scope of his or her powers or duties or when not acting for or on behalf of the corporation is not imputed to the corporation. 3 WILLIAM MEADE FLETCHER ET AL., FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 819, at 116 (perm. ed. 1994).

For some purposes involving notice to a corporation, cases have stated that there must be information conveyed to a "supervisory employee" to permit imputation to the entity, though among several candidates the liability of an entity does not normally require notice to any one individual among the supervisory ranks. Central Soya De Puerto Rico, Inc. v. Secretary of Labor, 653 F.2d 38, 39-40 (1st Cir. 1981).

In *O'Melveny & Myers v. FDIC*, the Supreme Court held that state law provides the rule of decision regarding imputation in cases in which state law supplies the rule of decision and on some corporate issues arguably federal in nature, where statutory regimes are silent on the topic given the absence of a federal common law on the topic. 512 U.S. 79 (1994). The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 contained no controlling provisions, and hence California law governed the question of whether corporate officers' knowledge can be imputed to the FDIC suing as receiver. *O'Melveny*, 512 U.S. at 89.

11. "[C]orporate knowledge and intent is a mosaic made up of smaller bits and pieces of motivation held by various . . . officers and employees, from its Chief Operating Officer to its Divisional Officers, as well as its lawyers, in house and outside." Universal City Studios v. Nintendo Co., 615 F. Supp. 838, 842 (S.D.N.Y. 1985).

A jury instruction to the effect that corporate knowledge depends on the combined knowledge of the employees and agents of the company is normally upheld. *See, e.g.*, People v. American Med. Ctr. of Mich., 324 N.W.2d 782, 792-93 (Mich. Ct. App. 1982).

12. Under traditional case law, the so-called presumption that the principal knows what the agent knows is "irrebuttable," "it cannot be avoided by showing that the agent did not in fact communicate his knowledge." Bowen v. Mount Vernon Sav. Bank, 105 F.2d 796, 799 (D.C. Cir. 1939). The rule provides a mechanism for imputing liability to a principal for actions of an officer or agent in order to protect innocent third parties; it is intended to preclude proclamations of ignorance that would serve "as a shield for unfair dealing." 3 FLETCHER ET AL., *supra* note 10, § 804, at 55; *see also* Mutual Life Ins. Co. v. Hilton-Green, 241 U.S. 613, 623 (1916).

13. Under standard principles of agency law, knowledge acquired by a

---

ern the attribution of certain *acts* of agents to their masters.[14] Where the master in question is a sizable organization, it may be held responsible for the activities of numerous individuals.[15]

Notice that the predicate for holding an organization such as a corporation or partnership responsible for what is known by its human participants is the patent truth that such entities have no eyes or ears (or minds) of their own:[16] whatever they may be said to know must be the result of whatever their human participants know.[17] But when an *individual* is deposed,

---

corporation's officers or agents is properly attributable to the corporation itself. BCCI Holdings (Lux.), S.A. v. Clifford, 964 F. Supp. 468, 478 (D.D.C. 1997). *See generally* 3 FLETCHER ET AL., *supra* note 10, § 790, at 15. Because a corporation can only operate through individuals, the "privity and knowledge of individuals at a certain level of responsibility must be deemed the privity and knowledge of the organization." FDIC v. Ernst & Young, 967 F.2d 166, 171 (5th Cir. 1992) (quoting Continental Oil Co. v. Bonanza Corp., 706 F.2d 1365, 1376 (5th Cir. 1983)). This is true whether or not the officer or agent has actually disclosed the information to the corporation. *Clifford*, 964 F. Supp. at 478. "The reason for the rule is simple: it is the duty of the officer or agent to communicate his or her knowledge to the corporation, and the law presumes that the officer or agent has carried out this duty." *Id.*; *see also* 3 FLETCHER ET AL., *supra* note 10, § 819, at 116.

It has sometimes been argued that a corporation should not be deemed aware of conditions when no single person has enough of the constituent facts to create a reasonable basis for becoming aware of the overall situation. Most courts hold, however, that the "imputed-collected-knowledge standard" applies where employees acting in the scope of their employment and authority learn or do something on behalf of the corporation, whether or not one employee puts the pieces together. Upjohn Co. v. New Hampshire Ins. Co., 476 N.W.2d 392, 401-02 (Mich. 1991). To allow a corporation to "plead innocence by asserting that the information obtained by several employees was not acquired by any one individual employee who then would have comprehended its full import[, is] something the cases . . . clearly reject as the antithesis of imputed collective corporate knowledge." *Upjohn*, 476 N.W.2d at 400, 401 n.14.

14. *See* RESTATEMENT (SECOND) OF AGENCY § 317 (1958) (principal-agent); RESTATEMENT (SECOND) OF TORTS § 486 (1965) (master-servant).

15. For example, it was held that while the status of the actor in the corporate hierarchy might well have decisive significance in determining questions concerning the intention to benefit the corporation, the corporation may be bound—even for criminal liability—"by the acts of subordinate, even menial, employees." Standard Oil Co. v. United States, 307 F.2d 120, 127 (5th Cir. 1962); *see* United States v. Steiner Plastics Mfg. Co., 231 F.2d 149, 153 (2d Cir. 1956); United States v. George F. Fish, Inc., 154 F.2d 798, 801 (2d Cir. 1946); United States v. E. Brooke Matlack, Inc., 149 F. Supp. 814, 819-20 (D. Md. 1957).

16. *See* Dartmouth College v. Woodward, 17 U.S. (4 Wheat.) 518, 636 (1819) ("A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law.").

17. *See, e.g.*, Oxford Shipping Co. v. New Hampshire Trading Corp., 697 F.2d 1 (1st Cir. 1982).

he or she is permitted (when it is true) to answer questions with the breathtakingly simple words, "I don't know" (or their cousins, "I don't recall"). And an individual witness cannot be compelled, and is not obliged, to review everything that may be "reasonably available" to prepare for the deposition.

But just as collective entities do not have the sensory or mental abilities to learn things "on their own," neither do they possess the capability to collect, sift and synthesize information for themselves.[18] Rather, they utilize human beings to perform such tasks. In the case of litigation, the discovery and collation of what needs to be known is characteristically undertaken by lawyers. It is the lawyer who investigates the facts, reviews a mosaic of documents, weeds through recollections of participants in the central events, and then attempts to put together a coherent account of "what really happened."

Accordingly, when a rule commands a collective entity to testify to everything that is "known or reasonably available," it is, perforce, in all but the simplest of cases, demanding testimony that can only be the result of an arduous process that has already been conducted by the organization (or its lawyers). It is one thing, of course, to require the organization (or its lawyers) to proffer the identity of witnesses who were involved in matters at issue in a lawsuit. While such an obligation may require the organization to create and reveal something that did not exist prior to the lawyers' involvement (that is, a compilation identifying the relevant witnesses), such an intrusion into work product is relatively de minimis, may be deemed worth the "price" for what it buys in increased efficiency, and is merely a propaedeutic to further discovery. It is quite another thing to require the organization to prepare one or more witnesses to express its single, final, and definitive position on the ultimate issues on which a case presumably turns.

---

18. Some courts, however, have at least been sensitive to the fact that information acquired by individuals in an entity often is lost, not re-conveyed, or not put together with other facts. See, e.g., First Nat'l Bank & Trust v. Cutright, 205 N.W.2d 542, 544 (Neb. 1973). Thus one court commented that it may well be that an entity's "corporate knowledge is less than the sum of the knowledge of all its officers, agents, and employees;" hence, imputation doctrine relies on a mere presumption, which is subject to the risks of "human error." Cutright, 206 N.W.2d at 544.

If it is a useful fiction to imagine that an organization's access to information is as rich as the collective input of its members, it is a pernicious fiction to assume that the entity possesses an inherent capacity to weed through those disparate sources to produce a single, unified account of the facts. Yet, as discussed in Part IV below, the most expansive interpretations of Rule 30(b)(6) presuppose that the quintessential lawyer's role is somehow part and parcel of an organization's inherent fact-collecting prowess.

## II. DEPOSITIONS OF CORPORATE PERSONNEL BEFORE AND AFTER RULE 30(B)(6)

### A. Goals in the Creation of Rule 30(b)(6)

The Federal Rules of Civil Procedure broadly authorize parties to obtain discovery by various means, of which perhaps the most prominent is depositions upon oral examination.[19] Depositions "rank high in the hierarchy of pre-trial, truth-finding mechanisms."[20] Rule 30(a), in unrestricted language, provides that any "[p]arty may take the testimony of any person, including a party, by deposition upon oral examination."[21]

Of course, "it is not literally possible to take the deposition of a corporation; instead, when a corporation is involved, the information sought must be obtained from natural persons who can speak for the corporation,"[22] and courts recognize that a corporation appears vicariously through individual representatives.[23] And while in one sense any employee might be viewed

---

19. FED. R. CIV. P. 30.

20. Founding Church of Scientology, Inc. v. Webster, 802 F.2d 1448, 1451 (D.C. Cir. 1986) ("Face-to-face confrontations prior to trial, with such indicia of formality as administration of the oath, the presence of counsel and stenographic recording of the proceedings, are a critical component of the tools of justice in civil litigation.").

21. FED. R. CIV. P. 30; cf. id. 26(b)(2). The triage provisions of Rule 26(b)(2) could theoretically require other, more efficient procedures in lieu of rote recourse to depositions in every instance. Searches of the reported opinions, however, uncover almost no cases in which this provision has been used to limit otherwise permissible discovery.

22. 8A CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2103, at 30 (2d ed. 1994).

23. See, e.g., Resolution Trust Corp. v. Southern Union Co., 985 F.2d 196, 197

as embodying a portion of the corporation's composite "memory,"[24] the pre-1970 rules made an important distinction between deponents who were officers, directors or managing agents of the entity—whose testimony could for that reason be used against the corporation for any purpose[25]—and all other employees (whose testimony was not automatically admissible against the entity).[26]

The discovering party who wished to elicit testimony at deposition that would be broadly admissible against the corporation was safe in naming top personnel such as the president or chairman of the board, but ran the risk that other employees or agents, even those with impressive titles and broad responsibilities, could later be viewed as falling below the level of officers and managing agents, and hence that the transcript would not be admissible against the entity.[27]

A second problem arose with the individual designation system for selecting witnesses from within a corporation: particularly during the early phases of preparation in a case, the discovering party was required to *guess* which of the adverse executives would have the knowledge sought. This sometimes burdened corporations with a series of unfruitful depositions[28] and on occasion led the discovering party to experience the frustration of "bandying," in which various officers of a corporation

were deposed and, in turn, each disclaimed knowledge of facts that were clearly known by *someone* in the organization.[29] Clearly, a mechanism was needed "to curb any temptation a [litigant] might have to shunt a discovering party from 'pillar to post . . . .'"[30]

Rule 30(b)(6) was created in 1970 to address both of these problem areas.[31] It provides that a party may, in a notice of deposition, simply name the corporation as deponent and identify the desired topics for testimony.[32] The corporation must thereupon designate one or more officers or directors or managing agents *or other persons* to testify on its behalf to "matters known or reasonably available to the organization."[33] In addition, an amendment to Rule 32 provides that the testimony of any witness designated under Rule 30(b)(6) (whether technically an officer or managing agent or not) may be used by the adverse parties for any purpose.[34]

---

(5th Cir. 1993).

24. United States v. Taylor, 166 F.R.D. 356, 361-62 (M.D.N.C. 1996), *aff'd*, 166 F.R.D. 367 (M.D.N.C. 1996).

25. FED. R. CIV. P. Rule 32(a)(2) allows adverse parties to introduce into evidence for any purpose the deposition of "anyone who at the time of taking the deposition was an officer, director, or managing agent . . . of a public or private corporation, partnership or association."

26. Mitsui & Co. (U.S.A.), Inc. v. Puerto Rico Water Resources Auth., 93 F.R.D. 62, 65 (D.P.R. 1981); *see* Cleveland v. Palmby, 75 F.R.D. 654, 656 (W.D. Okla. 1977); Intercontinental Fibres, Inc. v. United States, 352 F. Supp. 952, 956 (Cust. Ct. 1972); Proposed Amendments to the Federal Rules of Civil Procedure Relating to *Discovery*, 48 F.R.D. 487, 515 (1970). Note, however, that since the creation of the Federal Rules of Evidence, agent admissions on matters within the scope of the employment have been admissible against the employer under the definitions of non-hearsay in Rule 801.

27. *See* Founding Church of Scientology, Inc. v. Webster, 802 F.2d 1448, 1451 (D.C. Cir. 1986); Protective Nat'l Ins. Co. v. Commonwealth Ins. Co., 137 F.R.D. 267, 278 (D. Neb. 1989).

28. *Taylor*, 166 F.R.D. at 360; *see* Cates v. LTV Aerospace Corp., 480 F.2d 620, 623 (5th Cir. 1973); *Protective Nat'l Ins.*, 137 F.R.D. at 278.

---

29. One poignant example of how this frustration may arise was recounted by a federal judge in describing the tribulations of the plaintiffs in the Dalkon Shield products liability cases:

    The project manager for Dalkon Shield explains that a particular question should have gone to the medical department. The medical department representative explains that the question was really the bailiwick of the quality control department. The quality control department representative explains that the project manager was the one with the authority to make a decision on that question.

Miles W. Lord, *The Dalkon Shield Litigation: Revised Annotated Reprimand by Chief Judge Miles W. Lord*, 9 HAMLINE L. REV. 7, 11 (1986).

30. FDIC v. Butcher, 116 F.R.D. 196, 199 (E.D. Tenn. 1986).

31. Proposed Amendments to the Federal Rules of Civil Procedure Relating to *Discovery*, 48 F.R.D. 487, 515 (1970); *see* Cates, 480 F.2d at 623. *See generally* Founding Church of Scientology, 802 F.2d at 1448; Marlin M. Volz, *Depositions of Organizations: The Designation Procedure Under the Federal Rules*, 33 S.D. L. REV. 239 (1988). *See also* M. Minnette Massey, *Depositions of Corporations: Problems and Solutions—Fed. R. Civ. P. 30(b)(6)*, 1986 ARIZ. ST. L.J. 81.

32. FED. R. CIV. P. 30(b)(6).

33. *Id.*; *see* Protective Nat'l Ins., 137 F.R.D. at 277-78 (quoting FED. R. CIV. P. 30(b)(6)) (emphasis omitted).

34. FED. R. CIV. P. 32(a)(2). Although some commentators continue to voice concern regarding potentially lingering problems with the inclusion of the term "managing agent" in Rule 30(b)(6), *see, e.g.*, Massey, *supra* note 31, at 89-99, the list of persons who can be designated by a corporation is not limited to managing agents, or even officers, but rather includes a generic category of potential 30(b)(6) witnesses: "other persons who consent to testify on its behalf." FED. R. CIV. P. 30(b)(6). Thus, the managing agent issue is moot under Rule 30(b)(6) because the onus is on the corporation to designate some witness regardless of his position.

This procedure adds a convenient alternative means of locating an appropriate corporate witness, but "does not preclude taking a deposition by any other procedure authorized in these rules,"[35] and the more common procedure of specific notices naming an adverse corporate agent, "long known to the bar, thus remains available for litigants to employ if they see fit."[36]

The simple Rule 30(b)(6) procedure was thus conceived as an adjunct to the more common form of direct witness designation, an alternative especially helpful when the discovering party has no knowledge of the internal structure of an opposing entity.[37] In recent years, however, discovering parties have begun to warp this tool into a form of oral contention interrogatories and have read into the rule a requirement that a witness be prepared by the entity to provide a *binding synthesis* of every fact in the case. Ensuing sections of this Article sketch the basic operation of this deposition device and explore in greater depth the practical misuse to which some courts and litigants are putting the procedure.

## B. Basic Issues in the Operation of the Rule

*The Notice Must Invoke the Rule 30(b)(6) Mechanism.* A notice expressly invoking the concepts of Rule 30(b)(6) must be used if the discovering party wishes to be entitled to the efforts this rule requires in locating and producing knowledgeable witnesses from within an entity. In one case, a court denied sanctions in the face of a discovering party's claim that two witnesses produced lacked specific knowledge about the issues in question and were ill-prepared for their depositions[38] because the

court found that the discovering party's letter "requests" for "Deposition Witnesses" did not function as a notice pursuant to Rule 30(b)(6).[39]

In general, a deposition notice that states that the depositions are being taken pursuant to Rule 30(b)(6), but names specific individuals as deponents, is inconsistent with the procedure described in Rule 30(b)(6).[40] A simple notice under Rule 30(b)(1) will be sufficient to compel the production of a named officer of the entity, and no specification of subject matter is required for such notice.[41] A notice of deposition which simply indicates that the testimony "is being taken of the organization through the named official or representative" will ordinarily be interpreted as a standard Rule 30(b)(1) notice,[42] and while some courts have suggested that the person designated in the notice will then be expected to testify to matters known or reasonably available to the organization, as under Rule 30(b)(6),[43] no similar duty of preparation is imposed under Rule 30(b)(1).[44]

Hybrid deposition notices are not always treated as facially invalid. One such notice was issued in a Jeep-rollover death case, naming twenty-one specific deponents and also including ten "Rule 30(b)(6) categories."[45] In response, the car maker moved to quash the depositions and sought a protective order, and it offered to produce six individuals to provide the information sought by the plaintiffs.[46] The court ordered the company to produce those six individuals for deposition and, if necessary, any additional persons with knowledge of the ten Rule 30(b)(6) categories.[47]

Note that a narrow subject focus in a Rule 30(b)(6) notice

---

35. FED. R. CIV. P. 30(b)(6).

36. *Founding Church of Scientology*, 802 F.2d at 1451 (citing Atlantic Cape Fisheries v. Hartford Fire Ins. Co., 509 F.2d 577, 578-79 (1st Cir. 1975); 8A WRIGHT ET AL., *supra* note 22, § 2103). The Advisory Committee Note to Rule 30(b)(6) expressly states that the procedure does not supplant but merely "supplements the existing practice whereby the examining party designates the corporate official to be deposed." *Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery,* 48 F.R.D. 487, 515 (1970).

37. *Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery,* 48 F.R.D. 487, 515 (1970).

38. *Bank of N.Y. v. Meridien BIAO Bank Tanz., Ltd.,* 171 F.R.D. 135, 145 (S.D.N.Y. 1997).

39. *Bank of N.Y.,* 171 F.R.D. at 145. The court concluded that the papers exchanged by counsel were "more aptly described as informal requests between counsel," in the form of letters. *Id.* at 145.

40. *Operative Plasterers' & Cement Masons' Int'l Ass'n of the U.S. and Can. AFL-CIO v. Benjamin,* 144 F.R.D. 87, 89-90 (N.D. Ind. 1992).

41. *Benjamin,* 144 F.R.D. at 89-90.

42. *Id.*

43. *Id.*

44. *Compare* FED. R. CIV. P. 30(b)(1) (placing no duty of preparation on deponent), *with id.* 30(b)(6) (requiring that the person designated testify regarding matters known or reasonably available to the organization).

45. *Shelton v. American Motors Corp.,* 805 F.2d 1323, 1325 (8th Cir. 1986)

46. *Shelton,* 805 F.2d at 1324.

47. *Id.*

may have the effect of forcing designation of a specific individual as the witness. Thus, a notice calling for a witness who can testify as to "all communications" of a named person and four entities quite naturally was read as effectively calling for designation of the named individual, who presumably would have better knowledge of his own communications than any other person and might well be the only person on the planet who would have knowledge of them all.[48]

*Specificity Standards.* According to one court, "[f]or a Rule 30(b)(6) deposition to operate effectively, the deposing party must designate the areas of inquiry with reasonable particularity . . . ."[49] Some Rule 30(b)(6) designations are quite specific as to date, time, place and subject matter.[50] Decisions construing the rule have recognized that the particularity of the specification by the discovering party is crucial,[51] and one court found that the requisite specificity was provided where the actual scope of the deposition topics set forth in the notice had been the subject of a pre-deposition motion to quash, a "clarification" motion, and oral argument which had been resolved in two written orders prior to the deposition ever taking place.[52]

Subject listings that are overly broad are improper Rule 30(b)(6) topic specifications.[53] Some Rule 30(b)(6) deposition topic specifications are few in number but very broad in cover-

---

48. Arkwright Mut. Ins. Co. v. Nat'l Union Fire Ins. Co., No. 90-7811-KC, 1993 U.S. Dist. LEXIS 1153, at *4-*7 (S.D.N.Y. Feb. 4, 1993).

49. *United States v. Taylor,* 166 F.R.D. 356, 360 (M.D.N.C. 1996), *aff'd,* 166 F.R.D. 367 (M.D.N.C 1996).

50. For example, in one Arizona litigation, the discovering party asked the adversary to produce the following:

> [O]ne or more officers, directors, managing agents, or other persons who consent to testify [regarding] the events that occurred on June 15, 1990 at the [responding party's facility] located at Thirty-sixth Street and Indian School Road in Phoenix, Arizona between the hours of 10:00 p.m. and 12:00 a.m., June 16, 1990, involving Clayton Sanders and Richard Edmonds.

Sanders v. Circle K Corp., 137 F.R.D. 292, 293 (D. Ariz. 1991).

51. *E.g.,* Graco Childrens Prods., Inc. v. Century Prods. Co., No. 93-6710, 1996 WL 39476, at *33 (E.D. Pa. Feb. 1, 1996); Fleischer v. Resolution Trust Corp., Nos. 92-4018-DES, 92-4019-DES, 1994 WL 725342, at *1 (D. Kan. Dec. 29, 1994).

52. *Taylor,* 166 F.R.D. at 360.

53. Doe v. Yorkville Plaza Assoc., No. 92-8250 (JGK), 1996 U.S. Dist. LEXIS 8663, at *20 (S.D.N.Y. June 21, 1996) (determining, *inter alia,* that the listing "Fire Code requirements for residential buildings built in New York City from 1983 to date" was overly broad).

---

age, such as one in an insurance case which suggested that the witness would need to be fully familiar with her company's allegations of gross negligence against another insurance company in a complex reinsurance arrangement.[54] Using conclusory statements to serve as specifications is not sufficient to justify imposition of broad deposition testimony obligations.[55] Instead, information requests must be "structured" to reach relevant questions.[56] In the face of overbroad discovery demands, timely objection is useful, as is a constructive proffer of alternative means of setting forth information.[57] The Rule 30(b)(6) designation must also list topics that bear a reasonable relationship to the legal issues in the case.[58]

A specification in a blunderbuss format calling for all information supporting a claim or defense averment in a pleading does not, in the view of many courts, constitute a deposition demand providing reasonable particularity about the matters on which examination is requested; hence, it is not sufficient to impose an obligation on the entity to produce a witness who knows about each and every such averment.[59] As one court concluded in denying relief on this ground, "[p]laintiff should have specifically listed all subject matters for which a 30(b)(6) designation is sought."[60]

These decisions demonstrate that proper use of the Rule 30(b)(6) mechanism is a two-way street. The discovering party must take reasonable steps to spell out and confine the definition of topics to be covered so that the preparation burdens imposed on the responding entity remain reasonable.

---

54. *See* Protective Nat'l Ins. Co. v. Commonwealth Ins. Co., 137 F.R.D. 267, 278 (D. Neb. 1989).

55. *Doe,* 1996 U.S. Dist. LEXIS 8663, at *23.

56. *Id.*

57. *See id.*

58. *See id.* at *21 (stating that discovery must focus on legally operative subjects).

59. *See, e.g.,* Skladzien v. St. Francis Reg'l Med. Ctr., No. 95-1516-MLB, 1996 U.S. Dist. LEXIS 20621, at *1-*2 (D. Kan. Dec. 19, 1996).

60. *Skladzien,* 1996 U.S. Dist. LEXIS 20621, at *2.

### C. Designating the Witness

Once served with a Rule 30(b)(6) notice, the corporation is obligated to comply, and it may be ordered to designate witnesses if it fails to do so.[61]

The choice of whom to designate rests with the entity. On occasion, a would-be discovering party has sought to require the entity to designate a specific person as the Rule 30(b)(6) witness in a motion to compel.[62] Neither the Rule nor the Advisory Committee commentary suggests that the discovering party has this right. In one case in which the issue was litigated, the court declined to require the designation because the individual whose designation was sought had interests that were, in fact, adverse to the company on whose behalf the testimony was sought.[63]

In general, there is no need for the relief of compelling a corporation to designate a specific person to testify on its behalf. If the discovering party *knows* of a specific witness whose testimony may be beneficial to its case, the discoveror may issue a *regular* deposition notice and take the witness' testimony under Rule 30. If the employee is an officer, director or managing agent, the testimony will be admissible at trial.[64]

*Who May Be Designated.* Any employee of the entity, or any other persons, may be designated if capable of giving responsive testimony, as discussed in later sections of this Article.[65] When originally contacted, the witness need have no personal knowledge. Hence, a witness' assertion that he lacks "current" knowledge is insufficient to demonstrate a problem with the witness as a deponent.[66]

Some litigants have contended—unsuccessfully—that a person who was not personally involved in the underlying trans-

---

61. 8A WRIGHT ET AL., *supra* note 22, § 2103, at 33.

62. *Sanders v. Circle K Corp.*, 137 F.R.D. 292, 293 (D. Ariz. 1991).

63. *Sanders*, 137 F.R.D. at 293.

64. *See* FED. R. CIV. P. 32(a)(2).

65. Some litigants have contended that a person who is not an officer, director or managing agent for the responding entity is, for that reason, not an appropriate corporate spokesperson within the meaning of FED. R. CIV. P. 30(b)(6). *Sanders*, 137 F.R.D. at 293. Nothing in the Rule, however, limits appropriate designees to these senior officials.

66. *See* Arkwright Mut. Ins. Co. v. Nat'l Union Fire Ins. Co., No. 90-7811-KC, 1993 U.S. Dist. LEXIS 1163, at *5-6 (S.D.N.Y. Feb. 4, 1993).

---

actions is not a proper designee for Rule 30(b)(6) testimony.[67] Any witness who can gather responsive information may be designated by the company, and one common scenario finds that corporations have designated as Rule 30(b)(6) witnesses persons who, although lacking personal knowledge, have already performed some sort of internal investigation of the circumstances leading to the litigation.[68]

*Former Employees, Consultants and Third Parties as Rule 30(b)(6) Witnesses.* Outside of the Rule 30(b)(6) context, depositions of former employees are generally treated as depositions of non-parties, requiring service of a subpoena.[69] The former employee no longer has authority to testify on behalf of the entity, and the entity typically will not have control over the production of the witness.[70] As a result, the discovering party must proceed as in the case of any other individual non-party witness, which includes following the general rules applied to those witnesses residing beyond the court's subpoena power.[71]

It is generally held that a company cannot be "required to designate a retired employee to serve as a 30(b)(6) designee, because 'it cannot be supposed that . . . former employees would identify their interests with those of their former employers to such an extent that admissions by them should be held to bind the employer.'"[72] Thus the entity is under no *compulsion* to produce a non-party, such as a former employee, as a witness at a 30(b)(6) deposition.[73]

However, *at the option of the entity* a person who is not a director, officer or even an employee of the entity from whom evidence is sought may serve as a proper designee under Rule

---

67. *Sanders*, 137 F.R.D. at 293.

68. *Id.* (involving regional personnel officer who investigated the events for the company shortly after the incident).

69. Operative Plasterers' & Cement Masons' Int'l Ass'n of the U.S. and Can. AFL-CIO v. Benjamin, 144 F.R.D. 87, 90 (N.D. Ind. 1992).

70. *Benjamin*, 144 F.R.D. at 90.

71. *Id.* (citing Harris Corp. v. Amperex Elec. Corp., No. 86-C6338, 1987 U.S. Dist. LEXIS 14108, at *7 (N.D. Ill. May 8, 1987)); 7 MOORE'S FEDERAL PRACTICE § 30.21 (3d ed. 1997).

72. Irrardi v. Lorillard, Inc., No. 90-7049, 1991 U.S. Dist. LEXIS 11887, at *5 (E.D. Pa. Aug. 20, 1991) (quoting Proseus v. Anchor Line, Ltd., 26 F.R.D. 165, 167 (S.D.N.Y. 1960)).

73. Abramson v. Florida Gas Transmission Co., 908 F. Supp. 1376, 1382 (E.D. La. 1995).

30(b)(6). Many times a company responding to a Rule 30(b)(6) notice is hard-pressed to locate present employees who have any knowledge of bygone events. If the entity is willing to designate a former employee as its deponent (and if the witness accepts the role), the use of a former employee or any other person as a designee is fully permissible under the Rule.[74] In one litigation, a Swiss citizen was deposed on behalf of two entities which had been dormant for some years and had no current officer with knowledge of the transactions at issue in the lawsuit.[75] The designated witness was the sole person then directing and controlling the entities but had no personal knowledge of the issues.

In some cases, corporations served with a deposition request under the rule may then retain a former employee as a consultant to give testimony.[76] At least one observer has endorsed this process as indicating a flexible means by which a corporation may respond when the issues addressed in the deposition notice are within the knowledge of a particular former employee still favorably disposed toward the company.[77]

The entity designating a witness is ipso facto empowering that individual to give testimony admissible against the company.[78] Thus, it has been held that a company is free to designate third persons who have appropriate knowledge to give testimony on behalf of the entity under the Rule 30(b)(6) deposition procedure.[79]

Clearly, placing the fate of a corporate litigation party in the hands of former employees, consultants and non-parties is a dramatic step, one that is contemplated in practice only because the obligation to locate and prepare a witness in response to a Rule 30(b)(6) request sometimes cannot be satisfied by current personnel. Imposition of this burden—with its attendant risks—is

appropriate only where the discoveror has used the Rule 30(b)(6) device for proper purposes, and where proceeding with such testimony is a sensible and efficient means of illuminating the issues on which discovery is sought.[80]

*Designating Multiple Witnesses.* A party responding to a Rule 30(b)(6) request may designate a single witness or a slate of deponents calculated to address the various topics the discovering party has set forth.[81] A party intending to produce multiple witnesses in response to a Rule 30(b)(6) notice probably should indicate by letter or another written response the identity of all persons who will be designated as deponents at the Rule 30(b)(6) deposition, their dates of availability for examination, and, for each such person, the areas of inquiry and/or sub-area of inquiry as well as the period of time as to which such persons will testify.[82] Evidently, to facilitate determination of whether the party has adequately addressed the identified topics, some courts have required that the witnesses be produced in the *order* of the topic listing.[83] Obviously, as complexity increases, there is greater need for cooperation and negotiation to resolve practical difficulties with schedules, overlapping topic coverage of multiple individuals, and the like.

*Adopting the Testimony of Others as a 30(b)(6) Response.* In one of the most prominent decisions construing the Rule 30(b)(6) device, the court appears to have contemplated that a corporation could "adopt" testimony in prior depositions as its position on various issues.[84] This option is attractive for corporations who are litigating over events that happened so far in the past that they have no current witnesses with knowledge, and who may benefit from selecting among the versions of events expressed by third-party witnesses.[85] While this option provides the discovering party with testimony it can use against the enti-

74. *Ierardi*, 1991 U.S. Dist. LEXIS 11887, at *6.
75. Sierra Rutile, Ltd. v. Katz, No. 90-4913 (JFK), 1995 U.S. Dist. LEXIS 118, at *2-*3, *6 (S.D.N.Y. Jan. 10, 1995).
76. Hilburn v. John Deere & Co., No. 88-3692, 1990 U.S. Dist. Lexis 10299, at *9-*10 (E.D. Pa. Aug. 7, 1990).
77. John J. Barnhardt, III & Jeffrey S. Whittle, *Use of Rule 30(b)(6) Depositions in Intellectual Property Litigation*, 74 J. PAT. OFF. SOC'Y 683, 697 (1992).
78. *See* FED. R. CIV. P. 32(a)(2) (referring to testimony of "a person designated under Rule 30(b)(6)").
79. United States v. Taylor, 166 F.R.D. 356, 364 (M.D.N.C. 1996), *aff'd*, 166 F.R.D. 367 (M.D.N.C. 1996).

80. *See infra* discussion of alternative means for disclosure of facts text accompanying notes 165-66.
81. Bank of N.Y. v. Meridien BIAO Bank Tanz., Ltd., 171 F.R.D. 135, 151 (S.D.N.Y. 1997).
82. *See Taylor*, 166 F.R.D. at 364, ¶ 3.
83. *See id.* (adopting this procedure where the government had identified seventy-six topics and subtopics on which it demanded deposition testimony under the rule).
84. *See id.* at 365, ¶ 11.
85. *See id.*

ty for all purposes, it also raises the possibility that the prior depositions would have been conducted differently if the discoveror had known that the testimony elicited represented a statement of the corporate position of the entity on the subjects addressed.

In passing, however, at least one court has stated that a prior deposition of the designee "as a fact witness" is not grounds for precluding further questioning under Rule 30(b)(6).[86] To the extent that this approach prevails, the ability to adopt other testimony may have limited utility.

## D. Scope of the Questioning at the Deposition

A Rule 30(b)(6) notice does not limit the scope of the deposition to the designated topics.[87] Counsel for the discovering party is permitted to ask a witness produced pursuant to this Rule *any question pertinent to discovery in the suit*, and the witness must answer on behalf of the corporation to the extent that the witness is able.[88]

---

86.  Ierardi v. Lorillard, Inc., No. 90-7049, 1991 U.S. Dist. LEXIS 11687, at *6 (E.D. Pa. Aug. 20, 1991).

87.  King v. Pratt & Whitney, 161 F.R.D. 475, 476 (S.D. Fla. 1995).

88.  *See* Paparelli v. Prudential Ins. Co., 108 F.R.D. 727, 729 (D. Mass. 1985). Neither the text of the Rule 30(b)(6) nor the notes of the Advisory Committee indicates that the "matters on which examination is requested" which are listed in a 30(b)(6) deposition notice limit the scope of the examination. Thus, on the rare occasion where this issue has come up, courts have concluded that the sentence in Rule 30(b)(6) which states that the "persons so designated shall testify as to matters known or reasonably available to the organization" should be read to provide that the deposition is not strictly limited to the "matters" listed in the notice. *See Paparelli*, 108 F.R.D. at 729. Note that the purpose of Rule 30(b)(6) is to afford the party deposing the corporation the ability to obtain information on certain matters in the form of testimony on behalf of the corporation without having to name the individual in the corporation to be deposed. Therefore,

it makes little sense for a party to state in a notice that it wishes to examine a representative of a corporation on certain matters, have the corporation designate the person most knowledgeable with respect to those matters, and then to ask the representative about matters [different from or unrelated to the] ones listed in the notice.

*Id.* at 729-30. The goal of having witnesses who actually have the knowledge needed by the discovering party is also thwarted if the notice is not a guide to the scope of the testimony. *Id.* at 730. Finally, the "reasonable particularity" requirement applicable to the notice

also lends weight to the notion that a limitation on the scope of the deposi-

---

This breathtaking license for the discovering party allows it to capture admissions that may be used against the company on all manner of subjects. However, any more narrow reading of the scope of permissible examination would provide little comfort to the corporation (or witness) because the discovering party could expand the specified coverage by renewing the Rule 30(b)(6) deposition notice with a broader topic listing or simply by re-noticing the deponent under the regular notice provisions to ask him the same questions that were subject to objection in the 30(b)(6) deposition.[89] Prevailing judicial thinking, however, is that the discovering party "should not be forced to jump through that extra hoop absent some compelling reason."[90] Thus, while the discovering party has presumably listed the most important of the expected deposition topics in the Rule 30(b)(6) notice (so as to assure itself of a witness knowledgeable about the expected topics for examination), most courts have ruled that questioning on other topics is permissible.[91] Hence, if the witness happens to have knowledge on an appropriate topic not listed in the notice, answers will be required.[92]

It sometimes happens, of course, that at the deposition itself discovering counsel will think of topics that were not listed in the specification accompanying the Rule 30(b)(6) notice. In that situation, efforts to elicit testimony on the additional topics are obviously not barred, though gaps in the witness' responses are understandable given the lack of notice of the added topics.[93] One court observed that if the deponent does not know the answer to questions *outside* the scope of the matters described in the notice, then that is the examining party's problem.[94]

---

tion to the matters specified in the notice is implied in the rule. If a party were free to ask any questions, even if "relevant" to the lawsuit, which were completely outside the scope of the "matters on which examination is requested," the requirement that the matters be listed with "reasonable particularity" would make no sense.

*Id.*

89.  *King*, 161 F.R.D. at 476.

90.  *Id.*

91.  *Id.*

92.  *See id.*

93.  Skladzien v. St. Francis Reg'l Med. Ctr., No. 95-1518-MLB, 1996 U.S. Dist. LEXIS 20621, at *2 (D. Kan. Dec. 18, 1996); *see also King*, 161 F.R.D. at 475.

94.  *Skladzien*, 1996 U.S. Dist. LEXIS 20621, at *2.

The Rule's requirement that the notice "describe with reasonable particularity" the subjects is thus a two-edged sword. It imposes an obligation on a corporation to make reasonable efforts to locate a designee who can indeed answer the particular questions presaged by the notice, but Rule 30(b)(6) does not limit what can be asked at deposition.[94] Because there is no specific limitation in that rule on what can be asked at deposition, the general deposition standards govern.[95] The goals in adopting Rule 30(b)(6) were not to provide greater notice or protections to corporate deponents, but rather to have a knowledgeable person present at deposition to give testimony on its behalf.[96]

## III. Measuring Adequacy of the 30(b)(6) Deposition: Gaps, Fallbacks and Non-Appearance

### A. The Basic Obligation to Appear

Pursuant to Rule 37(d), the court can impose sanctions when a party or person designated under Rule 30(b)(6) fails "to appear before the officer who is to take the deposition, after being served with a proper notice."[97] Although one can easily

95. *Id.*
96. Fed. R. Civ. P. 30(b)(6) ("This subdivision (b)(6) does not preclude taking a deposition by any other procedure authorized in these rules.").
97. *King*, 161 F.R.D. at 476. In *King*, the court stated:
The Rule is not one of limitation but rather of specification within the broad parameters of the discovery rules. This is made clear by both the Advisory Committee's statement that 30(b)(6) "should be viewed as an added facility for discovery . . ." and the Rule's final sentence: "This subdivision (b)(6) does not preclude taking a deposition by any other procedure authorized in these rules." This Court sees no harm in allowing all relevant questions to be asked at a Rule 30(b)(6) deposition or any incentive for an examining party to somehow abuse this process.
*Id.* (citation omitted).
98. Fed. R. Civ. P. 37(d); *see* Bank of N.Y. v. Meridien BIAO Bank Tanz., Ltd., 171 F.R.D. 135, 151 (S.D.N.Y. 1997); *see also* Fed. R. Civ. P. 37(b)(2) (permitting the court to make such orders "as are just" and/or impose sanctions where the party or person designated under Rule 30(b)(6) "fails to obey an order to provide or permit discovery"); Republic of the Philippines v. Marcos, 888 F.2d 954 (2d Cir. 1989) (holding that sanction of dismissal for failure of corporate plaintiff to present two witnesses for deposition was proper).

grasp what is meant by the concept of appearance for specifically designated witnesses under Rule 30(b)(1), determining whether a corporation has arranged for an effective appearance by its designated Rule 30(b)(6) witnesses can be more elusive. Recent misuse of the Rule 30(b)(6) device is often manifested in and centered around arguments that gaps in the knowledge of a company's designated witness are effectively a form of "nonappearance" subject to draconian Rule 37 sanctions. A review of the case law and reflection on the purposes of this rule, however, suggest that the approach to gaps in the testimony should be quite different. Especially when one considers that often Rule 30(b)(6) depositions are sought on topics as to which the responding party simply has no viable witness possessing the requisite knowledge, forcing the responding party to recruit, educate, and prepare a person to give testimony on subject matters in which he or she had no involvement at the relevant times, a knee-jerk application of sanctions seems highly inappropriate.

*True Non-Appearance.* One prominent decision construing sanctions under this discovery device imposed the ultimate sanction of disposing of a case entirely.[99] Although dismissal of an action or proceeding is the most severe of appropriate sanctions,[100] the "element of willfulness or conscious disregard' for the discovery process . . . justifies the sanction of dismissal."[101] Thus, in a case in which there were clearly knowledgeable witnesses who blatantly refused to make themselves available for deposition pursuant to the notice after repeated court orders requiring appearance, the trial judge's decision to impose a dismissal sanction was upheld.[102] The testimony was so important to the action that failure to appear for deposition was found to have visited significant prejudice upon the other parties.[103] The

99. *Marcos*, 888 F.2d at 955.
100. *See* National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 642-43 (1976) (per curiam).
101. Founding Church of Scientology, Inc. v. Webster, 802 F.2d 1448, 1458 (D.C. Cir. 1986) (quoting Dellums v. Powell, 566 F.2d 231, 235 (D.C. Cir. 1977)).
102. *Marcos*, 888 F.2d at 955. The two witnesses who refused to appear were managing agents for the several corporations who were parties to the action, and one of the witnesses was the beneficial owner of much of the property involved. *See id.* at 955-57.
103. *See id.* at 956-57.

reviewing court was able to reach that conclusion because *other testimony* from witnesses documented the controlling role of the two witnesses who refused to appear.[104] Finally, there was a sense that the defaulting witnesses, owners of property who sought affirmative relief from the court, could not at the same time withhold information vital to the defense.[105] However, in keeping with the strong policy of deciding cases on the merits, the reviewing court noted that because the principal non-appearing financier had been extradited to the United States in another connection, the option existed to move the district court "to vacate its judgment upon tendering him for deposition."[106]

### B. Non-Responsiveness "Tantamount" to Non-Appearance

A party which does no more than produce a live body in the deposition room who disclaims any knowledge of the topics designated for testimony has, in the view of the cases, in effect not appeared at the deposition. Accordingly, designation of witnesses in response to a Rule 30(b)(6) deposition notice who claim to command no knowledge whatsoever about the topics listed by the discovering party has been deemed persuasive evidence of behavior by the party which is "tantamount to a complete failure of the corporation to appear."[107]

Many cases in recent years have spoken about this type of "non-appearance" and have created the specter that a broad range of weak deposition testimony may be deemed a failure to appear.[108] A close analysis of these cases indicates that the rhetoric of the decisions should not be read to erect burdens not contemplated in the rules and that most courts do not lunge toward the imposition of sanctions when problems arise in Rule 30(b)(6) depositions. A few courts, however, have taken the aspirational rhetoric as a literal synthesis of legal obligations, and sanction decisions are starting to emerge from this deposition procedure that are neither warranted under the Rule nor

---

104. *See id.*
105. *Moross*, 888 F.2d at 957.
106. *Id.*
107. Resolution Trust Corp. v. Southern Union Co., 985 F.2d 196, 197 (5th Cir. 1993).
108. *See infra* note 114.

sustainable in logic and common sense.[109] Our goal in this discussion, therefore, is to separate the dicta from the holdings in these cases and to identify the proper office of the Rule 30(b)(6) deposition device.

The test of compliance with the rules is actual testimony: it is *not* acceptable for the producing party to designate persons who simply "might have pertinent knowledge."[110] In an earlier era similar abusive behavior was encountered in some instances in which document production was used in lieu of interrogatory responses,[111] and led to an express comment in the Advisory Committee commentary to the effect that the producing party must have reason to believe that the information is likely to be available in the location to which the discovering party is directed.[112] Applying these concerns to Rule 30(b)(6) depositions, it has been noted that a responding party cannot satisfy the rule if its response reflects no recognition of an "obligation to make any investigation, including the review of readily available records, to identify an appropriate witness for Rule 30(b)(6) purposes."[113]

In this context, a few courts have held that "[p]roducing an unprepared witness is tantamount to a failure to appear."[114]

---

109. *See infra* notes 114-17.
110. *Southern Union Co.*, 985 F.2d at 197.
111. FED. R. CIV. P. 33(d) provides that a responding party may escape responsibility for preparing a textual response to an interrogatory if the answer to [the] interrogatory may be derived or ascertained from the business records of the party upon whom the interrogatory has been served or from an examination, audit or inspection of such business records, including a compilation, abstract or summary thereof, and the burden of deriving or ascertaining the answer is substantially the same for the party serving the interrogatory as for the party served . . . .
  *Id.* In practice, a disclosing party is *not free* to send the discovering party on a goose chase in search of information that "might" be located in documents. The Advisory Committee has commented that the disclosing party must have reason to conclude that the information is actually available in the records to which it would remit the discoverer. *See* Amendments to the Federal Rules of Civil Procedure, 85 F.R.D. 521, 531 (1980).
112. *See* Amendments to the Federal Rules of Civil Procedure, 85 F.R.D. 521, 531 (1980).
113. *Southern Union Co.*, 985 F.2d at 197.
114. United States v. Taylor, 166 F.R.D. 356, 363 (M.D.N.C. 1996), *aff'd*, 166 F.R.D. 367 (M.D.N.C. 1996) (citing *Southern Union Co.*, 985 F.2d at 197); *cf.* Great v. Equity Am. Ins. Co., 884 P.2d 228, 232 (Ariz. Ct. App. 1994) ("Providing an uninformed warm body for a Rule 30 deposition approximates providing no one at all.").

Courts, almost by rote, conclude that a party which fails to provide a witness who is knowledgeable in the areas requested in a Rule 30(b)(6) notice is subject to sanctions.[115] Where the 30(b)(6) process results in testimony that is judged to be tantamount to a total failure to appear, the rules provide the court with the discretion to impose a selection of sanctions that range from the imposition of costs to the entry of a default judgment.[116] However, to warrant imposition of sanctions, "the inadequacies in a deponent's testimony must be egregious and not merely lacking in desired specificity in discrete areas."[117]

One federal court found that where a witness was "wholly unable to render testimony regarding one of the three subject areas for which he was designated," the "performance amounts to non-appearance, which could warrant the imposition of sanctions."[118] While the partial inability to testify could thus be viewed as non-appearance on that topic, "because sanctions that prohibit a party from introducing evidence are typically reserved for only flagrant discovery abuses," preclusion orders should not flow from such incremental defects.[119]

*Hiding the Ball.* If the entity *has* a witness with pre-existing knowledge of specified topics at its disposal, designation of sham witnesses who lack knowledge of the subjects on which testimony is sought will subject the company to sanctions.[120] For example, in *Resolution Trust Corp. v. Southern Union Co.,*[121] a prominent case, the discovering party served a Rule 30(b)(6)

115. *See* Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 78 (S.D.N.Y. 1991); Thomas v. Hoffman-La Roche, Inc., 126 F.R.D. 522, 524-25 (N.D. Miss. 1989).

116. *See* FED. R. CIV. P. 37(b)(2); Bank of N.Y. v. Meridien BIAO Bank Tanz., Ltd., 171 F.R.D. 135, 151-52 (S.D.N.Y. 1997).

117. *Bank of N.Y.*, 171 F.R.D. at 151 (quoting Zappia Middle East Constr. Co. v. The Emirate of Abu Dhabi, No. 94-1942, 1995 WL 686715, at *8 (S.D.N.Y. Nov. 17, 1995)).

118. *Id.*

119. *Id.* at 151-52 (declining to impose even cost sanctions given the complexity of the issues and the disclosures that were in fact made). In *Turner v. Hudson Transit Lines, Inc.*, the designated witness lacked knowledge about two out of four designated areas and provided misleading testimony about a third. 142 F.R.D. at 79; *see also Thomas*, 126 F.R.D. at 524 (awarding sanctions where deponents, medical doctors, were unable to testify about marketing of a drug and dissemination of information about it as requested in the Rule 30(b)(6) deposition notice).

120. Resolution Trust Corp. v. Southern Union Co., 985 F.2d 196, 196 (5th Cir. 1993).

121. 985 F.2d 196 (5th Cir. 1993).

notice one and one-half pages in length, listing ten separate topics on which a knowledgeable witness was sought.[122] Counsel for the parties had several telephone calls about the arrangements.[123] Though the entity knew of at least one witness knowledgeable on the matters, it designated two individuals with no knowledge whatsoever.[124] Discovering counsel flew from Washington, D.C. to Texas for the depositions, and as he went down the roster of ten topics, to each subject the witnesses affirmed that they had no knowledge.[125]

*After* one discovering counsel's motion for sanctions, the corporation produced documents addressing some of the subjects, including some papers that identified another individual as having relevant knowledge.[126] This third individual was deposed and shown the relevant documents, and his recollection was refreshed.[127] The reviewing court concluded that the corporation "obviously made no effort to review documents which would have informed it of [the third witness'] relevant knowledge."[128] On this record sanctions were imposed and upheld by the Fifth Circuit.[129]

The Second Circuit has taken the position that a deponent's failure to answer questions at a deposition was not equivalent to a failure to appear.[130] Under this view, as long as the deponent physically appears, "the proper procedure is first to obtain an order from the court, as authorized by Rule 37(a), directing him to be sworn and to testify."[131] Most other courts, however, have taken the view that proffering a completely unknowledgeable witness may be construed as a form of default.[132] The Fifth Circuit rejected a direct analogy between the

122. *Southern Union Co.*, 985 F.2d at 196.

123. *Id.*

124. *Id.* at 196-97.

125. *Id.*

126. *Id.* at 197.

127. *Southern Union Co.*, 985 F.2d at 197.

128. *Id.*

129. *Id.* The sanction selected was an award of costs and fees incurred in deposing the first two designated representatives and in identifying the third individual as a person with knowledge. *Id.*

130. Salahuddin v. Harris, 782 F.2d 1127, 1131 (2d Cir. 1986).

131. *Salahuddin*, 782 F.2d at 1131 (quoting SEC v. Research Automation Corp., 521 F.2d 585, 588-89 (2d Cir. 1975)).

132. Greenwood v. Dittmer, 776 F.2d 785, 790-91 (8th Cir. 1985) (interpreting

deposition of a natural person under a normal notice and the deposition of a corporation under Rule 30(b)(6).[132] Because the purpose of the Rule 30(b)(6) device is to streamline the discovery process, this mechanism places the different form of burden on the corporation for identifying responsive witnesses. Under this procedure, when an entity designates a person to testify on its behalf, "the corporation appears vicariously through that agent."[134] Therefore, the Fifth Circuit held that if the designated agent is not knowledgeable about relevant facts, "the principal has failed to designate an available, knowledgeable, and readily identifiable witness, [and] the appearance is, for all practical purposes, no appearance at all."[135]

Thus, on one level, there is a distinction between a typical deposition in which *the discovering party selects the deponent* and a Rule 30(b)(6) deposition, where the responding entity is obliged to select a witness to address listed topics. The court acknowledged that there is, in some sense, a potential for abuse in the Rule 30(b)(6) context which is not present when the party

---

similar language in Rule 30(g)(2)). In *Greenwood*, the Eighth Circuit held that a court may "order a party to reimburse those attending a deposition if the witness does not appear because the party failed to serve a subpoena upon him" and stated that Rule 30(g)(2) also may be invoked if a physically present witness is unwilling to testify. *Greenwood*, 776 F.2d at 190-91.

In a multi-district, multi-party lawsuit where a defendant's attorneys from one of the districts had attended the deposition of a non-party witness and plaintiff's counsel had said that he would inquire into issues relevant to that defendant's case but only made inquiries into matters relevant to other cases, the Tenth Circuit held that the lower court should wait until the final disposition of the case before considering the propriety and amount of sanctions for attorney fees and expenses. Cronin v. Midwestern Okla. Dev. Auth., 619 F.2d 856, 864 (10th Cir. 1980). Although the appellate court noted that "[a]ttendance without proceeding forward with a deposition is sufficient to invoke the provisions of Rule 30(g)," the court reasoned that it was too early to determine the propriety of deposition vis-a-vis this particular defendant, because all of the pending cases "involved interrelated nationwide fraudulent schemes." Cronin, 619 F.2d at 864. The appellate court also held that the lower court erred by restraining further depositions until plaintiff had deposited reimbursement monies for this deposition with the court. *Id.* Lower courts have also treated unknowledgeable witnesses as a form of default. *E.g.*, Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 79 (S.D.N.Y. 1991) (awarding costs and fees to examining party where the deposed party's 30(b)(6) designee failed to have knowledge regarding two of four topics requested in the 30(b)(6) notice and provided misleading testimony regarding a third topic).

133. *Southern Union Co.*, 985 F.2d at 197.
134. *Id.*
135. *Id.*

---

noticing the deposition specifies the deponent.[136] While nothing in Rule 30(b)(6) requires *personal knowledge* in the sense of knowledge gained during the underlying transactions, case law implementing the rule focuses on whether the witness proffered has information to convey on the topics designated.

It is significant that the Fifth Circuit holding in *Resolution Trust Corp. v. Southern Union Co.*, upholding sanctions, was conditioned upon the fact that there *was* a knowledgeable witness readily available.[137] In this case, the producing entity possessed documents that clearly identified a third individual as having personal knowledge of the subject of the deposition, and the entity did not produce those documents or designate the third witness until *after* it had designated two utterly unknowledgeable witnesses, had imposed upon counsel for the discovering party the expense of traveling across the country for two pointless deposition exercises, and then had been served with a motion for sanctions.[138] In this egregious situation, the Fifth Circuit found that the trial court's conclusion that the producing party did not make a "meaningful effort to acquit its duty to designate an appropriate witness" was manifestly correct and surely not an abuse of discretion.[139] Hence, it upheld the award of costs and fees under Rule 37(d).[140]

### C. Determining when Some Testimony Is Enough

By contrast, one court determined that when the deponents in a case rendered testimony concerning some of the subject areas of their designations, regardless of what other subject areas could have been covered by the deponents, their performance did *not* amount to non-appearance,[141] and hence sanc-

---

136. *Id.*
137. *Id.*
138. *Southern Union Co.*, 985 F.2d at 197.
139. *Id.* The court also rejected the notion that a mini-hearing into the circumstances of the witnesses' designation was obligatory. In the context, the trial court could determine the sanction application without holding an evidentiary proceeding. *Id.*
140. *Id.*
141. Zappia Middle East Constr. Co. v. The Emirate of Abu Dhabi, No. 94-1942, 1995 U.S. Dist. LEXIS 17167, at *26-*27 (S.D.N.Y. Nov. 17, 1995).

tions were not applicable.

While a largely unresponsive corporate designee may be considered tantamount to a "no show,"[142] where there are claimed gaps in the deponent's testimony, the fact that the designated Rule 30(b)(6) witnesses "did render testimony concerning the subject areas of their designations"[143] is often considered controlling. Thus, in one case, the court found that four transcripts containing 183 pages of responsive testimony was at least an appearance, not tantamount to presentation of "no witness" and hence not subject to sanctions.[144]

*Unanswered Questions Versus Unaddressed Topics.* For purposes of determining whether the entity is culpable for failing to produce a proper witness, the test is whether the proffered deponent was "an utterly inadequate 30(b)(6) witness."[145]

Some courts have taken the inflexible view that where the corporate party's designee gives answers to one or more questions which are to the effect that the witness lacks knowledge or has no opinion, then "[a]s to the subject matter of each such question, [the discovering party] is entitled to an additional 30(b)(6) designee who is able to give responsive answers that will bind Plaintiff at the trial of this action."[146] The better decisions, however, approach the evaluation of a deposition by focusing on the roster of legitimate topics properly set forth and the proportion of those topics on which the witness produced had some relevant information.

One court, quite evidently irritated at a variety of misconduct in conjunction with the deposition program, ruled that if a Rule 30(b)(6) designee gave "noncommittal answers to any substantive question" bearing on a list of allegations in the pleadings, "then on the next business day [the entity] shall produce for deposition one or more 30(b)(6) designees who can answer all yet-unanswered questions and all reasonable follow-up

142. Barron v. Caterpillar, Inc., 168 F.R.D. 175, 177 (E.D. Pa. 1996).
143. *Zappia Middle East Constr. Co.*, 1995 U.S. Dist. LEXIS 17187, at *27.
144. *Id.* at n.13 (tabulating transcript pages).
145. *Id.* at *14.
146. *See, e.g.*, Masco Corp. v. Price Pfister, Inc., No. 94-728-A, 1994 U.S. Dist. LEXIS 20597, at *7-*8 (E.D. Va. Nov. 30, 1994), *aff'd in part, rev'd in part*, 1994 U.S. Dist. LEXIS 20355 (E.D. Va. Oct. 28, 1994).

questions."[147]

### D. Fallback Witnesses

Where the witness has *some* knowledge and has not totally failed to address the topics specified, no relief may be necessary. One court expressly concluded that the entity had satisfied its duty under Rule 30(b)(6) by providing "the most qualified person available" as its deponent.[148] Such a witness, combined with other discovery made available under regular means such as interrogatory responses and document production, will in many cases provide the deposing party with all that it needs to be ready to present its case at trial and to challenge the entity's case.[149] Particularly when substantial time has passed between the events being litigated and the date of the deposition, limits on the knowledge of the witness are not surprising, and where both 30(b)(6) and regular depositions have taken place, re-deposition under Rule 30(b)(6) can be avoided.[150]

Nonetheless, where there are needs not otherwise dealt with in other discovery, the appropriate response to gaps in the testimony may be either for the witness to be re-prepared, if there are information sources reasonably available to the entity, or for *other* witnesses to be designated to provide supplemental testimony pursuant to the notice under the Rule. As one court commented, if the witness designated initially "cannot answer the questions, perhaps other corporate representatives can."[151] If, despite good faith efforts by the entity to prepare its designee, a witness is unable to respond to a specific area of inquiry, the entity has been given leave promptly to designate and prepare a substitute to testify to that area of inquiry.[152] Some courts

147. *Masco Corp.*, 1994 U.S. Dist. LEXIS 20597, at *8.
148. Barron v. Caterpillar, Inc., 168 F.R.D. 175, 177 (E.D. Pa. 1996).
149. *See generally* Barron, 168 F.R.D. at 177 (noting that other discovery had been made available to the deposing party).
150. *See, e.g.*, United States v. Massachusetts Indus. Fin. Agency, 162 F.R.D. 410, 412 (D. Mass. 1995) (stating that one Rule 30(b)(6) deposition and five Rule 30(b)(1) depositions of specified individuals sufficed to make further 30(b)(6) testimony unnecessary).
151. Audiotext Communications Network v. US Telecom, Inc., No. 94-2395-GTV, 1995 U.S. Dist. LEXIS 15416, at *38 (D. Kan. Oct. 5, 1995).
152. *Audiotext Communications Network*, 1995 U.S. Dist. LEXIS 15416, at *39,

have stated that the party must do so,[153] and a few courts say the follow-up must take place "immediately."[154]

A step-by-step approach is implicit even in the decisions of the most demanding courts. Thus, they hold that once a company becomes aware that the chosen representative lacks sufficient knowledge about certain matters, the company has the duty to substitute another person for deposition or adequately prepare the initial deponent for a further session of testimony in which he could fully answer the questions.[155]

Of course, if a party recognizes in advance that no one witness could bear the burden of testifying for the company as to all issues in the deposition notice or for other strategic reasons, it may designate a slate of deponents calculated to address the various topics the discovering party has set forth.[156]

### E. Relevance of Other Information Sources

In determining whether a Rule 30(b)6) deposition with apparent gaps in the testimony represents a discovery shortfall, and hence demonstrates a need for remedial action, the question should not be whether the deposition transcript sets forth every fact in the case and takes a position on every issue, construes every document and describes every event. Rather, the question should be whether the deposition in conjunction with other information available to the discovering party is sufficient to permit fair preparation for the coming trial.

One measured response to uncontestable gaps in the testimony of a Rule 30(b)6) designee is to rely on alternative discovery tools to complete the discovering party's necessary picture of the events. Thus, it has been recognized by some courts that the mere fact that there are topics in the notice which the witness cannot address does *not* make out a prima facie showing that

153. *E.g.*, FDIC v. Butcher, 116 F.R.D. 196, 199 (E.D. Tenn. 1986), *aff'd* 116 F.R.D. 203 (E.D. Tenn. 1987).
154. *See, e.g.*, Sanstrom v. Ross, No. 93-7146 (RLC), 1996 U.S. Dist. LEXIS 11923, at *17 (S.D.N.Y. Aug. 16, 1996) (quoting 8A WRIGHT ET AL., *supra note* 22, § 2103, at 31-32).
155. Marker v. Union Fidelity Life Ins. Co., 125 F.R.D. 121, 126 (M.D.N.C. 1989).
156. *See supra* text accompanying notes 81-83.

there was conduct tantamount to a complete failure to appear.[157] Absent a showing of willfulness or bad faith, the better judicial response is to consider other means of shedding light on the facts.[158] One court declined the discovering party's motion for the appointment of an additional Rule 30(b)6) designee after the one presented purportedly failed to provide complete response to the government's requests.[159] In many cases "the most the Court will do . . . is to require [defendant] to produce more documents and clarify its position in response to a number of interrogatories."[160] The discovering party will need to specify in new requests the items of information needed and not previously addressed, and the entity will be permitted to "explain its position further through responses to those interrogatories and requests."[161]

As a result, some courts have taken the position that disclosing the identity of a knowledgeable employee, along with providing basic information to permit the discovering party to serve a notice upon the individual, is sufficient to render "moot any issue as to whether [the entity] should have produced him at a 30(b)6) deposition."[162]

In a complex antitrust case involving telephone rates, production of three witnesses in response to a Rule 30(b)6) deposition notice was held to be adequate, despite complaints from the discovering parties that there were gaps in the knowledge of the individuals and despite the fact that the producing entity failed to specify which of the twenty-six categories listed in the discovering party's motion about which the three witnesses could testify.[162] Because the discovering party was able to depose three witness who had some knowledge and had other discovery addressing the issues in the case, the trial judge's conclusion that

157. United States v. Massachusetts Indus. Fin. Agency, 162 F.R.D. 410, 412 (D. Mass. 1995).
158. *Massachusetts Indus. Fin. Agency*, 162 F.R.D. at 412.
159. *Id.*
160. *Id.*
161. Barron v. Caterpillar, Inc., 168 F.R.D. 175, 178 (E.D. Pa. 1996).
162. Abramson v. Florida Gas Transmission Co., 908 F. Supp. 1376, 1383 (E.D. La. 1995).
163. Directory Sales Management Corp. v. Ohio Bell Tel. Co., 833 F.2d 606, 609 (6th Cir. 1987).

further discovery was not required was upheld.[164]

*Rule 26 Triage Provisions.* There is little case law under Rule 26(b)(2), but arguments stressing the availability of simpler, cheaper means of learning facts may be pertinent in Rule 30(b)(6) contexts. In the reported decisions to date, an entity has occasionally attempted to use the availability of alternative avenues to obtain reversal through supervising courts of decisions by judges and magistrate judges who have already set a plan of discovery in motion. In that posture, where the abuse of discretion test applies, the fact that the judge managing discovery has not focused on the less burdensome alternative means has not generally proved persuasive.[165]

Rule 30(b)(6) was intended in part to promote the efficient discovery of facts.[166] For that reason, it seems eminently reasonable to use the balancing and triage provisions of Rule 26 when considering the appropriate scope of burdens to place on a party responding to a deposition notice under the Rule.

*Documents Previously Produced.* If the documents the deposition witness would be questioned about have already been made available to the discovering party, the discovering party does not have "a legitimate need" to inquire on deposition into the facts contained in the file.[167] As one experienced federal judge commented concerning the need for testimony which characterizes the supporting documents: "[The parties and] counsel can read them and determine which documents pertain to an allegation, and to what degree, directly or indirectly . . . . No Rosetta stone is necessary to unlock their mysteries."[168]

*Other Depositions Already Taken.* When there have already been witnesses deposed on behalf of an entity, most courts will view the Rule 30(b)(6) testimony as a "supplement" to the specif-

---

ic officers already deposed.[169] The scope of information needed is "narrowed" by the prior testimony, and a Rule 30(b)(6) designee's testimony may well be fully sufficient where it follows other officers who have been individually deposed, even when such testimony by the designee would be inadequate if it were the sole evidence disclosed by the entity on the listed subjects.[170] Where the entity designee—or the individual deponents from the corporate ranks—provides adequate coverage on the contested issues, "no relief is warranted."[171]

*Leads.* A straightforward reading of the legislative history of Rule 30(b)(6) makes it quite clear that the central function envisioned for this procedure by the Advisory Committee was to provide the discovering party with reliable leads to the identities of persons within the entity who have actual knowledge of the events in suit.[172] A corporation's willingness to disclose names of specific employees and former employees with knowledge is a factor demonstrating that the goals of full discovery are being advanced and that gaps in Rule 30(b)(6) testimony are insignificant.[173]

## IV. ADEQUACY OF PREPARATION EFFORT: BURDENS AND ALTERNATIVES

### A. Reasonable Scope or Absolute Perfection

Rule 30(b)(6) delineates what has been called an "affirmative duty" to produce a representative who can answer questions that are both within the scope of the matters described in the notice and are known or reasonably available to the corporation.[174] Our assessment from study of the emerging case law is that unrealistic expectations, glib verbal formulas, and a failure to consider other mechanisms in the exchange of information

---

164. *Directory Sales Management Corp.,* 833 F.2d at 608.

165. *See, e.g.,* Resolution Trust Corp. v. Sands, 151 F.R.D. 616, 618-20 (N.D. Tex. 1993).

166. Mitsui & Co. v. Puerto Rico Water Resources Auth., 93 F.R.D. 62, 66 (D.P.R. 1981); *see* Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery, 48 F.R.D. 487, 515 (1970).

167. EEOC v. American Int'l Group, Inc., No. 93-6390 (DKL) (RLE), 1994 U.S. Dist. LEXIS 9815, at *8-*9 (S.D.N.Y. July 18, 1994).

168. United States v. District Council of Carpenters, No. 90-5722 (CSH), 1992 U.S. Dist. LEXIS 12307, at *43 (S.D.N.Y. Aug. 18, 1992) (opinion of Judge Charles S. Haight).

169. Zappis Middle East Constr. Co. v. The Emirate of Abu Dhabi, No. 94-1942, 1995 U.S. Dist. LEXIS 17187, at *21-*22 (S.D.N.Y. Nov. 17, 1995).

170. Zappis Middle East Constr. Co., 1995 U.S. Dist. LEXIS 17187, at *21-*22.

171. *Id.*

172. *See* Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery, 48 F.R.D. 487, 515 (1970).

173. Lapenna v. Upjohn Co., 110 F.R.D. 15, 24 (E.D. Pa. 1996).

174. King v. Pratt & Whitney, 161 F.R.D. 475, 476 (S.D. Fla. 1995).

during pretrial phases of litigation have led to confusion in the courts. In one sense, the mistake being made in a number of the decisions is the assumption that this one' device, Rule 30(b)(6) depositions, must perform all preparation functions and must provide an evidentiary event that, in and of itself, culminates all preparations and distills all knowledge on a topic. Nothing in the Advisory Committee's conception of this deposition device suggests that it was intended to perform such extensive and Herculean roles.

While the initial purpose of the deposition procedure under the Rule centered upon the start-up phase of the proceedings and the issue of how a party litigating against an entity can avoid a series of missteps in locating personnel with knowledge,[175] one widely cited district court decision rejected as a "restrictive characterization" of the scope of Rule 30(b)(6) the view that this mechanism was "designed to save one step in the deposition process by eliminating a deposition designed to ascertain the name of witnesses to be deposed subsequently."[176] That purpose, which is clearly one of the goals of the representative deposition procedure, is not a complete description as the doctrine is applied today.

In addition, however, it is taken to be one of the "self-evident propositions" on the operation of 30(b)(6) derived from the plain language of the Rule that the "persons so designated shall testify as to matters known or reasonably available to the organization."[177] Thus, courts interpreting the rule generally hold that if the rule is to be implemented in a fashion calculated to promote effective discovery regarding the knowledge of a corporation, "the spokesperson must be informed."[178]

The issue, of course, is how much preparation is enough. The test of reasonableness in the Rule, which is compatible with the approach of the discovery rules in other contexts,[179] would

recognize limits and alternatives. Unfortunately, in one widely quoted distillation of the scope of the preparation duty, a trial court lost sight of those natural considerations and created a stringent, absolutist test for adequacy of the Rule 30(b)(6) witness.[180] The court stated that the goal of a meaningful deposition is that: "[The corporation] must make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought by [the interrogator] and to prepare those persons in order that they can answer fully, completely, unevasively, the questions posed by [the interrogator] as to the relevant subject matters."[181] None of the concepts in this test has a basis in either the text of the rule, the Advisory Committee Note, or the goals of the device. But the clarion call of this summary has led several other courts to treat it as the applicable standard nonetheless.[182]

The most demanding readings of the testimonial obligations inherent in the Rule proceed from a basic sense that such an interpretation of the scope of the obligations is necessary "in order to make the deposition a meaningful one and to prevent the 'sandbagging' of an opponent by conducting a half-hearted inquiry before the deposition but a thorough and vigorous one before the trial [which] would totally defeat the purpose of the discovery process."[183] As we will note below, however, the panoply of discovery and other procedural devices in federal litigation provide a number of protections against late revelation of information, such that it is not necessary that this discovery mechanism carry the full weight of the policy favoring active contest of proof on the merits.

---

175. See infra text accompanying notes 349-50.

176. Mitsui & Co. v. Puerto Rico Water Resources Auth., 93 F.R.D. 62, 64 (D.P.R. 1981).

177. Protective Nat'l Ins. Co. v. Commonwealth Ins. Co., 137 F.R.D. 267, 278 (D. Neb. 1989) (citing FED. R. CIV. P. 30(b)(6)).

178. See Protective Nat'l Ins., 137 F.R.D. at 278.

179. See, e.g., FED. R. CIV. P. 34(b) ("The request shall set forth . . . the items to be inspected [and] describe[d] with reasonable particularity.").

180. Mitsui, 93 F.R.D. at 66-67.

181. Id. at 67 (requiring a corporation to designate a 30(b)(6) spokesperson and imposing fees and sanctions for the failure to do so). Mitsui appears to be the origin of this test, which is cited with approval in several more recent decisions. See, e.g. Dravo Corp. v. Liberty Mut. Ins. Co., 164 F.R.D. 70, 75 (D. Neb. 1995); In re Analytical Sys., Inc., 71 B.R. 408, 412 (N.D. Ga. 1987). Mitsui cited no authority for the language setting forth these requirements. See 93 F.R.D. at 66-67.

182. Bank of N.Y. v. Meridien BIAO Bank Tanz., Ltd., 171 F.R.D. 135, 150 (S.D.N.Y. 1997); SEC v. Morelli, 143 F.R.D. 42, 45 (S.D.N.Y. 1992); see also Protective Nat'l Ins., 137 F.R.D. at 278; FDIC v. Butcher, 116 F.R.D. 196, 199 (E.D. Tenn. 1986), aff'd, 116 F.R.D. 203 (E.D. Tenn. 1987).

183. United States v. Taylor, 166 F.R.D. 356, 362 (M.D.N.C. 1996), aff'd 166 F.R.D. 367 (M.D.N.C. 1996).

A standard requiring only *reasonable efforts* should be applied here, as it does under each of the other discovery devices in the federal rules. For example, recall that under Rule 33, interrogatory answers for a corporate party must reflect corporate knowledge and not simply the knowledge of the individual making the answer.[184] In responding to interrogatories, a corporate party has the duty to undertake reasonable investigation.[185] The duty is interpreted to require reasonable efforts by the entity to locate information within its grasp.[186] These efforts include, for example, interviewing lower level employees[187] and in appropriate cases contacting affiliate entities or subsidiaries, domestic and foreign.[188] A similar reasonableness test is applied in assessing the duty of factual exploration under Rule 36 admissions practice.[189]

*A Reasonably Knowledgeable Witness.* Applying similar notions of reasonable preparation makes for a Rule that is both workable and successful at attaining its basic purposes and avoids the opportunities for misuse which arise when it is assumed that the Rule requires perfection.

The preparation of a Rule 30(b)(6) witness is often measured in the case law by considering the categories specified in the notice, rather than any abstract perspective on the subject matter of the suit or the education and practical background of the witness. Thus, in a case in which a Rule 30(b)(6) notice of deposition requested testimony as to corporate practices of a large financial institution, production of a witness who was only knowledgeable about one "team" of professionals and who could not confirm that other teams within the corporation followed the same practices was inadequate.[190] Similarly, a witness knowledgeable about corporate activity in one calendar year would not

be deemed sufficiently knowledgeable because part of the notice sought information as to a later year.[191]

It is generally recognized that the "duty to present and prepare a Rule 30(b)(6) designee goes beyond matters personally known to that designee or to matters in which that designee was personally involved."[192] An entity does not discharge its duty under the Rule simply by canvassing its personnel to determine whether it has any witness knowledgeable about the specified subjects, or to determine the most appropriate existing witness.[193] Using the discovering party's roster of desired information as a guide, the entity is expected to *create* a witness with responsive knowledge.[194] While, as noted above, the Rule should require reasonable efforts to prepare a witness to be responsive, the more absolutist courts embrace a stronger sense of the efforts required.

Imposition of considerable burdens in preparing a Rule 30(b)(6) deponent have been rationalized as "merely . . . the concomitant obligation from the privilege of being able to use the corporate form in order to conduct business."[195] No explanation is offered, however, as to why the opportunity to use the corporate form of organization requires more than disclosure of what persons under the control of the entity know. Of course, Rule 30(b)(6) is not limited to depositions of corporations, but can be used for partnerships, unincorporated associations or other entities.[196]

*Events Long Past.* One situation in which corporate knowledge is often sparse arises when the time period in which the events took place is quite remote, illustrated in *Barron v. Caterpillar, Inc.*, a products liability case litigated in the 1990s concerning machinery designed in the mid-1960s by then employees of the corporate entity.[197] Most courts, but not all,[198] have

184. Segarra v. Waterman S.S. Corp., 41 F.R.D. 245, 247 (D.P.R. 1966); Heller v. General Motors Corp., 3 F.R.D. 296, 297 (E.D. Mo. 1944).
185. *See* 8A WRIGHT ET AL., *supra* note 22, § 2261, at 560.
186. Weddington v. Consolidated Rail Corp., 101 F.R.D. 71, 75 (N.D. Ind. 1984).
187. *Weddington*, 101 F.R.D. at 75.
188. *E.g.*, Transcontinental Fertilizer Co. v. Samsung Co., 108 F.R.D. 650, 652-53 (E.D. Pa. 1985).
189. United States v. Taylor, 166 F.R.D. 356, 362 (M.D.N.C. 1996), *aff'd* 166 F.R.D. 367 (M.D.N.C. 1996).
190. Buycks-Roberson v. Citibank Fed. Sav. Bank, 162 F.R.D. 338, 343 (N.D. Ill. 1995).
191. Buycks-Roberson, 162 F.R.D. at 343.
192. *Taylor*, 166 F.R.D. at 361 (citing Buycks-Roberson, 162 F.R.D. at 343; SEC v. Morelli, 143 F.R.D. 42, 45 (S.D.N.Y. 1992)).
193. *Id.*
194. *See id.*
195. *Id.* at 362.
196. *See* Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery, 48 F.R.D. 487, 514-15 (1970).
197. 168 F.R.D. 175, 177 (E.D. Pa. 1996).
198. *See infra* discussion of Taylor, text accompanying notes 224-49.

recognized that where there is a delay, such as a twenty-five-year hiatus, *both parties should anticipate* the unavailability of certain information."[198]

In such circumstances, if the entity produces a senior person who had relevant responsibilities, such as a manager involved with the product, the company will have provided for the discovering party the "best chance of obtaining any information" concerning the relevant facts.[200] Where "the inescapable and unstoppable forces of time have erased items from [the initial designee's] memory which neither party can retrieve," but that person was the most knowledgeable individual still associated with the entity, requiring the company to appoint an additional corporate designee "presents an *inappropriate* remedy to cure the discovery problems presented . . . ."[201]

*Older Practices and Policies.* Perhaps even more troublesome than "facts" from years past is a discovery request that specifies an entity's general policies or practices from an earlier era. Such matters are not closed to discovery as a matter of law. One court has rejected a corporation's argument that "it is difficult and time-consuming to investigate unwritten practices that were in effect three years ago,"[202] finding that such arguments "fail to confront the fact that [the entity] had a duty to provide a witness or witnesses with the requisite knowledge and to prepare these witnesses, despite the difficulty of investigating the subject matter requested by the deposing party."[203] Obviously, however, if no personnel or documents reasonably accessible to the company illuminate the general practices specified, knowledge will understandably be very difficult to locate.

*Expertise?* In *Resolution Trust Corp. v. Sands,*[204] one governmental entity subjected to a deposition request under the Rule argued that the notice required it, in effect, to produce an expert witness in circumstances where the then-applicable requirements of Rule 26(b)(4) had not been met, indeed prior to

---

199.  *Barron,* 168 F.R.D. at 177 (emphasis added).
200.  *Id.*
201.  *Id.* (emphasis added).
202.  Buycks-Roberson v. Citibank Fed. Sav. Bank, 162 F.R.D. 338, 343 (N.D. Ill. 1995).
203.  *Buycks-Roberson,* 162 F.R.D. at 343.
204.  151 F.R.D. 616, 619-20 (N.D. Tex. 1993).

---

the time set for identification of experts.[205] The topic specification in the notice required the entity to tender a witness to testify about the party's "claims that the officers and directors were negligent, grossly negligent or breached their fiduciary duties."[206] The court, however, observed that while the discovering party might better have framed the request in terms of "the factual basis" for these claims, there was no implicit thrust in such a question calculated to discover anything other than the factual predicates for the causes of action.[207] Both substantive and damage-support questions were viewed as not inherently calling for expertise.[208]

### B. Where There Is No Knowledgeable Witness Within the Entity

One recent decision has suggested that the circumstance in which a corporate designee lacks sufficient knowledge of the relevant facts to provide adequate responses to the discovering party's requests is a frequent occurrence.[209] The normal solution for this common situation is for the entity to shoulder the burden of presenting additional designees capable of providing sufficient answers to the unaddressed requests.[210]

A few courts have taken the position that "[n]othing in Rule 30(b)(6) requires a party to 'create' a witness in response to a 30(b)(6) notice."[211] But the view that the duty to educate a person with no prior knowledge is "prejudicial" to a corporation[212] has not prevailed, and it appears now to be recognized that the Rule 30(b)(6) deponent must be woodshedded with information

---

205.  *See Sands,* 151 F.R.D. at 619-20.
206.  *Id.* at 620.
207.  *Id.*
208.  *Id.*
209.  Barron v. Caterpillar, Inc., 168 F.R.D. 175, 177 (E.D. Pa. 1996).
210.  *Barron,* 168 F.R.D. at 177 (quoting 8A WRIGHT ET AL., *supra* note 22, § 2103 ("If in the course of taking the deposition it becomes apparent that the . . . [sic] persons designated are not able to provide testimony on the matters specified in the notice, it is the duty of the corporation immediately to make a new designation substituting someone who can give the needed testimony.")).
211.  Resolution Trust Co. v. Kasimour, No. C92-0188, (N.D. Iowa Nov. 16, 1993) (unpublished opinion cited in Elbein, *supra* note 6, at 369).
212.  *See* unreported cases, most of which relate to the Resolution Trust Co. as a litigant, collected in Elbein, *supra* note 6, at 369 n.8.

that was never known to the witness prior to deposition preparation. In that sense, a deposition under the Rule "represents the knowledge of the corporation, not of the individual deponents."[213] Several courts have held, accordingly, that the duty to present and prepare a Rule 30(b)(6) designee goes beyond matters personally known to that designee or to matters in which that designee was personally involved.[214]

*When No Information Is Available.* Under Rule 30(b)(6), even the courts which impose the most stringent preparation burdens on an entity responding to a deposition notice commonly recite that it is possible for the corporation to plead lack of knowledge, sometimes analogized to an individual deponent's lack of memory.[215] Given the language of the Rule itself, it should be recognized that if the entity "does not possess such knowledge as to so prepare [the initial deponent] or another designate, then its obligations under Rule 30(b)(6) obviously cease, since the rule requires testimony only as to 'matters known or reasonably available to the organization.'"[216]

*When Information Can Be Collected.* When the corporation has available to it the sources of information needed to prepare a witness to give testimony on the corporation's behalf, several courts have subscribed to the general statement that "[i]f the persons designated by the corporation do not possess personal knowledge of the matters set out in the deposition notice, the corporation is obligated to prepare the designees so that they may give knowledgeable and binding answers for the corporation."[217] For example, a governmental regulatory body created in 1990 was required to produce a fact witness about events that had happened years earlier.[218] In general, governmental claims

---

213. United States v. Taylor, 166 F.R.D. 356, 361 (M.D.N.C. 1996), *aff'd*, 166 F.R.D. 367 (M.D.N.C. 1996).
214. *See, e.g.*, Buycks-Roberson v. Citibank Fed. Sav. Bank, 162 F.R.D. 338, 343 (N.D. Ill. 1995); SEC v. Morelli, 143 F.R.D. 42, 45-46 (S.D.N.Y. 1992).
215. *Taylor*, 166 F.R.D. at 361.
216. Dravo Corp. v. Liberty Mut. Ins. Co., 164 F.R.D. 70, 76 (D. Neb. 1995) (citing FED. R. CIV. P. 30(b)(6)). In rejecting case-dispositive consequences in such circumstances, one court reported that it could locate "no cases . . . in which a court has held that a party's *inability* to designate a corporate representative warrants Rule 11 sanctions." Federal Sav. and Loan Ins. Corp. v. Village Creek Joint Venture, 130 F.R.D. 357, 359 (N.D. Tex. 1989) (emphasis added).
217. *Taylor*, 166 F.R.D. at 361 (citing *Dravo Corp.*, 164 F.R.D. at 75).
218. *See, e.g.*, Resolution Trust Corp. v. Sands, 151 F.R.D. 616, 618-19 (N.D. Tex.

---

of lack of personal knowledge pertaining to the relevant time period have met a similar fate in disputes under Rule 30(b)(6).[219] However, it should be noted that on occasion a court has held that the existence of other forms of discovery information available to the adversary may excuse the obligation to create a deposition witness out of whole cloth.[220]

As a consequence of Rule 30(b)(6)'s requirement that the witness testify as to matters known or reasonably available, information held within the organization and documents reasonably available should be reviewed by the designee. Simply producing a participant in the underlying transactions, despite lack of current recall, has been held an inadequate Rule 30(b)(6) response.[221] When others within the entity have knowledge,

---

1993).
219. *Morelli*, 143 F.R.D. at 45 (rejecting the contention "that Rule 30(b)(6) is only intended to apply 'to actions in which a governmental agency or someone in its employ has participated in the transactions or events in controversy or has actual knowledge of facts or information relevant to the action.'"); FDIC v. Butcher, 116 F.R.D. 196, 199 (E.D. Tenn. 1986), *aff'd*, 116 F.R.D. 203 (E.D. Tenn. 1987) ("One of the purposes of Rule 30(b)(6) is to curb any temptation a corporation might have to shunt a discovering party from 'pillar to post' by presenting deponents who each disclaim knowledge of facts clearly known to someone in the organization.").
220. In one case, the F.S.L.I.C. sued with respect to transactions involving a failed Savings & Loan. *Village Creek Joint Venture*, 130 F.R.D. at 358. In the course of discovery, the defendants demanded that the F.S.L.I.C. designate a Rule 30(b)(6) corporate representative or other person to testify on its behalf. *Id.* Because the transactions and conduct upon which the complaint was predicated had occurred during the life and operation of the defunct savings bank, neither the F.S.L.I.C., nor its appointed manager, the FDIC, had any involvement with the bank's operations. Accordingly, plaintiff's counsel advised counsel for the discovering defendants, in response to a supplemental deposition notice, that plaintiff had no representative who could appear as a Rule 30(b)(6) representative and that persons with knowledge were either participants in the transaction in question (and were therefore aligned with defendants) or were former employees of the failed S & L. *Id.* at 358. The defendants followed with a motion to dismiss, predicated upon the legal premise that a party's inability to designate a Rule 30(b)(6) representative is legally equivalent to a party's concession that no factual basis existed for the filing of the alleged offending pleading, in this case plaintiff F.S.L.I.C.'s complaint. *Id.* However, the court expressly found this context "distinguishable from those circumstances in which a party has timely failed to designate a Rule 30(b)(6) representative, which ordinarily if established warrants the imposition of sanctions under Rule 37." *Id.* Other discovery, including interrogatory responses filed by the plaintiff, was sufficient to negate the thesis of the motion claiming effective failure to make a Rule 30(b)(6) designation. *Village Creek Joint Venture*, 130 F.R.D. at 358-59.
221. Bank of N.Y. v. Meridien BIAO Bank Tanz., Ltd., 171 F.R.D. 135, 151 (S.D.N.Y. 1997).

conferences by the designee with other current employees may be appropriate.[222] Indeed, two decisions have imposed an obligation for an entity's designee to confer with past employees, or "other sources."[223]

*Over-reading the Requirement.* Perhaps the high-water mark in federal decisions requiring a party to prepare a witness to give 30(b)(6) testimony even when there are *no* current employees with personal knowledge of the events in litigation is a magistrate's decision in *United States v. Taylor*,[224] upheld by the supervising district judge.[225] The decision, however, illustrates both the breadth and the limits of current case law concerning preparation duties because it reflects a broad conception of the duties borne by the parties under the Rule, but implements these obligations in a step-wise fashion, without sanctions, to facilitate gradual piecing together of the requisite information.

*Taylor* concerned a CERCLA action[226] in which the United States as plaintiff served a Rule 30(b)(6) notice of deposition on defendant Union Carbide Corporation.[227] A dispute arose concerning the scope of a party's necessary efforts to prepare a Rule 30(b)(6) deponent.[228] The case had been pending for seven

years when the dispute arose,[229] a consideration in a determination of the fair scope of duties imposed on a disclosing party.[230] While that timing might ordinarily favor forcing a party to make definitive statements, it was counterbalanced by a litigation history in which key claims against Union Carbide were not advanced until late in 1995, six years into the litigation and one month before the scheduled discovery cut-off on liability issues.[231]

The Rule 30(b)(6) deposition sought by the United States identified topics bearing on Union Carbide's alleged liability as an owner/operator of the Grower Systems facility. The time periods covered in the notice ran from 1959 through 1981.[232] At the time of the deposition dispute, Union Carbide's sale of the Grower Systems division had occurred fifteen years earlier.[233] As a result, the court observed, most of the individuals with knowledge of the Union Carbide/Grower Systems relationship and activities no longer were employed by Union Carbide and some of them had possibly died.[234]

Union Carbide moved for a protective order that would have quashed the Rule 30(b)(6) notice, and in late 1995 the court addressed that motion at a status hearing, entering a written order granting the motion only in part and denying other relief from the deposition.[235] The court adopted as its standard another decision from the same district which, several years before, had taken one of the most demanding views ever recorded of the duty to educate a Rule 30(b)(6) witness.[236] After Union Carbide sought clarification of the court's instructions, an initial session

---

222. *Bank of N.Y.*, 171 F.R.D. at 151. In instances where the knowledge required by the Rule 30(b)(6) deposition is extensive, or where it sounds in several domains, the organization has the option of designating one or more such persons or providing a single witness with his account of the events as a means of preparing him for the deposition. *Id.*

223. *United States v. Taylor*, 166 F.R.D. 356, 361 (M.D.N.C. 1996), *aff'd*, 166 F.R.D. 367 (M.D.N.C. 1996) (citing Ierardi v. Lorillard, Inc., No. 90-7049, 1991 WL 158911, at *3 (E.D. Pa. Aug. 13, 1991)).

224. 166 F.R.D. 356 (M.D.N.C. 1996), *aff'd*, 166 F.R.D. 367 (M.D.N.C. 1996).

225. *United States v. Taylor*, 166 F.R.D. 367 (M.D.N.C. 1996).

226. Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675 (1994). CERCLA is a complex environmental remediation statute whose primary purpose is prompt cleanup of hazardous waste sites. *Id.*

227. In *Taylor*, the United States sought to recover costs of cleaning up a Superfund site known as the "Aberdeen Pesticide Site." *Taylor*, 166 F.R.D. at 358. In addition, the government asserted that Union Carbide was liable as an owner or operator by virtue of its control of an entity known as Grower Service, which Union Carbide sold prior to the commencement of the litigation. *Id.*

228. *Id.* at 359-60. It may be relevant that during the same period in which the Rule 30(b)(6) dispute arose the government also served extensive Rule 36 Requests for Admissions on Union Carbide, which raised issues concerning the obligation of a party to authenticate documents. *Id.* at 365-66.

229. *Id.* at 358.

230. We note elsewhere that the timing of contention interrogatories is a matter of some significance in managing that discovery tool; to the extent that a discovering party is permitted to use the Rule 30(b)(6) device to explore similar sorts of subjects, the timing of the deposition request bears on whether the case has reached such a stage that it is reasonable to require a party to take a firm position on its legal theories and the factual support for such theories. *See infra* text accompanying note 328.

231. *Taylor*, 166 F.R.D. at 358.

232. *Id.*

233. *Id.*

234. *Id.*

235. *Id.*

236. *See* Marker v. Union Fidelity Life Ins. Co., 125 F.R.D. 121, 126-27 (M.D.N.C. 1989).

of the deposition went forward in December 1995.[237]

The government was dissatisfied with that initial session and argued to the court in a telephonic motion that Union Carbide had failed adequately to prepare the witnesses.[238] Carbide took the position that its duty of reasonable effort meant that it must locate any knowledgeable current employees and use any documents then available to the company in the preparation, but that where there were no current employees with knowledge and no documents, it could respond by identifying retired employees who would be in a position to speak on the topics.[239]

The court clarified its prior instructions by advising Carbide that:

> [i]f it did not have any employees who had any knowledge about a topic, it was not required to provide an answer and thereby take a stance or assert a position, but *as a consequence, it also could not offer any evidence, direct or rebuttal, or argument at trial as to that topic.*[240]

*Requiring Preparation Using Other Discovery Fruits.* Any implementation of the preparation required under Rule 30(b)(6) to require review of "prior fact witness deposition testimony as well as documents and deposition exhibits"[241] is extremely dangerous. The asserted justification for this obligation—which obviously requires the witness to be fully prepared on the entire litigation—is that this level of preparation will allow the witness for the entity to state the "corporate position" at the Rule 30(b)(6) deposition "with regard to the prior deposition testimony."[242]

However, there is no basis for imposing a requirement that the corporation take a "position" on all deposition testimony in a

237. *Taylor*, 166 F.R.D. at 358.
238. *Id.* at 358-59.
239. *Id.*
240. *Id.* at 359 (emphasis added). Because of the paucity of case law elucidating the duties of entities which lack employees with knowledge about a specified Rule 30(b)(6) deposition topic, the court imposed no sanctions despite expressing the conclusion that the deposition was "unacceptable." *See id.* After the parties could not agree on draft orders embodying the court's telephonic rulings and almost a year of submissions, the court entered the published opinion resolving Carbide's obligations. *Taylor*, 166 F.R.D. at 362.
241. *Id.*
242. *Id.*

case. In part, this nonsensical implementation of Rule 30(b)(6) obligations flows from the rote application of the thought that all items "reasonably available" to the entity must be consulted.[243] This observation gets to one aspect of the problem: the proper mission of a deposition under the rule should be to provide the discovering party with advance warning about what persons within the entity know. It is not a device intended to provide *reactions to or assessments of* the myriad assertions in all depositions given by other witnesses, including non-parties or the adversary's own personnel.[244]

*Preparation Involving Third Parties or the Adversary.* In the most demanding of rulings, the federal magistrate judge in *Taylor* required a party to have its Rule 30(b)(6) designee review not only documents recognized by the entity to be relevant for preparation, but also deposition transcripts of *other parties' witnesses selected by the examining adverse party.*[245] Collecting information from such sources is particularly troubling. Can it reasonably be argued that the corporation's witness must "learn" facts asserted by the adversary's witnesses in order to report the entity's "position" on contested facts? There are obviously many cases in which there are competing and inconsistent pieces of evidence. The notion that when the corporation has no knowledge through employees and documents in its possession, custody, or control, the company must select from, say, three nonparty witnesses' versions of the events the one that it adopts as its knowledge or position is glib at best. To require the deposition designee to consider adversary witness testimony as part of the corporation's knowledge base is even less defensible.[246]

243. *Id.* at 361-62.
244. Using the deposition mechanism to obtain "admissions" about various facts buried in other deposition testimony which took place "prior to" the 30(b)(6) deposition itself has several problems. For one, the oral testimony mechanism is inherently less precise than a written distillation of desired "admissions," and in fact a tool exists for precisely this purpose: Rule 36 Requests for Admissions. *See infra* text accompanying notes 315-18.
245. *Taylor*, 166 F.R.D. at 365, ¶8; *see also* Marker v. Union Fidelity Life Ins. Co., 125 F.R.D. 121, 126-27 (D.N.C. 1989) (describing the extensive duties of entity proffering Rule 30(b)(6) witness in preparing its designated deponents for testimony about the areas of inquiry set forth in a notice).
246. *Cf.* T. Rowe Price Small-Cap-Fund, Inc. v. Oppenheimer & Co., 174 F.R.D 38 (S.D.N.Y. 1997). At issue in the case was whether Oppenheimer had interviewed certain employees of its client, a bank, when conducting due diligence. *Oppenheimer,*

The placement of the burden of proof has a distinct bearing on the coherence of this position. If the corporation is the *defendant*, for example, it need not proffer any of the competing versions of the events, because the burden of producing evidence and the risk of non-persuasion on the factual propositions will lie with the opposition throughout the trial. The company can attack and oppose any or all of the "facts" asserted by the various witnesses purporting to have knowledge. Imposing an obligation on the entity to adopt one of the competing versions of events in such situations is senseless, unfair, and inconsistent with the standard (and accepted) burden.

In broad perspective, the enforcement of an obligation to review all disclosure material and to synthesize opposing as well as client-based factual materials is part and parcel of a view of the deposition process that seeks to make it the equivalent of a contention interrogatory device, which as we demonstrate below, is safer, less burdensome, and less subject to abuse than the oral deposition mechanism for these purposes.[347]

### C. Proving or Disproving Adequate Preparation

Where an entity's designee has no ability to recall "most of the events" on a topic designated for Rule 30(b)(6) testimony, the deposition testimony may be rendered meaningless.[348] And, predictably, where the topics on which the testimony is sought are matters over which the witness had personal responsibility, a fruitless deposition is sometimes taken as strong evidence of

---

174 F.R.D. at 45. Plaintiffs, contending that bank employees had given uncontradicted deposition testimony that they had not been interviewed, demanded that Oppenheimer must admit or deny that the interviews had taken place. *Id.* Oppenheimer responded that it was unable to admit or deny the request because its own personnel, when asked, could not remember whether they, or others who had done due diligence (some of whom were no longer available), had conducted such interviews. *Id.* The court held that "[u]nder these circumstances, Oppenheimer is not required to concede that [the third-party bank employees'] version of the facts is true." *Id.* In effect, the court recommended a solution which seems perfectly suitable for parallel situations that arise in the context of Rule 30(b)(6) controversies: Let the evidence be presented, and let the finder of fact evaluate its credibility and weight. *Id.; see also infra* text accompanying notes 360-70.

247.  *See infra* text accompanying notes 284-355.

248.  Bank of N.Y. v. Meridien BIAO Bank Tanz., Ltd., 171 F.R.D. 135, 151 (S.D.N.Y. 1997).

---

poor preparation.[249]

Even with respect to topics about which the designated witness did not have "first-hand knowledge and involvement in the underlying transaction, the focus remains on the preparedness of the witness."[250] Because the topics selected by the discovering party may be broad, covering many subjects and long periods of time, a better approach to these issues is to focus on the available sources of information and the extent to which the witness was exposed to those matters before giving testimony.

Once an initial session of the deposition is held and disputes arise about the completeness of the witness's preparation, courts regularly consider several factors. The factors considered in measuring adequacy of preparation include: conferences by the witness with predecessors or co-workers, checking with outside offices such as governments or regulatory officials, contacting appropriate branches of the enterprise, and contacting senior executives.[251]

Sometimes affidavits submitted for another purpose will demonstrate that others possess knowledge that the designated witness lacks, and hence that the witness is either inadequately prepared or an insufficient designee.[252] Even if the designee "may have been the individual best situated to testify" as to some subjects, the witness may be inadequate as to others.[253]

Perhaps the most common issues in assessing proper preparation of a deposition witness under the rule center around whether review of documents and familiarity with pertinent documentary sources of information can be demonstrated in support of finding that the witness was properly prepared.[254] Whether

---

249.  *Bank of N.Y.*, 171 F.R.D. at 151.

250.  *Id.* (citing SEC v. Morelli, 143 F.R.D. 42, 45 (S.D.N.Y. 1992)).

251.  Zappia Middle East Constr. Co. v. The Emirate of Abu Dhabi, No. 94-1942, 1995 U.S. Dist. LEXIS 17187, at *16 (S.D.N.Y. Nov. 17, 1995).

252.  *Bank of N.Y.*, 171 F.R.D. at 151.

253.  *Id.*

254.  Protective Nat'l Ins. Co. v. Commonwealth Ins. Co., 137 F.R.D. 267 (D. Neb. 1989). In this case, the following colloquy concerning preparedness occurred:
Mr. Facter: Well, hold on a second. The trouble is when you use lawyer's words the witness may not understand what you're talking about. I'll represent that Ms. Murphy took a look at the counterclaim that we had filed, and I assume that's embraced in what you mean by pleading. And she also took a

698                Alabama Law Review                [Vol. 50:3:651

the witness has reviewed the pleadings is a common issue.[255]

Theoretically, preparation of a witness should not be limited to those documents the discovering party has thought to seek in Rule 34 production as of the date of the deposition. Rather, documents reasonably pertinent to the subject matters of the requested deposition testimony should be reviewed, whether or not the documents themselves have been requested or produced for inspection.[256]

In some litigations it has been suggested that by limiting the documents reviewed by the designated Rule 30(b)(6) witness,

---

look at some interrogatory responses.

    I don't know whether that's embraced or not in what you mean by pleadings. And I also assume she's excluding from her answer things that she's seen over the past couple years before you served Exhibit 1 on Commonwealth's attorneys, which obviously are part of her background in being a designee of Commonwealth. So let me object to the ambiguity of the question.
Mr. Fitzgerald: Q. Well, let me just—I'll just clarify that.
    You looked at Commonwealth's answer and counterclaim and you looked at Commonwealth's answers to interrogatories and you looked at the notice.
    Did you look at anything else to get ready for this deposition:
    A. I looked at the notice today.
    Q. Okay. Did you do anything else to get ready for the deposition?
Mr. Factor: Same objection. It's the "get ready" part that we're having trouble with. She's obviously reviewed many documents related to this matter over the course of time. All of that is part of her readiness. If you're asking whether in the last few hours she's studied things, that's a different question.
Mr. Fitzgerald: Q. Have you looked at some of the documents that either Protective National or Global or Interre have provided as part of this lawsuit?
A. When?
Q. At any time before this deposition.
A. I guess I don't understand. Do you mean in the last couple of years?
Q. Yes.
A. Yes, in the last couple of years I've looked at some.
Q. You didn't look at any of that stuff specifically to get ready for this deposition within the last, I don't know, week or whatever. Is that a fair statement?
A. Yes.
Mr. Factor: There hasn't been much time to do anything but travel in the last week for either of us.
Mr. Fitzgerald: Okay.    (Pause.)
Q. Is there anybody at Commonwealth who is better qualified or more suitable to testify regarding the subjects that we have listed on page 2 of the notice to take deposition?    (Pause.)
A. At this time, no.
*Protective Nat'l Ins.,* 137 F.R.D. at 271.
255.  *Id.*
256.  *Zappia Middle East Constr. Co.,* 1995 U.S. Dist. LEXIS 17187, at *22-*24.

---

1999]          Discovering Corporate Knowledge                699

the disclosing party can undermine the efficacy of the deposition. However, it has been held that a record indicating merely that a party has previously produced all of the documents the witness reviewed in preparation for testimony is not, ipso facto, a sign of inadequate preparation.[257] Conversely, the fact that an entity's document production in an action has arguably been inadequate and erratic may well demonstrate that the witness it produces under Rule 30(b)(6) was not properly prepared.[258]

## V.  MISUSE OF RULE 30(B)(6) DEPOSITIONS TO DISCOVER CONTENTIONS OR "ALL SUPPORTING PROOF"

Rule 30(b)(6) was never intended to be a culminating stage at which a party's entire proof would be synthesized for the benefit of the other side, organized, then restated orally by one omniscient witness's integration.[259] Nor does it perform this

---

257.  *Id.* at *23. The following record was deemed barren of any suggestion that documents were selected for deposition preparation based on what has or has not been produced:
    Q: . . . In preparation for this deposition, did you review a box file of documents provided to you by your attorneys?
    A: Yes.
    Q: In preparation for the deposition, did you review any other documents?
    A: No.
    Mr. Weinstein: Have you provided us all the documents that were in the box file, Mr. Liebman?
    Mr. Liebman: Yes.
*Id.* at *24.
258.  *Id.* at *23.
259.  To appreciate the potential misuse of Rule 30(b)(6) and the mischief to which misapplication of its concepts may lead, assume that an entity has been noticed for a deposition under the Rule. The events giving rise to the claims, let us assume, are complex and involve the actions of any number of participants over a course of time. Assume further that the events which are central to the lawsuit occurred long ago, so that some number of the people who were agents of the entity are no longer under its control. Other participants in the events may be dead or missing. Still others are third parties who are not, and perhaps were never, under the control of the organization. Documents that bear upon the events are extremely voluminous, scattered, and often ambiguous—especially when their authors or recipients do not remember them, not to speak of when they are no longer available to interpret them. Counsel for the entity is now faced with the task of helping the client select and prepare one or more designees to testify on its behalf on what is "known or reasonably available" about the subjects which have been identified in a Rule 30(b)(6) notice.
    In order to get a feel for some of the problems which may be engendered by

function fairly if pressed into the service of that goal. Nonetheless, a very common misuse of this procedure is reflected in topic specifications calling for just such a complete summary, listing all proof in support of each paragraph of a claim or defense. A similar form of inquiry calls for testimony about any averment in the discovering party's pleading as to which the adversary entered a *denial*.[259] The effect is equally broad.

While most requests for depositions under the rule arise in litigation among private parties, the reporters also contain numerous cases in which parties litigating against a governmental agency attempt to use the device to compel the governmental body—which typically did not focus on the events in question until long after the actors actually completed them—to tender a witness to synthesize what its investigation has disclosed. Depositions have been sought regularly from the Resolution Trust Corporation,[261] the Equal Employment Opportunity Commis-

an expansive and (we believe) misguided reading of the obligations imposed by Rule 30(b)(6) (as well as parallel provisions frequently found in state rules of procedure), imagine that the defendant in this case is the United States, and that the designated subject of the deposition is: What were the events leading up to and surrounding the assassination of President Kennedy? Or, to choose another example: How did the United States get involved in the Vietnam conflict; what happened during the course of that involvement; and what were the results?

While it may be difficult to envision the cases out of which these hypothetical 30(b)(6) deposition notices could issue, the point of the examples is to imagine what the far-reaches of the Rule might be thought to demand and, thus, get a better idea of what is fundamentally wrong with that position. After all, because the Government was at the center of critical events in both scenarios, because documents and witnesses are theoretically available, and because there are virtually unlimited resources of legal assistance and fact-gathering mechanisms available to the party targeted for the deposition, why shouldn't that entity be held responsible for formulating definitive responses to the questions posed and thereafter bound to adhere to these positions at a trial? One's immediate impulse is to respond as follows: The folly of the hypothetical examples is demonstrated by the fact that today, more than thirty years after the events in question, new (and sometimes even scholarly) books are still being written that offer "answers" which differ in dozens and hundreds of ways as to the details and the most fundamental underlying facts, contributing factors, and causes of the central events at issue in the designated topics. It is not just that one person, or a vast collection of persons, cannot be said to "know" the answers; rather, what we are disposed to say is that no one (individually) and we (collectively) do not know the answers. Yet, as we shall see, some courts have subscribed to a reading of the Rule which will not tolerate that sort of response by a 30(b)(6) deponent.

260. Skladzien v. St. Francis Reg'l Med. Ctr., No. 95-1518-MLB, 1996 U.S. Dist. LEXIS 20621, at *1 (D. Kan. Dec. 19, 1996).

261. E.g., Resolution Trust Corp. v. Sands, 151 F.R.D. 616, 617-18 (N.D. Tex.

sion,[262] the Securities Exchange Commission,[263] and many others.[264]

One egregious Rule 30(b)(6) request called upon a large corporation to produce competent witnesses, as well as documents, in response to a 143-category notice under the Rule, many of which had additional subparts.[265] As interpreted by the court, the discovering party asked the entity to produce "every document, and recall every fact, conception, intention, understanding, belief, and sense impression" relevant to all of the issues in the case.[266]

The use of Rule 30(b)(6) depositions for this purpose flies in the face of the reasons for adopting the procedure as demonstrated in the legislative history of the Rule. In addition, this use of the questioning is unfair to the witness who is selected, as well to the party selecting the witness.[267] It ignores the concerns favoring the use of written discovery to obtain a specification of the contentions.

The potential for abuse by the discovering party is high here. Courts have noted that "if it's [sic] Rule 30(b)(6) representative cannot answer a question, either because the witness was not 'fully educated' or due to faulty memory, the party may well be confronted with a motion to dismiss or for summary judgment as a result of the witness' inability to answer."[268] Because in a complex case it may be impossible to "fully educate" any slate of witnesses to restate all aspects of the case in deposition format, the risk of a preclusive motion following the Rule 30(b)(6) depo-

1993) (seeking information on events occurring before Resolution Trust became involved in the underlying issue).

262. E.g., EEOC v. American Int'l Group, Inc., No. 93-6390 (DKL) (RLE), 1994 U.S. Dist. LEXIS 9815, at *6-*10 (S.D.N.Y. July 18, 1994) (upholding the Agency's objections to Rule 30(b)(6) requests).

263. E.g., SEC v. Morelli, 143 F.R.D. 42, 45 (S.D.N.Y. 1992).

264. See, e.g., Martin v. Valley Nat'l Bank of Ariz., 140 F.R.D. 291, 315-16 (S.D.N.Y. 1991) (allowing Rule 30(b)(6) deposition of Department of Labor).

265. General Foods Corp. v. Computer Election Sys., 211 U.S.P.Q. 49, 49-50 (S.D.N.Y. 1980).

266. General Foods, 211 U.S.P.Q. at 49-50.

267. Elbein, supra note 6, at 365 ("A savvy party, using Rule 30(b)(6) aggressively—and capitalizing on the organization's ignorance—can destroy an organization's accustomed defenses before the organization is aware of an attack.").

268. Id. at 369 n.10 (citing Resolution Trust Corp. v. Bright, No. 3-92-CV-995-D, and other unreported cases involving the Resolution Trust Corporation).

sition makes the propriety of requiring such a synthesis in the first place a consideration of enormous import.

### A. The Super-Human Witness Required to Synthesize an Entire Case

Many courts hold that the deponent must be both knowledgeable about a given area and prepared to give complete and binding answers on behalf of the organization.[269] But if the discovering party contends that the entity witness has "an obligation to prepare himself by searching files and interviewing witnesses so that he could fully and completely answer all questions," the super-human feat contemplated has led some courts to observe that "Rule 30(b)(6) is not designed to be a memory contest;" it may fairly be concluded that "[i]t is not reasonable to expect any individual to remember every fact in an [agency] investigative file."[270] Some courts have recognized the limits on a single human being who may otherwise be an appropriate designee in response to a Rule 30(b)(6) notice, characterizing the preparation and testimonial obligations to be an effort to testify "to the extent that she is able."[271]

*A Non-30(b)(6) Example.* Suppose, for example, that an examiner asks a corporate executive whether he has any basis for the company's claim. In one reported case, a party's president and chief executive officer testified at a deposition that he had no factual basis to support the company's allegations that the adversary had revealed confidential business information to third parties.[272] The adversary then moved for summary judg-

---

269. Bank of N.Y. v. Meridien BIAO Bank Tanz., Ltd., 171 F.R.D. 135, 150 (S.D.N.Y. 1997). *See generally* FDIC v. Butcher, 116 F.R.D. 196, 201 (E.D. Tenn. 1986), *aff'd,* 116 F.R.D. 203 (E.D. Tenn. 1986) (indicating a duty to prepare 30(b)(6) witnesses to speak for the corporation).

270. EEOC v. American Int'l Group, Inc., No. 93-6390 (DKL) (RLE), 1994 U.S. Dist. LEXIS 9815, at *8-*9 (S.D.N.Y. July 18, 1994); *Bank of N.Y.,* 171 F.R.D. at 150.

271. Protective Nat'l Ins. Co. v. Commonwealth Ins. Co., 137 F.R.D. 267, 283 (D. Neb. 1989).

272. Mike v. Dymon, Inc., No. 95-2405-EEB, 1996 U.S. Dist. LEXIS 18603, at *7 (D. Kan. Nov. 6, 1996). In *Mike,* The adversary moved for summary judgment based on testimony of this character:

Q: Do you know any factual basis for that allegation?

---

ment, claiming that the executive's "admission" bound the party, and that its claim therefore should be dismissed.[273] The court noted that the witness testified that he was not personally aware of any facts supporting the allegations in his company's claim, but the form of the questions did not purport to elicit overall corporate knowledge.[274] It held that a "corporation's knowledge certainly consists of more than the personal knowledge of a single officer."[275] As the court observed: "No corporate officer is required legally to have personal knowledge of the factual allegations supporting every lawsuit that involves the corporation."[276] The alternative would allow for unfair outcomes based on an artificial requirement that there be one omniscient executive who was capable of knowing and reporting all of the facts known to the entity as a whole:

> To hold otherwise would require the court to grant summary judgment in nearly every case that involves a large corporation. In each case, the moving party likely could find a single officer who did not know of the factual allegations of a lawsuit (and in fact did not even know a lawsuit had been filed).[277]

Thus, at least where counsel's questions were directed at the executive's *personal knowledge,* not the corporation's knowledge, from the form of the deposition notice, binding effect is denied.[278] Factors important to the court's conclusion that this was the concept of the deposition included whether the examiner noticed the deposition for testimony as an individual witness pursuant to Rule 30(b)(1), as a corporate officer under the same rule, or as a designated corporate representative most knowledgeable of the facts in the claim pursuant to Rule 30(b)(6).[279]

---

A: I have no factual basis.

Q: So no one has told you anything to show that he [the adversary party] has revealed confidential information?

A: No one showed me anything.

*Mike,* 1996 U.S. Dist. LEXIS 18603, at *8.

273. *Id.* at *6.

274. *Id.* at *8.

275. *Id.*

276. *Id.*

277. *Mike,* 1996 U.S. Dist. LEXIS 18603, at *8.

278. *Id.*

279. *Id.* at *9 (citing GTE Prods. Corp. v. Gee, 115 F.R.D. 67, 68 (D. Mass. 1987)).

Because an individual deposition was sought, the court rejected the argument that the party had admitted that it had no factual support for its claim.[280] The same conclusion follows when the deposition notice is issued pursuant to Rule 30(b)(6) as discussed below.

*The Omniscient Witness to Convey Analysis of the Case.* Reliance on Rule 30(b)(6) as a basis for requiring creation of a single, omniscient witness who can synthesize all of the preparations and knowledge of a party has been roundly castigated as a procedure not meriting serious consideration and one that refutes itself when spelled out. One court examined the logic of the process whereby a designee is expected to "supplement her limited personal knowledge with all relevant information known to the Government"[281] and concluded that however liberal the discovery rules are, they could not reasonably be construed as requiring a party in a case such as this to make a Rule 30(b)(6) deponent, who is an investigator assisting counsel, the repository of all information known to counsel so that she could then provide it to an adversary.[282]

While a party has the right to discover relevant factual information, when the facts are "available in the documents provided and through depositions of fact witnesses who were named as having relevant information," it is not appropriate to require an entity in effect to "marshall all of its factual proof and then provide it to [the Rule 30(b)(6) designee] so that she could respond to what are essentially a form of contention inter-

---

280.  *Id.*
281.  United States v. District Council of Carpenters, No. 90 Civ. 5722 (CHS), 1992 U.S. Dist. Lexis 12307, at *46 (S.D.N.Y. Aug. 14, 1992).
282.  *District Council of Carpenters*, 1992 U.S. Dist. Lexis 12307, at *46. The court there stated:

Defendants' contention that, as a Rule 30(b)(6) deponent, Agent Worsham has an obligation to supplement her limited personal knowledge with all relevant information known to the Government, does not, in my view, merit serious consideration. Taken to its logical conclusion, defendants' position would require that: 1) the various Assistant United States Attorneys with responsibility for drafting the Supplemental Complaint, supervising the investigation and preparing for trial in this action, collect and synthesize all of the information in their possession; 2) that they then impart that body of knowledge to Agent Worsham; and 3) that Agent Worsham, in turn, feed it back to defendants in response to their deposition questions. To state the proposition is to defeat it.

*Id.*

rogatories. Aside from any issues of privilege, this would be highly inefficient and burdensome, rather than the most direct manner of securing relevant information . . . ."[283]

### B. Contention Interrogatories and Rule 30(b)(6)

A party has a recognized right to learn before the trial begins what the contentions of the adversary will be. But in considering the discovery of contentions and expected evidentiary support for specific averments, "how this information should be elicited [is] another matter."[284] Whether to use a deposition tool under Rule 30(b)(6), which itself makes no reference to discovery of contentions, or some other device, is an important issue. According to one court, "[s]ome inquiries are better answered through contention interrogatories wherein the client can have the assistance of the attorney in answering complicated questions involving legal issues."[285] Because the modern procedure rules have one device specifically directed to disclosure of such matters in the discovery phase—contention interrogatories—it is appropriate to consider whether that device is either the exclusive means for discovery into such matters, or sufficiently superior so that use of depositions as an alternative should be rejected.[286]

---

283.  *Id.* at *48-*49; *accord In re* Independent Serv. Org. Antitrust Litig., 168 F.R.D. 651, 654 (D. Kan. 1996).
284.  *See* Protective Nat'l Ins. Co. v. Commonwealth Ins. Co., 137 F.R.D. 267, 281 (D. Neb. 1989).
285.  United States v. Taylor, 166 F.R.D. 356, 362 n.7 (M.D.N.C. 1996), *aff'd*, 166 F.R.D. 367 (M.D.N.C. 1996); *see* FED. R. CIV. P. 33(c).
286.  When formulating the 1970 amendment, the Advisory Committee viewed the expenditure of judicial energy in deciding upon the permissibility of contention interrogatories as futile. The Committee stated that "[e]fforts to draw sharp lines between facts and opinions have invariably been unsuccessful, and the clear trend of the cases is to permit 'factual' opinions." Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery, 48 F.R.D. 487, 524 (1970). Thus, Rule 33 was amended to permit contention interrogatories. FED. R. CIV. P. 33(b). The following sentence now included in Rule 33(c) reflects this amendment:

An interrogatory otherwise proper is not necessarily objectionable merely because an answer to the interrogatory involves an opinion or contention that relates to fact or the application of law to fact, but the court may order that such interrogatory need not be answered until after designated discovery has been completed or at a pre-trial conference or other later time.

FED. R. CIV. P. 33(c).

Under Rule 33, interrogatories asking for a statement of a party's opinion or contention that relates to fact or the application of law to fact is expressly permitted.[287] Generally speaking, the use of contention interrogatories has been restricted in many courts to the latter stages of the preparations:[288]

> Since interrogatories involving mixed questions of law and fact may create disputes between the parties which are best resolved after much or all of the other discovery has been completed, the court is expressly authorized to defer an answer. Likewise, the court may delay determination until pretrial conference, if it believes that the dispute is best resolved in the presence of the judge.[289]

Some districts have explicitly incorporated such a timing provision in their local rules,[290] while others have imposed timing limitations in case law.[291] However, some courts also permit contention interrogatories in the early stages of litigation if the interrogatories would promote the goals of discovery.[292]

Most experienced judges and litigators recognize that the answers to contention interrogatories are in fact written by lawyers, not parties.[293] This is often for good reason, as the lawyer may have collected information from many different sources and will have knowledge of the legal regime that transcends the understanding of the client and its personnel.[294]

---

287. FED. R. CIV. P. 33(c).

288. B. Braun Med. Inc. v. Abbott Laboratories, 155 F.R.D. 525, 527 (E.D. Pa. 1994); In re Convergent Technologies Securities Litig., 108 F.R.D. 328, 337 (N.D. Cal. 1985).

289. Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery, 48 F.R.D. 487, 524 (1970).

290. S.D.N.Y. Rule 33.3 ("At the conclusion of other discovery, and at least 30 days prior to the discovery cut-off date, interrogatories seeking the claims and contentions of the opposing party may be served unless the court has ordered otherwise.").

291. E.g., McCarthy v. Paine Webber Group, Inc., 168 F.R.D. 448, 450 (D. Conn. 1996); Fischer and Porter Co. v. Tolson, 143 F.R.D. 93, 95 (E.D. Pa. 1992).

292. E.g., King v. E.F. Hutton & Co., Inc., 117 F.R.D. 2, 6 n.5 (D.D.C. 1987).

293. McCormick-Morgan, Inc. v. Teledyne Indus., 134 F.R.D. 275, 287 (N.D. Cal. 1991), rev'd on other grounds, 765 F. Supp. 611 (N.D. Cal. 1991).

294. As the magistrate judge supervising a patent case commented: "Parties, of course, provide substantial input, but they cannot be expected to have the range of understanding of patent law or of proceedings in the patent office to reliably identify and accurately articulate all of the predicates for their legal positions." McCormick-Morgan, 134 F.R.D. at 287.

---

*Comparing Contention Interrogatories and Rule 30(b)(6) Depositions.* One magistrate judge observed that "[n]othing in the Federal Rules of Civil Procedure gives a party the *right* to not respond or inadequately respond to a Rule 30(b)(6) deposition notice or subpoena request and elect to supply the answers in a written response to an interrogatory."[295] But even with the vicissitudes of contention interrogatory practice well in mind, comparing that tool to the use of oral depositions makes it apparent that the written medium of responses to sensibly crafted contention interrogatories is more likely to convey information fairly to both sides.[296]

A few courts, without reflection, have held that to the extent a litigant is seeking factual information relating to each of the claims in the litigation, "the use of a 30(b)(6) deposition is wholly appropriate" and the discovering party "need not serve contention interrogatories to discover the facts underlying [the adverse entity's] legal contentions,"[297] essentially dismissing the issue of whether information could more appropriately be provided in response to contention interrogatories as "largely a matter of semantics."[298] Indeed a few district courts have taken the position that deposition questioning is superior to contention interrogatories. One court noted, for example, that while contention interrogatories are a simpler and often more appropriate discovery method, "the deposition process provides a means to obtain more complete information and is, therefore, favored."[299] And a handful of courts have viewed Rule 30(b)(6) depositions and contention interrogatories as equally suitable, alternative devices to achieve the same ends: "Whether a Rule 30(b)(6) deposition or a Rule 33(c) contention interrogatory is more appropriate will be a case by case factual determination."[300] Even these courts

---

295. Marker v. Union Fidelity Life Ins. Co., 125 F.R.D. 121, 126 (M.D.N.C. 1989) (emphasis added).

296. McCormick-Morgan, 134 F.R.D. at 287 (requiring, as a condition of an order pretermitting deposition under Rule 30(b)(6), that the entity be required to respond in full, forthcoming detail to the interrogatories that were to be served seeking similar contention information).

297. Arkwright Mut. Ins. Co. v. Nat'l Union Fire Ins. Co., No. 90-7811-KC, 1993 U.S. Dist. LEXIS 1163, at *7 (S.D.N.Y. Feb. 4, 1993).

298. Arkwright Mut. Ins., 1993 U.S. Dist. LEXIS 1163, at *7.

299. Ierardi v. Lorillard, Inc., No. 90-7049, 1991 U.S. Dist. LEXIS 11687, at *3 (E.D. Pa. Aug. 23, 1991) (quoting Marker, 125 F.R.D. at 126).

300. United States v. Taylor, 166 F.R.D. 356, 362 n.7 (M.D.N.C. 1996), aff'd, 166

have usually stopped short, however, of allowing the deposition mechanisms under this Rule to be used to pin down legal theories.[301]

More thoughtful decisions, exploring the related considerations in more depth, reach the conclusion that it is a misuse of the discovery tools to pursue contentions in a Rule 30(b)(6) deposition. These courts recognize that even the circumscribed form of "focused contention interrogatories," if over-used, can prove "pointless and can be highly burdensome (e.g., when they require a party to marshall all of its proof)," and *a fortiori* the use of an oral examination tool like a deposition under Rule 30(b)(6) in a fashion "which requires that person to inform herself of all relevant facts known by counsel or the [entity], is not an appropriate alternative."[302]

There is nothing in Rule 30(b)(6) to support the use of this tool to elicit contentions, and the very different Advisory Committee commentary on the scope and operation of the two rules, *issued on the same day by the same committee* considering both changes, speaks strongly for the opposite conclusion, that these are separate tools intended to address very different problems.[303] Most courts have, therefore, rejected the notion that these devices are equivalent.[304]

Even before the legitimation of contention interrogatories by express inclusion in Rule 33, one judge looked at the complexity of the legal allegations and concluded that the better way to derive the information was by interrogatories with respect to factual allegations respecting the contentions of the defendant.[305] On the other hand, where factual knowledge can con-

F.R.D. 367 (M.D.N.C. 1996).
301. *See Taylor*, 166 F.R.D. at 362 n.7.
302. United States v. District Council of Carpenters, No. 90 Civ. 5722 (CSH), 1992 U.S. Dist. LEXIS 12307, at *50 (S.D.N.Y. Aug. 14, 1992).
303. *See infra* text accompanying notes 345-55.
304. *See, e.g.*, McCormick-Morgan, Inc. v. Teledyne Indus., Inc., 134 F.R.D. 275, 286-87 (N.D. Cal. 1991), *rev'd on other grounds*, 765 F. Supp. 611 (N.D. Cal. 1991) (stating that a contention interrogatory, not a Rule 30(b)(6) deposition, is more appropriate in very complex and highly technical lawsuits); Protective Nat'l Ins. Co. v. Commonwealth Ins. Co., 137 F.R.D. 267, 282-83 (D. Neb. 1989) (stating that a Rule 30(b)(6) deposition, not contention interrogatories, is more appropriate where the designee has expertise to answer questions).
305. Lance, Inc. v. Ginsburg, 32 F.R.D. 51, 53 (E.D. Pa. 1962):
To be sure, the client presumably knows the facts (although not always), but

---

veniently be discovered by deposition, that procedure is appropriate.[306] More modern decisions under the present rules have found that a similar analysis is proper today.[307]

One seminal opinion gave the rationale that where the "legal consequences" of factual information is sought (for example, in a trademark case where usage or confusion facts are sought), it is "unrealistic to expect a lay witness to be able to give that information" on deposition because the legal aspects involved professional advice.[308]

One version of the test, therefore, is whether it "might be reasonably expected" that a witness of the character available to the company could "explain during an oral deposition" the information specified.[309] Of course, if the test is reduced to identifying propositions that are "purely legal" then most topics would be deemed suitable for deposition coverage.[310]

*Contentions and Beliefs.* Several courts have improvidently adopted the locution that the Rule 30(b)(6) designee "presents the corporation's 'position' on the topic."[311] Some courts have

he can hardly be expected to know their legal consequences. This is what lawyers are for. Defendant, of course, when asked the factual basis for what is obviously his lawyer's allegation, could simply aver lack of knowledge. Such an answer not only would not advance plaintiff's pre-trial knowledge, but could conceivably subject defendant to an unwarranted trial hazard on cross-examination. We think the cause of justice and the fruitful advancement of discovery will be better served by refusing plaintiff's motion to compel answers on depositions to inquiries on the factual basis of conclusionary allegations. While, as we have sought to make clear, plaintiff is undoubtedly entitled to such information, we think it could be more expeditiously and more intelligently obtained by written interrogatories.
*Lance*, 32 F.R.D. at 53.
306. *Id.*
307. *See Protective Nat'l Ins.*, 137 F.R.D. at 282.
308. *Id.*
309. *Id.*
310. *See id.* An example offered by the court illustrates the distinction:
It is one thing to ask a defendant why an affidavit is "invalid" under the "Trade-Mark Act of 1946" and quite another thing to ask an accountant, who deals with reinsurance issues on an everyday basis, what facts she has in her possession upon which her employer relied when it alleges that '[e]fforts to bill and recover deductibles and salvage were highly sporadic, resulting in enormous costs to the reinsurers." The same thing is true of damages; certainly Ms. Murphy as an accountant, and a person experienced in dealing with reinsurance matters, can explain, albeit only generally perhaps, how, why, and in what measure, her employer claims to be damaged as a matter of fact.
*Id.* at 282-83 (citing *Lance*, 32 F.R.D. at 53) (references to record omitted).
311. United States v. Taylor, 166 F.R.D. 356, 361 (M.D.N.C. 1996), *aff'd* 166

gone even further, holding that the designee "must not only testify about facts within the corporation's knowledge, but also as to 'its subjective beliefs and opinions'"[312] and 'its 'interpretation of documents and events.'"[313] There is no basis in the Rule or its legislative history for infusing the Rule 30(b)(6) deposition with such a function.

The argument for using the Rule 30(b)(6) mechanism to elicit beliefs, opinions and interpretations is that otherwise the company "would be able to deceitfully select at trial the most convenient answer presented by a number of finger-pointing witnesses at the depositions," and hence "[t]ruth would suffer."[314] In one sense this argument longs for something other than the adversary system, which allows a party to put its best face forward at trial by selecting the most favorable from the pool of potential witnesses to bring forward for testimony at trial. In another basic sense, the argument commits the fallacy of assuming that each discovery device must perform every function a well-designed litigation system must provide. This argument asserts that because the discovering party is entitled to obtain some definition about the adversary's actual contentions and expected trial position, the Rule 30(b)(6) deposition must be set up to provide that defining moment.

That view was clearly not among the intentions of the drafters of the rule. And it ignores the several other devices in the current procedural schema that provide exactly the sort of concrete specificity sought, without the burdens and unfairness of eliciting the information in a fluid, live format from one (or a few) persons who must master a complex situation of which they have no personal knowledge and about which, in the heat (or tedium) of a deposition they speak inaccurately, vaguely, ambiguously, or imprecisely. Such devices include, for example, Requests for Admissions under Rule 36, which can help assure that a party litigating against an entity is not "sandbagged" by new

---

F.R.D. 367 (M.D.N.C. 1996); *see* Lapenna v. Upjohn Co., 110 F.R.D. 15, 21 (E.D. Pa. 1986); Toys "R" Us, Inc. v. N.B.D. Trust Co., No. 88-10349, 1993 U.S. Dist. LEXIS 13621, at *4 (N.D. Ill. Sept. 27, 1993).

312.  *Taylor*, 166 F.R.D. at 361; *Lapenna*, 110 F.R.D. at 20.

313.  *Taylor*, 166 F.R.D. at 361; Ierardi v. Lorillard, Inc., No. 90-7049, 1991 U.S. Dist. LEXIS 11320, at *5 (E.D. Pa. Aug. 23, 1991).

314.  *Taylor*, 166 F.R.D. at 361 (citing *Lapenna*, 110 F.R.D. at 25).

---

or different factual assertions.[315] Unlike statements provided as answers to interrogatories, which may be refuted or explained at trial, answers to requests for admissions conclusively establish the matter[316] and may be withdrawn or amended only with the court's permission.[317] The answer to a request for admissions is treated as a judicial admission "comparable to an admission in pleadings or a stipulation drafted by counsel for use at trial" rather than as an evidentiary admission.[318]

Another device that can provide firm definition to an adversary's contentions and claims, including the factual support that will be offered at a trial, is *the pretrial order*.[319] In efforts "to eliminate the element of surprise" at trial,[320] the "formulation and simplification of the issues, including the elimination of frivolous claims or defenses," is one of the subjects for consideration at the pretrial conferences which leads to the formulation of the pretrial order.[321] Thus, attorneys are required to "make a full and fair disclosure of their views as to what the real issues of the trial will be."[322] The effect of a pretrial order is further strengthened by Rule 26(a)(3), which imposes an obligation on parties to identify documents and deposition testimony in its

---

315.  FED. R. CIV. P. 36(a).

316.  FED. R. CIV. P. 36(b); *see also* American Auto Ass'n v. AAA Legal Clinic, 930 F.2d 1117, 1120 (5th Cir. 1991) (holding that Rule 36 admissions conclusively establish a matter whether the admission was made affirmatively or through default, even if the matter pertains to material facts which may defeat the party's claim).

317.  FED. R. CIV. P. 36(b). A court's disposition on whether to permit withdrawal or amendment to a Rule 36 admission is based on a two prong evaluation: (1) whether the "presentation of the merits of the action will be subserved thereby" and (2) whether the party who has obtained the admission is able to satisfy the court that withdrawal or amendment will result in prejudice. Teleprompter, Inc. v. Erie, 567 F. Supp. 1277, 1286-87 (W.D. Pa. 1983).

318.  Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery, 48 F.R.D. 487, 524 (1970).

319.  FED. R. CIV. P. 16(e). The rule on pretrial orders states: "After any conference held pursuant to this rule, an order shall be entered reciting the action taken. This order shall control the subsequent course of the action unless modified by a subsequent order. The order following a final pretrial conference shall be modified only to prevent manifest injustice." *Id.*

320.  Gillming v. Simmons Indus., 91 F.3d 1168, 1173 (8th Cir. 1996) (quoting Nutt v. Black Hills Stage Lines, Inc. 452 F.2d 480, 483 (8th Cir. 1971)).

321.  FED. R. CIV. P. 16(c)(1).

322.  Erff v. MarkHon Indus., Inc. 781 F.2d 613, 617 (7th Cir. 1986) (citing Payne v. S.S. Nabob, 302 F.2d 803 (3d Cir. 1962); Cherney v. Holmes, 185 F.2d 718 (7th Cir. 1950)).

final pretrial disclosures.[323] Rule 37(c)(1) states that failure to make such identifications will render the items unusable as evidence at trial unless the failure to identify was harmless.[324]

The pretrial order controls the "issues to be considered at trial" because it "supersede[es] the pleadings."[325] Courts place importance on the pretrial orders "[b]ecause the parties rely on the pre-trial conference to inform them precisely what is in controversy."[326] Consequently, courts are empowered to bar testimony by witnesses not disclosed at the time of the pretrial order.[327]

Given these devices, and all of the other discovery tools themselves, the need to warp Rule 30(b)(6) proceedings into an all-purpose summary of a party's contentions, expected proof on each point, and synthesis of any contested factual matters is non-existent.

*Timing considerations.* Additionally, the problems of timing and unfairness must be faced. Imposing the obligation on a designated corporate representative to synthesize the corporate position on all prior testimony, which may be impossible in large cases in any event, presupposes that the state of the record at the date of the Rule 30(b)(6) deposition is definitive. Only if the entity deposition is taken at the end of the case—after completion and closure of all other depositions, all document production, rendition of all expert reports and any depositions of the experts—could the deposition of an entity under Rule 30(b)(6) even theoretically provide a distillation of the entity's "position" on all of the assertions made by all witnesses or reflected in all documents.

So the concept only works in the abstract if the Rule 30(b)(6) deposition is the last event on the eve of trial. There is,

---

323. FED. R. CIV. P. 26(a)(3).

324. *Id.* 37(c)(1).

325. *Erff,* 781 F.2d at 617 (citing In-Sink-Erator Mfg. Co. v. Waste King Corp., 346 F.2d 248, 251 (7th Cir. 1965)); *see* Hernandez v. Alexander, 671 F.2d 402, 407 (10th Cir. 1982) ("[T]he pre-trial order supersedes the pleadings and becomes the governing pattern of the suit.").

326. *Erff,* 781 F.2d at 617.

327. Mankey v. Bennett, 38 F.3d 353, 359 (7th Cir. 1994) (excluding the testimony of an expert witness whom the proffering party did not include in the witness list and when the proffering party failed to give notice of intent to add the witness until several days before trial).

---

not to put too fine a point on it, no indication whatsoever in the history of the Rule that it was intended to operate in that fashion. Indeed, in the same revisions to the federal rules by which Rule 30(b)(6) was added, the 1969 amendments effective in 1970, the drafters demonstrated that they knew how to suggest that a device was best reserved for late in the discovery process. Such a suggestion was made in the same 1969/1970 wave of amendments, and the same Advisory Committee notes, with respect to the newly recognized device of contention interrogatories, but *not* with respect to the newly created entity deposition procedure under Rule 30(b)(6).[328] Indeed, the commentary accompanying the entity deposition procedure suggests that these depositions would be useful at the *outset* of discovery, when the person opposing the entity is in the dark as to the identities of knowledgeable witnesses within the company.[329]

And, even assuming that the concept were to have this form of deposition be taken as a culminating event, it treads on unreasonable assumptions. It envisions a single, omniscient witness, or team of witnesses, who can manage to hold in his head all facts, actions, opinions, statements and documents of perhaps dozens of individuals stretching perhaps over many years, and that *oral testimony* at a deposition, with the vicissitudes of memory, oral expression and transcription is a sensible means of eliciting the "corporate position" on all facts and issues in a case. Written contention interrogatories, late in the case preparations, can address these issues, but the use of oral depositions for a similar purpose is foolishly impractical and unfair.

*Work Product Implications.* Some courts have held that

---

328. Compare the Advisory Committee's Note to Rule 30(b)(6), which makes no mention of delaying the scheduling of an entity deposition until the close of other preparations, with the note accompanying the contention interrogatory language in Rule 33, where the Advisory Committee observed that "[s]ince interrogatories involving mixed questions of law and fact may create disputes between the parties which are best resolved after much or all of the other discovery has been completed," the answer to an interrogatory may be deferred. The Advisory Committee's cautious approach regarding contentions in Rule 33 and the conspicuous absence of any such language in the Note to Rule 30(b)(6) suggest that the use of Rule 30(b)(6) to inquire into contentions was not envisioned by the Advisory Committee. Had it been otherwise, it is likely that the Note to Rule 30(b)(6) would contain similar language. *See* Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery, 48 F.R.D. 487, 524 (1970).

329. *See, e.g. id.*

contention interrogatories, at least when used late in the preparations, do not implicate attorney work product.[330] Of course, to some extent any identification of contentions reflects the thought processes and advice of counsel. However, at the end of preparations, the need for privacy for work product is alleviated, if only because the actual contentions selected for use at trial will be disclosed publicly shortly and, hence, are not expected or intended to remain protected. The alternative theories or plans considered by counsel along the way but ultimately rejected, which also would disclose counsel's thinking, are not proper subjects for contention interrogatories. On the other hand, a Rule 30(b)(6) deposition mid-stream, which inquires into the ordering of proof and the like, inevitably discloses the interim thinking of counsel on contentions, on the "relevant" or controlling documents for the witness to review, and on which testimony will prove admissible—or persuasive?—at trial. Hence, to this extent, contention interrogatories at the end of the litigation are far less likely to trammel upon a recognized, albeit qualified, area of confidentiality. Several decisions have suggested that the inherent work product concerns about eliciting the ordering and assessment of expected proof are easier to manage when the discovery tool is a written question rather than a more free-flowing and "real time" oral deposition.[331] One judge quoted with approval the conclusion that "contention interrogatories are not just a viable alternative, but the proper discovery device under the circumstances."[332]

*Abuse of the Witness and the Producing Party.* One concern with the use of depositions to catalog all expected proof sounds in fairness. A company responding to discovery demands may

330. *See, e.g., In re* San Juan Dupont Plaza Hotel Fire Litig., 859 F.2d 1007, 1017 (1st Cir. 1988); King v. E.F. Hutton & Co., Inc., 117 F.R.D. 2, 5 n.3 (D.D.C. 1987).
331. *See* SEC v. Morelli, 143 F.R.D. 42, 48 (S.D.N.Y. 1992) (citing McCormick-Morgan, Inc. v. Teledyne Indus., Inc., 134 F.R.D. 275, 286-87 (N.D. Cal. 1991), *rev'd on other grounds*, 765 F. Supp. 611 (N.D. Cal. 1991) (barring a Rule 30(b)(6) deposition and permitting contention interrogatories for discovering "the bases for the contentions made and for the positions taken")); Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp., 125 F.R.D. 578, 594 (N.D.N.Y. 1989) (recognizing the viability of interrogatories as an alternative discovery method).
332. *See Morelli,* 143 F.R.D. at 48 (S.D.N.Y. 1992); *accord* SEC v. Rosenfeld, No. 97-1467 (RPP), 1997 W.L. 576021 (S.D.N.Y. Sept. 16, 1997).

reasonably fear that the discovering party is attempting to build a record that could later be used unfairly (for example, in a motion for summary judgment, or to embarrass a witness on cross-examination at trial). In particular, the basic concern is that the discovering party, in effect, demands "that a human being who had been designated as a 30(b)(6) witness set forth in full detail every item of evidence and every aspect of legal argument or authority that had any tendency to help support any position (factual or legal) [that the company] was taking in the litigation."[333] Thus, an entity may believe that in a very complex, highly technical lawsuit, no human being could reliably and completely set forth this material, which leads to the specter of the discovering party attempting to use the transcripts of these depositions to limit the evidence and arguments the entity may present at trial, or to argue, as on a motion for summary judgment, that there were insufficient bases for one or more of the contentions.[334]

Other grounds for opting for a more limited construction of Rule 30(b)(6) are the general considerations of efficiency and common sense. One could argue that "by far the most reliable and complete discovery vehicle for setting forth the bases (in evidence, events, and law) for a party's contentions and positions would be a set of responses, written after the close of virtually all other discovery, to sensibly framed contention interrogatories."[335] Indeed, there seems to be no justification for pursuing this kind of information through more than one discovery tool; rather, it makes no sense to waste the time and money that would be involved in exploring the same topics through both a set of 30(b)(6) depositions and through a set of contention interrogatories.[336] While it has been noted that

> there might be some circumstances in which pursuing the same kind of information, or exploring the same subjects, through more than one discovery tool could be justified (e.g., where credibility issues were pivotal, or the information sought was of such an elusive and important character that fair explication of it would

333. *McCormick-Morgan,* 134 F.R.D. at 286.
334. *Id.*
335. *Id.*
336. *Id.*

require probes from more than one direction and in more than one form),

such a justification should affirmatively be made out before the duplication and waste are undertaken.[337]

When considered on the merits, the question as to "which of the available devices is most appropriate, i.e., which device would yield most reliable and in the most cost-effective, least burdensome manner information that is sufficiently complete to meet the needs of the parties and the court in a case like this[]" is not hard to answer.[338]

Thus, judges who have gone on record in other contexts expressing considerable skepticism about the appropriateness of the use of contention interrogatories at early stages of litigation generally, and in certain kinds of cases,[339] find themselves persuaded that "no one human being can be expected to set forth, especially orally in deposition, a fully reliable and sufficiently complete account of all the bases for the contentions made and positions taken by a party . . . ."[340]

The arguments are even stronger in cases where the "bases" for contentions "do not consist exclusively of relatively straightforward facts or evidence, as might be true, by contrast, in a case arising out of a traffic accident."[341] Therefore, for example, in intellectual property litigation and other domains involving a number of mixed questions of law and fact, "to set forth the bases for contentions . . . it is not enough to describe real world facts and events, even in considerable detail."[342]

> Rather, determining what the bases for contentions are in this environment involves compl~x judgments about the relationship between at least three kinds of things: (1) evidence/facts/events in the real world (outside litigation), (2) "claims" as particularly set forth in the patent in issue and in other patents or other material presented to the patent office, and (3) principles of intellectual property law set forth in statutes and in judicial opinions. A non-lawyer deponent might have great knowledge about the products

---

337.  Id.
338.  McCormick-Morgan, 134 F.R.D. at 286.
339.  In re Convergent Techs. Sec. Litig., 108 F.R.D. 328, 338 (N.D. Cal. 1985).
340.  McCormick-Morgan, 134 F.R.D. at 286.
341.  Id. at 287.
342.  Id.

---

in issue here, but quite ill-equipped to reason reliably about the legal implications of the relationship between those products, or their components, and the various claims of the patent in suit or of other patents or prior art. Patent cases turn peculiarly on a conceptually dense dynamic between physical objects, words in claims, and principles of law.[343]

In many forms of modern, complex litigation, therefore, "a substantial part of 'the bases for contentions' really consists of *quasi-legal argument*."[344]

*Legislative History.* It is inconceivable that the Advisory Committee intended Rule 30(b)(6) to be the means by which discovery of a party's contentions was to be secured. Prior to 1970 there were conflicts in the case law as to the permissibility of contention discovery vel non.[345] In 1970 the Advisory Committee sought to clarify and make coherent the law on the discovery of contentions, and it did so by amending the rule addressing only one of the discovery devices, Interrogatories under Rule 33.[346]

A reading of the advisory commentary accompanying the contention interrogatory language inserted in Rule 33 makes it clear that the Committee was aware of the friction that has historically attended contention discovery. The Committee was evidently cognizant of the history of motion practice, and the problem of *timing* of contention discovery in particular.[347] Thus, the Advisory Committee's Note went to the extraordinary length of suggesting that late scheduling of contention discovery was one means of avoiding difficulties with this newly legitimized form of discovery.[348]

Rule 30(b)(6) was created in the same discovery amendments report issued in 1969 and went into effect on the same

---

343.  Id. With respect to patent litigation, the court commented that "[u]nderstanding that dynamic, and describing the relationships that serve as the bases for a given parties' [sic] contentions, is something best done by patent lawyers, and best done after at least most other discovery has been completed." Id.
344.  McCormick-Morgan, 134 F.R.D. at 287.
345.  See Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery, 48 F.R.D. 469, 524 (1970).
346.  Id. at 523-24.
347.  Id. at 524.
348.  Id.

day in 1970 as the contention interrogatory provision.[349] The Advisory Committee's Note accompanying this new deposition provision *makes no mention of contentions*. Indeed the flavor of the deposition rule characterization by the Committee is that the designation device was a *minor convenience* being created to avoid unnecessary guesswork at the outset of a case when the party litigating against the entity may lack information as to which of many officers and employees has personal knowledge of topics relevant to the lawsuit.[350] Given the extensive discussion of the difficulties attending *contentions* in the Rule 33 amendments, it is inconceivable that the Committee intended to authorize an alternative exploration of these same matters under another procedure, and surely it would not have attempted to do so without even *mentioning* the concept anywhere in the Advisory Notes. If the Committee had intended to address the years of bickering over contention interrogatories by suggesting that oral deposition was a solution, that startling proposition would have required considerable explanation.

The timing aspects also demonstrate that it could not have been an intention of the rules' drafters that depositions be used for this purpose. The Committee was quite conscious of the fact that the discovery of contentions generates substantial volumes of motion practice, and that the goal of providing fair description of trial contentions is best advanced by a statement of them *late in the preparations*.[351] On the other hand, the entire flavor of the new provision for entity depositions reflects concerns applicable at *the outset of the litigation*.[352] It is at that early stage when the adversary of a company will know least about the internal structure of the entity.

The essential purpose of the Rule 30(b)(6) deposition mechanism is reflected in the Advisory Committee's focus on the burdens involved. The Committee recognized that finding witnesses to address topics required effort by an entity.[353] The counterweight—the factor which was stated by the Committee to justify

the imposition of this burden on the company[354]—was *not* that the discovering party had a need to learn contentions (a matter not even raised in the comment to Rule 30(b)(6)). Rather, it was the discovering party's need to obtain *leads to the identity of knowledgeable people* and some basic information about the company.[355]

Given the practical concerns of the courts discussed above, and this legislative history, it is crystal clear that depositions should not be used as a contention specification mechanism.

### C. *"Complete Support" Questions and Work Product*

The work product doctrine "promote[s] the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of an opponent."[356] The doctrine, set forth in Rule 26(b)(3), implements the Supreme Court's decision in *Hickman v. Taylor*.[357] It generally protects documents and tangible things prepared in anticipation of litigation or for trial and by or for another party or by or for that other party's representative.[358] Special concern is directed to disclosures which are calculated to reveal the mental processes of counsel.[359]

*Facts and the Confidentiality Doctrines.* Of course, the privilege and work product protections do not preclude discovery of *factual information*.[360] Clients cannot refuse to disclose facts which their attorneys conveyed to them and which the attorneys obtained from independent sources.[361] And a discovery request

349. *Id.* at 515, 524.
350. Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery, 48 F.R.D. 459, 524 (1970).
351. *Id.* at 524.
352. *Id.* at 515.
353. *Id.*

354. *Id.*
355. Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery, 48 F.R.D. 487, 524 (1970).
356. Shields v. Sturm, Ruger & Co., 864 F.2d 379, 382 (5th Cir. 1989) (citing United States v. AT&T, 642 F.2d 1285, 1299 (D.C. Cir. 1980)).
357. 329 U.S. 495 (1947).
358. Blockbuster Entertainment Corp. v. McComb Video, Inc., 145 F.R.D. 402, 403 (M.D. La. 1992) ("Protection is given to those documents prepared by agents of an attorney because an attorney must rely on the assistance of others in preparation for trial.").
359. Fed. R. Civ. P. 26(b)(3); *see Hickman*, 329 U.S. at 510, 512-13.
360. Upjohn Co. v. United States, 449 U.S. 383, 395-96 (1981).
361. Protective Nat'l Ins. Co. v. Commonwealth Ins. Co., 137 F.R.D. 267, 278-79 (D. Neb. 1989); *see* Sedco Int'l, S.A. v. Cory, 683 F.2d 1201, 1205 (5th Cir. 1982) (citing *Hickman*, 329 U.S. at 508; 8 J. Wigmore, Wigmore on Evidence § 2317

directed to facts supporting the allegations in a claim or defense does not implicate the protection of the confidentiality doctrine.[361]

Work product analysis in connection with midstream Rule 30(b)(6) depositions is more difficult. On occasion lawyers and judges have been tempted to skirt the reality of the effects of an early Rule 30(b)(6) deposition by noting that the attorney was "not asking [the deponent] to relate the opinion that your counsel gave you. I'm asking [the deponent] for the facts that support this allegation."[362] However, this approach fails to recognize that if an unknowledgeable witness has been educated by counsel in an effort to comply with Rule 30(b)(6) obligations, the attorney's thought processes in the selection of evidence and organization of issues will commonly be involved in that process. The deposition thus becomes an easy window into what the attorney for the entity thinks is important, relevant, supportive of a particular proposition, or persuasive on the facts.

Some courts have concluded flatly that "[t]here is simply nothing wrong with asking for facts from a deponent even though those facts may have been communicated to the deponent by the deponent's counsel."[363] This view proceeds from the assumption that questions asking a witness about what facts she was aware of which supported a claim or defense do not improperly tend to elicit the mental impressions of the entity's lawyers who participate in the preparation of the witness or advice to the company during that process.[364]

Rule 612 of the Federal Rules of Evidence, which provides for disclosure of writings used to refresh a witness's recollection at trial, also provides for production of material consulted beforehand in preparations, and to the extent that depositions are considered hearings under this rule by some courts, the argument exists that the examining counsel has a basis for requesting to know what material was reviewed.[365] Even so, where all

documents reviewed are a subset of the full production made to the discovering party, the specification of which members of that larger universe were identified by counsel in preparing the witness will reflect counsel's thinking most clearly. Indeed, it is the selection process itself that provides the basis for invoking work product protections relating to documents used to prepare witnesses for deposition testimony.

But even those courts taking a fairly uncompromising view of this proposition in the abstract recognize that the deposition device has special risks as a means of eliciting the factual information.[366] Thus, "depending upon how questions are phrased to the witness, deposition questions may tend to elicit the impressions of counsel about the relative significance of the facts; opposing counsel is not entitled to his adversaries' thought processes.[367] In such situations special effort is required "to protect against indirect disclosure of an attorney's mental impressions or theories of the case."[368]

Determining the degree to which a particular deposition question elicits the mental impressions of the attorney who communicated a fact to the deponent can be a difficult problem in the Rule 30(b)(6) situation in particular. "In a sense, any fact that a witness learns from his or her attorney presumably reveals in some degree the attorney's mental impressions of the case, or, presuming rationality, the attorney would not have communicated the fact to the client."[369] And the focus of Rule 30(b)(6) disputes on what a witness was asked to review presents the issue head on.

*Deposing Counsel or Witnesses Prepared by Counsel.* The propriety of questions of a specially prepared Rule 30(b)(6) witness raises some of the same concerns implicated when the deponent is the attorney herself. And where the deponent is opposing counsel and has engaged in a selective process of compiling documents from among voluminous files in preparation for liti-

(McNaughton rev. ed. 1961).
362. *Protective Nat'l Ins.*, 137 F.R.D. at 279.
363. *Id.*
364. *Id.* at 280.
365. *Id.*
366. *See* authorities collected in Eibein, *supra* note 6, at 371 nn.17-18; *see also*

Ronald B. Coolley, *Defending Corporate Officers in Depositions*, 73 J. PAT. OFF. SOC'Y 766, 773 (1991).
367. *Protective Nat'l Ins.*, 137 F.R.D. at 280.
368. *Id.* (citing Michael E. Wolfson, *Opinion Work Product—Solving the Dilemma of Compelled Disclosure*, 64 NEB. L. REV. 248, 258-62 (1985)).
369. *Id.*
370. *Id.*

gation, the mere acknowledgment of the study or review of, or perhaps even the existence of those documents, would reveal counsel's mental impressions, which are protected as work product.[371]

While the Federal Rules of Civil Procedure do not specifically prohibit the taking of opposing counsel's deposition,[372] the practice of taking opposing counsel's deposition is viewed by many as a "negative development in the area of litigation, and one that should be employed only in limited circumstances."[373] It is commonly thought that such activities should be undertaken only where no other means exist to obtain the information than to depose opposing counsel,[374] the information sought is relevant and nonprivileged, and the information is crucial to the preparation of the case.[375] The existence of interrogatory answers and documents already produced was deemed relevant to assessing the need for probing counsel's thought processes in assembling documents.[376]

To the extent that Rule 30(b)(6) depositions, particularly before the end of preparations, are uniquely calculated to disclose what counsel has advised the company are relevant or important or persuasive documents, similar considerations and similar need for restraint apply. Just as depositions of opposing counsel are shunned,[377] a Rule 30(b)(6) deposition that effectively discloses counsel's views on the preparation of the case for trial is inappropriate.[378]

Counsel's view as to the significance or lack thereof of particular facts, or any similar matters, reveals the company

attorney's mental impressions concerning the case.[379] When this issue has been raised, interrogating counsel have on occasion been directed that, when formulating questions, they should avoid lines of inquiry intended to elicit the advice rendered by the designating company's counsel.[380] In one insurance case, the carrier, resisting aspects of a Rule 30(b)(6) notice, declined to designate a "spokesperson" under the rule "because the allegations contained in the answer and counterclaim and the information concerning the answer and counterclaim were derived from an ongoing investigation conducted by [the company's] attorneys and not from an officer, director or managing agent of Commonwealth or any other person subject to designation under Rule 30(b)(6)."[381]

The relationship between communication from counsel and a designated witness's "knowledge" poses difficulties in the Rule 30(b)(6) context, and has been known to make a deposition under the Rule "really . . . unravel."[382]

Discovery which provides to the adversary a roadmap to the disclosing party's selection, organization and assessment of a welter of facts and documents raises fundamental work product concerns.[383] A seminal decision on the issue of whether selection and compilation of documents by counsel is within the protected category of opinion work product reasoned that the selection and compilation of documents by counsel inevitably reveals important aspects of an attorney's understanding of the case.[384] This conclusion follows

371. Shelton v. American Motors Corp., 805 F.2d 1323, 1328 (8th Cir. 1986).
372. See FED. R. CIV. P. 30(a) (a party may take the deposition of "any person").
373. Shelton, 805 F.2d at 1327.
374. Id. (citing Fireman's Fund Ins. Co. v. Superior Court, 140 Cal. Rptr. 677, 679 (Cal. Ct. App. 1977)).
375. Id.
376. Id. at 1327-28.
377. See N.F.A. Corp. v. Riverview Narrow Fabrics, Inc., 117 F.R.D. 83, 85 (M.D.N.C. 1987); see also Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp., 125 F.R.D. 578, 593 (N.D.N.Y. 1989) ("[T]he deposition of counsel increases the likelihood that the attorney will be called as a witness at trial. Under such circumstances the attorney would normally be disqualified from providing further services."); SEC v. World-Wide Coin Inv., Ltd., 92 F.R.D. 65, 67 (N.D. Ga. 1981) (barring deposition of SEC trial counsel).
378. See SEC v. Morelli, 143 F.R.D. 42, 46-47 (S.D.N.Y. 1992).

379. Protective Nat'l Ins. Co. v. Commonwealth Ins. Co., 137 F.R.D. 267, 283 (D. Neb. 1989); see Ford v. Philips Elec. Instruments Co., 82 F.R.D. 359, 361 (E.D. Pa. 1979).
380. See Protective Nat'l Ins., 137 F.R.D. at 283.
381. Id. at 270.
382. Id. at 272.
383. In one litigation, a union sought deposition of the United States Attorney's Office about the government's investigation of the matters in suit, and an FBI agent involved in the investigation gave an initial session of deposition testimony generally describing the procedures. Thereafter, the court found that the defendants' search for facts relevant to the allegations of the government's complaint created an inevitable clash with matters arguably protected by the work product doctrine. United States v. District Council of Carpenters, No. 90 Civ. 5722 (CSH), 1992 U.S. Dist. LEXIS 12307, at *3-*4 (S.D.N.Y. Aug. 14, 1992).
384. Sporck v. Peil, 759 F.2d 312, 316 (3d Cir. 1985) (citing James Julian, Inc. v. Raytheon Co., 93 F.R.D. 138, 144 (D. Del. 1982)).

even though the individual documents included in the compilation are not protected under the work product doctrine.[385]

In a case in which corporate litigants had exchanged over 200,000 pages of documents during the course of discovery, deposed dozens of witnesses, and exchanged hundreds of interrogatories, the court was more than willing to assume that the Rule 30(b)(6) witness's company counsel

have spent much of their time culling through hundreds of thousands of pages of documents, transcripts, and interrogatory responses, in an effort to select and compile the facts and documents relevant to each separate affirmative defense—in effect, to marshall the evidence in support of each of [the entity's] contentions. These activities are protected from discovery by the work-product doctrine.[386]

The criticism is true of a series of oral questions asking for the "facts and documents which [the entity] contends support" each affirmative claim averment or defense,[387] or of a notice stated with similar breadth.[388]

The "'selection and compilation theory'" of work product has been recognized by a number of courts.[389] Thus, in the document-production process, production of otherwise unprivileged documents may be protected from discovery if disclosure of the

---

385. Schwarzkopf Technologies Corp. v. Ingersoll Cutting Tool Co., 142 F.R.D. 420, 423 (D. Del. 1992).

386. American Nat'l Red Cross v. Travelers Indem. Co. of R.I., 896 F. Supp. 8, 13 (D.D.C. 1995); Shelton v. American Motors Corp., 805 F.2d 1323, 1329 (8th Cir. 1986) ("In cases that involve reams of documents and extensive document discovery, the selection and compilation of documents is often more crucial than legal research.") (citing James Julian, Inc., v. Raytheon Co., 93 F.R.D. 138, 144 (D. Del. 1982)); see also Berkey Photo, Inc. v. Eastman Kodak Co., 74 F.R.D. 613, 616 (S.D.N.Y. 1977) (barring discovery of "counsel's ordering of the 'facts,' referring to the prospective proofs, organizing, aligning, and marshaling empirical data with the view to combative employment that is the hallmark of the adversary enterprise").

387. American Nat'l Red Cross, 896 F. Supp. at 14.

388. See SEC v. Morelli, 143 F.R.D. 42, 47 (S.D.N.Y. 1992) (stating that defendant's notice of Rule 30(b)(6) deposition "constitute[d] an impermissible attempt . . . to inquire into the mental processes and strategies of the SEC . . . (in that defendant's notice was] intended to ascertain how the SEC intends to marshall the facts, documents and testimony in its possession . . . .").

389. See, e.g., United States v. District Council of Carpenters, No. 90 Civ. 5722 (CSH), 1992 U.S. Dist. LEXIS 12307, at *24 (S.D.N.Y. Aug. 14, 1992) (quoting In re Grand Jury Subpoenas Dated Oct. 22, 1991 and Nov. 1, 1991, 959 F.2d 1158 (2d Cir. 1992)).

---

items presents a real concern that the thought processes of counsel would be exposed.[390] A concrete or practical risk that the thought processes of counsel will be disclosed is a concern, while remote risks[391] or mere speculation to that effect will not trigger work product concerns.[392] At the end of the case, and particularly where production of documents is ordered by the court as a case-management tool in planning trial, some circuits have concluded either that disclosure of the selection and screening of documents would not substantially reveal an attorney's thought processes and therefore did not constitute "opinion work product," or that such thought processes would be revealed in any event in a short time at the trial itself.[393]

Thus, while some courts have imposed a form of synthesis obligation upon a party, particularly a governmental agency,[394] more recently courts are carefully considering the facts of such situations to determine whether legitimate information needs of a party preparing for trial are actually going un-met, after a frustrating effort to use other discovery avenues, before a designated deposition witness will be seen as a rational solution to the dilemma.[395] One factor that has been noted is whether the

---

390. See In re Grand Jury Subpoenas Dated October 22, 1991 and November 1, 1991, 959 F.2d 1158, 1167 (2d Cir. 1992) (determining that production was required because the documents sought from counsel were all telephone records relating to particular clients for a five-year period—not a select group of documents to which counsel attached particular relevance; recognizing a substantial need for the production because it was unlikely the information would otherwise be available from another source).

391. United States v. Pepper's Steel & Alloys, Inc., 132 F.R.D. 695, 698-99 (S.D. Fla. 1990) (noting that a Rule 30(b)(6) witness would be required to answer factual questions even if those facts were learned by reviewing documents provided by counsel but that this situation presented only a remote risk of disclosure of counsel's impressions and thought processes).

392. In re San Juan DuPont Fire Litig., 859 F.2d 1007, 1015 (1st Cir. 1988).

393. In re San Juan DuPont Plaza Hotel, 859 F.2d at 1017.

394. See FDIC v. Butcher, 116 F.R.D. 196 (E.D. Tenn. 1986), aff'd 116 F.R.D. 203 (E.D. Tenn. 1987).

395. See, e.g., United States v. District Council of Carpenters, No. 90 Civ. 5722 (CSH), 1992 U.S. Dist. LEXIS 12307, at *47-*48 (S.D.N.Y. Aug. 14, 1992). In District Council of Carpenters, the court analyzed the situation in FDIC v. Butcher, a case defendants relied on, as follows:

[The defendant bank officers, sued for various acts of negligence in carrying out their duties, were frustrated in securing information as to even the most basic facts underlying the accusations against them, e.g. identification of the

witness has at least some knowledge based on personal partici-
pation in the events.[395]

Another factor is whether the disclosing party can aver that
all of the underlying information that its deposition witness
reviewed has already been produced. When the entity demon-
strates that all relevant, non-privileged evidence has been dis-
closed to the defendants, a proposed Rule 30(b)(6) deposition
seeking synthesis of the supporting facts "constitutes an imper-
missible attempt by defendant to inquire into the mental pro-
cesses and strategies of the [entity],"[396] and hence the court
was "drawn inexorably to the conclusion that [the] Notice of
Deposition is intended to ascertain how the [entity] intends to
marshal the facts, documents and testimony in its possession,
and to discover the inferences that plaintiff believes properly can
be drawn from the evidence it has accumulated."[397]

---

loans they were alleged to have negligently executed and administered and the
amount of loss claimed for each loan. That information was known only by the
FDIC (which presumably stood in the shoes of the banks) and was thoroughly
set forth in an FDIC memorandum, which itself was found to be privileged.
However, the facts contained in the document were not themselves privileged
and were basic to understanding the claims asserted by the FDIC. When the
FDIC Rule 30(b)(6) witnesses were deposed, subject to deposition notices that
specifically apprised them of the facts being sought, they had not even re-
viewed the FDIC memorandum detailing those facts, had no role in preparing
the memorandum and, essentially, were able to provide little or no useful
information. The court, obviously concerned about the defendants facing "trial
by ambush", found the deposition tactics of the plaintiff to be inefficient and
wasteful since it could have presented the examiners who prepared the FDIC's
memorandum and who had precise, first-hand knowledge of the clearly dis-
coverable information being sough...

*District Council of Carpenters,* 1992 U.S. Dist. LEXIS 12307, at *47.*48.
    396. *See, e.g., id.* (distinguishing United States v. Pepper's Steel & Alloys, Inc.,
132 F.R.D. 695 (S.D. Fla. 1990) on the grounds that, in that case, the employee
designated under Rule 30(b)(6) "had knowledge of facts relevant to the claims in the
issues in the case . . . [and] much of his knowledge was acquired first-hand over
several years, as the supervising examiner of the company's liability division, and
only some of his information was acquired in conversations with counsel or by re-
viewing documents in connection with the litigation").
    397. SEC v. Morelli, 143 F.R.D. 42, 47 (S.D.N.Y. 1992).
    398. *Morelli,* 143 F.R.D. at 47. The same reasoning animated the court in *SEC v.
Rosenfeld,* No. 97 Civ. 1467 (RPP), 1997 U.S. Dist. Lexis 13996, at *2 (S.D.N.Y.
Sept. 16, 1997) in which defendant Rosenfeld attempted to depose the SEC under
Rule 30(b)(6), seeking, *inter alia,* "all information in the possession, custody, or con-
trol of, or reasonably available to, the SEC or its agents or employees, relating to
the truth or falsity of statements in the complaint . . . ." The district court correctly
reasoned that the designated witness would have to have participated in, or have

---

*Blunderbuss Requests.* A notice calling for a corporate wit-
ness to testify about facts supporting a large number of para-
graphs in the party's denials and affirmative defenses also poses
work product concerns. One court has acknowledged that while
the discovering party has a legitimate interest in obtaining in-
formation about the facts upon which the entity will rely, the
"attempt to discover those facts through a Rule 30(b)(6) deposi-
tion is overbroad, inefficient, and unreasonable."[398] Such a re-
quest also implicates serious privilege concerns, and potential
problems with confidential information.[399] The corporate entity
"is not required to have counsel 'marshal all of its factual proof'
and prepare a witness to be able to testify on a given defense or
counterclaim."[400]

Requiring a party to provide a response to an "all of the
facts" form of Rule 30(b)(6) designation, in effect, calls upon a
party "to marshal all of its factual proof and then provide it to
[the Rule 30(b)(6) designate] so that she could respond to what
are essentially a form of contention interrogatories."[401] Indeed,
if this procedure were permissible, one might ask why a party
opponent would ever need to call for more than one deposition:
the all-encompassing Rule 30(b)(6) deposition would provide a
binding rendition of all factual information. "Aside from any
issues of privilege, this would be highly inefficient and burden-

---

been prepared by, those who conducted the SEC investigation—namely the
Commission's attorneys. *Rosenfeld,* 1997 U.S. Dist. LEXIS 13996, at *5. Thus, the
30(b)(6) inquiry "amounts to the equivalent of an attempt to depose the attorney for
the other side." *Id.* The court then summarized the arsenal of alternatives available
to the would-be deposing party:

    Rather than using interrogatories as contemplated by the Local Civil Rules,
    and Requests to Produce Documents pursuant to Rule 34 of the Federal Rules
    of Civil Procedure, and then taking the necessary oral discovery from the
    witnesses with knowledge of the facts alleged in the complaint, Rosenfeld
    seeks to explore the extent of the SEC's knowledge (how much it knows and
    how much it does not know) as a result of the investigative efforts of its at-
    torneys. This Rule 30(b)(6) discovery is obviously aimed at finding the nature
    of the SEC's attorney work product, and is denied for that reason.

*Id.* at *9.
    399. *In re* Independent Serv. Org. Antitrust Litig., 168 F.R.D. 651, 654 (D. Kan.
1996).
    400. *In re* Independent Serv. Org., 168 F.R.D. at 654.
    401. *Id.*
    402. United States v. District Council of Carpenters, No. 90 Civ. 5722 (CSH),
1992 WL 208284, at *15 (S.D.N.Y. Aug. 14, 1992).

some, rather than the most direct manner of securing relevant information . . . .[403] Such reasoning is particularly persuasive where the context leaves open the prospect that the information can be discovered by other means.[404] At least one court has suggested that use of the Rule 30(b)(6) mechanism in this fashion would be permitted only upon a showing of substantial need to obtain the information via the broad Rule 30(b)(6) deposition mechanism.[405]

When the subjects sought in a notice under the Rule ask for all support for allegations in a pleading, the discovery does not "merely seek facts," but actually seeks to discover how the entity "intends to marshall the facts, documents and [statements] in its possession, and to discover the inferences that [the entity] believes properly can be drawn from the evidence it [h]as accumulated."[406] Several courts have held that "[w]ork product includes an attorney's intended lines of proof and his ordering of the facts."[407]

## VI. "BINDING" A WITNESS UNDER RULE 30(B)(6)

### A. Motivating a Misreading of the Rule

The decisions which take the most draconian view of the duty of preparation that attends production of a representative

---

403. *District Council of Carpenters*, 1992 WL 208284, at *15; *accord In re Independent Serv. Org.*, 168 F.R.D. at 651.

404. *In re Independent Serv. Org.*, 168 F.R.D. at 654 (citing EEOC v. HBE Corp., 157 F.R.D. 465, 466-67 (E.D. Mo. 1994)).

405. *In re Independent Serv. Org.*, 168 F.R.D. at 654. However, in response to the claim that disclosure of all supporting facts would disclose work product of counsel, another court dismissed the argument summarily, commenting that "a position taken in commercial litigation that was not the result of various privileged work product and communications would be a rare find." Masco Corp. v. Price Pfister, Inc., 33 U.S.P.Q. 2d 1694, 1695 (E.D. Va. 1994). Of course, specific facts can be disclosed without revealing privileged communications, and some courts simply ignore the issue whether identification of all supporting materials, in effect, asks one party to prepare the case for the other, and to disclose counsel's assessment of the welter of possible proof items. *See Masco Corp.*, 33 U.S.P.Q. 2d at 1695.

406. EEOC v. American Int'l Group, Inc., No. 93 Civ. 6390 (PKL), 1994 U.S. Dist. LEXIS 9815, at *6 (S.D.N.Y. July 18, 1994) (citing SEC v. Morelli, 143 F.R.D. 42, 47 (S.D.N.Y. 1992)).

407. *American Int'l Group*, 1994 U.S. Dist. LEXIS 9815, at *6.

---

witness often combine the notion of sufficient preparation with the concept that the testimony must be of a nature to bind the entity.[408] Recent efforts to encourage even more widespread use of Rule 30(b)(6) depositions repeatedly claim that the ability to force the entity to provide "binding" admissions is the key purpose and advantage of the procedure.[409] Often, cases cited for this proposition are sanction decisions that do not reflect the implications of the entity deposition procedure itself.[410] However, several courts have recited, almost by rote, that the discovering party is "entitled to a 30(b)(6) deposition that obtains explicit statements that will bind [the company] on the matters in issue."[411] The recently publicized claim: "The whole point of

---

408. For example, *United States v. Taylor*, 166 F.R.D. 356, 360-61 (M.D.N.C. 1996), *aff'd*, 166 F.R.D. 367 (M.D.N.C. 1996), noted the earlier expression of these combined concerns:

> A notice of deposition made pursuant to Rule 30(b)(6) requires the corporation to produce one or more officers to testify with respect to matters set out in the deposition notice or subpoena. A party need only designate, with reasonable particularity, the topics for examination. The corporation then must not only produce such number of persons as will satisfy the request, but more importantly, prepare them so that they may give complete, knowledgeable and binding answers on behalf of the corporation.

*Taylor*, 166 F.R.D. at 126 (quoting Marker v. Union Fidelity Life Ins., 125 F.R.D. 121, 126 (M.D.N.C. 1989)) (citations omitted); *see Mitsui & Co. v. Puerto Rico Water Resource Auth.*, 93 F.R.D. 62 (D.P.R. 1981).

409. *See* Solovy & Byman, *supra* note 1, at B13, cols. 1, 2, 3, 4 (repeated claims of binding effect).

410. *See id.* (citing Worthington Pump Corp. v. Hoffert Marine Inc., 34 Fed. R. Serv. 2d 855 (D.N.J. 1982)). The court in *Worthington Pump* reviewed a magistrate judge's recommendation about sanctions for improper assertion of the privilege against self-incrimination. *Worthington Pump*, 34 Fed. R. Serv. 2d at 855. The magistrate judge had found the information sought to be material which "the defendants would, in fact, be obliged to provide or face imposition of the most extreme sanction available under Rule 37." *Id.* The district judge imposed a proof preclusion sanction for improper invocation of the privilege to shield a corporation (which lacks the privilege). *Id.* The sanction was "an inference" that the defendant is "unable to deny truthfully the allegations contained in paragraphs 6 and 7 of plaintiff's complaint." *Id.* at 857. Neither this sanction nor the accompanying direction that contrary proof would be barred was in any way attributed to the structure or requirements of Rule 30(b)(6).

411. Masco Corp. v. Price Pfister, Inc., No. 94-728A, 1994 U.S. Dist. LEXIS 20597, at *6 (E.D. Va. Oct. 7, 1994); *see, e.g.*, Sanders v. Circle K Corp., 137 F.R.D. 292, 294 (D. Ariz. 1991); Mellon Bank v. Bank of Mid-Jersey, No. 91-3142, 1992 U.S. Dist. Lexis 5633, at *4 (E.D. Pa. Apr. 14, 1992); GTE Prods. Corp. v. Gee, 115 F.R.D. 67, 68 (D. Mass. 1987). Note that some of the courts taking this view conclude that a corporation cannot be required to designate a Rule 30(b)(6) designee who lacks authority to speak on behalf of the corporation. *See* Lapenna v. Upjohn

30(b)(6) is that it creates testimony that binds the corporate entity,[411] is utterly belied by the legislative history of the Rule. And in the main, this approach reflects a misunderstanding of the applicable civil procedure rules as well as the rules of evidence, and is misguided as a policy matter.[412]

Rule 32(a)(1) allows the use of deposition testimony to contradict or impeach a trial witness in accordance with the Federal Rules of Evidence. Furthermore, Rule 32(a)(2) provides that the depositions of an officer, director or managing agent of a corporate party may be used by an adverse party at trial *for any purpose*, which includes admissions on the merits.[413] This is similar to the effect of transcripts from a Rule 30(b)(6) deposition, which the adverse party may also use for any purpose.

However, a party is not "bound by its Rule 30(b)(6) deposition testimony as a matter of law" in the sense that matters admitted in the testimony cannot be controverted.[414] A corporation is "bound" by its Rule 30(b)(6) testimony only in the sense that any individual whose testimony was taken under Rule 30(b)(1) would be "bound" by that testimony. However, that locution simply means that the testimony locks the witness into a position at a particular point in time; it does not mean that the witness has made a *judicial admission* that formally and finally decides an issue.[415] Judicial admissions may not be contradict-

---

Co., 110 F.R.D. 15, 20 (E.D. Pa. 1986) (stating that a Rule 30(b)(6) designee must have authority to speak on behalf of the corporation).

412. Solory & Byman, *supra* note 1, at B13, col. 3.

413. Some courts have even asserted the nonsensical position that a corporate designee "can make admissions against interest under FED. R. EVID. 804(b)(3) which are binding on the corporation." United States v. Taylor, 166 F.R.D. 356, 362 (M.D.N.C. 1996), *aff'd*, 166 F.R.D. 367 (M.D.N.C. 1996) (citing Ierardi v. Lorillard, Inc., No. 90-749, 1991 U.S. Dist. LEXIS 11320 (E.D. Pa. Aug. 13, 1991)). This view is contradicted by accepted evidence law in two respects: first, the Rule 804 exceptions may only be used when the declarant is "unavailable" as defined in Rule 804(a). The corporation, a party in these situations, is always present, often through several representatives, and hence the hearsay exception would not apply. Second, and more importantly, Rule 804 provides only for admissibility, and testimony admitted pursuant to Rule 804(b)(3) may always be rebutted and contradicted.

414. W.R. Grace & Co. v. Viskase Corp., No. 90-5383, 1991 U.S. Dist. LEXIS 14651, at *4-*5 (N.D. Ill. Oct. 15, 1991); Fey v. Walston & Co., 493 F.2d 1036, 1045-46 (7th Cir. 1974) (ruling that a deposition of party witness may be introduced as substantive evidence even if party witness is available at trial).

415. *See* W.R. Grace & Co., 1991 U.S. Dist. LEXIS 14651, at *5.

416. *See id.*

---

ed.[417] Deposition testimony, on the other hand, is simply evidence, nothing more. Such evidence may be explained or contradicted.[418] The cases that use the word "binding" to describe deposition testimony should be read to use it in the limited sense described here.[419]

A party is not generally "bound" by the testimony of one of its employees taken in isolation, even if the subject matter is squarely within the subject matter of the witness's expertise and job functions. Thus, for example, in a case in which a party's damage claims were addressed by the testimony of an accountant who supervised the maintenance of plaintiffs' books and testified to damages totaling $956,256.10, the party was *not* restricted to that computation.[420] The fact-finder was not compelled to accept the testimony in question, nor was the fact-finder restricted to that testimony.[421] Where other witnesses have irrelevant information, neither the party nor the fact-finder is bound by the more limited testimony of one person. The party, it is said, is "entitled to the benefit of evidence from other witnesses more favorable to him."[422]

How impeachment operates after a Rule 30(b)(6) deposition has rarely been discussed. In the one reported opinion we have located which comments on the process, the court stated in dicta that if the entity calls a witness at trial who "makes a statement that contradicts a position previously taken in a Rule 30(b)(6) deposition, then [the adversary] may impeach that witness with

---

417. Brown & Root, Inc. v. American Home Assurance Co., 353 F.2d 113, 116 (5th Cir. 1965).

418. *See* W.R. Grace & Co., 1991 U.S. Dist. LEXIS 14651, at *5.

419. *Id.* at *5 n.1 (citing Sanders v. Circle K Corp., 137 F.R.D. 292 (D. Ariz. 1991) (holding that a corporation cannot be compelled to designate a witness under Rule 30(b)(6) if that witness lacks authority to bind the corporation); Poitain Tower Cranes, Inc. v. Capitol Tower Cranes, Inc., 892 F.2d 74 (4th Cir. 1989) (affirming summary judgment against a corporation based upon uncontroverted Rule 30(b)(6) deposition statements); Ierardi v. Lorillard, Inc., No. 90-7049, 1991 U.S. Dist. LEXIS 11687, at *3 (E.D. Pa. Apr. 11, 1991) (stating that a corporation has duty to prepare its Rule 30(b)(6) designee to give binding answers, rather than allow the designee to profess ignorance until trial); McDevitt & Street Co. v. Marriott Corp., 713 F. Supp. 906 (E.D. Va. 1989) (similar to *Ierardi*).

420. Charles Dowd Box Co. v. Fireman's Fund Ins. Co., 218 N.E.2d 64, 68 (Mass. 1966).

421. *Charles Dowd Box*, 218 N.E.2d at 68.

422. *Id.* at 69 (quoting Reynolds v. Sullivan, 116 N.E.2d 128, 131 (Mass. 1953)).

the prior inconsistent statement."[423] This is, however, a broad rule: it means that every witness with personal knowledge who testifies at the trial may be impeached with a statement made by another person designated by the company to testify on that topic. That notion is inconsistent with the normal role of impeachment as a tool to illuminate issues of personal truthtelling and not to have the company's statements used to impeach individual witnesses. For example, would an interrogatory answer submitted on behalf of an entity be usable to impeach an individual witness other than the person signing the answers?[424]

At least one appellate court has noted the erroneous notion that a party is somehow "bound" conclusively by its officials' depositions under Rule 30(b)(6).[425] It implied that, at most, garden variety admissions are a "normal risk of litigation" and to the extent that the adversary party sought and the trial court granted any greater binding effect, "leading to more horrendous results, the actual effects [of such a misapplication of the rule] can be considered and if need be ameliorated on appeal."[426]

Indeed, it may be worth noting that the broad scope of deposition testimony under the Rule will not serve as a basis for trial testimony except to the extent used by the adversary. Thus, it has been held that at a deposition a corporate officer is *permitted* to recount corporate knowledge in testimony as long as the witness has personal knowledge of the events, whether or not the witness personally participated in the activity described.[427] At trial, of course, the general standards of Rule 601 of the Federal Rules of Evidence will intrude, requiring some showing of personal knowledge on the part of the witness.[428]

423. *See* W.R. Grace & Co. v. Viskase Corp., No. 90-5383, 1991 U.S. Dist. LEXIS 14651, at *7 (N.D. Ill. Oct. 15, 1991).

424. The issue may be somewhat unreal because the use of employee *admissions* on the merits has a more powerful impact than mere impeachment; therefore, admissibility of the other statement on the merits may dwarf the impeaching consequences of having the statement of another, albeit inconsistent with the testimony of the witness on the stand, read into the record.

425. *In re* Puerto Rico Elec. Power Auth., 687 F.2d 501, 503 (1st Cir. 1982).

426. *In re* Puerto Rico Elec. Power Auth., 687 F.2d at 504 n.2.

427. Haeberle v. Texas Int'l Airlines, 497 F. Supp. 1294, 1299 (E.D. Pa. 1980).

428. *See* 3 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S EVIDENCE §§ 601, 602 (2d ed. 1999); CHRISTOPHER MUELLER & LAIRD KIRKPATRICK, FEDERAL EVIDENCE § 236 (2d ed. 1994).

### B. Bindingness and the Conception of Trial Proof

One premise which seems to pervade the discussions of theoretical abuse by the entity is that only corporate knowledge of the party is potential evidence. Thus, courts imposing draconian burdens under Rule 30(b)(6) are wont to equate the universe of a company's trial proof with knowledge of its personnel:

> If a corporation has knowledge or a position as to a set of alleged facts or an area of inquiry, it is its officers, employees, agents or others who must present the position, give reasons for the position, and, more importantly, stand subject to cross-examination. A party's trial attorney normally does not fit that bill. Therefore, if a party states it has no knowledge or position as to a set of alleged facts or area of inquiry at a Rule 30(b)(6) deposition, it cannot argue for a contrary position at trial without introducing evidence explaining the reasons for the change.[429]

This reasoning elides the varieties of proof open to the corporation at trial. Indeed, if deemed strategically beneficial, the corporation could call *none* of its own personnel at trial and rely wholly on third-party witnesses or testimony from adverse witnesses associated with the opponent or use documentary or physical evidence.

This approach also loses sight of the issue of surprise. To the extent that the issue is whether, to be properly prepared, a Rule 30(b)(6) witness must review *other parties'* deposition testimony and documents of others, the reality is that the discovering party already has this information.

*Restrictions Based on the Role of Counsel.* Another thesis apparently motivating some courts to favor almost unlimited preparation burdens under the rule is that "[o]therwise, it is the attorney who is giving evidence, not the party."[430] From the premise that the *attorney* for an entity "is not at liberty to manufacture the corporation's contentions" the argument concludes

429. United States v. Taylor, 166 F.R.D. 356, 362 (M.D.N.C. 1996), *aff'd*, 166 F.R.D. 367 (M.D.N.C. 1996); See Ierardi v. Lorillard, Inc., No. 90-7049, 1991 U.S. Dist. LEXIS 11887, at *8 (E.D. Pa. Apr. 11, 1991).

430. *Taylor*, 166 F.R.D. at 363; *see also id.* at 363 n.8 ("What the corporation cannot do is have the attorney assert that the facts show a particular position on a topic when, at the Rule 30(b)(6) deposition, the corporation asserts no knowledge and no position.").

that, instead, "the corporation may designate a person to speak on its behalf and it is this position which the attorney must advocate."[431] Under this view, the attorney may only serve as a "conduit of the party"[432] and the party must speak through one or more deponents. The most expansive interpretations of this duty to prepare for a Rule 30(b)(6) deposition include the concept that if an entity plans to offer at trial a position "based on testimony from third parties, or their documents, the designee . . . must present an opinion as to why the corporation believes the facts should be so construed."[433]

There is nothing in corporation law, evidence principles or civil procedure which supports this conclusion. Corporate litigation positions either are taken by the entity through the decisions of officers, whether managerial or more purely legal, or are acted upon by a board of directors, executive committee or the like. No one person must be identified either to make or to state the position. And, as noted elsewhere in this article, there are several tools in the modern litigation systems for identifying what those positions will be.

Proof on behalf of the entity likewise is not restricted, by evidence law or any other principles, to items originating within the company or to matters as to which a corporate witness is knowledgeable: any witness may be offered, no corporate witnesses need be offered, and facts from all sources may be used to defend the corporation's positions in the trial. Even if the company does not have knowledge available to it at the time of an early deposition, it is not barred from offering proof from third-parties or other sources at the eventual hearing. Thus, a party does (and should) have the right under our system of litigation "to deny knowledge or position now, but then at trial to rely on the documents and testimony of others or to at least present argument that the evidence presented by others does not reflect the state of facts as contended by those parties."[434]

431.  Id. at 361-82.
432.  Id. at 362.
433.  Id. at 361.
434.  Taylor, 166 F.R.D. at 362.

## C. Preclusion of Proof and Impeachment

In Taylor, Union Carbide argued for the right to call witnesses at trial on a Rule 30(b)(6) topic if the witnesses had been identified as knowledgeable by the time the Rule 30(b)(6) deposition transcript was closed.[435] It also argued that failure to designate a witness on a particular topic or sub-topic should not preclude the ability to make arguments at trial with respect to such subjects through use of testimony or documents admitted by otherwise competent means (for example, previous deposition testimony and documents previously produced in discovery).[436] The court found these arguments unpersuasive. It did, however, include in its disposition provisions allowing Carbide to promptly designate and prepare a substitute deponent if, despite good-faith efforts to prepare a deponent, the deponent were unable to respond to a specific area of inquiry.[437]

At trial, while a party may be impeached upon changing Rule 30(b)(6) testimony, some courts have made the mistaken assumption that an evidentiary showing would be necessary to support such a change, requiring some sort of permission to present the altered position.[438] Imposition of such a burden, which is nowhere supported in the Rule, its legislative history, or evidentiary principles, proceeds from the assumption that differing trial testimony presents "a disruptive situation."[439] Rather, there is a simple remedy of impeachment[440] and not much risk in any event: the pretrial order will have alerted the

435.  Id. at 360.
436.  Id.
437.  Id. at 359 n.5 (citing again the same court's earlier decision in Marker v. Union Fidelity Life Ins. Co., 125 F.R.D. 121, 126 (M.D.N.C. 1989)). The Taylor court characterized this rule as holding that
    even where defendant in good faith thought deponent would satisfy the deposition notice, it had a duty to substitute another person once the deficiency of its designation became apparent during the course of the deposition, and to act immediately where plaintiff had traveled out of state to defendant's offices placing defendant in a better position to take care of exigencies.
Id.
438.  Taylor, 166 F.R.D. at 363 n.8 ("At trial, [Carbide] will be required to make an evidentiary showing to support such a change in position.").
439.  Id.
440.  Olin Eng'g Corp. v. Trade & Dev. Corp., No. 92-1574, 1994 U.S. Dist. LEXIS 3132, at *2-*3 (E.D. La. Mar. 16, 1994).

adversary to contentions, and contention interrogatories may also have defined the positions of the entity. The list of witnesses and exhibits set forth by the entity for the pretrial order, other common elements,[441] will also avoid surprise and allow the entity's opponent to be prepared to meet the evidence. Thus, the situation is starkly unlike the cases in which a party spells out its trial positions *in a pretrial order* and thereafter seeks to spring additional evidence on new issues upon the adversary at trial. Of course, in those cases, the notion that changing the pretrial order requires a *showing* is sensible. Then again, Rule 16 specifies that such orders cannot be changed without the proper showing, which—with respect to the final pretrial order—is stringent: "The order following a final pretrial conference shall be modified only to prevent manifest injustice."[442]

In the only decision squarely ruling on the issue of limiting a party's trial testimony to the positions advanced in the Rule 30(b)(6) testimony of its designee, the court firmly held that the corporation was *not* barred from offering contrary proof.[443] In ruling on a motion captioned "Motion to Bar Otis Engineering Corporation from Materially Altering its Rule 30(b)(6) Deposition Testimony at Trial and from Offering Expert Evidence to the Contrary at Trial," the court found the relief unavailable.[444] The court commented that if a party "attempts to materially alter a Rule 30(b)(6) deposition, the opposing party has the ability and the responsibility to cross-examine and impeach the witness using the different, but sworn to, prior testimony. The trier of fact then determines which, if any, of the testimony to credit."[445] Thus, the court found that it was "more appropriate for the trier of fact to decide the credibility of witnesses as opposed to the court preventing a witness from changing her prior testimony . . . ."[446]

It is generally recognized, therefore, that while individual witnesses may not have comprehensive knowledge of the facts in a given case, their testimony cannot be deemed to limit the evi-

---

441. MANUAL FOR COMPLEX LITIGATION ¶ 41.7 (1995).

442. FED. R. CIV. P. 16(e).

443. *Otis Eng'g*, 1994 U.S. Dist. LEXIS 3132, at *2-*3.

444. *Id.* at *1.

445. *Id.* at *2.

446. *Id.* at *3.

---

dence that the entity can present at trial.[447] If a party wishes to confine trial evidence to that which is disclosed during discovery, it must propound appropriate contention interrogatories.[448] When courts have actually focused on the "binding" effect of testimony under the Rule, they have recognized, at least on the superficial level, that the testimony is not calculated to be the equivalent of a judicial admission.[449]

In sum, Rule 30(b)(6) nowhere states that the purpose of this device is to bind the corporation in any sense. Nor does the Advisory Committee commentary that accompanied the rule indicate that aspiration. Once it is understood that the true purpose of the Rule 30(b)(6) device is to provide leads to other discovery and to assure efficiency in a deposition program by avoiding random stabs by the discovering party, the question of whether the testimony "binds" the corporation loses significance.

## VII. SANCTIONS DOCTRINES RECAPITULATE THE SCOPE OF RULE 30(B)(6) DUTY TODAY

The burdens of depositions under the rule are so great and the potential for case-altering sanctions so near the surface of the proceedings, that authoritative rulings are avidly sought.[450]

---

447. Arkwright Mutual Ins. Co. v. National Union Fire Ins. Co., No. 90-7811-KC, 1993 U.S. Dist. LEXIS 1163, at *8 (S.D.N.Y. Feb. 4, 1993).

448. *Arkwright Mutual Ins.*, 1993 U.S. Dist. LEXIS 1163, at *8.

449. *See, e.g.*, United States v. Taylor, 166 F.R.D. 356, 362 n.6 (M.D.N.C. 1996), *aff'd*, 166 F.R.D. 367 (M.D.N.C. 1996):

When the Court indicates that the Rule 30(b)(6) designee gives a statement or opinion binding on the corporation, this does not mean that said statement is tantamount to a judicial admission. Rather, just as in the deposition of individuals, it is only a statement of the corporate person which, if altered, may be explained and explored through cross-examination as to why the opinion or statement was altered.

*Taylor*, 166 F.R.D. at 362 (citing W.R. Grace & Co. v. Viskase Corp., No. 90-5383, 1991 U.S. Dist. LEXIS 14651 (N.D. Ill. Oct. 15, 1991)).

450. Bald claims that the Rule 30(b)(6) deposition would generate "undue burden" have not been persuasive. In general, at least where records exist within the company to permit study and preparation, while the preparation task "may be somewhat difficult, it is clear that if a corporate employee familiar with the structure and organization of the corporation would find this task difficult, [the adversaries], who have no such familiarity, likely would find it impossible." Ierardi v. Lorillard, Inc., No. 90-7049, 1991 U.S. Dist. LEXIS 11887, at *4 (E.D. Pa. Aug. 23, 1991).

Similarly, some courts have expressed the view that a mere unsubstantiated

This conjunction of factors may explain, in part, the frequency with which "clarifications" are sought of rulings bearing on compliance with Rule 30(b)(6) obligations.[461] Most of the reported rulings arise on sanction applications, however, and without the benefit of appellate guidance.[462]

### A. Non-Appearance and Virtual Non-Appearance

Rule 37(d) of the Federal Rules of Civil Procedure provides that when a party or a person designated to testify under Rule 30(b)(6) fails to appear, an award of expenses will be entered.[463] As noted above, failure to designate an available,

belief that the deposing party will not discover new information is insufficient to merit the imposition of a protective order. *Ierardi*, 1991 U.S. Dist. LEXIS 11887, at *3 (quoting Mitsui & Co. (U.S.A.) Inc. v. Puerto Rico Water Resources Auth., 93 F.R.D. 62, 65 (D.P.R. 1981) ("Rule 30(b)(6) . . . is an additional, supplementary and complimentary deposition process designed to aid in the efficient discovery of facts.")).

451. *See Taylor*, 166 F.R.D. at 358; *In re Puerto Rico Elec. Power Auth.*, 687 F.2d 501, 503-04 (1st Cir. 1982); *see also Ierardi*, 1991 U.S. Dist. LEXIS 11887, at *8-*9. Even a prompt clarification motion, however, is not likely to yield an order quashing a deposition in its entirety. Pre-testimony motions to quash, quite apart from the Rule 30(b)(6) context, are not favored and the general canon is that an order vacating a notice of deposition is regarded as unusual and is treated unfavorably. *See Arkwright Mutual Ins.*, 1993 U.S. Dist. LEXIS 1163, at *5 (citing Investment Properties Int'l, Ltd. v. IOS, Ltd., 459 F.2d 705, 708 (2d Cir. 1972)). In *Arkwright Mutual Insurance*, the court stated that "[g]enerally, one is required to show both that there is a likelihood of harassment and that the information sought is fully irrelevant before a party is altogether denied the right to take an individual's deposition." *Id.* (quoting United States v. Miracle Recreation Equip. Co., 118 F.R.D. 100, 104 (S.D. Iowa 1987)) (citation omitted); *see* Salter v. Upjohn Co., 593 F.2d 649, 651 (5th Cir. 1979); West Peninsular Title Co. v. Palm Beach County, 132 F.R.D. 301, 302 (S.D. Fla. 1990).

452. In at least one case, a petition for mandamus was lodged prior to a Rule 30(b)(6) deposition after a flurry of cross-motions were filed in the wake of a notice under the Rule and rulings followed by "clarifications" were entered by the trial court. *In re Puerto Rico Elec. Power Auth.*, 687 F.2d at 503. Of course, in courts that will hear the matter at all, there is a heavy burden to justify mandamus against a discovery order of this sort. A party must demonstrate that the district court exceeded its jurisdictional authority to such a degree that its actions amounted to a "usurpation of power." *Id.* (citing DeBeers Consol. Mines, Ltd. v. United States, 325 U.S. 212, 217 (1945)). Merely characterizing the discovery request as so burdensome as to be impossible of fulfillment, or pointing to statements of opposing counsel in the record which seem to suggest a fallacious expectation that the deposition will "bind" the entity in some conclusive manner have been held to fall "well short of demonstrating a case for mandamus." *Id.*

453. Rule 37 provides in part that "the court shall require the party failing to

---

knowledgeable, and readily identifiable witness has been deemed in practical effect "no appearance at all."[454] Sanctions have been denied, on the other hand, where "four deponents testified at length concerning the areas of their respective designations."[455] Clearly, to justify the imposition of sanctions, "the inadequacies in a deponent's testimony must be egregious and not merely lacking in desired specificity in discrete areas."[456] For example, in *Resolution Trust Corp. v. Southern Union Co.*,[457] the deponent testified that he had no knowledge as to each item of inquiry designated in the notice.[458]

Seen through the lens of sanction decisions, much of the rhetoric which is driving the overuse of Rule 30(b)(6) depositions today is hollow. While dispositive sanctions are available when there is a total failure to appear for a properly noticed deposition under the Rule,[459] such situations are rare. And, in the normal case, if a witness of any sort is produced in response to a notice under the Rule, and the witness answers at least *some* questions, no dispositive sanctions have ever been awarded by a federal court.[460] Several decisions have ordered re-deposition

act or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust." FED. R. CIV. P. 37(d).

454. Resolution Trust Corp. v. Southern Union Co., 985 F.2d 196, 197 (5th Cir. 1993); *see supra* text accompanying notes 107-19; *see also* Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 78 (S.D.N.Y. 1991) (sanctioning a party that failed to provide witnesses knowledgeable in areas requested in notice under Rule 30(b)(6)).

455. Zappia Middle East Constr. Co. v. The Emirate of Abu Dhabi, No. 94 Civ. 1942, 1996 U.S. Dist. LEXIS 17187, at *26 (S.D.N.Y. Nov. 17, 1996).

456. *Zappia Middle East Constr. Co.*, 1996 U.S. Dist. LEXIS 17187, at *26.

457. 985 F.2d 196, 197 (5th Cir. 1993).

458. *Southern Union*, 985 F.2d at 196-97; *see supra* text accompanying notes 107-40.

459. *See* Eastway Gen. Hosp., Ltd. v. Eastway Women's Clinic, Inc., 737 F.2d 503, 504-05 (5th Cir. 1984) (determining that repeated non-designation and then non-appearance by the tardily designated witness combined with numerous other failures to abide by firm directions of the court in addition to those concerning Rule 30(b)(6) depositions after express warnings made it not an abuse of discretion to impose preclusive sanctions).

460. The situation is the same in state courts, where only one (unreported) decision of a state trial judge has imposed sanctions for failure of a designated witness to have complete knowledge of all of the topics designated for testimony. Ashley v. Coopers & Lybrand Deloitte (U.K.), No. CL-95-6466 (Albemarle County Circuit Court Mar. 31, 1997) (on file with the authors). Even within the state of Virginia, where

because answers were incomplete, but even most of these decisions decline to impose the cost recovery that Rule 37(a) would make available in that situation.

### B. Dealing with Gaps in Testimony: Rule 37(a) and (b) Situations Distinguished

*Violation of Orders.* In contrast to cases that involve some arguable failure to comply with a notice issued under the Rule itself, when there have been *orders* directing a party to provide certain testimony, violation of the orders triggers "a panoply of sanctions, from the imposition of costs to entry of default."[461] Of course, sanction orders that take a party's averments as established or barred, or which award judgment on that basis are "the most severe penalty," and are authorized only in "extreme circumstances."[462] Most courts have concluded, therefore, that to warrant imposition of such precipitous sanctions, the violations must be "due to willfulness, bad faith, or fault of the party."[463]

An oral order for the disclosure of contentions is enforceable,[464] and violation thereof can lead to Rule 37(b) sanctions, such as limiting a party's claims to the disclosed theories.[465] In a case involving the lucrative patents for air and liquid cushioned sports shoes, the defendant took the deposition of Nike Incorporated to elucidate Nike's theory of patent infringement.[466] At the deposition, the designated Nike witness denied

that case arose, the reported case law denies sanctions. See Aetna Cas. and Sur. Co. v. Corroon & Black, 10 Va. Cir. 207 (Richmond Cir. Ct. 1987).

461. United States v. Taylor, 166 F.R.D. 356, 363 (M.D.N.C. 1996), *aff'd*, 166 F.R.D. 367 (M.D.N.C. 1996) (citing FED. R. CIV. P. 37(b)(2)).

462. CFTC v. Noble Metals Int'l, 67 F.3d 766, 770-71 (9th Cir. 1995) (citing United States ex rel. Wiltec Guam, Inc. v. Kahaluu Constr. Co., 857 F.2d 600, 603 n.5 (9th Cir. 1988)); *see also* Fjelstad v. American Honda Motor Co., 762 F.2d 1334, 1338 (9th Cir. 1985).

463. *Noble Metals Int'l*, 67 F.3d at 771 (quoting Wyle v. R.J. Reynolds Indus., Inc., 709 F.2d 585, 589 (9th Cir. 1983)).

464. *See* Henry v. Sneiders, 490 F.2d 315, 318 (9th Cir. 1974) (upholding default judgment based upon an oral order to produce documents).

465. Nike, Inc. v. Wolverine World Wide, Inc., 43 F.3d 644, 648-49 (D.C. Cir. 1994).

466. *Nike*, 43 F.3d at 648. Nike is the assignee of the '304 patent, which is directed to a shoe having an improved cushioning sole structure. Claim One of the

that the company was asserting a claim of infringement under the "doctrine of equivalents," a set of patent law principles.[467] Nike then sent the discovering party a letter stating that "NIKE has not made any contention that defendants have infringed the '304 patent under the doctrine of equivalents."[468] Hedging Nike's position, however, the letter further asserted that "[w]hether or not NIKE will make such a contention in the future is dependent on the results of an investigation being conducted by NIKE's technical expert."[469] Because the discovery in Nike's case had closed without further disclosure concerning allegations of infringement based on the doctrine of equivalents, an order restricting the party's case to contentions identified within the time specified by directions of the court was upheld, even though there was no express violation of court order involved.[470]

*General Shortfalls.* On the other hand, if there has been no prior court order with respect to the *content* of a Rule 30(b)(6) deposition, the sanctions available in the discretion of the reviewing judge on an initial motion to compel are those of Rule 37(a)(4) of the Federal Rules of Civil Procedure, setting forth provisions for recovery of fees and expenses,[471] and not the pro-

patent is representative of the claims at issue and reads in relevant part as follows: Footwear comprising an upper, a sole member attached to said upper, said sole member including a sealed inner member of flexible material, *said inner member being inflated with a gaseous medium* to form a compliant and resilient insert having spaced upper, lower, front, back and side surfaces, an elastomeric yieldable outer member encapsulating said insert about preselected portions of said insert, said preselected portions including a major portion of at least said upper or lower surface and a portion of said side surfaces, said inner and outer members functioning together to form a viscoelastic unit for attenuating shock and returning energy of foot impact.

*Id.* at 646.

467. *Id.* at 648.

468. *Id.*

469. *Id.*

470. *Nike*, 43 F.3d at 648-49.

471. The proper measure of recoverable costs and fees on a successful motion to compel for gaps in the deponent's knowledge should be the portion of the deposition time devoted to demonstrating lack of knowledge (not the entire deposition, including the productive and responsive parts) and the time spent preparing and presenting the motion to compel. Some courts have noted this logic, though other courts have allowed recovery of the entire costs of the initial transcript and the time spent on the deposition as well as the motion. *See* Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 79 (S.D.N.Y. 1991) ("[A] total of 68.5 hours were expended, and at the

visions of Rule 37(b)(2), which provides more stringent sanctions for the flouting of a court order.[472] The most common outcome, therefore, when a deposition witness under the Rule is deemed to have been inadequately prepared to provide a reasonable scope of information is that the entity "will just have to do it again, probably at its own expense."[473]

Note that even in cases in which the *fact* or *timing* of a deposition has been the subject of a prior motion, as long as the issues concerning whether the witness should be compelled to answer the questions involved in a later motion were not previously before the court, only Rule 37(a) sanctions should be considered available. This issue commonly arises, given the broad reach of many Rule 30(b)(6) deposition notices. And a ruling that a witness "should be required to appear at a date and place certain" is not violated when a witness appears at the specified time and place but lacks the completeness of knowledge desired by the discovering party.[474] In such a situation the reviewing court on a motion to compel directed to the *content* of the deposition responses is "limited to awarding fees and expenses 'incurred in obtaining the order.'"[475] The court, therefore, would "not have the authority to impose sanctions, such as the award of expenses for the taking of the second deposition, pursuant to Federal Rule of Civil Procedure 37(b)(2), because the expense provisions of 37(a)(4) are more limited than the sanctions under 37(b)(2)."[476] Recovery has been denied for fees or expenses

---

requested rate of $95.00 per hour, this results in a total fee request of $6,517.00. In addition, the plaintiff incurred expenses of $206.65 for the transcript of the Huddleston deposition.").

When a second witness is designated after an initial representative deponent testifies with obvious gaps in the subject matters to be covered, the case law suggests that there is at least a theoretical argument for recoupment of incremental costs occasioned by having a second, separate deposition, if producing both individuals on the same day would, for example, have avoided duplicate travel expenses. *See* Autrey v. Bilsom Int'l, No. 94-0022, 1994 U.S. Dist. LEXIS 18883, at *7-*8 (S.D. Ala. Nov. 18, 1994) (denying sanctions absent a showing of costs attending a second deposition that could have been obviated if both witnesses had been produced for the initial response).

472. Protective Nat'l Ins. Co. v. Commonwealth Ins. Co., 137 F.R.D. 267, 283 (D. Neb. 1989). *See generally* FED. R. CIV. P. 37(a).

473. Cymrot, *supra* note 5, at 7.

474. *Protective Nat'l Ins.*, 137 F.R.D. at 283.

475. *Id.* (applying FED. R. CIV. P. 37(a)(4)).

476. *Id.*

---

which will be encountered upon a re-deposition or continuation of the examination of a witness whose testimony is found to be inadequate.[477]

Even in awarding fees, courts are mindful of the premise that such awards are improper under Rule 37(a)(4) if the court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust.[478] Similarly, various courts have denied recovery of expenses where there was a genuine disagreement on the merits of the discovery, such as a bona fide dispute over issues of privilege arising out of a deposition.[479]

However, where an examining counsel "[l]ike Jack Webb . . . wanted 'just the facts . . . ,'" costs and fees may be awarded, usually in fairly limited dollar amounts.[480]

### C. Patterns of Abuse in Sanction Cases

Most of the Rule 30(b)(6) cases in which even the minor remedies of costs and fees have been imposed in the course of ordering further disclosure may be explained by the fact that the disclosing party has engaged in other, distinct acts of discovery abuse, such as destruction of evidence.[481] Thus, one factor that clearly motivates some sanction decisions concerning Rule 30(b)(6) is a *pattern* of discovery difficulties. For example, a party which has produced documents reluctantly, after several motions, and then only on a "sample" basis, may be deemed to have sought to create for itself a right to "self-selecting discovery."[482] When that party subsequently produces a witness in

---

477. *Id.* at 283-84.

478. *Id.* at 283 (citing 4A JAMES WILLIAM MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 37.02[10] (2d ed. 1988)). *See generally* FED. R. CIV. P. 37(a).

479. *Protective Nat'l Ins.*, 137 F.R.D. at 283.

480. *Id.* at 284 (limiting recovery to a maximum of $1,000). The court, writing in 1989, did not feel it necessary to explain to readers the allusion to the long-running television series from the black-and-white era, *Dragnet*, from which the reference to Sergeant Joe Friday's portrayal by veteran actor Jack Webb arises.

481. Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 78 (S.D.N.Y. 1991) (imposing sanctions in the form of costs and attorneys fees for failure to respond to two of four designated deposition topics, lying about a third, and destroying evidence).

482. Buycks-Roberson v. Citibank Fed. Sav. Bank, 162 F.R.D. 338, 343 (N.D. Ill. 1995).

response to a Rule 30(b)(6) notice who has only partial knowledge of the corporation's activities, and especially when there is no reason to doubt that others within the organization could have supplied more complete information, the combination of earlier discovery recalcitrance and the deposition short-fall may lead to imposition of sanctions.[483]

In one case, on the deposition date only defense counsel appeared because the two corporate parties on whom the Rule 30(b)(6) notices were served failed to designate a deposition representative.[484] Their counsel assured the governmental plaintiff that appropriate designations would be made, and the depositions were rescheduled.[485] At the next scheduled deposition date, a principal officer of one of the two entities appeared on behalf of both companies and promptly invoked his Fifth Amendment privilege and refused to answer any relevant questions.[486]

When the inevitable motion to compel reached the magistrate judge supervising the trial preparations in the case, the court found that the entities had representatives available to them who would not have invoked their Fifth Amendment privilege; therefore, the entities had not made a good-faith effort to locate suitable representatives.[487] The magistrate judge ordered payment of a $500 sanction and directed the corporations to "designate a person to represent them, pursuant to Fed. R. Civ. P. 30(b)(6), who will not invoke the Fifth Amendment privilege."[488] Not only was this sanction award not paid, but the corporation failed to designate an appropriate representative, seek reconsideration of the order, or seek a protective order. Instead, the corporation simply elected to provide the discovering party with "a list of persons who, for various reasons, would *not* testify."[489] They then re-designated the same individual previously produced as their representative, knowing he would invoke the privilege against self-incrimination. The discovering

---

483. *Buycks-Roberson*, 162 F.R.D. at 343.
484. CFTC v. Noble Metals Int'l, 67 F.3d 766, 769 (9th Cir. 1995).
485. *Noble Metals Int'l*, 67 F.3d at 769.
486. *Id.*
487. *Id.* at 770.
488. *Id.* (emphasis omitted).
489. *Id.*

party moved for sanctions, and then the two entities for the first time sought a protective order. On this record, the magistrate judge ordered the corporations to explain "how responding to the area of inquiry would place either Defendant in danger of self-incrimination."[490] Neither entity responded. The magistrate judge made findings on these matters which were adopted by the district judge. Under the provisions of Rule 37(b)(2)(a), the district court decreed that all allegations of the complaint would be established as true against both of the responding entities.[491]

### D. Warnings and Limits on Trial Proof

Because of the fear that a corporation may at its Rule 30(b)(6) deposition aver that "it has no corporate knowledge of designated matters, and then, after the deposition has concluded, state that after further effort it does indeed have corporate knowledge of a designated matter," some courts have considered providing a "warning" to the entity that it will be "precluded from asserting a position at trial different than the position taken at its deposition," or that it may be precluded from asserting any position whatsoever at trial where none was taken during the deposition if the information forming the basis of that position was known or reasonably available to it prior to or during the deposition.[492] This urge has been tempered, however, by the recognition that information could be discovered in good faith later that could form the basis for a different position at trial.[493] Thus, "inadequate preparation of a Rule 30(b)(6) designee [may only] be sanctioned based on the lack of good faith, prejudice to the opposing side, and disruption of the proceedings."[494]

Another approach requires that for each deposition topic or subject of examination or area of inquiry for which the entity "intends to present evidence at trial through testimony or depo-

---

490. *Noble Metals Int'l*, 67 F.3d at 770.
491. *Id.*
492. United States v. Taylor, 166 F.R.D. 356, 363 (M.D.N.C. 1996), *aff'd* 166 F.R.D. 367 (M.D.N.C. 1996).
493. *See Taylor*, 166 F.R.D. at 363.
494. *Id.*

sition exhibits," the witness must designate one or more current or former employees or other designees to testify on that area of inquiry at the Rule 30(b)(6) deposition.[495]

The practical implication of this approach, of course, is that, if the entity intends to rely on testimony from a non-party at trial to address a topic listed in the deposition specification, the entity may be *required* to designate the non-party as its Rule 30(b)(6) witness. As discussed above,[496] this requirement, which overreaches any authority found in the rule, is problematic on several levels. Each litigant should be allowed to offer specific evidence from non-parties supporting its case without having to make them corporate spokespersons.

In *Taylor*, again setting a record for expansive reading of the rule, Carbide was ordered to designate deponents for all seventy-six topics listed in the government's Rule 30(b)(6) notice.[497] If the company chose not to designate a deponent to testify at its Rule 30(b)(6) deposition on one or more particular areas of inquiry, the court deemed that Carbide would "thereby tak[e] the position that it has no corporate knowledge and position on that area;" as a result, Carbide would not

> without extremely good cause shown, be allowed to introduce evidence consisting of documents prepared, sent or received by [it], or of testimony of current or former . . . employee to affirmatively support or oppose a designated claim or defense with respect to the area of inquiry, and in addition, it may be prohibited from introducing any evidence as to such area of inquiry, pursuant to Fed. R. Civ. P. 37(b)(2)(B).[498]

The court concluded that "[a]ll claims of newly discovered evidence to support an exception to this portion of the Order will be strictly scrutinized."[499]

*E. Talking Sanctions and Resorting to Warnings*

Even under the most expansive reading of preparation duties under Rule 30(b)(6), and even in a case in which there were several motions and pre-depositions orders, serious monetary or case-dispositive evidentiary sanctions have *not* been imposed under the Rule.[500] Most commonly, renewed sessions of the deposition are ordered if the initial sessions do not adequately address topics which are within the reasonable reach of the responding entity.[501]

Overall, therefore, in many cases even the courts which comment about the imposition of sanctions do not impose them. This may result from failure of the moving party to present the issue in the proper fashion,[502] but often it reflects the judgment that an initial failure to provide complete responses is generally grounds for a warning and expression of the expectation that further discovery will cure any defect.[503]

One factor that bears upon the imposition of sanctions appears to be whether the entity recognizes in advance that there will be difficulties addressing the topics specified in the notice served upon the entity. Even where a company does not move against the breadth of the notice, advising the discovering party's counsel of the limitations on the likely scope of the designee's testimony augurs against a finding of bad faith.[504]

Clearly, a party served with a problematic Rule 30(b)(6) deposition request will often be well-advised to elect to seek a protective order rather than presenting a limited witness in response to the notice of deposition.[505]

Conversely, the fact that a protest was lodged to the adequacy of the testimony of a Rule 30(b)(6) witness *nine months*

---

495. *Id.* at 364 ¶ 2.
496. *See supra* text accompanying notes 61-80
497. *Taylor*, 166 F.R.D. at 364.
498. *Id.* at 365.
499. *Id.*

---

500. *Id.* at 364-66.
501. *Id.* at 364 ¶ 1.
502. *See* Buycks-Roberson v. Citibank Fed. Sav. Bank, 162 F.R.D. 338, 343 (N.D. Ill. 1995) (holding that sanctions or other expense cannot be awarded when the moving party fails to negotiate a resolution before petitioning the court for relief).
503. *Id.*
504. Autrey v. Biloom Int'l, No. 94-0022, 1994 U.S. Dist. LEXIS 18883, at *6-*7 (S.D. Ala. Nov. 18, 1994).
505. Schwartzkopf Tech. Corp. v. Ingersoll Cutting Tool Co., 142 F.R.D. 420, 421-22 (D. Del. 1992).

*after* deposition appeared to be a factor undercutting the assertion that the testimony was unsatisfactory.[506] While the discovering party noted four discrete areas on which the testimony was allegedly lacking, the court noted that the discovering party "failed to follow up on the information conveyed" by the deponent tendered.[507] Thus, leads provided by the witness to sources of information relevant to subject matters on which the witness was not herself completely knowledgeable demonstrated that there was not a culpable failure to comply with the obligations of Rule 30(b)(6).[508] Identification by the witness of the appropriate "department" within the corporate entity was proper.[509] Specification of the categories of information that would aid the discovering party was also evidence that the deposition under the Rule achieved the expected purposes.[510] In denying sanctions, the reviewing court concluded that "[d]espite being provided with this roadmap, plaintiffs apparently did not follow up and obtain the information. No additional 30(b)(6) notice was served and no additional witnesses were requested."[511] Failure to "attempt[] to obtain the necessary information through utilization of other discovery mechanisms" was also relevant in assessing whether relief was appropriate for perceived weaknesses in the testimony of the initial Rule 30(b)(6) deponent.[512]

"[A]ny sanction [imposed] must be 'just' [and] specifically related to the particular 'claim' which was at issue in the order to provide discovery."[513] It is often held that "the record must show a willful and bad-faith failure to comply, and that the other party has been prejudiced by that failure."[514] The risk of

exposing work product has expressly been noted as a factor in finding that non-disclosure was not culpable under these standards.[515]

## VIII. CONCLUSION

The unfairness of using Rule 30(b)(6) depositions as a broad requirement for corporate parties to create a grand synthesis of the entire case, on pain of dismissal or summary judgment or sanction motions if the Herculean witnesses called on the entity's behalf have any gaps in their knowledge of corporate records, facts and contentions, seems quite evident.

Thus, what may once have been a "forgotten rule," originally adopted to ease an adversary's discovery of appropriate witnesses—in effect to defeat a shield of obfuscation and inefficiency that could be thrown up by an institutional litigant—has now sometimes been construed by courts as a powerful sword that fundamentally transforms the nature of discovery in cases involving corporations and other organizations.[516] So construed, it becomes an offensive weapon, predicated on pernicious assumptions, which has bizarre implications.[517] At the extreme of this interpretation, it implies that in no case involving a party subject to its application need the opposing party call more than the one or more witnesses designated under Rule 30(b)(6) to learn each and every fact about the case.[518] According to the broad reading, an institutional party must be prepared to proffer one or more Rule 30(b)(6) witnesses capable of testifying about any fact known or reasonably ascertainable by anyone having the requisite affiliation with that institutional party.

The Rule 30(b)(6) device, so construed, is seen as a "great assistance" to the plaintiff's bar in litigating against companies.[519] It operates as a tool to circumvent the normal privilege and work product protections that attend legal work on behalf of

506. IDS Life Ins. v. SunAmerica, Inc., 958 F. Supp. 1258, 1271 (N.D. Ill. 1997), aff'd in part and vacated on other grounds, 136 F.3d 537 (2d Cir. 1998).
507. IDS Life Ins., 958 F. Supp. at 1271.
508. Id.
509. Id. (specifying the department that would be knowledgeable about specialized financial maneuvers such as "dollar rolls" and the other department familiar with "reverse repos").
510. See id. (identifying passive investment information and corporate financial activities as topics the discovering party could pursue to obtain information beyond the knowledge of the designated deposition witness).
511. Id.
512. IDS Life Ins., 958 F. Supp. at 1271.
513. Insurance Corp. of Ir. v. Compagnie des Bauxites, 456 U.S. 694, 707 (1982).
514. Shelton v. American Motors Corp., 805 F.2d 1323, 1330 (8th Cir. 1986) (citing Edgar v. Slaughter, 548 F.2d 770, 773 (8th Cir. 1977)).

515. Shelton, 805 F.2d at 1330.
516. Cymrot, supra note 6, at 7-10; Elbein, supra note 6, at 365-66.
517. See Elbein, supra note 6, at 365-66.
518. Id. at 368-69.
519. P.N. Harkins, III, How to Mount an Effective Defense of Company Employee Depositions, 58 DEF. COUNS. J. 160, 184 (1991).

the entity,[520] which facilitates the making of unreasonable demands upon a party and its witnesses. Thus, counsel and those courts pushing the expansive view of the obligations under the Rule believe that "I do not know" and "I do not remember" are not adequate answers under Rule 30(b)(6)—even if they are true."[521]

In so inflating the scope of the Rule, this reading necessarily eclipses the privileged ground whereon the corporation's counsel attempts to prepare its witnesses and, through efforts traditionally respected as work product, synthesize what is known about the facts and their legal implications. On the expansive interpretation of the Rule, however, all the party's knowledge, as normally adduced through the testimony of a number of competent witnesses, must be ingested, digested, and regurgitated through the designee(s). And the very process by which such a witness might, under the best circumstances, be created—i.e., by painstaking fact-finding, cross-checking, integration, and amalgamation conducted by the party's lawyer—will itself be subject to disclosure through the examination of the witness whose testimony has been the product of the lawyer's efforts. One would surely think that if a single rule had been promulgated to radically transform the nature of litigation in cases involving one special kind of party, that far-reaching consequence would have been expressly disclosed and deliberated before the Rule was adopted. The legislative history in the form of Advisory Committee Note belies this reading.

While lawyers living under this system can only try to make "the best of a bad situation," the judiciary can focus more carefully on the legislative history and proper office of the deposition device, particularly in comparison to the contention interrogatories permitted under Rule 33. A more narrow conception of the mission of this tool is workable, useful, and fair.

The misuse of Rule 30(b)(6) discussed in this Article not only ignores the purposes and legislative history of the entity deposition device to the extent that it is applied to "contentions" of an entity, but also loses its philosophical bearings when it applies to defining corporate "knowledge."

520.  Cymrot, supra note 5, at 7-8.
521.  Elbein, supra note 6, at 375 (citing Cymrot, supra note 5, at 7).

The history of philosophy is replete with a disparate set of models, theories, and conceptions of what it means to "have knowledge" of something, and what is necessary to satisfy that definition. For example, knowledge is said to be an accurate "picture" of the facts;[522] to capture the unchanging forms or essences which give permanence and order to a world of changing appearances;[523] to consist of linguistic representations which stand in a one-to-one, mirror relationship with their designata;[524] or to provide a map on the basis of which usable and useful predictions may be generated.[525]

As elaborated in various epistemologies, knowledge has been identified broadly as consisting of some sort of correspondence with reality; or coherence within a general system; or with the potential to generate testable consequences. But with one exception, noted below, knowledge has invariably been thought to be something generated, possessed, and passed on by individuals. That is, the thing in question, however it is conceived, is joined at birth and by its very nature to a single human being capable of thinking, inquiring and/or perceiving in a way deemed adequate to create (or to comprehend) the knowledge in question.

The exception to the general view that knowledge is possessed exclusively by individuals is a contribution of idealist theorists. That view asserts that some sort of collective entity, rather than separate individuals, accumulates knowledge over time. Perhaps the most modern and plausible rendition of this somewhat moribund position was the one proposed by Charles Sanders Peirce, an American philosopher who wrote in the second half of the nineteenth and early twentieth centuries. Peirce,

522.  See, e.g., ARISTOTLE, METAPHYSICS Book IV ("To say of what is that it is not, or of what is not that it is, is false, while to say of what is that it is, and of what is not that it is not, is true . . . ."); see also LUCRETIUS, ON THE NATURE OF THINGS Book IV (The mind replicates the characteristics possessed by external objects).
523.  PLATO, THE REPUBLIC Book VI.
524.  E.g., LUDWIG WITTGENSTEIN, TRACTATUS LOGICO-PHILOSOPHICUS (true propositions correspond, element-by-element, to facts); Bertrand Russell, The Philosophy of Logical Atomism, reprinted in LOGIC AND KNOWLEDGE (R.C. Marsh ed., 1956).
525.  ABRAHAM KAPLAN, THE NEW WORLD OF PHILOSOPHY, LECTURE ONE: PRAGMATISM 27 (1961) ("The pragmatist theory of truth amounts, I think, to this: that candidates for truth are fundamentally not descriptions but predictions, and what they predict is the outcome of possible action."); see, e.g., WILLIAM JAMES, THE MEANING OF TRUTH Ch. 2 (1909).

a strikingly original thinker who is most often identified as one of the founders of pragmatism, conceived of truth as the limit approached by an infinite number of scientists making inquiry over an infinite course of time.[526] Thus, the object of knowledge-seeking activity becomes a kind of heuristic ideal: we get closer to it as collective human inquiry proceeds and as the results accumulate. At any given moment, however, we have only the best current *approximation* of that end. Further refinements will be made as history (and the attendant human inquiry) trudges onward.[527]

To the extent that current efforts to over-read the mission of Rule 30(b)(6) presuppose a deponent whose knowledge conforms to a collective, rather than individual model, such a reading fails to recognize that the process of integration and collection requires a community of actors (here, including corporate personnel and the lawyers representing the entity) to allow the process to proceed with any reasonable hope of success. The attempt to use a Rule 30(b)(6) deposition as a convenient synthesis of an entire case on demand simply ignores the everyday fact that the process of perfecting the product (i.e., the truth) demands a laborious sifting and winnowing of alternatives with unimpeded access to data which can be shared, tested and refined. And, most critically, it does not even grasp that this is a process and thus requires time to generate results, evolves as it proceeds,

and may not lead to fixed, final and definitive statements of position.[528]

In sum, even taking as a model the single modern epistemological theory that provides some meaningful view of what is required for an entity (such as a corporation or a partnership) to possess some sort of collective knowledge—a theoretical amalgamation of all the bits and pieces experienced by, or known to, its human agents—the extreme interpretation of Rule 30(b)(6) adopted by certain courts fails to acknowledge the time-bound, re-constructive efforts that must be undertaken to achieve the collective results.

In effect, what such courts are doing is committing a philosophical error: they are retaining a simplistic paradigm for human knowledge of matters of fact (the mind holds a mirror up to nature and simply reflects what is there)—which may serve well enough for practical purposes when what is being considered is the ability of individuals to record and recount what they have experienced—and then applying that paradigm to a larger entity, assuming that its ability to "know the facts" is just the same

---

526. Charles S. Peirce, *How to Make Our Ideas Clear*, POPULAR SCI. MONTHLY, Jan. 1878, at 286-302. "Truth is] the opinion which is fated to be ultimately agreed to by all who investigate."

527. Three things should be noted about this collective conception of knowledge: (1) It trades upon, and presupposes, a dedicated corps of skilled knowledgeseekers (scientists) whose work incrementally expands the boundaries of the known, weeding out inconsistencies, devising experiments to test new theories (in the sense of trying to dis-confirm them), and utilizing (or creating) whatever instruments are available at a given time to collect, examine, and test empirical data; (2) It assumes that there are open lines of communication within the community of scientists, so that anomalous results, or inconsistent hypotheses, may come to light and be challenged; and (3) It teaches that, rather than being an instantaneous, time-neutral affair, the accretion of knowledge is a process that only develops through time. Indeed, by its very nature, the collective fruits of human inquiry, while "better" as a whole than what had been achieved in times past, is also never quite as good, by definition, as what will be achieved as the process moves forward. It follows, then, that the cumulative approximation achieved by inquiry as it stands at any given moment is always subject to revision, is always incomplete, and is always going to be more accurate (useful, complete) in the future.

---

528. Indeed, from the perspective of Peirce's later cohorts in the species of epistemology that came to be known generally as "pragmatism," knowledge—as it is best elaborated and refined through the procedures adopted within scientific inquiry—is characteristically and inherently projective, testable by its fruits, and forward-looking. True statements ("warranted assertions" in the pragmatist lexicon) do not simply "picture" or re-produce what is (or was) there, but instead either elaborate operations for transforming what is there into something deemed more satisfactory, or predict what will be there if specified procedures are duplicated. If we adopt the rather metaphysical phrase "antecedent reality" to designate that which exists—"what is (or was) there"—prior to the onset of inquiry, then, according to this view of knowledge, the definitive function of inquiry is not to portray or mirror antecedent reality, because the unique business of discovery (i.e., of coming up with a true account of that which we are looking into) is to mediate the processes of discourse, experimentation, and prediction. From the pragmatist perspective, active reconstruction, not mere passive re-presentation, is the distinctive goal of human thought and inquiry. The specific function of knowledge-generating activities is to be a sort of tool of all tools which serves, not simply to hold a mirror up to "the facts," but rather to provide us with some leverage for the production of testable, observable consequences. Put yet another way: even the most precise, lightfingered, and delicate of descriptions cannot avoid an inherent requalification of the subject matter under investigation. In other words, even what is (or was) there to be described (viz., for example, something as pedestrian as a party's statement of the facts of the case) is a function of what is being looked for, and is dependent upon the tools, linguistic and legal categories, observational apparatus and techniques, and the specific purposes that we inevitably bring with us even when we set out simply to "look and see" what facts are there.

754    Alabama Law Review    [Vol. 50:3:651

sort of mirror, only writ large. This viewpoint results in a mud-
dled and incoherent picture of "collective knowledge." But, what
is worse, it leads some courts to enforce an unworkable, unreal-
istic, and unfair set of requirements in litigation under the Fed-
eral Rules of Civil Procedure.

ENHANCED OBLIGATION OF GOOD FAITH: A MINE
FIELD OF UNANSWERED QUESTIONS AFTER *L & S
ROOFING SUPPLY CO.*

*Karon O. Bowdre**

I. INTRODUCTION

In 1987, the Alabama Supreme Court took insurance compa-
nies, insurance defense counsel,[1] and insureds down a road less
traveled regarding the reservation-of-rights defense and good
faith in a liability insurance policy. On that road, a mine field
awaits even cautious insurance companies and prudent defense
counsel. This Article provides guidance through that mine field.
In *L & S Roofing Supply Co. v. St. Paul Fire & Marine
Insurance Co.,*[2] the Alabama Supreme Court adopted a minority
approach to the problems presented when an insurance company
defends its insured while maintaining its right to deny coverage
for the claims asserted against the insured.[3] In a reservation-of-
rights defense,[4] the interests of the insured and the insurance

---

* Professor of Law and Director of Legal Research & Writing, Cumberland
School of Law. B.A. 1977, Samford University; J.D. 1981, Cumberland School of Law.
The author wishes to express appreciation to J.D. Smith, Charles Jones, and Shea
Carroll for their research assistance, and to Mike Beard and Richard Ogle for their
review and comments. Special thanks to Cumberland Continuing Legal Education for
the opportunities to present and discuss the ideas contained in this Article with
practicing attorneys who regularly face these issues.
    1. As used in this Article, "insurance defense counsel" or "defense counsel"
refers to the attorney hired by the insurance company to defend its insured against
a liability claim. "Insurance coverage counsel" refers to the attorney hired by the
insurance company to advise it regarding coverage matters and possibly to represent
it in a coverage dispute with the insured.
    2. 521 So. 2d 1298 (Ala. 1987).
    3. *L & S Roofing Co.,* 521 So. 2d at 1304.
    4. A "reservation-of-rights" notice simply states that the insurance company will
defend the insured but reserves its right to challenge coverage. A reservation of
rights is unilateral, usually in the form of a letter to the insured in which the in-
surance company sets forth the reasons it claims that coverage may not exist and
notifies the insured of the right to hire separate counsel at the insured's expense. A

755

EXHIBIT 8

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              IN AND FOR THE DISTRICT OF DELAWARE
 3
   AXIOHM IPB, INC.,                  :
 4                                    :     CIVIL ACTION
       Plaintiff,                     :
 5                                    :
       v.                             :
 6                                    :
   EPSON AMERICA, INC. and            :
 7 SEIKO EPSON CORPORATION,           :
                                      :
 8     Defendants.                    :     NO. 00-420-SLR
                                      :
 9 SEIKO EPSON CORPORATION, and       :
   EPSON AMERICA, INC.,               :
10                                    :
       Counterclaims,                 :
11                                    :
       v.                             :
12                                    :
   AXIOHM IPB, INC., and AXIOHM       :
13 TRANSACTION SOLUTIONS, INC.,       :
                                      :
14     Counterclaim Defendants.       :
15                    Wilmington, Delaware
                  Thursday, March 29 2001 at 2:00 p.m.
16                       JUDGE'S DECISION
17                       - - -
18
   BEFORE:       HONORABLE SUE L. ROBINSON, Chief Judge
19                       - - -
20 APPEARANCES:
21         MORRIS NICHOLS ARSHT & TUNNELL
           BY:  JULIA HEANEY, ESQ.
22
23               and
24                        Brian P. Gaffigan
                          Official Court Reporter
25
```

Page 2

```
 1 APPEARANCES:  (Continued)
 2         McDERMOTT WILL & EMERY
           BY:  DONNA M. TANGUAY, ESQ. and
 3              MICHAEL D. SWITZER, ESQ.
                (Washington, District of Columbia)
 4
           Counsel for Axiohm IPB, Inc. and
 5         Axiohm Transaction Solutions, Inc.
 6
 7         CONNOLLY BOVE LODGE & HUTZ
           BY:  ARTHUR G. CONNOLLY, III, ESQ.
 8
 9               and
10         HOGAN & HARTSON L.L.P.
           BY:  STUART LUBITZ, ESQ. and
                JAI RHO, ESQ.
11              (Los Angeles, California)
12         Counsel for Seiko Epson Corporation
           and Epson America, Inc.
13
14
15                       - oOo -
16
17                  P R O C E E D I N G S
18         (Judge's opinion excerpted from proceedings.)
19         THE COURT:  Okay.  I'm ready to make my decision.
20         First of all, let me start out by saying that as
21 far as I'm concerned, what should have happened in this case
22 is you should have had documents production, should have
23 used your 30(b)(6) depositions at the beginning of discovery
24 to make sure that you have documents and that you have
25 individual witnesses identified.  It's hard for me to believe
```

Page 3

```
 1 that we're at the very end of discovery and you are still
 2 calling out 30(b)(6) depositions.  I mean it's rare and I
 3 think they're certainly less helpful than an individual
 4 deposition and I certainly would hate to think that is what
 5 you are counting on.
 6         Given that background, number one, it seems to me
 7 that at this point if Axiohm really wants to find out about
 8 the conception and reduction to practice, it's time you asked
 9 the inventors.  Forget the 30(b)(6).  So I'm denying that
10 request for relief.
11         Number two, about this third party.  It was my
12 understanding from what Mr. Switzer said that they have
13 produced all documents.  If there is an outstanding request
14 and the defendant has not, then the defendant needs to,
15 but with respect to the deposition testimony, forget the
16 30(b)(6).  We've got two individuals who are identified on
17 the documents that have been produced.  I'm going to order
18 that those depositions be scheduled and be taken.
19         Number three, and number four, the communications
20 between Foreign Patent Offices and our own Patent Office, I'm
21 only going to require that the prosecution files and publicly
22 available records be produced.  I am under the impression
23 that what Mr. Switzer wants is documents that are generally
24 not produced, at least not until patents issue, and I'm not
25 going to go behind the regular rule and allow basically those
```

Page 4

```
 1 kinds of documents to be produced prior to the time they
 2 would be publicly available anyway.
 3         With respect to the licenses, again it seems to
 4 me that if the license agreements themselves do not cover
 5 either the patents or the products, then they are not covered
 6 by a request for such license agreements.  Now, if in fact
 7 there are other business arrangements where people are
 8 practicing the invention and there is nothing specifically in
 9 place, I think that has to be covered by a different kind of
10 request.  So long as the specific question or request for
11 production has been appropriately responded to, and it
12 sounds as though it has, then I'm not going to order anything
13 further.
14         With respect to defendants' complaints, we don't
15 do contention depositions in this district, and the word
16 "entitled" is not generally one that I embrace, so that is
17 denied.
18         Number two, I think it makes sense for you all,
19 in order to get this done congenially and orderly, to extend
20 the discovery deadline until the end of April just for the
21 purpose of getting your depositions.  Within one week of
22 today, you need to have agreed among yourselves how you're
23 going to do that.  And if you are having problems, then I
24 will entertain a further conference with you all, but it
25 seems to me as though at this point in time, with the end of
```

File: 3H28AXI1.V1                          CondenseIt™                    2:00 p.m. Telephone Conference

**Page 5**

1   discovery looming, it's time for you all to get in gear and
2   get this done.
3           With respect to these folks who are not in this
4   country, I just want you to know that it is my belief, and
5   I'm not sure what I heard, if these individuals are employed,
6   whether they're directors or officers or anything else,
7   they'd better make themselves available not necessarily in
8   this country but someplace. If they're not in any way
9   related, then that is a problem for the person who wants to
10  take their deposition.
11          With respect to the software, I don't know,
12  apparently the software has been produced. Axiohm intends
13  to supplement all of these things by the end of this month,
14  which after all is Friday. With respect to the prior art, I
15  want to make sure Axiohm understands, I don't care whether
16  it's literally reproduced, but if it's not identified by
17  April 18, it will not be used or usable in summary judgment
18  or at trial. So you had better make sure whatever prior art
19  you intend to rely on through the case that you identify it
20  before the end of discovery.
21          Likewise, willful infringement. If in fact,
22  Axiohm, you intend to rely on the opinions of counsel,
23  generally this is not an issue that we address at the end
24  of discovery, you have to let Epson know by March 30.
25  Otherwise, you will be precluded from using that, and that

**Page 6**

1   will give an opportunity for discovery before the end of
2   discovery comes about. So March 30, which is after all,
3   what is it, Friday, is your deadline. This is something that
4   should have been addressed prior to this.
5           With respect to the damages, the complaint about
6   damages, what can I say when a party says we've produced
7   related materials? All I can say is if there are outstanding
8   contentions, they have to be replied to.
9           I think that addresses everything. If you all
10  are having problems with the depositions, you let me know.
11  We'll schedule something next week.
12          Is there anything further we can address?
13          MS. TANGUAY: No. Thank you, your Honor.
14          THE COURT: All right. Thank you. Good-bye.
15          MR. RHO: Can we ask the court reporter for an
16  expedited transcript of this judge's decision?
17          THE COURT: Well, if you identify yourself, I
18  will order it.
19          MR. RHO: Yes. Jai Rho. And I would like that
20  sent.
21          THE COURT: All right. Thank you.
22          (Telephone conference ended at 3:05 p.m.)
23
24
25
                                                        Page 5 - Page 6

**Axiohm v Epson, et al., Civil 00-420 (SLR)**

EXHIBIT 9

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3

4    TIEGEL MANU CO.,                    )
                                          )
5                    Plaintiff,           )
                                          )
6          v.                             )        Civil Action No. 84-483
                                          )
7    GLOBE-UNION, INC.,                   )
                                          )
8                    Defendant.           )

9                                         Wilmington, Delaware
                                          October 5, 1984
10                                        2:25 o'clock p.m.

11

12   BEFORE:

13              THE HON. WALTER K. STAPLETON, Chief Judge

14              A P P E A R A N C E S

15   For Plaintiff:

16              COLLINS J. SEITZ, JR., ESQUIRE
                Connolly, Bove, Lodge & Hutz
17              FRANK J. BENASUTTI, ESQUIRE
                C. FREDERICK KOENIG, III, ESQUIRE

18

19   For Defendant:

20              MARY B. GRAHAM, ESQUIRE
                Morris, Nichols, Arsht & Tunnell
21              GARY CLARK, ESQUIRE [By conference telephone]
                JAN WEIR, ESQUIRE [By conference telephone]

22

23

24

25

1                      [No response.]

2                THE COURT:  I view the noticed discovery

3  as being contention discovery.  It has been the consistent

4  position of this Court that a lay person shouldn't be

5  required to formulate a party's contention in response to

6  deposition questioning and that not even a lawyer should

7  be required to formulate trial strategy and contentions in

8  immediate response to questions on deposition.  And it has

9  accordingly been the consistent practice to require that

10  contention discovery, which is clearly permissible and

11  very constructive in narrowing the issues, but to confine

12  it to interrogatories to a party, period.

13                Now, we appear to have a time problem here,

14  although I am not sure whether we have a time problem or

15  not.  When did you say you are prepared -- what did you say

16  your turnaround time on interrogatories would be, Mr.

17  Clark?

18                MR. CLARK:  Your Honor, of course it would

19  depend on the number and the scope of them, but I think that

20  within a matter of -- if they were served on us, for

21  instance, on Monday, I think by Thursday or Friday we could

22  probably have answers for them, assuming that they are of a

23  scope limited to the issues raised on preliminary injunction

24                MR. BENASUTTI:  Your Honor, I might just add

25  one thing to this, and I think I covered it in my papers,

EXHIBIT 10

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              IN AND FOR THE DISTRICT OF DELAWARE
 3                        - - -
 4   McKESSON INFORMATION SOLUTIONS  :    CIVIL ACTION
     LLC,
 5              Plaintiff           :
 6         vs.                      :
 7   THE TRIZETTO GROUP, INC.,      :
 8              Defendant           :    NO. 04-01258 (SLR)
 9                        - - -
10                        Wilmington, Delaware
11                        Tuesday, August 2, 2005
                          4:50 o'clock, p.m.
12                        - - -
13   BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge
14                        - - -
15   APPEARANCES:
16
17        SKADDEN, ARPS, SLATE, MEAGHER & FLOM
          BY:  MICHAEL A. BARLOW, ESQ.
18
19                   -and-
20
21
22
23                        Valerie J. Gunning
                          Official Court Reporter
24
25
```

Page 2

```
 1   APPEARANCES (Continued):
 2        SKADDEN, ARPS, SLATE, MEAGHER & FLOM
 3        BY:  JEFFREY G. RANDALL, ESQ.
          (Palo Alto, California)
 4
               Counsel for Plaintiff
 5
 6        MORRIS, NICHOLS, ARSHT & TUNNELL
          BY:  RODGER D. SMITH, ESQ.
 7
 8                   -and-
 9
          GIBSON, DUNN & CRUTCHER LLP
10        BY:  MICHAEL SITZMAN, ESQ.
          (San Francisco, California)
11
               Counsel for Defendant
12                   - - -
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2                P R O C E E D I N G S
 3
 4        (Proceedings commenced in the courtroom,
 5   beginning at 4:50 p.m.)
 6
 7        THE COURT:  Good afternoon, counsel.  I take
 8   it the fact that you are here means that there must be
 9   some disputes?
10        MR. SITZMAN:  Actually, your Honor, to sort
11   of jump ahead, we've been trying to find out for a week
12   and a half from plaintiff what disputes they think are
13   at issue.  We wrote them about 12 days ago and said that
14   we ought to be able to obviate the need for a discovery
15   conference because there's nothing at issue between us
16   and, as of Friday, we still had no indication from them
17   what they planned on raising.
18        I got an e-mail Thursday night saying that
19   we will try in the next few days to get you an itemized
20   list and I have yet to see any kind of indication from
21   them as to what they intend on raising.
22        THE COURT:  All right.  Well, then you and I
23   are both in the same boat.
24        All right.  Let's hear from plaintiff's
25   counsel, then, as to what it is believed to be problematic
```

Page 4

```
 1   here.
 2        MR. RANDALL:  Your Honor, Jeff Randall,
 3   representing Plaintiff, McKesson, with Skadden Arps.
 4        I'm glad to hear that there are no issues
 5   that TriZetto has with McKesson.  We do have three
 6   issues that we'd like to raise with the Court.
 7        We did respond to the inquiries by TriZetto
 8   and indicated that we had been engaged in a whole series
 9   of letters with them regarding these three issues and
10   that we would raise these issues.
11        The first issue is TriZetto's continued
12   failure to comply with your Honor's May 19 order
13   requiring them to adequately identify the anticipatory
14   art that they are relying on and the art that they rely
15   on of their obviousness argument.
16        The second issue is their failure to provide
17   a 30(b)(6) witness or any witness for us in response to
18   two 30(b)(6) notices that we served in early July.
19        And the third issue is their failure to
20   provide adequate claim construction, as required by the
21   Court's scheduling order.
22        With respect to the first issue, your Honor,
23   let me give you some background.  We served our
24   Interrogatories on TriZetto in December and this case
25   involves a patent which they have known about for years.
```

Page 21

1   And so I guess I am hoping that we will hear
2 that document production is now finished.
3   And I think that's it.
4   THE COURT: All right. Before I hear from
5 Mr. Randall again, let me handle the easiest issues first.
6   That is with respect to the depositions.
7 Number one, I have never thought contention Interrogatories
8 are appropriately responded to via 30(b)(6) depositions. I
9 still maintain that position.
10   So if you ask for depositions concerning the
11 basis for a defense, that is a contention interrogatory.
12 You can ask who has knowledge and then you can take
13 individual depositions, but I don't believe that a
14 corporate deposition is appropriate for contention.
15   And may I ask of the six topics, there was an
16 indication from Mr. Randall that at least Topic No. 5,
17 there was agreement that that was not a contention
18 interrogatory; is that correct?
19   MR. SITZMAN: That is correct.
20   THE COURT: All right. With respect to the
21 outstanding contention interrogatory, the outstanding
22 30(b)(6) deposition notices and efforts to get invention
23 depositions by a week from today, and that is by August 9,
24 2005, by 5:00 o'clock, I will give you 15 minutes less
25 than a week, you are to exchange the names of the folks

Page 22

1 who will respond to all of the outstanding, as of today,
2 30(b)(6) notice depositions. You will provide to opposing
3 counsel the dates within the next 30 or -- I guess 30 days.
4 I don't know whether it should be 30 or 60 days that these
5 folks could be available. You will provide to opposing
6 counsel where they might be made available, so that you
7 all can coordinate efficiently the taking of these
8 depositions.
9   So that's by a week from today. Whoever fails
10 to comply with that will be brought to my attention and
11 we'll deal with whatever sanction there needs to be dealt
12 with. But it seems to me that, after all this time, you
13 all and your clients should have been thinking ahead and
14 getting this information together.
15   With respect to the Interrogatory about the
16 prior-art references, I am satisfied at this point with
17 the explanation provided by TriZetto. And that is that,
18 at this point, they only intend to use the 19 that are
19 charted, that the remaining have been identified as
20 relevant, but not as prior-art references that will be
21 used affirmatively at trial.
22   And I expect that if any are added, there
23 will be reason why they weren't added now as opposed to
24 later and that they will be charted adequately when they
25 are added.

Page 23

1   That leaves me with claim construction. And
2 I'm not sure I can respond to that without really looking
3 at the claim terms and construction and I have not heard
4 Mr. Randall on that. I do want to hear Mr. Randall on that.
5   And with respect to -- well, I guess I will
6 just hear also from Mr. Randall about whether, in fact,
7 they had provided the earliest version of the software
8 that they have in their possession or not.
9   So I think those are two issues that are still
10 left to be addressed by me.
11   And, Mr. Randall, I would like to hear your
12 response to those two issues.
13   MR. RANDALL: Sure. One clarification. That
14 is that our discovery cutoff is the 16th of September, so
15 I think that it would make sense to have all the
16 depositions at least scheduled by 30 days following the --
17   THE COURT: All right.
18   MR. RANDALL: And one other issue with respect
19 to their interrogatory claim chart. I would ask that they
20 be ordered to provide, at least as to those 19 that they
21 are relying on, identify where within the references
22 there's a motivation to combine the references that they
23 have asserted. So, for instance, for any one given claim,
24 if they are relying on an obviousness combination of six
25 references to render invalid based on obviousness one

Page 24

1 claim, they ought to identify where in those references
2 there's a motivation to combine the references.
3   THE COURT: Accept that the motivation to
4 combine can come from any place, can't it? It can come
5 from all sorts of different things. It does not
6 necessarily have to come from the references and, quite
7 frankly, I thought that was generally the gist of an
8 expert's report.
9   MR. RANDALL: Well, if they are relying on
10 anything within the documents, at least they should
11 identify that.
12   THE COURT: Certainly. If it's within the
13 documents, it should be identified. If it's not, then --
14   MR. RANDALL: They can do that by the 9th, as
15 well?
16   THE COURT: Yes.
17   MR. RANDALL: Thank you.
18   With respect to the document production, your
19 Honor, I wasn't aware that they were not seeking the most
20 current version. I have not gone through the transcript
21 of the hearing. I wasn't here. But it was my
22 understanding that they were arguing for the current
23 version of the software. But I will look -- we'll find
24 out if they were arguing for it or not. We went through
25 great efforts to get them the current version.

EXHIBIT 11

Tuesday, October 11, 2005

SHEET 1

```
                                                    1
1              IN THE UNITED STATES DISTRICT COURT
2             IN AND FOR THE DISTRICT OF DELAWARE
3                            - - -
4   PHARMACIA & UPJOHN COMPANY,      :  CIVIL ACTION
5                                    :
6            Plaintiff and           :
             Counter-defendant,      :
7                                    :
    v.                               :
8                                    :
    SICOR INC., and SICOR            :
9   PHARMACEUTICALS INC.,            :
                                     :
10           Defendants and          :  NO. 04-833 (KAJ)
             Counter-Claimants.      :
11                           - - -
12                   Wilmington, Delaware
             Tuesday, October 11, 2005 at 3:00 p.m.
13                  TELEPHONE CONFERENCE
14                           - - -
15  BEFORE:      HONORABLE KENT A. JORDAN, U.S.D.C.J.
16                           - - -
    APPEARANCES:
17
18            MORRIS NICHOLS ARSHT & TUNNELL
              BY:  MARYELLEN NORIEKA, ESQ.
19
                   and
20
              MCDONNELL BOEHNEN HULBERT & BERGHOFF, LLP
21            BY:  DANIEL A. BOEHNEN, ESQ.,
                   JOSHUA R. RICH, ESQ., and
22                 GRANTLAND G. DRUTCHAS, ESQ.
                   (Chicago, Illinois)
23
                        Counsel for Pharmacia & Upjohn
24                      Company
25
                              Brian P. Gaffigan
                              Registered Merit Reporter
```

```
                                                    2
1   APPEARANCES:  (Continued)
2
3             ASHBY & GEDDES
              BY:  JORN G. DAY, ESQ.
4
                   and
5
              SONNENSCHEIN NATH & ROSENTHAL, LLP
6             BY:  REID L. ASHINOFF, ESQ. and
                   DAVID R. BAUM, ESQ.
7                  (New York, New York)
8                  and
9             SONNENSCHEIN NATH & ROSENTHAL, LLP
              BY:  JORDAN A. SIGALE, ESQ.
10                 (Chicago, Illinois)
11                      Counsel for Sicor Inc. and Sicor
                        Pharmaceuticals Inc.
12
13
14                       - oOo -
15                  P R O C E E D I N G S
16           (REPORTER'S NOTE:  The following telephone
17  conference was held in chambers, beginning at 3:00 p.m.)
18           THE COURT:  Hi, this is Judge Jordan.  Who do I
19  have on the line?
20           MS. NOREIKA:  Good afternoon, Your Honor.  It's
21  Maryellen Noreika from Morris Nichols for plaintiff
22  Pharmacia; and I have with me, Dan Boehnen and Joshua Rich
23  of the McDonnell Boehnen firm in Chicago.
24           MR. BOEHNEN:  Also with us in Chicago is Grant
25  Drutchas.
```

```
                                                    3
1            MS. NOREIKA:  Oh.  I apologize, Grant.
2            THE COURT:  All right.  Who do I have on for
3   Sicor?
4            MR. DAY:  Good afternoon, Your Honor.  On behalf
5   of Sicor, you have John Day from Ashby & Geddes as local
6   counsel; and from the Sonnenschein firm in New York, Reid
7   Ashinoff and David Baum; and from Sonnenschein's office in
8   Chicago, Jordan Sigale.
9            THE COURT:  All right.
10           MR. ASHINOFF:  Good afternoon, Your Honor.
11           THE COURT:  Good afternoon.  Well, by my count,
12  this is the fifth time we're getting together in this case
13  because we have discovery issues.  So this is not a good
14  record, ladies and gentlemen, but we're going to plow
15  through what we've got here.
16           Before we start, however, I have a question
17  for the folks at Sicor, and that is, I got the in camera
18  submission that you sent over.  Did you send a version,
19  redacted, if you thought necessary, of your legal argument
20  to the opposing counsel?
21           MR. ASHINOFF:  Your Honor, what we served on
22  the opposing counsel is a motion that we filed and a
23  privilege log that listed the privilege material that the
24  Court got.  What we served in camera on the Court was the
25  short discussion of the substance of the privileged material
```

```
                                                    4
1   and the actual privileged material.  We did not serve copies
2   of the discussion and description of the privilege material
3   or the actual material on our adversary.
4            THE COURT:  All right.  I need to have you
5   identify yourself for the record.
6            MR. ASHINOFF:  It's Reid Ashinoff.  I'm sorry,
7   Your Honor.
8            THE COURT:  All right.  Mr. Ashinoff, that's not
9   going to cut it.  I'm going to quote to you what I said in
10  our last teleconference on the 19th of September.  Page 24
11  of the transcript:
12           "You can certainly submit your documents in
13  camera and your legal arguments ought to be submitted so
14  that the other side can respond to them."
15           Later on the same page:
16           "In short, you give me the documents but you
17  give your arguments to the attorney side, too, so they can
18  respond unless it's something genuinely extraordinary that
19  you think will get past me; all right?"
20           And what I was trying to communicate there and
21  what I will reemphasize is I'm not going to let you give me
22  legal argument without an opportunity for them to respond to
23  legal argument.
24           MR. ASHINOFF:  Your Honor, I don't think we cite
25  any law at all in the material we submitted in camera.  What
```

SHEET 9

---

**33**

1  representation from you folks that you have checked with the
2  folks he just named, an affirmation that in fact you have
3  inquired of and heard from these people that there are no
4  lab notebooks belonging to this inventor. And that's all
5  I'm hearing he is asking for. Are you telling me you got an
6  issue with that?
7        MR. BOEHNEN: To me, Your Honor, no, sir. And I
8  understand, just to restate it, I believe he is referring to
9  the Oblon firm, Jake Wood, which is JA Kemp & Co. in the
10  U.K, and --
11        MR. SIGALE: And the Nerviano Consulting firm
12  (phonetic) where many of these inventors found gainful
13  employment.
14        MR. BOEHNEN: -- the people in the Nerviano
15  Medical Sciences Facility as well as Pfizer itself.
16        THE COURT: Right. Okay.
17        MR. BOEHNEN: No, not a problem. We'll be happy
18  to do that.
19        THE COURT: Done.
20        MR. SIGALE: If I might, I'd prefer to have the
21  notebooks.
22        THE COURT: Well, I'm sure everybody would
23  prefer the notebooks were there because then we wouldn't be
24  having this fight at all. So obviously if the notebooks are
25  there, they'll be produced, but if they're not, you will get

---

**34**

1  an affirmation of what was done to look for them with these
2  other folks, right?
3        MR. BOEHNEN: Yes, sir.
4        MR. ASHINOFF: Your Honor, just to go back half
5  a step. On the foreign patent material that Mr. Boehnen,
6  Ms. Noreika say is now being collected, given that we plan
7  to try to go ahead and take the inventors on November 7th,
8  can we get some date not too late in October when that
9  material will be produced to us so we have the time to
10  assimilate it before we take the inventors?
11        THE COURT: Mr. Boehnen.
12        MR. BOEHNEN: We have already begun making every
13  effort to get that to them as soon as possible. Let's see.
14  We can start a rolling production to them by the end of next
15  week and I think we hope to have it to them by the end of
16  October.
17        THE COURT: All right. End of October it is.
18  And a rolling production is a good idea.
19        MR. ASHINOFF: Thank you.
20        THE COURT: Okay. Then we had the dispute about
21  the 30(b)(6) categories.
22        MR. ASHINOFF: And I'm going to let Mr. Sigale
23  address that, Your Honor.
24        MR. SIGALE: Your Honor, we propounded a number
25  of categories in a 30(b)(6) notice that asks for the factual

---

**35**

1  contentions underlying legal contentions I need to
2  understand and I thought this was an efficient way to do it.
3  For instance, if we take category number six. We asked for
4  the facts concerning Pharmacia's allegation that licensing
5  and adoption of the ready-to-use formula is evidence that
6  the patent satisfied the obviousness requirement.
7        I need to know what facts those are. That is
8  not a contention request. It is what licensing are you
9  talking about? What adoption are you talking about? What
10  are the circumstances about that licensing? And I thought
11  this was an efficient way to get that. I can go through a
12  couple other categories but I can assure you I'm not looking
13  for legal contentions, that is a waste of time. A lay
14  witness is not going to be able to give that to me, but
15  facts they certainly can.
16        THE COURT: All right. Mr. Boehnen, is this
17  yours again?
18        MS. NOREIKA: Your Honor, this is Maryellen
19  Noreika. I'll respond to this issue.
20        THE COURT: Okay.
21        MS. NOREIKA: Sicor, there doesn't seem to be
22  any disagreement that depositions are not the appropriate
23  means by which to obtain contentions. Instead, they're
24  saying, well, we're just seeking facts. But as the topic
25  that Mr. Sigale just read indicates, these are seeking

---

**36**

1  contentions: All facts regarding Pharmacia's allegations
2  regarding copying, commercial success, failure of others.
3  There is a topic asking for the data Pharmacia contends
4  shows secondary considerations and the conclusions a person
5  skilled in the art would draw from that data. There is a
6  topic asking for a witness to testify about Pharmacia's
7  response to a contention interrogatory on secondary
8  considerations.
9        THE COURT: Okay.
10        MS. NOREIKA: I mean the wording of these
11  topics.
12        THE COURT: I think I have your position. I
13  have other folks who need my attention at 4:00 o'clock so
14  let me tell you, having read this, what my impression is.
15        I think there is some good force to the argument
16  being made by Pharmacia that the inserting of the word
17  "facts" doesn't make this less of an effort to get at what
18  is essentially the legal position of the party, although you
19  may get the benefit as well of saying, well, these are the
20  pieces of specific evidence.
21        So in the first instance, and on an expedited
22  basis, not a 30-day turnaround, if you want the chance to
23  answer these as contention interrogatories, I'm going to
24  direct that you accept them as such and you answer them
25  forthwith. You know, the sort of thing that you get a

---

SHEET 10

37

1  couple of weeks to respond to.
2        And then if you folks on the Sicor side want to
3  do some follow-up deposition discovery, targeted at
4  inquiring about specific facts that are revealed in the
5  context of these interrogatory responses, you're free to
6  do that.
7        I take the point that Pharmacia is making here,
8  which is it's so broadly worded, it can't help but really be
9  a circumstance where somebody is asked to know every fact
10  pertaining to every contention and that's a little bit much
11  to put on a deponent.
12        So that is the resolution to that.  You want to
13  treat them as contention interrogatory attorneys.  Done.
14  Answer them in two weeks.
15        And then if you have some follow-up and more
16  targeted and specific 30(b)(6) effort you want to make,
17  Sicor, you follow up on it that way.
18        MR. ASHINOFF:  Thank you, Your Honor.
19        THE COURT:  Now, let me tell you one last thing.
20  And this is for you, Mr. Ashinoff, in the discussions that
21  you are going to be having with your client, to the extent
22  again that this is helpful.
23        And again, we're treading here carefully and
24  I'm very careful when we talk about the attorney-client
25  privilege.  I want to assure you I have not made lightly

39

1  front of a jury is reversible error and that comports with
2  what Your Honor is saying.
3        THE COURT:  Okay.  Well, I thank you for your
4  time today.  I hope it has been helpful in getting some
5  things worked out.  Let me tell you real quickly what I'm
6  looking for as a date in February because this is going to
7  appear in a revised scheduling order that we'll put out.
8  I'm going to see you folks for argument on February 3rd
9  instead of January 19th.  That's a Friday.  All right?
10        MR. BOEHNEN:  Your Honor, one quick point for
11  Pharmacia.
12        THE COURT:  Yes.
13        MR. BOEHNEN:  Can we have a new date when our
14  briefs in opposition to bifurcation will be due?  I would
15  suggest two weeks after they produced papers to us if they
16  chose to rely upon them.
17        THE COURT:  Mr. Ashinoff, you're fine with that,
18  I assume.
19        MR. ASHINOFF:  Yes, as long as Mr. Boehnen
20  doesn't in the interim try to put my witness in the chair
21  and force us to go through all kinds of contortions about
22  privilege.
23        THE COURT:  Well, I'm sure everybody wants to be
24  efficient here, or at least I would like to think so.
25        Mr. Boehnen, you take that point, I'm sure.

38

1  the decision I made about how to approach the bifurcation
2  request.  To the extent it's helpful in your discussing
3  with your client my understanding of the Knorr opinion, I
4  view Knorr-Bremse as saying no adverse inference can be
5  drawn from either failing to get an opinion or declining to
6  produce it; that you are entitled to get your opinion and
7  to stay silent about it.
8        Viewing it that way, I have never yet heard
9  anybody make a reasoned argument to me why it could be
10  put before a jury after the Knorr-Bremse opinion than an
11  opinion was received but not tendered.  And in the absence
12  of that, I'm inclined to think there probably isn't a
13  reasoned argument.  That the only reason for putting it
14  in front of a jury would be so they draw an adverse
15  inference, which with what Knorr-Bremse says could not
16  happen.
17        So I give that to you as my best reading of
18  Knorr, in the absence of people having really been able to
19  put it forth, but I think it only fair, since people are
20  trying to grope around and make a decision, that they grope
21  a little less blindly.  I hope that is helpful to you.
22        MR. ASHINOFF:  It is, Your Honor.  And it
23  actually comports with literally a 100-year old doctrine
24  in federal law in other appellate courts to the extent of
25  saying that to force somebody to assert the privilege in

40

1        MR. BOEHNEN:  Yes, sir.
2        MR. ASHINOFF:  Your Honor, one last comment on
3  what Your Honor last said, and I apologize for this.
4        This law firm has an annual weekend once a year
5  where it gathers its partners and their spouses and et
6  cetera and it happens to be February 1st through 4th of
7  2006.
8        THE COURT:  Okay.  That is enough said.  I will
9  not trample on a firm tradition.  If it's the 1st through
10  the 4th, then I'm shifting you guys to the next day I can
11  give you.  And I think it's, yes, the next day I can give
12  you is the 9th and that's when I will set you down.  We'll
13  do this at 10:00 a.m. on February 9th.
14        Can you do that, Mr. Boehnen?
15        MR. BOEHNEN:  Yes, sir.
16        THE COURT:  Okay.
17        MR. ASHINOFF:  Thank you very much, Your Honor.
18        MR. SIGALE:  Your Honor, I'm sorry.  This is
19  Mr. Sigale.  We left open the claim construction dates.  You
20  were suggesting December 12th for the opening brief.  The
21  opposition brief would be due?
22        THE COURT:  It will follow the ordinary course:
23  Two weeks for answer, one week for reply.
24        MR. SIGALE:  Right, which would be the 26th of
25  December; and inasmuch as I don't observe Christmas, I would

EXHIBIT 12

1

```
1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -

    ARTHROCARE CORPORATION
4                                   :       CIVIL ACTION
             Plaintiff,             :
5                                   :
             v.                     :
6                                   :
    SMITH & NEPHEW, INC.,           :       NO. 01-504 (SLR)
7                                   :
             Defendant.             - - -
8

9                          Wilmington, Delaware
                     Tuesday, October 15, 2002 at 11:36 a.m.
10                        TELEPHONE CONFERENCE

11                             - - -

12  BEFORE:      HONORABLE SUE L. ROBINSON, Chief Judge

13                             - - -

    APPEARANCES:
14

15           MORRIS NICHOLS ARHST  & TUNNELL
             BY:  JACK B. BLUMENFELD, ESQ., and
16                KAREN JACOBS LOUDEN, ESQ.

17           -and-

18           WEIL GOTSHAL & MANGES
             BY:  PERRY CLARK, ESQ.
19                (Redwood Shores, California)

20           -and-

21           WEIL GOTSHAL & MANGES
             BY:  JARED BOBROW, ESQ.
22                (Silicon Valley, California)

23                      Counsel for ArthroCare Corporation

24
                             Brian P. Gaffigan
25                           Official Court Reporter
```

13

1  don't have any particular conflicts that you need to tell me
2  about that week.
3          All right.  I take it you are still there.  We'll
4  schedule it for Wednesday, the 30th.  And again, because I was
5  supposed to be in trial, I have time in the morning available
6  if you all are available.
7          MR. BLUMENFELD:  Your Honor, from our side,
8  plaintiff's side, I think morning would be fine.
9          MR. MARSDEN:  I think that is fine, your Honor.
10  This is William Marsden.
11          THE COURT:  All right.  Let's make it at 9:30 then
12  when my trial day usually starts.  Hopefully by that time, you
13  will have conferred, and if in fact the 23 ring binders have
14  been supplied, that will be confirmed, so that this list of 76
15  documents or categories of documents can be whittled down to
16  at least what has been produced or not, and then they need to
17  be further whittled down to those that should not go, that
18  there is some resistance to producing vs. the suspicion they
19  exist but no one has produced them yet.
20          With respect to contention depositions, I'm not
21  sure I have ever said you can't take them, but in my mind, it
22  is very unfair and not reasonable.  Therefore, I would not
23  put any credence in contention depositions to have one person
24  be designated as the corporate spokesperson for legal issues
25  like infringement and even incorporating all the facts.  That's

14

1  what interrogatories are for.  To put that on one person I

2  think does not make sense.  If you produce things out of the

3  contention deposition, I would not give it any weight so I

4  would say don't bother taking them.  I think they're

5  ridiculous myself.

6        So do we need to talk about this other witness,

7  the Examiner?  And does the plaintiff have a position on

8  that?  Is that something that needs to be addressed today as

9  opposed to waiting until the 28th or 30th?

10        MR. BLUMENFELD:  I don't know that it can't wait

11  until the 30th.  Jared, I don't know whether you want to

12  address that today or not.

13        MR. BOBROW:  Your Honor, Jared Bobrow.  As far

14  as the Examiner deposition goes, we do think that it is

15  improper to take a deposition of an Examiner on a pending

16  reexamination.  It allows someone not a party to the reexam

17  to get involved in it and do things which are not otherwise

18  permitted in the normal course of patent prosecution and

19  patent examination.  So we have advised the Solicitor of that

20  objection in response to a request that we let them know we

21  have a position on that and we have done so.  I think the

22  Solicitor's Office was simply waiting to see whether or not

23  any extension of the discovery would be allowed so that they

24  would know whether or not the issue before them was ripe in

25  terms of deciding whether they would or would not make a