**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| WYETH, Plaintiff, v. IMPAX LABORATORIES, INC., Defendant. | ) | Civil Action No.: 06-222 JJF<br><br>**PUBLIC VERSION** |

**EXHIBITS TO THE DECLARATION OF KAREN JACOBS LOUDEN**
**<u>IN SUPPORT OF WYETH'S OPENING MARKMAN BRIEF</u>**

**VOLUME 1 OF 3**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
Chase Manhattan Centre, 18th Floor
1201 North Market Street
Wilmington, DE 19801
(302) 658-9200
Attorneys for Plaintiff Wyeth

OF COUNSEL:

Basil J. Lewris
Linda A. Wadler
Barbara R. Rudolph
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001
(202) 408-4000

Original File Date: May 8, 2007
Public Version File Date: May 14, 2007

# EXHIBIT 1



THE UNITED STATES OF AMERICA
TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

September 27, 2003

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *6,274,171*
ISSUE DATE: *August 14, 2001*

By Authority of the
COMMISSIONER OF PATENTS AND TRADEMARKS

N. WILLIAMS
Certifying Officer

US006274171B1

(12) **United States Patent**
**Sherman et al.**

(10) **Patent No.: US 6,274,171 B1**
(45) **Date of Patent: Aug. 14, 2001**

(54) **EXTENDED RELEASE FORMULATION OF VENLAFAXINE HYDROCHLORIDE**

(75) Inventors: **Deborah M. Sherman**, Plattsburgh; **John C. Clark**, Peru, both of NY (US); **John U. Lamer**, St. Albans, VT (US); **Steven A. White**, Champlain, NY (US)

(73) Assignee: **American Home Products Corporation**, Madison, NJ (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/488,629**

(22) Filed: **Jan. 20, 2000**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 08/964,328, filed on Nov. 5, 1997, now abandoned, which is a continuation-in-part of application No. 08/821,137, filed on Mar. 20, 1997, now abandoned.

(60) Provisional application No. 60/014,006, filed on Mar. 25, 1996.

(51) **Int. Cl.**[7] ..... **A61K 9/52**; A61K 9/54; A61K 9/62

(52) **U.S. Cl.** ..... 424/461; 424/457; 424/458; 424/459; 514/781; 514/962

(58) **Field of Search** ..... 424/495, 494, 424/461, 458, 459, 457, 456, 462

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,954,959 5/1976 Pedersen ..... 424/21
4,138,475 * 2/1979 McAinsh et al. ..... 424/19
4,369,172 1/1983 Schor et al. ..... 424/19
4,389,393 6/1983 Schor et al. ..... 424/19
4,535,186 8/1985 Husbands et al. ..... 564/336
4,966,768 10/1990 Michelucci et al. ..... 424/468
5,506,270 4/1996 Upton et al. ..... 514/730
5,552,429 * 9/1996 Wong et al. ..... 514/415

FOREIGN PATENT DOCUMENTS

0654264 11/1994 (EP).
0667150 1/1995 (EP).
0797991 10/1997 (EP).
9427589 12/1994 (WO).
9737640 10/1997 (WO).

* cited by examiner

*Primary Examiner*—James M. Spear
(74) *Attorney, Agent, or Firm*—Rebecca R. Barrett

(57) **ABSTRACT**

This invention relates to a 24 hour extended release dosage formulation and unit dosage form thereof of venlafaxine hydrochloride, an antidepressant, which provides better control of blood plasma levels than conventional tablet formulations which must be administered two or more times a day and further provides a lower incidence of nausea and vomiting than the conventional tablets. More particularly, the invention comprises an extended release formulation of venlafaxine hydrochloride comprising a therapeutically effective amount of venlafaxine hydrochloride in spheroids comprised of venlafaxine hydrochloride, microcrystalline cellulose and, optionally, hydroxypropylmethylcellulose coated with a mixture of ethyl cellulose and hydroxypropylmethylcellulose.

**25 Claims, No Drawings**

## EXTENDED RELEASE FORMULATION OF VENLAFAXINE HYDROCHLORIDE

This application continuation-in-part of Application Ser. No. 08/964,328, filed Nov. 5, 1997 abandoned, which is a continuation-in-part of Application Ser. No. 08/821,137, filed Mar. 20, 1997 abandoned, which, in turn, claims priority from Provisional Application No. 60/014,006 filed Mar. 25, 1996.

### BACKGROUND OF THE INVENTION

Extended release drug formulations are conventionally produced as compressed tablets by hydrogel tablet technology. To produce these sustained release tablet drug dosage forms, the active ingredient is conventionally compounded with cellulose ethers such as methyl cellulose, ethyl cellulose or hydroxypropylmethylcellulose with or without other excipients and the resulting mixture is pressed into tablets. When the tablets are orally administered, the cellulose ethers in the tablets swell upon hydration from moisture in the digestive system, thereby limiting exposure of the active ingredient to moisture. As the cellulose ethers are gradually leached away by moisture, water more deeply penetrates the gel matrix and the active ingredient slowly dissolves and diffuses through the gel, making it available for absorption by the body. An example of such a sustained release dosage form of the analgesic/anti-inflammatory drug etodolac (Lodine®) appears in U.S. Pat. No. 4,966,768. U.S. Pat. No. 4,389,393 discloses sustained release therapeutic compressed solid unit dose forms of an active ingredient plus a carrier base comprised of a high molecular weight hydroxypropylmethylcellulose, methyl cellulose, sodium carboxymethylcellulose and or other cellulose ether.

Where the production of tablets is not feasible, it is conventional in the drug industry to prepare encapsulated drug formulations which provide extended or sustained release properties. In this situation, the extended release capsule dosage forms may be formulated by mixing the drug with one or more binding agents to form a uniform mixture which is then moistened with water or a solvent such as ethanol to form an extrudable plastic mass from which small diameter, typically 1 mm, cylinders of drug/matrix are extruded, broken into appropriate lengths and transformed into spheroids using standard spheronization equipment. The spheroids, after drying, may then be film-coated to retard dissolution. The film-coated spheroids may then be placed in pharmaceutically acceptable capsules, such as starch or gelatin capsules, in the quantity needed to obtain the desired therapeutic effect. Spheroids releasing the drug at different rates may be combined in a capsule to obtain desired release rates and blood levels. U.S. Pat. No. 4,138, 475 discloses a sustained release pharmaceutical composition consisting of a hard gelatin capsule filled with film-coated spheroids comprised of propanolol in admixture with microcrystalline cellulose wherein the film coating is composed of ethyl cellulose, optionally, with hydroxypropylmethylcellulose and/or a plasticizer.

Venlafaxine, 1-[2-dimethylamino)-1-(4-methoxyphenyl) ethyl]cyclohexanol, is an important drug in the neuropharmacological arsenal used for treatment of depression. Venlafaxine and the acid addition salts thereof are disclosed in U.S. Pat. No. 4,535,186. Venlafaxine hydrochloride is presently administered to adults in compressed tablet form in doses ranging from 75 to 350 mg/day, in divided doses two or three times a day. In therapeutic dosing with venlafaxine hydrochloride tablets, rapid dissolution results in a rapid

increase in blood plasma levels of the active compound shortly after administration followed by a decrease in blood plasma levels over several hours as the active compound is eliminated or metabolized, until subtherapeutic plasma levels are approached after about twelve hours following administration, thus requiring additional dosing with the drug. With the plural daily dosing regimen, the most common side effect is nausea, experienced by about forty five percent of patients under treatment with venlafaxine hydrochloride. Vomiting also occurs in about seventeen percent of the patients.

### BRIEF DESCRIPTION OF THE INVENTION

In accordance with this invention, there is provided an extended release (ER), encapsulated formulation containing venlafaxine hydrochloride as the active drug s component, which provides in a single dose, a therapeutic blood serum level over a twenty four hour period.

Through administration of the venlafaxine formulation of this invention, there is provided a method for obtaining a flattened drug plasma concentration to time profile, thereby affording a tighter plasma therapeutic range control than can be obtained with multiple daily dosing. In other words, this invention provides a method for eliminating the sharp peaks and troughs (hills and valleys) in blood plasma drug levels induced by multiple daily dosing with conventional immediate release venlafaxine hydrochloride tablets. In essence, the plasma levels of venlafaxine Is hydrochloride rise, after administration of the extended release formulations of this invention, for between about five to about eight hours (optimally about six hours) and then begin to fall through a protracted, substantially linear decrease from the peak plasma level for the remainder of the twenty four hour period, maintaining at least a threshold therapeutic level of the drug during the entire twenty-four period. In contrast, the conventional immediate release venlafaxine hydrochloride tablets give peak blood plasma levels in 2 to 4 hours. Hence, in accordance with the use aspect of this invention, there is provided a method for moderating the plural blood plasma peaks and valleys attending the pharmacokinetic utilization of multiple daily tablet dosing with venlafaxine hydrochloride which comprises administering to a patient in need of treatment with venlafaxine hydrochloride, a one-a-day, extended release formulation of venlafaxine hydrochloride.

The use of the one-a-day venlafaxine hydrochloride formulations of this invention reduces by adaptation, the level of nausea and incidence of emesis that attend the administration of multiple daily dosing. In clinical trials of venlafaxine hydrochloride ER, the probability of developing nausea in the course of the trials was greatly reduced after the first week. Venlafaxine ER showed a statistically significant improvement over conventional venlafaxine hydrochloride tablets in two eight-week and one 12 week clinical studies. Thus, in accordance with this use aspect of the invention there is provided a method for reducing the level of nausea and incidence of emesis attending the administration of venlafaxine hydrochloride which comprises dosing a patient in need of treatment with venlafaxine hydrochloride with an extended release formulation of venlafaxine hydrochloride once a day in a therapeutically effective amount.

The formulations of this invention comprise an extended release formulation of venlafaxine hydrochloride comprising a therapeutically effective amount of venlafaxine hydrochloride in spheroids comprised of venlafaxine hydrochloride, microcrystalline cellulose and, optionally,

hydroxypropylmethylcellulose coated with a mixture of ethyl cellulose and hydroxypropylmethylcellulose. Unless otherwise noted, the percentage compositions mentioned herein refer to percentages of the total weight of the final composition or formulation.

More particularly, the extended release formulations of this invention are those above wherein the spheroids are comprised of from about 6% to about 40% venlafaxine hydrochloride by weight, about 50% to about 95% microcrystalline cellulose, NF, by weight, and, optionally, from about 0.25% to about 1% by weight of hydroxypropylmethylcellulose, USP, and coated with from about 2% to about 12% of total weight of film coating comprised of from about 80% to about 90% by weight of film coating of ethyl cellulose, NF, and from about 10% to about 20% by weight of film coating of hydroxypropylmethylcellulose, USP.

A preferred embodiment of this invention are formulations wherein the spheroids are comprised of about 30% to about 40% venlafaxine hydrochloride by weight, about 50% to about 70% microcrystalline cellulose, NF, by weight, and, optionally, from about 0.25% to about 1% by weight of hydroxypropylmethylcellulose, USP, and coated with from about 2% to about 12% of total weight of film coating comprised of from about 80% to about 90% by weight of film coating of ethyl cellulose, NF, and from about 10% to about 20% by weight of film coating of hydroxypropylmethylcellulose, USP.

Another preferred lower dose formulation of this invention are those wherein the spheroids are comprised less than 30% venlafaxine hydrochloride. These formulations comprise spheroids of from about 6% to about 30% venlafaxine hydrochloride by weight, about 70% to about 94% microcrystalline cellulose, NF, by weight, and, optionally, from about 0.25% to about 1% by weight of hydroxypropylmethylcellulose, USP, and coated with from about 2% to about 12% of total weight of film coating comprised of from about 80% to about 90% by weight of film coating of ethyl cellulose, NF, and from about 10% to about 20% by weight of film coating of hydroxypropylmethylcellulose, USP.

Within this subgroup of lower dose formulations are formulations in which the spheroids are comprised of from about 6% to about 25% venlafaxine hydrochloride and from about 94% to about 75% microcrystalline cellulose, with an optional amount of from 0.25% to about 1% by weight of hydroxypropylmethylcellulose. Another preferred subgroup of spheroids in these formulations comprises from about 6% to about 25% venlafaxine hydrochloride and from about 94% to about 75% microcrystalline cellulose, with an optional amount of from 0.25% to about 1% by weight of hydroxypropylmethylcellulose. A further preferred subgroup of spheroids in these formulations comprises from about 6% to about 20% venlafaxine hydrochloride and from about 94% to about 80% microcrystalline cellulose, with an optional amount of from 0.25% to about 1% by weight of hydroxypropylmethylcellulose. Within each of these subgroups is understood to be formulations in which the spheroids are comprised of venlafaxine HCl and microcrystalline cellulose in the amounts indicated, with no hydroxypropylmethylcellulose present. Each of these formulations is also preferably contained in a gelatin capsule, preferably a hard gelatin capsule.

## DETAILED DESCRIPTION OF THE INVENTION

1-[2-(dimethylamino)-1-(4-methoxyphenyl)ethyl] cyclohexanol hydrochloride is polymorphic. Of the forms

isolated and characterized to date, Form I is considered to be the kinetic product of crystallization which can be converted to Form II upon heating in the crystallization solvent. Forms I and II cannot be distinguished by their melting points but do exhibit some differences in their infrared spectra and X-ray diffraction patterns. Any of the polymorphic forms such as Form I or Form II may be used in the formulations of the present invention.

The extended release formulations of this invention are comprised of 1-[2-(dimethylamino)-1-(4-methoxyphenyl) ethyl]cyclohexanol hydrochloride in admixture with microcrystalline cellulose and hydroxypropylmethylcellulose. Formed as beads or spheroids, the drug containing formulation is coated with a mixture of ethyl cellulose and hydroxypropylmethyl cellulose to provide the desired level of coating, generally from about two to about twelve percent on a weight/weight basis of final product or more preferably from about five to about ten percent (w/w), with best results obtained at from about 6 to about 8 percent (w/w). More specifically, the extended release spheroid formulations of this invention comprise from about 30 to 40 percent venlafaxine hydrochloride, from about 50 to about 70 percent microcrystalline cellulose, NF, from about 0.25 to about 1 percent hydroxypropylmethylcellulose, USP, and from about 5 to about 10 percent film coating, all on a weight/weight basis. And preferably, the spheroid formulations contain about 35 percent venlafaxine hydrochloride, about 55 to 60 percent microcrystalline cellulose NF (Avicel® PH101), about one half percent hydroxypropylmethylcellulose 2208 USP (K3, Dow, which has a viscosity of 3 cps for 2% aqueous solutions, a methoxy content of 19–24% and a hydroxypropoxy content of 4–13%), and from about 6 to 8 percent film coating.

The film coating is comprised of 80 to 90 percent of ethyl cellulose, NF and 10 to 20 percent hydroxypropylmethylcellulose (2910), USP on a weight/weight basis. Preferably the ethyl cellulose has a ethoxy content of 44.0–51% and a viscosity of 50 cps for a 5% aqueous solution and the hydroxypropylmethylcellulose is USP 2910 having a viscosity of 6 cps at 2% aqueous solution with a methoxy content of 28–30% and a hydroxypropoxy content of 7–12%. The ethyl cellulose used herein is Aqualon HG 2834.

Other equivalents of the hydroxypropylmethylcelluloses 2208 and 2910 USP and ethyl cellulose, NF, having the same chemical and physical characteristics as the proprietary products named above may be substituted in the formulation without changing the inventive concept. Important characteristics of suitable hydroxypropylmethylcelluloses include a low viscosity, preferably less than 10 cps and more preferably 2–5 cps, and a gel temperature above that of the temperature of the extrudate during extrusion. As explained below, these and other characteristics which enable the extrudate to remain moist and soft (pliable) are preferred for the hydroxypropylmethylcellulose. In the examples below, the extrudate temperature was generally 50–55° C.

It was completely unexpected that an extended release formulation containing venlafaxine hydrochloride could be obtained because the hydrochloride of venlafaxine proved to be extremely water soluble. Numerous attempts to produce extended release tablets by hydrogel technology proved to be fruitless because the compressed tablets were either physically unstable (poor compressibility or capping problems) or dissolved too rapidly in dissolution studies. Typically, the tablets prepared as hydrogel sustained release formulations gave 40–50% dissolution at 2 hrs, 60–70% dissolution at 4 hrs and 85–100% dissolution at 8 hrs.

Numerous spheroid formulations were prepared using different grades of microcrystalline cellulose and hydroxypropylmethylcellulose, different ratios of venlafaxine hydrochloride and filler, different binders such as polyvinylpyrrolidone, methylcellulose, water, and polyethylene glycol of different molecular weight ranges in order to find a formulation which would provide a suitable granulation mix which could be extruded properly. In the extrusion process, heat buildup occurred which dried out the extrudate so much that it was difficult to convert the extruded cylinders into spheroids. Addition of hydroxypropylmethylcellulose 2208 to the venlafaxine hydrochloride-microcrystalline cellulose mix made production of spheroids practical.

The encapsulated formulations of this invention may be produced in a uniform dosage for a specified dissolution profile upon oral administration by techniques understood in the art. For instance, the spheroid components may be blended for uniformity with a desired concentration of active ingredient, then spheronized and dried. The resulting spheroids can then be sifted through a mesh of appropriate pore size to obtain a spheroid batch of uniform and prescribed size.

The resulting spheroids can be coated and resifted to remove any agglomerates produced in the coating steps. During the coating process samples of the coated spheroids may be tested for their distribution profile. If the dissolution occurs too rapidly, additional coating may be applied until the spheroids present a desired dissolution rate.

The following examples are presented to illustrate applicant's solution to the problem of preparation of the extended release drug containing formulations of this invention.

EXAMPLE NO. 1

Venlafaxine Hydrochloride Extended Release Capsules

A mixture of 44.8 parts (88.4% free base) of venlafaxine hydrochloride, 74.6 parts of the microcrystalline cellulose, NF, and 0.60 parts of hydroxypropylmethyl cellulose 2208, USP, are blended with the addition of 41.0 parts water. The plastic mass of material is extruded, spheronized and dried to provide uncoated drug containing spheroids.

Stir 38.25 parts of ethyl cellulose, NF, HG2834 and 6.75 parts of hydroxypropylmethylcellulose 2910, USP in a 1:1 v/v mixture of methylene chloride and anhydrous methanol until solution of the film coating material is complete.

To a fluidized bed of the uncoated spheroids is applied 0.667 parts of coating solution per part of uncoated spheroids to obtain extended release, film coated spheroids having a coating level of 3%.

The spheroids are sieved to retain the coated spheroids of a particle size between 0.85 mm to 1.76 mm diameter. These selected film coated spheroids are filled into pharmaceutically acceptable capsules conventionally, such as starch or gelatin capsules.

EXAMPLE NO. 2

Same as for Example 1 except that 1.11 parts of the film coating solution per part of uncoated spheroids is applied to obtain a coating level of 5%.

EXAMPLE NO. 3

Same as for Example 1 except that 1.33 parts of the film coating solution is applied to 1 part of uncoated spheroids to obtain a coating level of 6%.

EXAMPLE NO. 4

Same as for Example 1 except that 1.55 parts of the film coating solution is applied to 1 part of uncoated spheroids to obtain a coating level of 7%.

In the foregoing failed experiments and in Examples 1–4, the extrusion was carried out on an Alexanderwerk extruder. Subsequent experiments carried out on Hutt and Nica extruders surprisingly demonstrated that acceptable, and even improved, spheroids could be made without the use of an hydroxypropylmethylcellulose.

In such further experiments the applicability of the invention was extended to formulations wherein the weight percentage of venlafaxine hydrochloride is 6% to 40%, preferably 8% to 35%. Thus, the extended release spheroid formulations of this invention comprise from about 6 to about 40 percent venlafaxine hydrochloride, from about 50 to about 94 percent microcrystalline cellulose, NF, optionally, from about 0.25 to about 1 percent hydroxypropylmethylcellulose, and from about 2 to about 12 percent, preferably about 3 to 9 percent, film coating.

Spheroids of the invention were produced having 8.25% (w/w) venlafaxine hydrochloride and the remainder (91.75%, w/w) being microcrystalline cellulose, with a coating of from 3 to 5% (w/w), preferably 4%, of the total weight. The spheroids with 8.25% venlafaxine hydrochloride and 4% coating were filled into No. 2 white opaque shells with a target fill weight of 236 mg.

Further spheroids of the invention were produced having 16.5% (w/w) venlafaxine hydrochloride and the remainder (83.5%,w/w) being microcrystalline cellulose, with a coating of from 4 to 6% (w/w), preferably 5%, of the total weight. The spheroids 16.5% venlafaxine hydrochloride and 5% coating were filled into No. 2 white opaque shells with a target fill weight of 122 mg.

The test for acceptability of the coating level is determined by analysis of the dissolution rate of the finished coated spheroids prior the encapsulation. The dissolution procedure followed uses USP Apparatus 1 (basket) at 100 rpm in purified water at 37° C.

Conformance with the dissolution rate given in Table 1 provides the twenty-four hour therapeutic blood levels for the drug component of the extended release capsules of this invention in capsule form. Where a given batch of coated spheroids releases drug too slowly to comply with the desired dissolution rate study, a portion of uncoated spheroids or spheroids with a lower coating level may be added to the batch to provide, after thorough mixing, a loading dose for rapid increase of blood drug levels. A batch of coated spheroids that releases the drug too rapidly can receive additional film-coating to give the desired dissolution profile.

TABLE 1

Acceptable Coated Spheroid Dissolution Rates

| Time (hours) | Average % Venlafaxine HCl released |
|---|---|
| 2 | <30 |
| 4 | 30–55 |
| 8 | 55–80 |
| 12 | 65–90 |
| 24 | >80 |

Batches of the coated venlafaxine hydrochloride containing spheroids which have a dissolution rate corresponding to that of Table 1 are filled into pharmaceutically acceptable

capsules in an amount needed to provide the unit dosage level desired. The standard unit dosage immediate release (IR) tablet used presently provides amounts of venlafaxine hydrochloride equivalent to 25 mg, 37.5 mg, 50 mg, 75 mg and 100 mg venlafaxine. The capsules of this invention are filled to provide an amount of venlafaxine hydrochloride equivalent to that presently used in tablet form and also up to about 150 mg venlafaxine hydrochloride.

Dissolution of the venlafaxine hydrochloride ER capsules is determined as directed in the U. S. Pharmacopoeia (USP) using apparatus 1 at 100 rpm on 0.9 L of water. A filtered sample of the dissolution medium is taken at the times specified. The absorbance of the clear solution is determined from 240 to 450 nanometers (nm) against the dissolution medium. A baseline is drawn from 450 nm through 400 nm and extended to 240 nm. The absorbance at the wavelength of maximum absorbance (about 274 nm) is determined with respect to this baseline. Six hard gelatin capsules are filled with the theoretical amount of venlafaxine hydrochloride spheroids and measured for dissolution. Standard samples consist of venlafaxine hydrochloride standard solutions plus a gelatin capsule correction solution.

The percentage of venlafaxine released is determined from the equation

$$\%\ \text{Venlafaxine hydrochloride released} = \frac{(As)(Wr)(S)(V1)(0.888)(100)}{(Ar)(V2)(C)}$$

where As is absorbance of sample preparation, Wr is weight of reference standard, mg; S is strength of the reference standard, decimal; V1 is the volume of dissolution medium used to dissolve the dosage form, mL; 0.884 is the percent free base, Ar is the absorbance of the standard preparation, V2 is the volume of reference standard solution, mL; and C is the capsule claim in mg.

Table 2 shows the plasma level of venlafaxine versus time for one 75 mg conventional Immediate Release (IR) tablet administered every 12 hours, two 75 mg extended release (ER) capsules administered simultaneously every 24 hours, and one 150 mg extended release (ER) capsule administered once every 24 hours in human male subjects. The subjects were already receiving venlafaxine hydrochloride according to the dosage protocol, thus the plasma blood level at zero time when dosages were administered is not zero.

TABLE 2

Plasma venlafaxine level (ng/mL) versus time, conventional tablet (not extended release) versus ER capsule

| Time (hours) | 75 mg (IR)tablet (q 12 h) | 2 × 75 mg (ER)capsules (q 24 hr) | 1 × 150 mg (ER)capsules (q 24 h) |
|---|---|---|---|
| 0 | 62.3 | 55.0 | 55.8 |
| 0.5 | 76.3 | | |
| 1 | 135.6 | 53.3 | 53.2 |
| 2 | 212.1 | 69.8 | 70.9 |
| 4 | 162.0 | 138.6 | 133.3 |
| 6 | 114.6 | 149.0 | 143.5 |
| 8 | 86.7 | 129.3 | 129.5 |
| 10 | | 118.4 | 114.4 |
| 12 | 51.9 | 105.1 | 105.8 |
| 12.5 | 74.7 | | |
| 13 | 127.5 | | |
| 14 | 161.3 | 90.5 | 91.3 |
| 16 | 134.6 | 78.2 | 78.5 |
| 18 | 106.2 | | |
| 20 | 83.6 | 62.7 | 63.3 |
| 24 | 57.6 | 56.0 | 57.3 |

Table 2 shows that the plasma levels of two 75 mg/capsule venlafaxine hydrochloride ER capsules and one 150 mg/capsule venlafaxine hydrochloride ER capsule provide very similar blood levels. The data also show that the plasma level after 24 hours for either extended release regimen is very similar to that provided by two immediate release 75 mg tablets of venlafaxine hydrochloride administered at 12 hours intervals.

Further, the plasma levels of venlafaxine obtained with the extended release formulation do not increase to the peak levels obtained with the conventional immediate release tablets given 12 hours apart. The peak level of venlafaxine from (ER), somewhat below 150 ng/ml, is reached in about six hours, plus or minus two hours, based upon this specific dose when administered to patients presently under treatment with venlafaxine hydrochloride (IR). The peak plasma level of venlafaxine, somewhat over 200 ng/ml, following administration of (IR) is reached in two hours and falls rapidly thereafter.

Table 3 shows venlafaxine blood plasma levels in male human subjects having a zero initial blood plasma level. Again, a peak blood plasma concentration of venlafaxine is seen at about 6 hours after dosing with venlafaxine hydrochloride extended release capsules in the quantities indicated. The subjects receiving the single 50 mg immediate release tablet showed a peak plasma level occurring at about 4. hours. For comparative purposes, the plasma levels of venlafaxine for subjects receiving the conventional formulated tablet can be multiplied by a factor of three to approximate the plasma levels expected for a single dose of 150 mg. conventional formulation.

TABLE 3

Plasma Blood Levels in Human Males Having No Prior Venlafaxine Blood Level

| Time (Hours) | 1 × 50 mg IR tablet | 2 × 75 mg ER capsules | 1 × 150 mg ER capsule |
|---|---|---|---|
| 0 | 0 | 0 | 0 |
| 1 | 27.87 | 1.3 | 0 |
| 1.5 | 44.12 | 6.0 | 2.2 |
| 2 | 54.83 | 20.6 | 12.8 |
| 4 | 66.38 | 77.0 | 81.0 |
| 6 | 49.36 | 96.5 | 94.4 |
| 8 | 30.06 | 93.3 | 86.9 |
| 10 | 21.84 | 73.2 | 72.8 |
| 12 | 15.91 | 61.3 | 61.4 |
| 14 | 13.73 | 52.9 | 51.9 |
| 16 | 10.67 | 47.5 | 41.1 |
| 20 | 5.52 | 35.2 | 34.0 |
| 24 | 3.56 | 29.3 | 28.5 |
| 28 | 2.53 | 23.4 | 22.9 |
| 36 | 1.44 | 11.9 | 13.5 |
| 48 | 0.66 | 5.8 | 5.2 |

The blood plasma levels of venlafaxine were measured according to the following procedure. Blood samples from the subjects were collected in heparinized evacuated blood tubes and the tubes were inverted gently several times. As

quickly as possible, the tubes were centrifuged at 2500 rpm for 15 minutes. The plasma was pipetted into plastic tubes and stored at −20° C. until analysis could be completed.

To 1 mL of each plasma sample in a plastic tube was added 150 μL of a stock internal standard solution (150 μg/ml). Saturated sodium borate (0.2 mL) solution was added to each tube and vortexed. Five mL of ethyl ether was added to each tube which were then capped and shaken for 10 minutes at high speed. The tubes were centrifuged at 3000 rpm for 5 minutes. The aqueous layer was frozen in dry ice and the organic layer transferred to a clean screw cap tube. A 0.3 mL portion of 0.01 N HCl solution was added to each tube and shaken for 10 minutes at high speed. The aqueous layer was frozen and the organic layer removed and discarded. A 50 μL portion of the mobile phase (23:77 acetonitrile:0.1M monobasic ammonium phosphate buffer, pH 4.4) was added to each tube, vortexed, and 50 μL samples were injected on a Supelco Supelcoil LC-8-DB, 5 cm×4.6 mm, 5 μ; column in a high pressure liquid chromatography apparatus equipped with a Waters Lambda Max 481 detector or equivalent at 229 nm. Solutions of venlafaxine hydrochloride at various concentrations were used as standards.

## EXAMPLE NO. 5

Manufactured by the techniques described herein, another preferred formulation of this invention comprises spheroids of from about 30% to about 35% venlafaxine hydrochloride and from about 0.3% to about 0.6% hydroxypropylmethylcellulose. These spheroids are then coated with a film coating, as described above, to a coating level of from about 5% to about 9%, preferably from about 6% to about 8%. A specific formulation of this type comprises spheroids of about 33% venlafaxine hydrochloride and about 0.5% hydroxypropylmethylcellulose, with a film coating of about 7%.

Lower dosage compositions or formulations of this invention may also be produced by the techniques described herein. These lower dosage forms may be administered alone for initial titration or initiation of treatment, prior to a dosage increase. They may also be used for an overall low-dose administration regimen or in combination with higher dosage compositions, such as capsule formulations, to optimize individual dosage regimens.

These lower dose compositions may be used to create encapsulated formulations, such as those containing doses of venlafaxine hydrochloride from about 5 mg to about 50 mg per capsule. Particular final encapsulated dosage forms may include, but are not limited to, individual doses of 7.5 mg, 12.5 mg, 18.75 mg, or 28.125 mg of venlafaxine HCl per capsule.

The spheroids useful in these lower dose formulations may comprise from about 5% to about 29.99% venlafaxine HCl, preferably from about 5% to about 25%, from about 75% to about 95% microcrystalline cellulose, and, optionally from about 0.25% to about 1.0% hydroxypropylmethylcellulose. The spheroids may be coated as described above, preferably with a film coating of from about 5% to about 10% by is weight. In some preferred formulations, the spheroids comprise the cited venlafaxine HCl and microcrystalline cellulose, with no hydroxypropylmethyl cellulose.

## EXAMPLE NO. 6

Spheroids comprising 16.5% venlafaxine HCl and 83.5% microcrystalline cellulose were mixed with approximately 50% water (w/w) to granulate in a Littleford Blender Model FM-50E/1Z (Littleford Day Inc., P.O. Box 128, Florence, Ky. 41022-0218, U.S.A.) at a fixed speed of 180 rpm. The blended material was extruded through a 1.25 mm screen using a Nica extruder/speronization machine (Aeromatic-Fielder Division, Niro Inc., 9165 Rumsey Rd., Columbia, Md. 21045, U.S.A.) for a 12/20 mesh cut after drying. Two portions of the resulting spheroids were coated with a 5% and 7% coating level, respectively, by techniques described above using the coating formulation:

| Ingredient | % (w/w) |
|---|---|
| Methylene Chloride | 60.000 |
| Methanol Anhydrous | 35.500 |
| Ethylcellulose, NF, HG 2834, 50 cps | 3.825 |
| Hydroxypropyl Methylcellulose, 2910 USP, 6 cps | 0.675 |

These 5% and 7% coated lots were tested for dissolution on a Hewlett Packard automated dissolution system over a 24 hour period, resulting in the following dissolution patterns

| Time/hr | % Dissoluded 16.5%/5% | % Dissolved 16.5%/7% |
|---|---|---|
| 2 | 12.4 | 5.6 |
| 4 | 42.8 | 25.4 |
| 8 | 70.7 | 60.4 |
| 12 | 82.2 | 75.4 |
| 24 | 94.3 | 92.7 |

## EXAMPLE NO. 7

A formulation of spheroids containing 8.25% venlafaxine HCl and 91.75% microcellulose was prepared according to the techniques of Example No. 6 and coated with a 5% film coating. In the Hewlett Packard automated dissolution system these spheroids provided the following dissolution profile:

| Time/hr | % Dissolved 8.25%/5% |
|---|---|
| 2 | 4.4 |
| 4 | 24.2 |
| 8 | 62.9 |
| 12 | 77.8 |
| 24 | 93.5 |

Thus, the desired dissolution rates of sustained release dosage forms of venlafaxine hydrochloride, impossible to achieve with hydrogel tablet technology, has been achieved with the film-coated spheroid compositions of this invention.

What is claimed is:

1. An extended release formulation of venlafaxine hydrochloride comprising a pharmaceutically acceptable capsule containing spheroids comprised of from about 6% to about 40% venlafaxine hydrochloride by weight, about 50% to about 94% microcrystalline cellulose, NF, by weight, and optionally from about 0.25% to about 1% by weight of hydroxypropyl-methylcellulose, USP, wherein the spheroids are coated with a film coating composition comprised of ethyl cellulose and hydroxypropylmethylcellulose.

2. An extended release formulation of venlafaxine hydrochloride according to claim 1 which provides peak serum levels of up to 150 ng/ml and extended therapeutically effective plasma levels over a twenty four hour period.

3. An extended release formulation according to claim 1 wherein the spheroids are coated with from about 2% to about 12% of total formulation weight of film coating comprised of from about 80% to about 90% by weight of film coating of ethyl cellulose, NF, and from about 10% to about 20% by weight of film coating of hydroxypropylmethylcellulose, USP.

4. An extended release formulation according to claim 1 wherein the spheroids are comprised of from about 30% to 40% venlafaxine hydrochloride by weight, about 50% to about 70% microcrystalline cellulose, NF, by weight, and, optionally, from about 0.25% to about 1% by weight of hydroxypropylmethylcellulose, USP.

5. An extended release formulation according to claim 4 wherein the spheroids are coated with from about 2% to about 12% of total formulation weight of film coating comprised of from about 80% to about 90% by weight of film coating of ethyl cellulose, NF, and from about 10% to about 20% by weight of film coating of hydroxypropylmethylcellulose, USP.

6. An extended release formulation according to claim 1 wherein the spheroids comprise from about 6% to about 30% venlafaxine hydrochloride by weight, about 70.1% to about 94% microcrystalline cellulose, NF, by weight and, optionally, from about 0.25% to about 1% by weight of hydroxypropylmethylcellulose.

7. An extended release formulation according to claim 6 wherein the spheroids are coated with from about 2% to about 12% of total weight of film coating comprised of from about 80% to about 90% by weight of film coating of ethyl cellulose, NF, and from about 10% to about 20% by weight of film coating of hydroxypropylmethylcellulose, USP.

8. An extended release formulation according to claim 1 wherein the spheroids comprise from about 5% to about 25% venlafaxine hydrochloride and from about 95% to about 75% microcrystalline cellulose, with an optional amount of from 0.25% to about 1% by weight of hydroxypropylmethylcellulose.

9. An extended release formulation according to claim 6 wherein the spheroids comprise from about 6% to about 25% venlafaxine hydrochloride and from about 94% to about 75% microcrystalline cellulose, with an optional amount of from 0.25% to about 1% by weight of hydroxypropylmethylcellulose.

10. An extended release formulation according to claim 6 wherein the spheroids comprise from about 6% to about 20% venlafaxine hydrochloride and from about 94% to about 80% microcrystalline cellulose, with an optional amount of from 0.25% to about 1% by weight of hydroxypropylmethylcellulose.

11. An encapsulated, extended release formulation of venlafaxine hydrochloride according to claim 1 having the following dissolution profile in USP Apparatus 1 (basket) at 100 rpm in purified water at 37° C:

| Time (hours) | Average % Venlafaxine HCl released |
|---|---|
| 2 | <30 |
| 4 | 30–55 |
| 8 | 55–80 |
| 12 | 65–90 |
| 24 | >80 |

12. An extended release formulation according to claim 1 wherein the spheroids are composed of about 37% by weight of venlafaxine hydrochloride, about 0.5% by weight of hydroxypropylmethylcellulose, and about 62% by weight of microcrystalline cellulose.

13. An extended release formulation according to claim 1 wherein the film coating is comprised of ethyl cellulose (4.81% of total weight) and hydroxypropylmethylcellulose (0.85% of total weight).

14. An extended release formulation according to claim 1 wherein the film coating comprises 6–8% by weight of total weight.

15. An extended release formulation according to claim 1 wherein the film coating is comprised of ethyl cellulose (2.48% of total weight) and hydroxypropylmethylcellulose (0.437% of total weight).

16. An extended release formulation according to claim 1 wherein the film coating composition is comprised of ethyl cellulose having a 44.0–51.0% content of ethoxy groups and hydroxypropylmethylcellulose having a methoxy content of 28.0–30.0% and a hydroxypropoxy group content of 7.0–12.0%.

17. An extended release formulation according to claim 1 wherein the film coating composition is comprised of about 85% by total weight of film coating of ethyl cellulose having 44.0–51% content of ethoxy groups and about 15% by total weight of film coating of hydroxypropylmethylcellulose having a methoxy content of 28.0–30.0% and a hydroxypropoxy group content of 7.0–12.0%.

18. An extended release formulation according to claim 1 wherein the film coating composition is comprised of 85% by weight of ethyl cellulose having an ethoxy content of 44.0–51% and a viscosity of 50% cps for a 5% aqueous solution, and 15% by weight of hydroxypropylmethylcellulose having a viscosity of 6 cps at 2% aqueous solution with a methoxy content of 28–30% and a hydroxypropoxy content of 7–12%.

19. An extended release formulation of venlafaxine hydrochloride for once daily administration which comprises spheroids containing 37.3% venlafaxine, 62.17% microcrystalline cellulose and 0.5% hydroxypropylmethylcellulose coated with a quantity of a mixture comprised of 85% ethyl cellulose and 15% hydroxypropylmethylcellulose sufficient to give coated spheroids having a dissolution profile in USP Apparatus 1 (basket) at 100 rpm in purified water at 37° C.:

| Time | Average % Venlafaxine HCl Released |
|---|---|
| 2 | <30 |
| 4 | 30–55 |
| 8 | 55–80 |
| 12 | 65–90 |
| 24 | >80. |

20. A method for providing a therapeutic blood plasma concentration of venlafaxine over a twenty four hour period with diminished incidences of nausea and emesis which comprises administering orally to a patient in need thereof, an encapsulated, extended release formulation that provides

a peak blood plasma level of venlafaxine in from about four to about eight hours, said formulation containing venlafaxine hydrochloride as the active ingredient.

21. A method for eliminating the troughs and peaks of drug concentration in a patients blood plasma attending the therapeutic metabolism of plural daily doses of venlafaxine hydrochloride which comprises administering orally to a patient in need thereof, an encapsulated, extended release formulation that provides a peak blood plasma level of venlafaxine in from about four to about eight hours, said formulation containing venlafaxine hydrochloride as the active ingredient.

22. A method for providing a therapeutic blood plasma concentration of venlafaxine over a twenty-four hour period with diminished incidence of nausea and emesis which comprises administering orally to a patient in need thereof, an encapsulated extended release formulation that provides a peak blood plasma level of venlafaxine in from about 5 to about 8 hours, said formulation containing venlafaxine hydrochloride as the active ingredient.

23. A method for providing a therapeutic blood plasma concentration of venlafaxine over a twenty-four hour period with diminished incidence of nausea and emesis which comprises administering orally to a patient in need thereof,

an encapsulated extended release formulation that provides a peak blood plasma level of venlafaxine in about 6 hours, said formulation containing venlafaxine hydrochloride as the active ingredient.

24. A method for eliminating the troughs and peaks of drug concentration in a patient's blood plasma attending the therapeutic metabolism of plural daily doses of venlafaxine hydrochloride which comprises administering orally to a patient in need thereof, an encapsulated, extended release formulation that provides a peak blood plasma level of venlafaxine in from about 5 to about 8 hours, said formulation containing venlafaxine hydrochloride as the active ingredient.

25. A method for eliminating the troughs and peaks of drug concentration in a patient's blood plasma attending the therapeutic metabolism of plural daily doses of venlafaxine hydrochloride which comprises administering orally to a patient in need thereof, an encapsulated, extended release formulation that provides a peak blood plasma level of venlafaxine in about 6 hours, said formulation containing venlafaxine hydrochloride as the active ingredient.

* * * * *

# EXHIBIT 2



U 2071357

# THE UNITED STATES OF AMERICA

TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

September 30, 2003

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *6,403,120*
ISSUE DATE: *June 11, 2002*

By Authority of the
COMMISSIONER OF PATENTS AND TRADEMARKS

P. SWAIN
Certifying Officer

US006403120B1

# (12) United States Patent
Sherman et al.

(10) Patent No.: US 6,403,120 B1
(45) Date of Patent: Jun. 11, 2002

(54) EXTENDED RELEASE FORMULATION OF VENLAFAXINE HYDROCHLORIDE

(75) Inventors: Deborah M. Sherman, Plattsburgh; John C. Clark, Peru, both of NY (US); John U. Lamer, St. Albans, VT (US); Steven A. White, Champlain, NY (US)

(73) Assignee: Wyeth, Madison, NJ (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: 09/950,965

(22) Filed: Sep. 12, 2001

**Related U.S. Application Data**

(63) Continuation of application No. 09/884,412, filed on Jun. 19, 2001, which is a division of application No. 09/488,629, filed on Jan. 20, 2000, now Pat. No. 6,274,171, which is a continuation-in-part of application No. 08/964,328, filed on Nov. 5, 1997, now abandoned, which is a continuation-in-part of application No. 08/821,137, filed on Mar. 20, 1997, now abandoned.

(60) Provisional application No. 60/014,006, filed on Mar. 25, 1996.

(51) Int. Cl.[7] ........................ A61K 9/52; A61K 9/54; A61K 9/62

(52) U.S. Cl. .................... 424/461; 424/457; 424/458; 424/459; 514/781; 514/962

(58) Field of Search ............................ 424/461, 458, 424/459, 457, 456, 462, 494, 495

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,954,959 A 5/1976 Pedersen
4,138,475 A 2/1979 McAinsh et al.
4,369,172 A 1/1983 Schor et al.
4,389,393 A 6/1983 Schor et al.
4,535,186 A 8/1985 Husbands et al.
4,966,768 A 10/1990 Michelucci et al.
5,506,270 A 4/1996 Upton et al.
5,552,429 A 9/1996 Wong et al.

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0654264 | 11/1994 |
| EP | 0667150 | 1/1995 |
| EP | 0797991 | 10/1997 |
| WO | 9427589 | 12/1994 |
| WO | 9737640 | 10/1997 |

*Primary Examiner*—James M. Spear
(74) *Attorney, Agent, or Firm*—Rebecca R. Barrett

(57) **ABSTRACT**

This invention relates to a 24 hour extended release dosage formulation and unit dosage form thereof of venlafaxine hydrochloride, an antidepressant, which provides better control of blood plasma levels than conventional tablet formulations which must be administered two or more times a day and fiber provides a lower incidence of nausea and vomiting than the conventional tablets. More particularly, the invention comprises an extended release formulation of venlafaxine hydrochloride comprising a therapeutically effective amount of venlafaxine hydrochloride in spheroids comprised of venlafaxine hydrochloride, microcrystalline cellulose and, optionally, hydroxypropylmethylcellulose coated with a mixture of ethyl cellulose and hydroxypropylmethylcellulose.

**14 Claims, No Drawings**

# EXTENDED RELEASE FORMULATION OF VENLAFAXINE HYDROCHLORIDE

This application is a continuation of Ser. No. 09/884,412, filed Jun. 19, 2001, which is a a divisional application of Ser. No. 09/488,629, filed Jan. 20, 2000, now U.S. Pat. No. 6,274,171, which is a continuation-in-part of Application Ser. No. 08/964,328, filed Nov. 5, 1997, now abandoned, which is a continuation-in part of Application No. 08/821, 137, filed Mar. 20, 1997, now abandoned, which claims priority from Provisional Application No. 60/014,006 filed Mar. 25, 1996.

## BACKGROUND OF THE INVENTION

Extended release drug formulations are conventionally produced as compressed tablets by hydrogel tablet technology. To produce these sustained release tablet drug dosage forms, the active ingredient is conventionally compounded with cellulose ethers such as methyl cellulose, ethyl cellulose or hydroxypropylmethylcellulose with or without other excipients and the resulting mixture is pressed into tablets. When the tablets are orally administered, the cellulose ethers in the tablets swell upon hydration from moisture in the digestive system, thereby limiting exposure of the active ingredient to moisture. As the cellulose ethers are gradually leached away by moisture, water more deeply penetrates the gel matrix and the active ingredient slowly dissolves and diffuses through the gel, making it available for absorption by the body. An example of such a sustained release dosage form of the analgesic/anti-inflammatory drug etodolac (Lodin) appears in U.S. Pat. No. 4,966,768. U.S. Pat. No. 4,389,393 discloses sustained release therapeutic compressed solid unit dose forms of an active ingredient plus a carrier base comprised of a high molecular weight hydroxypropylmethylcellulose, methyl cellulose, sodium carboxymethylcellulose and or other cellulose ether.

Where the production of tablets is not feasible, it is conventional in the drug industry to prepare encapsulated drug formulations which provide extended or sustained release properties. In this situation, the extended release capsule dosage forms may be formulated by mixing the drug with one or more binding agents to form a uniform mixture which is then moistened with water or a solvent such as ethanol to form an extrudable plastic mass from which small diameter, typically 1 mm, cylinders of drug/matrix are extruded, broken into appropriate lengths and transformed into spheroids using standard spheronization equipment. The spheroids, after drying, may then be thin-coated to retard dissolution. The fin-coated spheroids may then be placed in pharmaceutically acceptable capsules, such as starch or gelatin capsules, in the quantity needed to obtain the desired therapeutic effect. Spheroids releasing the drug at different rates may be combined in a capsule to obtain desired release rates and blood levels. U.S. Pat. No. 4,138, 475 discloses a sustained release pharmaceutical composition consisting of a hard gelatin capsule filled with film-coated spheroids comprised of propanolol in admixture with microcrystalline cellulose wherein the film coating is composed of ethyl cellulose, optionally, with hydroxypropylmethylcellulose and/or a plasticizer.

Venlafaxine, 1-[2-(dimethylamino)-1-(4methoxyphenyl) ethyl]cyclohexanol, is an important drug in the neuropharmacological arsenal used for treatment of depression. Venlafaxine and the acid addition salts thereof are disclosed in U.S. Pat. No. 4,535,186. Venlafaxine hydrochloride is presently administered to adults in compressed tablet form in

doses ranging from 75 to 350 mg/day, in divided doses two or three times a day. In therapeutic dosing with venlafaxine hydrochloride tablets, rapid dissolution results in a rapid increase in blood plasma levels of the active compound shortly after administration followed by a decrease in blood plasma levels over several hours as the active compound is eliminated or metabolized, until sub-therapeutic plasma levels are approached after about twelve hours following administration, thus requiring additional dosing with the drug. With the plural daily dosing regimen the most common side effect is nausea, experienced by about forty five percent of patients under treatment with venlafaxine hydrochloride. Vomiting also occurs in about seventeen percent of the patients.

## BRIEF DESCRIPTION OF THE INVENTION

In accordance with this invention, there is provided an extended release (ER), encapsulated formulation containing venlafaxine hydrochloride as the active drug component, which provides in a single dose, a therapeutic blood serum level over a twenty four hour period.

Through administration of the venlafaxine formulation of this invention, there is provided a method for obtaining a flattened drug plasma concentration to time profile, thereby affording a tighter plasma therapeutic range control than can be obtained with multiple daily dosing. In other words, this invention provides a method for eliminating the sharp peaks and troughs hills and valleys) in blood plasma drug levels induced by multiple daily dosing with conventional immediate release venlafaxine hydrochloride tablets. In essence, the plasma levels of venlafaxine hydrochloride rise, after administration of the extended release formulations of this invention, for between about five to about eight hours (optimally about six hours) and then begin to fall through a protracted, substantially linear decrease from the peak plasma level for the remainder of the twenty four hour period, maintaining at least a threshold therapeutic level of the drug during the entire twenty-four period. In contrast, the conventional immediate release venlafaxine hydrochloride tablets give peak blood plasma levels in 2 to 4 hours. Hence, in accordance with the use aspect of this invention, there is provided a method for moderating the -plural blood plasma peaks and valleys attending the pharmacokinetic utilization of multiple daily tablet dosing with venlafaxine hydrochloride which comprises administering to a patient in need of treatment with venlafaxine hydrochloride, a one-a-day, extended release formulation of venlafaxine hydrochloride.

The use of the one-a-day venlafaxine hydrochloride formulations of this invention reduces by adaptation, the level of nausea and incidence of emesis that attend the administration of multiple daily dosing. In clinical trials of venlafaxine hydrochloride ER, the probability of developing nausea in the course of the trials was greatly reduced after the first week. Venlafaxine ER showed a statistically significant improvement over conventional venlafaxine hydrochloride tablets in two eight-week and one 12 week clinical studies. Thus, in accordance with this use aspect of the invention there is provided a method for reducing the level of nausea and incidence of emesis attending the administration of venlafaxine hydrochloride which comprises dosing a patient in need of treatment with venlafaxine hydrochloride with an extended release formulation of venlafaxine hydrochloride once a day in a therapeutically effective amount.

The formulations of this invention comprise an extended release formulation of venlafaxine hydrochloride compris-

ing a therapeutically effective amount of venlafaxine hydrochloride in spheroids comprised of venlafaxine hydrochloride, microcrystalline cellulose and, optionally, hydroxypropylmethylcellulose coated with a mixture of ethyl cellulose and hydroxypropylmethylcellulose. Unless otherwise noted, the percentage compositions mentioned herein refer to percentages of the total weight of the final composition or formulation.

More particularly, the extended release formulations of this invention are those above wherein the spheroids are comprised of from about 6% to about 40% venlafaxine hydrochloride by weight, about 50% to about 95% microcrystalline cellulose, NF, by weight, and, optionally, from about 0.25% to about 1% by weight of hydroxypropylmethylcellulose, USP, and coated with from about 2% to about 12% of total weight of film coating comprised of from about 80% to about 90% by weight of film coating of ethyl cellulose, NF, and from about 10% to about 20% by weight of film coating of hydroxypropylmethylcellulose, USP.

A preferred embodiment of this invention are formulations wherein the spheroids are comprised of about 30% to about 40% venlafaxine hydrochloride by weight, about 50% to about 70% microcrystalline cellulose, NT, by weight, and, optionally, from about 0.25% to about 1% by weight of hydroxypropylmethylcellulose, USP, and coated with from about 2% to about 12% of total weight of film coating comprised of from about 80% to about 90% by weight of film coating of ethyl cellulose, NF, and from about 10% to about 20% by weight of film coating of hydroxypropylmethylcellulose, USP.

Another preferred lower dose formulation of this invention are those wherein the spheroids are comprised less than 30% venlafaxine hydrochloride. These formulations comprise spheroids of from about 6% to about 30% venlafaxine hydrochloride by weight, about 70% to about 94% microcrystalline cellulose, NF, by weight, and, optionally, from about 0.25% to about 1% by weight of hydroxypropylmethylcellulose, USP, and coated with from about 2% to about 12% of total weight of film coating comprised of from about 80% to about 90% by weight of film coating of ethyl cellulose, NF, and from about 10% to about 20% by weight of film coating of hydroxypropylmethylcellulose, USP.

Within this subgroup of lower dose formulations are formulations in which the spheroids are comprised of from about 6% to about 25% venlafaxine hydrochloride and from about 94% to about 75% microcrystalline cellulose, with an optional amount of from 0.25% to about 1% by weight of hydroxypropylmethylcellulose. Another preferred subgroup of spheroids in these formulations comprises from about 6% to about 25% venlafaxine hydrochloride and from about 94% to about 75% microcrystalline cellulose, with an optional amount of from 0.25% to about 1% by weight of hydroxypropylmethylcellulose. A ether preferred subgroup of spheroids in these formulations comprises from about 6% to about 20% venlafaxine hydrochloride and from about 94% to about 80% microcrystalline cellulose, with an optional amount of from 0.25% to about 1% by weight of hydroxypropylmethylcellulose. Within each of these subgroups is understood to be formulations in which the spheroids are comprised of venlafaxine HCT and microcrystalline cellulose in the amounts indicated, with no hydroxypropylmethylcellulose present. Each of these formulations is also preferably contained in a gelatin capsule, preferably a hard gelatin capsule.

## DETAILED DESCRIPTION OF THE INVENTION

1-[2-(dimethylamino)-1-(4methoxyphenyl)ethyl] cyclohexanol hydrochloride is polymorphic. Of the forms

isolated and characterized to date, Form I is considered to be the kinetic product of crystallization which can be converted to Form II upon heating in the crystallization solvent. Forms I and II cannot be distinguished by their melting points but do exhibit some differences in their infrared spectra and X-ray diffraction patterns. Any of the polymorphic forms such as Form I or Form II may be used in the formulations of the present invention.

The extended release formulations of this invention are comprised of 1-[2-(dimethylamino)-1-(4-methoxyphenyl) ethyl]cyclohexanol hydrochloride in admixture with microcrystalline cellulose and hydroxypropylmethylcellulose. Formed as beads or spheroids, the drug containing formulation is coated with a mixture of ethyl cellulose and hydroxypropylmethyl cellulose to provide, the desired level of coating, generally from about two to about twelve percent on a weight/weight basis of final product or more preferably from about five to about ten percent (w/w), with best results obtained at from about 6 to about 8 percent (w/w). More specifically, the extended release spheroid formulations of this invention comprise from about 30 to 40 percent venlafaxine hydrochloride, from about 50 to about 70 percent microcrystalline cellulose, NF, from about 0.25 to about 1 percent hydroxypropylmethylcellulose, USP, and from about 5 to about 10 percent film coating, all on a weight/weight basis. And preferably, the spheroid formulations contain about 35 percent venlafaxine hydrochloride, about 55 to 60 percent microcrystalline cellulose NF (Avicel® PH101), about one half percent hydroxypropylmethylcellulose 2208 USP (K3, Dow, which has a viscosity of 3 cps for 2% aqueous solutions, a methoxy content of 19–24% and a hydroxypropoxy content of 4–13%), and from about 6 to 8 percent film coating.

The film coating is comprised of 80 to 90 percent of ethyl cellulose, NF and 10 to 20 percent hydroxypropylmethylcellulose (2910), USP on a weight/weight basis. Preferably the ethyl cellulose has a ethoxy content of 44.0–51% and a viscosity of 50 cps for a 5% aqueous solution and the hydroxypropylmethylcellulose is USP 2910 having a viscosity of 6 cps at 2% aqueous solution with a methoxy content of 28–30% and a hydroxypropoxy content of 7–12%. The ethyl cellulose used herein is Aqualon HG 2834.

Other equivalents of the hydroxypropylmethylcelluloses 2208 and 2910 USP and ethyl cellulose, NF, having the same chemical and physical characteristics as the proprietary products named above may be substituted in the formulation without changing the inventive concept. Important characteristics of suitable hydroxypropylmethylcelluloses include a low viscosity, preferably less than 10 cps and more preferably 2–5 cps, and a gel temperature above that of the temperature of the extrudate during extrusion. As explained below, these and other characteristics which enable the extrudate to remain moist and soft (pliable) are preferred for the hydroxypropylmethylcellulose. In the examples below, the extrudate temperature was generally 50–55° C.

It was completely unexpected that an extended release formulation containing venlafaxine hydrochloride could be obtained because the hydrochloride of venlafaxine proved to be extremely water soluble. Numerous attempts to produce extended release tablets by hydrogel technology proved to be fruitless because the compressed tablets were either physically unstable (poor compressibility or capping problems) or dissolved too rapidly in dissolution studies. Typically, the tablets prepared as hydrogel sustained release formulations gave 40–50% dissolution at 2 hrs, 60–70% dissolution at 4 hrs and 85–100% dissolution at 8 hrs.

Numerous spheroid formulations were prepared using different grades of microcrystalline cellulose and hydroxypropylmethylcellulose, different ratios of venlafaxine hydrochloride and filler, different binders such as polyinylpyrrolidone, methylcellulose, water, and polyethylene glycol of different molecular weight ranges in order to find a formulation which would provide a suitable granulation mix which could be extruded properly. In the extrusion process, heat buildup occurred which dried out the extrudate so much that it was difficult to convert the extruded cylinders into spheroids. Addition of hydroxypropylmethylcellulose 2208 -to the venlafaxine hydrochloride-microcrystalline cellulose mix made production of spheroids practical.

The encapsulated formulations of this invention may be produced in a uniform dosage for a specified dissolution profile upon oral administration by techniques understood in the art. For instance, the spheroid components may be blended for uniformity with a desired concentration of active ingredient, then spheronized and dried. The resulting spheroids can then be sifted through a mesh of appropriate pore size to obtain a spheroid batch of uniform and prescribed size.

The resulting spheroids can be coated and resifted to remove any agglomerates produced in the coating steps. During the coating process samples of the coated spheroids may be tested for their distribution profile. If the dissolution occurs too rapidly, additional coating may be applied until the spheroids present a desired dissolution rate.

The following examples are presented to illustrate applicant's solution to the problem of preparation of the extended release drug containing formulations of this invention.

EXAMPLE NO. 1

Venlafaxine Hydrochloride Extended Release Capsules

A mixture of 44.8 parts ( 88.4% free base) of venlafaxine hydrochloride, 74.6 parts of the microcrystalline cellulose, NF, and 0.60 parts of hydroxypropylmethyl cellulose 2208, USP, are blended with the addition of 41.0 parts water. The plastic mass of material is extruded, spheronized and dried to provide uncoated drug containing spheroids.

Stir 38.25 parts of ethyl cellulose, NF, HG2834 and 6.75 parts of hydroxypropylmethylcellulose 2910, USP in a 1:1 v/v mixture of methylene chloride and anhydrous methanol until solution of the film coating material is complete.

To a fluidized bed of the uncoated spheroids is applied 0.667 parts of coating solution per part of uncoated spheroids to obtain extended release, film coated spheroids having a coating level of 3%.

The spheroids are sieved to retain the coated spheroids of a particle size between 0.85 mm to 1.76 mm diameter. These selected film coated spheroids are filled into pharmaceutically acceptable capsules conventionally, such as starch or gelatin capsules.

EXAMPLE NO. 2

Same as for Example 1 except that 1.11 parts of the film coating solution per part of uncoated spheroids is applied to obtain a coating level of 5%.

EXAMPLE NO. 3

Same as for Example 1 except that 1.33 parts of the film coating solution is applied to 1 part of uncoated spheroids to obtain a coating level of 6%.

EXAMPLE NO. 4

Same as for Example 1 except that 1.55 parts of the film coating solution is applied to 1 part of uncoated spheroids to obtain a coating level of 7%.

In the foregoing failed experiments and in Examples 1–4, the extrusion was carried out on an Alexanderwerk extruder. Subsequent experiments carried out on Hutt and Nica extruders surprisingly demonstrated that acceptable, and even improved, spheroids could be made without the use of an hydroxypropylmethylcellulose.

In such fierier experiments the applicability of the invention was extended to formulations wherein the weight percentage of venlafaxine hydrochloride is 6% to 40%, preferably 8% to 35%. Thus, the extended release spheroid formulations of this invention comprise from about 6 to about 40 percent venlafaxine hydrochloride, from about 50 to about 94 percent microcrystalline cellulose, NF, optionally, from about 0.25 to about 1 percent hydroxypropylmethylcellulose, and from about 2 to about 12 percent, preferably about 3 to 9 percent, film coating.

Spheroids of the invention were produced having 8.25% (w/w) venlafaxine hydrochloride and the remainder (91.75%, w/w) being microcrystalline cellulose, with a coating of from 3 to 5% (w/w), preferably 4%, of the total weight. The spheroids with 8.25% venlafaxine hydrochloride and 4% coating were filled into No. 2 white opaque shells with a target fill weight of 236 mg.

Further spheroids of the invention were produced having 16.5% (w/w) venlafaxine hydrochloride and the remainder (83.5%,w/w) being microcrystalline cellulose, with a coating of from 4 to 6% (w/w), preferably 5%, of the total weight. The spheroids 16.5% venlafaxine hydrochloride and 5% coating were filled into No. 2 white opaque shells with a target fill weight of 122 mg.

The test for acceptability of the coating level is determined by analysis of the dissolution rate of the finished coated spheroids prior the encapsulation. The dissolution procedure followed uses USP Apparatus 1 (basket) at 100 rpm in purified water at 37° C.

Conformance with the dissolution rate given in Table 1 provides the twenty-four hour therapeutic blood levels for the drug component of the extended release capsules of this invention in capsule form. Where a given batch of coated spheroids releases drug too slowly to comply with the desired dissolution rate study, a portion of uncoated spheroids or spheroids with a lower coating level may be added to the batch to provide, after thorough mixing, a loading dose for rapid increase of blood drug levels. A batch of coated spheroids that releases the drug too rapidly can receive additional film-coating to give the desired dissolution profile.

TABLE 1

Acceptable Coated Spheroid Dissolution Rates

| Time (hours) | Average % Venlafaxine HCl released |
|---|---|
| 2 | <30 |
| 4 | 30–55 |
| 8 | 55–80 |
| 12 | 65–90 |
| 24 | >30 |

Batches of the coated venlafaxine hydrochloride containing spheroids which have a dissolution rate corresponding to that of Table 1 are filled into pharmaceutically acceptable capsules in an amount needed to provide the unit dosage level desired. The standard unit dosage immediate release (IR) tablet used presently provides amounts of venlafaxine hydrochloride equivalent to 25 mg, 37.5 mg, 50 mg, 75 mg and 100 mg venlafaxine. The capsules of this invention are

filled to provide an amount of venlafaxine hydrochloride equivalent to that presently used in tablet form and also up to about 150 mg venlafaxine hydrochloride.

Dissolution of the venlafaxine hydrochloride ER capsules is determined as directed in the U.S. Pharmacopoeia (JSP) using apparatus 1 at 100 rpm on 0.9 L of water. A filtered sample of the dissolution medium is taken at the times specified. The absorbance of the clear solution is determined from 240 to 450 nanometers (nm) against the dissolution medium. A baseline is drawn from 450 am through 400 nm and extended to 240 nm. The absorbance at the wavelength of maximum absorbance (about 274 mm) is determined with respect to this baseline. Six hard gelatin capsules are filled with the theoretical amount of venlafaxine hydrochloride spheroids and measured for dissolution. Standard samples consist of venlafaxine hydrochloride standard solutions plus a gelatin capsule correction solution.

The percentage of venlafaxine released is determined from the equation

$$\% \text{ Venlafaxine hydrochloride released} = \frac{(As)(Wr)(S)(V1)(0.888)(100)}{(Ar)(V2)(C)}$$

where As is absorbance of sample preparation, Wr is weight of reference standard, mg; S is strength of the reference standard, decimal; V1 is the volume of dissolution medium used to dissolve the dosage form, mL; 0.884 is the percent free base, Ar is the absorbance of the standard preparation, V2 is the volume of reference standard solution, mL; and C is the capsule claim in mg.

Table 2 shows the plasma level of venlafaxine versus time for one 75 mg conventional Immediate Release (IR) tablet administered every 12 hours, two 75 mg extended release (ER) capsules administered simultaneously every 24 hours, and one 150 mg extended release (ER) capsule administered once every 24 hours in human male subjects. The subjects were already receiving venlafaxine hydrochloride according to the dosage protocol, thus the plasma blood level at zero time when dosages were administered is not zero.

TABLE 2

Plasma venlafaxine level (ng/mL) versus time, conventional tablet (not extended release) versus ER causule

| Time (hours) | 75 mg (IR) tablet (q 12 h) | 2 × 75 mg (ER) capsules (q 24 hr) | 1 × 150 mg (ER) capsules (q 24 h) |
|---|---|---|---|
| 0 | 62.3 | 55.0 | 55.8 |
| 0.5 | 76.3 | | |
| 1 | 135.6 | 53.3 | 53.2 |
| 2 | 212.1 | 69.8 | 70.9 |
| 4 | 162.0 | 138.6 | 133.3 |
| 6 | 114.6 | 149.0 | 143.5 |
| 8 | 86.7 | 129.3 | 129.5 |
| 10 | | 118.4 | 114.4 |
| 12 | 51.9 | 105.1 | 105.8 |
| 12.5 | 74.7 | | |
| 13 | 127.5 | | |
| 14 | 161.3 | 90.5 | 91.3 |
| 16 | 134.6 | 78.2 | 78.5 |
| 18 | 106.2 | | |
| 20 | 83.6 | 62.7 | 63.3 |
| 24 | 57.6 | 56.0 | 57.3 |

Table 2 shows that the plasma levels of two 75 mg/capsule venlafaxine hydrochloride ER capsules and one 150 mg/capsule venlafaxine hydrochloride ER capsule provide very similar blood levels. The data also show that the plasma level after 24 hours for either extended release regimen is very similar to that provided by two immediate release 75 mg tablets of venlafaxine hydrochloride administered at 12 hour intervals.

Further, the plasma levels of venlafaxine obtained with the extended release formulation do not increase to the peak levels obtained with the conventional immediate release tablets given 12 hours apart. The peak level of venlafaxine from (ER), somewhat below 150 ng/ml, is reached in about six hours, plus or minus two hours, based upon this specific dose when administered to patients presently under treatment with venlafaxine hydrochloride (IR). The peak plasma level of venlafaxine, somewhat over 200 ng/ml, following administration of (IR) is reached in two hours and falls rapidly thereafter.

Table 3 shows venlafaxine blood plasma levels in male human subjects having a zero initial blood plasma level. Again, a peak blood plasma concentration of venlafaxine is seen at about 6 hours after dosing with venlafaxine hydrochloride extended release capsules in the quantities indicated The subjects receiving the single 50 mg immediate release tablet showed a peak plasma level occurring at about 4 hours. For comparative purposes, the plasma levels of venlafaxine for subjects receiving the conventional formulated tablet can be multiplied by a factor of three to approximate the plasma levels expected for a single dose of 150 mg. conventional formulation.

TABLE 3

Plasma Blood Levels in Human Males Having No Prior Venlafaxine Blood Level

| Time (Hours) | 1 × 50 mg IR tablet | 2 × 75 mg ER capsules | 1 × 150 mg ER capsule |
|---|---|---|---|
| 0 | 0 | 0 | 0 |
| 1 | 27.87 | 1:3 | 0 |
| 1.5 | 44.12 | 6.0 | 2.2 |
| 2 | 54.83 | 20.6 | 12.8 |
| 4 | 66.38 | 77.0 | 81.0 |
| 6 | 49.36 | 96.5 | 94.4 |
| 8 | 30.06 | 93.3 | 86.9 |
| 10 | 21.84 | 73.2 | 72.8 |
| 12 | 15.91 | 61.3 | 61.4 |
| 14 | 13.73 | 52.9 | 51.9 |
| 16 | 10.67 | 47.5 | 41.1 |
| 20 | 5.52 | 35.2 | 34.0 |
| 24 | 3.56 | 29.3 | 28.5 |
| 28 | 2.53 | 23.4 | 22.9 |
| 36 | 1.44 | 11.9 | 13.5 |
| 48 | 0.66 | 5.8 | 5.2 |

The blood plasma levels of venlafaxine were measured according to the following procedure. Blood samples from the subjects were collected in heparinized evacuated blood tubes and the tubes were inverted gently several times. As quickly as possible, the tubes were centrifuged at 2500 rpm for 15 minutes. The plasma was pipetted into plastic tubes and stored at −20° C. until analysis could be completed.

To 1 mL of each plasma sample in a plastic tube was added 150 μL of a stock internal standard solution (150 μg/ml). Saturated sodium borate (0.2 mL) solution was added to each tube and vortexed. Five mL of ethyl ether was added to each tube which were then capped and shaken for 10 minutes at high speed. The tubes were centrifuged at 3000 rpm for 5 minutes. The aqueous layer was frozen in dry ice and the organic layer transferred to a clean screw cap tube. A 0.3 ml portion of 0.01 N HCl solution was added to each tube and shaken for 10 minutes at high speed. The aqueous layer was frozen and the organic layer removed and discarded. A 50 μL portion of the mobile phase (23:77 acetonitrile:0.1M monobasic ammonium phosphate buffer, pH 4.4) was added to each tube, vortexed, and 50 μL samples were injected on a Superco Supercoil LC-8-DB, 5 cm×4.6 mm, 5 μ column in a high pressure liquid chromatography apparatus equipped with a Waters Lambda Max 481 detector or equivalent at 229 nm. Solutions of venlafaxine hydrochloride at various concentrations were used as standards.

EXAMPLE NO. 5

Manufactured by the techniques described herein, another preferred formulation of this invention comprises spheroids of from about 30% to about 35% venlafaxine hydrochloride and from about 0.3% to about 0.6% hydroxypropylmethylcellulose. These spheroids are then coated with a film coating, as described above, to a coating level of from about 5% to about 9%, preferably from about 6% to about 8%. A specific formulation of this type comprises spheroids of about 33% venlafaxine hydrochloride and about 0.5% hydroxypropylmethylcellulose, with a film coating of about 7%.

Lower dosage compositions or formulations of this invention may also be produced by the techniques described herein. These lower dosage forms may be administered alone for initial titration or initiation of treatment, prior to a dosage increase. They may also be used for an overall low-dose administration regimen or in combination with higher dosage compositions, such as capsule formulations, to optimize individual dosage regimens.

These lower dose compositions may be used to create encapsulated formulations, such as those containing doses of venlafaxine hydrochloride from about 5 mg to about 50 mg per capsule. Particular final encapsulated dosage forms may include, but are not limited to, individual doses of 7.5 mg, 12.5 mg, 18.75 mg, or 28.125 mg of venlafaxine HCl per capsule.

The spheroids useful in these lower dose formulations may comprise from about 5% to about 29.99% venlafaxine HCl, preferably from about 5% to about 25%, from about 75% to about 95% microcrystalline cellulose, and, optionally from about 0.25% to about 1.0% hydroxypropylmethylcellulose. The spheroids may be coated as described above, preferably with a film coating of from about 5% to about 10% by weight. In some preferred formulations, the spheroids comprise the cited venlafaxine HCl and microcrystalline cellulose, with no hydroxypropylmethyl cellulose.

EXAMPLE NO. 6

Spheroids comprising 16.5% venlafaxine HCl and 83.5% microcrystalline cellulose were mixed with approximately 50% water (w/w) to granulate in a Littleford Blender Model FM-50E/1Z (Littleford Day Inc., P.O. Box 128, Florence, Kent. 41022-0218, U.S.A.) at a fixed speed of 180 rpm. The blended material was extruded through a 1.25 mm screen using a Nica extruder/spheronization machine (Aeromatic-Fielder Division, Niro Inc., 9165 Rumsey Rd., Columbia, Md. 21045, U.S.A.) for a 12/20 mesh cut after drying. Two portions of the resulting spheroids were coated with a 5% and 7% coating level, respectively, by techniques described above using the coating formulation:

| Ingredient | % (w/w) |
|---|---|
| Methylene Chloride | 60.000 |
| Methanol Anhydrous | 35.500 |
| Ethylcellulose, NF, HG 2834, 50 cps | 3.825 |
| Hydroxypropyl Methylcelluose, 2910 USP, 6 cps | 0.675 |

The 5% and 7% coated lots were tested for dissolution on a Hewlett Packard automated dissolution system over a 24 hour period, resulting in the following dissolution patterns:

| Time/hr | % Dissoluded 16.5%/5% | % Dissolved 16.5%/7% |
|---|---|---|
| 2 | 12.4 | 5.6 |
| 4 | 42.8 | 25.4 |
| 8 | 70.7 | 60.4 |
| 12 | 82.2 | 75.4 |
| 24 | 94.3 | 92.7 |

EXAMPLE NO. 7

A formulation of spheroids containing 8.25% venlafaxine HCl and 91.75% microcrystalline cellulose was prepared according to the techniques of Example No. 6 and coated with a 5% film coating. In the Hewlett Packard automated dissolution system these spheroids provided the following dissolution profile:

| Time/hr | % Dissolved 8.25%/5% |
|---|---|
| 2 | 4.4 |
| 4 | 24.2 |
| 8 | 62.9 |
| 12 | 77.8 |
| 24 | 93.5 |

Thus, the desired dissolution rates of sustained release dosage forms of venlafaxine hydrochloride, impossible to achieve with hydrogel tablet technology, has been achieved with the film-coated spheroid compositions of this invention.

What is claimed is:

1. A method for providing therapeutic blood plasma concentration of venlafaxine over a twenty four hour period with diminished incidence of nausea and emesis which comprises administering orally to a patient in need thereof, an extended release formulation that provides peak blood plasma levels of venlafaxine of no more than about 150 ng/ml, said formulation containing venlafaxine hydrochloride as the active ingredient.

2. The method of claim 1 wherein the extended release formulation is encapsulated.

3. The method of claim 1 wherein the extended release formulation comprises venlafaxine hydrochloride in spheroids comprised of venlafaxine hydrochloride, microcrystalline cellulose and optionally, hydroxypropylmethylcellulose.

4. The method of claim 3 wherein the spheroids are comprised of from about 6% to about 40% venlafaxine hydrochloride by weight, about 50% to about 94% microcrystalline cellulose by weight, and optionally from about 0.25% to about 1% by weight of hydroxypropylmethylcellulose.

5. The method of claim 3 wherein the spheroids are coated with from about 2% to about 12% of total formulation weight of film coating comprised of from about 80% to about 90% by weight of film coating of ethyl cellulose, NF, and from about 10% to about 20% by weight of film coating of hydroxypropylmethylcellulose, USP.

6. The method of claim 5 wherein the spheroids are comprised of about 30% to 40% venlafaxine hydrochloride by weight, about 50% to about 70% microcrystalline cellulose, NF, by weight, and, optionally, from about 0.25% to about 1% by weight of hydroxypropylmethylcellulose, USP.

7. The method of claim 6 wherein the spheroids are coated with from about 2% to about 12% of total formulation weight of film coating comprised of from about 80% to about 90% by weight of film coating of ethyl cellulose, NF, and from about 10% to about 20% by weight of film coating of hydroxypropylmethylcellulose, USP.

8. The method of claim 3 wherein the spheroids are coated with from about 6% to about 30% venlafaxine hydrochloride by weight, about 70.1 % to about 94% microcrystalline cellulose, NF, by weight and, optionally, from about 0.25% to about 1% by weight of hydroxypropylmethylcellulose.

9. The method of claim 8 wherein the spheroids are coated with from about 2% to about 12% of total weight of film coating comprised of from about 80% to about 90% by weight of film coating of ethyl cellulose, NF, and from about 10% to about 20% by weight of film coating of hydroxypropylmethylcellulose, USP.

10. The method of claim 3 wherein the spheroids are coated with from about 5% to about 25% venlafaxine hydrochloride and from about 95% to about 75% microcrystalline cellulose, with an optional amount of from 0.25% to about 1% by weight of hydroxypropylmethylcellulose.

11. The method of claim 3 wherein the spheroids are coated with from about 6% to about 25% venlafaxine hydrochloride and from about 94% to about 75% microcrystalline cellulose, with an optional amount of from 0.25% to about 1% by weight of hydroxypropylmethylcellulose.

12. The method of claim 11 wherein the spheroids are comprised of about 6% to about 20% venlafaxine hydrochloride and from about 94% to about 80% microcrystalline cellulose, with an optional amount of from 0.25% to about 1% by weight of hydroxypropylmethylcellulose.

13. The method of claim 1 wherein the extended release formulation comprising venlafaxine hydrochloride in a spheroid.

14. The method of claim 1 wherein the extended release formulation comprises venlafaxine hydrochloride in an encapsulated spheroid.

* * * * *

# EXHIBIT 3



U 1071356
THE UNITED STATES OF AMERICA
TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

September 27, 2003

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *6,419,958*
ISSUE DATE: *July 16, 2002*

By Authority of the
COMMISSIONER OF PATENTS AND TRADEMARKS

N. WILLIAMS
Certifying Officer

US006419958B2

(12) **United States Patent**
**Sherman et al.**

(10) **Patent No.: US 6,419,958 B2**
(45) **Date of Patent: *Jul. 16, 2002**

(54) **EXTENDED RELEASE FORMULATION OF VENLAFAXINE HYDROCHLORIDE**

(75) Inventors: **Deborah M. Sherman**, Plattsburgh; **John C. Clark**, Peru, both of NY (US); **John U. Lamer**, St. Albans, VT (US); **Steven A. White**, Champlain, NY (US)

(73) Assignee: **Wyeth**, Madison, NJ (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/884,412**

(22) Filed: **Jun. 19, 2001**

**Related U.S. Application Data**

(60) Division of application No. 09/488,629, filed on Jan. 20, 2000, now Pat. No. 6,274,171, which is a continuation-in-part of application No. 08/964,328, filed on Nov. 5, 1997, now abandoned, which is a continuation-in-part of application No. 08/821,137, filed on Mar. 20, 1997, now abandoned.

(60) Provisional application No. 60/014,006, filed on Mar. 25, 1996.

(51) **Int. Cl.**[7] .................................................. **A61K 9/14**

(52) **U.S. Cl.** ....................................... **424/489**; 424/457

(58) **Field of Search** ................................ 424/495, 494, 424/461, 458, 459, 457, 456, 462, 489

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,954,959 A 5/1976 Pedersen
4,138,475 A * 2/1979 McAinsh et al. ............. 424/19
4,369,172 A 1/1983 Schor et al.
4,389,393 A 6/1983 Schor et al.
4,535,186 A 8/1985 Husbands et al.
4,966,768 A 10/1990 Michelucci et al.
5,506,270 A 4/1996 Upton et al.
5,552,429 A * 9/1996 Wong et al. ................ 514/415
6,274,171 B1 * 8/2001 Sherman et al. ........... 424/461

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0654264 | 11/1994 |
| EP | 0667150 | 1/1995 |
| EP | 0797991 | 10/1997 |
| WO | 9427589 | 12/1994 |
| WO | 9737640 | 10/1997 |

* cited by examiner

*Primary Examiner*—James M. Spear
(74) *Attorney, Agent, or Firm*—Rebecca R. Barrett

(57) **ABSTRACT**

This invention relates to a 24 hour extended release dosage formulation and unit dosage form thereof of venlafaxine hydrochloride, an antidepressant, which provides better control of blood plasma levels than conventional tablet formulations which must be administered two or more times a day and further provides a lower incidence of nausea and vomiting than the conventional tablets. More particularly, the invention comprises an extended release formulation of venlafaxine hydrochloride comprising a therapeutically effective amount of venlafaxine hydrochloride in spheroids comprised of venlafaxine hydrochloride, microcrystalline cellulose and, optionally, hydroxypropylmethylcellulose coated with a mixture of ethyl cellulose and hydroxypropylmethylcellulose.

**6 Claims, No Drawings**

## EXTENDED RELEASE FORMULATION OF VENLAFAXINE HYDROCHLORIDE

This application is a divisional application of Ser. No. 09/488,629, filed Jan. 20, 2000 U.S. Pat. No. 6,274,171 which is a continuation-in-part of application Ser. No. 08/964,328, filed Nov. 5, 1997, now abandoned, which is a continuation-in-part of application Ser. No. 08/821,137, filed Mar. 20, 1997, now abandoned, which claims priority from Provisional Application No. 60/014,006 filed Mar. 25, 1996.

### BACKGROUND OF THE INVENTION

Extended release drug formulations are conventionally produced as compressed tablets by hydrogel tablet technology. To produce these sustained release tablet drug dosage forms, the active ingredient is conventionally compounded with cellulose ethers such as methyl cellulose, ethyl cellulose or hydroxypropylmethylcellulose with or without other excipients and the resulting mixture is pressed into tablets. When the tablets are orally administered, the cellulose ethers in the tablets swell upon hydration from moisture in the digestive system, thereby limiting exposure of the active ingredient to moisture. As the cellulose ethers are gradually leached away by moisture, water more deeply penetrates the gel matrix and the active ingredient slowly dissolves and diffuses through the gel, making it available for absorption by the body. An example of such a sustained release dosage form of the analgesic/anti-inflammatory drug etodolac (Lodine®) appears in U.S. Pat. No. 4,966,768. U.S. Pat. No. 4,389,393 discloses sustained release therapeutic compressed solid unit dose forms of an active ingredient plus a carrier base comprised of a high molecular weight hydroxypropylmethylcellulose, methyl cellulose, sodium carboxymethylcellulose and or other cellulose ether.

Where the production of tablets is not feasible, it is conventional in the drug industry to prepare encapsulated drug formulations which provide extended or sustained release properties. In this situation, the extended release capsule dosage forms may be formulated by mixing the drug with one or more binding agents to form a uniform mixture which is then moistened with water or a solvent such as ethanol to form an extrudable plastic mass from which small diameter, typically 1 mm, cylinders of drug/matrix are extruded, broken into appropriate lengths and transformed into spheroids using standard spheronization equipment. The spheroids, after drying, may then be film-coated to retard dissolution. The film-coated spheroids may then be placed in pharmaceutically acceptable capsules, such as starch or gelatin capsules, in the quantity needed to obtain the desired therapeutic effect. Spheroids releasing the drug at different rates may be combined in a capsule to obtain desired release rates and blood levels. U.S. Pat. No. 4,138,475 discloses a sustained release pharmaceutical composition consisting of a hard gelatin capsule filled with film-coated spheroids comprised of propanolol in admixture with microcrystalline cellulose wherein the film coating is composed of ethyl cellulose, optionally, with hydroxypropylmethylcellulose and/or a plasticizer.

Venlafaxine, 1-[2-(dimethylamino)-1-(4-methoxyphenyl) ethyl]cyclohexanol, is an important drug in the neuropharmacological arsenal used for treatment of depression. Venlafaxine and the acid addition salts thereof are disclosed in U.S. Pat. No. 4,535,186. Venlafaxine hydrochloride is presently administered to adults in compressed tablet form in doses ranging from 75 to 350 mg/day, in divided doses two

or three times a day. In therapeutic dosing with venlafaxine hydrochloride tablets, rapid dissolution results in a rapid increase in blood plasma levels of the active compound shortly after administration followed by a decrease in blood plasma levels over several hours as the active compound is eliminated or metabolized, until sub-therapeutic plasma levels are approached after about twelve hours following administration, thus requiring additional dosing with the drug. With the plural daily dosing regimen, the most common side effect is nausea, experienced by about forty five percent of patients under treatment with venlafaxine hydrochloride. Vomiting also occurs in about seventeen percent of the patients.

### BRIEF DESCRIPTION OF THE INVENTION

In accordance with this invention, there is provided an extended release (ER), encapsulated formulation containing venlafaxine hydrochloride as the active drug component, which provides in a single dose, a therapeutic blood serum level over a twenty four hour period.

Through administration of the venlafaxine formulation of this invention, there is provided a method for obtaining a flattened drug plasma concentration to time profile, thereby affording a tighter plasma therapeutic range control than can be obtained with multiple daily dosing. In other words, this invention provides a method for eliminating the sharp peaks and troughs (hills and valleys) in blood plasma drug levels induced by multiple daily dosing with conventional immediate release venlafaxine hydrochloride tablets. In essence, the plasma levels of venlafaxine hydrochloride rise, after administration of the extended release formulations of this invention, for between about five to about eight hours (optimally about six hours) and then begin to fall through a protracted, substantially linear decrease from the peak plasma level for the remainder of the twenty four hour period, maintaining at least a threshold therapeutic level of the drug during the entire twenty-four period. In contrast, the conventional immediate release venlafaxine hydrochloride tablets give peak blood plasma levels in 2 to 4 hours. Hence, in accordance with the use aspect of this invention, there is provided a method for moderating the plural blood plasma peaks and valleys attending the pharmacokinetic utilization of multiple daily tablet dosing with venlafaxine hydrochloride which comprises administering to a patient in need of treatment with venlafaxine hydrochloride, a one-a-day, extended release formulation of venlafaxine hydrochloride.

The use of the one-a-day venlafaxine hydrochloride formulations of this invention reduces by adaptation, the level of nausea and incidence of emesis that attend the administration of multiple daily dosing. In clinical trials of venlafaxine hydrochloride ER, the probability of developing nausea in the course of the trials was greatly reduced after the first week. Venlafaxine ER showed a statistically significant improvement over conventional venlafaxine hydrochloride tablets in two eight-week and one 12 week clinical studies. Thus, in accordance with this use aspect of the invention there is provided a method for reducing the level of nausea and incidence of emesis attending the administration of venlafaxine hydrochloride which comprises dosing a patient in need of treatment with venlafaxine hydrochloride with an extended release formulation of venlafaxine hydrochloride once a day in a therapeutically effective amount.

The formulations of this invention comprise an extended release formulation of venlafaxine hydrochloride comprising a therapeutically effective amount of venlafaxine hydro-

chloride in spheroids comprised of venlafaxine hydrochloride, microcrystalline cellulose and, optionally, hydroxypropylmethylcellulose coated with a mixture of ethyl cellulose and hydroxypropylmethylcellulose. Unless otherwise noted, the percentage compositions mentioned herein refer to percentages of the total weight of the final composition or formulation.

More particularly, the extended release formulations of this invention are those above wherein the spheroids are comprised of from about 6% to about 40% venlafaxine hydrochloride by weight, about 50% to about 95% microcrystalline cellulose, NF, by weight, and, optionally, from about 0.25% to about 1% by weight of hydroxypropylmethylcellulose, USP, and coated with from about 2% to about 12% of total weight of film coating comprised of from about 80% to about 90% by weight of film coating of ethyl cellulose, NF, and from about 10% to about 20% by weight of film coating of hydroxypropylmethylcellulose, USP.

A preferred embodiment of this invention are formulations wherein the spheroids are comprised of about 30% to about 40% venlafaxine hydrochloride by weight, about 50% to about 70% microcrystalline cellulose, NF, by weight, and, optionally, from about 0.25% to about 1% by weight of hydroxypropylmethylcellulose, USP, and coated with from about 2% to about 12% of total weight of film coating comprised of from about 80% to about 90% by weight of film coating of ethyl cellulose, NF, and from about 10% to about 20% by weight of film coating of hydroxypropylmethylcellulose, USP.

Another preferred lower dose formulation of this invention are those wherein the spheroids are comprised less than 30% venlafaxine hydrochloride. These formulations comprise spheroids of from about 6% to about 30% venlafaxine hydrochloride by weight, about 70% to about 94% microcrystalline cellulose, NF, by weight, and, optionally, from about 0.25% to about 1% by weight of hydroxypropylmethylcellulose, USP, and coated with from about 2% to about 12% of total weight of film coating comprised of from about 80% to about 90% by weight of film coating of ethyl cellulose, NF, and from about 10% to about 20% by weight of film coating of hydroxypropylmethylcellulose, USP.

Within this subgroup of lower dose formulations are formulations in which the spheroids are comprised of from about 6% to about 25% venlafaxine hydrochloride and from about 94% to about 75% microcrystalline cellulose, with an optional amount of from 0.25% to about 1% by weight of hydroxypropylmethylcellulose. Another preferred subgroup of spheroids in these formulations comprises from about 6% to about 25% venlafaxine hydrochloride and from about 94% to about 75% microcrystalline cellulose, with an optional amount of from 0.25% to about 1% by weight of hydroxypropylmethylcellulose. A further preferred subgroup of spheroids in these formulations comprises from about 6% to about 20% venlafaxine hydrochloride and from about 94% to about 80% microcrystalline cellulose, with an optional amount of from 0.25% to about 1% by weight of hydroxypropylmethylcellulose. Within each of these subgroups is understood to be formulations in which the spheroids are comprised of venlafaxine HCl and microcrystalline cellulose in the amounts indicated, with no hydroxypropylmethylcellulose present. Each of these formulations is also preferably contained in a gelatin capsule, preferably a hard gelatin capsule.

## DETAILED DESCRIPTION OF THE INVENTION

1-[2-(dimethylamino)-1-(4-methoxyphenyl)ethyl] cyclohexanol hydrochloride is polymorphic. Of the forms isolated and characterized to date, Form I is considered to be the kinetic product of crystallization which can be converted to Form II upon heating in the crystallization solvent. Forms I and II cannot be distinguished by their melting points but do exhibit some differences in their infrared spectra and X-ray diffraction patterns. Any of the polymorphic forms such as Form I or Form II may be used in the formulations of the present invention.

The extended release formulations of this invention are comprised of 1-[2-(dimethylamino)-1-(4-methoxyphenyl) ethyl] cyclohexanol hydrochloride in admixture with microcrystalline cellulose and hydroxypropylmethylcellulose. Formed as beads or spheroids, the drug containing formulation is coated with a mixture of ethyl cellulose and hydroxypropylmethyl cellulose to provide the desired level of coating, generally from about two to about twelve percent on a weight/weight basis of final product or more preferably from about five to about ten percent (w/w), with best results obtained at from about 6 to about 8 percent (w/w). More specifically, the extended release spheroid formulations of this invention comprise from about 30 to 40 percent venlafaxine hydrochloride, from about 50 to about 70 percent microcrystalline cellulose, NF, from about 0.25 to about 1 percent hydroxypropylmethylcellulose, USP, and from about 5 to about 10 percent film coating, all on a weight/weight basis. And preferably, the spheroid formulations contain about 35 percent venlafaxine hydrochloride, about 55 to 60 percent microcrystalline cellulose NF (Avicel® PH101), about one half percent hydroxypropylmethylcellulose 2208 USP (K3, Dow, which has a viscosity of 3 cps for 2% aqueous solutions, a methoxy content of 19–24% and a hydroxypropoxy content of 4–13%), and from about 6 to 8 percent film coating.

The film coating is comprised of 80 to 90 percent of ethyl cellulose, NF and 10 to 20 percent hydroxypropylmethylcellulose (2910), USP on a weight/weight basis. Preferably the ethyl cellulose has a ethoxy content of 44.0–51% and a viscosity of 50 cps for a 5% aqueous solution and the hydroxypropylmethylcellulose is USP 2910 having a viscosity of 6 cps at 2% aqueous solution with a methoxy content of 28–30% and a hydroxypropoxy content of 7–12%. The ethyl cellulose used herein is Aqualon HG 2834.

Other equivalents of the hydroxypropylmethylcelluloses 2208 and 2910 USP and ethyl cellulose, NF, having the same chemical and physical characteristics as the proprietary products named above may be substituted in the formulation without changing the inventive concept. Important characteristics of suitable hydroxypropylmethylcelluloses include a low viscosity, preferably less than 10 cps and more preferably 2–5 cps, and a gel temperature above that of the temperature of the extrudate during extrusion. As explained below, these and other characteristics which enable the extrudate to remain moist and soft (pliable) are preferred for the hydroxypropylmethylcellulose. In the examples below, the extrudate temperature was generally 50–55° C.

It was completely unexpected that an extended release formulation containing venlafaxine hydrochloride could be obtained because the hydrochloride of venlafaxine proved to be extremely water soluble. Numerous attempts to produce extended release tablets by hydrogel technology proved to be fruitless because the compressed tablets were either physically unstable (poor compressibility or capping problems) or dissolved too rapidly in dissolution studies. Typically, the tablets prepared as hydrogel sustained release formulations gave 40–50% dissolution at 2 hrs, 60–70% dissolution at 4 hrs and 85–100% dissolution at 8 hrs.

Numerous spheroid formulations were prepared using different grades of microcrystalline cellulose and hydroxypropylmethylcellulose, different ratios of venlafaxine hydrochloride and filler, different binders such as polyvinylpyrrolidone, methylcellulose, water, and polyethylene glycol of different molecular weight ranges in order to find a formulation which would provide a suitable granulation mix which could be extruded properly. In the extrusion process, heat buildup occurred which dried out the extrudate so much that it was difficult to convert the extruded cylinders into spheroids. Addition of hydroxypropylmethylcellulose 2208 to the venlafaxine hydrochloride-microcrystalline cellulose mix made production of spheroids practical.

The encapsulated formulations of this invention may be produced in a uniform dosage for a specified dissolution profile upon oral administration by techniques understood in the art. For instance, the spheroid components may be blended for uniformity with a desired concentration of active ingredient, then spheronized and dried. The resulting spheroids can then be sifted through a mesh of appropriate pore size to obtain a spheroid batch of uniform and prescribed size.

The resulting spheroids can be coated and resifted to remove any agglomerates produced in the coating steps. During the coating process samples of the coated spheroids may be tested for their distribution profile. If the dissolution occurs too rapidly, additional coating may be applied until the spheroids present a desired dissolution rate.

The following examples are presented to illustrate applicant's solution to the problem of preparation of the extended release drug containing formulations of this invention.

EXAMPLE NO. 1

Venlafaxine Hydrochloride Extended Release Capsules

A mixture of 44.8 parts (88.4% free base) of venlafaxine hydrochloride, 74.6 parts of the microcrystalline cellulose, NF, and 0.60 parts of hydroxypropylmethyl cellulose 2208, USP, are blended with the addition of 41.0 parts water. The plastic mass of material is extruded, spheronized and dried to provide uncoated drug containing spheroids.

Stir 38.25 parts of ethyl cellulose, NF, HG2834 and 6.75 parts of hydroxypropylmethylcellulose 2910, USP in a 1:1 v/v mixture of methylene chloride and anhydrous methanol until solution of the film coating material is complete.

To a fluidized bed of the uncoated spheroids is applied 0.667 parts of coating solution per part of uncoated spheroids to obtain extended release, film coated spheroids having a coating level of 3%.

The spheroids are sieved to retain the coated spheroids of a particle size between 0.85 mm to 1.76 mm diameter. These selected film coated spheroids are filled into pharmaceutically acceptable capsules conventionally, such as starch or gelatin capsules.

EXAMPLE NO. 2

Same as for Example 1 except that 1.11 parts of the film coating solution per part of uncoated spheroids is applied to obtain a coating level of 5%.

EXAMPLE NO. 3

Same as for Example 1 except that 1.33 parts of the film coating solution is applied to 1 part of uncoated spheroids to obtain a coating level of 6%.

EXAMPLE NO. 4

Same as for Example 1 except that 1.55 parts of the film coating solution is applied to 1 part of uncoated spheroids to obtain a coating level of 7%.

In the foregoing failed experiments and in Examples 1–4, the extrusion was carried out on an Alexanderwerk extruder. Subsequent experiments carried out on Hutt and Nica extruders surprisingly demonstrated that acceptable, and even improved, spheroids could be made without the use of an hydroxypropylmethylcellulose.

In such further experiments the applicability of the invention was extended to formulations wherein the weight percentage of venlafaxine hydrochloride is 6% to 40%, preferably 8% to 35%. Thus, the extended release spheroid formulations of this invention comprise from about 6 to about 40 percent venlafaxine hydrochloride, from about 50 to about 94 percent microcrystalline cellulose, NF, optionally, from about 0.25 to about 1 percent hydroxypropylmethylcellulose, and from about 2 to about 12 percent, preferably about 3 to 9 percent, film coating.

Spheroids of the invention were produced having 8.25% (w/w) venlafaxine hydrochloride and the remainder (91.75%, w/w) being microcrystalline cellulose, with a coating of from 3 to 5% (w/w), preferably 4%, of the total weight. The spheroids with 8.25% venlafaxine hydrochloride and 4% coating were filled into No. 2 white opaque shells with a target fill weight of 236 mg.

Further spheroids of the invention were produced having 16.5% (w/w) venlafaxine hydrochloride and the remainder (83.5%, w/w) being microcrystalline cellulose, with a coating of from 4 to 6% (w/w), preferably 5%, of the total weight. The spheroids 16.5% venlafaxine hydrochloride and 5% coating were filled into No. 2 white opaque shells with a target fill weight of 122 mg.

The test for acceptability of the coating level is determined by analysis of the dissolution rate of the finished coated spheroids prior the encapsulation. The dissolution procedure followed uses USP Apparatus 1 (basket) at 100 rpm in purified water at 37° C.

Conformance with the dissolution rate given in Table 1 provides the twenty-four hour therapeutic blood levels for the drug component of the extended release capsules of this invention in capsule form. Where a given batch of coated spheroids relases drug too slowly to comply with the desired dissolution rate study, a portion of uncoated spheroids or spheroids with a lower coating level may be added to the batch to provide, after thorough mixing, a loading dose for rapid increase of blood drug level. A batch of coated spheroids that releases the drug too rapidly can receive additional film-coating to give the desired dissolution profile.

TABLE 1

Acceptable Coated Spheroid Dissolution Rates

| Time (hours) | Average % Venlafaxine HCl released |
|---|---|
| 2 | <30 |
| 4 | 30–55 |
| 8 | 55–80 |
| 12 | 65–90 |
| 24 | >80 |

Batches of the coated venlafaxine hydrochloride containing spheroids which have a dissolution rate corresponding to

that of Table 1 are filled into pharmaceutically acceptable capsules in an amount needed to provide the unit dosage level desired. The standard unit dosage immediate release (IR) tablet used presently provides amounts of venlafaxine hydrochloride equivalent to 25 mg, 37.5 mg, 50 mg, 75 mg and 100 mg venlafaxine. The capsules of this invention are filled to provide an amount of venlafaxine hydrochloride equivalent to that presently used in tablet form and also up to about 150 mg venlafaxine hydrochloride.

Dissolution of the venlafaxine hydrochloride ER capsules is determined as directed in the U.S. Pharmacopoeia (USP) using apparatus 1 at 100 rpm on 0.9 L of water. A filtered sample of the dissolution medium is taken at the times specified. The absorbance of the clear solution is determined from 240 to 450 nanometers (nm) against the dissolution medium. A baseline is drawn from 450 nm through 400 nm and extended to 240 nm. The absorbance at the wavelength of maximum absorbance (about 274 nm) is determined with respect to this baseline. Six hard gelatin capsules are filled with the theoretical amount of venlafaxine hydrochloride spheroids and measured for dissolution. Standard samples consist of venlafaxine hydrochloride standard solutions plus a gelatin capsule correction solution.

The percentage of venlafaxine released is determined from the equation

$$\%\ \textit{Venlafaxine hydrochloride released} = \frac{(As)(Wr)(S)(V1)(0.888)(100)}{(Ar)(V2)(C)}$$

where As is absorbance of sample preparation, Wr is weight of reference standard, mg; S is strength of the reference standard, decimal; V1 is the volume of dissolution medium used to dissolve the dosage form, mL; 0.884 is the percent free base, Ar is the absorbance of the standard preparation, V2 is the volume of reference standard solution, mL; and C is the capsule claim in mg.

Table 2 shows the plasma level of venlafaxine versus time for one 75 mg conventional Immediate Release (IR) tablet administered every 12 hours, two 75 mg extended release (ER) capsules administered simultaneously every 24 hours, and one 150 mg extended release (ER) capsule administered once every 24 hours in human male subjects. The subjects were already receiving venlafaxine hydrochloride according to the dosage protocol, thus the plasma blood level at zero time when dosages were administered is not zero.

TABLE 2

Plasma venlafaxine level (ng/mL) versus time, conventional tablet (not extended release) versus ER capsule

| Time (hours) | 75 mg (IR) tablet (q 12h) | 2 × 75 mg (ER) capsules (q 24hr) | 1 × 150 mg (ER) capsules (q 24h) |
|---|---|---|---|
| 0 | 62.3 | 55.0 | 55.8 |
| 0.5 | 76.3 | | |
| 1 | 135.6 | 53.3 | 53.2 |
| 2 | 212.1 | 69.8 | 70.9 |
| 4 | 162.0 | 138.6 | 133.3 |
| 6 | 114.6 | 149.0 | 143.5 |
| 8 | 86.7 | 129.3 | 129.5 |
| 10 | | 118.4 | 114.4 |
| 12 | 51.9 | 105.1 | 105.8 |
| 12.5 | 74.7 | | |
| 13 | 127.5 | | |
| 14 | 161.3 | 90.5 | 91.3 |
| 16 | 134.6 | 78.2 | 78.5 |

TABLE 2-continued

Plasma venlafaxine level (ng/mL) versus time, conventional tablet (not extended release) versus ER capsule

| Time (hours) | 75 mg (IR) tablet (q 12h) | 2 × 75 mg (ER) capsules (q 24hr) | 1 × 150 mg (ER) capsules (q 24h) |
|---|---|---|---|
| 18 | 106.2 | | |
| 20 | 83.6 | 62.7 | 63.3 |
| 24 | 57.6 | 56.0 | 57.3 |

Table 2 shows that the plasma levels of two 75 mg/capsule venlafaxine hydrochloride ER capsules and one 150 mg/capsule venlafaxine hydrochloride ER capsule provide very similar blood levels. The data also show that the plasma level after 24 hours for either extended release regimen is very similar to that provided by two immediate release 75 mg tablets of venlafaxine hydrochloride administered at 12 hour intervals.

Further, the plasma levels of venlafaxine obtained with the extended release formulation do not increase to the peak levels obtained with the conventional immediate release tablets given 12 hours apart. The peak level of venlafaxine from (ER), somewhat below 150 ng/ml, is reached in about six hours, plus or minus two hours, based upon this specific dose when administered to patients presently under treatment with venlafaxine hydrochloride (IR). The peak plasma level of venlafaxine, somewhat over 200 ng/ml, following administration of (IR) is reached in two hours and falls rapidly thereafter.

Table 3 shows venlafaxine blood plasma levels in male human subjects having a zero initial blood plasma level. Again, a peak blood plasma concentration of venlafaxine is seen at about 6 hours after dosing with venlafaxine hydrochloride extended release capsules in the quantities indicated. The subjects receiving the single 50 mg immediate release tablet showed a peak plasma level occurring at about 4 hours. For comparative purposes, the plasma levels of venlafaxine for subjects receiving the conventional formulated tablet can be multiplied by a factor of three to approximate the plasma levels expected for a single dose of 150 mg. conventional formulation.

TABLE 3

Plasma Blood Levels in Human Males Having No Prior Venlafaxine Blood Level

| Time (Hours) | 1 × 50 mg IR tablet | 2 × 75 mg ER capsules | 1 × 150 mg ER capsules |
|---|---|---|---|
| 0 | 0 | 0 | 0 |
| 1 | 27.87 | 1.3 | 0 |
| 1.5 | 44.12 | 6.0 | 2.2 |
| 2 | 54.83 | 20.6 | 12.8 |
| 4 | 66.38 | 77.0 | 81.0 |
| 6 | 49.36 | 96.5 | 94.4 |
| 8 | 30.06 | 93.3 | 86.9 |
| 10 | 21.84 | 73.2 | 72.8 |
| 12 | 15.91 | 61.3 | 61.4 |
| 14 | 13.73 | 52.9 | 51.9 |
| 16 | 10.67 | 47.5 | 41.1 |
| 20 | 5.52 | 35.2 | 34.0 |
| 24 | 3.56 | 29.3 | 28.5 |
| 28 | 2.53 | 23.4 | 22.9 |
| 36 | 1.44 | 11.9 | 13.5 |
| 48 | 0.66 | 5.8 | 5.2 |

The blood plasma levels of venlafaxine were measured according to the following procedure. Blood samples from

the subjects were collected in heparinized evacuated blood tubes and the tubes were inverted gently several times. As quickly as possible, the tubes were centrifuged at 2500 rpm for 15 minutes. The plasma was to plastic tubes and stored at −20° C. until analysis could be completed.

To 1 mL of each plasma sample in a plastic tube was added 150 μL of a stock internal standard solution (150 μg/ml). Saturated sodium borate (0.2 mL) solution was added to each tube and vortexed. Five mL of ethyl ether was added to each tube which were then capped and shaken for 10 minutes at high speed. The tubes were centrifuged at 3000 rpm for 5 minutes. The aqueous layer was frozen in dry ice and the organic layer transferred to a clean screw cap tube. A 0.3 mL portion of 0.01 N HCl solution was added to each tube and shaken for 10 minutes at high speed. The aqueous layer was frozen and the organic layer removed and discarded. A 50 μL portion of the mobile phase (23:77 acetonitrile:0.1M monobasic ammonium phosphate buffer, pH 4.4) was added to each tube, vortexed, and 50 μL samples were injected on a Supelco Supelcoil LC-8-DB, 5 cm×4.6 mm, 5 μ column in a high pressure liquid chromatography apparatus equipped with a Waters Lambda Max 481 detector or equivalent at 229 nm. Solutions of venlafaxine hydrochloride at various concentrations were used as standards.

EXAMPLE NO. 5

Manufactured by the techniques described herein, another preferred formulation of this invention comprises spheroids of from about 30% to about 35% venlafaxine hydrochloride and from about 0.3% to about 0.6% hydroxypropylmethylcellulose. These spheroids are then coated with a film coating, as described above, to a coating level of from about 5% to about 9%, preferably from about 6% to about 8%. A specific formulation of this type comprises spheroids of about 33% venlafaxine hydrochloride and about 0.5% hydroxypropylmethylcellulose, with a film coating of about 7%.

Lower dosage compositions or formulations of this invention may also be produced by the techniques described herein. These lower dosage forms may be administered alone for initial titration or initiation of treatment, prior to a dosage increase. They may also be used for an overall low-dose administration regimen or in combination with higher dosage compositions, such as capsule formulations, to optimize individual dosage regimens.

These lower dose compositions may be used to create encapsulated formulations, such as those containing doses of venlafaxine hydrochloride from about 5 mg to about 50 mg per capsule. Particular final encapsulated dosage forms may include, but are not limited to, individual doses of 7.5 mg, 12.5 mg, 18.75 mg, or 28.125 mg of venlafaxine HCl per capsule.

The spheroids useful in these lower dose formulations may comprise from about 5% to about 29.99% venlafaxine HCl, preferably from about 5% to about 25%, from about 75% to about 95% microcrystalline cellulose, and, optionally from about 0.25% to about 1.0% hydroxypropylmethylcellulose. The spheroids may be coated as described above, preferably with a film coating of from about 5% to about 10% by weight. In some preferred formulations, the spheroids comprise the cited venlafaxine HCl and microcrystalline cellulose, with no hydroxypropylmethyl cellulose.

EXAMPLE NO. 6

Spheroids comprising 16.5% venlafaxine HCl and 83.5% microcrystalline cellulose were mixed with approximately 50% water (w/w) to granulate in a Littleford Blender Model FM-50E/1Z (Littleford Day Inc., P.O. Box 128, Florence, Ky. 41022-0218, U.S.A.) at a fixed speed of 180 rpm. The blended. material was extruded through a 1.25 mm screen using a Nica extruder/speronization machine (Aeromatic-Fielder Division, Niro Inc., 9165 Rumsey Rd., Columbia, Md. 21045, U.S.A.) for a 12/20 mesh cut after drying. Two portions of the resulting spheroids were coated with a 5% and 7% coating level, respectively, by techniques described above using the coating formulation:

| Ingredient | % (w/w) |
|---|---|
| Methylene Chloride | 60.000 |
| Methanol Anhydrous | 35.500 |
| Ethylcellulose, NF, HG 2834, 50 cps | 3.825 |
| Hydroxypropyl Methylcellulose, 2910 USP, 6 cps | 0.675 |

These 5% and 7% coated lots were tested for dissolution on a Hewlett Packard automated dissolution system over a 24 hour period, resulting in the following dissolution patterns:

| Time/hr | % Dissoluded 16.5%/5% | % Dissolved 16.5%/7% |
|---|---|---|
| 2 | 12.4 | 5.6 |
| 4 | 42.8 | 25.4 |
| 8 | 70.7 | 60.4 |
| 12 | 82.2 | 75.4 |
| 24 | 94.3 | 92.7 |

A formulation of spheroids containing 8.25% venlafaxine HCl and 91.75% microcrystalline cellulose was prepared according to the techniques of Example No. 6 and coated with a 5% film coating. In the Hewlett Packard automated dissolution system these spheroids provided the following dissolution profile:

| Time/hr | % Dissolved 8.25%/5% |
|---|---|
| 2 | 4.4 |
| 4 | 24.2 |
| 8 | 62.9 |
| 12 | 77.8 |
| 24 | 93.5 |

Thus, the desired dissolution rates of sustained release dosage forms of venlafaxine hydrochloride, impossible to achieve with hydrogel tablet technology, has been achieved with the film-coated spheroid compositions of this invention.

What is claimed is:

1. A method for providing a therapeutic blood plasma concentration of venlafaxine over a twenty-four hour period with diminished incidence of nausea and emesis which comprises administering orally to a patient in need thereof, an extended release formulation that a peak blood plasma level of venlafaxine in from about 4 to about 8 hours, said formulation containing venlafaxine hydrochloride as the active ingredient.

2. A method for eliminating the troughs and peaks of drug concentration in a patient's blood plasma attending the therapeutic metabolism of plural daily doses of venlafaxine

hydrochloride which comprises administering orally to a patient in need thereof, extended release formulation that provides a peak blood plasma level of venlafaxine in from about 4 to about 8 hours, said formulation containing venlafaxine hydrochloride as the active ingredient.

3. A method for providing a therapeutic drug plasma concentration of venlafaxine over a twenty-four hour period with diminished incidence of nausea and emesis which comprises administering orally to a patient in need thereof, an extended release formulation that provides a peak blood plasma level of venlafaxine in from about 5 to about 8 hours, said formulation containing venlafaxine hydrochloride as the active ingredient.

4. A method for providing a therapeutic drug plasma concentration of venlafaxine over a twenty-four hour period with diminished incidence of nausea and emesis which comprises administering orally to a patient in need thereof, an extended release formulation that provides a peak blood plasma level of venlafaxine in about 6 hours, said formulation containing venlafaxine hydrochloride as the active ingredient.

5. A method for eliminating the troughs and peaks of drug concentration in a patient's blood plasma attending the therapeutic metabolism of plural daily doses of venlafaxine hydrochloride which comprises administering orally to a patient in need thereof, an extended release formulation that provides a peak blood plasma level of venlafaxine in from about 5 to about 8 hours, said formulation containing venlafaxine hydrochloride as the active ingredient.

6. A method for eliminating the troughs and peaks of drug concentration in a patient's blood plasma attending the therapeutic metabolism of plural daily doses of venlafaxine hydrochloride which comprises administering orally to a patient in need thereof, an extended release formulation that provides a peak blood plasma level of venlafaxine in about 6 hours, said formulation containing venlafaxine hydrochloride as the active ingredient.

* * * * *

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WYETH, Plaintiff, v. IMPAX LABORATORIES, INC., Defendant. | ) | C. A. No. 06-222 (JJF) |

**PUBLIC VERSION**

**DECLARATION OF JAMES W. MCGINITY, PH.D.**

I, James McGinity, Ph.D., declare as follows:

I have been retained by Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P. to testify on behalf of Plaintiff Wyeth in this litigation as an expert in the fields of the development and evaluation of pharmaceutical dosage forms.

**Qualifications**

My qualifications as an expert in these areas, as well as in other areas, are established by my *curriculum vitae,* attached hereto as Exhibit A.

1. I am a tenured professor at the College of Pharmacy, University of Texas at Austin, and have held the position of full Professor since 1985. I graduated from the University of Queensland, Brisbane, Australia, in 1967 with my B. Pharm. degree, and from the University of Iowa in 1972 with my Ph.D. in physical pharmacy.

2. I have taught pharmacy courses since 1973 and have been a faculty member of the College of Pharmacy, University of Texas at Austin since 1976. I have held positions of Assistant and Associate Professor of Pharmacy, Assistant Director and Director of the Drug Dynamics Institute and Area Coordinator for the Pharmaceutics Area.

3. I am also the Head of the Pharmaceutics Division within the College of Pharmacy, and Director of the Drug Dynamics Institute.

4. I have conducted research and published articles in areas including preformulation, materials science, tablet technology, film coating and pellet technologies, pharmaceutical processing, and transdermal technologies.

5. I have also consulted for innovator and generic pharmaceutical companies all over the world on issues related to analytical chemistry, content uniformity issues, processing, scale-up, materials science, film coating, drug stability, and preformulation issues. My consultancy has run the full range of issues from the discovery of new chemical entities to large-scale manufacture of the marketed product, including assisting pharmaceutical companies with regulatory filings. In particular, I have significant experience dealing with various types of extended release formulations, including encapsulated spheroids.

6. I was formerly the CEO of PharmaForm, L.L.C. in Austin, Texas. PharmaForm is a research and development company that works with both innovator and generic pharmaceutical companies in association with the areas of expertise identified in paragraph 5 above. PharmaForm's work in resolving formulation issues has resulted in several patents and patent applications, and I am a named inventor on some of these patents and patent applications.

**The Ordinary Meaning of the Term "Extended Release Formulation"**

7. The term "extended release formulation" is understood in the art to mean a formulation which releases the active ingredient in the gastrointestinal tract at a slower rate than an immediate release formulation such that the dosing frequency is reduced as compared to an immediate release product containing the same active ingredient. For example, a widely used pharmaceutical textbook, Remington: The Science and Practice of Pharmacy, p. 598 (19th ed. 1995) [Exh. B], defines extended release dosage forms as follows:

> "**Extended release dosage forms** (popularly known as timed-release or sustained-release) are defined as those that allow at least a twofold reduction in dosing frequency as compared to the drug presented in a conventional form, eg, a solution or a prompt drug-releasing conventional solid dosage form.

8. In addition, dictionaries define the term "extended" broadly. Merriam-Webster's Collegiate Dictionary, p. 410 (10th ed. 2001) defines "extended" as "drawn out in length esp. of time." [Exh. C]. Another dictionary defines "extended" as "continued for a long period of time; protracted." The American Heritage College Dictionary, p. 484 (3rd ed. 2000). [Exh. D].

9. Further, based upon my own personal experience, the term "extended release" as used above is consistent with how pharmaceutical scientists normally use the term.

**REDACTED**

REDACTED

**United States Patent Nos. 6,274,171 B1, 6,403,120 B1, and 6,419, 958 B2**

12. I have reviewed the above captioned patents together with the historical correspondence between Wyeth and the United States Patent and Trademark Office

that resulted in the above issued patents. I have been informed by counsel that such correspondence is referred to as the prosecution history for each patent.

13. As part of the BACKGROUND OF THE INVENTION, the patents describe the need for multiple daily dosing as a result of subtherapeutic plasma levels at certain times during the day, as well as the adverse side effects of nausea and vomiting, both associated with the use of immediate release venlafaxine hydrochloride tablets. ['171 patent, col. 1, l. 63 to col. 2, l. 11].

14. In the specification of the patented inventions, the patents describe broad methods for providing therapeutic blood plasma levels of venlafaxine from a once-a-day dosage form having a particular pharmacokinetic profile, and a reduction in the common side effects of nausea and vomiting associated with the immediate release product. In addition, the specification describes specific examples of formulations that may be used by one skilled in the art to practice the disclosed methods.

15. For example, the ABSTRACT (quoted below) first generally describes a twenty-four hour extended release formulation to control blood plasma levels of the venlafaxine and to reduce side effects without mentioning specific formulation ingredients (other than venlafaxine hydrochloride), and then "more particularly" describes an example of an extended release formulation that can be used to practice the invention:

> This invention relates to a 24 hour extended release dosage formulation and unit dosage form thereof of venlafaxine hydrochloride, an antidepressant, which provides better control of blood plasma levels than conventional tablet formulations which must be administered two or more times a day and further provides a lower incidence of nausea and vomiting than the conventional tablets. More particularly, the invention comprises an extended release formulation of venlafaxine hydrochloride comprising a therapeutically effective amount of venlafaxine hydrochloride in spheroids

> comprised of venlafaxine hydrochloride, microcrystalline cellulose and, optionally, hydroxypropylmethylcellulose coated with a mixture of ethyl cellulose and hydroxypropylmethylcellulose.

16. Similarly, the BRIEF DESCRIPTION OF THE INVENTION begins by describing the invention as an extended release formulation containing venlafaxine as the active drug component, which provides, in a single dose, a therapeutic blood serum level of venlafaxine over a twenty four hour period. ['171 patent[2], col. 2, ll. 14-19]. The specification further continues by contrasting the blood plasma profiles resulting from an immediate release and the extended release dosage forms, thereby describing "extended release formulation" in terms of a slower release rate and less frequent dosing than the immediate release formulation. Specifically, the patents describe the use of extended release venlafaxine formulations that provide blood plasma concentrations of the drug that increase after administration to peak between about 5 to about 8 hours, and then begin to fall from the peak plasma level in a protracted manner for the remainder of the twenty-four hour period:

> Through administration of the venlafaxine formulation of this invention, there is provided a method for obtaining a flattened drug plasma concentration to time profile, thereby affording a tighter plasma therapeutic range control than can be obtained with multiple daily dosing. In other words, this invention provides a method for eliminating the sharp peaks and troughs (hills and valleys) in blood plasma drug levels induced by multiple daily dosing with conventional <u>immediate release</u> venlafaxine hydrochloride tablets. In essence, the plasma levels of venlafaxine Is [sic] hydrochloride rise, after administration of the <u>extended release formulations</u> of this invention, for between about five to about eight hours (optimally about six hours) and then begin to fall through a protracted, substantially linear decrease from the peak plasma level for the remainder of the twenty four hour period, maintaining at

---

2 For simplicity, I am providing citations only for the '171 patent because all three patents have essentially the same specification, other than the first paragraph providing the family history of the patents. I intend for these citations to include the corresponding passages in the specifications of the '958 and '120 patents as well as their respective patent applications.

> least a threshold therapeutic level of the drug during the entire twenty-four period.

['171 patent, col. 2, ll. 20-36 (emphasis added)]. In contrast, the conventional immediate release venlafaxine hydrochloride tablets give earlier peak blood plasma levels:

> In contrast, the conventional immediate release venlafaxine hydrochloride tablets give peak blood plasma levels in 2 to 4 hours.

['171 patent, col. 2, ll. 36-38 (emphasis added)].

17. The "use aspect" of the patented invention is described as eliminating the sharp peaks and troughs (hills and valleys) in blood plasma levels of venlafaxine associated with multiple daily dosing of the immediate release tablet:

> Hence, in accordance with the use aspect of this invention, there is provided a method for moderating the plural blood plasma peaks and valleys attending the pharmacokinetic utilization of multiple daily tablet dosing with venlafaxine hydrochloride which comprises administering to a patient in need of treatment with venlafaxine hydrochloride, a one-a-day extended release formulation of venlafaxine hydrochloride.

['171 patent, col. 2, ll. 38-45]. The specification further describes the "use aspect" of the patented invention as follows:

> Thus, in accordance with this use aspect of the invention there is provided a method for reducing the level of nausea and incidence of emesis attending the administration of venlafaxine hydrochloride which comprises dosing a patient in need of treatment with venlafaxine hydrochloride with an extended release formulation of venlafaxine hydrochloride once a day in a therapeutically effective amount.

['171 patent, col. 2, ll. 55-62].

18.     Table 1 of the patents describes useful *in vitro* dissolution ranges for percent of venlafaxine hydrochloride released (at five different time points between two and twenty-four hours) for formulations made in accordance with the disclosures of the patents. Dissolution specifications, like those of Table 1, provide significant guidance to pharmaceutical scientists seeking to develop a generic equivalent to the disclosed invention. The patents specifically state that adherence to the *in vitro* dissolution ranges recited in Table 1 is likely to result in a formulation able to provide the therapeutic blood plasma profiles of the invention:

> Conformance with the dissolution rate given in Table 1 provides the twenty-four hour therapeutic blood levels for the drug component of the extended release capsules of this invention in capsule form.

['171 patent, col. 6, ll. 41-45]. The apparatus and conditions for the *in vitro* dissolution testing are recited in the patents so that the skilled artisan should be able to replicate the dissolution test methods. ['171 patent, col. 7, ll. 10-37]. The patents further provide guidance on how to modify formulations which are outside the dissolution specifications for drug release, as seen in Table 1:

> Where a given batch of coated spheroids releases drug too slowly to comply with the desired dissolution rate study, a portion of uncoated spheroids or spheroids with a lower coating level may be added to the batch to provide, after thorough mixing, a loading dose for rapid increase of blood drug levels. A batch of coated spheroids that releases the drug too rapidly can receive additional film-coating to give the desired dissolution profile.

['171 patent, col. 6, ll. 44-53].

19.     In Tables 2 and 3, the patents also disclose the *in vivo* evaluation of embodiments of the invention in comparison with an immediate release venlafaxine formulation, including a description of an analytical method which can be used to

determine venlafaxine levels in blood plasma samples, and examples of pharmacokinetic profiles of the invention over twenty-four and forty-eight hour time periods. ['171 patent, col. 7, l. 38 to col. 9, l. 23]. The *in vivo* information disclosed in the specification describes the pharmacokinetic parameters of $C_{max}$ and $T_{max}$ [col. 8, ll. 23-27], and furthermore, Tables 2 and 3 provide more than ten time points together with venlafaxine plasma levels.

20. Thus, one aspect of the inventions described in the patents' specification is extended release dosage formulations that meet the *in vitro* dissolution specifications of Table 1, and thereby provide the desired *in vivo* therapeutic blood plasma level profile. Patients can take such once daily extended release venlafaxine hydrochloride formulations that will be therapeutically effective and will result in diminished levels of nausea and incidences of emesis as compared to immediate release formulations of venlafaxine hydrochloride.

21. The use aspect of the patented invention is encompassed by the method claims of the patents.. For example, claim 20 of the '171 patent reads:

> A method for providing a therapeutic blood plasma concentration of venlafaxine over a twenty four hour period with diminished incidences of nausea and emesis
>
> which comprises administering orally to a patient in need thereof,
>
> an encapsulated, <u>extended release formulation</u> that provides a peak blood plasma level of venlafaxine in from about four to about eight hours,
>
> said formulation containing venlafaxine hydrochloride as the active ingredient.[3]

Claim 21 of the '171 patent reads:

---

[3] Claim 1 of the '958 patent omits the word "encapsulated," but is otherwise virtually identical.

> A method for eliminating the troughs and peaks of drug concentration in a patients blood plasma attending the therapeutic metabolism of plural daily doses of venlafaxine hydrochloride
>
> which comprises administering orally to a patient in need thereof,
>
> an encapsulated, extended release formulation that provides a peak blood plasma level of venlafaxine in from about four to about eight hours,
>
> said formulation containing venlafaxine hydrochloride as the active ingredient.[4]

Claims 1, 3 and 13 of the '120 patent read:

> 1. A method for providing therapeutic blood plasma concentration of venlafaxine over a twenty four hour period with diminished incidence of nausea and emesis
>
> which comprises administering orally to a patient in need thereof,
>
> an extended release formulation that provides peak blood plasma levels of venlafaxine of no more than about 150 ng/ml,
>
> said formulation containing venlafaxine hydrochloride as the active ingredient.
>
> 3. The method of claim 1 wherein the extended release formulation comprises venlafaxine hydrochloride in spheroids comprised of venlafaxine hydrochloride, microcrystalline cellulose and optionally, hydroxypropylmethylcellulose.
>
> 13. The method of claim 1 wherein the extended release formulation comprising venlafaxine hydrochloride in a spheroid.

22. Unlike the independent method claims of the patents, which broadly recite "an extended release formulation . . . containing venlafaxine hydrochloride," the product claims from the '171 patent recite extended release formulations with inert excipients, including microcrystalline cellulose, ethyl cellulose, and HPMC. For example, claim 1 of the '171 patent reads:

---

4 Claim 2 of the '958 patent omits the word "encapsulated," but is otherwise virtually identical.

> An extended release formulation of venlafaxine hydrochloride comprising
>
> a pharmaceutically acceptable capsule containing spheroids comprised of
>
> from about 6% to about 40% venlafaxine hydrochloride by weight, about 50% to about 94% microcrystalline cellulose, NF, by weight, and optionally from about 0.25% to about 1% by weight of hydroxypropyl-methylcellulose, USP,
>
> wherein the spheroids are coated with a film coating composition comprised of ethyl cellulose and hydroxypropylmethylcellulose.

23. Thus, a different aspect of the invention of these patents is the preferred embodiment of a spheroidal extended release venlafaxine formulation. When describing preferred "formulations of this invention," which correspond to the product claims in the patents, the specification describes extended release venlafaxine formulations with various functional excipients. For example, the specification states:

> The formulations of this invention comprise an extended release formulation of venlafaxine hydrochloride comprising a therapeutically effective amount of venlafaxine hydrochloride in spheroids comprised of venlafaxine hydrochloride, microcrystalline cellulose and, optionally, hydroxypropylmethylcellulose coated with a mixture of ethyl cellulose and hydroxypropylmethylcellulose.

['171 patent, col. 2, l. 63- col. 3, l. 2].

24. The patents also contain seven numbered examples which provide further details on selected embodiments of the inventions. Those seven examples disclose the use of spheroids containing the drug and a coating having a mixture of excipients that act to extend the rate of drug release by modifying the permeability of the polymeric film coat.

25. Finally, the inventors describe their unsuccessful attempts to use hydrogel tablet technology to satisfactorily formulate once a day venlafaxine hydrochloride products:

> Numerous attempts to produce extended release tablets by hydrogel technology proved to be fruitless because the compressed tablets were either physically unstable (poor compressibility or capping problems) or dissolved too rapidly in dissolution studies. Typically, the tablets prepared as hydrogel sustained release formulations gave 40-50% dissolution at 2 hrs, 60-70% dissolution at 4 hrs and 85-100% dissolution at 8 hrs.
>
> * * *
>
> Thus, the desired dissolution rates of sustained release dosage forms of venlafaxine hydrochloride, impossible to achieve with hydrogel tablet technology, has been achieved with the film-coated spheroid compositions of this invention.

['171 patent, col. 4, ll. 60-67; col. 10, ll. 53-57].

**The Meaning of the Term "Extended Release Formulation" Used in the Patents**

26. I have considered the meaning of the claim term "extended release formulation" in claims 20 through 25 of the '171 patent, claims 1, 2, 13, and 14 of the '120 patent, and claims 1 through 6 of the '958 patent.

27. As used in the patents, I understand the term "extended release formulation" to mean a formulation, other than a hydrogel tablet, which releases the active ingredient at a slower rate than the immediate release formulation of the active ingredient such that the dosing frequency is once-a-day rather than the plural daily dosing for the immediate release formulation. In contrast, I understand Impax's proposed construction of this term to be:

> a formulation comprising venlafaxine, microcrystalline cellulose and, optionally, HPMC coated with a mixture of ethyl cellulose and HPMC in an amount needed to provide a specific unit dosage administered once-a-day to provide a

therapeutic blood plasma level of venlafaxine over the entire 24-hour period of administration.

Impax's 4/13/07 Claim Construction.

28. I believe my construction is correct for the following reasons. The disclosure of the patents in no way artificially restricts the meaning of the term "extended release formulation" to only those "comprising venlafaxine, microcrystalline cellulose and, optionally, HPMC coated with a mixture of ethyl cellulose and HPMC." The specification, the claims, and indeed, all parts of the patents, do not support such a narrow definition. Impax's construction erroneously requires specific formulations such as those disclosed in Examples 1-7 of the patents, whereas the claims are not so limited. One skilled in the art would not define the entire universe of the disclosed inventions by the seven numbered examples in the patents. Rather, one skilled in the art would simply look at such examples as illustrative of some of the many possible ways of practicing each invention.

29. The patents' description of certain problems that were encountered with pre-existing hydrogel tablet technology would not suggest to one skilled in the art that other approaches could not be used to take advantage of the disclosed inventions. Persons of ordinary skill in the art do not expect a patent to include an all-inclusive list of each and every previously known approach to design an extended release formulation.

30. Although both the product claims (claims 1-19) and method claims (claims 20-25) of the '171 patent recite the term "extended release formulation," the product claims further recite functional excipients, whereas the method claims make no reference to excipients. The inclusion of excipients in dependent method claim 3 of the '120 patent further indicates that the term "extended release formulation" is not limited to those excipients. One skilled in the art would look to these differences as further

support for the conclusion that the patentees did not intend to define the term "extended release formulation" as including specific excipients.

31. In addition, the patents teach one of ordinary skill in the art to use the *in vitro* dissolution information in the specification as a bench test to screen for extended release formulations of venlafaxine that would most likely meet the *in vivo* limitations of the claims, regardless of how they are made, further confirming that the "use aspect of the invention" is broadly disclosed and claimed in the patents-in-suit. ['171 patent, Table 1 and col. 6, l. 41 to col. 7, l. 38]. From the specification, one of ordinary skill in the art would understand that the patents contemplate the routine testing of venlafaxine hydrochloride formulations for their "conformance with the dissolution rate given in Table I" [col. 6, l. 41], and that this *in vitro* dissolution profile can be used routinely to screen for other extended release formulations, in addition to the particular embodiments disclosed in Examples 1-7, for use in the claimed methods.

**REDACTED**

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

**REDACTED**

33.     Synthon B.V., a company involved in development of pharmaceutical dosage formulations, used the *in vitro* dissolution test methodology and results in Wyeth's patents to screen for hydrogel tablet formulations of venlafaxine and formulations containing a different salt form of venlafaxine.  [*See, e.g.*, Exh. O WO 03/082261 A1 at p. 8; Exh. P WO 03/082805 A1 at pp. 16-17].  Thus, Synthon

recognized and used the *in vitro* dissolution data provided in the patents as a reliable screen for different drug delivery systems and even a different salt form of venlafaxine.

34. The patent specifications, in my opinion, broadly teach to one of ordinary skill in the art to use extended release formulations of venlafaxine hydrochloride with once-a-day administration to provide therapeutic blood plasma levels of venlafaxine over a 24-hour period having the pharmacokinetic characteristics described in the claims. The details of the particular formulations to be employed to achieve this result *in vivo* can be selected with routine screening, as discussed above, by having the patents in hand . Such details, however, do not in my mind in any way limit the "use" aspect of the patented inventions. The independent method claims I have considered do not include inactive ingredients, but rather encompass the use of any extended release formulation of venlafaxine hydrochloride, other than a hydrogel tablet, that provides for the claimed *in vivo* parameters.

35. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 4th day of May 2007, at Austin, Texas.

James W. McGinity

James W. McGinity, Ph.D.

**REDACTED**

# EXHIBIT A

# CURRICULUM VITAE

*James William McGinity*
*Professor of Pharmaceutics*
*College of Pharmacy*
*The University of Texas at Austin*
*Austin, Texas 78712-1074*

I. Personal

Born in Brisbane, Australia. Citizen of the United States. Married; two children.

II. Education

B. Pharm. degree in December, 1967, from the University of Queensland, Brisbane, Australia. Graduated with the Ph.D. degree in Physical Pharmacy from the University of Iowa in May, 1972. Major Professor was John L. Lach, Ph.D. Short Courses - "Cosmetic Technology" at Columbia University.

III. Positions Held

June 12, 1972 to September 30, 1973 - Research Investigator for E.R. Squibb and Sons, New Brunswick, New Jersey.

October, 1973 to August, 1976 - Associate Professor of Pharmacy at the School of Pharmacy, Texas Southern University, Houston, Texas.

August, 1976 to August, 1979 - Assistant Professor of Pharmacy, College of Pharmacy, University of Texas at Austin, Austin, Texas.

September 1, 1979 to August 31, 1985 - Associate Professor of Pharmacy, College of Pharmacy, University of Texas at Austin, Austin, Texas.

September 1, 1979 to present - Assistant Director of the Drug Dynamics Institute, University of Texas at Austin, Austin, Texas.

Appointed to the position of Area Coordinator for the Pharmaceutics Area effective September 1, 1982 and Division Head of Pharmaceutics, January, 1983.

September 1, 1985 to present - Professor of Pharmacy, College of Pharmacy, University of Texas at Austin, Austin, Texas.

IV. Graduate and Undergraduate Courses Presented

Product Development, PHR 381D, (Graduate Class) – UT Austin
Advanced Manufacturing Pharmacy, PHR 381G (Graduate Class) – UT Austin
Advanced Pharmaceutical Processes, PHR 380Q (Graduate Class) – UT Austin
Recent Advances in Pharmaceutics, PHR 382R (Graduate Class) – UT Austin
Pharmaceutical Dosage Forms, PHR 356C
Pharmaceutics I, Lab and Calculations, PHR 133K - UT Austin
Basic Manufacturing Pharmacy, PHR 266K - UT Austin
Sterile Pharmaceutical Preparations, PHR 357 - UT Austin
Pharmaceutics I, PHR 356C and PHR 156P - UT Austin
PHR 363, PHR 225K and PHR 380M - UT Austin
Lectures were also presented in the following courses–
"Pharmacy Orientation" and "Clinical Toxicology" - TSU

## V. Professional Memberships

| | |
|---|---|
| Society of Cosmetic Chemists | 1972-1973 |
| American Pharmaceutical Association | 1969-Present |
| American Association of Pharmaceutical Scientists (Divisions of Basic Pharmaceutics and Industrial Pharmaceutical Technology) | 1985-Present |
| Rho Chi (Pharmacy Honorary Society) | 1970-Present |
| Phi Lambda Upsilon (Chemistry Honorary Society) | 1971-Present |
| Phi Delta Chi (Pharmacy Professional Fraternity) | 1976-Present |
| Member of the Drug Dynamics Institute, College of Pharmacy, University of Texas | 1974-Present |
| Director of the Drug Dynamics Institute College of Pharmacy, University of Texas | 1995-Present |

## VI. Current Research Interests

1. Several new techniques to microencapsulate drugs using biodegradable polymers have been developed. These formulations are currently under investigation along with the various parameters influencing loading dose, drug release characteristics and physico-chemical properties.

2. Topical Drug Delivery Systems: Studies with these systems have been concerned with the physical and chemical factors that influence the in vitro diffusion of drug from each vehicle. Emulsion technology with particular emphasis on micro and multiple emulsion systems .

3. Compaction properties of drugs, excipients and polymers using the tableting indices.

4. Sustained-Release Tablets: Novel controlled-release products have been designed and tested for their release properties in vitro. Mechanisms of drug release are also being investigated.

5. Study of the chemical, physical and physico-mechanical properties of polymeric delivery systems including drug delivery by the oral, parenteral and topical routes of administration.

6. Film coating technology using aqueous and alcoholic systems. Physico-chemical properties of polymers and processing considerations.

VII. Honors and Awards

1. Received award (monetary) for the highest grade in Pharmaceutical Chemistry in final undergraduate year, University of Queensland, 1967.

2. Recipient of the Lederle Research Award at Texas Southern University for 1974 and 1975.

3. Listed in the 1975 awards volume of "Outstanding Educators of America."

4. Listed in the 1976 and 1978 volumes of "Who's Who in the South and Southwest."

5. Elected to the position of National Secretary for the Basic Pharmaceutics Section of the American Pharmaceutical Association, 1981-1983.

6. Listed in the 1978-79 volume of "Personalities of the South."

7. Listed in the 1979-80 volume of "Dictionary of International Biography."

8. Listed in the first edition of "Personalities of America 1978-80."

9. Johnson & Johnson Centennial Chair in Pharmacy, 1985-present

10. Fellow of AAPS, 1990.

11. North American Editor for *European Journal of Pharmaceutics and Biopharmaceutics*, 1995.

12. Co-Editor for *European Journal of Pharmaceutics and Biopharmaceutics*, 1996.

13. Chairman of the AAPS Fellows Selection Committee, 1999.

14. Nominated for the 1999 Glaxo Wellcome International Achievement Award that is presented by the Royal Pharmaceutical Society of Great Britain.

15. Recipient of the 1999 Pharmaceutical Preparation and Particle Design (PPD) Award presented by the Society of Powder Technology Japan.

16. Feng Zhang, graduate student under the directorship of Dr. McGinity, received the Outstanding Dissertation Award in the Division of Engineering and Materials Sciences from the University of Texas of Austin. (2000). This is the first time a graduate student in Pharmacy has received this award.

17. Recipient of the APSTJ 2004 Takeru & Aya Higuchi Memorial Lectureship that is presented by The Academy of Pharmaceutical Science and Technology Japan, in July 2004 in Kisarazu, Japan.

18. Recipient of the 2005 Research Achievement Award in Pharmaceutical Technologies that is presented by the American Association of Pharmaceutical Scientists.

19. Recipient of the 2006 *Drug Development and Industrial Pharmacy* Outstanding Paper Award for "Controlled Release of a Poorly Water-Soluble Drug from Hot-Melt Extrudates Containing Acrylic Polymers" Yucun Zhu; Navnit H. Shah; A. Waseem Malick; Martin H. Infeld; James W. McGinity.

VIII. Committees

1. Seminar Chairman and Coordinator for the Squibb Institute for Medical Research (Pharm. R & D) 1972-1973.

2. Curriculum Committee 1974 & 1975.

3. Library Committee 1975.

4. Liaison Officer for the American Journal of Pharmaceutical Education, News Section 1974-1976.

5. Admissions Committee 1976, 1977, 1981, 1982.

6. Safety Committee 1976-1977.

7. Subcommittee on Graduate Student Recruitment 1976-present.

8. Curriculum Committee 1977-1980.

9. Ad Hoc Committee on Combined Degree Programs 1977-1978.

10. Minority Recruitment Committee (College of Pharmacy Representative on this University committee 1976-1978).

11. Member of Steering and Monograph Committee (Academy of Pharmaceutical Sciences) "Codex of Pharmaceutical Excipients" 1977-1980.

12. Equipment Committee 1980-1989.

13. Academic Performance Committee 1981-1983.

14. Administrative and Coordinating Subcommitttee 1982-1984.

15. Regulations and Scientific Policy Committee, Academy of Pharmaceutical Sciences 1982-1984.

16. National Secretary for the Basic Pharmaceutics Section of the American Pharmaceutical Association 1981-1983.

17. Program chairman for the 1983 Arden House Conference, a major conference sponsored by the I.P.T. section of the Academy of Pharmaceutical Sciences. Conference title: "Microparticulate Drug Delivery Systems."

18. UT College of Pharmacy Representative to "Pharmat" 1981-1982.

19. Member of IIPC - 1980-1985.

20. Equipment Committee 1980-present. Committee Chairman, 1988-present

21. Program Committee for the Basic Pharmaceutics Section of the APhA Academy of Pharmaceutical Sciences Midwest Regional meetings

22. Program Committee member of the Pharmaceutical Technology Section of the AAPS - annual meetings 1990 & 1991.

23. Member of AAPS Fellows Selection Committee, 1995-1998.

24. Member of Intellectual Property Committee, The University of Texas at Austin, 1994-2003.

25. Member of the U.S.P. committee on polymeric excipients. 1995-1997.

26. Chairman of the space committee, College of Pharmacy, The University of Texas at Austin, 1995-present.

27. Member of faculty development committee, College of Pharmacy, The University of Texas at Austin. 1995-present.

28. Chairman of Self Study Subcommittee on College Resources, 1996-97

29.   Chairman of AAPS Fellows Selection Committee, 1999.

30.   Member of the PDD Research Achievement Award Selection Committee, 1999.

31.   Member of the HØst Madsen Award Selection Committee for the International Pharmaceutical Association. The award is made available by the Danish Pharmaceutical Association to an eminent pharmaceutical scientist, 1999.

32.   Member of the search committee for the new Director of Intellectual Property. 2003

33.   Member of AAPS PharmSciTech Oustanding Publication award, member of the committee 2003.

34.   Member of the AAPS Books Program Review Team 2003.

35.   Member, AAPS Pharmaceutical Technology Education Committee, 2004-2005.

36.   Member of the Editorial Board for *The Journal of Pharmaceutical Sciences* (January 2005-December 2007).

IX.   Consultantships

List available on request.

X.   International Presentations

1.   Third International Symposium on Microencapsulation, Tokyo, Japan. September, 1976.

2.   First through Fifth International Conferences on Pharmaceutical Technology, (APGI) Paris, France. 1977, 1980, 1983, 1986 & 1989.

3.   First International Conference on Powder Technology and Pharmacy, Basel, Switzerland. June, 1978.

4.   Fourth International Symposium on Microencapsulation, Miami Beach, Florida, U.S.A. March, 1979.

5.   First British Pharmaceutical Technology Conference, London, England. April, 1980.

6.     Australian Pharmaceutical Science Conference and the Annual Meeting of the Australia and New Zealand Association for the Advancement of Science, Adelaide, Australia. May, 1980. Royal Australian Chemical Institute, Sydney, Australia. May, 1980.

7.     International Symposium on Powder Technology, Kyoto, Japan. September, 1981.

8.     Second British Pharmaceutical Technology Conference, London, England. April, 1982.

9.     Twenty-second Annual International Industrial Pharmacy Conference, Texas, U.S.A. February, 1983.

10.     Fourth British Pharmaceutical Technology Conference, Edinburgh, Scotland. April, 1984 (Member of International Review Board).

11.     Rohm Pharma Co., Darmstadt, West Germany. 1984, 1986, 1987, 1988, 1989, 1990, & 1991.

12.     Eudragit Symposium, Rohm Pharma Co., Darmstadt, West Germany. May, 1985.

13.     Synthelabo Corp., Paris, France, June, 1985.

14.     Kiel University, Kiel, West Germany, February, 1990.

15.     Second World Congress on Particle Technology, Kyoto, Japan, September 1990.

16.     International Conference on Aqueous Polymeric Coating Systems and Related Techniques, Gifu, Japan, September 1990.

17.     SmithKline Beecham Laboratories, Worthing, England, Short Course - "Compaction Technology", April, 1991.

18.     "Eudragit Symposium", Tokyo & Osaka, Japan, November, 1992.

19.     "Polymeric Dispersions for Aqueous Film Coating: Physical-Chemical Properties and Processing Considerations", presented at the symposium "Advances in Delivery of Therapeutic and Diagnostic Agents", Sydney, Australia, December 1992.

20.     The 12th Pharmaceutical Technology Conference, Elsinore, Denmark, March, 1993.

21.     9th Annual Microencapsulation Conference, Ankara, Turkey, September 1993.

22. 13th Pharmaceutical Technology Conference, Strasbourg, France, April 1994.

23. 14th Pharmaceutical Technology Conference, Barcelona, Spain, April 1995.

24. 1st World Meeting on Pharmaceutics, Budapest, Hungary, May 1995.

25. 10th International Symposium on Microencapsulation, Austin, Texas, September 1995, Chairman

26. APV Conference, Mainz, Germany, March '96.

27. Microencapsulation Mini-Symposium, St. Petersburg, Russia, September '96.

28. International Biotechnology Meeting, George R. Brown Convention Center, Houston, TX, June '97.

29. Particulate Powder Design Award Symposium, Hamamatsu, Japan, October '99.

30. APV/APGI 9th International Conference on Pharmaceutical Technology, Berlin, Germany, April 2000.

31. "Dry Powder Coating: A Novel Technique for Film Coating Solid Substrates", 29th Conference on Pharmaceutical Technology (sponsored by The Academy of Pharmaceutical Science and Technology, Japan), Kisarazu, Japan, July 2004

32. "Melt Extrusion and Controlled Release", 41st Annual Pharmaceutical Technologies Arden Conference-Oral Controlled Release Development and Technology, AAPS, West Point, NY, January 2006.

33. "Influence of Processing on the Properties of Pharmaceutical Dosage Forms Containing Acrylic Polymers: Hot-Melt Extrusion or Film Coating", Rohm Pharma, Darmstadt, Germany, March 2006.

34. "Curing of Eudragit RL and RS Coatings", "Thermal Processing of Pharmaceutical Powders", "Microencapsulation Technology", "Dry Powder Coating: A Novel Technique for Film Coating Solid Substrates", "Pharmaceutical Patents", "Formulation Design—Application of Principles of Materials Science", lectures presented at the University of Navarro, College of Pharmacy, Navarro, Spain, May 15-June 3, 2006.

35. "Thermal Processing of Pharmaceutical Powders" presented at Astellas, Shizuoka, Japan, July 17, 2006.

36. "Thermal Processing of Pharmaceutical Powders" presented at Dainippon Sumitomo Pharm, in Osaka, Japan, July 18, 2006.

37. "Pharmaceutical Patents" presented at Aichi Gakuin University, Nagoya, Japan, July 2006.

38. "Physicochemical Factors Influencing Drug Release From Solid Dosage Forms Film Coated by Either a Wet or a Dry Process" presented at The 4th New Pharmaceutical Technology and Engineering Conference, Tokyo, Japan, July 20, 2006.

39. "Physical and Chemical Properties of Melt Extruded Polymeric Drug Delivery Systems", 1st International Symposium on Hot Melt Extrusion, March 21-22, 2007, DeGussa, Frankfurt, Germany.

40. "Novel Approaches to Prevent Physical Aging of Acrylic Polymers", 8th EUDRAGIT® Workshop, April 10-11, 2007, DeGussa, New Brunswick, NJ.

XI. Referee for the Following Journals

1. Journal of Pharmaceutical Sciences

2. Science

3. Pharmacology Biochemistry and Behavior

4. International Journal of Pharmaceutics

5. Journal of Microencapsulation (Member of International Board of Editors)

6. Pharmaceutical Research

7. Journal of Membrane Science

8. Life Sciences

9. S.T.P. Pharma Sciences (France) (Member of Editorial Board)

10. Sciences Techniques et Pratiques Pharmaceuticques (Fr.)

11. Journal of Controlled Release

12. European Journal of Pharmaceutics and Biopharmaceutics – USA Editor

13. International Journal of Pharmaceutical Compounding

14. Drug Development and Industrial Pharmacy
(Member of Editorial Board)

15. Pharmaceutical Development and Technology
(Member of Editorial Board)

16. Drug Delivery Technology
(Member of Editorial Advisory Board)

17. European Journal of Pharmaceutics
(Member of Editorial Board)

18. Journal of Pharmacy and Pharmacology

19. European Journal of Pharmaceutical Sciences
(Member of Editorial Board)

20. Tablets and Capsules Magazine
(Member of Editorial Advisory Board 2003)

21. Current Drug Delivery

22. AAPS PharmSci Tech

23. Biomaterials

24. Journal of Applied Polymer Science

25. Journal of Drug Delivery Science and Technology

XII. Personnel Supervised

1. Michael R. Harris, Ph.D. (May, 1981) Director, Warner Lambert Corp., Morris Plains, New Jersey.

2. George W. Cuff, Ph.D. (May, 1982) Senior Research Scientist, Eli Lilly Co., Indianapolis, Indiana.

3. Janet C. Walkow, Ph.D. (August, 1982) Manager, Rorer Pharmaceuticals, Pennsylvania

4.    Chi-Tze Ku, M.S. (May, 1983) Research Chemist, Bristol Myers Squibb, New Brunswick, N.J.

5.    Juliette Castillo, M.S. (May, 1983) Lecturer, University of Honduras.

6.    Professor N.T. Naidoo, Ph.D. (1981-1982) Post-doctoral Research Scholar, Rhodes University, Grahamstown, South Africa.

7.    Philippe Maincent, Ph.D. (1981-1983) Post-doctoral Research Fellow from the University of Paris, SUD, France. Presently Professor, Nancy University, France.

8.    Masaki Yamamoto (1982-1983) Visiting Scientist, Takeda Chemical Industries, Osaka, Japan.

9.    Kenzo Ichizuka (1983-1984) Takeda Chemical Industries, Osaka, Japan, Visiting Scientist.

10.   Claud G. Cameron, Ph.D. (May, 1986) Watson Laboratories, Corona, CA.

11.   Robert O. Williams, III, Ph.D. (Dec., 1986) Associate Professor, College of Pharmacy, The University of Texas at Austin, Austin, Texas.

12.   Steven M. Liebowitz, Ph.D. (1986) Visiting Scientist, Senior Research Scientist, Schering Corp., Kenilworth, NJ

13.   Roland Bodmeier, Ph.D. (Dec., 1986) Professor, University of Berlin, Berlin, Germany.

14.   Kuei-Tu Chang, Ph.D. (Dec. 1986) Senior Research Director, Rexall Sundown, Boca Raton, Florida.

15.   Rafael E. Sarabia, Ph.D., (1985-86) VP, Research & Development, Cima Laboratories, Eden Prairie, Minnesota.

16.   George Woo, Ph.D. (May 1988) Research Scientist, Westwood Pharmaceuticals, New York.

17.   Susan Ashley, Ph.D. (May 1988) Research Scientist, Merck Sharp & Dohme, West Point, PA.

18.   Jay Thiele, Ph.D. (Dec., 1988) Director of Process Development, Genta Inc., San Diego, CA.

19.   Mark Schulze, Ph.D. , (Dec., 1989) Research Scientist, Glaxo, Inc., North Carolina

20.   Mark Coffin, Ph.D. (Dec. 1990) Research Scientist, Glaxo, Inc., North Carolina

21. Michelle Jenquin, Ph.D., (Dec., 1990) Research Scientist, Rhone-Poulenc Rorer Pharmaceuticals, Horsham, Pennsylvania

22. Motokazu Iwata, (1990-91) Visiting Scientist, Dainippon Corp., Osaka, Japan

23. Marcelo Omelczuk, Ph.D., (Dec. 1991) Research Scientist, Sandoz Inc., East Hanover, N.J.

24. Sakae Obara, Ph.D., (1992-93) Visiting Scientist, Shin-Etsu Chemical Co., Ltd., Tokyo, Japan

25. Jose Gutierrez-Rocca, Ph.D. (May 1993) Professor at University of South Miami, Florida

26. Steven E. Frisbee, Ph.D., (Dec. 1994), Senior Research Scientist, Biovail Technologies, Ltd., Chantilly, Virginia.

27. Carolyn Aitken Nichol, Ph.D., Postdoctoral Fellow, (1994-1995); Assistant Professor, M.D. Anderson Cancer Center, Houston, Texas.

28. Unchallee Kositprapa, Ph.D., Research Scientist, (1996) Cima Laboratories, Brooklyn Park, Minnesota.

29. Julia Schulze, Visiting Scientist, (1997-1998), University of Berlin, Berlin, Germany.

30. Stephan Promeluk, (1997) Visiting Scientist, Germany.

31. Chen-Chao Wang, Ph.D., Senior Scientist, (1997) Therics Inc., Princeton, New Jersey.

32. Linda Felton, Ph.D., Assistant Professor, (1997) University of New Mexico, Albuquerque, New Mexico.

33. Maria Frohoff Hülsmann, Visiting Scientist (1997), Heinrich-Heine-Universität, Dusseldorf, Germany.

34. Stefanie Bendels, Visiting Scientist, (1997), University of Berlin, Berlin, Germany.

35. Patrick O'Donnell, Ph.D., Research Scientist, (1997), Ligand Pharmaceuticals, San Diego, California.

36. Olaf Zindler, Visiting, Scientist (1998-1999), University of Berlin, Berlin, Germany.

37. Chuanbin Wu, Ph.D., (1999) Manager, Research & Development, Watson Foods Co., Inc, New Haven, Connecticut.

38. Feng Zhang, Ph.D., Research Scientist, (1999), PharmaForm L.L.C., Dallas, Texas.

39. Christelle Anquez, Visiting Scientist, (1999), University of Nancy, Nancy, France.

40. Toru Maejima, Visiting Scientist, (1999), Tanabe Seiyaki Co. Ltd, Japan.

41. Motonori Kidokoro, Visiting Scientist, (1999), Daiichi Pharmaceutical Co., Ltd., Japan.

42. Karl Wagner, Ph.D., Visiting Scientist, (2000), Eberhard-Karls-Universität Tübingen, Tübingen, Germany.

43. Michael A. Repka, Ph.D., (2000), Assistant Professor, University of Mississippi, Oxford, Mississippi.

44. Eva Gonzalez, Visiting Scientist (2000), Universidad de Santiago de Compostela, Santiago de Compostela, Spain.

45. Britta Schroeder, Visiting Scientist (2001-02), Freie Universität, Berlin, Germany.

46. Yucun Zhu, Ph.D. (2002), Research Scientist, KOS Pharmaceuticals, Florida.

47. L. Diane Bruce, Ph.D. (2002), Research Scientist, Quintilles, Kansas City, Kansas.

48. John J. Koleng, Ph.D. (2002), Research Scientist, PharmaForm, L.L.C., Dallas, Texas.

49. Caroline Dietzche, Visiting Scientist, (2002), Freie Universität, Berlin, Germany.

50. Dorothea Sauer, Visiting Scientist. (2002), Freie Universitat, Berlin, Germany.

51. Anke Fredersdorf, Visiting Scientist, (2003-2003), Freie Universitat, Berlin, Germany.

52. Michael Crowley, Ph.D. (2003), Research Scientist, PharmaForm, L.L.C.., Dallas, Texas.

53. Matteo Cerea, Visiting Scientist, (2002-2003), University of Milan, Milan, Italy.

54. Kevin Kiehm, Visiting Scientist (2003), Goethe University, Frankfurt, Germany.

55. Anke Reidel, Visiting Scientist (2003), Leipzig Universitat, Leipzig, Germany.

56. Mamoru Fukuda, Visiting Scientist (2003-2005), Kyorin Pharmaceutical Company, Japan.

57. Hiroto Onishi, Visiting Scientist (2003-2004), Hoshi University, Japan.

58. Hiroto Bando, Visiting Scientist (2004-2005), Takeda Chemical Industries, Inc, Japan.

59. Weijia Zheng, Ph.D. (2004), Research Scientist, Novartis, Cambridge, Massachusetts.

60. Christopher Young, Ph.D. (2004), Research Scientist, Vertex Pharmaceuticals, Boston, Massachusetts.

61. Sandra Schilling, Visiting Scientist (2004-2005), Freie Universitat, Berlin.

62. Gavin Andrews, Ph.D., Visiting Scientist (2005), Queen's University of Belfast, U.K.

63. Doreen Stimpel, Visiting Scientist (2006), Freie Universitat-Berlin, Germany.

64. Stephanie Bosselmann, Visiting Scientist (2006), Freie Universitat-Berlin, Germany.

65. Johan Unga, Visiting Scientist (2006), Chalmers University of Technology, Goteborg, Sweden.

66. Claudia Tessman, Visiting Scientist (2006-2007, Freie Universitat-Berlin, Germany.

<u>Students Currently Being Supervised</u>

Lonique Coots, Ph.D. Candidate
Caroline Dietzsch, Ph.D. Candidate
Shawn Kucera, Ph.D. Candidate
Dave Miller, Ph.D. Candidate
Dorothea Sauer, Ph.D. Candidate
Sandra Schilling, Ph.D. Candidate
Alan Watts, Ph.D. Candidate
James DiNunzio, Ph.D. Candidate
Claudia Tessman, Visiting Scientist

XIII. Publications

1. J.W. McGinity, J.A. Hill and A.L. La Via, "Influence of Peroxide Impurities in Polyethylene Glycols on Drug Stability," Journal of Pharmaceutical Sciences, 64, 356-357 (1975).

2. J.W. McGinity, A.B. Combs and A.N. Martin, "An Improved Method for Microencapsulation of Soluble Pharmaceuticals," Journal of Pharmaceutical Sciences, 64, 889-890 (1975).

3. J.W. McGinity and R.L. Brown, "Stabilizing Effect of Inorganic Phosphate Salts on Antibiotic-Steroid Ophthalmic Preparations," Journal of Pharmaceutical Sciences, 64, 1566-1568 (1975).

4. J.W. McGinity and J.A. Hill, "Influence of Monovalent and Divalent Electrolytes on Sorption of Neomycin Sulfate to Attapulgite and Montmorillonite Clays,"Journal of Pharmaceutical Sciences , 64, 1566-1568 (1975).

5. J.W. McGinity, D.D. Maness and G.J. Yakatan, "The Influence of Various Dispersion Methods on the Rate of Dissolution of Sulfabenzamide," Drug Development Communications, 1(5), 369-387 (1974-1975).

6. J.W. McGinity and J.L. Lach, "In Vitro Adsorption Studies of Various Pharmaceuticals to Montmorillonite," Journal of Pharmaceutical Sciences, 65, 896-902 (1976).

7. J.W. McGinity, T.R. Patel, A.H. Naqvi and J.A. Hill, "Implications of Peroxide Formation in Lotion and Ointment Dosage Forms Containing Polyethylene Glycols," Drug Development Communications, 2, 505-519 (1976).

8. J.W. McGinity and J.L. Lach, "Sustained-Release Applications of Montomorillonite Interactions with Amphetamine," Journal of Pharmaceutical Sciences, 66, 63-66 (1977).

9. J.W. McGinity and C.S. Mehta, "Chronic Administration of Cyanide: Urinary Excretion of Thiocyanate in Male and Female Rats," Acta Pharmacol. et Toxicol., 41, 49-52 (1977).

10. M.J. Akers, R.D. Schoenwald and J.W. McGinity, "Practical Aspects of Ophthalmic Drug Development," Drug Development and Industrial Pharmacy, 3, 185-217 (1977).

11. T.P. Faulkner, J.W. McGinity, J.H. Hayden, M. Martinez and E.G. Comstock, "Pharmacokinetic Studies on Tolerance to Multiple Doses of Sedative-Hypnotics in a Poly-Drug Abuse Population I. Secobarbital, "J. Clin. Pharm. and Therap., 23, 36-46 (1978).

12. J.W. McGinity, "Solving Dissolution Problems with Solid Dispersions," Journal of Pharmaceutical Technology, 2, (3), 50-54 (1978).

13. C.K. Erickson, K.I. Koch, C.S. Mehta and J.W. McGinity, "Chronic Alcohol Release: Subcutaneous Silastic Implants in Mice," Science, 199, 1457-1459 (1978).

14. C.K. Erickson, K.I. Koch, C.S. Mehta and J.W. McGinity, "Chronic Dependence with a Sustained Ethanol Release Implant in Mice," Life Science, 22, 1745-1754 (1978).

15. J.W. McGinity and C.S. Mehta, "Preparation and Evaluation of a Sustained Morphine Delivery System in Rats," Pharmacol. Biochem. Behav., 9, 705-708 (1978).

16. J. Newburger, S. Hayes, M. Ruff and J.W. McGinity, "Determination of Sodium Chloride Equivalents by Osmometry," Drug Development and Industrial Pharmacy, 5(2), 93-105 (1979).

17. J.W. McGinity, L.A. Hunke and A.B. Combs, "Effect of Water Soluble Carriers on the Release of Morphine Sulfate from a Silicone Polymer," Journal of Pharmaceutical Sciences, 68, 662-664 (1979).

18. T.P. Faulkner, J.W. McGinity et al., "Pharmacokinetic Studies on Tolerance to Multiple Doses of Sedative-Hypnotics in a Poly-Drug Abuse Population II. Secobarbital - Amobarbital," Journal of Clinical Pharmacology, 19, 605-616 (1979).

19. J.W. McGinity, A.B. Combs and A. Martin, "In Vitro Release Characteristics of Sodium Sulfathiazole from Formalin-Treated Nylon Gelatin Microcapsules," In Microencapsulation, T. Kondo, Ed., Techno Inc. Publishing Co., Tokyo, Japan, 57-77 (1979).

20. J.W. McGinity and M.R. Harris, "Increasing Dissolution Rates of Poorly Soluble Drugs by Adsorption to Montmorillonite," Drug Development and Industrial Pharmacy, 6, 35-48 (1980).

21. J.W. McGinity and M.R. Harris, "Influence of a Montmorillonite Clay on the Properties of Griseofulvin Tablets," Drug Development and Industrial Pharmacy, 6, 49-59 (1980).

22. W.H. Riffee, R.E. Wilcox, J.A. Anderson and J.W. McGinity, "Silastic Pellets for Sustained Delivery of Morphine in Mice", Journal of Pharmaceutical Sciences, 69, 980-982 (1980).

23. J.W. McGinity and M.R. Harris, "Optimization of Slow-Relese Tablet Formulations Containing Montmorillonite I. Properties of Tablets", Drug Development and Industrial Pharmacy, 6(4), 339-410 (1980).

24. C.K. Erickson, K.I. Koch and J.W. McGinity, "Subcutaneous Silastic Implants: Maintenence of High Blood Ethanol Levels in Rats Drinking a Liquid Diet," Pharmacology & Biochemistry Behavior, 13, 781-786 (1980).

25. J.W. McGinity, A. Martin, G.W. Cuff and A.B. Combs, "Influences of Matrixes on Nylon Encapsulated Pharmaceuticals," Journal of Pharmaceutical Sciences, 70 (4), 372-375 (1981).

26. J.W. McGinity, S. Stavchansky and A. Martin, "Bioavailability in Tablet Technology," in Pharmaceutical Dosage Forms: Tablets, Vol. 2, H. Liberman and L. Lackman, Editors, M. Dekker, Publisher, Chapter 6, 269-449 (1981).

27. J.W. McGinity, G.W. Cuff and A.B. Combs, "Microencapsulation of Pharmaceuticals," Aust. J. Pharm. Sci., 10, 17-19 (1981).

28. M.J. Miralles, J.W. McGinity and A. Martin, "Combined Water-Soluble Carriers for Coprecipitates of Tolbutamide," Journal of Pharmaceutical Sciences, 71, 302-304 (1982).

29. M.R. Harris and J.W. McGinity, "Optimization of Slow-Release Formulations Containing Montmorillonite II. Factors Affecting Drug Release," Drug Development and Industrial Pharmacy, 8(6), 783-793 (1982).

30. M.R. Harris and J.W. McGinity, "Optimization of Slow-Release Formulations Containing Montmorillonite III. Mechanism of Release," Drug Development and Industrial Pharmacy, 8(6), 795-809 (1982).

31. C.K. Erickson, S.A. Stavchansky, K.I. Koch and J.W. McGinity, "Sustained Release of Nicotine: A New Pharmacological Tool," Pharmacology Biochemistry and Behavior, 17, 183-185 (1982).

32. J.W. McGinity, C.G. Cameron and G.W. Cuff, "Controlled-Release Theophylline Tablet Formulations Containing Acrylic Resins. I. Dissolution Properties of Tablets," Drug Development and Industrial Pharmacy, 9, 57-68 (1983).

33. J.W. McGinity, "Drug Delivery Systems," Discovery 8(1), 11-14 (1983).

34. G.W. Cuff, A.B. Combs and J.W. McGinity, "Effect of Formulation Factors on the Matrix pH of Nylon Microcapsules," Journal of Microencapsulation, 1(1) 27-32 (1984).

35. J.W. McGinity, P. Maincent, H. Steinfink, "Crystallinity and Dissolution Rate of Tolbutamide Solid Dispersions Prepared by the Melt Method", Journal of Pharmaceutical Sciences, 73, 1441-1444 (1984).

36. G.W. Cuff and J.W. McGinity, "Expanded Versatility of Microcapsules Prepared by Interfacial Polymerization," Journal of Microencapsulation, 1(4) 343-347 (1984).

37. M.R. Harris, J.B. Schwartz and J.W. McGinity, "Optimization of Slow-Release Tablet Formulation Containing Sodium Sulfathiazole and Montmorillonite Clay," Drug Development and Industrial Pharmacy, 11(5) 1089-1110 (1985).

38. J.W. McGinity and G.W. Cuff, "Nylon Encapsulated Pharmaceuticals" in Drug and Enzyme Targeting, Vol. 1, Ed. K.J. Widder and R. Green, Academic Press, Inc., NY, 84-101 (1985).

39. J.W. McGinity, Chi-Tze Ku, R. Bodmeier and M.R. Harris, "Dissolution and Uniformity Properties of Ordered Mixes of Micronized Griseofulvin and a Directly Compressible Excipient," Drug Development and Industrial Pharmacy, II(4) 891-900 (1985).

40. J.W. McGinity and M.R. Harris, "Sodium Alginate," Codex of Pharmaceutical Excipients, 257-258 (1986).

41. J.W. McGinity and M.R. Harris, and K. Patel, "Carbomer," Codex of Pharmaceutical Excipients, 41-42 (1986).

42. J.W. McGinity, M.R. Harris, and R. Dusch, "Alginic Acid,"Codex of Pharmaceutical Excipients, 5 (1986).

43. C.G. Cameron and J.W. McGinity, "Controlled-Release Theophylline Tablet Formulation Containing Acrylic Resins, II. Combination Resin Formulation" Drug Development and Industrial Pharmacy, 13, 1409-1427 (1987).

44. C.G. Cameron and J.W. McGinity, "Controlled-Release Theophylline Tablet Formulations Containing Acrylic Resins. III. Influence of Filler Excipient" Drug Development and Industrial Pharmacy, 13, 303-318 (1987).

45. J.C. Walkow and J.W. McGinity, "The Effect of Physicochemical Properties on the In Vitro Diffusion of Drug Through Synthetic Membranes and Pigskin I. Methylsalicylate," International Journal of Pharmaceutics, 35, 91-102 (1987).

46. J.C. Walkow and J.W. McGinity, "The Effect of Physicochemical Properties on the In Vitro Diffusion of Drug Through Synthetic Membranes and Pigskin II. Salicylic Acid," International Journal of Pharmaceutics, 35, 103-109 (1987).

47. R. Bodmeier and J.W. McGinity, "Polylactic and Microspheres Containing Quinidine Base and Quinidine Sulphate Prepared by the Solvent

Evaporation Technique: I. Methods and Morphology," Journal of Microencapsulation, 4, 279-288 (1987).

48. R. Bodmeier and J.W. McGinity, "Polylactic and Microspheres Containing Quinidine Base and Quinidine Sulpha Prepared by the Solvent Evaporation Technique: II. Process Parameters Influencing the Preparation of Properties of Microspheres," Journal of Microencapsulation, 4, 289-297 (1987).

49. A.A. Fus, R.L. Talbert, and J. W. McGinity, "Fate of Ferrous Sulphate Prescription", The American Journal of Medicine, 83, 386-388 (1987).

50. R. Bodmeier and J.W. McGinity, "The Preparation and Evaluation of Drug-Containing Poly(DL-Lactic Acid) Microspheres Formed by the Solvent Evaporation Method", Pharmaceutical Research 4, 465-471(1987).

51. R. Bodmeier and J.W. McGinity, "Solvent Selection in the Preparation of Poly (dl-Lactide) Microspheres Prepared by the Solvent Evaporation Method," International Journal of Pharmaceutics, 43, 179-186 (1988).

52. R. Bodmeier and J.W. McGinity, "Polylactic Acid Microspheres Containing Quinidine Base and Quinidine Sulfate prepared by the Solvent Evaporation Technique: III, Morphology of the Microspheres During Dissolution Studies", Journal of Microencapsulation, 5, 325-330 (1988).

53. R.O. Williams III and J.W. McGinity, "The Use of Tableting Indices to Study the Compaction Properties of Powders", Drug Development and Industrial Pharmacy, 14, 1823-1844 (1988).

54. R.O. Williams and J.W. McGinity, "Compaction Properties of Microcrystalline Cellulose and Sodium Sulfathiazole in Combination with Talc or Magnesium Stearate", Journal of Pharmaceutical Sciences 78, 1025-1034 (1989).

55. M.D. Schulze, R.O. Williams and J.W. McGinity, "Compaction Properties of Acrylic Resin Polymers with Plastic and Brittle Drugs", Drug Development and Industrial Pharmacy 16(5), 741-754 (1990).

56. M.R. Jenquin, S.M. Liebowitz, R.E. Sarabia and J.W. McGinity, "Physical and Chemical Factors Influencing the Release of Drugs from Acrylic Resin Films", Journal of Pharmaceutical Sciences, 79(9), 811-816 (1990).

57. M.D. Schulze and J.W. McGinity, "Physical-Mechanical Properties of Spray-Dried and Milled Acrylic Resin Polymers in Combination with a Brittle or Plastic Drug", S.T.P. Pharma Sciences 1(13), 165-171 (1991).

58. M. Iwata and J.W. McGinity, "Preparation of Multi-phase Microcapsules of Poly (dl-lactic acid) and Poly(d,l-lactic-co-glycolic acid) Containing a

W/O Emulsion by a Multiple Emulsion Solvent Evaporation Technique", Journal of Microencapsulation, 9(2), 201-214 (1992).

59.  M.D. Coffin and J.W. McGinity, "Biodegradable Pseudolatexes: The Chemical Stability of Poly (d,l-lactide) and Poly (E-caprolactone) Nanoparticles in Aqueous Media", Pharmaceutical Research, 9(2), 200-205 (1992).

60.  M.O. Omelczuk and J.W. McGinity, "The Influence of Polymer Glass Transition Temperature and Molecular Weight on Drug Release from Tablets Containing Poly (dl-lactic acid)", Pharmaceutical Research, 9(1), 26-32 (1992).

61.  M.R. Jenquin, R.E. Sarabia, S.N. Liebowitz, and J.W. McGinity, "Relationship of Film Properties to Drug Release from Monolithic Films Containing Adjuvants", Journal of Pharmaceutical Sciences, 81, 983-989 (1992).

62.  J. Gutierrez-Rocca and J.W. McGinity, "Influence of Aging on the Physical-Mechanical Properties of Acrylic Resin Films Cast from Aqueous Dispersions  and Organic Solutions", Drug Development and Industrial Pharmacy, 19(3), 315-332, (1993).

63.  M.O. Omelczuk and J.W. McGinity "The Influence of Thermal Treatment on the Physical-Mechanical and Dissolution Properties of Tablets Containing Poly (d,l-lactic acid)", Pharmaceutical Research, 10(4), 542-548, (1993).

64.  M. Iwata and J.W. McGinity, "Dissolution, Stability, and Morphological Properties of Conventional and Multiphase Poly (D,L-Lactic-Co-Glycolic Acid) Microspheres Containing Water Soluble Compounds", Pharmaceutical Research, 10(8), 1219-1227, (1993).

65.  M.D. Schulze and J.W. McGinity, "Indices of Tableting Performance for Acrylic Resin Polymers with Plastic and Brittle Drugs", Drug Development and Industrial Pharmacy, 19(12), 1393-1441, (1993).

66.  M.R. Jenquin and J.W. McGinity, "Characterization of Acrylic Resin Matrix Films and Mechanisms of Drug-Polymer Interactions", International Journal of Pharmaceutics, 101, 23-34, (1993).

67.  J.C. Gutiérrez-Rocca and J.W. McGinity, "Influence of Water Soluble and Insoluble Plasticizes on the Physical and Mechanical Properties of Acrylic Resin Copolymers", International Journal of Pharmaceutics, 103, 293-301, (1994).

68.  S.E. Frisbee and J.W. McGinity, "Influence of Nonionic Surfactants on the Physical and Chemical Properties of a Biodegradeable Pseudolatex"

European Journal of Pharmaceutics and Biopharmacetics, 40(6), 355-363 (1994).

69.    S. Obara and J.W. McGinity, "Properties of Free Films Prepared From Aqueous Polymers by a Spraying Technique", Pharmaceutical Research 11(11), 1562-1567, (1994).

70.    M. Omelczuk and J.W. McGinity, "A Comparative Investigation of the Compaction and Dissolution Properties of Tablets Containing Poly (DL-Lactic Acid) as a Binder and Retardant Polymer", S.T.P. Pharma Sciences, 5(3), 181-185, (1995).

71.    P.B. O'Donnell, M. Iwata, and J.W. McGinity, "Properties of Multiphase Microspheres of Poly (DL-Lactic-Co-Glycolic Acid) Prepared by a Potentiometric Dispersion Technique", Journal of Microencapsulation, 12(2), 155-163, (1995).

72.    C. Wang and J.W. McGinity, "Compaction Properties of Spheronized Binary Granular Mixtures", Drug Development and Industrial Pharmacy, 21(7), 753-779, (1995).

73.    L.A. Felton, M.M. Haase, N.H. Shah, G. Zhang, M.H. Infeld, A.W. Malick and J.W. McGinity, "Physical and Enteric Properties of Soft Gelatin Capsules Coated with Eudragit L 30 D", International Journal of Pharmaceutics, 113, 17-24, (1995).

74.    S. Obara and J.W. McGinity, "Influence of Processing Variables on the Properties of Free Films Prepared from Aqueous Polymeric Dispersions by a Spray Technique", International Journal of Pharmaceutics, 126, 1-10 (1995).

75.    L. Felton, N. Shah, G. Zhang, M. Infeld, A. Malick and J.W. McGinity, "Physica-Mechanical Properties of Film-Coated Soft Gelatin Capsules", International Journal of Pharmaceutics, 127, 203-211, (1996).

76.    C. Aitken-Nichol, F. Zhang & J.W. McGinity, "Hot Melt Extrusion of Acrylic Films", Pharmaceutical Research, 13(5) 804-808, (1996).

77.    C. Wang, G. Zhang, N. Shah, M. Infeld, W. Malick, J.W. McGinity, "Mechanical Properties of Single Pellets Containing Acrylic Polymers" Pharmaceutical Development and Technology, 1(2), 213-222 (1996).

78.    P.B. O'Donnell, J.W. McGinity, "Properties of Multiphase Microspheres of Poly(dl-lactic acid) or Poly(dl-lactic-co-glycolic acid) Produced by Mechanical Agitation, Sonication, or Potentiometric Dispersion," Journal of Microencapsultion, 13(6), 667-677 (1996).

79. L. Felton, J.W. McGinity, "The Influence of Tablet Hardness and Tablet Hydrophobicity on the Adhesive Properties of an Acrylic Resin Copolymer", Pharmaceutical Development and Technology, 1(4), 381-389 (1996).

80. P. O'Donnell, C. Wu, J. Wang, B. Oshlack, M. Chasin, R. Bodmeier, J.W. McGinity, "Aqueous Pseudolatex of Zein for Film Coating of Solid Dosage Forms", European Journal of Pharmaceutics and Biopharmaceutics, 43(1), 83-89 (1997).

81. C. Wang, G. Zhang, N. Shah, M. Infeld, A. Malick, J.W. McGinity, "Influence of Plasticizers on the Mechanical Properties of Pellets Containing Eudragit RS 30D, International Journal of Pharmaceutics, 152, 153-163, (1997)

82. L. Felton, N. Shah, G. Zhang, M. Infeld, A. Malick, J.W. McGinity, "Compaction Properties of Non-pareil Beads Coated with an Acrylic Resin Copolymer, S.T.P. Pharma Sciences, 7(6), 457-462 (1997).

83. L. Felton & J.W. McGinity, "Influence of Plasticizers on the Adhesive Properties of an Acrylic Resin Copolymer to Hydrophylic and Hydrophobic Tablet Compacts" International Journal of Pharmaceutics, 154, 167-168 (1997).

84. T. Runge, J.W. McGinity, S. Frisbee, J. Briceno, S. Ottmers, J. Calhoon, C. Hantler, D. Korvick & J. Ybarra, "Enhancement of Brain $p0_2$ During Cardiopulmonary Bypass Using a Hyperosmolar Oxygen Carrying Solution", Art. Cells, Blood Subs., and Immob. Biotech, 25(3), 297-308 (1997).

85. P.B. O'Donnell & J.W. McGinity, "Preparation of Microspheres by the Solvent Evaporation Technique", Advanced Drug Delivery Reviews, 28, 25-42 (1997)

86. M. Iwata & J.W. McGinity, "Solvent System for the Preparation of Poly(d,l-lactic-co-glycolic acid) Microspheres Containing Tumor Necrosis Factor-alpha (TNF-□)", International Journal of Pharmaceutics, 160(2), 145-156 (1998).

87. P. O'Donnell & J.W. McGinity, "Influence of Processing on the Stability and Release Properties of Biodegradable Microspheres Containing Thioridazine Hydrochloride", European Journal of Pharmaceutics and Biopharmaceutics, 45(1), 83-94 (1998).

88. M. Iwata, Y. Nakamura and J.W. McGinity "Particle Size and Loading Efficiency of Poly(d,l-lactic-co-glycolic acid) Multiphase Microspheres Containing Water Soluble Substances Prepared by the Hydrous and

Anhydrous Solvent Evaporation Methods", Journal of Microencapsulation 16(1), 49-58 (1999).

89. M.A. Repka, T.G. Gerding, S.L. Repka, and J.W. McGinity, "Influence of Plasticizers and Drugs on the Physical-Mechanical Properties of Hydroxypropylcellulose Films Prepared by Hot Melt Extrusion Drug Development and Industrial Pharmacy, 25(5), 625-623 (1999).

90. L. Felton and J.W. McGinity, "Influence of pigment concentration and particle size on adhesion of an aqueous-based acrylic polymer to tablet compacts", Drug Development and Industrial Pharmacy, 25(5), 599-606 (1999).

91. F. Zhang and J.W. McGinity, "Properties of Sustained Release Tablets Prepared by Hot Melt Extrusion" Pharmaceutical Development and Technology, 4(2), 241-250 (1999).

92. C.B. Wu, J.W. McGinity, "Non-Traditional Plasticization of Polymeric Films", International Journal of Pharmaceutics, 177(1), 15-27, (1999).

93. M. Iwata, Y. Nakamura and J.W. McGinity, "In Vitro and In Vivo Release Properties of Brilliant Blue and Tumor Necrosis Factor-Alpha (TNF-α) from Poly(d,l-lactic-co-glycolic acid) Multiphase Microspheres", Journal of Microencapsulation, 16(6), 777-792, (1999).

94. L. Felton & J.W. McGinity, "Adhesion of polymeric films to pharmaceutical solids", European Journal of Pharmaceutics and Biopharmaceutics, 47, 3-14, (1999).

95. M. Frohoff-Hülsmann, B.C. Lippold, & J.W. McGinity, "Aqueous ethyl cellulose dispersion containing plasticizers of different water solubility and hydroxypropyl methyl-cellulose as coating material for diffusion pellets II properties of sprayed films", European Journal of Pharmaceutics and Biopharmaceutics, 48(1), 67-75, (1999).

96. F. Zheng and J.W. McGinity, "Properties of Hot-Melt Extruded Theophylline Tablets Containing Poly(vinyl acetate)", Drug Development and Industrial Pharmacy, 29(6), 938-948, (2000).

97. C.B. Wu and J.W. McGinity, "Influence of Relative Humidity on the Mechanical and Drug Release Properties of Theophylline Pellets Coated with an Acrylic Polymer Containing Methylparaben as a Non-Traditional Plasticizer", European Journal of Pharmaceutics and Biopharmaceutics, 50(2), 277-284, (2000).

98. M.A. Repka and J.W. McGinity, "Physical-Mechanical Moisture Absorption and Bioadhesive Properties of Hydroxypropylcellulose Hot-Melt Extruded Films" Biomaterials, 21(14), 1509-1517, (2000).

99. J.W. McGinity, F. Zhang, M.K. Repka and J.J. Koleng, "Thermal Processing of Pharmaceutical Powders", Pharm Tech Japan, 16(6), 897-913, (2000).

100. M.A. Repka and J.W. McGinity, "Influence of Vitamin E TPGS on the Properties of Hydrophilic Films Produced by Hot-Melt Extrusion", International Journal of Pharmaceutics, 202(1-2), 63-70, (2000).

101. J. Liu, F. Zhang and J.W. McGinity, "Properties of Lipophilic Matrix Tablets Containing Phenylpropanolamine Hydrochloride Prepared by Hot-melt Extrusion", European Journal of Pharmaceutics and Biopharmaceutics, 52/2, pp. 181-190, (2001).

102. M. Kikokoro, N.H. Shah, A.W. Malick, M.H. Infeld, and J.W. McGinity "Properties of tablets containing granulations of ibuprofen and acrylic copolymer prepared by thermal processes", Pharmaceutical Development and Technology, 6(2). 263-275 (2001).

103. T. Maejima and J.W. McGinity, "Influence of Film Additives on Stabilizing Drug Release Rates from Pellets Coated with Acrylic Polymers" Pharmaceutical Development and Technology, 6(2), 205-215 (2001).

104. M. Repka and J.W. McGinity, "Bioadhesive Properties of Hydroxypropylcellulose Topical Films Produced by Hot-Melt Extrusion", Journal of Controlled Release, 70, 341-351, (2001).

105. M. Repka and J.W. McGinity, "Influence of Chlorpheniramine Maleate on Topical Hydroxypropycellulose Films Produced by Hot-Melt Extrusion", Pharmaceutical Development and Technology, 6(3), 297-304 (2001).

106. J.W. McGinity, F. Zhang, M.A. Repka, and J.J. Koleng, "Hot-Melt Extrusion as a Pharmaceutical Process", American Pharmaceutical Review, 4:2, 25-36, (2001).

107. C.B. Wu and J.W. McGinity, "Influence of Ibuprofen as a Solid-State Plasticizer in Eudragit RS30D on the Physico-chemical Properties of Coated Beads", AAPS PharmSciTech, 2:4, Article 24 (2001).

108. S.E. Frisbee, K.A. Mehta, and J.W. McGinity, "Processing Factors that Influence the In Vitro and In Vivo Performance of Film Coated Drug Delivery Systems" Drug Delivery Technology, 2:1, pp. 72-76, (2002).

109. L.A. Felton and J.W. McGinity, "Influence of insoluble excipients on film coating systems", Drug Development and Industrial Pharmacy 28 (3), 225-243, 2002.

110. Y. Zhu, N.H. Shah, A.W. Malick, M.H. Infeld and J.W. McGinity, "Solid-state plasticization of an acrylic polymer with chlorpheniramine maleate and triethyl citrate", International Journal of Pharmaceutics, 241:2, 301-310, (2002).

111. M.M. Crowley, F. Zhang, J.J. Koleng and J.W. McGinity, "Stability of Polyethylene Oxide in Matrix Tablets Prepared by Hot-Melt Extrusion", Biomaterials, 23, 4241-4248, (2002).

112. K.G. Wagner and J.W. McGinity, "Influence of chloride ion exchange on the permeability and drug release of Eudragit RS 30D films", Journal of Controlled Release, 82:2-3, 385-397, (2002).

113. C. Young, J. Koleng, J.W. McGinity, "Production of Spherical Pellets by a Hot-Melt Extrusion and Spheronization Process", International Journal of Pharmaceutics, 242:1-2, 87-92, (2002).

114. Y. Zhu, N.H. Shah, A.W. Malick, M.H. Infeld, J.W. McGinity. "Influence of Thermal Processing on the Properties of Chlorpheniramine Maleate Tablets Containing an Acrylic Polymer" Pharmaceutical Development and Technology, 7:4, 481-489, (2002).

115. C.B. Wu and J.W. McGinity, "Influence of an Enteric Polymer on Drug Release Rates of Theophylline from Pellets Coated with Eudragit RS 30D", Pharmaceutical Development and Technology, 8:1, 109-116, (2003).

116. W. Zheng and J.W. McGinity, "Influence of Eudragit® NE 30 D Blended with Eudragit® L 30 D-55 on the Release of Phenylpropanolamine Hydrochloride from Coated Pellets", Drug Development and Industrial Pharmacy, 29:3, 357-366, (2003).

117. L.D. Bruce, H.U. Petereit, T. Beckert and J.W. McGinity, "Properties of Enteric Coated Sodium Valproate Pellets", International Journal of Pharmaceutics, 264:1-2, 86-90, (2003).

118. L.D. Bruce, J.J. Koleng and J.W. McGinity, "The Influence of Polymeric Subcoats and Pellet Formulation on the Release of Chlorpheniramine Maleate from Enteric Coated Pellets", Drug Development and Industrial Pharmacy, 29:8, 909-924, (2003).

119. C.B. Wu and J.W. McGinity, "Influence of Methylparaben as a Solid-State Plasticizer on the Physiochemical Properties of Eudragit® RS-PO Hot Melt Extrudates" European Journal of Pharmaceutics and Biopharmaceutics, 56:1, 95-100, (2003).

120. C.R. Young, J.J. Koleng and J.W. McGinity, "Properties of Drug-Containing Spherical Pellets Produced by a Hot-Melt Extrusion and

Spheronization Process", Journal of Microencapsulation, 20:5, September-October 2003, 613-625, (2003).

121. L. Felton, J.W. McGinity, "Enteric Film Coating of Soft Gelatin Capsules", Drug Delivery Technology, 3:6, 46-51, (2003).

122. Y. Zhu, N.H. Shah, A.W. Malick, M.H. Infeld, J.W. McGinity, "Influence of a lipophilic thermal lubricant on the processing conditions and drug release properties of chlorpheniramine maleate tablets prepared by hot-melt extrusion", Journal of Drug Delivery Science and Technology, 14(4), 313-318 (2004).

123. M.M. Crowley, A. Fredersdorf, B. Schroeder, S. Prodduturi, M.A. Repka, J.W. McGinity, "The Influence of Guaifenesin and Ketoprofen on the Properties of Hot-Melt Extruded Polyethylene Oxide Films", European Journal of Pharmaceutical Sciences, 22, 409-418 (2004).

124. M.M. Crowley, B. Schroeder, A. Fredersdorf, S. Obara, M. Talarico, S. Kucera, J.W. McGinity, "Physicochemical Properties and Mechanism of Drug Release from Ethyl Cellulose Matrix Tablets Prepared by Direct Compression and Hot-melt Extrusion", International Journal of Pharmaceutics, 269, 509-522 (2004).

125. J.W. McGinity, "Hot Melt Extrusion as a Pharmaceutical Process", AAPS Newsmagazine, 7:03, 21-25 (2004)

126. S. Tumuluri, S. Prodduturi, M. Crowley, S. Stodghill, J.W. McGinity, M. Repka, B. Avery, "The Use of Near-Infrared Spectroscopy for the Quantitation of a Drug in Hot-Melt Extruded Films", Drug Development and Industrial Pharmacy, 30:5, 505-511 (2004).

127. M. Cerea, W. Zheng, C.R. Young and J.W. McGinity, "Studies on a Novel Powder Coating Process for Attaining Taste Masking and Moisture Protective Films on Tablets" International Journal of Pharmaceutics, 279:1-2, 127-139, (2004).

128. W. Zheng, M. Cerea, D. Sauer and J.W. McGinity, "Properties of theophylline tablets powder-coated with methacrylate ester copolymers" submitted to Drug Delivery Science and Technology, 14(4), 319-325 (2004).

129. M.A. Repka and J.W. McGinity, "Hot-Melt Extruded Films for Transmucosal and Transdermal Drug Delivery Applications", Drug Delivery Technolgy, 4:7, 40-47, (2004).

130. W. Zheng, D. Sauer, and J.W. McGinity, "Influence of hydroxyethylcellulose on the drug release properties of theophylline pellets

coated with Eudragit® RS 30D", The European Journal of Pharmaceutics and Biopharmaceutics, 59(1), 147-154, (2005).

131. C.R. Young, C. Dietzsch and J.W. McGinity, "Compression of Controlled- Release Pellets Produced by a Hot-Melt Extrusion and Spheronization Process", Pharmaceutical Development and Technology, (1), 141-147, (2005).

132. L.D. Bruce, N.H. Shah, A.W. Malick, M.H. Infeld and J.W. McGinity, "Properties of Hot-Melt Extruded Tablet Formulations for the Colonic Delivery of 5-Aminosalicylic-Acid", European Journal of Pharmaceutics and Biopharmaceutics, 59, 85-97, (2005).

133. C.R. Young, C. Dietzsch, M. Cerea. T. Farrell, K.A. Fegely, A. Rajabi-Siahboomi, and J.W. McGinity, "Physicochemical characterization and mechanisms of release of theophylline from melt-extruded dosage forms based on a methacrylic acid copolymer", International Journal of Pharmaceutics, 301(1-2), 112-120, (2005).

134. J.W. McGinity, "Dry Powder Coating: A Novel Technique for Film Coating Solid Substrates", PharmaSci Tech Japan, 65(3), 134-138 (2005).

135. H. Onishi, T. Oosegi. Y. Machida and J.W. McGinity, "Preparation and In Vitro Evaluation of Chitosan Microspheres Containing Prednisolone: Comparison of Simple and Conjugate Microspheres", Drug Development and Industrial Pharmacy, 31(7), 597–605, (2005).

136. R. Bodmeier and J.W. McGinity, "Dry Coating of Solid Substrates with Polymeric Powders", Drug Delivery Technology, 5(9), 45-48, (2005).

137. A. Reidel, J.W. McGinity and C.S. Leopold, "Solid state interactions between the proton pump inhibitor omeprazole and various enteric coating polymers", Journal of Pharmaceutical Sciences, 95:6, 1342-1353,(2006).

138. Y. Zhu, K. A. Mehta, J.W. McGinity "Influence of plasticizer level on the drug release from sustained release film coated and hot-melt extruded dosage forms", Pharmaceutical Development and Technology, 11:285-294, (2006).

139. M. Fukuda, N.A. Peppas, J.W. McGinity, "Properties of Sustained Release Hot-Melt Extruded Tablets Containing Chitosan and Xanthan Gum", International Journal of Pharmaceutics, 310, 90-100, (2006).

140. H. Bando and J.W. McGinity, "Physicochemical Properties of Eudragit® S100:L100 Films Prepared from Aqueous Dispersions and Organic Solutions", International Journal of Pharmaceutics, 313, 43-38, (2006).

141. Y. Zhu, N.H. Shah, A.W. Malick, M.H. Infeld, J.W. McGinity, "Controlled Release of a Poorly Water-Soluble Drug from Hot-Melt Extrudates Containing Acrylic Polymers", Drug Development and Industrial Pharmacy, 32:569-583, (2006).

142. H. Bando and J.W. McGinity, "Relationship between Drug Dissolution and Leaching of Plasticizer for Pellets Coated with an Aqueous Eudragit® S100:L100 Dispersion", International Journal of Pharmaceutics, 323(1-2), 11-17, (2006).

143. M. Fukuda, N.A. Peppas, J.W. McGinity, "Floating Hot-Melt Extruded Tablets for Gastroretentive Controlled Drug Release System", Journal of Controlled Release, 115(2), 121-129, (2006).

144. J. Brock Thomas, Courtney M. Creecy, Nicholas A. Peppas, J.W. McGinity, "Synthesis and Properties of Lightly Crosslinked Poly((meth)acrylic acid) Microparticles Prepared by Free Radical Precipitation Polymerization", Polymer Bulletin, 57, 11-20, (2006).

145. D. Miller, M. Fukuda, J.W. McGinity, "The Properties of Chitosan as a Retardant Binder in Matrix Tablets for Sustained Drug Release", Drug Delivery Technology, 6:9, 45-52, (2006).

146. D.A. Miller, J.T. McConville, W. Yang, R.O. Williams III and J.W. McGinity, "Hot-Melt Extrusion for Enhanced Delivery of Drug Particles", Journal of Pharmaceutical Sciences, 96(2), 361-76, (2007).

147. C.R. Young, M.M. Crowley, C. Dietzsch and J.W. McGinity, "Physicochemical Properties of Film-Coated Melt-Extruded Pellets", Journal of Microencapsulation, 24:1, 57-71, February 2007.

148. S.A. Kucera, W. Zheng, N.H. Shah, A.W. Malick, M.H. Infeld, J.W. McGinity, "The Use of Proteins to Minimize the Physical Aging of Eudragit® Sustained Release Films", Drug Development and Industrial Pharmacy, in press, October 2006.

149. D. Sauer, L. Coots, W. Zheng, J.W. McGinity, "Influence of processing parameters and formulation factors on the drug release from tablets powder-coated with EudragitR L 100-55", European Journal of Pharmaceutics and Biopharmaceutics, in press, February 2007.

150. C. Dietzsch, K.A. Fegely, A.R. Rajabi-Siahboomi and J.W. McGinity, "Crystal Growth Formation in Melt Extrudates", submitted to International Journal of Pharmaceutics, accepted April 2007, in press.

XIV.   Book Chapters:

1.    J.W. McGinity, A.B. Combs and A. Martin, "In Vitro Release Characteristics of Sodium Sulfathiazole from Formalin-Treated Nylon Gelatin Microcapsules," in *Microencapsulation*, T. Kondo, Ed., Techno Inc. Publishing Co., Tokyo, Japan, pp. 57-77 (1979).

2.    J.W. McGinity, S. Stavchansky and A. Martin, "Bioavailability in Tablet Technology," in *Pharmaceutical Dosage Forms: Tablets, Vol. 2*, H. Liberman and L. Lachman, Editors, M. Dekker, Publisher, Chapter 6, 269-449 (1981).

3.    J.W. McGinity and G.W. Cuff, "Nylon Encapsulated Pharmaceuticals" in *Drug and Enzyme Targeting, Vol. 1*, Ed. K.J. Widder and R. Green, Academic Press, Inc., NY, pp. 84-101 (1985).

4.    Y. Kawashima, H. Takeuchi, T. Handa, W.J. Thiele, D.P. Deen and J.W. McGinity, "Aqueous Based Coatings in Matrix Tablet Formulations" a chapter in *Aqueous Based Coatings in Pharmaceutical Systems*, Ed. J.W. McGinity, Publ., Marcel Dekker Inc. New York, NY, (1988), pp 363-397.

5.    J.W. McGinity and M.D. Coffin, "Cooling Processes and Congealing", in *Encyclopedia of Pharmaceutical Technology, Vol. 3*, Publ. Marcel Dekker, Inc., New York, New York pp 315-335 (1990).

6.    J.W. McGinity, "Applications and Physical-Chemical Properties of Aqueous Polymeric Coatings for Drug Delivery Systems" in *Recent Advances on Aqueous Polymeric Coating Systems and Related Techniques*", Ed. Y Kawahima, pp 1-10 (1990).

7.    J.W. McGinity and S. Stavchansky, "Bioavailability in Tablet Technology" in *Pharmaceutical Dosage Forms: Tablets Vol. 2*, Ed. H Lieberman, pp 349-569 (1990).

8.    J.W. McGinity, K.T. Chang, and M.O. Omelczuk, "Biodegradable Polymers: Effect of Thermal Treatment on the Physicomechanical and Dissolution Properties of Compacts", in *Pharmaceutical Technology*, Ed. J. Wells and M. Rubinstein, pp 132-141 (1991).

9.    J.W. McGinity and M, D. Coffin, "Physical and Chemical Stability of Pseudolatex Dispersions of Biodegradable Polymers", in *Microencapsulation of Drugs*, Ed. T.L. Whatley and A.J. Baillie, in Series "Drug Delivery", Ed. A.T. Florence, pp 197-214 (1992).

10. P.B. O'Donnell and J.W. McGinity, "Pharmaceutical Applications of Minerals", in *Industrial Minerals and Their Uses: A Handbook & Formulary*, Ed. P.A. Ciullo, Noyes Publications, 401-433 (1996).

11. M. Coffin, S. Frisbee, and J.W. McGinity, "Properties of Aqueous Pseudolatex Dispersions of Biodegradable Polymers", chapter in *Aqueous Polymeric Coatings for Pharmaceutical Dosage Forms, 2nd Edition*, Marcel Dekker Inc., (1996).

12. P. O'Donnell and J.W. McGinity, "Mechanical Properties of Polymeric Films Prepared from Aqueous Polymeric Dispersions", chapter in *Aqueous Polymeric Coatings for Pharmaceutical Dosage Forms,l 2nd Edition*, Marcel Dekker Inc., (1996).

13. Theme Issue on Microparticles and Microcapsules, J.W. McGinity, Editor, *European Journal of Pharmaceutics and Biopharmaceutics*, Vol. 45, No. 1, (January 1998).

14. J. Koleng & J.W. McGinity, chapter on Carbomer in *Handbook of Pharmaceutical Excipients, 3rd Edition*, Ed. Arthur H. Kibbe, American Pharmaceutical Association and Pharmaceutical Press, 79-82, (2000).

15. M. Repka & J.W. McGinity, chapter on Alginic Acid in *Handbook of Pharmaceutical Excipients, 3rd Edition*, Ed. Arthur H. Kibbe, American Pharmaceutical Association and Pharmaceutical Press, 10-12, (2000).

16. J.W. McGinity, J.J. Koleng, M.A. Repka, and F. Zheng, *Hot Melt Extrusion Technology*, chapter in the Volume 19 of the *Encyclopedia of Pharmaceutical Technology*, Marcel Dekker, Ed. J. Swarbrick and J.C. Boylan, pp. 203-226 (2000).

17. J.W. McGinity, J.J. Koleng, M.A. Repka, and F. Zheng, *Hot Melt Extrusion Technology*, chapter in the 2nd Edition of the *Encyclopedia of Pharmaceutical Technology*, Marcel Dekker, Ed. J. Swarbrick and J.C. Boylan, pp. 1488-1505 (2002).

18. J.W. McGinity, chapter on Carbomer in *The Handbook of Pharmaceutical Excipients, 4th Ed.*, Ed. Arthur H. Kibbe, American Pharmaceutical Association and Pharmaceutical Press, 89-92 (2003).

19. J.W. McGinity & F. Zhang, "Melt-Extruded Controlled Release Oral Dosage Forms" chapter in *Pharmaceutical Extrusion Technology*, Volume 133 from Drugs and the Pharmaceutical Sciences series, Ed. I. Ghebre-Sellassie, Marcel Dekker, Chapter 10, pp. 183-208, May 2003.

20. J.W. McGinity & D. Miller, "Aqueous Polymeric Film Coating", chapter in *Tablet Technology*, Editors Stephen Hoag and Larry Augsberger. In press, April 2007.

XV.   Patents:

1.   J.W. McGinity, "Corticosteroid Phosphate Salts/Neomycin Sulfate Ophthalmic", U.S. Patent 3,898,330 (1975).

2.   R. Morrow, W. Kuebker and J.W. McGinity, "Fresh-gard Dental Lubricant Formulations", U.S. Patent 4,537,689, (1985).

3.   G.W. Cuff and J.W. McGinity, "Improved Method for Preparing Nylon Microcapsules", U.S. Patent 4,518,547, (1985). Foreign patent applications made in West Germany, U.K., and Japan.

4.   J. Schonfeld and J.W. McGinity, "Color Stabilized Hydrogel Dressing and Process",
U.S. Patent Number 4,646,730, (1987).

5.   Kuei-Tu Chang and J.W. McGinity, "Method for Preparing a Solid Sustained Release Form of a Functionally Active Composition",
U.S. Patent Number 5,051,261, (1991).

6.   J.C. Greco and J.W. McGinity, "Vaginal Progesterone Tablet",
U.S. Patent 5,084,277 (1992).

7.   J.C. Greco and J.W. McGinity, "Progesterone Vaginal Tablet",
U.S. Patent 5,116,619, (1992).

8.   J.W. McGinity and S.L. Ashley, "Delivery of Therapeutic Agents",
U.S. Patent 5,227,157, (1993).

9.   J.W. McGinity and M. Iwata, "Preparation and Uses of Multi-Phase Microspheres",
U.S. Patent 5,288,502, (1994).

10.  J.W. McGinity, R. Bodmeier, B. Oshlack, and M. Chasin, "Aqueous Dispersions of Zein and Preparation Thereof",
U.S. Patent 5,324,351, (1994).

11.  B. Oshlack, J.W. McGinity, R. Bodmeier, M. Chasin, "Controlled Release Coatings Derived from Aqueous Dispersions of Zein",
U.S. Patent 5,356,467, (1994).

12. J.W. McGinity, T. Gerding, R. Bodmeier, "Stick Formulations for Topical Drug Delivery of Therapeutic Agents and Uses Thereof", U.S. Patent 5,597,849 (1997)

13. R. Bodmeier, T.G. Gerding, J.W. McGinity, "Stick Formulations for Topical Drug Delivery of Therapeutic Agents and Uses Thereof", U.S. Patent 5,622.993, 1997.

14. V. Stella, J.W. McGinity *et al*, "Sulfoalkyl Ether Cyclodextrin Based Solid Pharmaceuticals", U.S. Patent 5,874,418, 1999.

15. V. Stella, J.W. McGinity *et al*, "Sulfoalkyl Ether Cyclodextrin Based Controlled Release Solid Pharmaceutical Formulations", U.S. Patent 6,046,177, April 4, 2000.

16. J.R. Robinson and J.W. McGinity, "Effervescent Granules and Methods for Their Preparation", U.S. Patent 6,071,539, June 6, 2000.

17. R. Bodmeier and J.W. McGinity, "Method for Improving the Dispersion of Redispersible Polymer Powders", U.S. Patent 6,169,130, January 2, 2001.

18. Z. Shaked and J.W. McGinity, "Pharmaceutical Formulation Containing DFMO for the Treatment of Cancer", U.S. Patent 6,277,411, August 21, 2001.

19. M.A. Repka, S.L. Repka and J.W. McGinity, "Bioadhesive Hot-Melt Extruded Film for Topical and Mucosal Adhesion Applications and Drug Delivery and Process for Preparation Thereof", U.S. Patent 6,375,963, April 23, 2002.

20. F. Zhang and J. W. McGinity, "Hot-Melt Extrudable Pharmaceutical Formulation" U.S. Patent 6,488,963, December 3, 2002.

21. J.R. Robinson and J.W. McGinity, "Effervescent Granules and Methods for Their Preparation" U.S. Patent 6,488,961, December 3, 2002.

22. J.R. Robinson, P. Delmas, J.W. McGinity, "Effervescent Granules and Methods for Their Preparation" U.S. Patent 6,649,186, November 18, 2003.

23. J.R. Robinson and J.W. McGinity, "Delivery System for Omeprazole and Its Salts", U.S. Patent 6,749,867, June 15, 2004

24. Dave A. Miller, Jason T. McConville, James W. McGinity, Robert O. Williams III, "Stabilized HME Composition with Small Drug Particles" Provisional Patent Application, November 2005.

XVI. Books:

1. J.W. McGinity, ed. Aqueous Polymeric Coatings for Pharmaceutical Dosage Forms, Marcel Dekker publ., (1989).

2. J.W. McGinity, ed. Aqueous Polymeric Coatings for Pharmaceutical Dosage Forms, 2nd Edition, Marcel Dekker Inc., (1996).

XVII: Book Reviews:

1. "Microencapsulation," J.R. Nixon, Editor, Marcel Dekker, Publisher, New York, N.Y. (1976). J. Pharm. Sci., 66, 148 (1977).

2. "Controlled-Release of Bioactive Materials," R. Baker, Editor, Academic Press, New York, N.Y. (1980). J. Pharm. Sci., 70, 837 (1981).

3. "Drug Stability: Principles and Practices", J.T. Carstensen, Editor, Marcel Dekker, Publisher, New York, N.Y. (1990). J. Pharm. Sci., 80, 98 (1991).

4. "Handbook of Pharmaceutical Granulation Technology", Second Edition, D.M. Parikh, Taylor and Francis, Boca Raton, FL 2005, Hardback, 656 pages, ISBN: 0824726472, Drug Development and Industrial Pharmacy, 33,1-2 (2007).

5/01/2007

# EXHIBIT B

# Remington: The Science and Practice of Pharmacy

## Nineteenth Edition

## Volume I

Fig 9. Effect of manufacturing process on the dissolution rate of tablets.[7]

*Key:* $B_1$ Direct compression with spray dried lactose, $B_2$ Wet granulation with ethylcellulose and lactose, $B_3$ Acacia mucilage and lactose, $B_4$ Starch paste and lactose.

to the formation of a firmer and more effective sealing layer by the lubricant under the high pressure and temperature that usually accompanies a strong compressive force (Fig 10[4]).

The curve profile of the compressive force of the tablet versus dissolution rate can take one of several shapes, as is observed in Fig 11[8].

### *Modified-Release Dosage Forms*

Since the early 1950s, pharmaceutical preparations with controlled-release characteristics have been introduced with the purpose of optimizing the bioavailability through the modulation of the time course of the drug concentration in the blood. Such designed control is intended to complement the pharmacological activity of the medicament in order to achieve better selectivity and/or longer duration of action. This adds an extra dimension to the traditional functions of the dosage form being a mere vehicle for drug storage, portability and administration.

**Modified-release dosage forms** is a term used by the compendia to describe those dosage forms for which the drug-release characteristics versus time and/or conditions at the site of dissolution are chosen to accomplish therapeutic or convenience objectives not offered by conventional dosage forms such as solutions, ointments or compressed tablets and capsules. At present, three types of modified-release dosage forms are described by USP. Procedures for the laboratory

Fig 10. Effect of precompression pressure on the dissolution rate of salicylic acid contained in compressed tablets.[4]

*Key:* ●, 715 kg; ×, 1430 kg; ■, 2860 kg; ○, 5730 kg pressure per cm.[2] (Average of five tablets each, formula D.)

Fig 11. Different types of relations between compressional force of tablets and dissolution rate.[8]

evaluation of the behavior of modified-release dosage forms are included in the USP in Section 724, *Drug Release*, and have been modified and expanded in supplements. In the *Drug Release* section five different apparatuses are described in addition to the inclusion of Apparatuses 1 and 2 from Section 711, *Dissolution*.

**Delayed-release dosage forms** are defined as those that release a drug (or drugs) at any time other than promptly after administration. Enteric-coated products are an example of such dosage forms. In order to evaluate delayed-release (enteric-coated) dosage forms, the USP uses two methods, A and B, which are carried out at 37 ± 0.5°. Both methods call for use of the apparatus specified in the monograph for the dosage form (*eg*, Aspirin Delayed-release Tablets, apparatus 1, 100 rpm) and expose the dosage units first to 0.1*N* hydrochloric acid and then to a pH 6.8 buffer in order to measure drug release. The same acceptance tables are used for both methods (limit of 10% dissolved drug in the acid after 2 hours, 75% dissolved drug in the buffer after 45 minutes; three stage testing provided).

**Extended-release dosage forms** (popularly known as timed-release or sustained-release) are defined as those that allow at least a twofold reduction in dosing frequency as compared to the drug presented in a conventional form, eg, a solution or a prompt drug-releasing conventional solid dosage form.

Two procedures using different apparatus variations are employed to evaluate extended-release dosage forms. Apparatus 3 is an assembly that consists of a cylindrical, flat bottom vessel that accommodates a glass reciprocating cylinder whose ends are closed with a polypropylene mesh screen. The dosage unit is placed inside the reciprocating cylinder and the release of drug into the solvent within the cylinder is measured.

Apparatus 4 uses a flow-through cell with a filter system through which the dissolution medium is pumped. There are two different cells, a small and a large cell for tablets and capsules, and tablet holders for the small and large cells. Procedures that use either Apparatus 3 or 4 are carried out at 37 ± 0.5° and use the same three-stage acceptance criteria for the interpretation of results.

**Transdermal delivery systems** are those systems designed to deliver drugs by passage from the dosage form through the skin to be available for distribution via the systemic circulation. An example of this kind of system is the nicotine patch.

In order to evaluate the drug release behavior of transdermal delivery systems, three different apparatus systems are used. Apparatus 5 uses the paddle and vessel from Section 711, *Dissolution* Apparatus 2, and adds a stainless-steel disc assembly to hold the transdermal system to be evaluated at the bottom of the vessel. Apparatus 6 uses the vessel assembly from Apparatus 1, *Dissolution*, except that the basket and shaft are replaced with a stainless steel cylinder stirring element. At the beginning of a measurement, the dosage unit is affixed to the cylinder. Apparatus 7 uses solution containers in which a specifically designed disc sample holder may be made to reciprocate. The procedures using Apparatuses 5, 6 and 7 are all carried out at 32 ± 0.5° (since the delivery systems are used on the skin) and yield results whose interpretation is made using the same three-stage acceptance criteria.

### *Dissolution Apparatus Design*

As the concept of dissolution developed in importance during the last several decades, the methods and techniques used

# Table of Contents

## Volume I

### Part 1 Orientation

1 Scope .... 3
2 Evolution of Pharmacy .... 7
3 Ethics .... 18
4 Community Pharmacy .... 25
5 Pharmacists in Industry .... 29
6 Pharmacists in Government .... 33
7 Drug Information .... 42
8 Research .... 52

### Part 2 Pharmaceutics

9 Metrology and Calculation .... 63
10 Statistics .... 94
11 Computer Science .... 128
12 Calculus .... 135
13 Molecular Structure, Properties and States of Matter .... 147
14 Complex Formation .... 169
15 Thermodynamics .... 184
16 Solutions and Phase Equilibria .... 194
17 Ionic Solutions and Electrolytic Equilibria .... 213
18 Reaction Kinetics .... 231
19 Interfacial Phenomena .... 241
20 Colloidal Dispersions .... 252
21 Coarse Dispersions .... 278
22 Rheology .... 292

### Part 3 Pharmaceutical Chemistry

23 Inorganic Pharmaceutical Chemistry .... 315
24 Organic Pharmaceutical Chemistry .... 340
25 Fundamentals of Radioisotopes .... 364
26 Natural Products .... 382
27 Drug Nomenclature—United States Adopted Names .... 413
28 Structure-Activity Relationship and Drug Design .... 425

### Part 4 Pharmaceutical Testing, Analysis and Control

29 Analysis of Medicinals .... 437
30 Biological Testing .... 491
31 Clinical Analysis .... 501
32 Chromatography .... 534
33 Instrumental Methods of Analysis .... 559
34 Dissolution .... 593
35 Bioavailability and Bioequivalency Testing .... 605
36 Tonicity, Osmoticity, Osmolality and Osmolarity .... 613
37 Separation .... 628
38 Stability of Pharmaceutical Products .... 639
39 Quality Assurance and Control .... 648

### Part 5 Pharmacodynamics

40 Diseases: Manifestations and Pathophysiology .... 655
41 Drug Absorption, Action and Disposition .... 697
42 Basic Pharmacokinetics .... 724
43 Clinical Pharmacokinetics .... 741
44 Principles of Immunology .... 752
45 Adverse Drug Reactions .... 761
46 Pharmacogenetics .... 775
47 Pharmacological Aspects of Drug Abuse .... 780
48 Introduction of New Drugs .... 795
49 Biotechnology and Drugs .... 809
50 Alternative Healthcare .... 829

## Volume II

### Part 6 Pharmaceutical and Medicinal Agents

51 Medical Applications of Radioisotopes .... 843
52 Topical Drugs .... 866
53 Gastrointestinal and Liver Drugs .... 886
54 Blood, Fluids, Electrolytes and Hematologic Drugs .... 910
55 Cardiovascular Drugs .... 943
56 Respiratory Drugs .... 971
57 Sympathomimetic Drugs .... 981
58 Cholinomimetic Drugs .... 1000
59 Adrenergic and Adrenergic Neuron Blocking Drugs .... 1009
60 Antimuscarinic and Antispasmodic Drugs .... 1020
61 Skeletal Muscle Relaxants .... 1027
62 Diuretic Drugs .... 1039
63 Uterine and Antimigraine Drugs .... 1052
64 Hormones .... 1057
65 Vitamins and Other Nutrients .... 1106
66 Enzymes .... 1137
67 General Anesthetic Drugs .... 1140
68 Local Anesthetic Drugs .... 1146
69 Sedative and Hypnotic Drugs .... 1154
70 Antiepileptic Drugs .... 1171
71 Psychopharmacologic Agents .... 1180
72 Antipyretic and Anti-inflammatory Drugs .... 1196
73 Histamine and Antihistaminic Drugs .... 1222
74 Central Nervous System Stimulants .... 1231
75 Antineoplastic and Immunoactive Drugs .... 1236
76 Anti-infective Drugs .... 1263
77 Parasiticides .... 1337
78 Pesticides .... 1343
79 Diagnostic Agents .... 1365
80 Pharmaceutical Necessities .... 1380
81 Immunizing Agents and Diagnostic Skin Antigens .... 1417
82 Allergenic Extracts .... 1434

### Part 7 Industrial Pharmacy

83 Preformulation .... 1447
84 Sterilization .... 1463
85 Plastic Packaging Materials .... 1487
86 Solutions, Emulsions, Suspensions and Extracts .... 1495
87 Parenteral Preparations .... 1524
88 Intravenous Admixtures .... 1549
89 Ophthalmic Preparations .... 1563
90 Medicated Applications .... 1577
91 Powders .... 1598
92 Oral Solid Dosage Forms .... 1615
93 Coating of Pharmaceutical Dosage Forms .... 1650
94 Sustained-Release Drug Delivery Systems .... 1660
95 Aerosols .... 1676

### Part 8 Pharmacy Practice

96 Ambulatory Patient Care .... 1695
97 Institutional Patient Care .... 1720
98 Long-Term Care Facilities .... 1740
99 The Pharmacist and Public Health .... 1755
100 The Patient: Behavioral Determinants .... 1773
101 Patient Communication .... 1779
102 Drug Education .... 1786
103 Patient Compliance .... 1796
104 The Prescription .... 1808

105 Drug Interactions .... 1822
106 Clinical Drug Literature .... 1837
107 Health Accessories .... 1842
108 Surgical Supplies .... 1873
109 Poison Control .... 1883
110 Laws Governing Pharmacy .... 1892
111 Community Pharmacy Economics and Management .... 1913
112 Pharmacoeconomics .... 1929

**Appendix**

Dose Equivalents .... A1
Periodic Chart .... A2
Logarithms .... A4

**Glossary and Index**

Alphabetic Index .... I1
Glossary .... G1

Entered according to Act of Congress, in the year 1885 by Joseph P Remington, in the Office of the Librarian of Congress, at Washington DC

Copyright 1889, 1894, 1905, 1907, 1917, by Joseph P Remington

Copyright 1926, 1936, by the Joseph P Remington Estate

Copyright 1948, 1951, by The Philadelphia College of Pharmacy and Science

Copyright 1956, 1960, 1965, 1970, 1975, 1980, 1985, 1990, 1995, by The Philadelphia College of Pharmacy and Science

*All Rights Reserved*

Library of Congress Catalog Card No. 60-53334

ISBN 0-912734-04-3

*The use of structural formulas from USAN and the USP Dictionary of Drug Names is by permission of The USP Convention. The Convention is not responsible for any inaccuracy contained herein.*

NOTICE—*This text is not intended to represent, nor shall it be interpreted to be, the equivalent of or a substitute for the official United States Pharmacopeia (USP) and/or the National Formulary (NF). In the event of any difference or discrepancy between the current official USP or NF standards of strength, quality, purity, packaging and labeling for drugs and representations of them herein, the context and effect of the official compendia shall prevail.*

*Printed in the United States of America by the Mack Printing Company, Easton, Pennsylvania*

# EXHIBIT C



Merriam-
Webster's
Collegiate®
Dictionary
TENTH EDITION



# Merriam-Webster's Collegiate® Dictionary

## TENTH EDITION

Merriam-Webster, Incorporated
Springfield, Massachusetts, U.S.A.



**A GENUINE MERRIAM-WEBSTER**

The name *Webster* alone is no guarantee of excellence. It is used by a number of publishers and may serve mainly to mislead an unwary buyer.

*Merriam-Webster*™ is the name you should look for when you consider the purchase of dictionaries or other fine reference books. It carries the reputation of a company that has been publishing since 1831 and is your assurance of quality and authority.

Copyright © 2001 by Merriam-Webster, Incorporated

Philippines Copyright 2001 by Merriam-Webster, Incorporated

Library of Congress Cataloging in Publication Data
Main entry under title:

Merriam-Webster's collegiate dictionary. — 10th ed.
p. cm.
Includes index.
ISBN 0-87779-708-0 (unindexed : alk. paper). — ISBN 0-87779-709-9 (indexed : alk. paper). — ISBN 0-87779-710-2 (deluxe indexed : alk. paper). — ISBN 0-87779-707-2 (laminated cover, unindexed).
1. English language—Dictionaries. I. Merriam-Webster, Inc.
PE1628.M36 1998
423—dc21 97-41846
CIP

Merriam-Webster's Collegiate® Dictionary, Tenth Edition principal copyright 1993

COLLEGIATE is a registered trademark of Merriam-Webster, Incorporated

All rights reserved. No part of this book covered by the copyrights hereon may be reproduced or copied in any form or by any means—graphic, electronic, or mechanical, including photocopying, taping, or information storage and retrieval systems—without written permission of the publisher.

Made in the United States of America

30313233RT:WC01

b : EXACT, PRECISE 2 a : designed for or adapted to its purpose b : of a particular sort : SPECIFIC ⟨for that ~ purpose⟩ 3 a : traveling at high speed; *specif* : traveling with few or no stops along the way ⟨~ train⟩ b : adapted or suitable for travel at high speed ⟨an ~ highway⟩ c *Brit* : designated to be delivered without delay by special messenger *syn* see EXPLICIT

²**express** *adv* (14c) 1 *obs* : EXPRESSLY 2 : by express ⟨delivered ~⟩

³**express** *n* (1619) 1 a *Brit* : a messenger sent on a special errand b *Brit* : a dispatch conveyed by a special messenger c (1) : a system for the prompt and safe transportation of parcels, money, or goods at rates higher than standard freight charges (2) : a company operating such a merchandise freight service d *Brit* : SPECIAL DELIVERY 2 : an express vehicle

⁴**express** *vt* [ME, fr. MF & L; MF *expresser*, fr. OF, fr. *expres*, adj., fr. L *expressus*, pp.] (14c) 1 a : DELINEATE, DEPICT b : to represent in words : STATE c : to give or convey a true impression of : SHOW, REFLECT d : to make known the opinions or feelings of (oneself) e : to give expression to the artistic or creative impulses or abilities of (oneself) f : to represent by a sign or symbol : SYMBOLIZE 2 a : to force out (as the juice of a fruit) by pressure b : to subject to pressure so as to extract something 3 : to send by express 4 : to cause (a gene) to manifest its effects in the phenotype — **ex·press·er** *n* — **ex·press·ible** \-ə-bəl\ *adj*

*syn* EXPRESS, VENT, UTTER, VOICE, BROACH, AIR mean to make known what one thinks or feels. EXPRESS suggests an impulse to reveal in words, gestures, actions, or what one creates or produces ⟨*expressed* her feelings in music⟩. VENT stresses a strong inner compulsion to express esp. in words ⟨a tirade *venting* his frustration⟩. UTTER implies the use of the voice not necessarily in articulate speech ⟨*utter* a groan⟩. VOICE does not necessarily imply vocal utterance but does imply expression or formulation in words ⟨an editorial *voicing* their concerns⟩. BROACH adds the implication of disclosing for the first time something long thought over or reserved for a suitable occasion ⟨*broached* the subject of a divorce⟩. AIR implies an exposing or parading of one's views often in order to gain relief or sympathy or attention ⟨publicly *airing* their differences⟩.

**ex·press·age** \ik-ˈspre-sij\ *n* (1857) : a carrying of parcels by express; *also* : a charge for such carrying

**ex·pres·sion** \ik-ˈspre-shən\ *n* (15c) 1 a : an act, process, or instance of representing in a medium (as words) : UTTERANCE ⟨freedom of ~⟩ b (1) : something that manifests, embodies, or symbolizes something else ⟨this gift is an ~ of my admiration for you⟩ (2) : a significant word or phrase (3) : a mathematical or logical symbol or a meaningful combination of symbols (4) : the detectable effect of a gene; *also* : EXPRESSIVITY 1 2 a : a mode, means, or use of significant representation or symbolism; *esp* : felicitous or vivid indication or depiction of mood or sentiment ⟨read the poem with ~⟩ b (1) : the quality or fact of being expressive (2) : facial aspect or vocal intonation as indicative of feeling 3 : an act or product of pressing out — **ex·pres·sion·al** \-ˈspresh-nəl, -ˈspre-shə-nᵊl\ *adj*

**ex·pres·sion·ism** \ik-ˈspre-shə-ˌni-zəm\ *n, often cap* (ca. 1901) : a theory or practice in art of seeking to depict the subjective emotions and responses that objects and events arouse in the artist — **ex·pres·sion·ist** \-ˈspre-shə-nist\ *n or adj, often cap* — **ex·pres·sion·is·tic** \-ˌspre-shə-ˈnis-tik\ *adj* — **ex·pres·sion·is·ti·cal·ly** \-ti-k(ə-)lē\ *adv*

**ex·pres·sion·less** \ik-ˈspre-shən-ləs\ *adj* (1831) : lacking expression ⟨an ~ face⟩ — **ex·pres·sion·less·ly** *adv* — **ex·pres·sion·less·ness** *n*

**ex·pres·sive** \ik-ˈspre-siv\ *adj* (15c) 1 : of or relating to expression ⟨the ~ function of language⟩ 2 : serving to express, utter, or represent ⟨foul and novel terms ~ of rage —H. G. Wells⟩ 3 : effectively conveying meaning or feeling ⟨an ~ silence⟩ ⟨~ line drawings⟩ — **ex·pres·sive·ly** *adv* — **ex·pres·sive·ness** *n*

**ex·pres·siv·i·ty** \ˌek-ˌspre-ˈsi-və-tē\ *n, pl* **-ties** (1934) 1 : the relative capacity of a gene to affect the phenotype of the organism of which it is a part 2 : the quality of being expressive

**ex·press·ly** \ik-ˈspres-lē\ *adv* (14c) 1 : in an express manner : EXPLICITLY ⟨~ rejected the proposal⟩ 2 : for the express purpose : PARTICULARLY, SPECIFICALLY ⟨made ~ for me⟩

**Express Mail** *service mark* — used for overnight delivery of mail

**ex·press·man** \ik-ˈspres-ˌman, -mən\ *n* (1839) : a person employed in the express business

**ex·pres·so** \ik-ˈspre-(ˌ)sō\ *var of* ESPRESSO

**ex·press·way** \ik-ˈspres-ˌwā\ *n* (1944) : a high-speed divided highway for through traffic with access partially or fully controlled

**ex·pro·pri·ate** \ek-ˈsprō-prē-ˌāt\ *vt* **-at·ed; -at·ing** [ML *expropriatus*, pp. of *expropriare*, fr. L *ex-* + *proprius* own] (1611) 1 : to deprive of possession or proprietary rights 2 : to transfer (the property of another) to one's own possession — **ex·pro·pri·a·tor** \-ˌā-tər\ *n*

**ex·pro·pri·a·tion** \(ˌ)ek-ˌsprō-prē-ˈā-shən\ *n* (15c) : the act of expropriating or the state of being expropriated; *specif* : the action of the state in taking or modifying the property rights of an individual in the exercise of its sovereignty

**ex·pulse** \ik-ˈspəls\ *vt* **ex·pulsed; ex·puls·ing** (15c) : EXPEL

**ex·pul·sion** \ik-ˈspəl-shən\ *n* [ME, fr. L *expulsion-, expulsio*, fr. *expellere* to expel] (15c) : the act of expelling : the state of being expelled — **ex·pul·sive** \-ˈspəl-siv\ *adj*

**ex·punc·tion** \ik-ˈspəŋ(k)-shən\ *n* [L *expungere*] (1606) : the act of expunging : the state of being expunged : ERASURE

**ex·punge** \ik-ˈspənj\ *vt* **ex·punged; ex·pung·ing** [L *expungere* to mark for deletion by dots, fr. *ex-* + *pungere* to prick — more at PUNGENT] (1602) 1 : to strike out, obliterate, or mark for deletion 2 : to efface completely : DESTROY — **ex·pung·er** *n*

**ex·pur·gate** \ˈek-spər-ˌgāt\ *vt* **-gat·ed; -gat·ing** [L *expurgatus*, pp. of *expurgare*, fr. *ex-* + *purgare* to purge] (1678) : to cleanse of something morally harmful, offensive, or erroneous; *esp* : to expunge objectionable parts from before publication or presentation ⟨an *expurgated* edition of the letters⟩ — **ex·pur·ga·tion** \ˌek-spər-ˈgā-shən\ *n* — **ex·pur·ga·tor** \ˈek-spər-ˌgā-tər\ *n*

**ex·pur·ga·to·ri·al** \(ˌ)ek-ˌspər-gə-ˈtōr-ē-əl, -ˈtȯr-\ *adj* (1807) : relating to expurgation or an expurgator : EXPURGATORY

**ex·pur·ga·to·ry** \ek-ˈspər-gə-ˌtōr-ē, -ˌtȯr-\ *adj* (1625) : serving to purify from something morally harmful, offensive, or erroneous

¹**ex·qui·site** \ek-ˈskwi-zət, ˈek-(ˌ)\ *adj* [ME *exquisit*, fr. L *exquisitus*, pp. of *exquirere* to search out, fr. *ex-* + *quaerere* to seek] (15c) 1 : carefully selected : CHOICE 2 *archaic* : ACCURATE 3 a : marked by flawless craftsmanship or by beautiful, ingenious, delicate, or elaborate execution b : marked by nice discrimination, deep sensitivity, or subtle understanding ⟨~ taste⟩ c : ACCOMPLISHED, PERFECTED ⟨an ~ gentleman⟩ 4 a : pleasing through beauty, fitness, or perfection ⟨an ~ white blossom⟩ b : ACUTE, INTENSE ⟨~ pain⟩ c : having uncommon or esoteric appeal *syn* see CHOICE — **ex·qui·site·ly** *adv* — **ex·qui·site·ness** *n*

²**exquisite** *n* (1819) : one who is overly fastidious in dress or ornament

**ex·san·gui·na·tion** \(ˌ)ek(s)-ˌsaŋ-gwə-ˈnā-shən\ *n* [L *exsanguinatus* drained of blood, fr. *ex-* + *sanguin-, sanguis* blood] (ca. 1909) : the action or process of draining or losing blood — **ex·san·gui·nate** \ek(s)-ˈsaŋ-gwə-ˌnāt\ *vt*

**ex·scind** \ek-ˈsind\ *vt* [L *exscindere*, fr. *ex-* + *scindere* to cut, tear — more at SHED] (1662) : to cut off or out : EXCISE

**ex·sert** \ek-ˈsərt\ *vt* [L *exsertus*, pp. of *exserere* — more at EXERT] (1836) : to thrust out — **ex·ser·tile** \-ˈsər-tᵊl, -ˈsər-ˌtīl\ *adj* — **ex·ser·tion** \-ˈsər-shən\ *n*

**ex·sert·ed** *adj* (1816) : projecting beyond an enclosing organ or part

**ex·sic·cate** \ˈek-si-ˌkāt\ *vt* **-cat·ed; -cat·ing** [ME, fr. L *exsiccatus*, pp. of *exsiccare*, fr. *ex-* + *siccare* to dry, fr. *siccus* dry — more at SACK] (15c) : to remove moisture from : DRY — **ex·sic·ca·tion** \ˌek-si-ˈkā-shən\ *n*

**ex·so·lu·tion** \ˌek-sə-ˈlü-shən\ *n* (1929) : the process of separating or precipitating from a solid crystalline phase

**ex·tant** \ˈek-stənt; ek-ˈstant, ˈek-ˌ\ *adj* [L *exstant-, exstans*, prp. of *exstare* to stand out, be in existence, fr. *ex-* + *stare* to stand — more at STAND] (1545) 1 *archaic* : standing out or above 2 a : currently or actually existing ⟨the most charming writer ~ —G. W. Johnson⟩ b : not destroyed or lost ⟨~ manuscripts⟩

**ex·tem·po·ral** \ek-ˈstem-p(ə-)rəl\ *adj* [L *extemporalis*, fr. *ex tempore*] (1570) *archaic* : EXTEMPORANEOUS — **ex·tem·po·ral·ly** \-ē\ *adv*

**ex·tem·po·ra·ne·i·ty** \(ˌ)ek-ˌstem-pə-rə-ˈnē-ə-tē, -ˈnā-\ *n* (1937) : the quality or state of being extemporaneous

**ex·tem·po·ra·ne·ous** \(ˌ)ek-ˌstem-pə-ˈrā-nē-əs\ *adj* [LL *extemporaneus*, fr. L *ex tempore*] (1673) 1 a (1) : composed, performed, or uttered on the spur of the moment : IMPROMPTU (2) : carefully prepared but delivered without notes or text b : skilled at or given to extemporaneous utterance c : happening suddenly and often unexpectedly and usu. without clearly known causes or relationships ⟨a great deal of criminal and delinquent behavior is . . . ~ —W. C. Reckless⟩ 2 : provided, made, or put to use as an expedient : MAKESHIFT — **ex·tem·po·ra·ne·ous·ly** *adv* — **ex·tem·po·ra·ne·ous·ness** *n*

**ex·tem·po·rary** \ik-ˈstem-pə-ˌrer-ē\ *adj* (1596) : EXTEMPORANEOUS — **ex·tem·po·rar·i·ly** \-ˌstem-pə-ˈrer-ə-lē\ *adv*

**ex·tem·po·re** \ik-ˈstem-pə-(ˌ)rē\ *adv or adj* [L *ex tempore*, fr. *ex* + *tempore*, abl. of *tempus* time] (1553) : in an extemporaneous manner ⟨speaking ~⟩

**ex·tem·por·i·sa·tion**, **ex·tem·po·rise** *Brit var of* EXTEMPORIZATION, EXTEMPORIZE

**ex·tem·po·ri·za·tion** \ik-ˌstem-pə-rə-ˈzā-shən\ *n* (ca. 1860) 1 : the act of extemporizing : IMPROVISATION 2 : something extemporized

**ex·tem·po·rize** \ik-ˈstem-pə-ˌrīz\ *vb* **-rized; -riz·ing** *vi* (1644) 1 : to do something extemporaneously : IMPROVISE; *esp* : to speak extemporaneously 2 : to get along in a makeshift manner ~ *vt* : to compose, perform, or utter extemporaneously : IMPROVISE — **ex·tem·po·riz·er** *n*

**ex·tend** \ik-ˈstend\ *vb* [ME, fr. MF or L; MF *estendre*, fr. L *extendere*, fr. *ex-* + *tendere* to stretch — more at THIN] *vt* (14c) 1 : to spread or stretch forth : UNBEND ⟨~*ed* both her arms⟩ 2 a : to stretch out to fullest length b : to cause (as a horse) to move at full stride c : to exert (oneself) to full capacity ⟨could work long and hard without seeming to ~ himself⟩ d (1) : to increase the bulk of (as by adding a cheaper substance or a modifier) (2) : ADULTERATE 3 [ME, fr. ML *extendere* (fr. L) or AF *estendre*, fr. OF] a *Brit* : to take possession of (as lands) by a writ of extent b *obs* : to take by force 4 a : to make the offer of : PROFFER ⟨~*ing* aid to the needy⟩ b : to make available ⟨~*ing* credit to customers⟩ 5 a : to cause to reach (as in distance or scope) ⟨national authority was ~*ed* over new territories⟩ b : to cause to be longer : PROLONG ⟨~ the side of a triangle⟩ ⟨~*ed* their visit another day⟩; *also* : to prolong the time of payment of c : ADVANCE, FURTHER ⟨~*ing* her potential through job training⟩ 6 a : to cause to be of greater area or volume : ENLARGE b : to increase the scope, meaning, or application of : BROADEN ⟨beauty, I suppose, opens the heart, ~*s* the consciousness —Algernon Blackwood⟩ c *archaic* : EXAGGERATE ~ *vi* 1 : to stretch out in distance, space, or time : REACH ⟨their jurisdiction ~*ed* over the whole area⟩ 2 : to reach in scope or application ⟨his concern ~*s* beyond mere business to real service to his customers⟩ — **ex·tend·abil·i·ty** \ik-ˌsten-də-ˈbi-lə-tē\ *n* — **ex·tend·able** *also* **ex·tend·ible** \-ˈsten-də-bəl\ *adj*

*syn* EXTEND, LENGTHEN, PROLONG, PROTRACT mean to draw out or add to so as to increase in length. EXTEND and LENGTHEN imply a drawing out in space or time but EXTEND may also imply increase in width, scope, area, or range ⟨*extend* a vacation⟩ ⟨*extend* welfare services⟩ ⟨*lengthen* a skirt⟩ ⟨*lengthen* the workweek⟩. PROLONG suggests chiefly increase in duration esp. beyond usual limits ⟨*prolonged* illness⟩. PROTRACT adds to PROLONG implications of needlessness, vexation, or indefiniteness ⟨*protracted* litigation⟩.

**ex·tend·ed** *adj* (15c) 1 : drawn out in length esp. of time ⟨an ~ visit⟩ 2 a : fully stretched out ⟨an ~ battle line⟩ b *of a horse's gait* : performed with a greatly lengthened stride but without a break ⟨compare COLLECTED⟩ c : INTENSIVE ⟨~ efforts⟩ 3 : having spatial magnitude : being larger than a point ⟨an ~ source of light⟩ 4 : EXTENSIVE 1 ⟨made available ~ information —Ruth G. Strickland⟩ 5 : DERIVATIVE 1, SECONDARY 2a ⟨an ~ sense of a word⟩ 6 *of a typeface* : having a wider face than that of a standard typeface — **ex·tend·ed·ly** *adv* — **ex·tend·ed·ness** *n*

**extended family** *n* (ca. 1935) : a family that includes in one household near relatives in addition to a nuclear family

**ex·tend·er** \ik-ˈsten-dər\ *n* (1611) : one that extends: as a : a substance added to a product esp. in the capacity of a diluent, adulterant, or modifier b : an added ingredient used to increase the bulk of a food (as soup or meat)

**ex·ten·si·ble** \ik-ˈsten(t)-sə-bəl\ *adj* (1611) : capable of being extended — **ex·ten·si·bil·i·ty** \-ˌsten(t)-sə-ˈbi-lə-tē\ *n*

**ex·tend** \ik-ˈstend\ *vb* [ME, fr. MF or L; MF *estendre*, fr. L *extendere*, fr. *ex-* + *tendere* to stretch — more at THIN] *vt* (14c) **1** : to spread or stretch forth : UNBEND ⟨~*ed* both her arms⟩ **2 a** : to stretch out to fullest length **b** : to cause (as a horse) to move at full stride **c** : to exert (oneself) to full capacity ⟨could work long and hard without seeming to ~ himself⟩ **d (1)** : to increase the bulk of (as by adding a cheaper substance or a modifier) **(2)** : ADULTERATE **3** [ME, fr. ML *extendere* (fr. L) or AF *estendre*, fr. OF] **a** *Brit* : to take possession of (as lands) by a writ of extent **b** *obs* : to take by force **4 a** : to make the offer of : PROFFER ⟨~*ing* aid to the needy⟩ **b** : to make available ⟨~*ing* credit to customers⟩ **5 a** : to cause to reach (as in distance or scope) ⟨national authority was ~*ed* over new territories⟩ **b** : to cause to be longer : PROLONG ⟨~ the side of a triangle⟩ ⟨~*ed* their visit another day⟩; *also* : to prolong the time of payment of **c** : ADVANCE, FURTHER ⟨~*ing* her potential through job training⟩ **6 a** : to cause to be of greater area or volume : ENLARGE **b** : to increase the scope, meaning, or application of : BROADEN ⟨beauty, I suppose, opens the heart, ~*s* the consciousness —Algernon Blackwood⟩ **c** *archaic* : EXAGGERATE ~ *vi* **1** : to stretch out in distance, space, or time : REACH ⟨their jurisdiction ~*ed* over the whole area⟩ **2** : to reach in scope or application ⟨his concern ~*s* beyond mere business to real service to his customers⟩ — **ex·tend·abil·i·ty** \-ˌsten-də-ˈbi-lə-tē\ *n* — **ex·tend·able** *also* **ex·tend·ible** \-ˈsten-də-bəl\ *adj*

***syn*** EXTEND, LENGTHEN, PROLONG, PROTRACT mean to draw out or add to so as to increase in length. EXTEND and LENGTHEN imply a drawing out in space or time but EXTEND may also imply increase in width, scope, area, or range ⟨*extend* a vacation⟩ ⟨*extend* welfare services⟩ ⟨*lengthen* a skirt⟩ ⟨*lengthen* the workweek⟩. PROLONG suggests chiefly increase in duration esp. beyond usual limits ⟨*prolonged* illness⟩. PROTRACT adds to PROLONG implications of needlessness, vexation, or indefiniteness ⟨*protracted* litigation⟩.

**ex·tend·ed** *adj* (15c) **1** : drawn out in length esp. of time ⟨an ~ visit⟩ **2 a** : fully stretched out ⟨an ~ battle line⟩ **b** *of a horse's gait* : performed with a greatly lengthened stride but without a break — compare COLLECTED **c** : INTENSIVE ⟨~ efforts⟩ **3** : having spatial magnitude : being larger than a point ⟨an ~ source of light⟩ **4** : EXTENSIVE 1 ⟨made available ~ information —Ruth G. Strickland⟩ **5** : DERIVATIVE 1, SECONDARY 2a ⟨an ~ sense of a word⟩ **6** *of a typeface* : having a wider face than that of a standard typeface — **ex·tend·ed·ly** *adv* — **ex·tend·ed·ness** *n*

# EXHIBIT D

# THE AMERICAN HERITAGE COLLEGE DICTIONARY

THIRD EDITION

HOUGHTON MIFFLIN COMPANY
*Boston • New York*

Words are included in this Dictionary on the basis of their usage. Words that are known to have current trademark registrations are shown with an initial capital and are also identified as trademarks. No investigation has been made of common-law trademark rights in any word, because such investigation is impracticable. The inclusion of any word in this Dictionary is not, however, an expression of the Publisher's opinion as to whether or not it is subject to proprietary rights. Indeed, no definition in this Dictionary is to be regarded as affecting the validity of any trademark.

American Heritage and the eagle logo are registered trademarks of Forbes Inc. Their use is pursuant to a license agreement with Forbes Inc.

Copyright © 1993 by Houghton Mifflin Company.
All rights reserved.

No part of this work may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying and recording, or by any information storage or retrieval system without the prior written permission of Houghton Mifflin Company unless such copying is expressly permitted by federal copyright law. Address inquiries to Reference Permissions, Houghton Mifflin Company, 222 Berkeley Street, Boston MA 02116.

0-395-67161-2 (UPC)

*Library of Congress Cataloging-in-Publication Data*

The American heritage college dictionary. —3rd ed.
p. cm.
ISBN 0-395-66917-0 (plain edge). —ISBN 0-395-44638-4 (thumb edge). —ISBN 0-395-66918-9 (deluxe binding).
1. English language—Dictionaries. 2. Americanisms.
PE1628.A6227 1993
423—dc20 92-42124
CIP

Manufactured in the United States of America

For information about this and other Houghton Mifflin trade and reference books and multimedia products, visit The Bookstore at Houghton Mifflin on the World Wide Web at (http://www.hmco.com/trade/).

delivery or transport. —*n.* 1.a. A rapid, efficient system for the delivery of goods and mail. b. Goods and mail conveyed by such a system. 2. A means of transport, such as a train, that travels rapidly and makes few or no stops before its destination. 3. *Chiefly British.* a. A special messenger. b. A message delivered by special courier. [ME *expressen* < OFr. *expresser* < Med.Lat. *expressāre,* freq. of Lat. *exprimere* : *ex-,* ex- + *premere,* to press; see **per-⁴**.] — **ex•press′er** *n.* — **ex•press′i•ble** *adj.*

**ex•pres•sion** (ĭk-sprĕsh′ən) *n.* 1. The act of expressing, conveying, or representing in words, art, music, or movement; a manifestation. 2. Something that expresses or communicates. 3. *Math.* An operation or a quantity stated in symbolic form, such as $\sqrt{x}$, $y^2$, or $x + y$. 4. The manner in which one expresses oneself, esp. in speaking, depicting, or performing. 5. A particular word or phrase. 6. The outward manifestation of a mood or a disposition. 7. A facial aspect or a look that conveys a special feeling. 8. The act of pressing or squeezing out. 9. *Genet.* The act or process of expressing a gene.

**ex•pres•sion•ism** (ĭk-sprĕsh′ə-nĭz′əm) *n.* A movement in the arts during the early part of the 20th century that emphasized subjective expression of the artist's inner experiences. — **ex•pres′sion•ist** *n.* — **ex•pres′sion•is′tic** *adj.* — **ex•pres′sion•is′ti•cal•ly** *adv.*

**ex•pres•sion•less** (ĭk-sprĕsh′ən-lĭs) *adj.* Lacking expression.

**ex•pres•sive** (ĭk-sprĕs′ĭv) *adj.* 1. Of, relating to, or characterized by expression. 2. Serving to express or indicate. 3. Full of expression; significant: *an expressive glance.* — **ex•pres′sive•ly** *adv.* — **ex•pres′sive•ness** *n.*

*Syns: expressive, eloquent, meaningful, significant.* The central meaning shared by these adjectives is "effectively conveying a feeling, an idea, or a mood": *an expressive gesture; an eloquent speech; a meaningful look; a significant smile.*

**ex•pres•siv•i•ty** (ĕk′sprĕ-sĭv′ĭ-tē) *n., pl.* **-ties.** 1. The quality of being expressive. 2. *Genet.* The degree to which an expressed gene produces its effects in an organism.

**ex•press•ly** (ĭk-sprĕs′lē) *adv.* 1. In an express or a definite manner; explicitly. 2. Especially; particularly.

**ex•pres•so** (ĭk-sprĕs′ō, ĕk-) *n.* Var. of **espresso.**

**ex•press•way** (ĭk-sprĕs′wā′) *n.* A major divided highway designed for high-speed travel.

**ex•pro•pri•ate** (ĕk-sprō′prē-āt′) *tr.v.* **-at•ed, -at•ing, -ates.** 1. To deprive of possession. 2. To transfer (another's property) to oneself. [Med.Lat. *expropriāre, expropriāt-* : Lat. *ex-,* ex- + Lat. *propriāre,* to appropriate (< *proprius,* one's own; see PROPER).] — **ex•pro′pri•a′tion** *n.* — **ex•pro′pri•a′tor** *n.* — **ex•pro′pri•a•to′ry** (-ə-tôr′ē, -tōr′ē) *adj.*

**expt.** *abbr.* Experiment.

**exptl.** *abbr.* Experimental.

**ex•pul•sion** (ĭk-spŭl′shən) *n.* The act of expelling or the state of being expelled. [ME *expulsioun* < OFr. *expulsion* < Lat. *expulsiō, expulsiōn-* < *expulsus,* p.part. of *expellere,* to expel. See EXPEL.]

**expressionism**
*No More War!*
by Käthe Kollwitz

**ex•punc•tion** (ĭk-spŭngk′shən, -spŭng′shən) *n.* The act of expunging or the condition of being expunged. [LLat. *expunctiō, expunctiōn-,* execution < Lat. *expunctus,* p.part. of *expungere,* to strike out. See EXPUNGE.]

**ex•punge** (ĭk-spŭnj′) *tr.v.* **-punged, -pung•ing, -pung•es.** 1. To erase or strike out. 2. To eliminate completely; annihilate. See Syns at **erase.** [Lat. *expungere* : *ex-,* ex- + *pungere,* to prick; see **peuk-**.] — **ex•pung′er** *n.*

**ex•pur•gate** (ĕk′spər-gāt′) *tr.v.* **-gat•ed, -gat•ing, -gates.** To remove erroneous, vulgar, obscene, or otherwise objectionable material from (a book, for example) before publication. [Lat. *expūrgāre, expūrgāt-,* to purify : *ex-,* intensive pref.; see EX- + *pūrgāre,* to cleanse; see **peuə-**.] — **ex′pur•ga′tion** *n.* — **ex′pur•ga′tor** *n.*

**ex•pur•ga•to•ry** (ĭk-spûr′gə-tôr′ē, -tōr′ē) also **ex•pur•ga•to•ri•al** (-tôr′ē-əl, -tōr′-) *adj.* Of or relating to expurgation or an expurgator.

**expy** *abbr.* Expressway.

**ex•qui•site** (ĕk′skwĭ-zĭt, ĭk-skwĭz′ĭt) *adj.* 1. Marked by intricate and beautiful design or execution. 2. Of such beauty or delicacy as to arouse delight. See Syns at **delicate.** 3. Excellent; flawless. 4. Acutely perceptive or discriminating. 5. Intense; keen. 6. *Obsolete.* Ingeniously devised or thought out. —*n.* One excessively fastidious in dress, manners, or taste. [ME *exquisit,* carefully chosen < Lat. *exquīsītus,* p.part. of *exquīrere,* to search out : *ex-,* ex- + *quaerere,* to seek.] — **ex′qui•site•ly** *adv.* — **ex′qui•site•ness** *n.*

**exr.** *abbr.* Executor.

**exrx.** *abbr.* Executrix.

**ex•san•gui•nate** (ĕks-săng′gwə-nāt′) *tr.v.* **-nat•ed, -nat•ing, -nates.** To drain of blood. [< Lat. *exsanguinātus,* drained of blood : *ex-,* ex- + *sanguis, sanguin-,* blood.] — **ex•san′gui•na′tion** *n.*

**ex•san•guine** (ĕks-săng′gwĭn) *adj.* Lacking blood; anemic. [Lat. *exsanguis, exsanguin-* : *ex-,* ex- + *sanguis,* blood.]

**ex•scind** (ĭk-sĭnd′) *tr.v.* **-scind•ed, -scind•ing, -scinds.** To cut out; excise. [Lat. *exscindere* : *ex-,* ex- + *scindere,* to cut; see **skei-**.]

**ex•sert** (ĭk-sûrt′) *tr.v.* **-sert•ed, -sert•ing, -serts.** To thrust (something) out or forth; cause to protrude. —*adj.* Also **ex•sert•ed** (-sûr′tĭd). Thrust outward or protruding. [Lat. *exserere, exsert-.* See EXERT.] — **ex•ser′tion** *n.*

**ex•sic•cate** (ĕk′sĭ-kāt′) *intr. & tr.v.* **-cat•ed, -cat•ing, -cates.** To dry up or cause to dry up. [Ult. < Lat. *exsiccāre, exsiccāt-* : *ex-,* ex- + *siccāre,* to dry (< *siccus,* dry).] — **ex′sic•ca′tion** *n.* — **ex′sic•ca′tive** *adj.* — **ex′sic•ca′tor** *n.*

**ex•stip•u•late** (ĕks-stĭp′yə-lĭt) *adj. Bot.* Lacking stipules.

**ext.** *abbr.* 1. Extension. 2.a. External. b. Externally. 3. Extinct. 4. Extra. 5. Extract.

**ex•tant** (ĕk′stənt, ĕk-stănt′) *adj.* 1. Still in existence; not destroyed, lost, or extinct. 2. *Archaic.* Standing out; projecting. [Lat. *exstāns, exstant-,* pr.part. of *exstāre,* to stand out : *ex-,* ex- + *stāre,* to stand; see **stā-**.]

**ex•tem•po•ral** (ĭk-stĕm′pər-əl) *adj. Archaic.* Extemporaneous. [Lat. *extemporālis* < *ex tempore.* See EXTEMPORE.]

**ex•tem•po•ra•ne•ous** (ĭk-stĕm′pə-rā′nē-əs) *adj.* 1. Carried out or performed with little or no preparation; impromptu. 2. Prepared in advance but delivered without notes or text. 3. Skilled at or given to unrehearsed speech or performance. 4. Provided, made, or adapted as an expedient; makeshift. [< LLat. *extemporāneus* < Lat. *ex tempore.* See EXTEMPORE.] — **ex•tem′po•ra•ne′i•ty** (-pər-ə-nē′ĭ-tē), — **ex•tem′po•ra′ne•ous•ness** *n.* — **ex•tem′po•ra′ne•ous•ly** *adv.*

**ex•tem•po•rar•y** (ĭk-stĕm′pə-rĕr′ē) *adj.* Spoken, done, or composed with little or no preparation or forethought. [< EXTEMPORE.] — **ex•tem′po•rar′i•ly** (-râr′ə-lē) *adv.*

**ex•tem•po•re** (ĭk-stĕm′pə-rē) *adj.* Extemporary. —*adv.* In an extemporaneous manner. [Lat. *ex tempore* : *ex,* of; see EX- + *tempore,* ablative of *tempus,* time.]

**ex•tem•po•rize** (ĭk-stĕm′pə-rīz′) *v.* **-rized, -riz•ing, -riz•es.** —*tr.* To do or perform (something) without prior preparation or practice. —*intr.* To perform an act or utter something in an impromptu manner; improvise. — **ex•tem′po•ri•za′tion** (-pər-ĭ-zā′shən) *n.* — **ex•tem′po•riz′er** *n.*

**ex•tend** (ĭk-stĕnd′) *v.* **-tend•ed, -tend•ing, -tends.** —*tr.* 1. To open or straighten (something) out; unbend. 2. To stretch or spread (something) out to greater or fullest length. 3.a. To exert (oneself) vigorously or to full capacity. b. To cause to move at full gallop. Used of a horse. 4.a. To increase in quantity or bulk by adding a cheaper substance. b. To adulterate. 5.a. To enlarge the area, scope, or range of. b. To expand the influence of. c. To make more comprehensive or inclusive. See Syns at **increase.** 6.a. To offer. b. To make available; provide. 7.a. To cause (something) to be or last longer. b. To prolong the time allowed for payment of. 8. *Chiefly British.* a. To appraise or assess; value. b. To seize or make a levy on for the purpose of settling a debt. —*intr.* To be or become long, large, or comprehensive. [ME *extenden* < OFr. *extendre* < Lat. *extendere* : *ex-,* ex- + *tendere,* to stretch; see **ten-**.] — **ex•tend′i•bil′i•ty** *n.* — **ex•tend′i•ble, ex•tend′i•ble** *adj.*

**ex•tend•ed** (ĭk-stĕn′dĭd) *adj.* 1. Stretched or pulled out: *an extended telescope.* 2. Continued for a long period of time; protracted. 3. Enlarged or broad in meaning, scope, or influence. — **ex•tend′ed•ly** *adv.*

**extended family** *n.* A family group that consists of parents, children, and other close relatives, often in close proximity.

**ex•tend•er** (ĭk-stĕn′dər) *n.* A substance added to another substance to modify, dilute, or adulterate it.

**ex•ten•si•ble** (ĭk-stĕn′sə-bəl) *adj.* 1. Capable of being extended or protruded. 2. *Comp. Sci.* Of or relating to a programming language or a system that can be modified by changing or adding features. — **ex•ten′si•bil′i•ty** *n.*

**ex•ten•sile** (ĭk-stĕn′sĭl) *adj.* Extensible.

**ex•ten•sion** (ĭk-stĕn′shən) *n.* 1. The act of extending or the condition of being extended. 2. The amount, degree, or range to which something extends or can extend. 3.a. The act of straightening or extending a limb. b. The position assumed by an extended limb. 4. *Medic.* The application of traction to a fractured or dislocated limb to restore the normal position. 5.a. An addition that increases the area, influence, operation, or contents of something. b. An additional telephone connected to a main line. 6.a. An allowance of extra time for the repayment of a debt. b. The period of this extra time. 7. The property of an object by which it occupies space. 8. A program in a university, college, or school for students unable to attend at the usual time or in the usual place. 9. *Logic.* The class of objects designated by a specific term or concept; denotation. 10. *Math.* A set that includes a given and similar set as a subset. [ME *extensioun* < OFr. *extension* < Lat. *extēnsiō, extēnsiōn-* < *extēnsus,* p.part. of *extendere,* to extend. See EXTEND.] — **ex•ten′sion•al** *adj.*

**ex•ten•si•ty** (ĭk-stĕn′sĭ-tē) *n., pl.* **-ties.** 1.a. The quality of having extension or being extensive. b. A specific degree or range of extension. 2. The attribute of sensation that enables one to perceive space or size.

**ex•ten•sive** (ĭk-stĕn′sĭv) *adj.* 1. Large in extent, range, or amount. 2. Of or relating to the cultivation of vast areas of land with a minimum of labor or expense. — **ex•ten′sive•ly** *adv.* — **ex•ten′sive•ness** *n.*

**ex•ten•som•e•ter** (ĕk′stĕn-sŏm′ĭ-tər) *n.* An instrument

**ex•tend** (ĭk-stĕnd′) *v.* **-tend•ed, -tend•ing, -tends.** —*tr.* **1.** To open or straighten (something) out; unbend. **2.** To stretch or spread (something) out to greater or fullest length. **3.a.** To exert (oneself) vigorously or to full capacity. **b.** To cause to move at full gallop. Used of a horse. **4.a.** To increase in quantity or bulk by adding a cheaper substance. **b.** To adulterate. **5.a.** To enlarge the area, scope, or range of. **b.** To expand the influence of. **c.** To make more comprehensive or inclusive. See Syns at **increase. 6.a.** To offer. **b.** To make available; provide. **7.a.** To cause (something) to be or last longer. **b.** To prolong the time allowed for payment of. **8.** *Chiefly British.* **a.** To appraise or assess; value. **b.** To seize or make a levy on for the purpose of settling a debt. —*intr.* To be or become long, large, or comprehensive. [ME *extenden* < OFr. *extendre* < Lat. *extendere* : *ex-*, ex- + *tendere*, to stretch; see **ten-***.] —**ex•tend′i•bil′i•ty** *n.* —**ex•tend′a•ble, ex•tend′i•ble** *adj.*

**ex•tend•ed** (ĭk-stĕn′dĭd) *adj.* **1.** Stretched or pulled out: *an extended telescope.* **2.** Continued for a long period of time; protracted. **3.** Enlarged or broad in meaning, scope, or influence. —**ex•tend′ed•ly** *adv.*

# EXHIBIT E

## FULLY REDACTED

# EXHIBIT F

## FULLY REDACTED

# EXHIBIT G

## FULLY REDACTED

# EXHIBIT H

## FULLY REDACTED

# EXHIBIT I

## FULLY REDACTED

# EXHIBIT J

## FULLY REDACTED

# EXHIBIT K

## FULLY REDACTED

# EXHIBIT L

## FULLY REDACTED

# EXHIBIT M

## FULLY REDACTED

# EXHIBIT N

## FULLY REDACTED

# EXHIBIT O

(12) INTERNATIONAL APPLICATION PUBLISHED UNDER THE PATENT COOPERATION TREATY (PCT)

(19) World Intellectual Property Organization
International Bureau

(43) International Publication Date
9 October 2003 (09.10.2003)

PCT

(10) International Publication Number
WO 03/082261 A1

(51) International Patent Classification[7]: A61K 31/135, 9/22, A61P 25/24

(21) International Application Number: PCT/EP03/03310

(22) International Filing Date: 27 March 2003 (27.03.2003)

(25) Filing Language: English

(26) Publication Language: English

(30) Priority Data:
60/367,735 28 March 2002 (28.03.2002) US

(71) Applicant (*for all designated States except US*): SYNTHON B.V. [NL/NL]; Microweg 22, NL-6545 CM Nijmegen (NL).

(72) Inventors; and
(75) Inventors/Applicants (*for US only*): PLATTEEUW, Johannes, Jan [NL/NL]; Zandveldstraat 30, NL-5223 JE 's-Hertogenbosch (NL). MARGALLO LANA, Inocencia [ES/ES]; Wellington 90 8-3, E-08018 Barcelona (ES). SILES ORTEGA, Arturo [ES/ES]; Castelló, 1, Polígono las Salinas, E-08830 Sant Boi de Llobregat (ES).

(74) Agent: PRINS, Hendrik, Willem; Arnold & Siedsma, Sweelinckplein 1, NL-2517 GK The Hague (NL).

(81) Designated States (*national*): AE, AG, AL, AM, AT, AU, AZ, BA, BB, BG, BR, BY, BZ, CA, CH, CN, CO, CR, CU, CZ, DE, DK, DM, DZ, EC, EE, ES, FI, GB, GD, GE, GH, GM, HR, HU, ID, IL, IN, IS, JP, KE, KG, KP, KR, KZ, LC, LK, LR, LS, LT, LU, LV, MA, MD, MG, MK, MN, MW, MX, MZ, NO, NZ, OM, PH, PL, PT, RO, RU, SC, SD, SE, SG, SK, SL, TJ, TM, TN, TR, TT, TZ, UA, UG, US, UZ, VC, VN, YU, ZA, ZM, ZW.

(84) Designated States (*regional*): ARIPO patent (GH, GM, KE, LS, MW, MZ, SD, SL, SZ, TZ, UG, ZM, ZW), Eurasian patent (AM, AZ, BY, KG, KZ, MD, RU, TJ, TM), European patent (AT, BE, BG, CH, CY, CZ, DE, DK, EE, ES, FI, FR, GB, GR, HU, IE, IT, LU, MC, NL, PT, RO, SE, SI, SK, TR), OAPI patent (BF, BJ, CF, CG, CI, CM, GA, GN, GQ, GW, ML, MR, NE, SN, TD, TG).

**Published:**
— *with international search report*

*For two-letter codes and other abbreviations, refer to the "Guidance Notes on Codes and Abbreviations" appearing at the beginning of each regular issue of the PCT Gazette.*

WO 03/082261 A1

(54) Title: EXTENDED RELEASE VENLAFAXINE FORMULATIONS

(57) Abstract: The invention relates to a pharmaceutical composition comprising venlafaxine hydrochloride and sodium carboxymethyl cellulose,wherein preferably said composition is in the form of a tablet containing a pharmaceutically effective amount of venlafaxine hydrochloride, and to a method for treating a venlafaxine-treatable disease or condition, which comprises administering to a patient in need thereof an effective amount of the pharmaceutical composition.

# EXTENDED RELEASE VENLAFAXINE FORMULATIONS

This application claims the benefit of priority under 35 U.S.C. § 119 from prior U.S. provisional application serial No. 60/367,735, filed March 28, 2002, the entire contents of which are incorporated herein by reference.

BACKGROUND OF THE INVENTION

The present invention relates to extended release formulations of venlafaxine hydrochloride and to the use thereof in treating various diseases or conditions.

Venlafaxine is the common name for the compound 1-[2-(dimethylamino)-1-(4-methoxyphenyl) ethyl]cyclohexanol, having the structure shown below.

US 4,535,186 describes a class of hydroxycycloalkanephenethyl amines as being useful antidepressants and exemplifies the compound now known as venlafaxine hydrochloride as one of the suitable species. Venlafaxine hydrochloride is approved for sale in various countries including the United States of America under the brand name EFFEXOR® (Wyeth Ayerst). It is available as an immediate release tablet and as an extended release

capsule under the brand name EFFEXOR® (Wyeth Ayerst) and EFFEXOR XR® (Wyeth Ayerst), respectively.

Venlafaxine has been the subject of various research endeavors. For example, US 5,043,466 describes a process for making cyclohexanol derivatives in a specified solvent composition. Example 3 of this patent shows the synthesis of venlafaxine as the hydrochloride salt thereof.

US 6,274,171 and related EP 0 797 991A1 disclose encapsulated extended release formulations for venlafaxine hydrochloride. These patents indicate that commercial venlafaxine hydrochloride tablets were administered two or three times daily, but that due to variations in the drug concentration in the patient's blood plasma caused by such a dosing regimen, unwanted side effects, especially nausea and vomiting were common. A once daily, encapsulated extended release dosage form is disclosed that provides a flattened drug plasma profile and reduces these side effects. The encapsulated dosage form is taught to comprise spheroids of venlafaxine hydrochloride, microcrystalline cellulose, and hydroxypropylmethylcellulose (HPMC). These spheroids are coated with a mixture of ethyl cellulose and HPMC. By providing an appropriate amount of the coating, the desired blood plasma profile can be obtained. An acceptable batch of coated spheroids will meet the following _in vitro_ dissolution profile:

| Time (hours) | Average % venlafaxine hydrochloride released |
|---|---|
| 2 | <30 |

| 4 | 30-55 |
|---|---|
| 8 | 55-80 |
| 12 | 65-90 |
| 24 | >80 |

using USP Apparatus 1 (basket) at 100 rpm in purified water at 37 °C. The coated spheroids can be from a single batch or represent a blend of different batches.

US 6,274,171 and EP 0 797 991 also state that forming an extended release dosage from of venlafaxine hydrochloride was difficult in part due to the high water solubility of the hydrochloride salt. In fact, these patents disclose that "[n]umerous attempts to produce extended release tablets by hydrogel technology proved to be fruitless because the compressed tablets were either physically unstable (poor compressibility or capping problems) or dissolved too rapidly in dissolution studies." See US '171 at column 4, lines 60-65 and EP '991 at page 3 lines 35-37. Unlike the encapsulated extended release formulations described in these patents, a hydrogel extended release venlafaxine hydrochloride tablet is taught to typically exhibit a dissolution profile wherein 40%-50% is released at 2 hours, 60%-70% is released at 4 hours, and 85%-100% is released at 8 hours.

WO99/22724 also discloses encapsulated venlafaxine hydrochloride extended release dosage forms. These formulations differ from those in US '171 and EP '991 in that the spheroid is substantially free of HPMC.

Apparently HPMC can be omitted from the spheroid when smaller amounts of venlafaxine hydrochloride are employed.

Although a venlafaxine extended release capsule has been produced, it would be advantageous to provide a less complicated dosage form that nonetheless provides extended release of venlafaxine.

SUMMARY OF THE INVENTION

The present invention relates to the surprising discovery that sodium carboxymethyl cellulose can provide superior controlled release of venlafaxine hydrochloride. Accordingly, a first aspect of the present invention relates to a pharmaceutical composition that comprises venlafaxine hydrochloride and sodium carboxymethyl cellulose. The pharmaceutical composition includes finished dosage forms as well as intermediates/precursors thereof such as tabletting blends. The pharmaceutical compositions are generally in tablet form and can exhibit good extended release properties such that a twice daily or more preferably a once daily dosage form is provided.

Another aspect of the present invention relates to a method for treating venlafaxine-treatable diseases and conditions, especially depression, by administering an effective amount of the above-described pharmaceutical composition to a patient in need thereof. The pharmaceutical composition is preferably administered once daily in the form of one or two tablets.

DETAILED DESCRIPTION OF THE INVENTION

The present invention is based on the discovery of a hydrogel polymer that can adequately control the release of venlafaxine hydrochloride. Contrary to the

investigations reported in the prior art, a hydrogel technology has been found that can extend the release of the very water soluble venlafaxine hydrochloride. Specifically, the polymer sodium carboxymethyl cellulose can be used to formulate a venlafaxine hydrochloride hydrogel tablet that can exhibit a more desirable release profile.

Sodium carboxymethyl cellulose useable in the present invention is desirably not crosslinked. Further, higher viscosity polymers are preferred over lower viscosity polymer forms. While higher molecular weight is normally associated with higher viscosity, such is not required and between the two physical properties viscosity is more important. Sodium carboxymethyl cellulose is well known in the art and is commercially available.

The venlafaxine hydrochloride used in the present invention can be based on the racemate or mixture of enantiomers of venlafaxine, or, on the pure or substantially pure (+) or (-) enantiomer of venlafaxine (hereinafter referred to as (+)-venlafaxine hydrochloride and (-)-venlafaxine hydrochloride). All of these possibilities are included within the meaning of "venlafaxine hydrochloride," unless specifically noted otherwise, and can be made by synthetic techniques known in the art.

The pharmaceutical compositions of the present invention contain venlafaxine hydrochloride and sodium carboxymethyl cellulose. As pharmaceutical compositions, the kind and amount of additional ingredients is limited to those excipients that are pharmaceutically acceptable

and in pharmaceutically acceptable amounts. Typical excipients are described hereinafter. The pharmaceutical compositions of the present invention generally contain, by weight, 10%-50% of the venlafaxine hydrochloride and 30% to 75%, more typically 30% to 50%, of the sodium carboxymethyl cellulose. In some embodiments it is preferable to have the ratio of venlafaxine hydrochloride to sodium carboxymethyl cellulose within the range of 0.8-1.2:1, more preferably approximately 1:1, respectively. The pharmaceutical compositions generally take the form of a tablet, in particular a hydrogel tablet, but are not limited thereto. The pre-tablet or pre-compression blends are also included as are tablets that are further treated such as by coating, packaging, etc.

A "hydrogel tablet" is one that contains a hydrophilic matrix material that swells or "gels" upon contact with water to thereby slow the diffusion release of the active ingredient. Sodium carboxymethyl cellulose is a hydrophilic matrix material. Other hydrophilic matrix materials that can be combined with sodium carboxymethyl cellulose in forming the hydrogel include other celluloses such as methylcelluloses (i.e. having a viscosity of 400cP to 4000 cP), hydroxyethylcellulose, and HPMC; polysaccharides such as galactomannanes, potassium alginates, sodium alginates, agar-agar, carrageen, arabic gum, and sterculia gum; polyacrylates such as CARBOPOL 934, EUDRAGIT LD 35; Noveon or polycarbophils; and other water swellable polymers such as polyvinyl alcohol. Generally the sodium carboxymethyl cellulose comprises the majority of the matrix material

and typically accounts for at least 50%, more commonly at least 60%, still more commonly at least 65%, and in many embodiments at least 70% or at least 80%. A preferred embodiment comprising a combination of matrix materials includes sodium carboxymethyl cellulose with HPMC and/or microcrystalline cellulose. The amount of sodium carboxymethyl cellulose in these embodiments is generally in the range of 50% to 90% , more commonly 65% to 85%.

Additional pharmaceutically acceptable excipients are well known in the art and include, without limitation, diluents, fillers, binders, lubricants, disintegrants, glidants, colorants, pigments, taste masking agents, sweeteners, and plasticizers. The excipient(s) are selected based in part on the dosage form, the intended mode of administration, the intended release rate, and manufacturing reliability. Typically the composition may further comprise fillers and lubricants in order to assure good properties of the composition and good tabletting. Suitable fillers are, e.g. calcium hydrogenphosphate, microcrystalline cellulose or lactose, suitable lubricants are magnesium stearate or talc.

The hydrogel tablet of the present invention is an extended release dosage form. An extended release dosage form as used herein means that in a dissolution test using USP Apparatus 1 (basket) at 100 rpm in purified water at 37 °C, less than 80% of the venlafaxine hydrochloride is dissolved during the first two hours, more typically less than 50%, and preferably less than 30% of the venlafaxine hydrochloride is dissolved during the first two hours. Extended release tablets generally

allow for twice a day, or more preferably once a day dosing, to provide 24 hour therapeutic blood plasma levels of venlafaxine to the patient. In this regard, the most preferred dosage form is one which provides once daily dosing. Such a composition should meet the following in vitro dissolution profile:

| Time (hours) | Average % venlafaxine hydrochloride released |
|---|---|
| 2 | <30 |
| 4 | 30-55 |
| 8 | 55-80 |
| 12 | 65-90 |
| 24 | >80 |

using USP Apparatus 1 (basket) at 100 rpm in purified water at 37 °C.

In terms of in vivo performance, the extended release venlafaxine hydrochloride pharmaceutical composition according to the present invention preferably exhibits on average a maximum venlafaxine blood plasma level not earlier than 4 hours, more preferably not earlier than 6 hours after administration of the composition. Typically the average peak plasma level is reached between 4 and 10 hours, more preferably between 6 and 8 hours after administration. In this regard, it is preferred in some embodiments to be bioequivalent to the commercially available EFFEXOR XR®.

The tablets may be produced by any standard tabletting technique, e.g. by wet granulation, dry

granulation or direct compression. The tabletting methods that do not employ a solvent ("dry processes") are generally preferable.

In general, dry granulation procedures comprise mixing the solid excipients (except lubricants), compacting the mixture in a compactor (e.g. a roller compactor), or double compression, milling the compacted mass, screening the milled granules, mixing with a lubricant and compressing the mixture into tablets. Direct compression procedures generally comprise mixing the solid excipients in one or more stages and compressing the uniform mixture into tablets. After tablet formation, the tablets may optionally be coated such as by a film coat. The coating may serve as an environmental barrier to light, heat or moisture, as a taste masking aide, or as an enteric coating. While the later is not common with hydrogel technology, it may be advantageous given the pH sensitivity of the sodium carboxymethyl cellulose, to insure extended release. Alkaline or buffering materials can also be incorporated into the coating, the outer portion of the tablet or throughout the tablet to assist in pH control, if necessary. In one embodiment, a further overcoat layer containing venlafaxine hydrochloride is provided to allow initial release, as desired, in the low pH of the stomach while the remainder, generally the majority (i.e., 90% or more) of the venlafaxine hydrochloride, is isolated under the enteric coating. This outer drug layer can be dissolving or diffusing in nature.

A unit dose, i.e. one tablet, of the pharmaceutical composition of the present invention generally contains

from 2 mg to 300 mg, more typically 30 mg to 300 mg of venlafaxine hydrochloride. Contemplated doses include 37.5 mg, 75 mg, 100 mg, 150 mg, 200 mg, and 300 mg strengths. For clarity, all amounts of venlafaxine hydrochloride are expressed in terms of the weight of the free base contained in the hydrochloride salt, as is conventional in the art.

The venlafaxine hydrochloride compound of the present invention can be used to treat any disease or condition that is treatable by venlafaxine. A venlafaxine-treatable disease or condition is one that could be improved by a serotonin or norepinephrine uptake inhibitor and specifically includes, without limitation, depressions, panic disorder, generalized anxiety disorder, obesity, post-traumatic stress disorder, late luteal phase dysphoric disorder, attention deficit disorders, Gilles de la Tourette syndrome, bulimia nervosa, and Shy Drager syndrome. See published US patent application US 2001/0012855 A1 for a description of the uses of venlafaxine and salts thereof. The pharmaceutical composition of the present invention can be used to treat such conditions by administering an effective amount to a patient in need thereof. An effective amount is generally known in the art and/or determined using routine skill. Typically the effective amount for a human contains 30 to 300 mg of venlafaxine per day. The patients used herein include human and non-human mammals such as dogs, cats, and horses. Preferably, the venlafaxine hydrochloride compound is administered orally via one or two unit dosage forms (tablets) of the present invention as described above.

The entire disclosure in each of the patents mentioned in the above description is incorporated herein by reference. The invention will be further described with reference to the following non-limiting examples.

**Examples**

Example 1

Tablet composition comprising venlafaxine hydrochloride

Composition of a tablet:

Venlafaxine hydrochloride 133.5 mg

Sodium carboxymethyl cellulose (Blanose [TM] 7HF) 133.5 mg

Microcrystalline cellulose (Avicel[TM] PH101 ) 30.0mg

Hydroxypropylmethylcellulose (Methocel[TM] K4M) 30.0mg

Magnesium stearate 3.0 mg

Modus operandi: compaction followed by compression.

Round biconvex tablets of 9 mm diameter and having total mass of 330 mg were made by dry compaction and compression.

Dissolution rate (USP1, water, 37°C) was determined by UV spectrophotometry and is expressed in % of the declared amount:

2hrs 17.8%

4hrs 33.2%

8 hrs 59.4%

12 hrs 82.2%

24 hrs 103.1%

Example 2

Composition of a tablet:

Venlafaxine hydrochloride 133.5 mg

Sodium carboxymethyl cellulose (Blanose [TM] 7HF) 133.5 mg

Microcrystalline cellulose (Avicel[TM] PH101 ) 30.0mg

Magnesium stearate 3.0 mg

Modus operandi: compaction followed by compression.

Round biconvex tablets of 9 mm diameter and having total mass of 300 mg were made by dry compaction and compression.

Dissolution rate (USP1, water, 37°C) was determined by UV spectrophotometry and is expressed in % of the declared amount:

2hrs 23.1%

4hrs 44.0%

8 hrs 78.9%

12 hrs 100.4%

24 hrs 104.4%

The invention having been described, it will be readily apparent to those skilled in the art that further changes and modifications in actual implementation of the concepts and embodiments described herein can easily be made or may be learned by practice of the invention, without departing from the spirit and scope of the invention as defined by the following claims.

We Claim:

1. A pharmaceutical composition comprising venlafaxine hydrochloride and sodium carboxymethyl cellulose.
2. The pharmaceutical composition according to claim 1, wherein said venlafaxine hydrochloride is racemic venlafaxine hydrochloride.
3. The pharmaceutical composition according to claim 1, wherein said venlafaxine hydrochloride is (+)-venlafaxine hydrochloride or (-)-venlafaxine hydrochloride.
4. The pharmaceutical composition according to claim 1-3, wherein said venlafaxine hydrochloride and said sodium carboxymethyl cellulose are present in a weight ratio of 0.8-1.2:1, respectively.
5. The pharmaceutical composition according to claim 4, wherein said weight ratio is about 1:1.
6. The pharmaceutical composition according to claim 1-5, wherein said composition is in the form of a tablet containing a pharmaceutically effective amount of venlafaxine hydrochloride.
7. The pharmaceutical composition according to claim 6, wherein said tablet contains 10%-50% of said venlafaxine hydrochloride and 30% to 75% of said sodium carboxymethyl cellulose.
8. The pharmaceutical composition according to claim 7, wherein said venlafaxine hydrochloride and said sodium carboxymethyl cellulose are present in said tablet in a weight ratio of about 1:1.
9. The pharmaceutical composition according to claim 6-8, wherein said tablet contains 30 to 300 mg of venlafaxine as said venlafaxine hydrochloride.

10. The pharmaceutical composition according to claim 6-9, wherein said tablet further comprises hydroxypropyl methylcellulose, microcrystalline cellulose, or a combination thereof.

11. The pharmaceutical composition according to claim 6-10, which further comprises a coating.

12. The pharmaceutical composition according to claim 6-11, wherein said tablet has a dissolution profile wherein no more than 30% of said venlafaxine hydrochloride is released during the first two hours in a USP Apparatus 1 (basket) at 100 rpm in purified water at 37 °C.

13. The pharmaceutical composition according to claim 12, wherein said tablet dissolution profile meets the following criterion:

| Time (hours) | Average % venlafaxine hydrochloride released |
|---|---|
| 2 | <30 |
| 4 | 30-55 |
| 8 | 55-80 |
| 12 | 65-90 |
| 24 | >80 |

using USP Apparatus 1 (basket) at 100 rpm in purified water at 37 °C.

14. A method for treating a venlafaxine-treatable disease or condition, which comprises administering to a patient in need thereof an effective amount of

the pharmaceutical composition according to claim 1-13.

15. The method according to claim 14, wherein said venlafaxine-treatable disease or condition is depression.

16. The method according to claim 14 or 15, wherein said composition is administered once daily.

17. The method according to claim 16, wherein said pharmaceutical composition is administered orally in the form of one or two tablets once daily.

# INTERNATIONAL SEARCH REPORT

International Application No
PCT/EP 03/03310

**A. CLASSIFICATION OF SUBJECT MATTER**
IPC 7 A61K31/135 A61K9/22 A61P25/24

According to International Patent Classification (IPC) or to both national classification and IPC

**B. FIELDS SEARCHED**

Minimum documentation searched (classification system followed by classification symbols)
IPC 7 A61K

Documentation searched other than minimum documentation to the extent that such documents are included in the fields searched

Electronic data base consulted during the international search (name of data base and, where practical, search terms used)
EPO-Internal, WPI Data, PAJ, BIOSIS, EMBASE, PASCAL, CHEM ABS Data

**C. DOCUMENTS CONSIDERED TO BE RELEVANT**

| Category ° | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
|---|---|---|
| A | EP 0 797 991 A (AMERICAN HOME PROD) 1 October 1997 (1997-10-01) cited in the application the whole document --- | 1-17 |
| A | WO 99 22724 A (AMERICAN HOME PROD) 14 May 1999 (1999-05-14) cited in the application the whole document --- | 1-17 |
| A | AH KIBBE : "Handbook of Pharmaceutical Excipients" , AMERICAN PHARMACEUTICAL ASSOCIATION , WASHINGTON XP002242001 page 87-90 --- -/-- | 1-17 |

[X] Further documents are listed in the continuation of box C.

[X] Patent family members are listed in annex.

° Special categories of cited documents :

"A" document defining the general state of the art which is not considered to be of particular relevance

"E" earlier document but published on or after the international filing date

"L" document which may throw doubts on priority claim(s) or which is cited to establish the publication date of another citation or other special reason (as specified)

"O" document referring to an oral disclosure, use, exhibition or other means

"P" document published prior to the international filing date but later than the priority date claimed

"T" later document published after the international filing date or priority date and not in conflict with the application but cited to understand the principle or theory underlying the invention

"X" document of particular relevance; the claimed invention cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone

"Y" document of particular relevance; the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents, such combination being obvious to a person skilled in the art.

"&" document member of the same patent family

| Date of the actual completion of the international search | Date of mailing of the international search report |
|---|---|
| 21 May 2003 | 11/06/2003 |
| Name and mailing address of the ISA<br>European Patent Office, P.B. 5818 Patentlaan 2<br>NL – 2280 HV Rijswijk<br>Tel. (+31-70) 340-2040, Tx. 31 651 epo nl,<br>Fax: (+31-70) 340-3016 | Authorized officer<br>Zimmer, B |

INTERNATIONAL SEARCH REPORT

International Application No
PCT/EP 03/03310

C.(Continuation) DOCUMENTS CONSIDERED TO BE RELEVANT

| Category ° | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
|---|---|---|
| A | US 2001/012855 A1 (RUDOLPH RICHARD L ET AL) 9 August 2001 (2001-08-09)<br>cited in the application<br>page 3, left-hand column, paragraph 6<br>----- | 1-17 |

Form PCT/ISA/210 (continuation of second sheet) (July 1992)

International application No.
PCT/EP 03/03310

## INTERNATIONAL SEARCH REPORT

**Box I Observations where certain claims were found unsearchable (Continuation of item 1 of first sheet)**

This International Search Report has not been established in respect of certain claims under Article 17(2)(a) for the following reasons:

1. [X] Claims Nos.: –
because they relate to subject matter not required to be searched by this Authority, namely:

Rule 39.1(iv) PCT - Method for treatment of the human or animal body by therapy Although claims 14-17 are directed to a method of treatment of the human/animal body, the search has been carried out and based on the alleged effects of the compound/composition.

2. [ ] Claims Nos.:
because they relate to parts of the International Application that do not comply with the prescribed requirements to such an extent that no meaningful International Search can be carried out, specifically:

3. [ ] Claims Nos.:
because they are dependent claims and are not drafted in accordance with the second and third sentences of Rule 6.4(a).

**Box II Observations where unity of invention is lacking (Continuation of item 2 of first sheet)**

This International Searching Authority found multiple inventions in this international application, as follows:

1. [ ] As all required additional search fees were timely paid by the applicant, this International Search Report covers all searchable claims.

2. [ ] As all searchable claims could be searched without effort justifying an additional fee, this Authority did not invite payment of any additional fee.

3. [ ] As only some of the required additional search fees were timely paid by the applicant, this International Search Report covers only those claims for which fees were paid, specifically claims Nos.:

4. [ ] No required additional search fees were timely paid by the applicant. Consequently, this International Search Report is restricted to the invention first mentioned in the claims; it is covered by claims Nos.:

Remark on Protest

[ ] The additional search fees were accompanied by the applicant's protest.

[ ] No protest accompanied the payment of additional search fees.

# INTERNATIONAL SEARCH REPORT

Information on patent family members

International Application No.
PCT/EP 03/03310

| Patent document cited in search report | | Publication date | Patent family member(s) | | Publication date |
|---|---|---|---|---|---|
| EP 0797991 | A | 01-10-1997 | AU | 727653 B2 | 21-12-2000 |
| | | | AU | 1640097 A | 02-10-1997 |
| | | | BR | 9701304 A | 29-09-1998 |
| | | | CA | 2199778 A1 | 25-09-1997 |
| | | | CN | 1403077 A | 19-03-2003 |
| | | | CN | 1164389 A ,B | 12-11-1997 |
| | | | CZ | 9700772 A3 | 12-11-1997 |
| | | | EP | 0797991 A1 | 01-10-1997 |
| | | | HU | 9700589 A2 | 29-09-1997 |
| | | | JP | 10007552 A | 13-01-1998 |
| | | | NO | 971206 A | 26-09-1997 |
| | | | NZ | 314442 A | 29-06-1999 |
| | | | PL | 318954 A1 | 29-09-1997 |
| | | | RU | 2176912 C2 | 20-12-2001 |
| | | | SK | 30197 A3 | 08-10-1997 |
| | | | TR | 9700190 A2 | 21-10-1997 |
| | | | US | 2002197307 A1 | 26-12-2002 |
| | | | US | 6274171 B1 | 14-08-2001 |
| | | | US | 2001055612 A1 | 27-12-2001 |
| | | | US | 2002025339 A1 | 28-02-2002 |
| | | | ZA | 9702403 A | 21-09-1998 |
| WO 9922724 | A | 14-05-1999 | AU | 747978 B2 | 30-05-2002 |
| | | | AU | 1300399 A | 24-05-1999 |
| | | | BG | 104397 A | 28-02-2001 |
| | | | BR | 9813179 A | 22-08-2000 |
| | | | CA | 2305242 A1 | 14-05-1999 |
| | | | CN | 1278165 T | 27-12-2000 |
| | | | CZ | 20001659 A3 | 17-10-2001 |
| | | | EE | 200000212 A | 16-04-2001 |
| | | | EP | 1028718 A2 | 23-08-2000 |
| | | | HR | 20000213 A1 | 31-12-2000 |
| | | | HU | 0004287 A2 | 29-04-2002 |
| | | | JP | 2001521892 T | 13-11-2001 |
| | | | NO | 20002126 A | 04-05-2000 |
| | | | NZ | 504460 A | 31-01-2003 |
| | | | PL | 341141 A1 | 26-03-2001 |
| | | | SK | 6472000 A3 | 07-11-2000 |
| | | | TR | 200001232 T2 | 21-12-2000 |
| | | | WO | 9922724 A2 | 14-05-1999 |
| | | | US | 2002197307 A1 | 26-12-2002 |
| | | | US | 6274171 B1 | 14-08-2001 |
| | | | US | 2001055612 A1 | 27-12-2001 |
| | | | US | 2002025339 A1 | 28-02-2002 |
| | | | ZA | 9810081 A | 04-05-2000 |
| US 2001012855 | A1 | 09-08-2001 | US | 6310101 B1 | 30-10-2001 |
| | | | US | 5916923 A | 29-06-1999 |
| | | | US | 2001053799 A1 | 20-12-2001 |
| | | | US | 2002052405 A1 | 02-05-2002 |
| | | | AT | 213407 T | 15-03-2002 |
| | | | AU | 5831298 A | 21-05-1998 |
| | | | AU | 6592994 A | 05-01-1995 |
| | | | CA | 2126305 A1 | 29-12-1994 |
| | | | DE | 69429895 D1 | 28-03-2002 |
| | | | DE | 69429895 T2 | 29-08-2002 |
| | | | DK | 639374 T3 | 06-05-2002 |
| | | | EP | 1153603 A2 | 14-11-2001 |

**INTERNATIONAL SEARCH REPORT**

Information on patent family members

International Application No
PCT/EP 03/03310

| Patent document cited in search report | Publication date | Patent family member(s) | Publication date |
|---|---|---|---|
| US 2001012855 A1 | | EP 0639374 A2 | 22-02-1995 |
| | | ES 2174864 T3 | 16-11-2002 |
| | | JP 7089851 A | 04-04-1995 |
| | | LV 12881 B | 20-11-2002 |
| | | PT 639374 T | 31-07-2002 |
| | | SG 47711 A1 | 17-04-1998 |

# EXHIBIT P

(12) INTERNATIONAL APPLICATION PUBLISHED UNDER THE PATENT COOPERATION TREATY (PCT)

(19) World Intellectual Property Organization
International Bureau

(43) International Publication Date
9 October 2003 (09.10.2003)

PCT

(10) International Publication Number
WO 03/082805 A1

(51) International Patent Classification[7]: C07C 217/74, A61K 31/135

(21) International Application Number: PCT/EP03/03319

(22) International Filing Date: 27 March 2003 (27.03.2003)

(25) Filing Language: English

(26) Publication Language: English

(30) Priority Data:
60/367,704 28 March 2002 (28.03.2002) US
60/372,447 16 April 2002 (16.04.2002) US

(71) Applicant (*for all designated States except US*): SYNTHON B.V. [NL/NL]; Microweg 22, NL-6545 CM Nijmegen (NL).

(72) Inventors; and
(75) Inventors/Applicants (*for US only*): OOSTERBAAN, Marinus, Jacobus, Maria [NL/NL]; Paulus Potterstraat 15, NL-6523 CP Nijmegen (NL). KELTJENS, Rolf [NL/NL]; Van den Havestraat 81, NL-6521 JP Nijmegen (NL).

(74) Agent: PRINS, Hendrik, Willem; Arnold & Siedsma, Sweelinckplein 1, NL-2517 GK The Hague (NL).

(81) Designated States (*national*): AE, AG, AL, AM, AT, AU, AZ, BA, BB, BG, BR, BY, BZ, CA, CH, CN, CO, CR, CU, CZ, DE, DK, DM, DZ, EC, EE, ES, FI, GB, GD, GE, GH, GM, HR, HU, ID, IL, IN, IS, JP, KE, KG, KP, KR, KZ, LC, LK, LR, LS, LT, LU, LV, MA, MD, MG, MK, MN, MW, MX, MZ, NO, NZ, OM, PH, PL, PT, RO, RU, SC, SD, SE, SG, SK, SL, TJ, TM, TN, TR, TT, TZ, UA, UG, US, UZ, VC, VN, YU, ZA, ZM, ZW.

(84) Designated States (*regional*): ARIPO patent (GH, GM, KE, LS, MW, MZ, SD, SL, SZ, TZ, UG, ZM, ZW), Eurasian patent (AM, AZ, BY, KG, KZ, MD, RU, TJ, TM), European patent (AT, BE, BG, CH, CY, CZ, DE, DK, EE, ES, FI, FR, GB, GR, HU, IE, IT, LU, MC, NL, PT, RO, SE, SI, SK, TR), OAPI patent (BF, BJ, CF, CG, CI, CM, GA, GN, GQ, GW, ML, MR, NE, SN, TD, TG).

**Published:**
— *with international search report*

*For two-letter codes and other abbreviations, refer to the "Guidance Notes on Codes and Abbreviations" appearing at the beginning of each regular issue of the PCT Gazette.*

WO 03/082805 A1

(54) Title: LOW WATER-SOLUBLE VENLAFAXINE SALTS

(57) Abstract: The invention relates to a venlafaxine maleate compound, to a pharmaceutical composition comprising a venlafaxine maleate compound and a pharmaceutically acceptable excipient, to a method for treating a venlafaxine-treatable disease or condition, which comprises administering to a patient in need thereof an effective amount of a venlafaxine maleate compound, to a low water-soluble venlafaxine salt other than venlafaxine besylate, to a pharmaceutical composition comprising a low water-soluble venlafaxine salt compound, other than venlafaxine besylate, and a hydrophilic matrix material, and to the use of venlafaxine maleate or low-water-soluble venlafaxine salt other than venlafaxine besylate as a medicament.

# LOW WATER-SOLUBLE VENLAFAXINE SALTS

This application claims the benefit of priority under 35 U.S.C. § 119 from U.S. provisional application serial No. 60/367704, filed March 28, 2002 and from U.S. provisional application serial No. 60/372447, filed April 16, 2002; the entire contents of each application being incorporated herein by reference.

## BACKGROUND OF THE INVENTION

The present invention relates to low water-soluble venlafaxine salts, especially venlafaxine maleate, various forms thereof, and the use of the same in pharmaceutical compositions for treating depression and other conditions.

Venlafaxine is the common name for the compound 1-[2-(dimethylamino)-1-(4-methoxyphenyl) ethyl]cyclohexanol, having the structure shown below.

$CH_3$ $CH_3$ N HO $CH_3O$

US 4,535,186 describes a class of hydroxycycloalkanephenethyl amines as being useful antidepressants and exemplifies the compound now known as venlafaxine hydrochloride as one of the suitable species. Venlafaxine hydrochloride is approved for sale in various countries including the United States of America. It is

available as an immediate release tablet and as an extended release capsule, under the brand name EFFEXOR ® (Wyeth Ayerst) and EFFEXOR XR® (Wyeth Ayerst) respectively.

Venlafaxine has been the subject of various research endeavors. For example, US 5,043,466 describes a process for making cyclohexanol derivatives in a specified solvent composition. Example 3 of this patent shows the synthesis of venlafaxine as the hydrochloride salt thereof.

US 6,274,171 and related EP 0 797 991A1 disclose encapsulated extended release formulations for venlafaxine hydrochloride. These patents indicate that commercial venlafaxine hydrochloride tablets were administered two or three times daily, but that due to variations in the drug concentration in the patient's blood plasma caused by such a dosing regimen, unwanted side effects, especially nausea and vomiting were common. A once daily, encapsulated extended release dosage form is disclosed that provides a flattened drug plasma profile and reduces these side effects. The encapsulated dosage form is taught to comprise spheroids of venlafaxine hydrochloride, microcrystalline cellulose, and hydroxypropylmethylcellulose (HPMC). These spheroids are coated with a mixture of ethyl cellulose and HPMC. By providing an appropriate amount of the coating, the desired blood plasma profile can be obtained. An acceptable batch of coated spheroids will meet the following <u>in vitro</u> dissolution profile:

| Time (hours) | Average % venlafaxine |
|---|---|

| | hydrochloride released |
|---|---|
| 2 | <30 |
| 4 | 30-55 |
| 8 | 55-80 |
| 12 | 65-90 |
| 24 | >80 |

using USP Apparatus 1 (basket) at 100 rpm in purified water at 37 °C. The coated spheroids can be from a single batch or represent a blend of different batches.

US 6,274,171 and EP 0 797 991 also state that forming an extended release dosage form of venlafaxine hydrochloride was difficult in part due to the high water solubility of the hydrochloride salt. In fact, these patents disclose that "[n]umerous attempts to produce extended release tablets by hydrogel technology proved to be fruitless because the compressed tablets were either physically unstable (poor compressibility or capping problems) or dissolved too rapidly in dissolution studies." See US 6,274,171 at column 4, lines 60-65 and EP 0 797 991 at page 3 lines 35-37. Unlike the encapsulated extended release formulations described in these patents, a hydrogel extended release venlafaxine hydrochloride tablet is taught to typically exhibit a dissolution profile wherein 40%-50% is released at 2 hours, 60%-70% is released at 4 hours, and 85%-100% is released at 8 hours.

WO99/22724 also discloses encapsulated venlafaxine hydrochloride extended release dosage forms. These

formulations differ from those in US 6,274,171 and EP 0 797 991 in that the spheroid is substantially free of HPMC. Apparently HPMC can be omitted from the spheroid when smaller amounts of venlafaxine hydrochloride are employed.

US 6,197,828 and WO00/32556 discloses the use of individual (+) and (-) enantiomers, respectively, of venlafaxine as well as metabolites thereof. While the commercial venlafaxine hydrochloride is a racemate, these patents teach that various side effects may be reduced by using one isomer substantially without the presence of the other.

Although venlafaxine hydrochloride provides good pharmaceutical activity, it would be beneficial to find other forms of venlafaxine. In particular, venlafaxine forms that are easier handle would be advantageous. Venlafaxine hydrochloride is relatively aggressive towards handling equipment and is irritating to the skin, etc. of human personnel that handle the pure active. A venlafaxine form that is less aggressive and less irritating would be desirable. It is further desirable to provide a venlafaxine form that can be easily formulated into various dosage forms including hydrogel extended release tablets.

SUMMARY OF THE INVENTION

The present invention is based on the discovery of low water-soluble venlafaxine salts. Unlike venlafaxine hydrochloride, the low water-soluble salts of the present invention are more easily formulated into extended release formulations including hydrogel tablets. Thus, a

first aspect of the present invention relates to a low water-soluble venlafaxine salt. Such salts exhibit lower water-solubility relative to venlafaxine hydrochloride and preferably 380 mg/ml or less.

A preferred low water-soluble venlafaxine salt is venlafaxine maleate. Accordingly, a second aspect of the invention relates to a venlafaxine maleate compound. The compound can be isolated and/or purified or it can be part of a composition. The compound can be in solid form including crystalline forms but is not limited thereto. A preferred compound is crystalline venlafaxine hydrogenmaleate anhydrate.

Another aspect of the present invention relates to a pharmaceutical composition comprising an effective amount of venlafaxine maleate and a pharmaceutically acceptable excipient. The composition can be an immediate release dosage form or an extended release dosage form and embraces tablets as well as pellets/beads/spheroids or other encapsulated forms. In one embodiment, the venlafaxine maleate is provided in a hydrogel tablet. The hydrogel tablet preferably provides sufficient extended release so that the tablet is a once daily dosage form.

An additional aspect of the present invention relates to a pharmaceutical composition comprising a low water-soluble venlafaxine salt and a hydrophilic matrix material. Such a composition includes finished hydrogel tablets as well as tabletting powder blends and other intermediates in making a final dosage form. The hydrogel tablet exhibits extended release such that no

more than twice daily dosing and preferably once daily dosing can be achieved.

A further aspect of the invention relates to the use of a low water-soluble venlafaxine salt, and in particular venlafaxine maleate, in treating venlafaxine-treatable diseases or conditions. Hence the invention provides a method for treating a venlafaxine-treatable disease or condition, which comprises administering to a patient in need thereof an effective amount of a low water-soluble venlafaxine salt such as venlafaxine maleate. The low water-soluble salt is typically administered as an oral composition such as a tablet or capsule and is preferably administered once daily.

DETAILED DESCRIPTION OF THE INVENTION

The present invention is based on the surprising discovery that various salts of venlafaxine are low water-soluble relative to the water solubility of venlafaxine hydrochloride. As used herein "low water-soluble" venlafaxine salt means that the salt exhibits a water solubility that is less than two thirds the water solubility of venlafaxine hydrochloride, preferably less than half, more preferably one third and more preferably less than one quarter the water solubility of venlafaxine hydrochloride. In absolute values, a low water-soluble salt of venlafaxine preferably has a water solubility of 380 mg/ml or less, preferably 200 mg/ml or less, more preferably 150 mg/ml or less.

Such low water soluble salts include venlafaxine maleate compounds and venlafaxine benzenesulfonate (besylate) compounds and is expected to also include

venlafaxine fumarate compounds, but is not limited thereto. Any salt of venlafaxine that exhibits a solubility within the above range is included within the meaning of low water soluble salts. Venlafaxine besylate compounds are more fully described in U.S. provisional patent application serial no. 60/367734, filed March 28, 2002, entitled "Venlafaxine Besylate," the entire contents of which are incorporated herein by reference. For simplicity, the present invention will be described with reference to a venlafaxine maleate compound, but it should be understood that it equally applies to all low water-soluble venlafaxine salts.

A venlafaxine maleate compound is any form of the salt formed by venlafaxine and maleic acid. Typically the venlafaxine and maleate moieties are present in about a 1:1 molar ratio, which is referred to herein as "venlafaxine hydrogenmaleate." However, other ratios such as 2:1 or 3:2 are also possible due to the fact that maleic acid contains two acid groups, each having the potential to from a salt with a venlafaxine moiety. In addition, venlafaxine maleate is less aggressive, less irritating, and easier to handle than venlafaxine hydrochloride. Note that maleic acid is generally easier to handle than hydrochloric acid. Accordingly, venlafaxine maleate is easier to formulate into a variety of dosage forms, especially extended release dosage forms, than venlafaxine hydrochloride. The preferred form is the venlafaxine hydrogenmaleate.

Venlafaxine maleate compounds are low-water soluble venlafaxine salts. For example, venlafaxine hydrogenmaleate anhydrate exhibits a water solubility of

about 370 mg/ml, i.e. 368 mg/ml, while venlafaxine hydrochloride exhibits a water solubility of about 570 mg/ml at ambient conditions.

The venlafaxine in the venlafaxine maleate compound of the present invention can be any form of venlafaxine. For example, venlafaxine has one optically active carbon, thus allowing for existence of two enantiomers and a racemate. Both enantiomers are pharmaceutically active. The venlafaxine maleate compound can be based on the racemate or mixture of enantiomers of venlafaxine or on the pure or substantially pure (+) or (-) enantiomer of venlafaxine (hereinafter referred to as (+)-venlafaxine maleate and (-)-venlafaxine maleate): all are included within the meaning of "venlafaxine maleate" unless specifically noted otherwise.

The compound can be in isolated and/or purified form, but such is not required. The compound includes various physical forms of the salt including dissolved forms, oil or liquid forms, and solid forms including amorphous and crystalline forms.

The compound is typically in a crystalline form. Crystalline forms include venlafaxine maleate anhydrates, hydrates, and solvates. Preferably the venlafaxine maleate is venlafaxine maleate anhydrate, more preferably venlafaxine hydrogenmaleate anhydrate.

A venlafaxine maleate compound can be prepared by contacting a venlafaxine substrate with a maleate substrate. Typically the contacting occurs in a suitable solvent system. The venlafaxine maleate product can be isolated, if desired, by precipitation, evaporation,

spray drying, or other conventional techniques known in the art.

The "venlafaxine substrate" includes any substance that provides a venlafaxine moiety or ion thereof and specifically includes racemic and enantiomeric venlafaxine base, a venlafaxine salt other than venlafaxine maleate, e.g. venlafaxine HCl, or a raw venlafaxine, i.e. a reaction product or reaction mixture comprising venlafaxine that has been obtained after the last step of production of venlafaxine. The venlafaxine substrate can be obtained by conventional processes and synthesis schemes known in the art. For example, US 4,535,186, US 5,043,466, and US 6,197,828 all teach methods for making venlafaxine. Venlafaxine base in its isolated state is obtainable by neutralization of venlafaxine hydrochloride, extraction by ethyl acetate and evaporation of the solvent, according to the method disclosed in US 6,197,828 and WO 00-32566. Alternatively, venlafaxine base can be obtained as a precipitate, preferably a filtratable precipitate, by the use of a contrasolvent, e.g. heptane, optionally with cooling and/or solvent removal, without the need to convert to a salt, as is more fully described in U.S. provisional patent application serial no. 60/367736, filed March 28, 2002, entitled "Venlafaxine Free Base," the entire contents of which are incorporated herein by reference. Single enantiomers of venlafaxine free base can be made as described in J.Med.Chem. 1990, 33 (10), 2899-2905. Venlafaxine hydrochloride is commercially available and can be produced according to US 4,535,186, EP 112669, US 5,043,466, US 6,197,828 and WO 01-07397.

Other salts can be formed by methods analogous to those disclosed in these cited patent documents.

The "maleate substrate" includes any substance that provides a maleic acid moiety or ion thereof and specifically includes any form of maleic acid as well as a salt of maleic acid with a base. A preferred substrate is maleic acid. Maleate substrates are commercially available and/or may be prepared by methods known in the prior art.

The molar ratio of the substrates is not particularly limited and is generally about stoichiometric to the desired ratio. Typically a slight excess of maleate substrate is used. Commonly the molar ratio of venlafaxine substrate to maleate substrate is within the range of 0.8:1 to 1.2:1, more typically 0.9:1 to 1.1:1 or about 1:1. However, up to a significant excess of one substrate, especially the maleate substrate can be used. Such excess of either maleate or venlafaxine is typically in the range of 1.1 to 3.0:1, more typically 1.1 to 2:1. For economy reasons, excesses are normally kept small and typically the excess maleate substrate, if any, is provided in slight stoichiometric excess such as 1.01 to 1.5 times the molar amount of venlafaxine.

The solvent system is preferably selected so as to facilitate the salt reaction and to allow subsequent separation of the resulting maleate. Advantageously, both venlafaxine substrate and the maleate substrate are dissolvable in the solvent system, at least at elevated temperatures. In the process, a mixture, slurry, or solution of venlafaxine substrate and a solvent may be

contacted with a maleate substrate, or conversely, a mixture, slurry, or solution of maleate substrate and a solvent may be contacted with venlafaxine substrate. In another embodiment, both partners may be combined with a solvent system prior to being contacted together, whereby the solvent system used for maleate substrate may be identical with or different from the solvent system used for the venlafaxine substrate. The solvent system can be comprised of a single solvent or a mixture of solvents. When two or more solvents are used, a two phase reaction scheme may be used wherein the venlafaxine substrate and maleate substrate are primarily reacted in one phase and the resulting venlafaxine maleate compound is primarily present in the other phase due to, inter alia, solubility differences, etc. Suitable solvents include water, a lower alcohol ($C_1$ - $C_6$) such as methanol or ethanol, an aliphatic ketone such as acetone, an ether such as dioxane, an ester such as ethyl acetate, and mixtures thereof.

The temperature of contact of both substrates in the solvent system is from ambient to the boiling point of the solvent system, the later being preferred. It is not required that a complete solution is formed in this step, i.e. a slurry or two phase solution are also possible, though a single solution is generally preferred.

The venlafaxine maleate compound can be isolated or recovered from the salt forming reaction by any convenient means. For example, the venlafaxine maleate compound can be precipitated out of a solution or reaction mixture. The precipitation may be spontaneous depending upon the solvent system used and the

conditions. Alternatively, the precipitation can be induced by reducing the temperature of the solvent, especially if the initial temperature at contact is elevated. The precipitation may also be facilitated by reducing the volume of the solution/solvent or by adding a contra solvent, i.e. a liquid miscible with the solvent in which the venlafaxine maleate is less soluble. Seed crystals of venlafaxine maleate may also be added to help induce precipitation. The precipitated venlafaxine maleate compound can be isolated by conventional methods such as filtration or centrifugation, optionally washed and dried, preferably under diminished pressure.

Alternatively, the venlafaxine maleate compound can be isolated by evaporating away the solvent and collecting the residue. Such a method generally leads to an oil or solid amorphous form of venlafaxine maleate. Similarly, an amorphous solid form of the venlafaxine maleate compound can be recovered by spray drying or freeze drying a solution containing the venlafaxine maleate compound.

In a preferred mode, venlafaxine base is dissolved in acetone under heating, maleic acid is added to the solution under stirring, the mixture is heated to complete dissolution and the clear solution is allowed to cool. Venlafaxine maleate anhydrate crystallizes from the solution and is separated by filtration and dried.

Venlafaxine maleate prepared in solid state may be, if necessary, purified to the desired degree of purity. Venlafaxine maleate can be purified for instance by a (re)crystallization from a suitable solvent that may be identical or different from the solvent system used for

its production. Examples of preferred suitable solvents for a purifying crystallization step are acetone, ethanol, water, and combinations thereof.

Single enantiomers of venlafaxine maleate may be prepared essentially as disclosed above, whereby the venlafaxine substrate comprises the single enantiomer of venlafaxine. Preferred substrates are single enantiomers of venlafaxine base or venlafaxine hydrochloride.

The venlafaxine maleate compound of the present invention can be formulated with a pharmaceutically acceptable excipient into a pharmaceutical composition. The pharmaceutical compositions of the present invention include the unit dosage form as well as the intermediate bulk formulations such as pellets, beads, powder blends, etc. Typically the composition is a finished dosage form also referred to as a unit dose. Dosage forms include oral dosage forms, topical dosage forms such as a transdermal patch, parenteral dosage forms such as an injectable solution, and rectal dosage forms such as a suppository, but is not limited thereto. Oral dosage forms are the most preferred due to the ease of administration and include solid oral dosage forms such as capsules, tablets, sachets/granules, and powders, as well as liquid oral dosage forms such as solutions, suspensions, and emulsions.

Pharmaceutically acceptable excipients are well known in the art and include diluents, fillers, binders, lubricants, disintegrants, glidants, colorants, pigments, taste masking agents, sweeteners, plasticizers, and any acceptable auxiliary substances such as absorption enhancers, penetration enhancers, surfactants, co-

surfactants, and specialized oils. The proper excipient(s) are selected based in part on the dosage form, the intended mode of administration, the intended release rate, and manufacturing reliability. Examples of common types of excipients include various polymers, waxes, calcium phosphates, and sugars. Polymers include cellulose and cellulose derivatives such as HPMC, hydroxypropyl cellulose, hydroxyethyl cellulose, microcrystalline cellulose, carboxymethylcellulose, sodium carboxymethylcellulose, calcium carboxymethylcellulose, and ethylcellulose; polyvinylpyrrolidones; polyethylenoxides; and polyacrylic acids including their copolymers and crosslinked polymers thereof, i.e. Carbopol® (B.F. Goodrich), Eudragit® (Rohm), polycarbophil and chitosan polymers. Waxes include white beeswax, microcrystalline wax, carnauba wax, hydrogenated castor oil, glyceryl behenate, glycerylpalmito stearate, saturated polyglycolyzed glycerate. Calcium phosphates include dibasic calcium phosphate, anhydrous dibasic calcium phosphate, and tribasic calcium phosphate. Sugars include simple sugars such as lactose, maltose, mannitol, fructose, sorbitol, sacarose, xylitol, isomaltose, and glucose as well as complex sugars (polysaccharides) such as maltodextrin, amylodextrin, starches, and modified starches.

Any form of the venlafaxine maleate can be used in the pharmaceutical composition. Preferred venlafaxine maleate forms are: crystalline venlafaxine hydrogenmaleate anhydrate, (+)-venlafaxine maleate anhydrate, and (-)-venlafaxine maleate anhydrate. The amount of venlafaxine maleate compound contained in a

unit dosage form is an amount effective to treat one or more venlafaxine-treatable diseases or conditions as is hereinafter defined and can be determined by workers skilled in the art without undue experimentation. Generally this amount ranges from 2 mg to 300 mg. For oral dosage forms the amount is generally from 30 mg to 300 mg per unit dose. Contemplated doses include amounts of about 37.5 mg, 75 mg, 100 mg, 112.5 mg, 150 mg, 200 mg, and 300 mg strengths. For clarity, all amounts of venlafaxine maleate are expressed herein in terms of the weight of the free base contained in the venlafaxine maleate compound, as is conventional in the art.

As mentioned above, oral dosage forms are preferred and include tablets, capsules, sachets/granules, and powders. Tablets can be soluble tablets, dispersible tablets, effervescent tablets, chewable tablets, lyophilized tablets, coated tablets including sugar coatings, enteric coatings, and gastro-soluble coatings, and modified release tablets including microencapsulated active substance tablets, matrix tablets, and coated tablets such as polymer coated extended release tablets and osmotic tablets of the mono-compartmental or bi-compartmental type. Capsules include hard gelatin capsules that can be filled with powder, pellets, granules, small tablets or mini-tablets. The capsule and/or the material placed within can be coated such as for enteric release or modified release. Soft capsules are also included and are more typically filled with liquids or dispersions, but are not limited thereto. Sachets or granules can be effervescent granules, coated granules, enteric granules, or modified release granules.

One embodiment of the present invention relates to an immediate release tablet. An "immediate release" as used herein means that at least 80 % of the venlafaxine maleate in the tablet is dissolved by 30 minutes under a dissolution test using USP Apparatus 1 (basket) at 100 rpm in purified water at 37 °C. Any conventional immediate release composition can be used in formulating the venlafaxine maleate immediate release tablet. Typically such tablets contain one or more binders and/or diluents such as HPMC, microcrystalline cellulose, a calcium phosphate, lactose, and mannitol; a lubricant such as magnesium stearate; and optionally a disintegrant such as sodium starch glycollate, crosscarmellose or crosspovidone. Additional excipients such as colorants, antioxidants, etc can also be present.

More preferably, however, the solid oral dosage form is an extended release dosage form. This can be accomplished in either a tablet or a capsule form. An extended release dosage form as used herein means that in a dissolution test using USP Apparatus 1 (basket) at 100 rpm in purified water at 37 °C, less than 80% of the venlafaxine maleate is dissolved during the first two hours, more typically less than 50%, and preferably less than 30% of the venlafaxine maleate is dissolved during the first two hours. Extended release tablets or capsules generally allow for twice a day, or more preferably once a day dosing, to provide 24 hour therapeutic blood plasma levels of venlafaxine to the patient. In this regard, the most preferred dosage form is one which provides once daily dosing. Such a

composition should meet the following in vitro dissolution profile:

| Time (hours) | Average % venlafaxine maleate released |
|---|---|
| 2 | <30 |
| 4 | 30-55 |
| 8 | 55-80 |
| 12 | 65-90 |
| 24 | >80 |

using USP Apparatus 1 (basket) at 100 rpm in purified water at 37 °C. Most advantageously the extended release dosage from meets the above dissolution profile also in 0.1N HCl aqueous solution.

In terms of in vivo performance, the extended release venlafaxine maleate pharmaceutical composition according to the present invention preferably exhibits on average a maximum venlafaxine blood plasma level not earlier than 4 hours, more preferably not earlier than 6 hours after administration of the composition. Typically the average peak plasma level is reached between 4 and 10 hours, more preferably between 6 and 8 hours after administration. In this regard, a preferred composition is bioequivalent to the commercially available EFFEXOR XR®.

Extended release tablets can be formulated according to any of the known techniques such as those based on matrix technology, osmotic pressure technology, multiparticulates compressed into tablets, multilayer

tablets having at least one layer based on one of the foregoing, as well as coated tablets, using known materials and methods.

Tablets employing a matrix, in either a monolithic tablet or in one or more layers optionally built on a tablet core, are generally the most common and frequently the easiest to form from a commercial manufacturing standpoint. The matrix provides a diffusion and/or erosion release of the drug. The matrix is generally composed of at least one type of matrix material selected from hydrophilic (hydrogel), inert, lipophilic, and biodegradable matrix materials. Materials used for each of these kinds of matrices in pharmaceutical oral dosage forms are well known in the art and are briefly described below.

A hydrophilic matrix material is generally a polymeric material that swells upon contact with water to form a diffusion barrier. Suitable materials include cellulose derivatives such as methylcelluloses (i.e. having a viscosity of 400cP to 4000 cP), hydroxyethylcellulose, HPMC, and sodium carboxymethyl cellulose; polysaccharides such as galactomannanes, potassium alginates, sodium alginates, agar-agar, carrageen, arabic gum, and sterculia gum; polyacrylates such as CARBOPOL 934, EUDRAGIT LD 35; Noveon or polycarbophils; and other water swellable polymers such as polyvinyl alcohol.

Inert matrix materials provide a tortuous path for the drug to escape the dosage form thereby controlling diffusion of the drug. Such materials include ethylcellulose (ETHOCEL).

Lipophilic matrix materials work through a combination of erosion and diffusion. Examples of lipophilic materials include glyceryl palmitosterate (PRECIROL ATO 5), glyceryl behenate (COMPRITOL 888 ATO) and Hydrogenated castor oil (CUTINA HR).

Biodegradable matrix materials also operate through a combination of erosion and diffusion. Biodegradable materials include, for example, polyesters of lactic acid and glycolic acid, polyorthoesters, polyanhydrides and caprolactones. A further description of this technology is set forth in WO02/11701, WO92/04013, and EP 1 005 863.

Because venlafaxine maleate has a surprisingly lower water solubility than venlafaxine hydrochloride, venlafaxine maleate can be more readily formulated into conventional extended release forms including hydrogel tablets. Surprisingly, venlafaxine maleate can even be formulated into a once-a-day extended release hydrogel tablet. A "hydrogel tablet" is one that contains a hydrophilic matrix material that swells or "gels" upon contact with water to thereby slow the diffusion release of the active ingredient. Any of the above-described hydrophilic matrix materials can be used in forming venlafaxine maleate hydrogel tablets of the present invention.

Preferably a hydrogel tablet of the present invention comprises 10%-50% of a venlafaxine maleate compound, preferably a monohydrate form, and 30% to 75% of a hydrogel-forming agent, preferably an HPMC. In some embodiments it may be advantageous for the weight ratio of venlafaxine maleate to hydrogel-forming agent to be in the range of 0.8-1.2:1, preferably approximately 1:1,

respectively. In addition to the venlafaxine maleate and hydrogel-forming agent, the composition may further comprise other suitable inert ingredients such as fillers and lubricants in order to assure good properties of the composition in the process of making final medicinal forms, particularly for compression into tablets. Suitable fillers are, e.g. calcium hydrogenphosphate, microcrystalline cellulose or lactose, suitable lubricants are magnesium stearate, precirol, sodium stearyl fumarate (Pruv) or talc.

The tablets of venlafaxine maleate according to the present invention may be produced by any standard tabletting technique, e.g. by wet granulation, dry granulation or direct compression. The tabletting methods that do not employ a solvent ("dry processes") are generally preferable.

In general, dry granulation procedures comprise mixing the solid excipients (except lubricants), compacting the mixture in a compactor (e.g. a roller compactor), or double compression, milling the compacted mass, screening the milled granules, mixing with a lubricant and compressing the mixture into tablets. Direct compression procedures generally comprise mixing the solid excipients in one or more stages and compressing the uniform mixture into tablets. After tablet formation, the tablets may optionally be coated.

The tablets can be of any size and shape. In one preferred embodiment the tablets are small or mini-tablets in size. Small tablets have a diameter of 3-6 mm while mini-tablets have a diameter of 1-3 mm. One or more of the tablets can be taken as such or, more

preferably one or more are loaded into a single capsule to provide a unit dose. Most preferably, the small or mini-tablets provide additive amounts of the venlafaxine maleate without modifying the release profile. For example, by making a hydrogel round small tablet of diameter 5 to 6 mm and containing 37.5 mg of venlafaxine (as maleate), capsules containing 37.5 mg, 75 mg, and 150 mg of venlafaxine maleate can be formed by filling a standard No. 0 capsule with 1, 2, or 4 of the small tablets, respectively. Such an additive effect is not as easily obtained with a proportionally larger hydrogel tablet. This is because the release is a function of the volume to surface area ratio. Scaling up the amount and size of a satisfactory 37.5 mg tablet will likely not result in a satisfactory release profile for the resulting 150 mg tablet, for example, because the volume to surface area ratio is different between the two tablets. For each desired single dosage level, a separate formulation, size and/or shape would be needed. Similar proportionality issues arise with other delayed release tablet technologies. By using small tablets in a single capsule, only one tablet formulation and shape is needed to produce multiple dosage strengths. Typically a small or mini-tablet contains 5 to 50 mg of venlafaxine maleate, especially 10, 25, 30, 37.5, 40, and 50 mg. Depending on the size of the tablet and the capsule from 1 to 10 or more small or mini-tablets can be placed in the capsule.

In addition to filling capsules with small or mini-tablets, an extended release capsule can be formed by filling it with more traditional pellets, beads, and/or

spheres. The pellets can be coated with an extended release coating or composition. In addition, different populations of coated pellets can be used in a single capsule, each providing a different release characteristic so that the aggregate release is sustained over a long period; i.e. 12 to 24 hours. Alternatively, the bead population can be substantially homogeneous. A preferred capsule of the pellet type is described in the above-mentioned US 6,274,171 and related EP 0 797 991A1 wherein the venlafaxine hydrochloride used in these patents is replaced with the venlafaxine maleate compound of the present invention.

The venlafaxine maleate compound of the present invention can be used to treat any disease or condition that is treatable by venlafaxine. A venlafaxine-treatable disease or condition is one that could be improved by a serotonin or norepinephrine uptake inhibitor and specifically includes, without limitation, depressions, panic disorder, generalized anxiety disorder, obesity, post-traumatic stress disorder, late luteal phase dysphoric disorder, attention deficit disorders, Gilles de la Tourette syndrome, bulimia nervosa, and Shy Drager syndrome. See published US patent application US 2001/0012855 A1 for a description of the uses of venlafaxine and salts thereof. The venlafaxine maleate compound of the present invention can be used to treat such conditions by administering an effective amount to a patient in need thereof. An effective amount is generally known in the art and/or determined using routine skill. Typically the effective amount for a human is 30 to 300 mg of venlafaxine per

day. The patients used herein include human and non-human mammals such as dogs, cats, and horses. The route of administration is not particularly limited and includes peroral, parenteral, and transdermal administration. Preferably, the venlafaxine maleate compound is administered orally via one or two unit dosage forms, especially extended release tablets or capsules, as described above.

The above description and details have been set forth with respect to venlafaxine maleate compounds, but also applies with equal force, mutatis mutandis, to all other low water-soluble venlafaxine salts. The entire disclosure in each of the patents mentioned in the above description is incorporated herein by reference. The invention will be further described with reference to the following non-limiting examples.

**Examples**

Example 1. Synthesis of venlafaxine hydrogenmaleate.

In a 2-liter flask equipped with a mechanical stirrer, 250 g of venlafaxine base was dissolved under heating and stirring in 500 ml of acetone. Then 106.7g of maleic acid was added to the hot clear solution and the resulting mixture was heated until clear. The clear solution was allowed to cool to room temperature under stirring, and was kept at 4C for 30 minutes.

The obtained crystals were isolated by filtration, washed with a small amount of acetone and dried overnight under reduced pressure at 40°C.

Yield: 332.3 g.

Identity confirmed by NMR.

No water present ( K. Fischer titration)

M.p. 136-138 °C, DSC peak at 137.78 °C

HPLC purity: min. 99.9%

Example 2

Round immediate release tablets, 6 mm in diameter, having a venlafaxine dosage strength of 37.5 were made by direct compression having the following ingredients and proportions.

| Ingredients | mg/tablet |
|---|---|
| Venlafaxine hydrogenmaleate | 53.125 |
| Microcrystalline cellulose (Avicel PH 102) | 29.875 |
| Lactose monohydrate direct compression | 16.00 |
| Magnesium stearate | 1.00 |

In SGF more than 70% of the venlafaxine was dissolved in 15 minutes.

Example 3

The following extended release hydrogel tablets were made by direct compression:

| Ingredients | Ratio 1:1 | Ratio 1:1.48 |
|---|---|---|
| Venlafaxine hydrogenmaleate | 53.125 | 53.125 |
| HPMC (Methocel K 4M EP) | 53.125 | 78.625 |
| Microcrystalline cellulose (Avicel PH 102) | 12.0 | 12.0 |
| Dibasic calcium phosphate | 5.0 | 5.0 |

| anhydrous (Emcompress) | | |
|---|---|---|
| Magnesium stearate | 1.250 | 1.250 |

The invention having been described, it will be readily apparent to those skilled in the art that further changes and modifications in actual implementation of the concepts and embodiments described herein can easily be made or may be learned by practice of the invention, without departing from the spirit and scope of the invention as defined by the following claims.

We Claim:

1. A venlafaxine maleate compound.
2. The venlafaxine maleate compound according to claim 1, which is crystalline venlafaxine maleate.
3. The venlafaxine maleate compound according to claim 1 or 2, which is crystalline venlafaxine hydrogenmaleate.
4. The venlafaxine maleate compound according to claim 3, which is venlafaxine maleate anhydrate, preferably crystalline venlafaxine maleate anhydrate.
5. The venlafaxine maleate compound according to claim 1, wherein said venlafaxine is pure or substantially pure (+) or (-) venlafaxine enantiomer.
6. A pharmaceutical composition comprising a venlafaxine maleate compound of claims 1-5and a pharmaceutically acceptable excipient.
7. The pharmaceutical composition according to claim 6, wherein said excipient is selected from the group consisting of calcium phosphates, microcrystalline cellulose, cellulose derivatives, polyvinylpyrrolidones, sugars, and combinations thereof.
8. The composition according to claim 6 or 7, wherein said composition is a unit dosage form and said venlafaxine maleate is contained in an amount between 30 mg and 300 mg, calculated on venlafaxine free base.
9. The pharmaceutical composition according to claim 6-8, wherein said composition is in the form of a tablet.

10. The pharmaceutical composition according to claim 6-9, wherein said composition is an extended release composition.

11. The composition according to claim 10, wherein said composition is a hydrogel tablet.

12. The composition according to claim 11, wherein said composition is a once daily dose tablet.

13. The composition according to claim 9-12, wherein said tablet comprises hydroxypropylmethyl cellulose and venlafaxine maleate.

14. The composition according to claim 10-13, wherein said composition has a dissolution profile such that less than 30% of said venlafaxine maleate is released from said composition in 2 hours using either purified water or SGF at 37 °C with stirring at 100 r.p.m. in a basket apparatus.

15. The composition according to claim 14, wherein said composition has a release profile that satisfies the following

| Time (hours) | Average % venlafaxine maleate released |
|---|---|
| 2 | <30 |
| 4 | 30-55 |
| 8 | 55-80 |
| 12 | 65-90 |
| 24 | >80 |

using USP Apparatus 1 (basket) at 100 rpm in purified water at 37 °C.

16. The composition according to claim 6-15, wherein said composition is in the form of pellets.

17. The composition according to claim 16, wherein said composition is a once daily dose capsule.

18. The composition according to claim 16 or 17, wherein said pellets have a dissolution profile that satisfies the following criteria:

| Time (hours) | Average % venlafaxine maleate released |
|---|---|
| 2 | <30 |
| 4 | 30-55 |
| 8 | 55-80 |
| 12 | 65-90 |
| 24 | >80 |

using USP Apparatus 1 (basket) at 100 rpm in purified water at 37 °C

19. A method for treating a venlafaxine-treatable disease or condition, which comprises administering to a patient in need thereof an effective amount of a venlafaxine maleate compound.

20. The method according to claim 19, wherein said venlafaxine maleate compound is administered in the form of a tablet.

21. The method according to claim 19 or 20, wherein said patient suffers from depression and said effective

amount of venlafaxine maleate is an antidepressant amount.

22. The method according to claim 19-21, wherein said venlafaxine maleate compound is administered once daily.

23. The method according to claim 22, wherein said venlafaxine maleate compound is administered orally in the form of one or two tablets once daily.

24. A process for making venlafaxine maleate comprising contacting a venlafaxine substrate and maleate substrate in a suitable solvent, optionally followed by precipitation of venlafaxine maleate from the solvent.

25. A low water-soluble venlafaxine salt other than venlafaxine besylate.

26. The low-water-soluble venlafaxine salt according to claim 25 in the form of a precipitate.

27. The low water-soluble venlafaxine salt according to claim 25 or 26 that has a water solubility of not more than 380 mg/ml at ambient conditions.

28. A pharmaceutical composition comprising a low water-soluble venlafaxine salt compound, other than venlafaxine besylate, and a hydrophilic matrix material.

29. The pharmaceutical composition according to claim 28, wherein said composition is in the form of a hydrogel tablet.

30. The pharmaceutical composition according to claim 29, wherein said tablet has a release profile that satisfies the following

| Time (hours) | Average % venlafaxine salt released |
|---|---|
| 2 | <30 |
| 4 | 30-55 |
| 8 | 55-80 |
| 12 | 65-90 |
| 24 | >80 |

using USP Apparatus 1 (basket) at 100 rpm in purified water at 37 °C

31. The composition according to claim 29 or 30, wherein said composition is a once daily dose tablet.

32. The composition according to claim 29-31, wherein said tablet comprises hydroxypropylmethyl cellulose, microcrystalline cellulose, and said low water-soluble venlafaxine salt.

33. A method for treating a venlafaxine-treatable disease or condition, which comprises administering to a patient in need thereof an effective amount of the pharmaceutical composition according to claim 28-32.

34. The method according to claim 33, wherein said pharmaceutical composition is administered in the form of a tablet.

35. The method according to claim 33 or 34, wherein said patient suffers from depression and said effective amount is an antidepressant amount.

36. The method according to claim 33-35, wherein said pharmaceutical composition is administered once daily.

37. The method according to claim 36, wherein said pharmaceutical composition is administered orally in the form of one or two tablets once daily.

38. Use of venlafaxine maleate or low water-soluble venlafaxine salt other than venlafaxine besylate as a medicament.

# INTERNATIONAL SEARCH REPORT

International Application No
PCT/EP 03/03319

**A. CLASSIFICATION OF SUBJECT MATTER**
IPC 7 C07C217/74 A61K31/135

According to International Patent Classification (IPC) or to both national classification and IPC

**B. FIELDS SEARCHED**

Minimum documentation searched (classification system followed by classification symbols)
IPC 7 C07C A61K

Documentation searched other than minimum documentation to the extent that such documents are included in the fields searched

Electronic data base consulted during the international search (name of data base and, where practical, search terms used)

EPO-Internal, CHEM ABS Data, WPI Data

**C. DOCUMENTS CONSIDERED TO BE RELEVANT**

| Category ° | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
|---|---|---|
| A | EP 0 797 991 A (AMERICAN HOME PROD) 1 October 1997 (1997-10-01) cited in the application the whole document --- | 1-24,38 |
| A | WO 01 62236 A (ROGOSKY KAREN ;UPJOHN CO (US); JORN DEBORAH (US)) 30 August 2001 (2001-08-30) page 6, line 5 page 6, line 15 --- | 1-24,38 |
| A | WO 00 59851 A (SEPRACOR INC) 12 October 2000 (2000-10-12) page 4, line 12 --- | 1-24,38 |
| A | WO 00 76955 A (AMERICAN HOME PROD) 21 December 2000 (2000-12-21) examples 1,3-6 ----- | 1-24,38 |

[ ] Further documents are listed in the continuation of box C.

[X] Patent family members are listed in annex.

° Special categories of cited documents :

"A" document defining the general state of the art which is not considered to be of particular relevance

"E" earlier document but published on or after the international filing date

"L" document which may throw doubts on priority claim(s) or which is cited to establish the publication date of another citation or other special reason (as specified)

"O" document referring to an oral disclosure, use, exhibition or other means

"P" document published prior to the international filing date but later than the priority date claimed

"T" later document published after the international filing date or priority date and not in conflict with the application but cited to understand the principle or theory underlying the invention

"X" document of particular relevance; the claimed invention cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone

"Y" document of particular relevance; the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents, such combination being obvious to a person skilled in the art.

"&" document member of the same patent family

Date of the actual completion of the international search

9 July 2003

Date of mailing of the international search report

16/07/2003

Name and mailing address of the ISA
European Patent Office, P.B. 5818 Patentlaan 2
NL – 2280 HV Rijswijk
Tel. (+31–70) 340–2040, Tx. 31 651 epo nl,
Fax: (+31–70) 340–3016

Authorized officer

Janus, S

International Application No. PCT/EP 03 03319

FURTHER INFORMATION CONTINUED FROM    PCT/ISA/ 210

Continuation of Box I.2

Claims Nos.: 25-37 (entirely), 38 (in part)

Present claims 25-37 (entirely) and 38 (in part) relate to a product defined by reference to a desirable characteristic or property, namely its "low" solubility in water.

Apart from the fact that neither the highest solubility envisaged by the applicant nor a method for the determination thereof are mentioned in the claims, it must be mentioned that the claims cover all compounds having this characteristic or property, whereas the application provides support within the meaning of Article 6 PCT and/or disclosure within the meaning of Article 5 PCT for only a very limited number of such compounds. In the present case, the claims so lack support, and the application so lacks disclosure, that a meaningful search over the whole of the claimed scope is impossible. Independent of the above reasoning, the claims also lack clarity (Article 6 PCT). An attempt is made to define the compound by reference to a result to be achieved. Again, this lack of clarity in the present case is such as to render a meaningful search over the whole of the claimed scope impossible. Consequently, the search has been carried out for those parts of the claims which appear to be clear, supported and disclosed, namely those parts relating to the venlafaxine maleate compounds.

The applicant's attention is drawn to the fact that claims, or parts of claims, relating to inventions in respect of which no international search report has been established need not be the subject of an international preliminary examination (Rule 66.1(e) PCT). The applicant is advised that the EPO policy when acting as an International Preliminary Examining Authority is normally not to carry out a preliminary examination on matter which has not been searched. This is the case irrespective of whether or not the claims are amended following receipt of the search report or during any Chapter II procedure.

**INTERNATIONAL SEARCH REPORT**

International application No.
PCT/EP 03/03319

**Box I Observations where certain claims were found unsearchable (Continuation of item 1 of first sheet)**

This International Search Report has not been established in respect of certain claims under Article 17(2)(a) for the following reasons:

1. [X] Claims Nos.:
because they relate to subject matter not required to be searched by this Authority, namely:
Although claims 19-23 and 33-38 are directed to a method of treatment of the human/animal body, the search has been carried out and based on the alleged effects of the compound/composition.

2. [X] Claims Nos.: 25-37 (entirely), 38 (in part)
because they relate to parts of the International Application that do not comply with the prescribed requirements to such an extent that no meaningful International Search can be carried out, specifically:
see FURTHER INFORMATION sheet PCT/ISA/210

3. [ ] Claims Nos.:
because they are dependent claims and are not drafted in accordance with the second and third sentences of Rule 6.4(a).

**Box II Observations where unity of invention is lacking (Continuation of item 2 of first sheet)**

This International Searching Authority found multiple inventions in this international application, as follows:

1. [ ] As all required additional search fees were timely paid by the applicant, this International Search Report covers all searchable claims.

2. [ ] As all searchable claims could be searched without effort justifying an additional fee, this Authority did not invite payment of any additional fee.

3. [ ] As only some of the required additional search fees were timely paid by the applicant, this International Search Report covers only those claims for which fees were paid, specifically claims Nos.:

4. [ ] No required additional search fees were timely paid by the applicant. Consequently, this International Search Report is restricted to the invention first mentioned in the claims; it is covered by claims Nos.:

**Remark on Protest**

[ ] The additional search fees were accompanied by the applicant's protest.

[ ] No protest accompanied the payment of additional search fees.

# INTERNATIONAL SEARCH REPORT

Information on patent family members

International Application No
PCT/EP 03/03319

| Patent document cited in search report | | Publication date | Patent family member(s) | | | Publication date |
|---|---|---|---|---|---|---|
| EP 0797991 | A | 01-10-1997 | AU | 727653 | B2 | 21-12-2000 |
| | | | AU | 1640097 | A | 02-10-1997 |
| | | | BR | 9701304 | A | 29-09-1998 |
| | | | CA | 2199778 | A1 | 25-09-1997 |
| | | | CN | 1403077 | A | 19-03-2003 |
| | | | CN | 1164389 | A ,B | 12-11-1997 |
| | | | CZ | 9700772 | A3 | 12-11-1997 |
| | | | EP | 0797991 | A1 | 01-10-1997 |
| | | | HU | 9700589 | A2 | 29-09-1997 |
| | | | JP | 10007552 | A | 13-01-1998 |
| | | | NO | 971206 | A | 26-09-1997 |
| | | | NZ | 314442 | A | 29-06-1999 |
| | | | PL | 318954 | A1 | 29-09-1997 |
| | | | RU | 2176912 | C2 | 20-12-2001 |
| | | | SK | 30197 | A3 | 08-10-1997 |
| | | | TR | 9700190 | A2 | 21-10-1997 |
| | | | TW | 493993 | B | 11-07-2002 |
| | | | US | 2002197307 | A1 | 26-12-2002 |
| | | | US | 6274171 | B1 | 14-08-2001 |
| | | | US | 2001055612 | A1 | 27-12-2001 |
| | | | US | 2002025339 | A1 | 28-02-2002 |
| | | | ZA | 9702403 | A | 21-09-1998 |
| WO 0162236 | A | 30-08-2001 | AU | 3802801 | A | 03-09-2001 |
| | | | CA | 2399442 | A1 | 30-08-2001 |
| | | | CN | 1396829 | T | 12-02-2003 |
| | | | EP | 1257277 | A2 | 20-11-2002 |
| | | | WO | 0162236 | A2 | 30-08-2001 |
| | | | US | 2002010216 | A1 | 24-01-2002 |
| WO 0059851 | A | 12-10-2000 | AU | 4062700 | A | 23-10-2000 |
| | | | CA | 2368083 | A1 | 12-10-2000 |
| | | | CZ | 20013607 | A3 | 12-06-2002 |
| | | | EP | 1165487 | A1 | 02-01-2002 |
| | | | HU | 0200898 | A2 | 28-10-2002 |
| | | | NO | 20014816 | A | 04-12-2001 |
| | | | PL | 350924 | A1 | 10-02-2003 |
| | | | WO | 0059851 | A1 | 12-10-2000 |
| WO 0076955 | A | 21-12-2000 | AU | 5738700 | A | 02-01-2001 |
| | | | WO | 0076955 | A1 | 21-12-2000 |

# EXHIBIT 5

## FULLY REDACTED

# EXHIBIT 6

## FULLY REDACTED

# EXHIBIT 7

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **WYETH,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**TEVA PHARMACEUTICALS USA, INC. and TEVA PHARMACEUTICAL INDUSTRIES LTD.,**<br><br>**Defendants.** | 03-CV-1293 (WJM)<br><br>MARKMAN OPINION |

This matter comes before the Court on the parties' submissions seeking construction of four disputed claim terms found in the patents-in-suit. Having taken into consideration the parties' submissions and their arguments made during the *Markman* hearing, the Court construes the disputed claim terms as follows.

## BACKGROUND

This is an Abbreviated New Drug Application ("ANDA") patent infringement action. Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Ltd. ("Teva") filed an ANDA seeking to market a generic version of Wyeth's Effexor® XR. Wyeth filed suit, alleging Teva's generic extended release venlafaxine formulation infringes three of its patents: U.S. Patent Nos. 6,274,171 B1 (the "'171 patent"), 6,419,958 B2 (the "'958 patent"), and 6,403,120 B1 (the "'120 patent"). The three patents are related and share an essentially identical specification.

Wyeth charges Teva with infringement of claims 20-25 of the '171 patent, claims 1-6 of the '958 patent, and claims 1, 2, 13 and 14 of the '120 patent. These claims are all method claims and are directed towards a method of administering an extended release formulation of venlafaxine hydrochloride that provides a therapeutic blood plasma concentration of venlafaxine over twenty-four hours. The specification states that the extended release formulation provides two advantages over the immediate release formulation. First, it eliminates the sharp peaks and troughs in blood plasma drug levels caused by multiple daily dosing with conventional immediate release venlafaxine hydrochloride tablets. '171 patent, col. 2, lines 24-28.[1] Thus, rather than take two to three doses a day, patients need only take the extended release formulation once a day. Second, it reduces the side effects experienced by patients who have taken the immediate release tablets. *See id.* at col. 2, lines 46-55. The extended release formulation was found to reduce the incidence of nausea and emesis (the act of vomiting). According to Wyeth, these two advantages provided improved patient compliance and tolerability, making Effexor® XR a blockbuster drug. (*See* Wyeth's Br. at 2).

Although the named inventors attempted to develop an extended release formulation in the form of a tablet, they failed, finding it "impossible" to achieve a sustained release tablet formulation. Col. 10, lines 53-57. They did, however, succeed in developing a film-coated spheroid formulation that could be administered in a capsule. The specific formulation they found worked was composed of "venlafaxine hydrochloride, microcrystalline cellulose and,

---

[1]Because the patents-in-suit share an essentially identical specification, all future citations will be to the '171 patent unless otherwise noted.

optionally, hydroxypropylmethylcellulose coated with a mixture of ethyl cellulose and hydroxypropylmethylcellulose." Col. 2, line 67 - col. 3, line 2.

Prior to submitting their *Markman* briefs, the Court required the parties to submit a Joint Claim Construction Chart ("Chart") setting forth the claim terms in dispute and the parties' respective proposed constructions for each term. The parties identified four disputed claim terms: "extended release formulations," "spheroid," "with diminished incidence(s) of nausea and emesis," and "encapsulated." (*See* Chart). For claim construction purposes, the following claims are illustrative of how these terms are used. Claims 20 and 21 of the '171 patent recite:

> 20. A method for providing a therapeutic blood plasma concentration of venlafaxine over a twenty four hour period with diminished incidences of nausea and emesis which comprises administering orally to a patient in need thereof, an encapsulated, extended release formulation that provides a peak blood plasma level of venlafaxine in from about four to about eight hours, said formulation containing venlafaxine hydrochloride as the active ingredient.
>
> 21. A method for eliminating the troughs and peaks of drug concentration in a patients [sic] blood plasma attending the therapeutic metabolism of plural daily doses of venlafaxine hydrochloride which comprises administering orally to a patient in need thereof, an encapsulated, extended release formulation that provides a peak blood plasma level of venlafaxine in from about four to about eight hours, said formulation containing venlafaxine hydrochloride as the active ingredient.

Claims 1 and 14 of the '120 patent recite:

> 1. A method for providing therapeutic blood plasma concentration of venlafaxine over a twenty four hour period with diminished incidence of nausea and emesis which comprises administering orally to a patient in need thereof, an extended release formulation that provides peak blood plasma levels of venlafaxine of no more than about 150 ng/ml, said formulation containing venlafaxine hydrochloride as the active ingredient.
>
> 13. The method of claim 1 wherein the extended release formulation comprises venlafaxine hydrochloride in an encapsulated spheroid.

## DISCUSSION

### I. Law of Claim Construction

The Federal Circuit en banc recently reaffirmed the claim construction methodology articulated by *Markman v. Westview Instruments, Inc.*[2] and its progeny and clarified the role that dictionaries play in claim construction. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). In *Phillips*, the Federal Circuit reestablished the primacy of the intrinsic evidence – the claims, specification and prosecution history – and reclassified dictionaries as part of the less significant extrinsic evidence. In doing so, the Federal Circuit emphasized the need to construe the claims in their proper context, which is the specification. *Id.* at 1321.

The objective of claim construction is to determine how a person of ordinary skill in the art would understand the claim terms. *Id.* at 1313, 1324. Generally, claim terms are given their ordinary and customary meaning. *Id.* at 1312-13 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). That meaning "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. In determining the ordinary meaning of claim terms, the person of ordinary skill in the art is deemed to read the claim terms in the context of the entire patent, including the particular claims in which they appear and the specification. *Id.* at 1313.

The claims "provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314. Oftentimes, the context in which a term is used in asserted and unasserted claims

---

[2] 52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

"can be highly instructive." *Id.* Further, differences among claims can provide useful insight into a term's meaning. *Id.*

But the claims cannot be looked at in isolation; rather, they must be considered in view of the specification. *Id.* at 1315. The specification is considered to be the "single best guide" for construing the claims. *Id.* The specification may reveal whether the patentee acted as his own lexicographer by giving a claim term a special definition. *Id.* Or, it may show that the patentee intentionally disclaimed claim scope. *Id.* In either case, the patentee's intent is dispositive. *Id.*

A court should also consider the prosecution history, if it is in evidence. *Id.* at 1317. The prosecution history "consists of the complete record of the proceedings before the [Patent and Trademark Office ("PTO")] and includes the prior art cited during the examination of the patent." *Id.* (citing *Autogiro Co. of Am. v. United States*, 181 Ct. Cl. 55, 384 F.2d 391, 399 (1967)). Although it "often lacks the clarity of the specification and thus is less useful for claim construction purposes," the prosecution history sheds light on the PTO's and inventor's understanding of the patent. *Id.*

A court may, in its discretion, consult extrinsic evidence, i.e., dictionaries, treatises, and expert and inventor testimony, when construing claim terms. *Id.* A court may consult extrinsic evidence to educate itself about the field of the invention and to aid its understanding of what one of ordinary skill in the art would understand a claim term to mean. *Id.* at 1319. But extrinsic evidence is "less significant" and "less reliable" than intrinsic evidence because it gives meaning to a claim term in the abstract, rather than in the particular context of the patent. *Id.* at 1317-18. Thus, although it may play a supporting role in claim construction, extrinsic evidence may not be used to contradict an unambiguous meaning established by the intrinsic record. *See id.* at 1324.

## II. The Disputed Claim Terms

### 1. "extended release formulation"

Wyeth contends that "extended release formulation" should be given its ordinary meaning and construed as "[a] formulation which releases the active ingredient at a slower rate than the immediate release formulation of the active ingredient such that the dosing frequency is once-a-day rather than the plural daily dosing for the immediate release formulation." (Chart). Teva asserts that the patentees acted as their own lexicographers by identifying certain ingredients that must be present in the formulation. Teva asserts that "extended release formulation" means "[a] formulation comprising venlafaxine hydrochloride, microcrystalline cellulose and, optionally, hydroxypropylmethylcellulose coated with a mixture of ethyl cellulose and hydroxypropylmethylcellulose in an amount needed to provide a specific unit dosage administered once-a-day to provide a therapeutic blood plasma level of venlafaxine over the entire 24-hour period of administration." (*Id.*, emphasis added). Because the Court agrees with Teva that the patentees acted as their own lexicographers, the Court will adopt Teva's proposed claim construction.

The Court begins by looking at the context in which the term "extended release formulation" is used in the claims of the patents-in-suit. Wyeth argues that the asserted claims demonstrate that the patentees did not intend to limit "extended release formulation" to any specific set of ingredients. Every asserted claim recites: "A method . . . which comprises administering orally to a patient in need thereof, an . . . extended release formulation . . ., said formulation containing venlafaxine hydrochloride as the active ingredient." (*See, e.g.*, '171 patent, claim 20, emphasis added). Wyeth argues that if in fact "extended release formulation"

encompassed particular ingredients, including venlafaxine hydrochloride, then the limitation "said formulation containing venlafaxine hydrochloride as the active ingredient" would be superfluous. (Wyeth's Br. at 11). According to Wyeth, if "extended release formulation" already included venlafaxine hydrochloride, then there is no need for the claims to specify the active ingredient. Thus, argues Wyeth, "extended release formulation" does not include any particular ingredients.

Wyeth also contends that the doctrine of claim differentiation supports its broad construction of "extended release formulation." The doctrine of claim differentiation gives rise to a presumption that a limitation added in a dependent claim is not present in the independent claim. *Phillips*, 415 F.3d at 1314-15. Comparing independent claim 1 of the '120 patent with dependent claim 3, Wyeth argues that the doctrine creates a presumption that "extended release formulation" does not include specific ingredients. (Wyeth's Br. at 13). Independent claim 1 recites: "A method . . . which comprises administering orally to a patient in need thereof, an extended release formulation . . ., said formulation containing venlafaxine hydrochloride as the active ingredient." '120 patent, claim 1 (emphasis added). Dependent claim 3 recites: "The method of claim 1 wherein the extended release formulation comprises venlafaxine hydrochloride in spheroids comprised of venlafaxine hydrochloride, microcrystalline cellulose and optionally, hydroxypropylmethylcellulose." '120 patent, claim 3 (emphasis added). Because claim 3 includes the additional limitation of specific ingredients, the Court agrees with Wyeth that a presumption arises that claim 1 does not include that limitation. Thus, the Court agrees with Wyeth that the plain language of the claims implies that "extended release formulation" does not include specific ingredients.

Teva does not dispute that the claims, on their face, imply a broad construction for "extended release formulation." Rather, Teva argues that the presumption the broader construction applies is overcome by the narrow definition given to "extended release formulation" by the patentees in the specification. This Court agrees.

The patentees defined "extended release formulation" several times in the specification. In the abstract, they disclosed:

> More particularly, the invention comprises an extended release formulation of venlafaxine hydrochloride comprising a therapeutically effective amount of venlafaxine hydrochloride in spheroids comprised of venlfaxine hydrochloride, microcrystalline cellulose and, optionally, hydroxypropylmethylcellulose coated with a mixture of ethyl cellulose and hydroxypropylmethylcellulose.

'171 patent, Abstract. They reiterated this same restrictive definition in the "Brief Description of the Invention:"

> The formulations of this invention comprise an extended release formulation of venlafaxine hydrochloride comprising a therapeutically effective amount of venlafaxine hydrochloride in spheroids comprised of venlafaxine hydrochloride, microcrystalline cellulose and, optionally, hydroxypropylmethylcellulose coated with a mixture of ethyl cellulose and hydroxypropylmethylcellulose.

'171 patent, col. 2, line 62 - col. 3, line 2. Only after setting forth this description of their invention, did the inventors then go on to address the preferred embodiments of their invention. *See* '171 patent, col. 3, lines 5-62. Similarly, in the "Detailed Description of the Invention," the patentees defined "extended release formulations" by their ingredients:

> The extended release formulations of this invention are comprised of [venlafaxine] hydrochloride in admixture with microcrystalline cellulose and hydroxypropylmethylcellulose. Formed as beads or

> spheroids, the drug containing formulation is coated with a mixture of ethyl cellulose and hydroxypropylmethyl cellulose [sic] to provide the desired level of coating . . . .

'171 patent, col. 4, lines 9-15 (emphasis added).

Wyeth asserts that these statements merely identify a preferred embodiment of the invention. The Court disagrees. Because the specification definitively states that the "extended release formulations" of the invention are limited to particular ingredients, the Court finds that the patentees acted as their own lexicographers and limited the meaning of "extended release formulation." *See Astrazeneca AB v. Mutual Pharm. Co.*, 384 F.3d 1333, 1339-40 (Fed. Cir. 2004) (finding that the inventors acted as their own lexicographers and limited the term "solubilizer" to surfactants by stating in the specification that "[t]he solubilizers suitable according to the invention are defined below", and later describing the suitable solubilizers as surfactants).

Moreover, the specification provides additional support for a narrow construction of "extended release formulation." Although it is improper to limit the claims based on the preferred embodiments, the Federal Circuit has stated that the "preferred embodiments can shed light on the intended scope of the claims." *Id.* at 1340. Here, the specification sets forth seven examples describing different embodiments the named inventors worked with. Each and every embodiment of an "extended release formulation" recited in these examples includes venlafaxine hydrochloride, microcrystalline cellulose and, optionally, HPMC[3] coated with ethyl cellulose and HPMC. *See, e.g.*, '171 patent, col. 5, line 33 - col. 10, line 57. The fact that all of these examples use the same core set of ingredients buttresses the conclusion that "extended release

[3] "HPMC" is the abbreviation for "hydroxypropylmethylcellulose."

formulation" should be narrowly construed. *See Astrazeneca*, 384 F.3d at 1340-41 (finding additional support for a limited construction of "solubilizer" in the fact that "all of the solubilizers listed in the specification and used in the working examples were surfactants").

Further, the specification distinguishes the "extended release formulations" of the invention from extended release hydrogel tablet formulations. Wyeth admits that under its proposed construction, an extended release hydrogel tablet having the claimed *in vivo* characteristics may fall within the asserted claims. (*See* Wyeth's Br. at 16 n.6). The specification, however, discloses that the inventors' attempts to develop extended release hydrogel tablets were "fruitless" and teaches one of ordinary skill that it is "impossible to achieve" the desired dissolution rates using hydrogel tablet technology. Col. 4, lines 60-64; col. 10, lines 53-57. These statements were made without qualification. Accordingly, the specification supports construing "extended release formulation" more narrowly than Wyeth proposes. *See Cultor Corp. v. A.E. Staley Mfg. Co.*, 224 F.3d 1328, 1331 (Fed. Cir. 2000) ("Claims are not correctly construed to cover what was expressly disclaimed.").

Wyeth responds that the specification supports its broader, ordinary meaning of the term. Wyeth asserts that Teva ignores several portions of the specification which allegedly refer only to the "extended release formulation" as including venlafaxine hydrochloride. *See, e.g.*, '171 patent, Abstract ("This invention relates to a 24 hour extended release dosage formulation and unit dosage form thereof of venlafaxine hydrochloride, an antidepressant . . . .") (emphasis added); *Id.* at col. 2, lines 14-16 ("In accordance with this invention, there is provided an extended release (ER), encapsulated formulation containing venlafaxine hydrochloride as the active drug s [sic] component . . . .") (emphasis added); *Id.* at col. 2, lines 37-44 ("Hence, in

accordance with the use aspect of this invention, there is provided a method for moderating the plural blood plasma peaks and valleys . . . which comprises administering to a patient in need of treatment with venlafaxine hydrochloride, a one-a-day, extended release formulation of venlafaxine hydrochloride.") (emphasis added). Wyeth further asserts that its broad construction is supported by those portions of the specification that compare "extended release formulations" with immediate release formulations. *See, e.g.*, '171 patent, col. 2, lines 24-37 (contrasting blood plasma profiles for both types of formulations without reference to specific ingredients). And Wyeth contends that Table 1 in the specification supports a broader construction because it allegedly teaches an ordinary artisan how to screen for other useful inactive ingredients that may work in combination with venlafaxine hydrochloride to develop an extended release venlafaxine formulation. But there is no merit to Wyeth's arguments because they ignore those portions of the specification set forth above that explicitly characterize and limit the invention to a formulation containing specific ingredients.

When the term "extended release formulation" is looked at in its proper context in the specification, this Court believes that one of ordinary skill in the art would construe the term to include specific ingredients. The unequivocal language the patentees used when describing their invention – "the invention comprises an extended release formulation of", "[t]he formulations of this invention comprise" and "[t]he extended formulations of this invention are" – rebuts the presumption established by the doctrine of claim differentiation. *See, e.g., Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1368-69 (Fed. Cir. 2000) (finding the presumption of claim differentiation overcome because the specification and prosecution history described the "protecting back panel" as one that must be relatively stiff). Although this may make certain

dependent claims coterminous and certain claim limitations superfluous, that result is inevitable and inescapable in a case such as this where the patentees act as their own lexicographers. *See Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1480 (Fed. Cir. 1998) ("[T]he doctrine of claim differentiation can not broaden claims beyond their correct scope, determined in light of the specification and the prosecution history and any relevant extrinsic evidence."); *Sule v. Kloehn Co., Ltd.*, 149 F. Supp. 2d 115, 128 (D.N.J. 2001) ("Claim differentiation is a guide, not a rigid rule. If a claim will bear only one interpretation, similarity will have to be tolerated.") (quoting *Autogiro*, 384 F.2d at 404).

The portions of the prosecution history in evidence do not alter this conclusion. Although Wyeth contends that the prosecution history supports a broader construction because the method claims were allowed without limitation to specific ingredients, given the clear and unambiguous language in the specification, the Court believes that the prosecution adds, at most, nothing more than the claims themselves reveal. That being the case, the definition provided by the specification, which is the "single best guide to the meaning of a disputed term," shall be adopted. *Vitronics*, 90 F.3d at 1582.

Because the meaning of the term can be ascertained from the intrinsic record, the Court will not rely on extrinsic evidence that suggests a broader construction. *See Phillips*, 415 F.3d at 1324 (prohibiting the use of extrinsic evidence to contradict the unambiguous meaning provided to a claim term by the intrinsic evidence). That evidence takes the term out of its all-important context in the specification and, thus, will be given no weight.

In sum, "extended release formulation" means "a formulation comprising venlafaxine hydrochloride, microcrystalline cellulose and, optionally, HPMC coated with a mixture of ethyl

cellulose and HPMC in an amount needed to provide a specific unit dosage administered once-a-day to provide a therapeutic blood plasma level of venlafaxine over the entire 24-hour period of administration."

**2. "spheroid"**

Wyeth contends that "spheroid" means "[o]ne or more particles that are generally shaped like a sphere, although they do not have to be perfectly round", including "granules, beads and pellets." (Chart). Teva asserts that "spheroid" means "[o]ne or more particles that are generally shaped like a sphere and result from an extrusion and spheronization process." (*Id.*, emphasis added). Essentially, although the parties agree that "spheroid" means "one or more particles that are generally shaped like a sphere," they dispute whether the term should be limited to a particular manufacturing process. Because the intrinsic evidence does not narrow the meaning of "spheroids," which connotes shape, the Court will not limit its construction to a specific manufacturing process.

The term "spheroid" is contained in asserted claims 13 and 14 of the '120 patent. Wyeth argues that these claims are drawn broadly to include any "spheroid," regardless of the method of manufacture. Claim 13 recites: "The method of claim 1 wherein the extended release formulation comprising venlafaxine hydrochloride in a spheroid." '120 patent, claim 13 (emphasis added). Claim 14 is similarly broad: "The method of claim 1 wherein the extended release formulation comprises venlafaxine hydrochloride in an encapsulated spheroid." '120 patent, claim 14 (emphasis added). Thus, the plain language of the claims does not suggest that the term "spheroid" has anything other than its ordinary meaning. Morever, the specification

uses the ordinary meaning of "spheroid," equating "beads" with "spheroids" without any apparent limitation on the method of manufacture. *See* '171 patent, col. 4, lines 12-13 ("Formed as beads or spheroids, the drug containing formulation is coated . . . ."). This ordinary, unrestricted meaning is consistent with how "spheroid" is defined in a dictionary – "[a] body that is shaped like a sphere but is not perfectly round, esp. an ellipsoid that is generated by revolving an ellipse around one of its axes." Am. Heritage College Dict. 1310 (3d ed. 1993).

Teva does not dispute that Wyeth's construction comports with the ordinary meaning of the word "spheroid." (*See* Teva's Opp'n Br. at 23). Rather, it contends that in this case the patents do not support the broader definition because they only identify one method of manufacture – the extrusion and spheronization process. For example, in the "Background of the Invention," the patentees described the process they used for making "spheroids:"

> In this situation, the extended release capsule dosage forms may be formulated by mixing the drug with one or more binding agents to form a uniform mixture which is then moistened with water or a solvent such as ethanol to form an extrudable plastic mass from which small diameter, typically 1 mm, cylinders of drug/matrix are extruded, broken into appropriate lengths and transformed into spheroids using standard spheronization equipment. The spheroids, after drying, may then be film-coated to retard dissolution.

'171 patent, col. 1, lines 38-47 (emphasis added); *see also* col. 5, lines 1-13 (stating that the addition of microcrystalline cellulose and HPMC made manufacture of spheroids with extruders possible); col. 6, lines 6-11 (stating that different extruders allowed spheroids to be made without HPMC).

Teva overreaches. Although the patents disclose only one method of manufacturing "spheroids" – the extrusion and spheronization process – it appears to be described as a preferred

method of manufacture, not the only method of manufacture. *See* '171 patent, col. 1, lines 38-47 (stating that the extended release formulations "may be formulated by" extrusion and spheronization, not must be formulated by this method). Teva appears to be attempting to import the preferred process into the claims. But there is no clear disclaimer of the term's ordinary meaning, nor do the patentees define "spheroid" as being limited to that method of manufacture. Further, the Federal Circuit has held that merely disclosing only one method of manufacture in the specification does not, by itself, limit the term to that one method. *See Vanguard Products Corp. v. Parker Hannifan Corp.*, 234 F.3d 1370, 1371-72 (Fed. Cir. 2000) (construing the word "integral" to define the relationship between layers in a gasket, and refusing to limit the formation of those layers by co-extrusion, the only manufacturing process disclosed in the specification and extolled in the prosecution history); *AFG Indus., Inc. v. Cardinal IG Co., Inc.*, 375 F.3d 1367, 1373 (Fed. Cir. 2004).

Teva raises one additional argument to support its narrow construction. It alleges that because the patentees neither described nor enabled the making of "spheroids" by any method other than by extrusion and spheronization, the term "spheroid" should be limited to maintain the validity of claims 13 and 14. (Teva's Br. at 28). Teva notes that the named inventors were aware of other methods of making "spheroids," but did not disclose them to the public. Absent that disclosure, Teva contends that the claims are not enabled or described. This argument is flawed. A court should not construe a claim term to preserve a claim's validity unless, "after applying all the available tools of claim construction," the claim term remains ambiguous. *Liebel-Flarsheim*, 358 F.3d at 911. Here, the term "spheroid" is not ambiguous and, therefore, the Court will not embark on a validity analysis at this time.

In conclusion, the Court finds that "spheroids" should not be limited to a particular method of manufacture. As such, the Court finds that "spheroids" means "one or more particles that are generally shaped like a sphere, although they do not have to be perfectly round."

**3. "with diminished incidence(s) of nausea and emesis"**

The parties agree that the meaning of the term "incidence" should include "frequency" of an occurrence or event. (Chart). They disagree, however, whether it should include "degree" or "level." (*See id.*).

The claims that contain this limitation are unilluminating. *See, e.g.*, '171 patent, claims 20, 22-23. Therefore, the Court begins by looking at the specification. Both parties refer to the same passage in the specification to support their construction:

> The use of the one-a-day venlafaxine hydrochloride formulations of this invention reduces by adaptation, the <u>level</u> of nausea and <u>incidence</u> of emesis that attend the administration of multiple daily dosing. In clincial trials of venlafaxine hydrochloride ER, the probability of developing nausea in the course of the trials was greatly reduced after the first week. Venlafaxine ER showed a statistically significant improvement over conventional venlafaxine hydrochloride tablets in two eight-week and one 12 week clinical studies. Thus, in accordance with this use aspect of the invention there is provided a method for reducing the <u>level</u> of nausea and <u>incidence</u> of emesis attending the administration of venlafaxine hydrochloride which comprises dosing a patient in need of treatment with venlafaxine hydrochloride with an extended release formulation of venlafaxine hydrochloride once a day in a therapeutically effective amount.

'171 patent, col. 2, lines 45-62 (emphasis added).

Both parties agree that the reference to "level," as used in the above passage, connotes degree. They disagree, however, on what affect, if any, that has on the meaning of "incidence."

Teva contends that the passage above distinguishes between "level," i.e., degree, and "incidence," i.e., frequency. Teva further points out that the claims do not use level or degree; rather, they only refer to "incidence." Wyeth contends that the passage equates "incidence" with "level," thereby broadening the meaning of the term to include degree. Wyeth also juxtaposes the above passage with an excerpt that appears earlier in the specification:

> With the plural daily dosing regimen, the most common side effect is nausea, experienced by about forty five percent of patients under treatment with venlafaxine hydrochloride. Vomiting also occurs in about seventeen percent of the patients.

'171 patent, col. 2, lines 7-11 (emphasis added). Wyeth asserts that this passage demonstrates that when the patentees meant to refer to the number of patients experiencing a side effect, they did so by stating that they were "experienced by" or "occurs in" a certain "percent" of patients. Significantly, according to Wyeth, the patentees did not equate percent with "incidence." Thus, Wyeth asserts "incidence" is broader than frequency.

Wyeth's argument is inapt. Simply because the patentees did not use the word "incidence" in the earlier passage does not by itself redefine "incidence." Rather, that passage makes clear that the patentees were concerned with the number of patients experiencing side effects, not necessarily the severity of those side effects. Moreover, the abstract states that the invention "provides a lower incidence of nausea and vomiting than the conventional tablets." '171 patent, Abstract (emphasis added). Because the only discussion of the conventional tablets in the specification that is relevant to the term "incidence" concerns the percent of patients that experienced side effects, the abstract supports a narrow construction.

Ultimately, Teva appears to be correct that the patentees drew a distinction between "level" and "incidence." Although the specification refers to both terms, the claims only recite "incidence." If indeed "incidence" meant the same thing as "level," or was broader, it begs the question why the word "level" was used in the first place. The reason must be because the patentees meant to differentiate between the two terms. It is clear from the specification that when the patentees wanted to refer to "incidence," they did. Thus, the term "incidence" will be limited to its ordinary meaning as informed by the specification.

Lastly, it is worth noting that "[t]he fact that a patent asserts that an invention achieves several objectives does not require that each of the claims be construed as limited to structures that are capable of achieving all of the objectives." *Liebel-Flarsheim*, 358 F.3d at 908. Thus, the fact that the patents may discuss a reduced "level" and "incidence" of nausea does not require that claims using the word "incidence" encompass both benefits. In addition, the "incidence" limitation is not present in all of the asserted claims. *See, e.g.*, '171 patent, claims 21, 24-25; '958 patent, claims 2, 5-6. Therefore, to the extent that Wyeth suggests that a narrow construction of this term unjustifiably excludes one of the primary benefits of the invention, namely the reduction in degree of side effects, that is not the case for all asserted claims. The asserted claims that do not contain the "incidence" limitation are obviously broader and would read on such benefits.

Furthermore, to the extent that Wyeth relies on extrinsic evidence to support its broad construction, the Court does not find that evidence particularly helpful. The specification draws a clear distinction between "incidence" and "level." General dictionary definitions that allegedly support a broader construction ignore the context within which the patents use the term. *See,*

*e.g.*, Concise Oxford Dict. of Current English 614 (5th ed. 1964) (defining "incidence" as "range, scope, extent, of influence"). The Federal Circuit in *Phillips* warned of relying on such definitions: "[H]eavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification." *Phillips*, 415 F.3d at 1321. In any event, other dictionaries define the term as limited to frequency. *See* Webster's Third New Int'l Dict. (Unabridged) 1142 (2002) (defining "incidence" as "rate, range, or amount of occurrence or influence . . . *sometimes*: the rate of occurrence of new cases of a particular disease in a population being studied") (emphasis in original); Taber's Cyclopedic Med. Dict. 1077 (19th ed. 2001) (defining "incidence" as "the frequency of new cases of a disease or condition in a specific population or group"). These dictionaries provide a common meaning that is more fitting given the distinction the specification draws between "incidence" and "level."

Wyeth's experts' opinions, which remove the term "incidence" from its proper context, are also given no weight. *See Phillips*, 415 at 1318 (stating that a court "should discount any expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent'") (quoting *Key Pharms. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998)). Further, these experts' opinions are countered by Teva's experts, who opine that the common meaning of "incidence" is consistent with only frequency. *See* Schoenfeld Expert Report ¶ 9; Morrow Expert Report ¶ 11.

Accordingly, the Court finds that "with diminished incidence(s) of nausea and emesis" means "a decrease in the number of patients suffering from nausea and vomiting compared to

patients receiving the same total daily dose of an immediate release formulation that is administered at least twice a day."

**4. "encapsulated"**

Wyeth asserts that "encapsulated" means "[a] formulation that is present in a capsule, i.e., one that is filled into a pharmaceutically acceptable capsule." (Chart). Teva essentially proposes two different constructions depending on how the Court construes the term "extended release formulation." If the Court construes "extended release formulation" broadly to not include any particular ingredients, Teva contends that "encapsulated" means "[a] formulation that is present in a capsule." (*Id.*). On the other hand, if the Court construes "extended release formulation" to include particular ingredients, Teva agrees with Wyeth's narrower construction. (*See, e.g.*, Teva's Br. at 29 ("If the Court adopts Teva's construction of the term 'extended release formulation,' there is no dispute concerning the term "encapsulated.")).

Although the Court disagrees with Teva's argument that the construction of the term "encapsulated" is contingent on the construction of "extended release formulation," there appears to be no need for this Court to perform an exhaustive analysis of how this term should be construed because the Court has adopted the narrower construction of "extended release formulation." That being the case, the parties do not dispute the meaning of the term "encapsulated." Accordingly, the Court finds that "encapsulated" means "a formulation that is filled into a pharmaceutically acceptable capsule."

**CONCLUSION**

For the aforementioned reasons, the Court construes the disputed claim terms as follows:

1. "extended release formulation" means "a formulation comprising venlafaxine hydrochloride, microcrystalline cellulose and, optionally, HPMC coated with a mixture of ethyl cellulose and HPMC in an amount needed to provide a specific unit dosage administered once-a-day to provide a therapeutic blood plasma level of venlafaxine over the entire 24-hour period of administration;"

2. "spheroids" means "one or more particles that are generally shaped like a sphere, although they do not have to be perfectly round;"

3. "with diminished incidence(s) of nausea and emesis" means "a decrease in the number of patients suffering from nausea and vomiting compared to patients receiving the same total daily dose of an immediate release formulation that is administered at least twice a day;"

4. "encapsulated" means "a formulation that is filled into a pharmaceutically acceptable capsule."

**Dated:** September 6, 2005

s/ William J. Martini
**William J. Martini, U.S.D.J.**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

**WYETH,**

**Plaintiff,**

**v.**

**TEVA PHARMACEUTICALS USA, INC. and TEVA PHARMACEUTICAL INDUSTRIES LTD.,**

**Defendants.**

03-CV-1293 (WJM)

**MARKMAN ORDER**

This matter comes before the Court on motions to construe certain disputed claim terms in the patents-in-suit. After having reviewed the parties' submissions, and having considered the parties' arguments made at the *Markman* hearing, and for good cause shown,

**IT IS** on this 6th day of September 2005, hereby

**ORDERED** that the disputed claim terms shall have the following meanings:

1. "extended release formulation" means "a formulation comprising venlafaxine hydrochloride, microcrystalline cellulose and, optionally, HPMC coated with a mixture of ethyl cellulose and HPMC in an amount needed to provide a specific unit dosage administered once-a-day to provide a therapeutic blood plasma level of venlafaxine over the entire 24-hour period of administration;"

2. "spheroids" means "one or more particles that are generally shaped like a sphere, although they do not have to be perfectly round;"

3. "with diminished incidence(s) of nausea and emesis" means "a decrease in the number of patients suffering from nausea and vomiting compared to patients receiving the same total daily dose of an immediate release formulation that is administered at least twice a day;"

4. "encapsulated" means "a formulation that is filled into a pharmaceutically acceptable capsule."

s/ William J. Martini
**William J. Martini, U.S.D.J.**

# EXHIBIT 8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

WYETH,

Plaintiff,

v.

TEVA PHARMACEUTICALS USA, INC., and
TEVA PHARMACEUTICAL INDUSTRIES LTD.,

Defendants.

Civil Action No.: 03-1293 (WJM)

**DISMISSAL ORDER**

As a result of the parties having executed the Settlement and Release Agreement dated November 2, 2005 and the License Agreement (as defined in the Settlement and Release Agreement), the Court hereby Orders:

1) Until the expiration of United States Patent Nos. 6,274,171 B1; 6,403,120 B1; and 6,419,958 B2; or the termination of the License Agreement, Defendants shall not make, use, sell, offer for sale, or import XR Product, as that term is defined in the License Agreement, for use in the Territory, except as licensed under the License Agreement.

2) Defendants' Counterclaim(s) of patent invalidity and unenforceability are dismissed with prejudice. Defendants' Counterclaim(s) of non-infringement are dismissed without prejudice.

3) The Settlement and Release Agreement and the License Agreement entered into between the parties, which have been filed with this Court under seal, are adopted by the Court as part of this Order.

4) This Court retains jurisdiction to enforce this Order and the parties' Settlement and Release Agreement and License Agreement.

SO ORDERED.

William J. Martini, U.S.D.J.
Jan 12, 2006

# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| WYETH,<br>Plaintiff,<br>v.<br>TEVA PHARMACEUTICALS USA, INC., and TEVA PHARMACEUTICAL INDUSTRIES LTD.,<br>Defendants. | Civil Action No.: 03-1293 (WJM) |

**ORDER VACATING MARKMAN RULINGS**

Having considered the parties Joint Motion to Vacate Markman Rulings, and as a result of the parties' having executed the Settlement and Release Agreement dated November 2, 2005, the Court hereby Orders that:

The September 6, 2005 Markman Opinion and Order, and the October 6, 2005, Letter Opinion and Order denying Wyeth's Request for Reconsideration of the Markman Opinion and Order, are hereby vacated.

SO ORDERED THIS 12th day of January, 2006

William J. Martini, U.S.D.J.

# EXHIBIT 10



PW 1002864

THE UNITED STATES OF AMERICA

TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

May 09, 2003

THIS IS TO CERTIFY THAT ANNEXED IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF THE FILE WRAPPER AND CONTENTS OF:

APPLICATION NUMBER: *60/014,006*
FILING DATE: *March 25, 1996*

By Authority of the
COMMISSIONER OF PATENTS AND TRADEMARKS

E. Bornett

E. BORNETT
Certifying Officer

WYETH 002-000937



CHARGE

Class | Subclass | ISSUE CLASSIFICATION

PROVISIONAL APPLICATION

60014006

| SERIAL NUMBER | FILING DATE | CLASS | SUBCLASS | GROUP ART UNIT | EXAMINER |
| --- | --- | --- | --- | --- | --- |
| 60/014,006 PROVISIONAL | 03/25/96 | | | | |

APPLICANTS: DEBORAH M. SHERMAN, PLATTSBURG, NY.

**CONTINUING DATA*********************
VERIFIED

**FOREIGN/PCT APPLICATIONS
VERIFIED

FOREIGN FILING LICENSE GRANTED 05/09/96

| Foreign priority claimed / 35 USC 119 conditions met / Verified and Acknowledged / Examiner's Initials | AS FILED | STATE OR COUNTRY | SHEETS DRWGS. | TOTAL CLAIMS | INDEP. CLAIMS | FILING FEE RECEIVED | ATTORNEY'S DOCKET NO. |
| --- | --- | --- | --- | --- | --- | --- | --- |
| ☐ yes ☐ no / ☐ yes ☐ no | → | NY | 0 | | | $150.00 | [illegible] |

ADDRESS: DONALD W ALTOE
AMERICAN HOME PRODUCTS CORPORATION
FIVE GIRALDA FARMS
MADISON NJ 07940

TITLE: EXTENDED RELEASE FORMULATION

U.S. DEPT. OF COMM./PAT. & TM—PTO-436L (Rev.12-94)

Form PTO-1625
(Rev. 5/95)

(FACE)

69652 U.S. PTO
60014006
03/25/96

MAIL ROOM
MAR 25 1996
PAT. & TRADEMARK OFF.

# PROVISIONAL APPLICATION

This is a request for filing a PROVISIONAL APPLICATION FOR PATENT under 37 CFR 1.53(b)(2)

| Docket Number | AHP-95011 | Type a plus sign (+) inside this box | + |
|---|---|---|---|

**INVENTOR(s) / APPLICANT(s)**

| LAST NAME | FIRST NAME | MIDDLE INITIAL | RESIDENCE (CITY, AND EITHER STATE OR FOREIGN COUNTRY) |
|---|---|---|---|
| SHERMAN | DEBORAH | M | PLATTSBURG, NEW YORK N/Y |

**TITLE OF THE INVENTION (280 characters max)**

EXTENDED RELEASE FORMULATION

**CORRESPONDENCE ADDRESS**

Ronald W. Alice
American Home Products Corporation
Five Giralda Farms
Madison

| STATE | NJ | ZIP CODE | 07940-0874 | COUNTRY | USA |
|---|---|---|---|---|---|

**ENCLOSED APPLICATION PARTS** *(check all that apply)*

- [X] Specification — Number of Pages: 13
- [ ] Small entity Statement
- [ ] Drawing(s) — Number of Sheets:
- [ ] Other (specify)

**METHOD OF PAYMENT** *(check one)*

- [ ] A check or money order is enclosed to cover the Provisional filing fees
- [X] The Commissioner is hereby authorized to charge filing fees and credit deposit account Number: 01-1425

PROVISIONAL FILING FEE ($): 150.00

The invention was made by an agency of the United States Government or under a contract with an agency of the United States Government.

- [X] No.
- [ ] Yes, the name of the U.S. Government agency and the Government contract number are: ____________________

Respectfully submitted,

SIGNATURE Robert F. Boswell Jr. DATE March 25, 1996

TYPED OR PRINTED NAME Robert F. Boswell, Jr. REG. NO. 35,072

TELEPHONE (804) 257-3613

- [ ] Additional inventors are being named on separately numbered sheets attached hereto.

69652 U.S. PTO
60014006

PATENT APPLICATION SERIAL NO. 03/25/96

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
FEE RECORD SHEET

MG11013 04/15/96 60014006 01-1425 110 114 150.00CH AHP-95011

PTO-1556
(5/87)

09652 U.S. PTO
60014006
03/25/96

AHP-95011
PROVISIONAL PATENT APPLICATION

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

**In re Patent Application of:** SHERMAN

**Title:** EXTENDED RELEASE FORMULATION

**For:** Provisional Patent Application

**Attorney's Docket No.:** AHP-95011

Assistant Commissioner for Patents
Washington, DC 20231

CERTIFICATE OF MAILING UNDER 37 CFR 1.10

"Express Mail" mailing label number EF837269251US

Date of Deposit MARCH 25, 1996

I hereby certify that this paper or fee is being deposited with the United States Postal Service "Express Mail Post Office to Addressee" service under 37 CFR 1.10 on the date indicated above and is addressed to the Box Provisional Patent Application, Assistant Commissioner for Patents, Washington, DC, 20231.

Robert F. Boswell, Jr.
Name of Person Mailing Paper or Fee

Robert F. Boswell Jr
Signature of Person Mailing Paper or Fee





# EXTENDED RELEASE FORMULATION

## Background of the invention

Extended release drug formulations are conventionally produced as compressed tablets by hydrogel tablet technology. To produce these sustained release tablet drug dosage forms, the active ingredient is conventionally compounded with cellulose ethers such as methyl cellulose, ethyl cellulose or hydroxypropylmethylcellulose with or without other excipients and the resulting mixture is pressed into tablets. When the tablets are orally administered, the cellulose ethers in the tablets swell upon hydration from moisture in the digestive system, thereby limiting exposure of the active ingredient to moisture. As the cellulose ethers are gradually leached away by moisture, water more deeply penetrates the gel matrix and the active ingredient slowly dissolves and diffuses through the gel, making it available for absorption by the body. An example of such a sustained release dosage form of the analgesic/antiinflammatory drug etodolac (Lodine®) appears in US patent 4,966,768.

Where the production of tablets is not feasible, it is conventional in the drug industry to prepare encapsulated drug formulations which provide extended or sustained release properties. In this situation, the extended release capsule dosage forms may be formulated by mixing the drug with one or more binding agents to form a uniform mixture which is then moistened with water or a solvent such as ethanol to form an extrudable plastic mass from which small diameter, typically 1 mm, cylinders of drug/matrix are extruded, chopped into appropriate lengths and transformed into spheroids using standard spheronization equipment. The spheroids, after drying, may then be film-coated to retard dissolution. Gelatin capsules are filled with the film-coated spheroids in the quantity needed to obtain the desired therapeutic effect. Spheroids releasing the drug at different rates may be combined in a gelatin capsule to obtain desired release rates and blood levels. US patent 4,138,475 discloses a sustained release pharmaceutical composition consisting of a hard gelatin capsule filled with film-coated spheroids comprised of propanolol in admixture with microcrystalline cellulose wherein the film coating is composed of ethyl cellulose, optionally with hydroxypropylmethylcellulose and/or a plasticizer.

Venlafaxine, 1-[2-(dimethylamino)-1-(4-methoxyphenyl)ethyl]cyclohexanol, is an important drug in the neuropharmacological arsenal used for treatment of depression. Venlafaxine and the acid addition salts thereof are disclosed in US patent 4,535,186. Venlafaxine hydrochloride is presently administered to adults in compressed tablet form in doses ranging from 75 to 350 mg/day , in divided doses two or three times a day. In therapeutic dosing with venlafaxine hydrochloride tablets, rapid dissolution results in a

rapid increase in blood plasma levels of the active compound shortly after administration followed by a decrease in blood plasma levels over several hours as the active compound is eliminated or metabolized, until sub-therapeutic plasma levels are approached after about twelve hours following administration, thus requiring additional dosing with the drug. With the plural daily dosing regimen, the most common side effect is nausea, experienced by about forty five percent of patients under treatment with venlafaxine hydrochloride. Vomiting also occurs in about seventeen percent of the patients.

## Brief Description of the Invention

In accordance with this invention, there is provided an extended release (ER), encapsulated formulation containing venlafaxine hydrochloride as the active drug component, which provides in a single dose, a therapeutic blood serum level over a twenty four hour period.

Through administration of the venlafaxine formulation of this invention, there is provided a method for obtaining a flattened drug plasma concentration to time profile, thereby affording a tighter plasma therapeutic range control than can be obtained with multiple daily dosing. In other words, this invention provides a method for eliminating the sharp peaks and troughs (hills and valleys) in blood plasma drug levels induced by multiple daily dosing with conventional immediate release venlafaxine hydrochloride tablets. In essence, the plasma levels of venlafaxine hydrochloride rise, after administration of the extended release formulations of this invention, for between about five to about eight hours ( optimally about six hours) and then begin to fall through a protracted, substantially linear decrease from the peak plasma level for the remainder of the twenty four hour period, maintaining at least a threshold therapeutic level of the drug during the entire twenty-four period. In contrast, the conventional immediate release venlafaxine hydrochloride tablets give peak blood plasma levels in 2 to 4 hours. Hence, in accordance with the use aspect of this invention, there is provided a method for moderating the plural blood plasma peaks and valleys attending the pharmacokinetic utilization of multiple daily tablet dosing with venlafaxine hydrochloride which comprises administering to a patient in need of treatment with venlafaxine hydrochloride, a one-a-day, extended release formulation of venlafaxine hydrochloride.

The use of the one-a-day venlafaxine hydrochloride formulations of this invention reduces by adaptation, the level of nausea and incidence of emesis that attend the administration of multiple daily dosing. In clinical trials of venlafaxine hydrochloride ER,

the probability of developing nausea in the course of the trials was greatly reduced after the first week. Venlafaxine ER showed a statistically significant improvement over conventional venlafaxine hydrochloride tablets in two eight-week and one 12 week clinical studies. Thus, in accordance with this use aspect of the invention there is provided a method for reducing the level of nausea and incidence of emesis attending the administration of venlafaxine hydrochloride which comprises dosing a patient in need of treatment with venlafaxine hydrochloride with an extended release formulation of venlafaxine hydrochloride once a day in a therapeutically effective amount.

## Detailed Description of the Invention

1-[2-(dimethylamino)-1-(4-methoxyphenyl)ethyl]cyclohexanol hydrochloride is polymorphic. Of the forms isolated and characterized to date, Form I is considered to be the kinetic product of crystallization which can be converted to Form II upon heating in the crystallization solvent. Forms I and II cannot be distinguished by their melting points but do exhibit some differences in their infrared spectra and X-ray diffraction patterns. Any of the polymorphic forms such as Form I or Form II may be used in the formulations of the present invention.

The extended release formulations of this invention are comprised of 1-[2-(dimethylamino)-1-(4-methoxyphenyl)ethyl] cyclohexanol hydrochloride in admixture with microcrystalline cellulose and hydroxypropylmethylcellulose. Formed ass beads or spheroids, the drug containing formulation is coated with a mixture of ethyl cellulose and hydroxypropylmethyl cellulose to provide the desired level of coating, generally from about two to about twelve percent on a weight/weight basis of final product or more preferably from about five to about ten percent (w/w), with best results obtained at from about 6 to about 8 percent (w/w). More specifically, the extended release spheroid formulations of this invention comprise from about 30 to 40 percent venlafaxine hydrochloride, from about 50 to about 70 percent microcrystalline cellulose, NF, from about 0.25 to about 1 percent hydroxypropylmethylcellulose, USP, and from about 5 to about 10 percent film coating, all on a weight/weight basis. And preferably, the spheroid formulations contain about 35 percent venlafaxine hydrochloride, about 55 to 60 percent microcrystalline cellulose NF (Avicel® PH101), about one half percent hydroxypropyl methylcellulose 2208 USP (K3, Dow, which has a viscosity of 3 cps for 2% aqueous solutions, a methoxy content of 19–24% and a hydroxypropoxy content of 4–13%), and from about 6 to 8 percent film coating.

WYETH 002-000944

The film coating is comprised of 80 to 90 percent of ethyl cellulose, NF and 10 to 20 percent hydroxypropyl methylcellulose (2910), USP on a weight/weight basis. Preferably the ethyl cellulose has a ethoxy content of 44.0–51% and a viscosity of 50 cps for a 5% aqueous solution and the hydroxypropylmethylcellulose is USP 2910 having a viscosity of 6 cps at 2% aqueous solution with a methoxy content of 28–30% and a hydroxypropoxy content of 7–12%. The ethyl cellulose used herein is Aqualon HG 2834.

Other equivalents of the hydroxypropylmethylcelluloses 2208 and 2910 USP and ethyl cellulose, NF, having the same chemical and physical characteristics as the proprietary products named above may be substituted in the formulation without changing the inventive concept.

It was completely unexpected that an extended release formulation containing venlafaxine hydrochloride could be obtained because the hydrochloride of venlafaxine proved to be extremely water soluble. Numerous attempts to produce extended release tablets by hydrogel technology proved to be fruitless because the compressed tablets were either physically unstable (poor compressibility or capping problems) or dissolved too rapidly in dissolution studies. Typically, the tablets prepared as hydrogel sustained release formulations gave 40-50% dissolution at 2 hrs, 60-70% dissolution at 4 hrs and 85-100% dissolution at 8 hrs.

Numerous spheroid formulations were prepared using different grades of microcrystalline cellulose and hydroxypropyl methylcellulose, different ratios of venlafaxine hydrochloride and filler, different binders such as polyvinylpyrrolidone, methylcellulose, water, and polyethylene glycol of different molecular weight ranges in order to find a formulation which would provide a suitable granulation mix which could be extruded properly. In the extrusion process, heat buildup occurred which dried out the extrudate so much that it was difficult to convert the extruded cylinders into spheroids. Addition of hydroxypropylmethylcellulose 2208 to the venlafaxine hydrochloride–microcrystalline cellulose mix made production of spheroids practical.

The following examples are presented to illustrate applicant's solution to the problem of preparation of the extended release drug containing formulations of this invention.

WYETH 002-000945

Example 1.

VENLAFAXINE HYDROCHLORIDE EXTENDED RELEASE CAPSULES

A mixture of 44.8 parts ( 88.4 % free base) of venlafaxine hydrochloride, 74.6 parts of the microcrystalline cellulose, NF, and 0.60 parts of hydroxypropylmethyl cellulose 2208, USP, are blended with the addition of 41.0 parts water. The plastic mass of material is extruded, spheronized and dried to provide uncoated drug containing spheroids.

Stir 38.25 parts of ethyl cellulose, NF, HG2834 and 6.75 parts of hydroxypropyl methylcellulose 2910, USP in a 1:1 v/v mixture of methylene chloride and anhydrous methanol until solution of the film coating material is complete.

To a fluidized bed of the uncoated spheroids is applied 0.667 parts of coating solution per part of uncoated spheroids to obtain extended release, film coated spheroids having a coating level of 3%.

The spheroids are sieved to retain the coated spheroids of a particle size between 0.85 mm to 1.76 mm diameter. These selected film coated spheroids are filled into hard gelatin capsules conventionally.

Example 2.

Same as for Example 1 except that 1.11 parts of the film coating solution per part of uncoated spheroids is applied to obtain a coating level of 5%.

Example 3.

Same as for Example 1 except that 1.33 parts of the film coating solution is applied to 1 part of uncoated spheroids to obtain a coating level of 6%.

Example 4.

Same as for Example 1 except that 1.55 parts of the film coating solution is applied to 1 part of uncoated spheroids to obtain a coating level of 7%.

The test for acceptability of the coating level is determined by analysis of the dissolution rate of the finished coated spheroids prior the encapsulation. The dissolution procedure followed uses USP Apparatus 1 (basket) at 100 rpm in purified water at 37°C. Conformance with the dissolution rate given in Table 1 provides the twenty-four hour therapeutic blood levels for the drug component of the extended release capsules of this invention in capsule form. Where a given batch of coated spheroids releases drug too slowly to comply with the desired dissolution rate study, a portion of uncoated spheroids

or spheroids with a lower coating level may be added to the batch to provide, after thorough mixing, a loading dose for rapid increase of blood drug levels. A batch of coated spheroids that releases the drug too rapidly can receive additional film-coating to give the desired dissolution profile.

Table 1

Acceptable Coated Spheroid Dissolution Rates

| Time (hours) | Average % Venlafaxine HCL released |
|---|---|
| 2 | <30 |
| 4 | 30-55 |
| 8 | 55-80 |
| 12 | 65-90 |
| 24 | >80 |

Batches of the coated venlafaxine hydrochloride containing spheroids which have a dissolution rate corresponding to that of Table 1 are filled into hard gelatin capsules in an amount needed to provide the unit dosage level desired. The standard unit dosage immediate release (IR) tablet used presently provides amounts of venlafaxine hydrochloride equivalent to 25 mg, 37.5 mg, 50 mg, 75 mg and 100 mg venlafaxine. The capsules of this invention are filled to provide an amount of venlafaxine hydrochloride equivalent to that presently used in tablet form and also up to about 150 mg venlafaxine hydrochloride.

Dissolution of the venlafaxine hydrochloride ER capsules is determined as directed in the U. S. Pharmacopoeia (USP) using apparatus 1 at 100 rpm on 0.9 L of water. A filtered sample of the dissolution medium is taken at the times specified. The absorbance of the clear solution is determined from 240 to 450 nanometers (nm) against the dissolution medium. A baseline is drawn from 450 nm through 400 nm and extended to 240 nm. The absorbance at the wavelength of maximum absorbance (about 274 nm) is determined with respect to this baseline. Six hard gelatin capsules are filled with the theoretical amount of venlafaxine hydrochloride spheroids and measured for dissolution. Standard samples consist of venlafaxine hydrochloride standard solutions plus a gelatin capsule correction solution. The percentage of venlafaxine released is determined from the equation

$$\%\ \text{Venlafaxine hydrochloride released} = \frac{(As)(Wr)(S)(V1)(0.888)(100)}{(Ar)(V2)(C)}$$

where As is absorbance of sample preparation, Wr is weight of reference standard, mg; S is strength of the reference standard, decimal; V1 is the volume of dissolution medium used to dissolve the dosage form, mL; 0.884 is the percent free base, Ar is the absorbance of the standard preparation, V2 is the volume of reference standard solution, mL; and C is the capsule claim in mg.

Table 2 shows the plasma level of venlafaxine versus time for one 75 mg conventional Immediate Release (IR) tablet administered every 12 hours, two 75 mg extended release (ER) capsules administered simultaneously every 24 hours, and one 150 mg extended release (ER) capsule administered once every 24 hours in human male subjects. The subjects were already receiving venlafaxine hydrochloride according to the dosage protocol, thus the plasma blood level at zero time when dosages were administered is not zero.

WYETH 002-000948

Table 2

Plasma venlafaxine level (ng/mL) versus time, conventional tablet (not extended release) versus ER capsule

| Time (hours) | 75 mg (IR)tablet (q 12 h) | 2 x 75 mg (ER)capsules (q 24 hr) | 1 x 150 mg (ER)capsules (q 24 h) |
|---|---|---|---|
| 0 | 62.3 | 55.0 | 55.8 |
| 0.5 | 76.3 | | |
| 1 | 135.6 | 53.3 | 53.2 |
| 2 | 212.1 | 69.8 | 70.9 |
| 4 | 162.0 | 138.6 | 133.3 |
| 6 | 114.6 | 149.0 | 143.5 |
| 8 | 86.7 | 129.3 | 129.5 |
| 10 | | 118.4 | 114.4 |
| 12 | 51.9 | 105.1 | 105.8 |
| 12.5 | 74.7 | | |
| 13 | 127.5 | | |
| 14 | 161.3 | 90.5 | 91.3 |
| 16 | 134.6 | 78.2 | 78.5 |
| 18 | 106.2 | | |
| 20 | 83.6 | 62.7 | 63.3 |
| 24 | 57.6 | 56.0 | 57.3 |

Table 2 shows that the plasma levels of two 75 mg/capsule venlafaxine hydrochloride ER capsules and one 150 mg/capsule venlafaxine hydrochloride ER capsule provide very similar blood levels. The data also show that the plasma level after 24 hours for either extended release regimen is very similar to that provided by two immediate release 75 mg tablets of venlafaxine hydrochloride administered at 12 hour intervals.

Further, the plasma levels of venlafaxine obtained with the extended release formulation do not increase to the peak levels obtained with the conventional immediate release tablets given 12 hours apart. The peak level of venlafaxine from (ER), somewhat below 150 ng/ml, is reached in about six hours, plus or minus two hours, based upon this

specific dose when administered to patients presently under treatment with venlafaxine hydrochloride (IR). The peak plasma level of venlafaxine, somewhat over 200 ng/ml, following administration of (IR) is reached in two hours and falls rapidly thereafter.

Table 3 shows venlafaxine blood plasma levels in male human subjects having a zero initial blood plasma level. Again, a peak blood plasma concentration of venlafaxine is seen at about 6 hours after dosing with venlafaxine hydrochloride extended release capsules in the quantities indicated. The subjects receiving the single 50 mg immediate release tablet showed a peak plasma level occurring at about 4 hours. For comparative purposes, the plasma levels of venlafaxine for subjects receiving the conventional formulated tablet can be multiplied by a factor of three to approximate the plasma levels expected for a single dose of 150 mg. conventional formulation.

**Table 3. Plasma Blood Levels in Human Males Having No Prior Venlafaxine Blood Level**

| Time (Hours) | 1 x 50 mg IR tablet | 2 x 75 mg ER capsules | 1 x 150 mg ER capsule |
|---|---|---|---|
| 0 | 0 | 0 | 0 |
| 1 | 27.87 | 1.3 | 0 |
| 1.5 | 44.12 | 6.0 | 2.2 |
| 2 | 54.83 | 20.6 | 12.8 |
| 4 | 66.38 | 77.0 | 81.0 |
| 6 | 49.36 | 96.5 | 94.4 |
| 8 | 30.06 | 93.3 | 86.9 |
| 10 | 21.84 | 73.2 | 72.8 |
| 12 | 15.91 | 61.3 | 61.4 |
| 14 | 13.73 | 52.9 | 51.9 |
| 16 | 10.67 | 47.5 | 41.1 |
| 20 | 5.52 | 35.2 | 34.0 |
| 24 | 3.56 | 29.3 | 28.5 |
| 28 | 2.53 | 23.4 | 22.9 |
| 36 | 1.44 | 11.9 | 13.5 |
| 48 | 0.66 | 5.8 | 5.2 |

The blood plasma levels of venlafaxine were measured according to the following procedure. Blood samples from the subjects were collected in heparinized evacuated blood

tubes and the tubes were inverted gently several times. As quickly as possible, the tubes were centrifuged at 2500 rpm for 15 minutes. The plasma was pipetted into plastic tubes and stored at -20°C until analysis could be completed.

To 1 mL of each plasma sample in a plastic tube was added 150 µL of a stock internal standard solution (150 µg/ml). Saturated sodium borate (0.2 mL) solution was added to each tube and vortexed. Five mL of ethyl ether was added to each tube which were then capped and shaken for 10 minutes at high speed. The tubes were centrifuged at 3000 rpm for 5 minutes. The aqueous layer was frozen in dry ice and the organic layer transferred to a clean screw cap tube. A 0.3 mL portion of 0.01 N HCl solution was added to each tube and shaken for 10 minutes at high speed. The aqueous layer was frozen and the organic layer removed and discarded. A 50µL portion of the mobile phase (23:77 acetonitrile:0.1M monobasic ammonium phosphate buffer, pH 4.4) was added to each tube, vortexed, and 50 µL samples were injected on a Supelco Supelcoil LC-8-DB, 5 cm x 4.6 mm, 5 µ column in a high pressure liquid chromatography apparatus equipped with a Waters Lambda Max 481 detector or equivalent at 229 nm. Solutions of venlafaxine hydrochloride at various concentrations were used as standards.

Thus, the desired dissolution rate of a sustained release dosage form of venlafaxine hydrochloride, impossible to achieve with hydrogel tablet technology, has been achieved with the film-coated spheroid compositons of this invention.

What is claimed is:

1. An encapsulated, extended release formulation of venlafaxine hydrochloride comprising a hard gelatin capsule containing a therapeutically effective amount of spheroids comprised of venlafaxine hydrochloride, microcrystalline cellulose and hydroxypropyl methylcellulose coated with ethyl cellulose and hydroxypropylmethylcellulose.

2. An extended release formulation according to claim 1 wherein the spheroids are composed of about 37.3% by weight of venlafaxine hydrochloride, about 0.5% by weight of hydroxypropylmethylcellulose 2208, and about 62.17% by weight of microcrystalline cellulose.

3. A composition according to claim 1 wherein the film coating is comprised of ethyl cellulose (4.81% of total weight) and hydroxypropylmethylcellulose (0.85% of total weight).

4. A composition according to claim 1 wherein the film coating is comprised of ethyl cellulose (4.04% of total weight) and hydroxypropylmethylcellulose (0.714% of total weight).

5. A composition according to claim 1 wherein the film coating is comprised of ethyl cellulose (2.48% of total weight) and hydroxypropylmethylcellulose (0.437% of total weight).

6 A film coating composition which is composed of ethyl cellulose (15% of total weight), having a 44.0-51.0% content of ethoxy groups, and hydroxypropylmethylcellulose (85% of total weight) having a methoxy content of 28.0-30.0% and a hydroxypropoxy group content of 7.0-12.0%.

7. An extended release formulation of venlafaxine hydrochloride for once daily administration which comprises spheroids containing 37.3% venlafaxine, 62.17% microcrystalline cellulose and 0.5% hydroxypropylmethylcellulose type 2208, coated with a quantity of a mixture comprised of 15% ethyl cellulose type HG 2834 and 85% hydroxypropyl-methylcellulose type 2910 sufficient to give coated spheroids having a dissolution profile which gives the desired release rate over a 24 hour period.

WYETH 002-000952

8. An extended release formulation of venlafaxine hydrochloride according to claim 7 which provides lower peak serum levels of up to 150 ng/ml and extended therapeutically effective plasma levels over a twenty four hour period.

9. A method for providing a therapeutic blood plasma concentration of venlafaxine over a twenty four hour period with diminished incidences of nausea and emesis which comprises administering orally to a patient in need thereof, an encapsulated, extended release formulation that provides a peak blood plasma level of venlafaxine in from about four to about eight hours, said formulation containing venlafaxine hydrochloride as the active ingredient.

10. A method for eliminating the troughs and peaks of drug concentration in a patients blood plasma attending the therapeutic metabolism of plural daily doses of which comprises administering orally to a patient in need thereof, an encapsulated, extended release formulation that provides a peak blood plasma level of venlafaxine in from about four to about eight hours, said formulation containing venlafaxine hydrochloride as the active ingredient.

AHP-95011

ABSTRACT

EXTENDED RELEASE FORMULATION

This invention relates to a 24 hour extended release dosage formulation and unit dosage form thereof of venlafaxine hydrochloride, an antidepressant, which provides better control of blood plasma levels than conventional tablet formulations which must be administered two or more times a day and further provides a lower incidence of nausea and vomiting than the conventional tablets.

WYETH 002-000954

PTO/SB/68 (11-96)
Approved for use through 10/31/99. OMB 0651-0031
Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# REQUEST FOR ACCESS OF ABANDONED APPLICATION UNDER 37 CFR 1.14(a)

RECEIVED
SEP 25 2001
File Information Unit

| In re Application of | |
|---|---|
| Sherman et al | |
| Application Number: 60/014,006 | Filed: 3/25/96 |
| Group Art Unit | Examiner |

Paper No. 2

Assistant Commissioner for Patents
Washington, DC 20231

I hereby request access under 37 CFR 1.14(a)(3)(iv) to the application file record of the above-identified ABANDONED application, which is: (CHECK ONE)

✓ (A) referred to in United States Patent Number 6274171, column 1

___ (B) referred to in an application that is open to public inspection as set forth in 37 CFR 1.11, i.e., Application No. _____, filed _____, on page _____ of paper number _____

___ (C) an application that claims the benefit of the filing date of an application that is open to public inspection, i.e., Application No. _____, filed _____, or

___ (D) an application in which the applicant has filed an authorization to lay open the complete application to the public.

Please direct any correspondence concerning this request to the following address:

_____

_____

_____

Signature: [signature]
Date: 9/25/01

Typed or printed name: Kathy Gore

FOR PTO USE ONLY
Approved by: _____ (initials)
Unit: _____

This form is estimated to take 0.2 hours to complete. Time will vary depending upon the needs of the individual ... should be sent to the Chief Information Officer, Patent ... SEND FORMS TO THIS ADDRESS. SEND TO:

WYETH 002-000955

PTO/SB/68 (04-01)
Approved for use through 10/31/2002. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# REQUEST FOR ACCESS TO AN APPLICATION UNDER 37 CFR 1.14(e)

RECEIVED
DEC 0 5 2001
File Information Unit

| In re Application of Sherman | |
|---|---|
| Application Number 60/014,006 | Filed 3-25-96 |
| Art Unit | Examiner Spear |

Paper No. #3

Assistant Commissioner for Patents
Washington, DC 20231

1. ☑ I hereby request access under 37 CFR 1.14(e)(2) to the application file record of the above-identified ABANDONED Application, which is not within the file jacket of a pending Continued Prosecution Application (CPA) (37 CFR 1.53(d)) and is: (CHECK ONE)

☑ (A) referred to in:

United States Patent Application Publication No. ________, page ____, line____,

United States Patent Number 6,274,171 B1, column FF, line ____, or

an International Application which was filed on or after November 29, 2000 and which designates the United States, WIPO Pub. No. ________, page ____, line____.

☐ (B) referred to in an application that is open to public inspection as set forth in 37 CFR 1.11(b) or 1.14(e)(2)(i), i.e., Application No.________, paper No. ____, page ____, line ____.

2. ☐ I hereby request access under 37 CFR 1.14(e)(1) to an application in which the applicant has filed an authorization to lay open the complete application to the public.

John Semiklose
Signature

Dec. 5, 2001
Date

John Semiklose
Typed or printed name

FOR PTO USE ONLY
Approved by: [initials]
(initials)
Unit: ________

Burden Hour Statement: This form is estimated to take 0.2 hours to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Washington, DC 20231.

WYETH 002-000956

PTO/SB/65 (11-96)
Approved for use through 1/99. OMB 0651-0031
Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# REQUEST FOR ACCESS OF ABANDONED APPLICATION UNDER 37 CFR 1.14(a)

| In re Application of | |
|---|---|
| Application Number 60/014006 | Filed 03-25-96 |
| Group Art Unit | Examiner |

RECEIVED
JAN 2 4 2002
File Information Unit

Paper No. #4

Assistant Commissioner for Patents
Washington, DC 20231

I hereby request access under 37 CFR 1.14(a)(3)(iv) to the application file record of the above-identified ABANDONED application, which is: (CHECK ONE)

✓ (A) referred to in United States Patent Number 6274171, column ______.

___ (B) referred to in an application that is open to public inspection as set forth in 37 CFR 1.11, i.e., Application No. ______, filed ______, on page ______ of paper number ______.

___ (C) an application that claims the benefit of the filing date of an application that is open to public inspection, i.e., Application No. ______, filed ______, or

___ (D) an application in which the applicant has filed an authorization to lay open the complete application to the public.

Please direct any correspondence concerning this request to the following address:

______

______

______

Shoaib Chayour (signature) 01-24-02
Signature Date

Shoaib Chayour
Typed or printed name

| FOR PTO USE ONLY |
|---|
| Approved by: [initials] (Initials) |
| Unit: [illegible] |

Burden Hour Statement: This form is estimated to take 0.2 hours to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, Patent and Trademark Office, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Washington, DC 20231.

PTO/SB/... Approved for use through .../.../... OMB ...
Patent and Trademark Office U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control nu

# REQUEST FOR ACCESS OF ABANDONED APPLICATION UNDER 37 CFR 1.14(e

RECEIVED
FEB 2 0 2002
File Information Unit

In re Application of

| Application Number | Filed |
|---|---|
| 60/014886 | Mar 25, 1996 |

| Group Art Unit | Examiner |
|---|---|
| | |

Paper No. #6

Assistant Commissioner for Patents
Washington, DC 20231

I hereby request access under 37 CFR 1.14(a)(3)(iv) to the application file record of the above-identified ABANDONED application, which is: (CHECK ONE)

___ (A) referred to in United States Patent Number 6027421, column ______

___ (B) referred to in an application that is open to public inspection as set forth in 37 CFR 1.11, i.e., Application No. ______ filed ______ on page ______ or paper number ______

___ (C) an application that claims the benefit of the filing date of an application that is open to public inspection, i.e., Application No. ______ filed ______ o

___ (D) an application in which the applicant has filed an authorization to lay open the complete application to the public.

Please direct any correspondence concerning this request to the following address:

______

______

______

Darlene Jones
Signature

2. 20. 02
Date

Darlene Jones
Typed or printed name

RECEIVED
FOR PTO USE ONLY
Approved by: FEB 2 1 2002
(Initials)
File Information Unit

Burden Hour Statement: This form is estimated to take 0.2 hours to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Washington, DC 20231.

PTO/SB/68 (04-01)
Approved for use through 10/31/2002. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# REQUEST FOR ACCESS TO AN APPLICATION UNDER 37 CFR 1.14(e)

| In re Application of | |
|---|---|
| Application Number 60/014006 | Filed 3-25-96 |
| Art Unit | Examiner |

RECEIVED
JUN 19 2002
File Information Unit

Paper No. #6

Assistant Commissioner for Patents
Washington, DC 20231

1. ☑ I hereby request access under 37 CFR 1.14(e)(2) to the application file record of the above-identified ABANDONED Application, which is not within the file jacket of a pending Continued Prosecution Application (CPA) (37 CFR 1.53(d)) and is: (CHECK ONE)

☑ (A) referred to in:

United States Patent Application Publication No. 6274171, page ____, line ____,

United States Patent Number ________, column ____, line ____, or

an International Application which was filed on or after November 29, 2000 and which designates the United States, WIPO Pub. No. ________, page ____, line ____.

☐ (B) referred to in an application that is open to public inspection as set forth in 37 CFR 1.11(b) or 1.14(e)(2)(i), i.e., Application No. ________, paper No. ____, page ____, line ____.

2. ☐ I hereby request access under 37 CFR 1.14(e)(1) to an application in which the applicant has filed an authorization to lay open the complete application to the public.

[signature]
Signature

6-19-02
Date

Henry Dure
Typed or printed name

| FOR PTO USE ONLY |
|---|
| Approved by: [initials] (initials) |
| Unit: [illegible] |

Burden Hour Statement: This form is estimated to take 0.2 hours to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Washington, DC 20231.

PTO/SB/68 (04-01)
Approved for use through 10/31/2002. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## REQUEST FOR ACCESS TO AN APPLICATION UNDER 37 CFR 1.14(e)

| In re Application of | |
|---|---|
| Application Number 60/014006 | Filed 3/25/96 |
| Art Unit | Examiner |

RECEIVED
JUL 23 2002
File Information Unit

Paper No. #7

Assistant Commissioner for Patents
Washington, DC 20231

1. ☐ I hereby request access under 37 CFR 1.14(e)(2) to the application file record of the above-identified ABANDONED Application, which is not within the file jacket of a pending Continued Prosecution Application (CPA) (37 CFR 1.53(d)) and is: (CHECK ONE)

☐ (A) referred to in:

United States Patent Application Publication No. ________, page ____, line ____,

United States Patent Number 6403120, column ____, line ____, or

an International Application which was filed on or after November 29, 2000 and which designates the United States, WIPO Pub. No. ________, page ____, line ____.

☐ (B) referred to in an application that is open to public inspection as set forth in 37 CFR 1.11(b) or 1.14(e)(2)(i), i.e., Application No. ________, paper No. ____, page ____, line ____.

2. ☐ I hereby request access under 37 CFR 1.14(e)(1) to an application in which the applicant has filed an authorization to lay open the complete application to the public.

[signature]
Signature

7/23/02
Date

DAVID E HASS
Typed or printed name

FOR PTO USE ONLY
Approved by: J. Bryant (initials)
Unit: 1614

Burden Hour Statement: This form is estimated to take 0.2 hours to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Washington, DC 20231.

PTO/SB/38 (04-01)
Approved for use through 10/31/2002. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# REQUEST FOR ACCESS TO AN APPLICATION UNDER 37 CFR 1.14(e)

| In re Application of | |
|---|---|
| Application Number 60-014006 | Filed 3-25-96 |
| Art Unit | Examiner |

RECEIVED
AUG 0 6 2002
File Information Unit

Paper No. #8

Assistant Commissioner for Patents
Washington, DC 20231

1. ☐ I hereby request access under 37 CFR 1.14(e)(2) to the application file record of the above-identified ABANDONED Application, which is not within the file jacket of a pending Continued Prosecution Application (CPA) (37 CFR 1.53(d)) and is: (CHECK ONE)

☐ (A) referred to in:

United States Patent Application Publication No. ________, page ____, line ____,

____ United States Patent Number 6403120, column ____, line ____, or

an International Application which was filed on or after November 29, 2000 and which designates the United States, WIPO Pub. No. ________, page ____, line ____.

☐ (B) referred to in an application that is open to public inspection as set forth in 37 CFR 1.11(b) or 1.14(e)(2)(i), i.e., Application No. ________, paper No. ____, page ____, line ____.

2. ☐ I hereby request access under 37 CFR 1.14(e)(1) to an application in which the applicant has filed an authorization to lay open the complete application to the public.

[signature]
Signature

8-6-02
Date

Victor Telleria
Typed or printed name

FOR PTO USE ONLY

Approved by: [initials] (initials)

Unit: [initials]

Burden Hour Statement: This form is estimated to take 0.2 hours to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Washington, DC 20231.

PTO/SB/68 (04-01)
Approved for use through 10/31/2002. OMB 0651-0031
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# REQUEST FOR ACCESS TO AN APPLICATION UNDER 37 CFR 1.14(e)

RECEIVED
SEP 27 2002
File Information Unit

In re Application of

Application Number 60 014006

Filed 3 25 96

Art Unit

Examiner

Paper No. 9

Assistant Commissioner for Patents
Washington, DC 20231

1. ☐ I hereby request access under 37 CFR 1.14(e)(2) to the application file record of the above-identified ABANDONED Application, which is not within the file jacket of a pending Continued Prosecution Application (CPA) (37 CFR 1.53(d)) and is: (CHECK ONE)

☐ (A) referred to in:

United States Patent Application Publication No. ________, page ____, line____,

United States Patent Number 6274171, column ____, line ____, or

an International Application which was filed on or after November 29, 2000 and which designates the United States, WIPO Pub. No. ________, page ____, line ____.

☐ (B) referred to in an application that is open to public inspection as set forth in 37 CFR 1.11(b) or 1.14(e)(2)(i), i.e., Application No.________, paper No. ____, page ____, line ____.

2. ☐ I hereby request access under 37 CFR 1.14(e)(1) to an application in which the applicant has filed an authorization to lay open the complete application to the public.

Moe Johnson
Signature

9 27 02
Date

MOE JOHNSON
Typed or printed name

FOR PTO USE ONLY

Approved by: ________ (initials)

Unit: ________

Burden Hour Statement: This form is estimated to take 0.2 hours to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Washington, DC 20231.

PTO/SB/68 (04-01)
Approved for use through 10/31/2002. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# REQUEST FOR ACCESS TO AN APPLICATION UNDER 37 CFR 1.14(e)

| In re Application of | |
|---|---|
| Application Number 60/014006 | Filed |
| Art Unit | Examiner |

RECEIVED
NOV 0 4 2002
File Information Unit

Paper No. 10

Assistant Commissioner for Patents
Washington, DC 20231

1. ☐ I hereby request access under 37 CFR 1.14(e)(2) to the application file record of the above-identified ABANDONED Application, which is not within the file jacket of a pending Continued Prosecution Application (CPA) (37 CFR 1.53(d)) and is: (CHECK ONE)

☐ (A) referred to in:

United States Patent Application Publication No. 6419958 page _____, line_______,

United States Patent Number________________________, column _______, line _______, or

an International Application which was filed on or after November 29, 2000 and which designates the United States, WIPO Pub. No. __________________, page _____, line_ ____.

☐ (B) referred to in an application that is open to public inspection as set forth in 37 CFR 1.11(b) or 1.14(e)(2)(i), i.e., Application No._________________, paper No. ______, page ______, line _____.

2. ☐ I hereby request access under 37 CFR 1.14(e)(1) to an application in which the applicant has filed an authorization to lay open the complete application to the public.

Darlene Jones
Signature

Date ________________

Darlene Jones
Typed or printed name

| FOR PTO USE ONLY |
|---|
| Approved by: ________________ (initials) |
| Unit: ________________ |

Burden Hour Statement: This form is estimated to take 0.2 hours to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Washington, DC 20231.

PTO/SB/68 (11-96)
Patent and Trademark for use through 10/31/1999. CMB 0651-0031
Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Production Act of 1995, no persons are required to respond to a collection of information unless it displays a valid CMB control number.

# REQUEST FOR ACCESS OF ABANDONED APPLICATION UNDER 37 CFR 1.14(A)

RECEIVED
DEC 09 2002
File Information Unit

In re Application of Sherman, et al

Application Number 60/014,006 Filed 3/26/96

Group Art Unit Examiner

Assistant Commissioner for Patients
Washington, DC 20231

Paper No. 11

**I hereby request access under 37 CFR 1.14(a)(3)(iv) to the application file record of the above identified ABANDONED application, which is: (CHECK ONE)**

☒ (A) referred to in United States Patent Number 6,274,171, column ______.

☐ (B) referred to in an application that is open to public inspection as set forth in 37 CFR 1.11, i.e., Application No. ______, filed ______, on page ______ of paper number ______.

☐ (C) an application that claims the benefit of the filing date of an application that is open to public inspection, i.e., Application No. ______, filed ______, or

☐ (D) an application in which the applicant has filed an authorization to lay open the complete application to the public.

**Please direct any correspondence concerning this request to the following address:**

Cantwell and Paxton, Inc.
Signature

12/9/02
Date

FOR PTO USE ONLY

______________________
Type or Printed Name

Approved by: ______
Inititals

Unit: ______

Burden Hour Statement: This form is estimated to take 0.2 hours to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, Patent and Trademark Office, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS, SEND TO: Assistant Commissioner for the Patents, Washington, DC 20231.

2-22D

PTO/SB/68 (04-01)
Approved for use through 10/31/2002. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# REQUEST FOR ACCESS TO AN APPLICATION UNDER 37 CFR 1.14(e)

| In re Application of Sherman et al | |
|---|---|
| Application Number 60/014006 | Filed 3/25/96 |
| Art Unit | Examiner |

RECEIVED
FEB 07 2003
File Information Unit

Paper No. #12

Assistant Commissioner for Patents
Washington, DC 20231

1. ☐ I hereby request access under 37 CFR 1.14(e)(2) to the application file record of the above-identified ABANDONED Application, which is not within the file jacket of a pending Continued Prosecution Application (CPA) (37 CFR 1.53(d)) and is: (CHECK ONE)

☐(A) referred to in:

United States Patent Application Publication No. 6274171, page ____, line______,

United States Patent Number________________________, column ______, line ______, or

an International Application which was filed on or after November 29, 2000 and which designates the United States, WIPO Pub. No. __________________, page ____, line_ ____.

☐(B) referred to in an application that is open to public inspection as set forth in 37 CFR 1.11(b) or 1.14(e)(2)(i), i.e., Application No.________________, paper No. ______, page ______, line _____.

2. ☐ I hereby request access under 37 CFR 1.14(e)(1) to an application in which the applicant has filed an authorization to lay open the complete application to the public.

Nancy Perry (signature)
Signature

2/7/03
Date

Nancy Perry
Typed or printed name

| FOR PTO USE ONLY |
|---|
| Approved by: (initials) |
| Unit: |

Burden Hour Statement: This form is estimated to take 0.2 hours to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Washington, DC 20231.

3-50D

PTO/SB/85 (04-01)
Approved for use through 10/31/2002. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# REQUEST FOR ACCESS TO AN APPLICATION UNDER 37 CFR 1.14(e)

| In re Application of Sherman | |
|---|---|
| Application Number 60/014006 | Filed 3/25/96 |
| Art Unit | Examiner |

RECEIVED
MAR 1 1 2003
File Information Unit

Paper No. #13

Assistant Commissioner for Patents
Washington, DC 20231

1. ☐ I hereby request access under 37 CFR 1.14(e)(2) to the application file record of the above-identified ABANDONED Application, which is not within the file jacket of a pending Continued Prosecution Application (CPA) (37 CFR 1.53(d)) and is: (CHECK ONE)

☐ (A) referred to in:
United States Patent Application Publication No. 6274171, page ____, line_____,
United States Patent Number____________________, column ______, line ______, or
an International Application which was filed on or after November 29, 2000 and which designates the United States, WIPO Pub. No. ________________, page _____, line_ ____.

☐ (B) referred to in an application that is open to public inspection as set forth in 37 CFR 1.11(b) or 1.14(e)(2)(i), i.e., Application No.________________, paper No. ______, page ______, line _____.

2. ☐ I hereby request access under 37 CFR 1.14(e)(1) to an application in which the applicant has filed an authorization to lay open the complete application to the public.

[signature]
Signature

Anita Myles
Typed or printed name

3/11/03
Date

RECEIVED
FOR PTO USE ONLY
MAR 1 1 2003
Approved by: [initials]
(initials)
File Information Unit

Burden Hour Statement: This form is estimated to take 0.2 hours to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Washington, DC 20231.

4-125A

PTO/SB/68 (04-01)
Approved for use through 10/31/2002. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# REQUEST FOR ACCESS TO AN APPLICATION UNDER 37 CFR 1.14(e)

| In re Application of | Sherman |
|---|---|
| Application Number 60/014006 | Filed 3/29/96 |
| Art Unit | Examiner |

APR 24 2003

Paper No. #14

Assistant Commissioner for Patents
Washington, DC 20231

1. ☐ I hereby request access under 37 CFR 1.14(e)(2) to the application file record of the above-identified ABANDONED Application, which is not within the file jacket of a pending Continued Prosecution Application (CPA) (37 CFR 1.53(d)) and is: (CHECK ONE)

☐ (A) referred to in:

United States Patent Application Publication No. 6274171, page ____, line ____,

United States Patent Number ________, column ____, line ____, or

an International Application which was filed on or after November 29, 2000 and which designates the United States, WIPO Pub. No. ________, page ____, line ____.

☐ (B) referred to in an application that is open to public inspection as set forth in 37 CFR 1.11(b) or 1.14(e)(2)(i), i.e., Application No. ________, paper No. ____, page ____, line ____.

2. ☐ I hereby request access under 37 CFR 1.14(e)(1) to an application in which the applicant has filed an authorization to lay open the complete application to the public.

[signature]
Signature

Anita Myles
Typed or printed name

4/24/03
Date

FOR PTO USE ONLY

Approved by: APR 24 2003 [initials]
(initials)

Unit: ________

Burden Hour Statement: This form is estimated to take 0.2 hours to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Washington, DC 20231.



US006274171B1

(12) **United States Patent**
Sherman et al.

(10) **Patent No.: US 6,274,171 B1**
(45) **Date of Patent: Aug. 14, 2001**

(54) **EXTENDED RELEASE FORMULATION OF VENLAFAXINE HYDROCHLORIDE**

(75) Inventors: **Deborah M. Sherman**, Plattsburgh; **John C. Clark**, Peru, both of NY (US); **John U. Lamer**, St. Albans, VT (US); **Steven A. White**, Champlain, NY (US)

(73) Assignee: **American Home Products Corporation**, Madison, NJ (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/488,629**

(22) Filed: **Jan. 20, 2000**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 08/964,328, filed on Nov. 5, 1997, now abandoned, which is a continuation-in-part of application No. 08/821,137, filed on Mar. 20, 1997, now abandoned.

(60) Provisional application No. 60/014,006, filed on Mar. 25, 1996.

(51) **Int. Cl.**[7] ........ **A61K 9/52; A61K 9/54; A61K 9/62**

(52) **U.S. Cl.** ........ **424/461; 424/457; 424/458; 424/459; 514/781; 514/962**

(58) **Field of Search** ........ 424/495, 494, 424/461, 458, 459, 457, 456, 462

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,954,959 | 5/1976 | Pedersen | 424/21 |
| 4,138,475 * | 2/1979 | McAinsh et al. | 424/19 |
| 4,369,172 | 1/1983 | Schor et al. | 424/19 |
| 4,389,393 | 6/1983 | Schor et al. | 424/19 |
| 4,535,186 | 8/1985 | Husbands et al. | 564/336 |
| 4,966,768 | 10/1990 | Michelucci et al. | 424/468 |
| 5,506,270 | 4/1996 | Upton et al. | 514/730 |
| 5,552,429 * | 9/1996 | Wong et al. | 514/415 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0654264 | 11/1994 | (EP) . |
| 0667150 | 1/1995 | (EP) . |
| 0797991 | 10/1997 | (EP) . |
| 9427589 | 12/1994 | (WO) . |
| 9737640 | 10/1997 | (WO) . |

* cited by examiner

*Primary Examiner*—James M. Spear
(74) *Attorney, Agent, or Firm*—Rebecca R. Barrett

(57) **ABSTRACT**

This invention relates to a 24 hour extended release dosage formulation and unit dosage form thereof of venlafaxine hydrochloride, an antidepressant, which provides better control of blood plasma levels than conventional tablet formulations which must be administered two or more times a day and further provides a lower incidence of nausea and vomiting than the conventional tablets. More particularly, the invention comprises an extended release formulation of venlafaxine hydrochloride comprising a therapeutically effective amount of venlafaxine hydrochloride in spheroids comprised of venlafaxine hydrochloride, microcrystalline cellulose and, optionally, hydroxypropylmethylcellulose coated with a mixture of ethyl cellulose and hydroxypropylmethylcellulose.

**25 Claims, No Drawings**

BAR CODE LABEL

# U.S. PATENT APPLICATION

| SERIAL NUMBER | FILING DATE | CLASS | GROUP ART UNIT |
|---|---|---|---|
| 60/014,006 PROVISIONAL | 03/25/96 | | |

APPLICANT

DEBORAH M. SHERMAN, PLATTSBURG, NY.

**CONTINUING DATA**********************
VERIFIED

**FOREIGN/PCT APPLICATIONS************
VERIFIED

FOREIGN FILING LICENSE GRANTED 05/09/96

| STATE OR COUNTRY | SHEETS DRAWING | TOTAL CLAIMS | INDEPENDENT CLAIMS | FILING FEE RECEIVED | ATTORNEY DOCKET NO. |
|---|---|---|---|---|---|
| NY | 0 | | | $150.00 | AHP-95011 |

ADDRESS

RONALD W ALICE
AMERICAN HOME PRODUCTS CORPORATION
FIVE GIRALDA FARMS
MADISON NJ 07940-0874

TITLE

EXTENDED RELEASE FORMULATION

This is to certify that annexed hereto is a true copy from the records of the United States Patent and Trademark Office of the application which is identified above.

By authority of the
COMMISSIONER OF PATENTS AND TRADEMARKS

Date Certifying Officer



Form PTO 1130 (REV 2/94)

U.S. DEPARTMENT OF COMMERCE
Patent and Trademark Office

# PACE DATA ENTRY CODING SHEET

1ST EXAMINER: [signature] DATE: 5/8/96

2ND EXAMINER: DATE:

69652 U.S. PTO
60014006
03/25/96

| APPLICATION NUMBER | TYPE APPL | FILING DATE (MONTH / DAY / YEAR) | SPECIAL HANDLING | GROUP ART UNIT | CLASS | SHEETS OF DRAWING |
|---|---|---|---|---|---|---|
| 60014006 | 9 | 05 25 96 | 0 | | | |

| TOTAL CLAIMS | INDEPENDENT CLAIMS | SMALL ENTITY? | FILING FEE | FOREIGN LICENSE | ATTORNEY DOCKET NUMBER |
|---|---|---|---|---|---|
| | | Ø | 150 | 9 | AHP-95011 |

## CONTINUITY DATA

| CONT CODE | STATUS CODE | PARENT APPLICATION SERIAL NUMBER | PCT APPLICATION SERIAL NUMBER | PARENT PATENT NUMBER | PARENT FILING DATE (MONTH / DAY / YEAR) |
|---|---|---|---|---|---|
| | | | PCT / / | | |
| | | | PCT / / | | |
| | | | PCT / / | | |
| | | | PCT / / | | |
| | | | PCT / / | | |

## PCT/FOREIGN APPLICATION DATA

| FOREIGN PRIORITY CLAIMED | COUNTRY CODE | PCT/FOREIGN APPLICATION SERIAL NUMBER | FOREIGN FILING DATE (MONTH / DAY / YEAR) |
|---|---|---|---|
| | | | |

☆ U.S. GPO: 1995-401-429

WYETH 002-000970

| POSITION | | ID NO. | DATE |
|---|---|---|---|
| CLASSIFIER | | 21 | 4/18/96 |
| EXAMINER | | 249 | 5/8/96 |
| TYPIST | | 335 | 5/9/96 |
| VERIFIER | | 84 | 5/10/96 |
| CORPS CORR. | | | |
| SPEC. HAND | | | |
| FILE MAINT | | | |
| DRAFTING | | | |

(LEFT INSIDE)

APPROVED FOR LICENSE

PATENT APPLICATION

60014006

INITIALS

Date Entered or Counted

Date Received or Mailed

CONTENTS

1. Application papers.
2. 12-5-01
3. 12-5-01
4. Request for access 1/24/02
5. Request for access 2/21/02
6. Request for access 6/19/02
7. Request for access 7/23/02
8. Request for access 8/6/02
9. Request for access 9/27/02
10. Request for access 11/4/02
11. Request for access 12/9/02
12. Request for access 2/7/03
13. Request for access 3-11-03
14. Request for access 4/24/03
15.
16.
17.
18.
19.
20.
21.
22.
23.
24.
25.
26.
27.
28.
29.
30.
31.
32.

(FRONT)



U.S. DEPARTMENT OF COMMERCE
PATENT & TRADEMARK OFFICE

WYETH 002-000973

PTO-1683
(Rev. 7-96)

WYETH 002-000974