IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| WYETH, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: 06-222 JJF |
| v. | ) | |
| | ) | **PUBLIC VERSION** |
| IMPAX LABORATORIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF ARTHUR H. KIBBE, Ph.D.
## IN SUPPORT OF DEFENDANT'S MARKMAN BRIEF

Richard K. Herrmann (I.D. No. 405)
Mary B. Matterer (I.D. No. 2696)
MORRIS JAMES LLP
500 Delaware Avenue, 15th Floor
Wilmington, DE 19801
Telephone: (302) 888-6800
mmatterer@morrisjames.com

Daralyn J. Durie
Asim Bhansali
Paula L. Blizzard
KEKER & VAN NEST LLP
710 Sansome Street
San Francisco, CA 94111
Telephone: (415) 391-5400

M. Patricia Thayer
John M. Benassi
Jessica R. Wolff
Daniel N. Kassabian
Samuel F. Ernst
HELLER EHRMAN LLP
4350 La Jolla Village Drive, 7th Floor
San Diego, CA 92101
Telephone: (858) 450-8400          *Attorneys for IMPAX LABORATORIES, INC.*

Original Dated: May 8, 2007
Public Version: May 15, 2007

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WYETH, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No.: 06-222 JJF |
| v. | ) |
| | ) **FILED UNDER SEAL** |
| IMPAX LABORATORIES, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

**DECLARATION OF ARTHUR H. KIBBE, Ph.D.
IN SUPPORT OF DEFENDANT'S MARKMAN BRIEF**

I, Arthur H. Kibbe, Ph.D., declare:

1.      I am a pharmaceutical formulations scientist with over 35 years of experience in the fields of biopharmaceutics, pharmacokinetics and pharmaceutical excipients. A copy of my current curriculum vitae is attached as Exhibit 1.

2.      I hold a Ph.D. in Pharmacy-Pharmacokinetics from the University of Florida, an M.S. in Pharmacy from the University of Florida and a B.S. in Pharmacy from Columbia University.

3.      I am currently a Professor of Pharmaceutical Sciences at Wilkes University in Wilkes-Barre, Pennsylvania and a consultant to the pharmaceutical industry.

4.      I have worked with the pharmaceutical industry in various capacities. I have served as Senior Director of Professional and Scientific Affairs of the American Pharmaceutical Association, and I have chaired the

Pharmaceutical Advisory Committee of the FDA. I have worked with, consulted about and evaluated extended release formulations.

5.    I was editor-in-chief of the internationally recognized reference text Handbook of Pharmaceutical Excipients, 3rd Edition.

6.    I have trained professional pharmacists and pharmaceutical scientists. I have trained over 12 PhDs working as formulators in the pharmaceutical industry.

7.    I have been asked to provide my expert opinion regarding the meaning of the terms "extended release formulation" and "therapeutic metabolism" as a person having ordinary skill in the art in the mid-1990's would understand these terms from reading U.S. Patent No. 6,274,171 (the "'171 patent"), U.S. Patent No. 6,403,120 (the "'120 patent"), and U.S. Patent No. 6,149,958 (the "'958 patent"). I have reviewed these patents and their prosecution histories before the United States Patent & Trademark Office. I have also reviewed Judge Martini's Markman Opinion from *Wyeth v. Teva Pharmaceuticals* in the District Court for the District of New Jersey and expert reports and declarations submitted in that case. I have also reviewed the Declaration of Bertram A. Spilker in Support of Defendant's Markman Brief. I have also reviewed the proposed claim constructions from Wyeth and Impax in this case. I have also reviewed portions of Impax's ANDA.

## PERSON HAVING ORDINARY SKILL IN THE ART

8.    For purposes of this Declaration, I assume a person having ordinary skill in the art is a person with at least a bachelors degree in pharmacy or some closely related discipline; at least two years of work experience or skill in the formulation, design, or evaluation of pharmaceutical dosage forms, including

2

extended release dosage forms; and would have taken courses in both pharmacokinetics and pharmacodynamics or would have acquired comparable knowledge through work experience. Such a person would also have a working knowledge of, or would be able to consult as necessary with persons with expertise in (1) the pharmacologic profile, mechanism of action, and efficacy and adverse effects of serotonin, norepinephrine, and dopamine reuptake inhibitors in the treatment of psychiatric disorders, (2) the diagnosis and treatment of patients with psychiatric disorders, and (3) biostatistics.

## REPRESENTATIVE ASSERTED METHOD CLAIMS

9.    Claims 20-25 of the '171 patent, claims 1, 2, 13 and 14 of the '120 patent and claims 1-6 of the '958 patent are method claims that require administering an "extended release formulation." Some of these claims recite administration of the extended release formulation to eliminate the troughs and peaks associated with plural daily dosing. Other claims recite administration of the extended release formulation to provide a therapeutic blood plasma concentration of venlafaxine over a twenty-four hour period with diminished incidences of nausea and emesis. The following claims of the '171 patent are representative:

> 20.    A method for providing a therapeutic blood plasma concentration of venlafaxine over a twenty four hour period with diminished incidences of nausea and emesis which comprises administering orally to a patient in need thereof, an encapsulated, extended release formulation that provides a peak blood plasma level of venlafaxine in from about four to about eight hours, said formulation containing venlafaxine hydrochloride as the active ingredient.

> 24.    A method for eliminating the troughs and peaks of drug concentration in a patient's blood plasma attending the therapeutic metabolism of plural daily doses of venlafaxine hydrochloride which comprises administering orally to a patient in need thereof, an encapsulated, extended release formulation that provides a peak

3

blood plasma level of venlafaxine in from about 5 to about 8 hours, said formulation containing venlafaxine hydrochloride as the active ingredient.

'171 Patent, Col. 12, line 63 – Col. 13, line 3; Col. 14, lines 5-13.

## EXTENDED RELEASE FORMULATION

10.    A person having ordinary skill in the art would understand that the term "extended release formulation" as used in the patents-in-suit refers to a formulation comprising venlafaxine hydrochloride, microcrystalline cellulose ("MCC") and, optionally, hydroxypropylmethylcellulose ("HPMC") coated with a mixture of ethyl cellulose and HPMC in an amount needed to provide a specific unit dosage administered once-a-day to provide a therapeutic blood plasma level of venlafaxine over the entire 24-hour period of administration. For shorthand purposes, I will refer to this as an "MCC matrix formulation." This is the only extended release formulation disclosed in the patents-in-suit.

11.    The patents' specification repeatedly characterizes "the invention" as this "MCC matrix formulation." A person having ordinary skill in the art reading the term "extended release formulation" in the claims in light of the specification would believe that the patentees intended "extended release formulation" to refer to what they viewed as their invention:

> [T]he invention comprises an extended release formulation of venlafaxine hydrochloride comprising a therapeutically effective amount of venlafaxine hydrochloride in spheroids comprised of venlafaxine hydrochloride, microcrystalline cellulose and, optionally, hydroxypropylmethylcellulose coated with a mixture of ethyl cellulose and hydroxypropylmethylcellulose." '171 patent, Abstract.
>
> The formulations of this invention comprise an extended release formulation of venlafaxine hydrochloride comprising a therapeutically effective amount of venlafaxine hydrochloride in spheroids

4

comprised of venlafaxine hydrochloride, microcrystalline cellulose and, optionally, hydroxypropylmethylcellulose coated with a mixture of ethyl cellulose and hydroxypropylmethylcellulose. '171 patent, Col. 2, line 62 to Col. 3, line 2.

The extended release formulations of this invention are comprised of [venlafaxine] hydrochloride in admixture with microcrystalline cellulose and hydroxypropylmethylcellulose. '171 patent, Col. 4, lines 9-15.

The extended release spheroid formulations of this invention comprise from about 6 to about 40 percent venlafaxine hydrochloride, from about 50 to about 94 percent microcrystalline cellulose, NF, optionally, from about 0.25 to about 1 percent hydroxypropylmethylcellulose, and from about 2 to about 12 percent, preferably about 3 to 9 percent, film coating. '171 patent, Col. 6, lines 15-21.

12.    All of the examples disclosed in the patent specification are

formulations that contain venlafaxine hydrochloride, microcrystalline cellulose

and optionally, HPMC, in various amounts and proportions:

EXAMPLE NO. 1

A mixture of 44.8 parts ( 88.4% free base) of venlafaxine hydrochloride, 74.6 parts of the microcrystalline cellulose, NF, and 0.60 parts of hydroxypropylmethylcellulose 2208, USP, are blended with the addition of 41.0 parts water. '171 patent, Col. 5, lines 38-41.

EXAMPLE NO. 2

Same as for Example 1 except that 1.11 parts of the film coating solution per part of uncoated spheroids is applied to obtain a coating level of 5%. '171 patent, Col. 5, lines 59-61.

EXAMPLE NO. 3

Same as for Example 1 except that 1.33 parts of the film coating solution is applied to 1 part of uncoated spheroids to obtain a coating level of 6%. '171 patent, Col. 5, lines 65-67.

EXAMPLE NO. 4

Same as for Example 1 except that 1.55 parts of the film coating solution is applied to 1 part of uncoated spheroids to obtain a coating level of 7%. '171 patent, Col. 6, lines 3-5.

EXAMPLE NO. 5

The spheroids useful in these lower dose formulations may comprise from about 5% to about 29.99% venlafaxine HCl, preferably from about 5% to about 25%, from about 75% to about 95% microcrystalline cellulose, and, optionally from about 0.25% to about 1.0% hydroxypropylmethylcellulose. '171 patent, Col. 9, lines 53-58.

EXAMPLE NO. 6

Spheroids comprising 16.5% venlafaxine HCl and 83.5% microcrystalline cellulose were mixed with approximately 50% water (w/w) to granulate in a Littleford Blender Model FM-50E/1Z (Littleford Day Inc., P.O. Box 128, Florence, Ky. 41022-0218, U.S.A.) at a fixed speed of 180 rpm. '171 patent, Col. 9, line 15 to Col. 10, line 2.

EXAMPLE NO. 7

A formulation of spheroids containing 8.25% venlafaxine HCl and 91.75% microcellulose was prepared according to the techniques of Example No. 6 and coated with a 5% film coating. '171 patent, Col. 10, lines 37-40.

13.    A person having ordinary skill in the art would understand that the only extended release formulations successfully developed by the inventors contained venlafaxine hydrochloride, microcrystalline cellulose and, optionally, HPMC, in a matrix coated with a mixture of ethyl cellulose and HPMC. No other successful formulations are disclosed, discussed, or suggested. The only other formulations discussed or suggested were unsuccessful.

14.    The description of HPMC in the specification as "optional" teaches me that the other disclosed ingredients are not optional. In other words, the

6

specification makes explicit which ingredients are optional, and which are not. I understand from the specification that the other ingredients (venlafaxine and microcrystalline cellulose) are mandatory elements of "the formulations of this invention." '171 Patent, Col. 2, line 63.

## OTHER FAILED EXPERIMENTS

15.    During prosecution, the patentees cited their inability to make hydrogel tablets. '171 Patent, Col. 4, lines 60-67. In particular, the specification discloses that the inventors' attempts to develop extended release hydrogel tablets were "fruitless" and teaches one of ordinary skill that it is "impossible to achieve" the desired dissolution rates using hydrogel tablet technology. '171 Patent, Col. 4, lines 60-64; col. 10, lines 53-57.

16.    The patentees also told the Examiner about numerous failures in making an extrudable matrix:

> Numerous spheroid formulations were prepared using different grades of microcrystalline cellulose and hydroxypropylmethylcellulose, different ratios of venlafaxine hydrochloride and filler, different binders such as polyvinylpyrrolidone, methylcellulose, water, and polyethylene glycol of different molecular weight ranges in order to find a formulation which would provide a suitable granulation mix which could be extruded properly. In the extrusion process, heat buildup occurred which dried out the extrudate so much that it was difficult to convert the extruded cylinders into spheroids. Addition of hydroxypropylmethylcellulose 2208 to the venlafaxine hydrochloride-microcrystalline cellulose mix made production of spheroids practical.

'171 Patent, Col. 5, lines 1-13.

17.    I note the patent specification indicates that the inventors' attempts to develop formulations with different binders such as polyvinylpyrrolidone failed. The specification states that when the inventors tried to develop extended release formulations with other binders, heat buildup occurred during the

7

extrusion process and the resulting extrudate was too dry to be converted into the spheroid shape of the claimed formulation. '171 patent, Col. 5, lines 1-11. It is my understanding from reading the specification that subsequent experiments on different machinery demonstrated that the HPMC was optional:

> In the foregoing failed experiments and in Examples 1-4, the extrusion was carried out on an Alexanderwerk extruder. Subsequent experiments carried out on Hutt and Nica extruders surprisingly demonstrated that acceptable, and even improved, spheroids could be made without the use of an hydroxypropylmethylcellulose.

'171 patent, Col. 6, lines 6-11.

18.     When I compare the description of the numerous failures to the description of the MCC matrix formulation, it is clear that the only formulation successfully developed by the patentees was the MCC matrix formulation, and that the patentees were not in possession of any other extended release venlafaxine formulations that they viewed as successful.

## OTHER EXTENDED RELEASE TECHNOLOGIES

19.     At the time of the invention, numerous other extended release technologies were known and understood in the art. Some examples of these known technologies are drug-coated sugar beads, diffusion systems, reservoir systems, enteric coatings, swellable matrices, and wax coatings. A person having ordinary skill in the art would know of all these extended release technologies, because they are taught in basic classes and enumerated in basic textbooks (such as Exhibit 2, a textbook excerpt). All these techniques have been around for many years and used in marketed products. These techniques are used with many different active ingredients.

20.     Many of these known extended release technologies work in a completely different way than the MCC matrix formulation disclosed in the

specification. Such technologies can use different ingredients performing different functions, perform the functions in different ways, and differ in their results.

21.     The specification of the patents-in-suit is completely silent on how to use any other type of extended release technology that was in existence when the applications were filed. Other than the failures described by the inventors, which suggest techniques that will not work, no indication is given of which other extended release technologies will work, if any. There is no indication that the inventors tried any of these other techniques, nor whether the inventors thought some more suitable than others for developing extended release venlafaxine. There is no teaching in the patent that would assist a person of ordinary skill in the art in making any type of extended release formulation other than the MCC matrix formulation. Nor is there any indication that the inventors were in possession of any extended release venlafaxine formulation other than the disclosed MCC matrix formulation.

22.     In contrast to the silence about other known extended release techniques, the patentees do describe a number of example formulations using the MCC matrix formulation. One of skill in the art reading the specification would determine that the patentees were capable of and did develop numerous example formulations, but limited all those examples to the MCC matrix formulation.

23.     I note that the specification ends with an in vitro dissolution study of the MCC formulation of Example 6 and states, "[t]hus, the desired dissolution rates of sustained release dosage forms of venlafaxine hydrochloride, impossible to achieve with hydrogel tablet technology, has been achieved with the film-coated spheroid composition of this invention." '171 Patent, Col. 10, lines 53-57. By reference to Example 6 specifically, I understand the "film coated spheroid" to

be the MCC matrix formulation. Given the context, the inventors only showed achievement with an MCC matrix formulation, not with others.

## UNASSERTED FORMULATION CLAIMS

24.    I have reviewed the formulation claims of the patents-in-suit. Those claims recite only extended release formulations containing venlafaxine hydrochloride, microcrystalline cellulose and, optionally, HPMC. I understand that Wyeth is not asserting any of these formulation claims against Impax. Claim 1 of the '171 patent is representative:

> 1. An extended release formulation of venlafaxine hydrochloride comprising a pharmaceutically acceptable capsule containing spheroids comprised of from about 6% to about 40% venlafaxine hydrochloride by weight, about 50% to about 94% microcrystalline cellulose, NF, by weight, and optionally from about 0.25% to about 1% by weight of hydroxypropyl-methylcellulose, USP, wherein the spheroids are coated with a film coating composition comprised of ethyl cellulose and hydroxypropylmethylcellulose.

'171 Patent, Col. 10, lines 59-67.

25.    In my opinion, this claim recites what the patentees thought they had invented, i.e., a once-a-day venlafaxine extended release formulation containing microcrystalline cellulose and, optionally, HPMC. Claim 1 of the '171 patent expressly limits the extended release formulation to a dosage form containing microcrystalline cellulose and, optionally, HPMC.

26.    Reading the asserted method claims of the patents in the context of the unasserted formulation claims, such as claim 1, and the specification, a person of ordinary skill in the art would understand the claimed methods of treatment to be likewise limited to extended release formulations containing microcrystalline cellulose and, optionally, HPMC. Thus, for the reasons stated above, a person of ordinary skill in the art would read the claims of the patents-in-suit, including the

10

asserted method claims, to recite "extended release formulations" limited to those ingredients.

## TEVA MARKMAN ORDER

27.    Based on my experience and review of the patents and prosecution history, I agree with Judge Martini's Markman Opinion from *Wyeth v. Teva Pharmaceuticals* in the District Court for the District of New Jersey.  That Opinion determined that "extended release formulation" means "a formulation comprising venlafaxine, microcrystalline cellulose, and, optionally, hydroxypropylmethylcellulose coated with a mixture of ethyl cellulose and hydroxypropylmethylcellulose in an amount needed to provide a specific unit dosage administered once-a-day to provide a therapeutic blood plasma level of venlafaxine over the entire 24-hour period of administration."  Judge Martini correctly found that one of ordinary skill in the art would construe this term to include specific ingredients because the patentees used "unequivocal language" to define "extended release formulation" in the specification by their ingredients.

## THERAPEUTIC METABOLISM OF PLURAL DAILY DOSES

28.    I have noted in several of the claims of the patents-in-suit the use of the phrase "therapeutic metabolism of plural daily doses."  Claim 24 is representative:

> 24.    A method for eliminating the troughs and peaks of drug concentration in a patient's blood plasma attending the therapeutic metabolism of plural daily doses of venlafaxine hydrochloride which comprises administering orally to a patient in need thereof, an encapsulated, extended release formulation that provides a peak blood plasma level of venlafaxine in from about 5 to about 8 hours, said formulation containing venlafaxine hydrochloride as the active ingredient.

29.    The phrase "therapeutic metabolism" is unknown to me as a term of art.  While "therapeutic" and "metabolism" each have meanings, the

11

combination of the two words is not commonly used by persons of ordinary skill in the art. I have reviewed the specification and do not find any reference to this term. I reserve the right to comment on this topic further at a later time.

## OVERVIEW OF PROCESS

30.     The process described in the patent specification is known in the art as "extrusion and spheronization." This process creates spheroids having a core composed of an active ingredient mixed with a matrix former/binder. First, the active ingredient is mixed with a matrix former and binder (MCC) and with water to activate the binder and create an elastic mass that has a putty-like texture. Second, this wet, putty-like mass is processed through an "extruder," a machine which presses the material through small holes in a metal plate, creating strands of material – known in the art as "extrudate" – that are shaped like short pieces of spaghetti. Third, the extrudate is placed in a "spheronizer," a machine consisting of a bowl with a grooved, rapidly rotating bottom. In the spheronizer, frictional forces break the extrudate into uniform pieces and rounds them off into spheroids. A coating that slows the dissolution of the spheroids is then applied.

31.     Microcrystalline cellulose in this formulation is both a matrix former and a binder that is especially well-adapted for use in the extrusion and spheronization process, because it is sufficiently elastic to be successfully extruded and sufficiently plastic to be successfully spheronized. The patent suggests that HPMC can be used in conjunction with MCC to manufacture spheroids.

32.

## REDACTED

12

REDACTED

33.

REDACTED

## CONCLUSION

34.     Based on all of the above, a person having ordinary skill in the art would understand the term "extended release formulation" to mean "a formulation comprising venlafaxine, microcrystalline cellulose, and, optionally, hydroxypropylmethylcellulose coated with a mixture of ethyl cellulose and

13

hydroxypropylmethylcellulose in an amount needed to provide a specific unit dosage administered once-a-day to provide a therapeutic blood plasma level of venlafaxine over the entire 24-hour period of administration."

35.    The term "therapeutic metabolism" as used in the claims does not have a clear meaning to one of ordinary skill in the art and is not defined in the specification.

36.    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on this _8_ day of May, 2007 at Wilkes-Barre, Pennsylvania.

Date: _5/8/07_                    By: _Arthur H Kibbe_
                                      Arthur H. Kibbe, Ph.D.

14

394646.04

# EXHIBIT 1

ARTHUR H. KIBBE, Ph.D.
WILKES UNIVERSITY
BOX 111
WILKES-BARRE, PA  18766
(570) 408-4274
(570) 408-7828 fax
kibbe@wilkes.edu

Dr. Kibbe has a Ph.D. in Pharmacokinetics and Biopharmaceutics and a score of years working directly or indirectly with the Pharmaceutical Industry, FDA, Professional and Trade Associations and Academia. Spoke on behalf of the profession of pharmacy before Congress and the regulatory agencies. Organized and conducted successful marketing programs for two contract research organizations. Trained professional pharmacists and pharmaceutical scientists. Investigated the operations of the FDA on behalf of the commissioners. I am currently active representing several major pharmaceutical manufacturers as an expert witness in litigation.

**EXPERIENCE:**

WILKES UNIVERSITY, Wilkes-Barre, PA                                    August 1994 - present
Wilkes University Nesbitt School of Pharmacy, Department of Pharmaceutical Sciences
Chair and Tenured Professor
- Oversaw construction of laboratory and research space in new school
- Directs a science faculty of seven Ph.D.'s.
- Resource consultant to industry on generic drug issues, regulatory affairs, international pharmaceutical manufacture
- Expert witness representing pharmaceutical companies in litigation.
- Editor-in-Chief, *Handbook of Pharmaceutical Excipients, 3rd Edition*
- Consultant to Commerce Committee, United States Congress
- Co-chair, Core Curriculum Development Committee
- Serves as Chair of Governor's Renal Disease Advisory Panel
- Member of the Food and Drug Administration's Scientific Advisory Committee; Chair since 2002
- Developed a new BS in Pharmaceutical Sciences

PHARMAKON RESEARCH INTERNATIONAL, INC., Waverly, Pa          1992-1994
Director of Marketing
- Developed all promotional materials, slide presentations and brochures
- Developed and implemented sales and promotion strategies that resulted in continued revenue and profit growth
- Evaluated the market, established market segments, and recommended marketing strategies for each segment
- Initiated Japanese Market Plan designed to penetrate that valuable market

1

AMERICAN PHARMACEUTICAL ASSOCIATION, Washington, DC    1987 - 1992
Senior Director of Professional and Scientific Affairs
- Developed and managed symposium on scientific issues
- Developed policy statements on scientific issues that impacted both pharmaceutical scientist and professional pharmacists
- Represented Association before Congress, FDA and EPA
- Managed 10 professional staff including-the Directors of Scientific Affairs, International Affairs, Professional Affairs, Student Affairs, Government Affairs and Policy
- Managed Journal of Pharmaceutical Science
- Scientific Consultant to the House of Representative's Committee on Energy and Commerce, Subcommittee on Oversight and Investigations, as part of its review of the generic drug industry practices and the FDA's generic drug review activities
- Member of the FDA's Generic Drug Advisory Committee
- Chairman of a special panel appointed by the FDA Commissioner to investigate Fairness in the Generic Drug Approval Process, which resulted in the "Kibbe Report"

BIORESEARCH LABORATORIES LTD., Montreal, Quebec, Canada    1985 to 1987
Director of Client Services
- Managed protocol development, negotiated contracts and prices.
- Directed all the marketing and sales efforts.
- Responsible for highest division revenue and profit levels either before or since.

NATIONAL INSTITUTES OF HEALTH, Bethesda, MD    1984 to 1985
Chief of Pharmaceutical Development Services
- Directed a staff of 15 scientists
- Developed delivery systems for Phase I clinical trials.
- Controlled the use of all investigational drugs in the NIH intramural program
- Provided pharmacokinetics and analytical support for NIH intramural clinical research program.

SCHOOL OF PHARMACY, UNIVERSITY OF MISSISSIPPI, Oxford, MS    1972 to 1984
Professor of Pharmaceutics
- Taught undergraduate and graduate level courses in formulation design and development, pharmacokinetics and physical chemistry of heterogeneous systems.
- Conducted research in the areas of formulation development, pharmacokinetics of drugs of abuse, bioequivalency evaluations and impact of formulation changes on bioavailability.
- Conducted research into the effectiveness of different teaching techniques on short term recall.
- Funded by the National Institutes of Health and the Pharmaceutical Industry.
- Provided Continuing Education Symposia to the Profession of Pharmacy.

2

- Produced over 30 publications in refereed Journals and many essays and articles in the professional press.

U.S. ARMY, Leavenworth, KS                                              1969 to 1970
Pharmacist/Director of Pharmacy Services

- Pharmacist at a 150 bed army hospital.
- Supervised two pharmacist and three technical support staff.
- Reached rank of E-5 in 11 months after induction.
- Advised the post commander on how to control drug abuse problems.

**EDUCATION:**

Ph.D., Pharmacy-Pharmacokinetics - 1973
University of Florida, Gainesville, Florida
M.S. Pharmacy- 1968
University of Florida, Gainesville, Florida
B.S. Pharmacy- 1966
Columbia University, New York, New York

**PUBLICATIONS IN PEER REVIEW SCIENTIFIC JOURNALS:**

Kibbe, A.H. and Araujo, O.E., "Nuclear Magnetic Resonance and Rheological Studies of the Thixotropic Properties of Montmorillonite-Water Systems", J. Pharm Sci., 58: (1969).

Kibbe, A.H. and Araujo, O.E., "Rapid Quantitative Determination of Digoxin on the Gas Chromatograph", I. Pharm. Sci., 62: 1703-1705 (1973).

Kibbe, A.H. and Wilson, M.C., "Pharmacokinetics of Cocaine in the Rhesus Monkey", Ih Pharmacologist, 18: 158 (1976).

Wilson, M.C. and Kibbe, A.H., "Correlation Between Blood Levels and Acute Pharmacological Effects of Cocaine in the Rhesus Monkey", Federation Proceeding, 35: 506 (1976).

Bedford, J.A., Kibbe, A.H. and Wilson, M.C., "Chronic Intravenous Dosing and Blood Collection in the Unanesthetized Monkey", Pharm. Biochem. Behave., 6: 601 (1977).

Borne, R.F., Bedford, J.A., Craig, C.B., Hardin, T.C., Kibbe, A.H. and Wilson, M.C., "Biological Effects of Cocaine Derivatives I: Synthesis and Brief Pharmacological Evaluation of Norcocaine", J. Pharm. Sci., 66: 119 (1977).

Kibbe, A.H., Bedford, I.A., Borne, R.F. and Wilson, M.C., "Biological Effects of Cocaine Derivatives II: Pharmacological Evaluation of N-Allyl Norcocaine in Cynomolgus Monkeys", Pharm. Res. Comm., 9: 367-374 (1977).

3

Wilson, M.C., Bedford, J.A., Kibbe, A.H. and Sam, J.A., "Comparative Pharmacology of Norcocaine in M. Mulatta and M. Fascicularis", Pharmacology Biochemistry & Behavior, 9: 141-145 (1978).

Kibbe, A.H. and Maginnis, P.T., "An Evaluation of a Model for the Study of the Effects of Aerobic Exercise on Atherosclerosis", Proceeding of the Southeastern Pharmacology Society, 1: 21 (1980).

Chambliss, W.G., Cleary, R.W., Fischer, R.G., Jones, A.B., Skierkowski, P. and Kibbe, A.H., "The Effect of Docusate Sodium on Drug Release from a Controlled Release Dosage Form", L Pharm. Sci., 70: 11 (1981).

Fischer, R.G., Kibbe, A.H., Nicholas, W.C., Sbravati, C. and Read, V.H., "Equivalence of Various Levothyroxine Preparations", The Journal of Family Practice, 14: 591 (1981).

Abidi, S.E., Kibbe, A.H., Cleary, R.W., Jones, A.B. and Harland, E.C., "Pharmacokinetic Interactions of Tolazamide and Oxyphenbutazone in Dogs", J. Pharm. Sci., 71: 1 (1982).

Fischer, R.G., Booth, B.H., Mitchell, D.Q. and Kibbe, A.H., "Influence of the Trivalent Influenza Virus Vaccine on Serum Theophylline Levels", Journal of the Canadian Medical Association, CMA Journal, 126: 1312 (1982).

Beasley, M.W., Skierkowski, P., Cleary, R.W., Kibbe, A.H. and Jones, A.B., "A Comparison of HPLC and RIA in the Determination of Content Uniformity of Digoxin Tablets", J. Pharm. Sci, 72:5 505-509 (1983).

Chambliss, W.G., Chambliss, D.A., Cleary, R.W., Jones, A.B., Harland, E.C. and Kibbe, A.H., "Development and Evaluation of Enteric Coated Penicillamine Tablets", J. Pharm. Sci., (1983).

Hunsinger, R.N., Kibbe, A.H. and Wilson, M.C., "The Effect of Previous d-Amphetamine Treatment on the Disposition and Lethality of Fenfluramine in the Rat", Toxicology and Applied Pharmacology, (1984).

Silva, B.O., Cleary, R.W., ElSohly, M.A., Jones, A.B. and Kibbe, A.H., "Kinetic Study of Hydrolysis of N-Methyl Glucarnine Salt of 8-Tetrahydrocannabinol Hemisuccinate in SemiAqueous Solvent", J. Pharm. Sci., 73:6 420425 (1984).

Smith, M.C., Kibbe, A.H. and Brown, T.R., "Dermatologic Prescriptions Requiring Compounding", J. Am. Acad. Dermatol, II: 148-151 (1984).

Farber, M.S., Greene, R.F., Kibbe, A.H. and Gallelli, J.F., "Morphine Compatibility with Drugs Commonly Used in Patients Receiving Morphine Continuous Infusion", American Journal of Hospital Pharmacy, (1985).

Viegas, T.X., Kibbe, A.H., Hikal, A.H., Clear, R.W. and Jones, A.B., "An in vitro Method of Evaluating Talnaflate Release from Topical Powder", Pharmaceutical Research, 3: 88-92 (1986).

4

Kibbe, A.H. "Generic Drugs and Generic Equivalency" chapter in Encyclopedia of Pharmaceutical Technology, 2nd Edition Editors Swarbrick, J. and Boylan J.C., Marcel Dekker.(1999)

Kibbe, A.H. Editor-n-Chief and Contributing author, Handbook of Pharmaceutical Excipients, 3rd Edition, monographs on Benzalkonium Chloride, pg. 33; Crospovidone, pg. 163; Fructose, pg. 210; Guar Gum, pg. 233; Lactose, pg. 276; Mineral Oil and Lanolin Alcohols, pg. 349; Paraffin, pg. 358; Peanut Oil, pg. 361; Povidone, pg. 433; Sodium Starch Glycolate, pg. 501; Starch, pg. 523; Sucrose, pg. 539; Sugar, confectioner's, pg. 546; Talc, pg. 555; Thimerosal, pg. 562; Wax, microcrystalline, pg. 591; Wax, white, pg. 595; Wax, yellow, pg. 597; 2000.

Kibbe, A.H. "Generic Drugs and Generic Equivalency" chapter in Encyclopedia of Pharmaceutical Technology, 3nd Edition Editors Swarbrick, J. and Boylan J.C., Marcel Dekker.(2001)

Kibbe, A.H. Contributing author, Handbook of Pharmaceutical Excipients, 4th Edition, monographs on Benzalkonium Chloride, pg. 45; Crospovidone, pg. 185; Guar Gum, pg. 271; Lactose, pg. 323; Mineral Oil and Lanolin Alcohols, pg. 400; Paraffin, pg. 417; Peanut Oil, pg. 419; Potassium Hydroxide, pg 502; Povidone, pg. 508; Sodium Hydroxide, pg 566; Sugar, confectioner's, pg. 628; Talc, pg. 641; Thimerosal, pg. 648; Wax, microcrystalline, pg. 683; Wax, white, pg. 687; Wax, yellow, pg. 689; 2003.

**PUBLICATIONS IN PROFESSIONAL JOURNALS:**

Schondelmeyer, S.W., Mason, H.L., Schafermeyer, K.W. and Kibbe, A.H., "Pharmacists' Compensation and Work Patterns: Overview of 1988 National Survey", American Pharmacy, 29:11 25-30 (1989).

Schondelmeyer, S.W., Mason, H.L., Schafermeyer, K.W. and Kibbe, A.H., "Final Report of the National Pharmacists' Compensation Survey: 1988", American Pharmaceutical Association.

Kibbe, A.H., "Successful Supervision: Using Interpersonal Skills", American Pharmacy, 29:12 23-26 (1989).

Kibbe, A.H., "A Prescription for Disaster", American Pharmacy, 30:7 (1990).

Kibbe, A.H., "Generic Drug Industry Under Attack", Florida Pharmacy Today, 55: 1 6-9 (1990).

Kibbe, A.H., "Generic Drug Industry Under Attack", The Kentucky Pharmacy, 54-57 (1990).

Kibbe, A.H., "Generic Drug Industry Under Attack", J. of Mississippi Pharmacists Association, May/June 15-19 (1990).

Kibbe, A.H., Kopf, J.A., Zarembo, J.E., "Fairness in the Food and Drug Administration's Generic Drugs Program, April 1991

Kibbe, A.H., Weaver, L.C., "Generic Drugs and Generic Equivalency" chapter in Encyclopedia of Pharmaceutical Technology Editors Swarbrick, J. and Boylan J.C., Marcel Dekker.(1993)

Schondelmeyer, S.W., Mason, H.L., and Kibbe, A.H., "Pharmacists' Compensation and Work Patterns: Overview of the 1990-91 Survey" American Pharmacy, 32:1 (1992).

Schondelmeyer, S.W., Mason, H.L., Kibbe, A.H., "Final Report of the National Pharmacists' Compensation Survey: 1990-91" American Pharmaceutical Association.

Kibbe, A.H. Contributing author, NDA Pipeline, 1994, Published in 1995.

Kibbe, A.H. Nationally reprinted editorial on the FDA approval process, various newspapers, Fall, 1995.

Kibbe, A.H. Quoted in New York Times article on the importation of drug products and the Food and Drug Administrations oversight, October, 1995.

Kibbe, A.H. Invited article, commentary on the GAO report on International Drug Classification Systems, GAO Report on Need for a Third Class: "Prove It", Journal of the American Pharmaceutical Association, 35:48 Fall, 1995.


**PRESENTATIONS:**

Wilson, M.C. and Kibbe, A.H., "Correlation Between Blood Levels and Acute Pharmacological Effects of Cocaine in the Rhesus Monkey". Presented at the FASEB meeting in Anaheim, California, 1976.

Kibbe, A.H. and Wilson, M.C., "Pharmacokinetics of Cocaine in the Rhesus Monkey". Presented at the Fall ASPET meeting, New Orleans, Louisiana, 1976.

Kibbe, A.H. and Burdock, N., "An Evaluation of the Five Minute Quiz in Teaching Pharmacy Calculations". Presented at the Fall AACP meeting, 1976.

Kibbe, A.H., Bedford, J.A., Borne, R.F. and Wilson, M.C., "Pharmacological Evaluation of N-Allyl-Norcocaine in the Cynomolgus Monkey". Presented at Academy of Pharmaceutical Science Meeting, Orlando, Florida, November, 1976.

Kibbe, A.H. and Maginnis, P.T., "An Evaluation of Model for the Study of the Effects of Aerobic Exercise on Atherosclerosis". Presented at the first annual meeting of the Southeastern Pharmacology Society, Fall, 1980.

Kibbe, A.H., Chambliss, W.G., Fischer, R.G. and Scott, L.S., "Zomepirac Pharmacokinetics in Renal Failure Patients". Presented at the Academy of Pharmaceutical Science Meeting, April, 1982.

Beasley, M.W., Skierkowski, P., Cleary, R.W., Kibbe, A.H. and Jones, A.B., "A Comparison of HPLC and RIA in the Determination of Content Uniformity of Digoxin Tablets". Presented at the Academy of Pharmaceutical Sciences Meeting, April, 1982.

Hunsinger, R.N., Kibbe, A.H. and Wilson, M.C., "Subacute d-Amphetamine (AM) Treatment Enhances Fenfluramine (FN) Lethality in Rats". Presented ASPET/SOT, 1982.

Murphy, J.C., Kibbe, A.H., Ma, G.E., ElSohly, M.A. and Walker, L.A., "Effects of Marijuana Smoke on Cocaine Pharmacokinetics in Rats". Presented at the Southeastern Pharmacological Society Meeting, October, 1982.

Quintana, B.A., Cleary, R.W., Kibbe, A.H., Skierkowski, P. and Jones, A.B., "The Degradation of Ethylene Oxide in the Presence of Chloride Ion in Aqueous Media at pH 7.4". Presented at the Academy of Pharmaceutical Science Meeting, April, 1983.

Silva, B.O., Cleary, R.W., ElSohly, M.A., Jones, A.B. and Kibbe, A.H., "Kinetic Study of Hydrolysis of N-Methyl Glucamine Salt of 8-Tetrahydrocannabinol Hemisuccinate in SemiAqueous Solvent". Presented at the Academy of Pharmaceutical Science Meeting, April, 1983.

Bowers, C.J., Anderson, E.R. and Kibbe, A.H., "The Effects of Potassium and Magnesium Salt of Aspartic Acid on Strength, Endurance, Anthropometric, Measurements, and Body Composition of Male College Age Advance Weight Lifters". Presented at the Southern District American Alliance of HPERD, Biloxi, MS, February, 1984.

Kibbe, A.H., Anslow, J., Bohaychuk, W., Dabrowski, J., Faulkner, B., Silber, B.M. and Woodward, D., "Pharmacokinetics of Cefixine on the Fasted and Fed State". Presented at the l5th International Congress of Chemotherapy, Elmadag, Istanbul, Turkey, July, 1987.

Kibbe, A.H., "The Scientific & Professional Aspects of the Generic Drug Issue". Presented at the national meeting of the National Council for Prescription Drug Programs (NCPDP), Scottsdale, AZ, February, 1990.

Kibbe, A.H., "Generic Drugs: A Scientific and Professional Perspective". Presented at the Thirty-Fifth Annual Ohio Pharmaceutical Seminar, Columbus, OH, April, 1990.

Kibbe, A.H., Kopf, J.A., Zarembo, J.E., Testimony before Congress. Fairness in the Food and Drug Administration's Generic Drugs Program, Washington, D.C., June, 1991.

Kibbe, A.H. The Drug Approval Process - The Food and Drug Administration. Changing for the Future. Presented to Pharmacy Associations in Harrisburg and Wilkes-Barre, 1995.

Kibbe, A.H.,Testimony before Congress: Subcommittee on Oversight and Investigations of the Committee on Commerce House of Representatives. U.S. Government Printing Office, Washington, D.C. Serial No. 104-23, pg. 138. June 19, 1995.

Kibbe A.H. Chair and keynote address "Pharmaceutical Excipients" Philadelphia, PA June 27 & 28 , 2002

Kibbe A.H. Chair and keynote address "Pharmaceutical Excipients" Philadelphia, PA June 26 & 27 , 2003

Kibbe, A. H., "Rheology" Food and Drug Administration educational presentation, June 19, 2003

Kibbe, A.H. Heterogeneous Systems – Nomenclature and Preparation Food and Drug Administration presentation at June 2004

**PUBLISHED BOOKS**

Editor-in-Chief, Handbook of Pharmaceutical Excipients, 3rd Edition, published jointly by Royal Pharmaceutical Society of Great Britain and American Pharmaceutical Association, 2000

**ACADEMIC GRANTS AND CONTRACTS:**

"A Study of Biopharmaceutical Parameters Associated with Cocaine Blood Level in Primates After Self-Injection", Committee on Faculty Research of the Graduate School, University of Mississippi; Sum $4,000.
"Pharmacodynamics of Stimulant Self-Administration", PYSlROIDA01002; Sum $87,892 by NIDA.

"Pharmacokinetics and Metabolism of HP 549 After Three Different Single Oral Doses to Normal Adult Males"; Sum $16,000 by Hoechst-Roussel.

"Pharmacokinetics and Metabolism of HP 549 After Antacid Therapy"; Sum $12,000 by Hoechst-Roussel .

**EDITORIAL AND REVIEW ACTIVITIES:**

Editor-in-Chief, Handbook of Pharmaceutical Excipients, 3rd Edition

Reviewer, Journal of Pharmaceutical Science  (Present)

Reviewer, Journal of American Pharmaceutical Association  (Present)

Consulting Editor, NDA Pipeline, 1994-1995

Editorial Review Panel, Journal of Drug Development and Industrial Pharmacy (Present)

**LEGAL CONSULTING ACTIVITY/ EXPERT WITNESS**

8

Civil Action 95-1378 (PG) Upjohn v Mova Pharmaceutical Corp
For Upjohn – Deposed and Testified (1997-1998)
Law Firm: Kay Scholer, Fierman, Hays & Handler; 425 Park Avenue, NY, NY 10022-3598

Civil Action 97-C-3992; Pharmacia & Upjohn Co. v. Novopharm Ltd
For Pharmacia - Deposed  Case Filed in Illinois
Law Firm: Kay, Scholer, Fierman, Hays & Handler; 425 Park Avenue, NY, NY 10022-3598

Civil Action 01 CV 5572 (SHS) Bristol-Myers Squibb Co. and E.R. Squibb & Sons, LLC v.
Teva Pharmaceutical USA, Inc
For Teval Pharmaceuticals USA, Inc – Deposed and Testified ( 2003 - 2004)
Law Firm: Goodwin Procter LLP 599 Lexington Avenue, NY, NY 10022

Civil Action 00-CV-1439 & 01-CV-0009(JWB)(GDH), Schering Corporation v. Andrex
Corporation & Impax Laboratories
For Andrex & Impax – Deposed (2004)
Law Firms:Venable, Baetjer, Howard & Civiletti, LLP, 1201 New York Avenue, Washington,
DC 20005-3917 and
Hedman & Costigan, P.C. 1185 Avenue of the Americas, NY, NY 10036-2646

Civil Action 03-CV-1164 GMS,  Shire Laboratories v. Impax Laboratories
For Impax – Deposed 2005
Law Firm Kenyon & Kenyon LLP,  1500 K Street NW, Washington DC 20005-1257

Civil Action 03-120-KAJ, Abbott Laboratories, Fournier Industrie et Sante and Laboratories
Fournier SA v. Impax Laboratories, Inc.
For Impax – Deposed 2005
Law Firm Kenyon and Kenyon LLP,  1500 K Street NW, Washington DC 20005-1257

Civil Action 05 C 1490 (N.D.Ill) Abbott Labs Inc. v. Andrx Pharms Inc., et.al
For Andrx Deposed August 2005
Law Firm Hedman & Costigan, P.C. 1185 Avenue of the Americas, NY, NY 10036-2646

Civil Action 03-2854 DWF/SRN Solvay Pharma v Global Pharma
For Global Deposed 2005
Law Firm Venable LLP, Washington DC 20005

Civil Action 05 CV 1085 Biovail Lab. Inter. SRL v Impax Lab. Inc.
For Impax Deposed March 2006
Law Firm Goodwin Procter, Exchange Place, Boston MA 02109

Civil Action 05-CV-39(M.D.N.C.) Pfizer v Synthon Lab. Inc., et.a;.
For Synthon
Deposed and Testified 2006
Law Firm, Kenyon & Kenyon LLP, 1500 K Street, Washington, DC 20005-1257

9

**HONORS:**

Fellow of the Academy of Pharmaceutical Research and Science - 1994

Member of Rho Chi - A Pharmacy Scholarship Fraternity - 1972

Outstanding Professor of the Year - University of Mississippi School of Pharmacy - 1978

Outstanding Faculty, School of Pharmacy - Wilkes University, 1996, 2001

# EXHIBIT 2

# 19TH
## EDITION

# Remington: Practice of

**ALFONSO   R   GENNARO**

*Chairman of the Editorial Board
and Editor*

# The Science and Pharmacy

**1995**

**MACK   PUBLISHING   COMPANY**
**Easton, Pennsylvania 18042**

CHAPTER 94

# Sustained-Release Drug Delivery Systems

**Charles S L Chiao, PhD**
Ando 3R Pharmaceuticals, Inc
Davie, FL 33314

**Joseph R Robinson, PhD**
Professor of Pharmacy
School of Pharmacy
University of Wisconsin
Madison, WI 53706

The goal of any drug delivery system is to provide a therapeutic amount of drug to the proper site in the body to achieve promptly, and then maintain, the desired drug concentration. That is, the drug-delivery system should deliver drug at a rate dictated by the needs of the body over the period of treatment. This idealized objective points to the two aspects most important to drug delivery, namely, *spatial placement* and *temporal delivery* of a drug. Spatial placement relates to targeting a drug to a specific organ or tissue, while temporal delivery refers to controlling the rate of drug delivery to the target tissue. An appropriately designed sustained-release drug delivery system can be a major advance toward solving these two problems. It is for this reason that the science and technology responsible for development of sustained-release pharmaceuticals have been and continue to be the focus of a great deal of attention in both industrial and academic laboratories. There currently exist numerous products on the market formulated for both oral and parenteral routes of administration that claim sustained or controlled drug delivery. The bulk of research has been directed at oral dosage forms that satisfy the temporal aspect of drug delivery, but many of the newer approaches under investigation may allow for spatial placement as well. This chapter will define and explain the nature of sustained-release drug therapy, briefly outline relevant physicochemical and biological properties of a drug that affect sustained-release performance and review the more common types of oral and parenteral sustained-release dosage forms. In addition, a brief discussion of some methods currently being used to develop targeted delivery systems will be presented.

## Conventional Drug Therapy

To gain an appreciation for the value of sustained release therapy it is useful to review some fundamental aspects of conventional drug delivery.[1] Consider single dosing of a hypothetical drug that follows a simple one-compartment pharmacokinetic model for disposition. Depending on the route of administration, a conventional dosage form of the drug, eg, a solution, suspension, capsule, tablet, etc, probably will produce a drug blood level versus time profile similar to that shown in Fig 1. The term "drug blood level" refers to the concentration of drug in blood or plasma, but the concentration in any tissue could be plotted on the ordinate. It can be seen from this figure that administration of a drug by either intravenous injection or an extravascular route, eg, orally, intramuscularly or rectally, does not maintain drug blood levels within the therapeutic range for extended periods of time. The short duration of action is due to the inability of conventional dosage forms to control temporal delivery. If an attempt is made to maintain drug blood levels in the therapeutic range for longer periods by, for example, increasing the initial dose of an intravenous injection, as shown by the dotted line in the figure, toxic levels may be produced at early times. This approach obviously is undesirable and unsuitable. An alternate approach is to administer the drug repetitively using a constant dosing interval, as in multiple-dose therapy. This is shown in Fig 2 for the oral route. In this case the drug blood level reached and the time required to reach that level depend on the dose and the dosing interval. There are several potential problems inherent in multiple-dose therapy:

1. If the dosing interval is not appropriate for the biological half-life of the drug, large "peaks" and "valleys" in the drug blood level may result. For example, drugs with short half-lives require frequent dosings to maintain constant therapeutic levels.

2. The drug blood level may not be within the therapeutic range at sufficiently early times, an important consideration for certain disease states.

3. Patient noncompliance with the multiple-dosing regimen can result in failure of this approach.

In many instances, potential problems associated with conventional drug therapy can be overcome. When this is the case, drugs given in conventional dosage forms by multiple-dosing can produce the desired drug blood level for extended periods of time. Frequently, however, these problems are significant enough to make drug therapy with conventional dosage forms less desirable than sustained-release drug therapy. This fact, coupled with the intrinsic inability of conventional dosage forms to achieve spatial placement, is a compelling motive for investigation of sustained-release drug delivery systems. There are numerous potential advantages of sustained-release drug therapy that will be discussed in the next section.

## Sustained-Release Drug Therapy

As already mentioned, conventional dosage forms include solutions, suspensions, capsules, tablets, emulsions, aerosols, foams, ointments and suppositories. For this discussion, these dosage forms can be considered to release their active ingredients into an absorption pool immediately. This is illustrated in the following simple kinetic scheme:

$$\text{Dosage Form} \xrightarrow[\text{drug release}]{k_r} \text{Absorption Pool} \xrightarrow[\text{absorption}]{k_a} \text{Target Area} \xrightarrow[\text{elimination}]{k_e}$$

The absorption pool represents a solution of the drug at the site of absorption, and the terms $k_r$, $k_a$ and $k_e$ are first-order rate constants for drug release, absorption and overall elimination, respectively. Immediate release from a conventional dosage form implies that $k_r \ggg k_a$ or, alternatively, that absorption of drug across a biological membrane, such as the intestinal epithelium, is the rate-limiting step in delivery of the drug to its target area. For nonimmediate-release dosage forms, $k_r \lll k_a$, that is, release of drug from the dosage form is the rate-limiting step. This causes the above kinetic scheme to reduce to

$$\text{Dosage Form} \xrightarrow[\text{drug release}]{k_r} \text{Target Area} \xrightarrow[\text{elimination}]{k_e}$$

Essentially, the absorptive phase of the kinetic scheme becomes insignificant compared to the drug release phase. Thus, the effort to develop a nonimmediate-release delivery



Fig 1. Typical drug blood level versus time profiles for intravenous injections and an extravascular route of administration.



Fig 3. Typical drug blood level versus time profiles for delayed-release drug delivery by a repeat-action dosage form.

system must be directed primarily at altering the release rate by affecting the value of $k_r$. The many ways in which this has been attempted will be discussed later in this chapter.

Nonimmediate-release delivery systems may be divided conveniently into four categories:

1. Delayed release
2. Sustained release
   a. Controlled release
   b. Prolonged release
3. Site-specific release
4. Receptor release

*Delayed-release* systems are those that use repetitive, intermittent dosings of a drug from one or more immediate-release units incorporated into a single dosage form. Examples of delayed-release systems include repeat-action tablets and capsules, and enteric-coated tablets where timed release is achieved by a barrier coating. A delayed-release dosage form does not produce or maintain uniform drug blood levels within the therapeutic range, as shown in Fig 3, but, nonetheless, is more effective for patient compliance than conventional dosage forms.

*Sustained-release* systems include any drug delivery system that achieves slow release of drug over an extended period of time. If the systems can provide some control, whether this be of a temporal or spatial nature, or both, of drug release in the body, or in other words, the system is successful at maintaining constant drug levels in the target tissue or cells, it is considered a *controlled-release* system. If it is unsuccessful at this, but nevertheless prolongs therapeutic blood or tissue level of the drug for an extended period of time, it is considered a *prolonged-release* system. This is illustrated in Fig 4.

*Site-specific* and *receptor release* refer to targeting of a drug directly to a certain biological location. In the case of site-specific release, the target is adjacent to, or in the diseased organ or tissue; for receptor release, the target is the particular receptor for a drug within an organ or tissue. Both of these systems satisfy the spatial aspect of drug delivery.

*Release Rate and Dose Considerations[2]*

Although it is not necessary or desirable to maintain a constant level of drug in the blood or target tissue for all therapeutic cases, this is the ideal goal of a sustained-release delivery system. In fact, in some cases optimum therapy is achieved by oscillating, rather than constant, drug levels. An example of this is antibiotic therapy, where the activity of the drug is required only during growth phases of the microorganism. A constant drug level will succeed at curing or controlling the condition, however, and this is true for most forms of therapy.

The objective in designing a sustained-release system is to deliver drug at a rate necessary to achieve and maintain a constant drug blood level. This rate should be analogous to that achieved by continuous intravenous infusion where a drug is provided to the patient at a constant rate just equal to its rate of elimination. This implies that the rate of delivery must be independent of the amount of drug remaining in the dosage form and constant over time. That is, release from the dosage form should follow *zero-order* kinetics, as shown by

$$k_r^0 = \text{Rate In} = \text{Rate Out} = k_e \cdot C_d \cdot V_d \quad (1)$$

where $k_r^0$ is the zero-order rate constant for drug release (amount/time), $k_e$ is the first-order rate constant for overall drug elimination (time⁻¹), $C_d$ is the desired drug level in the body (amount/volume) and $V_d$ is the volume space in which the drug is distributed. The values of $k_e$, $C_d$ and $V_d$ needed to calculate $k_r^0$ are obtained from appropriately designed single-dose pharmacokinetic studies. Equation 1 provides the method to calculate the zero-order release rate constant necessary to maintain a constant drug blood or tissue level for the simplest case where drug is eliminated by first-order kinetics. For many drugs, however, more complex elimination kinetics and other factors affecting their disposition are involved. This in turn affects the nature of the release kinetics necessary to maintain a constant drug blood level. It is important to recognize that while zero-order release may be desirable theo-



Fig 2. Typical drug blood level versus time profile following oral multiple-dose therapy.



Fig 4. Drug blood level versus time profiles showing the relationship between controlled-release (A), prolonged-release (B) and conventional-release (C) drug delivery.

retically, nonzero-order release may be equivalent clinically to constant release in many cases. Aside from the extent of intra- and intersubject variation is the observation that, for many drugs, modest changes in drug tissue levels do not result in an improvement in clinical performance. Thus, a nonconstant drug level may be indistinguishable clinically from a constant drug level.

To achieve a therapeutic level promptly and sustain the level for a given period of time, the dosage form generally consists of two parts: an initial priming dose, $D_i$, that releases drug immediately and a maintenance or sustaining dose, $D_m$. The total dose, $W$, thus required for the system is

$$W = D_i + D_m \qquad (2)$$

For a system where the maintenance dose releases drug by a zero-order process for a specified period of time, the total dose[2] is

$$W = D_i + k_r^0 T_d \qquad (3)$$

where $k_r^0$ is the zero-order rate constant for drug release and $T_d$ is the total time desired for sustained release from one dose. If the maintenance dose begins the release of drug at the time of dosing ($t = 0$), it will add to that which is provided by the initial dose, thus increasing the initial drug level. In this case a correction factor is needed to account for the added drug from the maintenance dose:

$$W = D_i + k_r^0 T_d - k_r^0 T_p \qquad (4)$$

The correction factor, $k_r^0 T_p$, is the amount of drug provided during the period from $t = 0$ to the time of the peak drug level, $T_p$. No correction factor is needed if the dosage form is constructed in such a fashion that the maintenance dose does not begin to release drug until time $T_p$.

It already has been mentioned that a perfectly invariant drug blood or tissue level versus time profile is the ideal goal of a sustained-release system. The way to achieve this, in the simplest case, is by use of a maintenance dose that releases its drug by zero-order kinetics. However, satisfactory approximations of a constant drug level can be obtained by suitable combinations of the initial dose and a maintenance dose that releases its drug by a first-order process. The total dose for such a system is

$$W = D_i + (k_e C_d / k_r) V_d \qquad (5)$$

where $k_r$ is the first-order rate constant for drug release (time$^{-1}$), and $k_e$, $C_d$ and $V_d$ are as defined previously. If the maintenance dose begins releasing drug at $t = 0$, a correction factor is required just as it was in the zero-order case. The correct expression for this case is

$$W = D_i + (k_e C_d / k_r) V_d - D_m k_e T_p \qquad (6)$$

In order to maintain drug blood levels within the therapeutic range over the entire time course of therapy, most sustained-release drug delivery systems are, like conventional dosage forms, administered as multiple rather than single doses. For an ideal sustained-release system that releases drug by zero-order kinetics, the multiple dosing regimen is analogous to that used for a constant intravenous infusion, as discussed in Chapter 42. For those sustained-release systems having release kinetics other than zero-order, the multiple dosing regimen is more complex and its analysis is beyond the scope of this chapter; Welling and Dobrinska[3] provide more detailed discussion.

## Potential Advantages of Sustained Drug Therapy

All sustained-release products share the common goal of improving drug therapy over that achieved with their nonsustained counterparts. This improvement in drug therapy is represented by several potential advantages of the use of sustained-release systems, as shown in Table 1.

Patient compliance has been recognized as a necessary and important component in the success of all self-administered

### Table 1—Potential Advantages of Sustained Drug Therapy

1. Avoid patient compliance problems
2. Employ less total drug
   a. Minimize or eliminate local side effects
   b. Minimize or eliminate systemic side effects
   c. Obtain less potentiation or reduction in drug activity with chronic use
   d. Minimize drug accumulation with chronic dosing
3. Improve efficiency in treatment
   a. Cure or control condition more promptly
   b. Improve control of condition, ie, reduce fluctuation in drug level
   c. Improve bioavailability of some drugs
   d. Make use of special effects, eg, sustained-release aspirin for morning relief of arthritis by dosing before bedtime
4. Economy

drug therapy. Minimizing or eliminating patient compliance problems is an obvious advantage of sustained-release therapy. Because of the nature of its release kinetics, a sustained-release system should be able to use less total drug over the time course of therapy than a conventional preparation. The advantages of this are a decrease or elimination of both local and systemic side effects, less potentiation or reduction in drug activity with chronic use and minimization of drug accumulation in body tissues with chronic dosing.

Unquestionably the most important reason for sustained-drug therapy is improved efficiency in treatment, ie, optimized therapy. The result of obtaining constant drug blood levels from a sustained-release system is to achieve promptly the desired effect and maintain it for an extended period of time. Reduction or elimination of fluctuations in the drug blood level allows better disease state management. In addition, the method by which sustained release is achieved can improve the bioavailability of some drugs. For example, drugs susceptible to enzymatic inactivation or bacterial decomposition can be protected by encapsulation in polymer systems suitable for sustained release. For drugs that have a "specific window" for absorption, increased bioavailability can be attained by localizing the sustained-release delivery system in certain regions of the gastrointestinal tract. Improved efficiency in treatment also can take the form of a special therapeutic effect not possible with a conventional dosage form (see Table 1).

The last potential advantage listed in Table 1, that of economy, can be examined from two points of view. Although the initial unit cost of most sustained-drug delivery systems usually is greater than that of conventional dosage forms because of the special nature of these products, the average cost of treatment over an extended time period may be less. Economy also may result from a decrease in nursing time/hospitalization, less lost work time, etc.

## Drug Properties Relevant to Sustained-Release Formulation

The design of sustained-release delivery systems is subject to several variables of considerable importance. Among these are the route of drug delivery, the type of delivery system, the disease being treated, the patient, the length of therapy and the properties of the drug. Each of these variables are interrelated and this imposes certain constraints upon choices for the route of delivery, the design of the delivery system and the length of therapy. Of particular interest to the scientist designing the system are the constraints imposed by the properties of the drug. It is these properties that have the greatest effect on the behavior of the drug in the delivery system and in the body. For the purpose of discussion, it is convenient to describe the properties of a drug as being either physicochemical or biological. Obviously, there is no clearcut distinction between these two categories since the biological properties of a drug are a function of its physicochemical properties. For purposes of this discussion, however, those attributes that

can be determined from *in vitro* experiments will be considered as physicochemical properties. Included as biological properties will be those that result from typical pharmacokinetic studies on the absorption, distribution, metabolism and excretion (ADME) characteristics of a drug and those resulting from pharmacological studies.

### Physicochemical Properties

**Aqueous Solubility and pK$_a$**—It is well known that in order for a drug to be absorbed it first must dissolve in the aqueous phase surrounding the site of administration and then partition into the absorbing membrane. Two of the most important physicochemical properties of a drug that influence its absorptive behavior are its aqueous solubility and, if it is a weak acid or base (as are most drugs), its pK$_a$. These properties play an influential role in performance of nonsustained-release products; their role is even greater in sustained-release systems.

The aqueous solubility of a drug influences its dissolution rate, which in turn establishes its concentration in solution and hence the driving force for diffusion across membranes. Dissolution rate is related to aqueous solubility as shown by the Noyes-Whitney equation, under sink conditions, is

$$dC/dt = k_D A C_s \qquad (7)$$

where $dC/dt$ is the dissolution rate, $k_D$ is the dissolution rate constant, $A$ is the total surface area of the drug particles and $C_s$ is the aqueous saturation solubility of the drug. The dissolution rate is constant only if surface area, $A$, remains constant, but the important point to note is that the initial rate is proportional directly to aqueous solubility $C_s$. Therefore, the aqueous solubility of a drug can be used as a first approximation of its dissolution rate. Drugs with low aqueous solubility have low dissolution rates and usually suffer oral bioavailability problems.

It will be recalled from Chapter 16 that the aqueous solubility of weak acids and bases is governed by the pK$_a$ of the compound and the pH of the medium. For a weak acid:

$$S_t = S_0(1 + K_a/[H^+]) = S_0(1 + 10^{pH - pK_a}) \qquad (8)$$

where $S_t$ is the total solubility (both the ionized and unionized forms) of the weak acid, $S_0$ is the solubility of the unionized form, $K_a$ is the acid dissociation constant and [H$^+$] is the hydrogen ion concentration of the medium. Equation 8 predicts that the total solubility, $S_t$, of a weak acid with a given pK$_a$ can be affected by the pH of the medium. Similarly, for a weak base

$$S_t = S_0(1 + [H^+]/K_a) = S_0(1 + 10^{pK_a - pH}) \qquad (9)$$

where $S_t$ is the total solubility (both the conjugate acid and free-base forms) of the weak base, $S_0$ is the solubility of the free-base form and $K_a$ is the acid dissociation constant of the conjugate acid. Analogous to Eq 8, Eq 9 predicts that the total solubility, $S_t$, of a weak base whose conjugate acid has a given pK$_a$ can be affected by the pH of the medium. Considering the pH-partition hypothesis, the importance of Eqs 8 and 9 relative to drug absorption is evident. The pH-partition hypothesis simply states that the un-ionized form of a drug will be absorbed preferentially, in a passive manner, through membranes. Since weakly acidic drugs will exist in the stomach (pH = 1 to 2) primarily in the un-ionized form, their absorption will be favored from this acidic environment. On the other hand, weakly basic drugs will exist primarily in the ionized form (conjugate acid) at the same site, and their absorption will be poor. In the upper portion of the small intestine, the pH is more alkaline (pH = 5 to 7) and the reverse will be expected for weak acids and bases. The ratio of Eq 8 or 9 written for either the pH of the gastric or intestinal fluid and the pH of blood is indicative of the driving force for absorption based on pH gradient. For example, consider the ratio of the total solubility of the weak acid aspirin in the blood

and gastric fluid:

$$R = (1 + 10^{pH_b - pK_a})/(1 + 10^{pH_g - pK_a}) \qquad (10)$$

where pH$_b$ is the pH of blood (pH 7.2), pH$_g$ is the pH of the gastric fluid (pH 2) and the pK$_a$ of aspirin is about 3.4. Substituting these values into Eq 10 gives a value for $R$ of $10^{3.8}$ which indicates that aspirin is in a form to be well-absorbed from the stomach. The same calculation for intestinal pH (about 7) yields a ratio close to 1, implying a less-favorable driving force for absorption at that location. Ideally, the release of an ionizable drug from a sustained-release system should be "programmed" in accordance with the variation in pH of the different segments of the gastrointestinal (GI) tract so that the amount of preferentially absorbed species, and thus the plasma level of drug, will be approximately constant throughout the time course of drug action.

In general, extremes in the aqueous solubility of a drug are undesirable for formulation into a sustained-release product. A drug with very low solubility and a slow dissolution rate will exhibit dissolution-limited absorption and yield an inherently sustained blood level. In most instances, formulation of such a drug into a sustained-release system is redundant. Even if a poorly soluble drug was considered as a candidate for formulation into a sustained-release system, a restraint would be placed upon the type of delivery system which could be used. For example, any system relying upon diffusion of drug through a polymer as the rate-limiting step in release would be unsuitable for a poorly soluble drug, since the driving force for diffusion is the concentration of drug in the polymer or solution and this concentration would be low. For a drug with very high solubility and a rapid dissolution rate, it often is quite difficult to decrease its dissolution rate and slow its absorption. Preparing a slightly soluble form of a drug with normally high solubility is, however, one possible method for preparing sustained-release dosage forms. This will be elaborated upon elsewhere in this chapter.

**Partition Coefficient**—Between the time that a drug is administered and the time it is eliminated from the body, it must diffuse through a variety of biological membranes which act primarily as lipid-like barriers. A major criterion in evaluation of the ability of a drug to penetrate these lipid membranes is its apparent oil/water partition coefficient, defined as

$$K = C_0/C_w \qquad (11)$$

where $C_0$ is the equilibrium concentration of all forms of the drug, eg, ionized and un-ionized, in an organic phase at equilibrium, and $C_w$ is the equilibrium concentration of all forms in an aqueous phase. A frequently used solvent for the organic phase is 1-octanol. Although not always valid, an approximation to the value of $K$ may be obtained by the ratio of the solubility of the drug in 1-octanol to that in water. In general, drugs with extremely large values of $K$ are very oil-soluble and will partition into membranes quite readily. The relationship between tissue permeation and partition coefficient for the drug generally is known as the *Hansch correlation*, discussed in Chapter 28. In general, it describes a parabolic relationship between the logarithm of the activity of a drug or its ability to be absorbed and the logarithm of its partition coefficient for a series of drugs as shown in Fig 5. The explanation for this relationship is that the activity of a drug is a function of its ability to cross membranes and interact with the receptor; as a first approximation, the more effectively a drug crosses membranes, the greater its activity. There is also an optimum partition coefficient for a drug at which it most effectively permeates membranes and thus shows greatest activity. Values of the partition coefficient below this optimum result in decreased lipid solubility, and the drug will remain localized in the first aqueous phase it contacts. Values larger than the optimum result in poorer aqueous solubility, but enhanced lipid solubility and the drug will not partition out of the lipid membrane once it gets in. The value of $K$ at which optimum activity is observed is approximately 1000/1 in 1-octanol/water. Drugs with a partition coefficient that is higher or

1664    CHAPTER 94



**Fig 5.** Typical relationship between drug activity and partition coefficient, $K$, generally known as the Hansch correlation.

lower than the optimum are, in general, poorer candidates for formulation into sustained-release dosage forms.

**Drug Stability**—Of importance for oral dosage forms is the loss of drug through acid hydrolysis and/or metabolism in the GI tract. Since a drug in the solid state undergoes degradation at a much slower rate than a drug in suspension or solution, it seems possible to improve significantly the relative bioavailability of a drug, which is unstable in the GI tract, by placing it in a slowly available sustained-release form. For those drugs that are unstable in the stomach, the most appropriate sustaining unit would be one that releases its contents only in the intestine. The reverse is the case for those drugs that are unstable in the environment of the intestine; the most appropriate sustaining unit in this case would be one that releases its contents only in the stomach. However, most sustained-release systems currently in use release their contents over the entire length of the GI tract. Thus, drugs with significant stability problems in any particular area of the GI tract are less suitable for formulation into sustained-release systems that deliver their contents uniformly over the length of the GI tract. Delivery systems that remain localized in a certain area of the GI tract eg, bioadhesive drug delivery system, and act as reservoirs for drug release are much more advantageous for drugs that not only suffer from stability problems but have other bioavailability problems as well. Development of this type of system is still in its infancy.

The presence of metabolizing enzymes at the site of absorption is not necessarily a negative factor in sustained-release formulation. Indeed, the prodrug approach to drug delivery takes advantage of the presence of these enzymes to regenerate the parent molecule of an inactive drug derivative. This will be amplified upon below and in Chapter 28.

*Protein Binding*

Chapters 14 and 43 described the occurrence of drug binding to plasma proteins (eg, albumin) and the resulting retention of drug in the vascular space. Distribution of the drug into the extravascular space is governed by the equilibrium process of dissociation of the drug from the protein. The drug–protein complex can serve therefore as a reservoir in the vascular space for sustained drug release to extravascular tissues, but only for those drugs that exhibit a high degree of binding. Thus, the protein binding characteristics of a drug can play a significant role in its therapeutic effect, regardless of the type of dosage form. Extensive binding to plasma proteins will be evidenced by a long half-life of elimination for the drug, and such drugs generally do not require a sustained-release dosage form. However, drugs that exhibit a high degree of binding to plasma proteins also might bind to biopolymers in the GI tract, which could have an influence on sustained-drug delivery.

The main forces of attraction responsible for binding are van der Waals forces, hydrogen bonding and electrostatic forces. In general, charged compounds have a greater tendency to bind a protein than uncharged compounds, due to electrostatic effects. The presence of a hydrophobic moiety on the drug molecule also increases its binding potential.

Some drugs that exhibit greater than 95% binding at therapeutic levels are amitriptyline, bishydroxycoumarin, diazepam, diazoxide, dicumarol and novobiocin.

**Molecular Size and Diffusivity**—As previously discussed, a drug must diffuse through a variety of biological membranes during its time course in the body. In addition to diffusion through these biological membranes, drugs in many sustained-release systems must diffuse through a rate-controlling membrane or matrix. The ability of a drug to diffuse through membranes, its so called diffusivity (diffusion coefficient), is a function of its molecular size (or molecular weight). An important influence upon the value of the diffusivity, $D$, in polymers is the molecular size (or molecular weight) of the diffusing species. In most polymers, it is possible to relate $\log D$ empirically to some function of molecular size, as shown in Eq 12:[4]

$$\log D = -s_v \log v + k_v = -s_M \log M + k_m \qquad (12)$$

where $v$ is molecular volume, $M$ is molecular weight and $s_v$, $s_M$, $k_v$ and $k_m$ are constants. The value of $D$ thus is related to the size and shape of the cavities as well as size and shape of drugs. Generally, values of the diffusion coefficient for intermediate-molecular-weight drugs, ie, 150 to 400, through flexible polymers range from $10^{-6}$ to $10^{-9}$ cm²/sec, with values on the order of $10^{-8}$ being most common.[5] A value of approximately $10^{-5}$ is typical for these drugs through water as the medium. It is of interest to note that the value of $D$ for one gas in another is on the order of $10^{-1}$ cm²/sec, and for one liquid through another, $10^{-5}$ cm²/sec. For drugs with a molecular weight greater than 500, the diffusion coefficients in many polymers frequently are so small that they are difficult to quantify, ie, less than $10^{-12}$ cm²/sec. Thus, high-molecular-weight drugs and/or polymeric drugs should be expected to display very slow-release kinetics in sustained-release devices using diffusion through polymeric membranes or matrices as the releasing mechanism.

*Biological Properties*

**Absorption**—The rate, extent and uniformity of absorption of a drug are important factors when considering its formulation into a sustained-release system. Since the rate-limiting step in drug delivery from a sustained-release system is its release from a dosage form, rather than absorption, a rapid rate of absorption of the drug relative to its release is essential if the system is to be successful. As stated previously in discussing terminology, $k_r \lll k_a$. This becomes most critical in the case of oral administration. Assuming that the transit time of a drug through the absorptive area of the GI tract is between 9 and 12 hours, the maximum absorption half-life should be 3 to 4 hours.[6] This corresponds to a minimum absorption rate constant $k_a$ of 0.17 hr⁻¹ to 0.23 hr⁻¹ necessary for about 80 to 95% absorption over a 9- to 12-hour transit time. For a drug with a very rapid rate of absorption (ie, $k_a \gg 0.23$ hr⁻¹), the above discussion implies that a first-order release-rate constant $k_r$ less than 0.17 hr⁻¹ is likely to result in unacceptably poor bioavailability in many patients. Therefore, slowly absorbed drugs will be difficult to formulate into sustained-release systems where the criterion that $k_r \lll k_a$ must be met.

The extent and uniformity of the absorption of a drug, as reflected by its bioavailability and the fraction of the total dose absorbed, may be quite low for a variety of reasons. This usually is not a prohibitive factor in its formulation into a sustained-release system. Some possible reasons for a low extent of absorption are poor water solubility, small partition coefficient, acid hydrolysis and metabolism, or site-specific absorption. The latter reason also is responsible for nonuniformity of absorption. Many of these problems can be overcome by an appropriately designed sustained-release system, as exemplified by the discussion under the potential advantages of sustained drug therapy.

**Distribution**—For the design of sustained-release systems it is desirable to have as much information as possible

regarding drug disposition, but in actual practice decisions usually are based on only a few pharmacokinetic parameters, one of which is the volume of distribution as given in Eq 1. The distribution of a drug into vascular and extravascular spaces in the body is an important factor in its overall elimination kinetics. This, in turn, influences the formulation of that drug into a sustained-release system, primarily by restricting the magnitude of the release rate and the dose size which can be employed.[5] At present, the calculation of these quantities is based primarily on one-compartment pharmacokinetic models as described under terminology. A description of the estimation of these quantities based on multicompartment models is beyond the scope of this chapter. However, the main considerations that need to be dealt with if a two-compartment model is operative will be presented.

Two parameters that are used to describe the distribution characteristics of a drug are its apparent volume of distribution and the ratio of drug concentration in tissue to that in plasma at the steady state, the so-called $T/P$ ratio. The apparent volume of distribution is merely a proportionality constant which relates drug concentration in the blood or plasma to the total amount of drug in the body. The magnitude of the apparent volume of distribution can be used as a guide for additional studies and as a predictor for a drug dosing regimen and hence the need to employ sustained-release system. For drugs which obey a one-compartment model, the apparent volume of distribution is

$$V = dose/C_0 \qquad (13)$$

where $C_0$ is the initial drug concentration immediately after an intravenous bolus injection, but before any drug has been eliminated. The application of this equation is based upon the assumption that the distribution of a drug between plasma and tissues takes place instantaneously. This is rarely a good assumption, and it usually is necessary to invoke multicompartment models to account for the finite time required for the drug to distribute fully throughout the available body space. In the case of a two-compartment model, it has been shown[7] that the best estimate of total volume of drug distribution is given by the apparent volume of distribution at steady state:

$$V_{ss} = (1 + k_{12}/k_{21})V_1 \qquad (14)$$

where $V_1$ is the volume of the central compartment, $k_{12}$ is the rate constant for distribution of drug from the central to the peripheral compartment and $k_{21}$ is that from the peripheral to the central compartment. As its name implies, $V_{ss}$ relates drug concentration in the blood or plasma at the steady state to the total amount of drug in the body during repetitive dosing or constant-rate infusion. The use of Eq 14 is limited to those instances where a steady-state drug concentration in both compartments has been reached; at any other time, it tends to overestimate or underestimate the total amount of drug in the body.

To avoid the ambiguity inherent in the apparent volume of distribution as an estimator of the amount of drug in the body, the $T/P$ ratio also can be used. If the amount of drug in the central compartment, $P$, is known, the amount of drug in the peripheral compartment, $T$, and hence the total amount of drug in the body can be calculated[5] by

$$T/P = k_{12}(k_{21} - \beta) \qquad (15)$$

Here, $\beta$ is the slow disposition rate constant and $k_{12}$ and $k_{21}$ are as defined previously. The important point to note is that the $T/P$ ratio estimates the relative distribution of drug between compartments, whereas $V_{ss}$ estimates the extent of distribution in the body. Both parameters contribute to an estimation of the distribution characteristics of a drug, but their relative importance in this respect is open to debate.

**Metabolism**—The metabolic conversion of a drug to another chemical form usually can be considered in the design of a sustained-release system for that drug. As long as the location, rate and extent of metabolism are known and the rate

constant(s) for the process(es) are not too large, successful sustained-release products can be developed.

There are two factors associated with the metabolism of some drugs, however, that present problems for their use in sustained-release systems. One is the ability of the drug to induce or inhibit enzyme synthesis; this may result in a fluctuating drug blood level with chronic dosing. The other is a fluctuating drug blood level due to intestinal (or other tissue) metabolism or through a hepatic first-pass effect. Examples of drugs that are subject to intestinal metabolism upon oral dosing are hydralazine, salicylamide, nitroglycerin, isoproterenol, chlorpromazine and levodopa. Examples of drugs that undergo extensive first-pass hepatic metabolism are propoxyphene, nortriptyline, phenacetin, propranolol and lidocaine.

**Elimination and Biological Half-Life**—The rate of elimination of a drug is described quantitatively by its biological half-life, $t_{1/2}$. The half-life of a drug is related to its apparent volume of distribution $V$ and its systemic clearance:

$$t_{1/2} = 0.693 \ V/Cl_s = 0.693 \ V \ AUC/dose \qquad (16)$$

The systemic clearance, $Cl_s$, is equal to the ratio of an intravenously administered dose to the total area under the drug blood level versus time curve, AUC. A drug with a short half-life requires frequent dosing and this makes it a desirable candidate for a sustained-release formulation. On the other hand, a drug with a long half-life is dosed at greater time intervals and thus there is less need for a sustained-release system. It is difficult to define precise upper and lower limits for the value of the half-life of a drug that best suits it for sustained-release formulation. In general, however, a drug with a half-life of less than 2 hours probably should not be used, since such systems will require unacceptably large release rates and large doses. At the other extreme, a drug with a half-life of greater than 8 hours also probably should not be used; in most instances, formulation of such a drug into a sustained-release system is unnecessary. Some examples of drugs with half-lives of less than 2 hours are ampicillin, cephalexin, cloxacillin, furosemide, levodopa, penicillin G and propylthiouracil. Examples of those with half-lives of greater than 8 hours are dicumarol, diazepam, digitoxin, digoxin, guanethidine, phenytoin and warfarin.

**Side Effects and Safety Considerations**—There are very few drugs whose specific therapeutic concentrations are known. Instead, a therapeutic concentration range is listed, with increasing toxic effects expected above this range and a falloff in desired therapeutic response observed below the range. For some drugs, the incidence of side effects, in addition to toxicity, is believed to be a function of plasma concentration.[8] As mentioned in the discussion on the potential advantages of sustained-release drug therapy, a sustained-release system can, at times, minimize side effects for a particular drug by controlling its plasma concentration and using less total drug over the time course of therapy.

The most widely used measure of the margin of safety of a drug is its therapeutic index, TI, discussed in Chapter 41 and defined in the following equation:

$$TI = TD_{50}/ED_{50} \qquad (17)$$

where $TD_{50}$ is the median toxic dose and $ED_{50}$ is the median effective dose. The value of TI varies from as little as unity, where the effective dose is also producing toxic symptoms, to several thousand. For very "potent" drugs, whose therapeutic concentration range is narrow, the value of TI is small. In general, the larger the value of TI, the safer the drug. Drugs with very small values of TI usually are poor candidates for formulation into sustained-release products primarily due to technological limitations of precise control over release rates. A drug is considered to be relatively safe if its TI value exceeds 10. Examples of drugs with values of TI < 10 are aprobarbital, digitoxin, phenobarbital and digoxin.

**Dose Size**—Since a sustained-release system is designed to alleviate repetitive dosing, it naturally will contain a greater amount of drug than a corresponding conventional form. The typical administered dose of a drug in the conventional

dosage form will give some indication of the total amount needed in the sustained-release preparation. For those drugs requiring large conventional doses, the volume of the sustained dose may be so large as to be impractical or unacceptable, depending on the route of administration. The same may be true of drugs which require a large release rate from the sustained-release system, eg, drugs with short half-lives. For the oral route the volume of the product is limited by patient acceptance. For the intramuscular, intravenous or subcutaneous routes, the limitation is tolerance of the drug at the injection site. It also should be mentioned that for drugs with a low therapeutic index, incorporation of amounts greater than the $TD_{50}$ potentially may be dangerous if the system fails.

## Oral Dosage Forms

For sustained-release systems, the oral route of administration has, by far, received the most attention. This is, in part, because there is more flexibility in dosage-form design for the oral route than there is for the parenteral route. Patient acceptance of the oral route is quite high. It is a relatively safe route of administration, compared to most parenteral routes, and the constraints of sterility and potential damage at the site of administration are minimal. In this section, the more common methods that are used to achieve sustained release of orally administered drugs are discussed.

### Diffusion Systems

In these systems, the release rate of drug is determined by its diffusion through a water-insoluble polymer. There are basically two types of diffusion devices: *reservoir devices*, in which a core of drug is surrounded by a polymeric membrane, and *matrix devices*, in which dissolved or dispersed drug is distributed uniformly in an inert polymeric matrix. It should be mentioned that in actual practice many devices which use diffusion also rely upon some degree of dissolution to determine the release rate. Systems using dissolution will be discussed later in this section.

**Reservoir Devices**—The release of drug from a reservoir device is governed by Fick's first law of diffusion:

$$J = -D \, dC_m/dx \tag{18}$$

where $J$ is the flux of drug across a membrane in the direction of decreasing concentration (amount/area-time), $D$ is the diffusion coefficient of the drug in the membrane (area/time) and $dC_m/dx$ is the change in concentration of drug in the membrane over a distance $x$. If it is assumed that the drug on either side of the membrane is in equilibrium with the respective surface layer of the membrane, as shown in Fig 6[9], then the concentration just inside the membrane surface can be related to the concentration in the adjacent region by the expressions

$$K = C_{m(0)}/C_{(0)} \text{ at } x = 0 \tag{19}$$

$$K = C_{m(l)}/C_{(l)} \text{ at } x = l \tag{20}$$

where $K$ is a partition coefficient. Assuming that $D$ and $K$ are



Fig 6. Schematic representation of a reservoir diffusion device. $C_{m(0)}$ and $C_{m(l)}$ represent concentrations of drug at the inside surfaces of the membrane and $C_{(0)}$ and $C_{(l)}$ represent concentrations in the adjacent regions. (Reproduced with permission.[9])

constant, Eq 18 can be integrated to give

$$J = DK\Delta C/l \tag{21}$$

where $\Delta C$ is the concentration difference across the membrane.

If the activity of the drug inside the reservoir is maintained constant and the value of $K$ is less than unity, zero-order release can be achieved. This is the case when the drug is present as a solid, ie, its activity is unity. Depending on the shape of the device, the equation describing drug release will vary. Only the simplest geometry, that of a rectangular slab or "sandwich," will be presented here. For the slab geometry, the equation describing release is

$$dM_t/dt = ADK\Delta C/l \tag{22}$$

where $M_t$ is the mass of drug released after time $t$, $dM_t/dt$ is the steady-state release rate at time $t$, $A$ is the surface area of the device and $D$, $K$ and $l$ are as defined previously. Similar equations can be written for cylindrical or spherical geometric devices. In order to obtain a constant drug-release rate, it is necessary to maintain constant area, diffusion path length, concentration and diffusion coefficient. In other words, all of the terms on the right hand side of Eq 22 are held constant. This is often not the case in actual practice because one or more of the above terms will change in the product, thus nonzero-order release is frequently observed.

Common methods used to develop reservoir-type devices include microencapsulation of drug particles and press-coating of tablets containing drug cores. In most cases, particles coated by microencapsulation form a system where the drug is contained in the coating film as well as in the core of the microcapsule. Drug release usually involves a combination of dissolution and diffusion, with dissolution being the process that controls the release rate. If the encapsulating material is selected properly, diffusion will be the controlling process. Microencapsulation is discussed further with reference to systems using dissolution. Some materials used as the membrane barrier coat, alone or in combination, are hardened gelatin, methyl or ethylcelluloses, polyhydroxymethacrylate, hydroxypropylcellulose, polyvinylacetate and various waxes. Examples of some marketed products using an encapsulated reservoir of drug are shown in Table 2. Drug release from these products probably is based primarily on diffusion, but dissolution may be occurring as well.

**Matrix Devices**—The rate of release of a drug dispersed as a solid in an inert matrix has been described by Higuchi.[10,11] Figure 7 depicts the physical model for a planar slab. In this model, it is assumed that solid drug dissolves from the surface layer of the device first; when this layer becomes exhausted of drug, the next layer begins to be depleted by dissolution and diffusion through the matrix to the external solution. In this fashion, the interface between the region containing dissolved drug and that containing dispersed drug moves into the inte-

### Table 2—Reservoir Diffusion Products

| Product | Active ingredient(s) | Manufacturer |
|---|---|---|
| Plateau CAPS capsules | | |
|   Nico-400 | Nicotinic acid | Jones |
|   Nitro-Bid | Nitroglycerin | Marion |
| Cerespan capsules | Papaverine hydrochloride | Rhone-Poulenc Rorer |
| Histaspan capsules | Chlorpheniramine maleate, phenylephrine hydrochloride, methscopolamine nitrate | Rhone-Poulenc Rorer |
| Nitrospan capsules | Nitroglycerin | Rhone-Poulenc Rorer |
| Measurin tablets | Acetylsalicylic acid | Sanofi-Winthrop |
| Bronkodyl S-R capsules | Theophylline | Sanofi-Winthrop |

(right margin — partially visible, obscured)
Fig 7.
planar
rior a
emati
1.
2.
is subs
volum
3.
4.
tance
5.
6.
Ba
unit a
$dh_t$ is
whe
Fick'
whe
and 2
back
obtai
Simil
descr
whe
solut
diffu
syste
pore
Po
nient
whe
versu
the d
rate
decr
clin
Th
of m
and
vesti
viny
both
Hyd
metl
pol



**Fig 7.** Schematic representation of the physical model used for a planar slab matrix diffusion device.

rior as a front. The assumptions made in deriving the mathematical model are as follows:

1. A pseudo-steady state is maintained during release.
2. The total amount of drug present per unit volume in the matrix, $C_0$, is substantially greater than the saturation solubility of the drug per unit volume in the matrix, $C_s$, ie, excess solute is present.
3. The release medium is a perfect sink at all times.
4. Drug particles are much smaller in diameter than the average distance of diffusion.
5. The diffusion coefficient remains constant.
6. No interaction occurs between the drug and the matrix.

Based on Fig 7, the change in amount of drug released per unit area, $dM$, with a change in the depleted zone thickness, $dh$, is

$$dM = C_0 dh - (C_s/2)dh \qquad (23)$$

where $C_0$ and $C_s$ are as defined above. However, based on Fick's first law

$$dM = (D_m C_s/h)dt \qquad (24)$$

where $D_m$ is the diffusion coefficient in the matrix. If Eqs 23 and 24 are equated, solved for $h$ and that value of $h$ substituted back into the integrated form of Eq 24, an equation for $M$ is obtained:

$$M = [C_s D_m(2C_0 - C_s)t]^{1/2} \qquad (25)$$

Similarly, a drug released from a porous or granular matrix is described by

$$M = [D_s C_a(\epsilon/T)(2C_0 - \epsilon C_a)t]^{1/2} \qquad (26)$$

where $\epsilon$ is porosity of the matrix, $T$ is *tortuosity*, $C_a$ is the solubility of the drug in the release medium and $D_s$ is the diffusion coefficient of drug in the release medium. In this system, drug is leached from the matrix through channels or pores.

For purposes of data treatment, Eqs 25 and 26 are conveniently reduced to

$$M = kt^{1/2} \qquad (27)$$

where $k$ is a constant, so that a plot of amount of drug released versus the square root of time should be linear if the release of the drug from the matrix is diffusion-controlled. The release rate of drug from such a device is not zero-order, since it decreases with time but, as previously mentioned, this may be clinically equivalent to constant release for many drugs.

The three major types of materials used in the preparation of matrix devices are insoluble plastics, hydrophilic polymers and fatty compounds. Plastic matrices which have been investigated include methyl acrylate–methyl methacrylate, polyvinyl chloride and polyethylene. The Gradumet tablet (*Abbott*) is an example of a dosage form using a plastic matrix. Hydrophilic polymers include methylcellulose, hydroxypropylmethylcellulose, sodium carboxymethylcellulose and carbopol 934. Fatty compounds include various waxes such as

carnauba wax and glyceryl tristearate. An example of a dosage form using a wax matrix is the Lontab tablet (*Ciba*).

The most common method of preparation is to mix the drug with the matrix material and then compress the mixture into tablets. In the case of wax matrices, the drug generally is dispersed in molten wax, which is then congealed, granulated and compressed into cores. In any sustained-release system it is necessary for a portion of the drug to be available immediately as a priming dose, and the remainder to be released in a sustained fashion. This is accomplished in a matrix tablet by placing the priming dose in a coat of the tablet. The coat can be applied by press coating or by conventional pan or air suspension coating. Some marketed matrix diffusion products are listed in Table 3.

### Dissolution Systems

As mentioned earlier in the chapter, a drug with a slow dissolution rate will yield an inherently sustained blood level. In principle, then, it would seem possible to prepare sustained-release products by decreasing the dissolution rate of drugs which are highly water-soluble. This can be done by preparing an appropriate salt or derivative, by coating the drug with a slowly soluble material or by incorporating it into a tablet with a slowly soluble carrier. Ideally, the surface area available for dissolution must remain constant in order to achieve a constant release rate. This is, however, difficult to achieve in practice.

The dissolution process can be considered diffusion-layer-controlled, where the rate of diffusion from the solid surface to the bulk solution through an unstirred liquid film is the rate-determining step. In this case, the dissolution process at steady state is described by the Noyes-Whitney equation:

$$dC/dt = k_D A(C_s - C) = (D/h)A(C_s - C) \qquad (28)$$

where $dC/dt$ is the dissolution rate, $k_D$ is the dissolution rate constant, $A$ is the total surface area, $C_s$ is the saturation solubility of the solid and $C$ is the concentration of solute in the bulk solution. The dissolution-rate constant, $k_D$, is equal to the diffusion coefficient, $D$, divided by the thickness of the diffusion layer, $h$. The above equation predicts a constant dissolution rate if the surface area, diffusion coefficient, diffusion layer thickness and concentration difference are kept constant. However, as dissolution proceeds, all of these parameters may change, especially surface area. For spherical particles, the change in area can be related to the weight of the particle and, under the assumption of sink conditions, Eq 28 becomes the cube-root dissolution equation

$$w_0^{1/3} - w^{1/3} = k_D' t \qquad (29)$$

where $k_D'$ is the cube-root dissolution-rate constant, and $w_0$ and $w$ are initial weight and weight of the amount remaining at time $t$, respectively.

Two common formulations relying on dissolution to determine release rate of drug are shown in Fig 8. Most of the products fall into two categories: encapsulated dissolution systems and matrix dissolution systems.

### Table 3—Matrix Diffusion Products

| Product | Active ingredient(s) | Manufacturer |
|---|---|---|
| Gradumet tablets |  | Abbott |
| Desoxyn | Methamphetamine HCl |  |
| Fero-Gradumet | Ferrous sulfate |  |
| Fero-Grad-500 | Ferrous sulfate, sodium ascorbate |  |
| Tral | Hexocyclium methylsulfate |  |
| Lontab tablets |  | Ciba |
| PBZ-SR | Tripelennamine HCl |  |
| Procan SR tablets | Procainamide HCl | Parke-Davis |
| Choledyl SA tablets | Oxtriphylline | Parke-Davis |



**Fig 8.** Schematic representation of systems using dissolution. A, encapsulated formulation where drug release is determined by thickness and dissolution rate of the polymer membrane; B, matrix formulation where drug release is determined by dissolution rate of the polymer.

Encapsulated dissolution systems can be prepared either by coating particles or granules of drug with varying thicknesses of slowly soluble polymers or by microencapsulation. Microencapsulation can be accomplished by using phase separation, interfacial polymerization, heat-fusion or the solvent-evaporation method. The coating materials may be selected from a wide variety of natural and synthetic polymers, depending on the drug to be coated and the release characteristics desired. The most commonly used coating materials include gelatin, carnauba wax, shellacs, ethylcellulose, cellulose acetate phthalate or cellulose acetate butyrate. Drug release from microcapsules, is a mass-transport phenomenon; and can be controlled by adjusting the size of microcapsules, thickness of coating materials and the diffusivity of core materials. The coating thickness of microcapsules is normally very thin, and for a given coating-core ratio, it decreases rapidly as the microcapsule size decreases. The thickness can be varied from less than 1 μm to 200 μm by changing the amount of coating material from 3 to 30% of the total weight. If only a few different thicknesses are used, usually three or four, drugs will be released at different, predetermined times to give a delayed release effect, ie, repeat-action. If a spectrum of different thicknesses is employed, a more uniform blood level of the drug can be obtained. Microcapsules commonly are filled into capsules and rarely are tableted as their coatings tend to disrupt during compression. A partial listing of some marketed sustained-release products relying primarily on encapsulated dissolution are shown in Table 4.

Matrix dissolution devices are prepared by compressing the drug with a slowly soluble polymer carrier into a tablet form. There are two general methods of preparing drug–wax particles: congealing and aqueous dispersion methods. In the congealing method, drug is mixed with a wax material and either spray-congealed or congealed and screened. In the aqueous dispersion method, the drug–wax mixture simply is sprayed or placed in water and the resulting particles are collected. Matrix tablets also are made by direct compression of a mixture of drug, polymer and excipients. Examples of marketed products relying primarily on matrix dissolution are listed in Table 5.

#### Table 4—Encapsulated Dissolution Products

| Product | Active ingredient(s) | Manufacturer |
|---|---|---|
| Spansule capsules | | SmithKline Beecham |
| Dexedrine | Dextroamphetamine sulfate | |
| Illspril | Diphenylpyraline HCl | |
| Ornade | Phenylpropanolamine HCl, chlorpheniramine maleate | |
| Thorazine | Chlorpromazine HCl | |
| Contac capsules | Phenylpropanolamine HCl, chlorpheniramine maleate | SmithKline Beecham |
| Sequel capsules | | Lederle |
| Artane | Trihexyphenidyl HCl | |
| Diamox | Acetazolamide | |
| Ferro-sequels | Ferrous fumarate, docusate sodium | |

#### Table 5—Matrix Dissolution Products

| Product | Active ingredient(s) | Manufacturer |
|---|---|---|
| Extentab tablets | | Robins |
| Dimetane | Brompheniramine maleate | |
| Dimetapp | Brompheniramine maleate, phenylpropanolamine HCl | |
| Donnatal | Phenobarbital, hyoscamine sulfate, atropine sulfate, scopolamine hydrobromide | |
| Quinidex | Quinidine sulfate | |
| Timespan tablets | | Roche |
| Mestinon | Pyridostigmine bromide | |
| Dospan tablets | | Lakeside |
| Tenuate | Diethylpropion HCl | |
| Chronotab tablets | | Schering |
| Disophrol | Dexbrompheniramine maleate, pseudoephedrine sulfate | |
| Tempule capsules | | Rhone-Poulenc Rorer |
| Nicobid | Nicotinic acid | |
| Pentritol | Pentaerythritol tetranitrate | |
| Repetab tablets | | Schering |
| Chlor-trimeton | Chlorpheniramine maleate | |
| Demazin | Chlorpheniramine maleate, phenylephrine HCl | |
| Polaramine | Dexchlorpheniramine maleate | |
| Trilafon | Perphenazine | |

### Osmotic Systems

Osmotic pressure can be employed as the driving force to generate a constant release of drug provided a constant osmotic pressure is maintained and a few other features of the physical system are constrained. Consider a tablet consisting of a core of an osmotically active drug, or a core of an osmotically inactive drug, in combination with an osmotically active salt surrounded by a semipermeable membrane containing a small orifice, as shown in Fig 9. The membrane will allow free diffusion of water, but not drug. When the tablet is exposed to water or any fluid in the body, water will flow into the tablet due to osmotic pressure difference and the volume flow rate, $dV/dt$, of water into the tablet is

$$dV/dt = (kA/h)(\Delta\pi - \Delta P) \qquad (30)$$

where $k$, $A$ and $h$ are the membrane permeability, area and thickness, respectively, $\Delta\pi$ is the osmotic pressure difference and $\Delta P$ is the hydrostatic pressure difference. If the orifice is sufficiently large, the hydrostatic pressure difference will be small compared to the osmotic pressure difference, and Eq 30 becomes

$$dV/dt = (kA/h)\Delta\pi \qquad (31)$$

Thus, the volume flow rate of water into the tablet is determined by permeability, area and thickness of the membrane. The drug will be pumped out of the tablet through the orifice at a controlled rate, $dM/dt$, equal to the volume flow rate of water into the tablet multiplied by the drug concentration, $C_s$:

$$dM/dt = (dV/dt)C_s \qquad (32)$$



**Fig 9.** Schematic diagram of an osmotic tablet. (Reproduced with permission.[12])



**Fig 10.** Osmotic pressure-controlled drug-delivery system with two compartments separated by a movable partition.[13]

The release rate will be constant until the concentration of drug inside the tablet falls below saturation.

Several modifications of the osmotic pressure-controlled drug delivery system have been developed. A layer of bio-erodible polymer can be applied to the external surface of the semipermeable membrane. A system consists of two compartments separated by a movable partition, as shown in Fig. 10. For a system that does not have an orifice, hydraulic pressure is built up inside as the GI fluid is imbibed until the wall ruptures and the contents are released to the environment.

The advantage of the osmotic system is that it requires only osmotic pressure to be effective and is essentially independent of the environment. The drug release rate can be predetermined precisely regardless of pH change through the GI tract. Some materials used as the semipermeable membrane include polyvinyl alcohol, polyurethane, cellulose acetate, ethylcellulose and polyvinyl chloride. Drugs that have demonstrated successful release rates from an osmotic system *in vivo* after oral dosing are potassium chloride and acetazolamide.

### Ion-Exchange Resins

Ion-exchange resins are water-insoluble crosslinked polymers containing salt forming groups in repeating positions on the polymer chain. Drug is bound to the resin by repeated exposure of the resin to the drug in a chromatographic column, or by prolonged contact of the resin with the drug solution. The drug-resin then is washed to remove contaminating ions and dried to form particles or beads. Drug release from the drug–resin complex depends on the ionic environment, ie, pH and electrolyte concentration, within the GI tract as well as properties of the resin.

Drug molecules attached to the resin are released by exchanging with appropriately charged ions in the GI tract, as shown in Fig 11, followed by diffusion of the free drug molecule out of the resin. The rate of diffusion is controlled by the area of diffusion, diffusional pathlength and extent of crosslinking in the resin. A modification of the release rate can be made by coating the drug–resin complex. Further improvement of this ion-exchange type drug delivery system is called the Penn Kinetic system. In this system, the drug-containing resin granules first are treated with an impregnating polymer such as PEG 4000 to retard the rate of swelling in water and further coated with a water-insoluble polymer, such

as ethylcellulose, to serve as a rate-limiting barrier to control the drug release.

Most ion-exchange resins currently employed in sustained-release products contain sulfonic acid groups that exchange cationic drugs such as those with an amine functionality. Examples of some of these drugs are amphetamine, phenyl *t*-butylamine (phentermine), phenyltoloxamine and hydrocodone, as shown in Table 6.

### Prodrugs

A prodrug is a compound formed by chemical modification of a biologically active compound which will liberate the active compound *in vivo* by enzymatic or hydrolytic cleavage. The primary purpose of employing a prodrug for oral administration is to increase intestinal absorption or to reduce local side effects, such as GI irritation by aspirin. On this basis, one generally does not classify a prodrug as a sustained-release dosage form. However, the ability to bio-reversibly modify the physicochemical properties of a drug allows better intestinal transport properties and hence influences the drug blood level versus time profile. Thus, prodrugs can be used to increase the strategies for sustained release and, in a limited sense, can be sustaining in their own right.

As an example of the use of a prodrug as a sustaining mechanism, consider a water-soluble drug which is modified to a water-insoluble prodrug. The prodrug will have a slower dissolution rate in an aqueous medium than the parent drug and, thus, the appearance of the parent drug in plasma will be slowed. This is observed with theophylline and its prodrug, 7,7'-succinylditheophylline. Alternatively, a water-soluble prodrug of a water-insoluble parent drug can be made to be a substrate for enzymes in the brush border region of the microvilli. The water-soluble prodrug complexes with the enzyme just prior to reaching the membrane surface, is metabolized and its membrane/water partition coefficient increases. The result is an increase in the blood level of the drug. See Chapter 28.

## Parenteral Dosage Forms

The most common types of dosage forms used for parenteral sustained-release drug therapy are intramuscular (IM) injections, implants for subcutaneous tissues and various body cavities and transdermal devices. Due to physiological and anatomical constraints, many of the other parenteral routes of administration, eg, intravenous, intra-arterial, intrathecal and intraperitoneal, are not as useful in this regard. The application of the former three types of dosage forms to sustained-release drug delivery will be discussed in this section. The final section is devoted to other parenteral dosage forms being developed for targeted drug delivery.

### Intramuscular Injections

**Aqueous Solutions**—It is conceivable and likely that increased viscosity of the medium not only decreases molecular diffusion but also localizes the injected volume. Thus, the absorptive area is reduced and the rate of drug release is controlled. Examples of thickening agents are methylcellulose, sodium carboxymethylcellulose and polyvinylpyrrolidone.

**Complex Formation**—The formation of a dissociable complex of a drug with a macromolecule is the same physicochemi-



**Fig 11.** Schematic of drug release from ion-exchange resin.

### Table 6—Ion-Exchange Products

| Product | Active Ingredient(s) | Manufacturer |
|---|---|---|
| Biphetamine capsules | Amphetamine, dextroamphetamine | Pennwalt |
| Tussionex capsules, tablets, suspension | Hydrocodone, chlorpheniramine | Pennwalt |
| Ionamin capsules | Phentermine | Pennwalt |

their membrane characteristics. In addition to coating with antibodies, removal of portions of cell-surface carbohydrates reduces the circulating half-life. The ability of resealed erythrocytes to deliver drug to the liver or spleen can be viewed as a disadvantage in that other organs and tissues are inaccessible. Thus, the application of this system to targeted delivery has been limited mainly to treatment of lysosomal storage diseases and metal toxicity, where the site of drug action is in the reticuloendothelial system. A more detailed discussion of the application of resealed erythrocytes has been presented by Ihler.[27]

## Immunologically Based Systems

As discussed in the section pertaining to intramuscular injections, the formation of dissociable complex of a drug with a macromolecule is a viable method of achieving a sustained-release effect. If the macromolecule used is an antibody, an antigen-specific targeted effect also can be achieved. In addition to complex formation by noncovalent forces, drugs also may be linked covalently to antibodies, provided the activity of both drug and antibody is retained or the activity of drug is recoverable after release.

Most studies of antibody–drug systems have employed covalent conjugation of the drug to the antibody. Chemical crosslinking agents are used commonly to attach a drug to an antibody by reacting with appropriate groups available on both species. Among the crosslinking agents used are carbodiimide, glutaraldehyde, bisazobenzidine, cyanuric chloride, diethylmalonimidate or various mixed anhydrides. The reaction should allow effective control of the antibody–drug conjugate size, and the crosslink must readily be broken by available lysosomal hydrolases within the receptor cell, if drug release is critical to activity.

Certain specificities expressed on tumor cells, referred to as membrane-bound tumor-associated antigens (TAAs), may be exploited for the purpose of targeting antibody–drug conjugates directly at the malignant tumor by various parenteral routes of administration. Since anticancer drugs are indiscriminate to cell type in their action, a targeted delivery system for these drugs would offer a significant improvement in cancer chemotherapy. A wide variety of antineoplastic drugs have been conjugated to tumor-specific antibodies. Three that have received the most attention are chlorambucil, adriamycin and methotrexate. The effectiveness of these systems depends on the nature of the crosslinking agent and the method of reaction. The interested reader is directed to two reviews that discuss the use of antibody–drug conjugates for treatment of tumors.[28,29]

## References

1. Lee VHK, Robinson JR, Lee VHL: In Robinson JR, Lee VHL, eds: *Controlled Drug Delivery*, 2nd ed, Marcel Dekker, New York, 3, 1987.
2. Robinson JR, Erikson SP: *J Pharm Sci 55:* 1254, 1966.
3. Welling PG, Dobrinska MR, in Robinson JR, Lee VHL, eds: *Controlled Drug Delivery*, 2nd ed, Marcel Dekker, New York, 253, 1987.
4. Flynn GL, Yalkowsky SH, Roseman T: *J Pharm Sci 63:* 479, 1974.
5. Burnette RR, in Robinson JR, Lee VHL, eds: *Controlled Drug Delivery*, 2nd ed, Marcel Dekker, New York, 95, 1987.
6. Gibaldi M, Perrier D: *Pharmacokinetics*, 2nd ed, Marcel Dekker, New York, 189, 1982.
7. Riegelman S, Loo JCK, Rowland M: *J Pharm Sci 57:* 128, 1968.
8. Wagner JG: *Am J Pharm 141:* 5, 1969.
9. Park K, Wood RW, Robinson JR, in Langer R, Wise D, eds: *Medical Applications of Controlled Release Technology*, CRC Press, Boca Raton, FL, 171, 1985.
10. Higuchi T: *J Pharm Sci 50:* 874, 1961.
11. Higuchi T: *Ibid 52:* 1145, 1963.
12. Chandrasekaran SK, Benson H, Urquhart J, in Robinson JR, ed: *Sustained and Controlled Release Drug Delivery Systems*, Marcel Dekker, New York, 557, 1978.
13. Hui HW, Robinson JR, Lee VHL: In Robinson JR, Lee VHL, eds: *Controlled Drug Delivery*, 2nd ed, Marcel Dekker, New York, 373, 1987.
14. Buckwalter R, Dickinson J: *J APhA 47:* 661, 1958.
15. Hussain MA et al: *Drug Dev Ind Pharm 17:* 67, 1991.
16. *Physician's Desk Reference*, 48th ed, Medical Economics, Oradell, NJ 1994.
17. Higuchi W: *J Pharm Sci 53:* 405, 1964.
18. Windheuser JL, Best ML, Perrin JH: *Bull Parenter Drug Assoc 24:* 286, 1970.
19. Brodin AF, Kavaliunas DR, Frank SG: *Acta Pharm Suec 15:* 1, 1978.
20. Chien YW: In Chien YW, ed: *Novel Drug Delivery Systems*, 2nd ed, Marcel Dekker, New York, 1, 1992.
21. *Ibid:* 43, 1992.
22. Hsieh DST, Smith N, Chien YW: In Meyers WE, Dunn RL, eds: *Proceeding of 11th International Symposium on Controlled Release of Bioactive Materials*, The Controlled Release Society, Chicago, 134, 1984.
23. Oppenheim RC: *J Steroid Biochem 6:* 182, 1975.
24. Juliano RL, Layton D: *Ibid:* 200, 1980.
25. Gregoriadis G et al: In Gregoriadis C, Senior J, Trout A, eds: *Targeting of Drugs*, Plenum, New York, 155, 1982.
26. Cooper RA: In William WJ et al, eds: *Hematology*, 2nd ed, Mc-Graw-Hill, New York, 216, 1977.
27. Ihler G: In Gregoriadis C, ed: *Drug Carriers in Biology and Medicine*, Academic, London, 129, 1979.
28. Arnon R: In Spreafics F, Arnon R, eds: *Tumor-Associated Antigens and Their Specific Immune Response*, Academic, New York, 287, 1979.
29. O'Neill GJ: In Gregoriadis G, ed: *Drug Carriers in Biology and Medicine*, Academic, London, 23, 1979.

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of May, 2007, I electronically filed the foregoing document, **REDACTED VERSION OF DECLARATION OF ARTHUR M. KIBBE, Ph.D. IN SUPPORT OF DEFENDANT'S MARKMAN BRIEF,** with the Clerk of the Court using CM/ECF which sent notification of such filing to the following:

Jack B. Blumenfeld
Karen Jacobs Louden
Morris Nichols Arsht & Tunnell
1201 N. Market Street
Wilmington, DE 19801

Additionally, I hereby certify that the foregoing document was served as indicated below:

**VIA EMAIL**

Jack B. Blumenfeld
Karen Jacobs Louden
Morris Nichols Arsht & Tunnell
1201 N. Market Street
Wilmington, DE 19801
jblumenfeld@mnat.com
klouden@mnat.com

**VIA EMAIL**

Basil J. Lewris
Linda A. Wadler
Finnegan Henderson Farabow
 Garrett & Dunner
901 New York Avenue, NW
Washington, DE 20001
Bill.Lewris@finnegan.com
Linda.Wadler@finnegan.com

_/s/ Mary B. Matterer_
Mary B. Matterer (I.D. No. 2696)
Morris James LLP
500 Delaware Avenue, 15th Floor
Wilmington, DE 19801
(302) 888-6800
mmatterer@morrisjames.com

*Attorneys for IMPAX LABORATORIES, INC.*