IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WYETH, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 06-222 (JJF) |
| | ) | |
| v. | ) | |
| | ) | |
| IMPAX LABORATORIES, INC., | ) | REDACTED — |
| | ) | PUBLIC VERSION |
| Defendant. | ) | |
| | ) | |

**WYETH'S COUNTERSTATEMENT CERTIFYING THAT GENUINE
ISSUES OF MATERIAL FACT EXIST PRECLUDING GRANT OF IMPAX'S
MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT,
LACK OF WRITTEN DESCRIPTION, LACK OF ENABLEMENT,
<u>MISJOINDER OF INVENTORS, AND INDEFINITENESS</u>**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
Attorneys for Plaintiff Wyeth

OF COUNSEL:

Basil J. Lewris
Linda A. Wadler
Barbara R. Rudolph
Alan A. Wright
Finnegan, Henderson, Farabow,
  Garrett & Dunner, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001
(202) 408-4000

Original Filing Date:  December 28, 2007

Redacted Filing Date:  January 8, 2008

# TABLE OF CONTENTS

I.    THE COURT'S CLAIM CONSTRUCTION RULING DISPOSES OF IMPAX'S NON-INFRINGEMENT AND INDEFINITENESS DEFENSES ......................................1

II.    WRITTEN DESCRIPTION—GENUINE ISSUES OF MATERIAL FACT .....................3

    A.    Whether the Entirety of the Specification of the Patents-in-Suit Clearly Indicates to One Skilled in the Art that the Invention Is of a Narrower Scope Than the Claims ............................................................................................4

    B.    Whether the Original Method Claims Convey to Persons Skilled in the Art that the Inventors Described the Claimed Method Invention in Their Originally Filed Patent Application.........................................................................6

III.    ENABLEMENT—GENUINE ISSUES OF MATERIAL FACT ........................................7

    A.    Whether a Person Skilled in the Pertinent Art Could Use a Formulation, Other Than the Disclosed Exemplary Formulations, to Practice the Claimed Method Without Undue Experimentation Using the Knowledge Available to Such a Person and the Disclosure in the Patent ..................................8

    B.    Whether Wyeth's Patent Specification Conveys to a Person Skilled in the Art that Extended-Release Venlafaxine Hydrochloride Formulations That Contain REDACTED Will Not Work ................................................................10

IV.    INVENTORSHIP—GENUINE ISSUES OF MATERIAL FACT ..................................11

REDACTED

    .......................................................................................................11

V.    CONCLUSION.............................................................................................................14

APPENDIX A:  INFRINGEMENT—GENUINE ISSUES OF MATERIAL FACT THAT HAVE BEEN MOOTED BY THE COURT'S CLAIM CONSTRUCTION......................1

    A.    Did Impax's Extended-Release Formulation Contain Elements Identical or Equivalent to Each Claim Element of the Patented Invention..................................1

    B.    Whether the Combination of REDACTED in Impax's Extended-Release Formulation Is an Equivalent to the Microcrystalline Cellulose Element Required by Impax's Claim Construction..................................1

    C.    Whether the Combination of REDACTED as a Substitute for Microcrystalline Cellulose Was Disclosed in the Patents-in-Suit ...........................4

i

D.      Whether Wyeth Disclaimed the Use of <sup>REDACTED</sup> in the Patents-in-Suit ........................4

E.      Whether the Interchangeability of Substituting     REDACTED      for
        Microcrystalline Cellulose to Form the Drug-Containing Core Was Known
        in the Art .......................................................................................................5

F.      Whether Wyeth Acquiesced in Limiting Its Method Claims to the Specific
        Formulation Set Forth in Impax's Proposed Claim Construction ..........................6

APPENDIX B:  INDEFINITENESS—GENUINE ISSUES OF MATERIAL FACT
        THAT HAVE BEEN MOOTED BY THE COURT'S CLAIM CONSTRUCTION ..........1

        Whether the Meaning of the Term "Therapeutic Metabolism" Is
        Discernable to a Person of Skill in the Art .............................................................1

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Caterpillar Inc. v. Sturman Indus.*,
  387 F.3d 1358 (Fed. Cir. 2004)....................................................................................12

*Cooper Cameron Corp. v. Kvaerner Oilfield Products Inc.*,
  291 F. 3d 1317 (Fed. Cir. 2000)....................................................................................3

*Cordis Corp. v. Medtronic AVE., Inc.*,
  339 F.3d 1352 (Fed. Cir. 2003)....................................................................................6

*Durel Corp. v. Osram Sylvania Inc.*,
  256 F.3d 1298 (Fed. Cir. 2001)................................................................................1, 7

*Exxon Chemical Patents, Inc. v. Lubrizol Corp.*,
  137 F.3d 1475 (Fed. Cir. 1998)....................................................................................1

*Exxon Research & Eng'g Co. v. United States*,
  265 F.3d 1371 (Fed. Cir. 2001)....................................................................................2

*Gentry Gallery, Inc. v. Berkline Corp.*,
  134 F.3d 1473 (Fed. Cir. 1998)....................................................................................3

*Hess v. Advanced Cardiovascular Sys., Inc.*,
  106 F.3d 976 (Fed. Cir. 1997)....................................................................................12

*Northern Telecom, Inc. v. Datapoint Corp.*,
  908 F.2d 931 (Fed. Cir. 1990)....................................................................................7

*Pannu v. Iolab Corp.*,
  155 F.3d 1344 (Fed. Cir. 1998)..................................................................................12

*In re Rasmussen*,
  650 F.2d 1212 (CCPA 1981) ........................................................................................6

*Union Oil Co. of Cal. v. Atlantic Richfield Co.*,
  208 F.3d 989 (Fed. Cir. 2000)....................................................................................6

*Vas-Cath, Inc. v. Mahurkar*,
  935 F.2d 1555 (Fed. Cir. 1991)..............................................................................3, 13

*In re Wands*,
  858 F.2d 731 (Fed. Cir. 1998)....................................................................................7

*Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*,
   520 U.S. 17 (1997)..................................................................................................A-1, A-3, A-5

## FEDERAL STATUTES

35 U.S.C. § 112...............................................................................................................................3

## **GLOSSARY**

Declaration of James W. McGinity, Ph.D. = McG.

Declaration of Ronald J. Sawchuk, Ph.D.  =  Saw.

Hydrochloride = HCl

I.    **THE COURT'S CLAIM CONSTRUCTION RULING DISPOSES OF IMPAX'S NON-INFRINGEMENT AND INDEFINITENESS DEFENSES**

In its motion for summary judgment of non-infringement, Impax contends that the "asserted claims, properly construed, require 'a formulation comprising venlafaxine hydrochloride, MCC and, optionally, HPMC.'"    D.I. 302 at 17.[1]    The Court rejected this contention, however, in its December 13, 2007, claim construction ruling.  In construing the term "extended release formulation," the Court held that in "[r]eviewing the plain language of the asserted claims in light of the patents' specifications and prosecution histories, the Court agrees with Wyeth's position that the term 'extended release formulation' should not be limited to specific ingredients."  D.I. 315 at 6.  The Court's claim construction ruling thus disposes of Impax's motion for summary judgment of non-infringement, which is premised entirely on Impax's rejected claim construction.[2]    *Exxon Chem. Patents, Inc. v. Lubrizol Corp.,* 137 F.3d 1475, 1479 (Fed. Cir. 1998) ("Once the district judge construed the claim language in [the patentee's] favor, the doctrine-of-equivalents issue in the case became moot."); *accord Durel Corp. v. Osram Sylvania Inc.*, 256 F.3d 1298, 1305 (Fed. Cir. 2001) (citing *Exxon Chem.* with approval).

---

[1]  Impax's alleged Statement of Undisputed Facts is identical to the Statement of Undisputed Facts contained in Impax's Motion for Summary Judgment of Anticipation and Obviousness. Wyeth has addressed Impax's Statement in Wyeth's Opposition to that Motion and will not repeat that discussion here.  Impax's discussion in its Statement relating to the prosecution of the patents-in-suit (D.I. 302 at 11-14) is no longer relevant in light of the Court's December 13, 2007, claim construction ruling.  However, to ensure that the record is complete, Wyeth addresses Impax's discussion of the prosecution in the attached Appendix A, at pages A-6 to A-9.

[2]  Had the Court adopted Impax's claim construction, the motion still would have raised genuine issues of material fact.  Although these issues of material fact have now been mooted by the Court's claim construction, to assure that the record is complete, Wyeth provides its certification of genuine issues of material fact on the issue of infringement under Impax's proposed claim construction in Appendix A submitted herewith.

The Court's claim construction ruling also disposes of Impax's indefiniteness defense. That defense was premised on Impax's assertion that the meaning of the term "therapeutic metabolism" is not discernible. The term "therapeutic metabolism," however, is part of the claim term "eliminating the troughs and peaks of drug concentration in a patient's blood plasma . . . attending the therapeutic metabolism of plural daily doses of venlafaxine hydrochloride." The Court in its claim construction ruling found this claim term amenable to construction and construed it as follows:

> A method in which the extended-release formulation is administered once in a 24-hour period, resulting in a venlafaxine blood plasma concentration that rises to a maximum value, followed by a generally protracted decrease over the remaining period while maintaining during that 24-hour period levels of venlafaxine in blood plasma that are sufficient to provide, during the course of treatment, relief from the condition being treated, thereby eliminating the multiple sharp peaks and troughs resulting from multiple daily dosing of the same total daily dose of the immediate release formulation as reflected in a graph of venlafaxine blood plasma concentration versus time.

D.I. 315 at 17-18.

Thus, because the Court was able to discern the meaning of this claim language, which includes "therapeutic metabolism," the claim is not indefinite as a matter of law. *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001) ("If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds."). To ensure, however, that the record is complete, Wyeth provides its certification of genuine issues of material fact on the issue of indefiniteness in Appendix B.

The remaining issues raised by Impax's Motion (*i.e.*, lack of written description, lack of enablement, and misjoinder of inventors) all raise genuine issues of material fact. Pursuant to

the Court's Memorandum Order on Summary Judgment Procedure, Wyeth hereby certifies that the following genuine issues of material fact preclude summary judgment. Pursuant to the Court's Memorandum Order, should the Court conclude that there are no factual disputes, Wyeth respectfully requests the opportunity to file an answering brief to Impax's motion.

## II.    WRITTEN DESCRIPTION—GENUINE ISSUES OF MATERIAL FACT

"[C]ompliance with the 'written description' requirement of § 112 is a question of fact." *Vas-Cath, Inc. v. Mahurkar*, 935 F.2d 1555, 1563 (Fed. Cir. 1991). Impax's written description defense relies on the Federal Circuit's *Gentry*[3] and *Cooper*[4] cases and is premised on Impax's factual contention that "the entirety of the specification [of the patents-in-suit] clearly indicates that the invention is of a much narrower scope" than the claims. D.I. 302 at 23. This factual contention has now been rejected by the Court.[5] For example, the Court held that:

> Throughout the specification, the claimed invention is described first in broad terms and later in more narrow terms. These broad terms describe a "use aspect" of the invention which correspond to the method claims Wyeth asserts here. The portions of the specification relating to this "use aspect" do not limit the "extended release formulation" to a specific list of inactive ingredients, and instead, describe the methods of achieving certain results that represent the claimed invention in terms of an "extended release formulation of venlafaxine hydrochloride."

D.I. 315 at 7. In and of itself, this conclusion dictates denial of Impax's motion. However, to complete the record Wyeth identifies the following genuine issues of material fact that preclude summary judgment in favor of Impax on the lack of written description defense.

---

[3]  *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473 (Fed. Cir. 1998).

[4]  *Cooper Cameron Corp. v. Kvaerner Oilfield Prods. Inc.*, 291 F. 3d 1317 (Fed. Cir. 2000).

[5]  D.I. 315 at 7-8.

A. **Whether the Entirety of the Specification of the Patents-in-Suit Clearly Indicates to One Skilled in the Art that the Invention Is of a Narrower Scope Than the Claims**

Impax argues that the invention described in the patents-in-suit is limited to an extended-release formulation that contains microcrystalline cellulose ("MCC formulation"). D.I. 302 at 21-23. The Court has rejected that, pointing to numerous passages from the patent specification of the patents-in-suit, which indicate that the claimed invention includes a "use aspect" that is not limited to a specific list of inactive ingredients. As the Court stated:

For example, the specification provides:

> [I]n accordance with the *use aspect of this invention,* there is provided a method for moderating the plural blood plasma peaks and valleys attending the pharmacokinetic utilization of multiple daily tablet dosing with venlafaxine hydrochloride which comprises administering to a patient in need of treatment with venlafaxine hydrochloride, a one-a-day, extended release formulation of venlafaxine hydrochloride.

Ex. 1, col. 2:38-45 (emphasis added).

Similarly, the specification goes on to describe another "use aspect" of the invention in similar terms:

> Thus, in accordance with this *use aspect of the invention* there is provided a method for reducing the level of nausea and incidence of emesis attending the administration of venlafaxine hydrochloride which comprises dosing a patient in needs [sic] of treatment with venlafaxine hydrochloride with an extended release formulation of venlafaxine hydrochloride once a day in a therapeutically effective amount.

Ex. 1, col. 2:55-62 (emphasis added).

D.I. 315 at 7-8; *see also*, Ex. 4, McG., Ex. 2, ¶¶ 10-28.[6]

---

[6] All supporting exhibits referenced herein are attached to the Consolidated Declaration of Karen Jacobs Louden, filed herewith, and are referred to as "Ex. __."

Furthermore, the specification includes an "ABSTRACT," which first explains that this invention relates to an "extended release" formulation and then later uses the words "more particularly" to introduce the MCC formulation. Ex. 4, McG., Ex. 2, ¶ 10. One skilled in the art would have understood the term "extended release" formulation to be a broad term that is not limited by specific excipients, and the "more particularly" language would indicate to one skilled in the art that the invention was not limited to just the MCC formulation. *Id.*, ¶¶ 6-13. As the Court stated in its claim construction ruling:

> With respect to the more narrow descriptions provided for in the specification, the Court concludes that those descriptions either relate to the "formulation aspect" of the invention contained in the unasserted claims and/or suggest preferred embodiments for practicing the invention.

D.I. 315 at 8.

Additionally, Table 1 of the specification describes an *in vitro* dissolution profile. Ex. 4, McG., Ex. 2, ¶ 14 ('171 patent, col. 7, lines 20-37). The specification explains that "[c]onformance with the dissolution rate given in Table 1 provides the twenty-four hour therapeutic blood levels for the drug component of the extended release capsules of this invention in capsule form." *Id.* ('171 patent, col. 6, lines 41-45). The specification also discloses how to replicate this dissolution testing and how to adjust formulations that are outside the Table 1 dissolution specification by adjusting the coating. *Id.* ('171 patent, col. 6, lines 44-53 and col. 7, lines 10-37). Furthermore, the specification explains that the specific formulation used in the Examples was presented by the inventors "to illustrate" their invention. *Id.*, ¶ 19 ('171 patent, col. 5, lines 29-31). The specification also includes the inventors' statement that the "formulations of this invention may be produced . . . by techniques understood in the art." *Id.* ('171 patent, col. 5, lines 14-17). Wyeth's formulations expert, Dr. McGinity, explains further how the Impax product was made by                    REDACTED

REDACTED

The significance of Table 1 is discussed in further detail below in Section III(A) in connection with the enablement issue.

These material facts require denial of Impax's motion for summary judgment of lack of written description. In *Cordis Corp. v. Medtronic AVE., Inc.*, 339 F.3d 1352, 1365 (Fed. Cir. 2003), the Federal Circuit rejected a written description defense because "the entirety of the specification does not reflect that the invention goes to the narrower scope" asserted by the defendant. *See In re Rasmussen*, 650 F.2d 1212, 1214-15 (CCPA 1981) ("35 USC § 112 requires disclosure of only one mode of practicing the invention." Here, "one skilled in the art who read [the] specification would understand that it is unimportant how the layers are adhered, so long as they are adhered. Thus, [the broader claim language] is supported by the example found in the specification."). By the same token, the Court here should reject Impax's written description defense. At the very least, genuine issues of material fact exist that preclude summary judgment.

**B.    Whether the Original Method Claims Convey to Persons Skilled in the Art that the Inventors Described the Claimed Method Invention in Their Originally Filed Patent Application**

Summary judgment would also be improper here because Impax ignores the original method claims. Disclosure in an originally filed claim can satisfy the written description requirement. *Union Oil Co. of Cal. v. Atlantic Richfield Co*., 208 F.3d 989, 998 n.4 (Fed. Cir. 2000) ("One of this court's predecessor courts clarified that disclosure in an originally filed claim satisfies the written description requirement."). Impax acknowledges that the original method claims are similar to those at issue here and "did not explicitly recite the ingredients of the formulation to be administered using the claimed method." D.I. 302 at 13. The original

method claims thus constitute further evidence refuting Impax's factual assertion that the claimed invention was not described in the patent specification, raising yet another genuine issue of material fact requiring the denial of Impax's motion.

## III.     ENABLEMENT—GENUINE ISSUES OF MATERIAL FACT

"Enablement is a question of law based on underlying factual determinations." *Durel Corp. v. Osram Sylvania Inc.*, 256 F.3d 1298, 1307 (Fed. Cir. 2001). Without these factual determinations, the legal question cannot be resolved. *Id.* ("Without any specific factual determinations in the record below regarding whether the disclosure enables the preparation of oxide coatings within the scope of the claims, we are unable to conclude as a matter of law whether the claims are fully enabled."). That is, a decision on the legal issue of enablement requires the factual "determination of whether a person skilled in the pertinent art, using the knowledge available to such a person and the disclosure in the patent document, could make and use the invention without undue experimentation." *Northern Telecom, Inc. v. Datapoint Corp*., 908 F.2d 931, 941 (Fed. Cir. 1990). "Enablement is not precluded by the necessity for some experimentation such as routine screening." *In re Wands*, 858 F.2d 731, 736-37 (Fed. Cir. 1998). Rather, "experimentation needed to practice the invention must not be undue experimentation." *Id.* at 737. "Factors to be considered in determining whether a disclosure would require undue experimentation . . . include (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims." *Id.* Applying the above test for enablement, the following genuine issues of material fact preclude summary judgment.

A.    **Whether a Person Skilled in the Pertinent Art Could Use a Formulation, Other Than the Disclosed Exemplary Formulations, to Practice the Claimed Method Without Undue Experimentation Using the Knowledge Available to Such a Person and the Disclosure in the Patent**

Wyeth's pharmaceutical formulations expert, Dr. McGinity, has opined that a person skilled in the pertinent art could use a formulation, other than the disclosed exemplary formulations, to practice the claimed method inventions without undue experimentation using the knowledge available to such a person and the disclosures in the patents.  Dr. McGinity explains that the *in vitro* dissolution profile provided by Table 1 of the patents-in-suit provides valuable guidance in that regard.  Ex. 4, McG., Ex. 1, ¶¶ 18-25 and 121-29 and Ex. 2, ¶¶ 14 and 16. According to Dr. McGinity, when developing a pharmaceutical product, it is desirable to identify a useful range for the percent drug released at a number of different time points and Table 1 of the patents-in-suit provides such an *in vitro* dissolution specification.  *Id.*, Ex. 1, ¶ 19.

Moreover, Dr. McGinity points out that the patents-in-suit direct that "[c]onformance with the dissolution rate given in Table 1 provides the twenty-four hour therapeutic blood levels for the drug component of the extended release capsules of this invention . . . ."  Ex. 4, McG., Ex. 2, ¶ 14 (quoting '171 patent, col. 6, lines 41-45).  Additionally, the apparatus and conditions for the *in vitro* dissolution testing are recited in the patents (*e.g.*, '171 patent, col. 7, lines 10-37) so that the skilled artisan would be able to replicate the testing methodology.  Ex. 4, McG., Ex. 2, ¶ 14.  The patents further describe how to adjust formulations that are outside the Table 1 dissolution specifications for drug release.  *Id.* (quoting '171 patent, col. 6, lines 44-53).

REDACTED

8

REDACTED

Not only do the patents-in-suit provide considerable direction and guidance, but the state of the art and the relative skill of those in the art provided considerable further useful information. Indeed, Impax's own expert, Dr. Kibbe, acknowledged that "[a]t the time of the invention, there were numerous formulation techniques known and understood by persons of ordinary skill in the art" and that "[a] person having ordinary skill in the art would know of all these technologies, because they are taught in basic classes and enumerated in basic textbooks . . . ." Ex. 47, Expert Report of Arthur H. Kibbe, Ph.D., dated 09/27/2007, at ¶¶ 23-24.

Wyeth's expert, Dr. McGinity, cited a 1995 textbook (*Remington: The Science and Practice of Pharmacy*), which specifically directed persons skilled in the art to multiple techniques for forming spheroid drug-containing cores. Ex. 4, McG., Ex. 1, ¶ 111, Ex. 49, 19th Edition of *Remington: The Science and Practice of Pharmacy*, (1995) Vol. II, Ch. 92, p. 1627. These techniques, which were well known as of the filing date of the patents-in-suit, included

REDACTED

At a minimum, this evidence raises genuine issues of material fact as to whether a person skilled in the pertinent art could practice the claimed invention without undue experimentation using known formulation techniques and the disclosures of the patents-in-suit, including the disclosure of the target *in vitro* dissolution profile, the *in vivo* disclosure, and the disclosure that conformance with the *in vitro* dissolution profile would provide the desired *in vivo* plasma profiles for a satisfactory once-a-day formulation.

Impax tries to skirt these genuine issues by arguing that Wyeth's patent specification "tells the public that extended release venlafaxine formulations                REDACTED

will not work." D.I. 302 at 26. This factual assertion, while incorrect, raises yet another disputed issue of fact.

**B.     Whether Wyeth's Patent Specification Conveys to a Person Skilled in the Art that Extended-Release Venlafaxine Hydrochloride Formulations         REDACTED         Will Not Work**

Dr. McGinity has refuted Impax's factual assertion that the patents-in-suit convey to persons skilled in the art that formulations        REDACTED      will not work. Ex. 4, McG., Ex. 1, ¶ 118 and Ex. 2, ¶ 24. Dr. McGinity notes that the patent specification reports that experiments were run on the Alexanderwerk extruder wherein "heat buildup occurred which dried out the extrudate so much that it was difficult to convert the extruded cylinders into spheroids." *Id.*, Ex. 2, ¶ 24 (quoting from '171 patent, col. 5, lines 1-11; col. 6, lines 6-7). The patent specification later explains that the use of the larger-scale Hutt and Nica extruders alleviated the difficulty previously experienced. '171 patent, col. 6, lines 8-11. Thus, one skilled in the art would understand that the difficulty reported in the patent was primarily equipment-related, and

one skilled in the art would not understand the Wyeth patents to be describing    REDACTED    or

the other experiments mentioned as "unsuccessful."  Ex. 4, McG., Ex. 2, ¶ 24.[7]

   The patent's specification also expressly teaches that "other techniques understood in the

art" could be used to produce "formulations of this invention."  *Id.* (quoting from '171 patent,

col. 5, lines 14-17).                              REDACTED

                                                                      This evidence and

testimony raises another genuine issue of material fact precluding summary judgment.

**IV.    INVENTORSHIP—GENUINE ISSUES OF MATERIAL FACT**

REDACTED


REDACTED

---

[7]                              REDACTED

REDACTED

To be a joint inventor, however, one must "do more than merely explain to the real inventors well-known concepts and/or the current state of the art." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1351 (Fed. Cir. 1998). In *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976 (Fed. Cir. 1997), the Federal Circuit concluded that Mr. Hess was not an inventor because:

> Mr. Hess was "doing nothing more than explaining to the inventors what the then state of the art was and supplying a product to them for use in their invention," that "most, if not all, of his discussion with them were [sic] telling them what was available in the marketplace by way of product, and telling them how the product worked;" and that "what Mr. Hess was doing was showing them available product, telling them its properties, telling them how it could be used, and how it might be used." The principles Mr. Hess explained to them were well known and found in textbooks. Mr. Hess did no more than a skilled salesman would do in explaining how his employer's product could be used to meet a customer's requirements.

*Hess*, 106 F.3d at 981.

Impax's defense thus raises a genuine issue of material fact as to whether or not Mr. Sheskey made an inventive contribution or whether he merely explained to the real inventors how available products with known properties might be used. *Caterpillar Inc. v. Sturman Indus.*, 387 F.3d 1358, 1378 (Fed. Cir. 2004) (individuals who identified 52100 and 4140 as grades of

steel to use for residual magnetic latching in claimed invention did not make a significant enough contribution to qualify as inventors where "various publicly available texts and patents describe the basic magnetic properties of 52100 and 4140 steel.").

Wyeth's expert, Dr. McGinity, has opined that                    REDACTED

Dr. McGinity's opinion, and the evidence he relies on, was not refuted by any of Impax's technical experts.[8]  Thus, this testimony raises a genuine issue of material fact precluding summary judgment.  *Vas-Cath, Inc.*, 935 F.2d at 1567 ("the Ash

---

[8]  The only expert opinion Impax proffers on this issue is that of its patent practice expert, Mark E. Nusbaum.  Mr. Nusbaum, however, is an electrical engineer and lawyer and is not qualified to provide expert testimony in the field of pharmaceutical formulations.  Wyeth has filed a motion to strike Mr. Nusbaum's expert report.

declaration and Vas-Cath's non-refutation thereof, without more, gave rise to a genuine issue of material fact inappropriate for summary disposition.").

## V.    CONCLUSION

The Court's claim construction rulings dispose of Impax's non-infringement and indefiniteness defenses in Wyeth's favor as a matter of law.  The remaining defenses asserted in Impax's motion (*i.e.*, lack of written description, lack of enablement, and misjoinder of invention), raise genuine issues of material fact that preclude summary judgment.  Accordingly, Impax's motion for summary judgment of non-infringement, lack of written description, lack of enablement, misjoinder of inventors, and indefiniteness should be denied.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Karen Jacobs Louden (#2881)*

_____

Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
1201 North Market Street
Wilmington, DE  19899-1347
(302) 658-9200
klouden@mnat.com
 Attorneys for Plaintiff Wyeth

OF COUNSEL:
Basil J. Lewris
Linda A. Wadler
Barbara R. Rudolph
Alan A. Wright
FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001
(202) 408-4000

December 28, 2007
1348266

**APPENDIX A:  INFRINGEMENT—GENUINE ISSUES OF MATERIAL FACT THAT HAVE BEEN MOOTED BY THE COURT'S CLAIM CONSTRUCTION**

Under Impax's proposed claim construction rejected by the Court, Wyeth was asserting infringement under the doctrine of equivalents.  Application of the doctrine of equivalents to Impax's proposed claim construction raised the following genuine issues of material fact.

**A.     Did Impax's Extended-Release Formulation Contain Elements Identical or Equivalent to Each Claim Element of the Patented Invention**

The "essential inquiry" under the doctrine of equivalents is:  "Does the accused product or process contain elements identical or equivalent to each claimed element of the patented invention?"  *Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 40 (1997).  Under Impax's rejected claim construction, the extended-release formulation must include a core containing venlafaxine HCl and microcrystalline cellulose ("MCC") and a coating containing ethyl cellulose and HPMC.

Wyeth's expert in the fields of the development and evaluation of pharmaceutical dosage forms, Dr. James W. McGinity concluded that Impax's product includes elements identical or equivalent to each claimed element of the patented invention under Impax's claim construction.  Ex. 4,  McG., Ex. 1,  ¶¶ 101-20.                    REDACTED

**B.     Whether the Combination of          REDACTED          in Impax's Extended-Release     Formulation     Is     an     Equivalent     to     the**

**Microcrystalline Cellulose Element Required by Impax's Claim Construction**

In the embodiment of the claimed invention containing MCC in the core, the microcrystalline cellulose functions with the venlafaxine HCl to form a solid substrate core of active ingredient.  *Id.*, ¶ 103.  The way in which the MCC performs that function is to act as a filler or diluent to provide bulk and as a binder for the venlafaxine HCl in the resulting core.  *Id.*  As a result, a drug-containing core is formed containing sufficient quantities of venlafaxine HCl to permit once-a-day dosing and having adequate size, shape, and physical integrity to permit the application of the extended-release ethyl cellulose/HPMC coating.  *Id.*

The     REDACTED     in Impax's product perform the same function as the MCC, *i.e.*, to form a solid substrate core of active ingredient.  *Id.*, ¶ 107.  Moreover, they do this in substantially the same way.  That is,     REDACTED     act as a filler or diluent to provide bulk to the core and     REDACTED     acts as a binder to adhere the venlafaxine HCl to the core.  *Id.*  Furthermore, the end result is the same.  Whether using MCC or     REDACTED    , the result is cores containing sufficient venlafaxine HCl to permit once-a-day dosing and having adequate size, shape, and physical integrity to permit the application of the extended-release ethyl cellulose/HPMC coating.  *Id.*, ¶ 108.

Further explaining the function of MCC in an extended-release formulation are *Remington: The Science and Practice of Pharmacy,* Nineteenth Edition, Vol. 2 (1995) at pages 1617 and 1627 ("MCC has been shown to be an effective diluent and binder in granulations to be spheronized") and *The Handbook of Pharmaceutical Excipients* (4th Ed. 2003) at page 108 ("Microcrystalline cellulose is widely used in pharmaceuticals, primarily as a binder/diluent in oral tablet and capsule formulations . . . . ").  Exs. 49 and 56.  These treatises make clear that the

way microcrystalline cellulose works in the claimed formulations is by serving as both a substrate diluent and binder.  Ex. 4, McG., Ex. 1, ¶ 104.

REDACTED

The evidence showing that the substitute (          REDACTED          ) matches the function, way, and result of the claimed element (MCC) would have created a genuine issue of fact under Impax's claim construction.  *See Warner-Jenkinson*, 520 U.S. at 40 ("An analysis of the role played by each element in the context of the specific patent claim will thus inform the inquiry as to whether a substitute element matches the function, way, and result of the claimed element, or whether the substitute element plays a role substantially different from the claimed element.")

Rather than acknowledge this genuine issue of fact, Impax tried to side-step it by asserting that the patents-in-suit disclosed but did not claim          REDACTED

REDACTED                    D.I. 302 at 18-19.  This argument, however, raised another

genuine issue of material fact:  *i.e.*, whether the combination of       REDACTED        was

disclosed in the patents-in-suit.

C.    **Whether the Combination of** REDACTED **as a Substitute
for Microcrystalline Cellulose Was Disclosed in the Patents-in-Suit**

Dr. McGinity has opined that there is no specific discussion of using       REDACTED

in the patents-in-suit.  Ex. 4, McG., Ex. 1, ¶ 118.  Impax's

experts have not contradicted Dr. McGinity on this point.  Nor does Impax in its motion.  Rather,

Impax's motion only points to the patent specification's reference to the use of       REDACTED

D.I. 302 at 18.  Impax does not

identify any express disclosure of             REDACTED

Thus, Impax fails to present any evidence that the combination of       REDACTED

as a substitute for microcrystalline cellulose is disclosed in the patents-in-suit.

D.    **Whether Wyeth Disclaimed the Use of** REDACTED **in the Patents-in-Suit**

In its motion, Impax also asserted that Wyeth characterized its experiments with REDACTED as

"failed" experiments and thereby disclaimed the use of REDACTED.  D.I. 302 at 18.  This is incorrect.

The patent specification reports that experiments were run on the Alexanderwerk extruder

wherein "heat buildup occurred which dried out the extrudate so much that it was difficult to

convert the extruded cylinders into spheroids."  *Id.*, Ex. 2, ¶ 24 (quoting from '171 patent, col. 5,

lines 1-11; col. 6, lines 6-7).  The patent specification later explains that the use of the larger-

scale Hutt and Nica extruders alleviated the difficulty previously experienced.  '171 patent, col.

6, lines 8-11.  Thus, one skilled in the art would understand that the difficulty reported in the

patent was primarily equipment-related, and that the patent was not describing the use of REDACTED

mentioned as "unsuccessful."  Ex. 4, McG., Ex. 2, ¶ 24.  Thus, a person

skilled in this art would not conclude from the patents-in-suit that the inventors disclaimed the use of<sup>REDACTED</sup>. *Id.*[1]

E.    **Whether the Interchangeability of Substituting** REDACTED **for Microcystalline Cellulose to Form the Drug-Containing Core Was Known in the Art**

"The known interchangeability of substitutes for an element of a patent is one of the express objective factors . . . bearing upon whether the accused device is substantially the same as the patented invention." *Warner-Jenkinson*, 520 U.S. at 37. In 1996 one skilled in the art knew that the drug-containing core could be made by multiple techniques. Ex. 4, McG., Ex. 1, ¶¶ 109-11. It was known in the art that extrusion with MCC and drug-layering with <sup>REDACTED</sup>

were interchangeable techniques for forming a drug-containing core. *Id.*, ¶¶ 111-13. The 19th Edition of *Remington, the Science and Practice of Pharmacy*, Vol. II, Ch. 92 "Oral Solid Dosage Forms" by Rudnic and Schwartz, p. 1627 (1995) explains that "[m]icrocrystalline cellulose has been shown to be an effective diluent and binder in granulations to be spheronized

REDACTED

REDACTED

---

[1]                    REDACTED

A-5

REDACTED

Moreover, neither the MCC nor the combination of          REDACTED          has any

significant effect on the dissolution rate of venlafaxine from the uncoated spheroids.  Ex. 4,

McG., Ex. 1, ¶ 117; Ex. 62, WYETH 009-000118.  Rather, in both formulations, the drug-

containing cores are coated with a mixture of ethyl cellulose and HPMC.  Ex. 4, McG., Ex. 1,

¶ 119.  It is the ethyl cellulose/HPMC coating that results in the extended-elease of venlafaxine

HCl.  *Id.*

### F.    Whether Wyeth Acquiesced in Limiting Its Method Claims to the Specific Formulation Set Forth in Impax's Proposed Claim Construction

Impax also contends that during prosecution of the patents-in-suit, Wyeth acquiesced in

limiting its method claims to the specific formulation set forth in Impax's proposed claim

construction.  This factual assertion is refuted by the prosecution histories of the patents-in-suit

and was rejected by the Court.  D.I. 315 at 9-10.

During the prosecution of the grand-parent application of the application that matured

into the '171 patent, the examiner initiated a telephone interview at which a tentative agreement

was reached to amend method claims 9 and 10 to depend from formulation claim 1.  Ex. 63,

08/821,137 Prosecution History at WYETH 002-000850.  That amendment was made in an

Examiner's Amendment, in which the examiner noted that if the amendment was not acceptable,

the applicants could file an amendment.  *Id.* at WYETH 002-000853-54.

However, the amendment was not accepted by the applicants.  Rather than accepting the

Examiner's Amendment and allowing the patent to issue with the examiner's proposed amended

claims, the applicants filed another application (*i.e.*, the parent application of the application that

matured into the '171 patent) and abandoned the grand-parent application.  *Id.* at WYETH 002-

000911; Ex. 64, 08/964,328 Prosecution History at WYETH 002-000565-583.  In doing so, the applicants resubmitted the method claims as originally filed, not limited to any specific type of extended-release formulation or any specific ingredients, other than venlafaxine HCl.   Ex. 64, 08/964,328 Prosecution History at WYETH 002-000582.   They resubmitted those original method claims in the parent application and again in the application that matured into the '171 patent.  Ex. 65, 09/488,629 Prosecution History at WYETH 002-000035.  Those resubmitted claims, without any limitation to any specific type of extended-release formulation or any specific ingredient other than venlafaxine HCl, were allowed in the first office action in the parent application without rejection, amendment, or argument.  *Id*. at WYETH 002-000239. They eventually issued as the method claims in the '171 patent.

Similarly, during the prosecution of the '958 patent, the only rejection of the method claims was on the basis of obviousness-type double-patenting.  Ex. 66, 09/884,412 Prosecution History at WYETH 002-000490-494.  That rejection was obviated by the filing of a terminal disclaimer.  *Id*. at WYETH 002-000524-30.  Accordingly, the method claims were allowed in the '958 patent without amendment or argument.  *Id*. at WYETH 002-000535.

During the prosecution of the '120 patent, the method claims were either allowed or indicated as being allowable in the first office action.  Ex. 67, 09/950,965 Prosecution History at WYETH 002-000406-410.  The only change to these claims was to correct the form of their dependency.  *Id*. at WYETH 002-000415-17.  Following this amendment, the method claims were allowed.  *Id*. at WYETH 002-000418.

Thus, the asserted method claims of the patents-in-suit were allowed without substantive amendment or argument.  Impax's assertion to the contrary thus raised a genuine issue of material fact, on which the Court has already ruled in Wyeth's favor.  D.I. 315 at 9-10 ("The

Court's conclusion in this regard is also consistent with the prosecution histories of the patents. Initially, the patent examiner concluded that the method claims would only be patentable if Wyeth agreed to make those claims dependent upon the product claims recited in the patent. The first examiner's approach to the patents reflected his view that extended-release formulation was broadly interpreted and not limited to specific ingredients. Although Wyeth initially agreed to this amendment and the examiner issued a Notice of Allowance, Wyeth later abandoned the application and refiled a continuation-in-part application which left the method claims in the broader form, without making them dependent on the narrower product claims. The second examiner allowed the refiled method claims to issue without rejection or amendment.").

**APPENDIX B:  INDEFINITENESS—GENUINE ISSUES OF MATERIAL FACT THAT HAVE BEEN MOOTED BY THE COURT'S CLAIM CONSTRUCTION**

### Whether the Meaning of the Term "Therapeutic Metabolism" Is Discernable to a Person of Skill in the Art

In its motion, Impax asserts that the meaning of "therapeutic metabolism," a term used in some of the asserted claims, is not discernible and that nothing in the claims or specification clarifies its meaning.  D.I. 302 at 29.  As explained in the foregoing Counterstatement, the Court's claim construction ruling disposes of Impax's indefiniteness defense.  To ensure that the record is complete, however, Wyeth provides the following certification of genuine issues of material fact on the issue of indefiniteness.

Wyeth's expert in the field of pharmacokinetics, Dr. Ronald Sawchuk, refutes Impax's assertion that the meaning of "therapeutic metabolism" is not discernible and that nothing in the claims or specification clarifies its meaning.  Ex. 3, Saw., Ex. 1, pp. 20-22.  Dr. Sawchuk notes that in the patent claims the term "therapeutic metabolism" is used as part of the expression "a method for eliminating the troughs and peaks of drug concentration in a patient's blood plasma attending the therapeutic metabolism of plural daily doses of venlafaxine hydrochloride."  In his initial expert report, Dr. Sawchuk interprets the phrase in a manner consistent with the Court's December 13, 2007, claim construction ruling.  *Id*. at 17.

As support for this interpretation of the claim language, Dr. Sawchuk cites to the following passage from the specification, which use the terms "therapeutic" and "metabolized" in combination in the context of the clinical use of venlafaxine HCl to treat a patient:

> In <u>therapeutic dosing</u> with venlafaxine hydrochloride tablets, rapid dissolution results in a rapid increase in blood plasma levels of the active compound shortly after administration followed by a decrease in blood plasma levels over several hours <u>as the active compound is eliminated or metabolized,</u> until subtherapeutic plasma levels are approached after about twelve hours following administration, thus requiring additional dosing with the drug.

*Id*. at 21 (quoting from '171 patent, col. 1, 1.66-col. 2, 1.7)  Dr. Sawchuk concludes that because the words "therapeutic" and "metabolism" in the claim and "therapeutic" and "metabolized" in the specification are both linked to the clinical  use of venlafaxine HCl to treat a patient, the term "therapeutic metabolism" in the claim refers to "the *metabolic* processing of the drug when *therapeutic* doses of venlafaxine hydrochloride are administered to a patient."   *Id.* at 21-22 (emphasis added).

       Dr. Sawchuk's testimony, thus, would raise a genuine issue of material fact as to whether the meaning of the term "therapeutic metabolism," in the context of the claims and specification, is discernible to a person skilled in this art.  But the Court has already found the term capable of construction, and hence not indefinite.

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on January 8, 2008, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

>Mary B. Matterer
>MORRIS JAMES LLP

I also certify that copies were caused to be served on January 8, 2008 upon the following in the manner indicated:

### BY E-MAIL AND HAND

Mary B. Matterer
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19899

### BY E-MAIL

Joseph C. Gratz
Daralyn J. Durie
KEKER & VAN NEST LLP
710 Sansome Street
San Francisco, CA 94111-1704

*/s/ Karen Jacobs Louden*

Karen Jacobs Louden (#2881)
klouden@mnat.com